Conte Cicala (SBN 173554)
conte.cicala@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Jordan W. Garman (*pro hac vice* forthcoming)
jordan.garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone: 212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an
individual and derivatively on behalf of
Intrepid Studios, Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDING LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No. '26CV0965 LL    JLB <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and DIRECT COMPLAINT** <br><br> JURY DEMAND |

Plaintiff, Steven Sharif, an individual, ("Sharif" or "Plaintiff") on behalf of

himself and separately on behalf of all other shareholders of Intrepid Studios, Inc.

(collectively, "Derivative Plaintiffs"), by his undersigned counsel, alleges as follows

against Intrepid Studios, Inc. ("Intrepid" or the "Company"), Robert Dawson, Ryan Ogden, Theresa Fette, and Aaron Bartels (the "Board Defendants"), and TFE Games Holding LLC ("TFE" and, collectively, the "Defendants"):

## NATURE OF THE ACTION

1.    This lawsuit seeks to stop Intrepid's rogue board of directors from intentionally destroying the Company, including through layoffs of nearly its entire work force, through manufactured crises, and through bad faith foreclosures on secured loans. The Board Defendants intentionally sabotaged Intrepid to steal its assets, including its most valuable assets: its intellectual property and trade secrets. That intellectual property was developed under the leadership of Plaintiff Steven Sharif, a shareholder in Intrepid, its visionary founder, and creator of the MMORPG (Massively Multiplayer Online Role Playing Game), *Ashes of Creation*.

2.    Plaintiff has dedicated more than a decade to developing *Ashes of Creation*, including its world, lore, gameplay systems, software architecture, and proprietary development tools. The gaming community has been anxiously anticipating the full release of *Ashes of Creation* for years. Defendants well understood that the success—or failure—of *Ashes of Creation* would be exceedingly public and personal to Plaintiff. They also understood that its success would be exceedingly profitable. The Board Defendants took steps to ensure they alone profited from that success at the expense of Plaintiff, Derivative Plaintiffs, and Intrepid as a company.

3.    Beginning in 2024, Defendant Rob Dawson, Intrepid's principal lender, embarked on a campaign to extort control of Intrepid from Plaintiff and, ultimately, to strip Intrepid of its assets, including its groundbreaking intellectual property and trade secrets, for Dawson's own use and financial gain. Through repeated threats to withhold funding for payroll, to shut Intrepid down, to financially ruin Plaintiff, and even to physically harm Plaintiff, Dawson ██████████████████████████ ████████████████████████, elected himself to the board, and cherry-

picked additional board members who would do his bidding. Those board members are Defendants Ryan Ogden, who is also duly appointed Chief Financial Officer, Theresa Fette, and Aaron Bartels (collectively with Dawson, the "Board Defendants"). The Board Defendants failed to fulfill their fiduciary duties to the Company; instead, they engineered and executed a plan to strip Intrepid of its assets and transfer those assets to a Dawson-created-and-controlled entity (TFE), of which they are likely also members, and to misappropriate and claim ownership over Intrepid's intellectual property, trade secrets, and other assets.

4.      The plan included, among other things: deliberately starving Intrepid of cash to manufacture justification for a foreclosure by TFE; attempting to divert revenues owed to Intrepid to accounts controlled by TFE and Dawson; and attempting to execute a wrongful Article 9 foreclosure in favor of TFE's junior secured lien without notice to senior secured creditors. This was all done with the goal of leaving unpaid debts and existing shareholders with Intrepid, while continuing to develop or sell, and profit from, *Ashes of Creation* through the new TFE entity. When Plaintiff objected to the foreclosure and alerted a senior secured creditor to Defendants' scheme, Defendants realized their plan had unraveled, and they abruptly and wrongfully terminated nearly Intrepid's entire workforce.

5.      Defendants' actions signified to the public a complete collapse of Intrepid, and they triggered severe and intense public scrutiny regarding the apparent failure of the game, the treatment of employees, and Plaintiff's perceived role in both. Defendants intentionally set up Plaintiff as the scapegoat to face this backlash alone, including by intentionally filing a false corporate disclosure listing Plaintiff as the sole board member, and Plaintiff's husband, John Moore, as Chief Financial Officer, even though Ogden was the duly appointed Chief Financial Officer and all of the Board Defendants were board members. They did this for no other reason than to conceal the identities of the Board of Directors and insulate them from the public fallout.

6.     Since destroying Intrepid, Defendants have been actively soliciting buyers for *Ashes of Creation*—inclusive of Intrepid's intellectual property and trade secrets—in an attempt to salvage their own financial exposure. They have also been publicly defaming Plaintiff to the gaming community.

7.     Defendants' conduct has harmed the Company and Plaintiff, and poses a continuing imminent and existential threat to the Company. Through this action, Plaintiff, both individually and on behalf of Intrepid, seeks damages based on Defendants' efforts to sabotage Intrepid and its work on one of the most ambitious gaming projects ever developed. Plaintiff also seeks injunctive and equitable relief to remedy harm to Intrepid and Derivative Plaintiffs from Defendants' continued efforts to irrevocably destroy the Company in pursuit of their own greed.

## JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim under the Defend Trade Secrets Act, codified at 18 U.S.C. §§ 1831, *et seq*. The Court has supplemental jurisdiction over the related state law claims, which form part of the same case or controversy, under 28 U.S.C. § 1367(a).

9.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the Southern District of California, where Intrepid maintains its headquarters and where Defendants' acts were directed.

## PARTIES

10.     Plaintiff is the founder of Intrepid Studios, Inc. He is the former CEO of the Company, and he served on the board of directors from the Company's inception until his January 19, 2026 resignation. Plaintiff either himself invented or was directly involved in Intrepid's creation of the intellectual property and trade secrets that comprise the MMORPG *Ashes of Creation*.

11.    Nominal defendant Intrepid Studios, Inc. is a California corporation headquartered in San Diego County, California. Plaintiff founded the Company to develop and sell *Ashes of Creation*.

12.    Defendant Robert Dawson has served as Intrepid's Chairman of the Board since September 2024. He has been Intrepid's majority shareholder since July 2024, and he is a junior secured lender to Intrepid. He resides in Longwood, Florida. By virtue of his role as Intrepid's Chairman of the Board, majority shareholder, and junior secured lender, Dawson has purposefully availed himself of the benefits and protections of California's laws, including by conducting activities in California that target California residents—such as by conceiving and executing the wrongful foreclosure strategy described herein, and through his post-closure efforts to solicit buyers and employees in California to exploit the Company's intellectual property and trade secrets, as alleged herein. Plaintiff's claim arises out of and relates to Dawson's contacts with California.

13.    Defendant Ryan Ogden has served as Intrepid's Chief Financial Officer since September 2024 and as a board member since on or around August 2024. He resides in Sanford, Florida. By virtue of his role as Intrepid's Chief Financial Officer and member of the board, Ogden has purposefully availed himself of the benefits and protections of California's laws, including by conducting activities in California that target California residents—such as by voting to approve, ratifying, and participating in the wrongful foreclosure strategy described herein, personally participating in and directing the preparation of the foreclosure assets list, attempting to divert Company revenues, and by submitting false regulatory filings in California that give rise to Plaintiff's claims as alleged herein. Plaintiff's claim arises out of and relates to Ogden's contacts with California.

14.    Defendant Theresa Fette has served on Intrepid's board of directors since August 2025. She is a debtholder of the Company. She resides in Las Vegas, Nevada. By virtue of her role as a member of Intrepid's board and as a creditor of Intrepid,

1   Fette has purposefully availed herself of the benefits and protections of California's
2   laws, including by conducting activities in California that target California
3   residents—such as by voting to approve, ratifying, and participating in the wrongful
4   foreclosure strategy described herein, and through her post-closure efforts to solicit
5   buyers and employees in California to exploit the Company's intellectual property
6   and trade secrets, as alleged herein. Plaintiff's claim arises out of and relates to Fette's
7   contacts with California.

8       15.    Defendant Aaron Bartels has served on Intrepid's board of directors
9   since August 2025. He resides in Las Vegas, Nevada. By virtue of his role as a
10  member of Intrepid's board, Bartels has purposefully availed himself of the benefits
11  and protections of California's laws, including by conducting activities in California
12  that target California residents—such as by voting as a board member to authorize
13  and implement the wrongful foreclosure strategy described herein and related acts in
14  California that form the basis of Plaintiff's claims. Plaintiff's claim arises out of and
15  relates to Bartel's contacts with California.

16      16.    Defendant TFE Games Holdings, LLC is a Delaware limited liability
17  company that was created by and is controlled by Defendant Dawson. TFE was
18  created by Dawson for the sole purpose of receiving, exploiting, and monetizing the
19  Company's trade secrets and intellectual property. TFE had no independent or
20  legitimate business purpose apart from the wrongful conduct alleged herein,
21  functioning solely as an instrumentality and vehicle through which Dawson and the
22  Board Defendants consummated their wrongful scheme. At all relevant times,
23  Dawson and the Board Defendants acted within the scope of their authority as TFE's
24  agents and for TFE's benefit, such that their California-based conduct is properly
25  imputed to TFE. At all relevant times, TFE, through its agents, Dawson and the Board
26  Defendants, participated in, benefitted from, and knowingly furthered a wrongful
27  scheme that was conceived, planned, and executed in California and expressly aimed
28  at Intrepid.

1

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

2      17.     Plaintiff brings certain claims derivatively on behalf of Intrepid pursuant

3   to Federal Rule of Civil Procedure 23.1 to redress injuries suffered, and that continue

4   to be suffered, by the Company as a direct and proximate result of the Board

5   Defendants' unlawful conduct, including, without limitation, violation of the Defend

6   Trade Secrets Act (18 U.S.C. §§ 1831, *et seq*.); violation of the California Uniform

7   Trade Secrets Act (Cal. Civ. Code §§ 3426, *et seq*.); violations of California

8   Commercial Code §§ 9101, *et seq*.; breaches of fiduciary duty and aiding and abetting

9   breaches of fiduciary duty; corporate waste; and civil conspiracy.

10      18.     Plaintiff was a shareholder of Intrepid at the time of the relevant

11   transactions, has continuously maintained that status, and remains a shareholder of

12   Intrepid.

13      19.     This action is not a collusive effort to confer jurisdiction on this Court.

14   Instead, Plaintiff is the founder of Intrepid and a current shareholder with a vested

15   interest in the success of the Company and *Ashes of Creation*.

16      20.     Plaintiff will adequately and fairly represent the interests of Intrepid and

17   Derivative Plaintiffs in enforcing and prosecuting their rights.

18      21.     Based on the facts alleged herein, demand upon Intrepid's Board of

19   Directors (the "Board") to initiate this action would be futile pursuant to Federal Rule

20   of Civil Procedure 23.1.

21            a.   At all relevant times, the majority of the Board comprised the

22                Board Defendants, each of whom participated in and approved the

23                conduct and conspiracy giving rise to the claims asserted herein.

24                Plaintiff was previously a member of the Board, but he was unable

25                to prevent the illegal efforts undertaken by the Board Defendants

26                and therefore resigned from both the Company and the Board.

27            b.   The Board Defendants authorized, ratified, permitted, and/or

28                knowingly failed to prevent the wrongful acts alleged herein,

including breaches of fiduciary duty, violations of California Commercial Code §§ 9101, *et seq*., and misappropriation of corporate assets and intellectual property. As a result, they lack the disinterestedness and independence required to evaluate a demand.

c.  By virtue of their fiduciary roles and their direct involvement in the challenged conduct, the Board Defendants would be required to investigate and pursue claims arising from their own misconduct and face a substantial likelihood of liability.

d.  Because each Board Defendant participated personally in the alleged wrongdoing, the Board cannot exercise independent or disinterested business judgment in deciding whether to bring this action or to prosecute it vigorously.

e.  Any demand would, therefore, have required the Board Defendants to authorize litigation against themselves, rendering any demand a useless and futile act. The requirement for a demand is thus excused under Rule 23.1.

## GENERAL ALLEGATIONS

### A. Plaintiff Founds Intrepid, Fosters Intrepid's Creation of Intellectual Property and Trade Secrets, and Obtains Early Financing

21.     Sharif is a lifelong gamer and, prior to founding Intrepid, he participated in the gaming market as an avid consumer, taking a particular interest in MMO (Massively Multiplayer Online) and MMORPG games. After years of experience with MMOs and MMORPGs on the player-side, Sharif was inspired to create his own game that would upgrade the player experience beyond what was available on the market. Sharif's original idea for the game stemmed from a tabletop RPG (role-playing game) concept also created by Sharif, and also titled *Ashes of Creation*. In creating his own new and innovative MMORPG, Sharif sought to create a complex

and dynamic virtual game universe based on popular fantasy and science fiction themes. To realize his vision for *Ashes of Creation*, Sharif and his team set out to build deep and intricate systems that would present players with a greater degree of circumstances in response to their actions, as well as provide a level of positive player-to-player interaction not achieved by any previous MMORPGs

22.    In 2015, Sharif co-founded Intrepid alongside his husband, John Moore, to develop the MMORPG, *Ashes of Creation*.  Due to the novelty of Sharif's vision for *Ashes of Creation*, and despite Sharif's own familiarity with requirements for developing the game, Sharif surrounded himself with seasoned game developers to help bring his vision to life, whom he closely directed and supervised.

23.    What started as a passion project soon gained significant traction across the gaming industry, including an award for the "Most Anticipated MMO" in 2017,[1] 2020, and 2022.[2]  Public excitement about the development of the game was further fueled by Sharif's innovative development approach, in which he fostered an open dialogue with *Ashes of Creation*'s potential user base.  In furtherance of this approach, Sharif would host live webinars on the *Ashes of Creation* YouTube channel to update players on the game's development and solicit player feedback and participation to a greater degree than any previous MMORPG.

24.    There were many concrete benefits to this novel development approach. However, an abundance of player feedback contributed to the already iterative and lengthy process that is typical of MMORPG development. Prior to the public Early

---

[1] *See* Suzie Ford, *MMORPG.com's Best of 2017 Awards*, MMORPG.com (Dec. 21, 2017, 4:00 AM), https://www.mmorpg.com/awards/mmorpgcoms-best-of-2017-awards-2000107055.

[2] *See* Bree Royce, *MassivelyOP's complete 2022 awards debrief and annual recap*, massivelyop.com (Jan. 6, 2023 12:00 PM), https://massivelyop.com/2023/01/06/massivelyops-complete-2022-awards-debrief-and-annual-recap/?utm_source=chatgpt.com#.

Access release of the game in 2025, *Ashes of Creation* had been tested with players in three separate iterations. Following years of this iterative diligence, an Early Access version of the game was released to the public in 2025 through Steam, a popular gaming platform. Prior to the execution of Dawson's and the Board Defendants' illicit plan, *Ashes of Creation* boasted the highly unusual Day 30 player retention rate of approximately 76%.

25.    Throughout the last decade, Intrepid developed the following intellectual property and trade secrets (the "Trade Secret Materials"):

    a.  Audio/visual effects;

    b.  Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (*i.e.*, production assets created by employees/contractors and incorporated into builds);

    c.  The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;

    d.  Designs and implementations of server meshing technology and distributed networking systems;

    e.  Proprietary Player versus Player risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems;

    f.  The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

g. Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

h. The event tool used to create open world events, wars, and caravan systems;

i. The implemented seasonal environmental systems as built into the engine;

j. The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

k. Class implementation logic and stat balancing systems as embodied in the Company's codebase;

l. Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

26.     The Trade Secret Materials are not generally known to the public, and they derive competitive value from the fact that they are kept secret from the public, as shown by (1) the funding interest in Intrepid based upon the Trade Secret Materials, as described herein; and (2) the revenue generated during the Early Access event in December 2025, as described herein.

27.     Intrepid has kept the Trade Secret Materials a secret by subjecting its employees to strict confidentiality and protection of trade secrets obligations in their employment agreements, pursuant to which employees agreed to not publish or disclose any Company trade secrets or confidential information, and via the Company handbook, which requires employees to safeguard confidential and trade secret information and to access such information only on a need-to-know basis with authorization from a supervisor, and which informs employees that breach of the policy may result in legal action.

28.     Moreover, Intrepid ensured that contractors and third-party vendors were routinely required to sign non-disclosure agreements and/or were subject to

contractual confidentiality obligations, in an effort to maintain the secrecy of the Trade Secret Materials.

29.    Intrepid further ensured there were internal access controls limiting those who had access to the Trade Secret Materials on a need-to-know basis. For example: source code repositories were maintained in private, permission-based version control systems (*e.g.*, restricted Git and P4 repositories), with role-based access controls limiting access to only those developers whose responsibilities required it; backend server architecture and production infrastructure credentials were restricted to designated engineering personnel and were not broadly accessible across the company; design documentation and internal development tools were maintained in secured internal systems (*e.g.*, restricted drives / internal platforms) with permission settings limiting access on a need-to-know basis; and external builds and public-facing materials did not expose backend logic, proprietary balancing formulas, node progression algorithms, or server-side systems. Access credentials were also revoked upon termination or separation of personnel. These measures were implemented to ensure that the Trade Secret Materials were not publicly disclosed and were accessible only to individuals with legitimate development-related responsibilities.

30.    Intrepid was Sharif's passion project: he provided early funding to the Company from his personal funds. Thereafter, in 2017, the Company raised approximately $3 million in a Kickstarter campaign, demonstrating from the outset the commercial value of Intrepid's intellectual property and Trade Secret Materials.

31.    During this initial phase of the Company, its board of directors consisted of Sharif, John Moore, and Thomas Alkazin. The Company's sole shareholders were John Moore and Thomas Alkazin.

32.    Starting in 2017, the Company began acquiring debt financing, much of which Sharif and Moore personally guaranteed. In 2020, the Company acquired a $6 million loan from CommerceWest Bank pursuant to the Federal Reserve's Main Street Lending Program. The loan carried a maturity term of five years, was

personally guaranteed by Moore, and was collateralized by all of the Company's assets, including specifically its intellectual property, which includes the Trade Secret Materials.

33.    A year later, in 2021, one of the Company's existing lenders introduced Sharif and the Company to claimed billionaire Robert Dawson as a potential lender. From 2021 to 2025, Dawson continuously extended debt to the Company. Dawson was originally cooperative and supportive of Sharif and his vision, and he held himself out as a confidante for Sharif. Dawson came up in the multi-level marketing space, and he was not a gamer. When it became clear the project was not going to turn as quick a profit as he had hoped, his behavior toward Sharif changed dramatically starting in 2023.

**B. Dawson's Campaign of Control and Coercion**

34.    In late 2022 and early 2023, a major video game developer expressed interest in acquiring Intrepid for hundreds of millions of dollars. Dawson urged Sharif to reject the proposed deal, in favor of continuing to develop Intrepid from the ground up under his financing. Sharif heeded his advice, rejected the acquisition bid, and acquisition discussions ended in early 2023.

35.    The acquisition offer, however, was the turning point in Sharif's and Dawson's relationship: Dawson saw that the Company had very real potential for providing extremely high returns, and Dawson began a ruthless campaign for control of the Company in order to realize those returns as quickly as possible, without consideration for the quality of the game and the typical development timeline of MMORPGs.

36.    From early 2023 through May 2024, Dawson repeatedly held Sharif and the then-board hostage by threatening to withhold financing for employee payroll and health-insurance funding days before payroll deadlines, to shut down the Company through litigation, and to cause Sharif financial ruin and physical harm, unless Sharif signed documents granting Dawson greater and greater amounts of equity and control.

In just one example, Dawson demanded a warrant granting him 10% of the Company for $10. In other instances, Dawson demanded zero-cost nondilutable equity options in his convertible debt notes. Sharif and the then-board acquiesced to Dawson's demands because they believed Dawson would make good on his threats and that refusing would result in imminent catastrophe for employees and the Company. Dawson also required Sharif to involve him in all discussions with Company counsel, despite his outsider status, and even falsely represented that he was an agent of the Company to retain Company counsel.

37. As a direct result of this intentional and mounting pressure, Plaintiff suffered an extreme health crisis, including a hypertensive emergency and acute kidney failure, hospitalization, and vision loss from blood-pressure complications, including macular edema. Plaintiff suffers long-term impairment from the health issues he experienced during this period. Dawson was privy to Plaintiff's health issues at the time, and he is well aware of the long-term impacts Plaintiff suffers.

**C. Dawson Extracts** ████████████████████ **and Reconstitutes the Board**

38. By May 2024, ████████████████████████████████████
████████████████████████████████████████████████
████████ **Exhibit A**), ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

39. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

WITHERS
BERGMAN LLP

40. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███

41.    Dawson also insisted on revising the Company's corporate governance documents and shareholders' shareholder agreements.

42.    On May 16, 2024, Company Shareholders entered into a Shareholders Agreement (the "Shareholders Agreement"). Under the Shareholder Agreement, Plaintiff expressly retained full creative control of the Company.

43.    After ████████████████████████████, Dawson gained both de jure and de facto control of the Company's finances and governance. He was not only the majority shareholder, but he also remained the primary provider of crucial debt financing. He leveraged his newly acquired power over Sharif and his team of employees by continuing to routinely threaten to withhold funds, especially just before bi-weekly payroll deadlines, to extract concessions. For example, based on the threat of withholding payroll funds, he forced Moore to resign from the board and transfer his equity to Sharif. Dawson and his deputies also frequently threatened to harm Steven and his loved ones physically if Steven did not comply with his demands.

44.    On May 13, 2024, Dawson securitized his debt against all assets and all personal property of the Company, including intellectual property, which includes the Trade Secret Materials. (Dawson Lien Financing Statement attached hereto as **Exhibit B.)** Lenders that hold senior priority positions to Dawson are the Small Business Administration and CommerceWest Bank, whose loan is also collateralized by all assets and personal property of the Company, including intellectual property, which includes the Trade Secret Materials. (Small Business Administration and CommerceWest Bank Lien Financing Statements attached hereto as **Exhibits C and D**, respectively.) Dawson knew or should have known of these senior liens because they are publicly available.

45.     As majority shareholder, Dawson voted himself and his close business associate, Ryan Ogden, onto the board of directors. During a September 4, 2024, board meeting, the board appointed Dawson as Chairman of the Board, and Ogden as CFO. Dawson directed Ogden to open new bank accounts for Intrepid at Pathway Bank, which is a bank over which Dawson exercises de facto or de jure control. Sharif ceased to have any access to active company bank accounts, and he was effectively stripped of financial and other authority.

46.     By August 2025, Dawson elected his close associates Theresa Fette, also a substantial Company creditor, and Aaron Bartels to the board. Thus, from that time until Sharif's January 19, 2026, resignation from the Company, the board consisted of: Dawson, Ogden, Fette, Bartels, and Sharif. Ogden, Fette, and Bartels acted at the behest of Dawson rather than as independent board members, and they continually voted in alignment with him.

47.     Dawson frequently insisted that Sharif not publicize Dawson's role with the company. Ogden, too, did not wish for his identity and role to be revealed publicly. Sharif was under no express obligation to hide Dawson's or Ogden's roles and identities, but Sharif complied out of fear of reprisals, and he continued to act as the external face of the company.

48.     On October 15, 2025, Sharif notified the board that he would take a temporary medical leave, relating to the medical issues he had suffered in 2024. He advised the Board that he would be stepping back from his role as CEO and board member, but that he would continue, as he was able, as Creative Director.

**D. Intrepid Partners with Valve**

49.     In or around September 2025, the Board, against Sharif's and other senior leadership's advice, directed that Intrepid undertake an Early Access launch of *Ashes of Creation* in partnership with the online gaming platform, Steam, owned by Valve Corporation ("Valve"). The Early Access launch occurred on December 11, 2025. Steam is a worldwide platform; accordingly, *Ashes of Creation*, to which the

Trade Secret Materials relate, was distributed worldwide and used in interstate commerce.

50.    Ogden specifically assured CommerceWest Bank that the revenue owing to the Company from Valve under the revenue share agreement relating to the Steam Early Access launch would cover outstanding obligations on the CommerceWest Bank loan.

**E. Dawson, TFE, and the Board Execute a Wrongful Foreclosure in an Effort to Steal the Company's Intellectual Property and Trade Secrets**

51.    Beginning in 2025, the Board Defendants collectively devised a plan and agreement to take possession of the Company's assets via a wrongful Article 9 foreclosure process using Dawson's junior secured lien against the Company. They intentionally planned to do so without providing proper and legally required notice to senior secured lenders so that they could transfer Company assets to a new company created and controlled by Dawson, TFE, and wipe out equity holders and prior creditors in Intrepid. All of the Board Defendants are likely members of TFE. The Board Defendants also intended to lay off a large proportion of the Intrepid workforce without required wages, PTO, and severance because those debts would remain with Intrepid, while bringing a proportion of the employee base over to TFE to finish development of the *Ashes of Creation* project in order to monetize it for their own personal benefit. Dawson had indicated that he was considering executing this strategy to obtain greater control over the development project as early as 2024.

52.    This agreement was undertaken with the intent that TFE would take purported ownership of all of the Company's assets, including specifically the Company's intellectual property and Trade Secret Materials.

53.    Beginning in 2025 and in furtherance of their scheme, the Board Defendants intentionally permitted the Company to accrue substantial unpaid obligations to vendors and service providers with the goal of using this debt to

improperly declare a default and justify an Article 9 foreclosure on Dawson's junior secured lien.

54.    Prior to the wrongful foreclosure, and in furtherance of their underhanded plan, Dawson directed Ogden as CFO to open bank accounts at Pathway Bank for TFE, the new company Dawson had created to house the wrongfully foreclosed upon assets.

55.    Prior to the wrongful foreclosure, and to further justify a declaration of default, Ogden wrongfully directed Valve to divert and deposit funds owed to the Company under the partnership with Steam to the new Pathway Bank account for TFE. Valve did not comply.

56.    Plaintiff first objected to the Board Defendants' plan during a December 15, 2025, in-person board meeting. Specifically, he objected to the board causing the Company to not pay vendors, to the board's plan to lay off a large proportion of employees without requisite pay and benefits, and to the legality of the foreclosure plan. After the meeting ended and other board members had left, Dawson confronted Plaintiff in a physically intimidating manner, told him he "didn't want any sh**," and coerced him to sign between 30 and 40 signature pages, the corresponding agreements for which Plaintiff was not permitted to review.

57.    Plaintiff next objected to the Board Defendants' plan to foreclose without notice to the senior secured lenders on a phone call with Dawson and Dawson's personal counsel that occurred between December 28, 2025, and January 3, 2026.

58.    On December 30, 2025, in furtherance of the foreclosure scheme, Ogden, at the direction of and in concert with the other Board Defendants, filed a false California Statement of Information document with California's Secretary of State in an effort to conceal the Board Defendants' identities from the public during the planned foreclosure and attempted revenue diversion scheme. The Statement of Information listed Plaintiff as the sole director of the Company, intentionally omitting

Dawson, Ogden, Fette, and Bartels. It further misidentified the Company's CFO as Moore, despite the fact that Ogden had been duly appointed CFO since September 2024.

59. Ogden, in concert with the other Board Defendants, filed the false California Statement of Information in an effort to direct any public fallout from their conduct directly to Sharif. The Board Defendants did so despite actual knowledge of Sharif's fragile medical condition and knowledge that the gaming community would likely wrongly blame and eviscerate Sharif—as the only publicly identified director— should Intrepid and the *Ashes of Creation* endeavor fail or be involved in controversy.

60. In advance of the wrongful foreclosure, and in furtherance of the Board Defendants' scheme to steal the Company's intellectual property and trade secrets, Ogden prepared a Company asset list on December 31, 2025. That list specifically references components of *Ashes of Creation* that comprise the Company's intellectual property and Trade Secret Materials. The list references: "Ashes of Creation Codebase" (*e.g.*, the game design and other systems discussed *supra* ¶ 25) "Game content," (*e.g.*, models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations), "Customized Game Play: Audio Effects, Visual effects" and "Other Special Effects." It also includes a list titled "from ChatGPT" that includes "Software & Game Code," (*e.g.*, source code) "Game Engine & Technical Frameworks," (*e.g.*, all tool or game code); "Gameplay Systems & Trade Secrets," (*e.g.*, the systems and trade secrets described *supra* ¶ 25); and "Creative Content & Copyrighted Works."

61. Sharif embarked on a campaign to convince the Board to abandon its foreclosure scheme. At every board meeting between January 3, 2026 and his January 19, 2026 resignation—estimated to be between ten and fifteen times—he objected to the Board Defendants' plan to wrongfully foreclose on Dawson's junior secured lien without notice to senior secured lenders, to the Board Defendants' attempt to divert the funds from the Steam partnership from the Company to TFE, and to the Board

Defendants' plan to terminate a large portion of the Intrepid employee base without compensating PTO and severance.

62.     On January 7, 2026, in advance of the wrongful foreclosure, and in furtherance of the Board Defendants' scheme to steal the Company's intellectual property and trade secrets, Dawson changed the secured party on his secured party financing statement from himself to TFE. (Change of Secured Party attached hereto as **Exhibit E**.)

63.     On January 14, 2026, Dawson, in concert with the Board Defendants, represented to investors that the Company had secured the necessary capital commitments to make it to the September 2026 launch. During this meeting, Dawson revealed the foreclosure scheme and his intent to wipe the investor and lender table clean.

64.     On January 15, 2026, Sharif blew the whistle on Defendants' foreclosure plan to CommerceWest Bank, whom Defendants had intentionally failed to notify of the foreclosure. Prompted by this information, CommerceWest Bank issued an Event of Default letter on January 18, 2026, demanding immediate and full repayment from either the Company or the personal guarantor of the loan, Moore.

65.     On January 16, 2026, Dawson caused Intrepid to declare default, on the one hand, and he caused TFE to foreclose on the Company's assets, on the other hand. Dawson caused TFE to engage in a non-judicial disposition, in favor, instead, of a private sale.

66.     Dawson, TFE, and the Board Defendants failed to advertise the sale in industry-standard publications or platforms. They did not involve a broker or auctioneer and did not publish any marketing of the sale in any manner.

67.     The intellectual property and trade secrets of an MMORPG are not customarily sold on a recognized market, but Dawson, TFE, and the Board Defendants pursued a self-serving private sale anyway.

68.     TFE obtained Intrepid's assets via a self-interested transaction between Dawson, who controlled Intrepid on the one hand, and Dawson, who controlled TFE on the other hand. This self-interested transaction was completed at the specific design of Dawson and the Board Defendants, who blessed the sale for their own personal profits. This foreclosure proximately and directly caused Intrepid harm in the form of the loss of its most valuable assets—its intellectual property and trade secrets—through a commercially unreasonable sale.

69.     Dawson and the Board Members executed their agreement over Sharif's objections and in violation of the rights of senior secured creditors and Derivative Plaintiffs. Dawson performed the foreclosure in an intentionally clandestine manner, and he specifically ignored his counsel's advice that Dawson must provide notice to senior secured creditors, including CommerceWest Bank.

70.     Immediately thereafter, on January 19, 2026, Sharif resigned from the Company and as a member of the board. In his resignation letter, he specifically identified his reasons for resignation, among others, as: (1) his disagreement with the Board's repeated attempts to terminate employees without payment of wages and compensation legally owed to them; (2) his disagreement with the private foreclosure, given his serious concerns the approach raised regarding fiduciary duties owed to Derivative Plaintiffs, creditors, employees, and the Company; and (3) his being subjected to repeated threats, coercion, and ultimatums to execute documents and actions that he openly and consistently protested.

**F. Dawson and the Board Illegally Separate Intrepid's Entire Workforce and Leave Plaintiff to Suffer the Fallout**

71.     On or about January 31, 2026, the Board Defendants caused Intrepid to issue WARN Act notices without the required notice period.

72.     On or about February 2, 2026, the Board Defendants caused Intrepid to terminate all Intrepid employees without providing the required 60 days' advance written notice under the federal WARN Act and California's WARN Act. The Board

Defendants also caused Intrepid to not pay the Intrepid employees their final wages, including unpaid weeks of work and accrued paid time off, in violation of state wage laws.

73.   The Board Defendants took this action upon learning that CommerceWest Bank had learned of the wrongful foreclosure and had contacted Valve to intercept the funds due to Intrepid from the Steam partnership, meaning the Board Defendants could no longer access that money to fund TFE's ramp up.

74.   The corporate unrest followed by the mass layoff generated significant agitation in the online gaming community. However, Dawson and the Board Defendants have intentionally hidden behind the guise of anonymity. It was no error that Ogden filed a blatantly false Statement of Information with the California Secretary of State identifying only Sharif and Moore as company directors and/or officers. Rather, it was a calculated action intended to shield the Board from the fallout of their actions and wrongfully place the public blame on Sharif.

75.   The fallout for Sharif has been swift and devastating. The public has wrongly blamed Sharif for the downfall of Intrepid, accused Sharif of legal wrongdoing, and called Sharif a liar. Sharif has received death threats and both Sharif and his family fear constantly for their physical safety.

76.   The Board Defendants specifically discussed during a January 30, 2026, board meeting, with multiple witnesses present, using this online campaign to frame Sharif for the Company's collapse: they would let Sharif take the fall and emerge as white knights in a few months with plans to revive the game beloved by millions.

77.   To the same end, the Board Defendants have piled onto this false narrative by making false allegations that Sharif misled creditors and investors as to game development milestones and completion dates, that Sharif misrepresented the nature of his relationships with business partners, and that Plaintiff and Moore misappropriated Company funds. On information and belief, the Board Defendants have taken the further step of distributing defamatory material, including false

statements of criminal wrongdoing, about Sharif to members of the gaming public for public dissemination.

78.     At all times, Sharif appropriately caveated to potential lenders that any estimated timeframes with respect to *Ashes of Creation* development milestones or completion were just estimates, subject to a number of variables outside of Sharif's control. Game development is an iterative process and delays are standard in the industry. At no time did Sharif guarantee that *Ashes of Creation,* as a large, ambitious, and extremely innovative game-changer in the world of MMORPG, would reach specific milestones, or be completed, by a specific time.

79.     At all times, Sharif appropriately caveated that relationships that could increase the value of the game, *e.g.*, publishing deals, were speculative and were not guaranteed.

80.     At no time did Sharif intentionally misappropriate funds from the Company. Public statements to the contrary are intended to invoke public outrage and outcry against Sharif to shield the Defendants from the fallout of their wrongful actions, described herein.

**G. Valve Freezes Revenues**

81.     On February 3, 2026, Valve terminated Intrepid's partnership with Steam. Among others, Valve cited as reasons for the termination that it received multiple conflicting requests from alleged account administrators for Intrepid requesting authority to change Intrepid's banking information, without response to Valve's follow up requests seeking to confirm the validity of the requests; that Valve has received demands from multiple potential creditors for Intrepid's revenues; and that Valve is receiving a large number of refund requests from players who purchased the early access release version of *Ashes of Creation*. Before the issue of refunds, Intrepid would have been entitled to approximately $5 million, thus demonstrating the value of, among other things, the Trade Secret Materials.

**H. Defendants' Continued Plan to Imminently Steal the Company's Intellectual Property and Trade Secrets**

82.     TFE and the Board Defendants are currently and actively (1) soliciting former employees and the former Director of IT, including with offers of compensation, to provide them access to *Ashes of Creation*, along with its intellectual property and Trade Secret Material components, and (2) attempting to sell *Ashes of Creation*, along with its intellectual property and Trade Secret Material components—the lifeblood of the Company and key to the value of shares owned by Sharif and the Derivative Shareholders—to competitor game developers in order to recoup their own investments.

83.     The Defendants' actions are in furtherance of the agreement between the Board Defendants to appropriate the Company's intellectual property and Trade Secret Materials.

84.     Defendants' actions have already harmed the Company, and they continue to pose irreparable and imminent harm to the Company.

## FIRST CLAIM FOR RELIEF

(Defend Trade Secrets Act, 18 U.S.C. §§ 1831, *et seq.*)

AGAINST ALL DEFENDANTS

85.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

86.     This cause of action is brought by the Company as a derivative claim.

87.     The Company owned trade secret information as defined under 18 U.S.C. § 1839(3) and took reasonable steps to protect it.

88.     The Company's Trade Secret Materials derived independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person, including competitors, who can obtain economic value from the disclosure or use of the Company's trade secrets. Evidence of the value of the Trade Secret Materials includes the fact that they served as collateral for loans

(*see, e.g.*, Exhibit B (securitizing the Company's intellectual property, which includes the Trade Secret Materials); Exhibit D (same)); their use within *Ashes of Creation* generated revenues during the Early Access launch on Steam; and the existence of the Board Defendants' conspiracy alleged herein to steal them.    The Trade Secret Materials include:

a. Audio/visual effects;

b. Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (i.e., production assets created by employees/contractors and incorporated into builds);

c. The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;

d. Designs and implementations of server meshing technology and distributed networking systems;

e. Proprietary PvP risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems;

f. The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

g. Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

    h.  The event tool used to create open world events, wars, and caravan systems;

    i.  The implemented seasonal environmental systems as built into the engine;

    j.  The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

    k.  Class implementation logic and stat balancing systems as embodied in the Company's codebase;

    l.  Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

89. Defendants conspired to complete the wrongful foreclosure—which they knew or had reason to know was improper—in order to misappropriate the Company's intellectual property and Trade Secret Materials.

90. Defendants are actively seeking to (1) obtain access to *Ashes of Creation*, including the intellectual property and Trade Secret Materials, from former Intrepid employees in exchange for compensation; and (2) quickly sell the game to a third-party developer.

91. Defendants' actions in attempting to convert and misappropriate the Company's Trade Secret Materials for their own benefit is willful, wanton, and malicious, and taken with reckless disregard for the Company's rights.

92. The Company's Trade Secret Materials, which Defendants have wrongfully misappropriated to Defendant TFE, and to which Defendants are actively seeking access, relates to *Ashes of Creation*, a MMORPG that has been and was intended to be offered and provided in interstate commerce.

93. Defendants' use, access, or sale of the Company's Trade Secret Material, Defendants violates the DTSA (18 U.S.C. § 1836(b)(1)).

94. As a direct and proximate result of Defendants' wrongful acts alleged herein, the Company has been harmed, and is at imminent risk of being further

irreparably harmed by the loss of access to and use of its intellectual property and its Trade Secret Materials if Defendants are not preliminarily and permanently enjoined. The Company has no adequate remedy at law because the loss of the Trade Secret Materials would deprive the Company of the ability to finish *Ashes of Creation*, the project it has pursued for the past decade.

95.    Accordingly, Plaintiff requests that the Court enjoin Defendants from accessing, using, or selling the Company's Trade Secret Materials.

96.    The Board Defendants agreed to deprive the Company of its intellectual property and Trade Secret Materials via the wrongful foreclosure. In furtherance of this agreement, Defendant Ogden created a list of Intrepid's pre-foreclosure assets as described *supra* ¶ 60. When the Board Defendants' plan failed and they shuttered Intrepid by laying off all employees, they pivoted and instead are seeking to obtain imminent access to the Company's intellectual property and Trade Secret Materials from former employees in order to sell it, causing the Company harm and posing an imminent threat of further irreparable harm to the Company.

## SECOND CLAIM FOR RELIEF

(Misappropriation of Trade Secrets under California's Uniform Trade Secret Act,

Cal. Civ. Code §§ 3426, *et seq.*)

AGAINST ALL DEFENDANTS

97.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

98.    This cause of action is brought by the Company as a derivative claim.

99.    The Company owned trade secret information as defined under California's Uniform Trade Secrets Act ("CUTSA"), California Civil Code § 3426.1(d) and took reasonable steps to protect it.

100.    The Company's trade secret information derived independent economic value from not being generally known to, and not being readily ascertainable though proper means by, another person, including competitors, who can obtain economic

value from the disclosure or use of the Company's trade secrets. Evidence of the value of the Trade Secret Materials includes the fact that they served as collateral for loans (*see, e.g.*, Exhibit B (securitizing the Company's intellectual property, which includes the Trade Secret Materials); Exhibit D (same)); their use within *Ashes of Creation* generated revenues during the Early Access launch on Steam; and the existence of the Board Defendants' conspiracy alleged herein to steal them. The Trade Secret Materials include:

    a.  Audio/visual effects;

    b.  Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (i.e., production assets created by employees/contractors and incorporated into builds);

    c.  The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;

    d.  Designs and implementations of server meshing technology and distributed networking systems;

    e.  Proprietary PvP risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems;

    f.  The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

g. Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

h. The event tool used to create open world events, wars, and caravan systems;

i. The implemented seasonal environmental systems as built into the engine;

j. The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

k. Class implementation logic and stat balancing systems as embodied in the Company's codebase;

l. Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

101. Defendants conspired to complete the wrongful foreclosure—which they knew or had reason to know was improper—in order to misappropriate the Company's intellectual property and Trade Secret Materials.

102. Defendants are actively seeking to (1) obtain access to *Ashes of Creation*, including the intellectual property and Trade Secret Materials, from former Intrepid employees in exchange for compensation; and (2) quickly sell the game to a third-party developer.

103. Defendants' actions in attempting to convert and misappropriate the Company's trade secret information for their own benefit is willful, wanton, and malicious, and taken with reckless disregard for the Company's rights.

104. Defendants' use, access, or sale the Company's Trade Secret Material, Defendants violates the CUTSA (Cal. Civ. Code § 3426 *et seq.*).

105. As a direct and proximate result of Defendants' wrongful acts alleged herein, the Company has been harmed, and is at imminent risk of being further irreparably harmed by the loss of access to and use of its intellectual property and its Trade Secret Materials if Defendants are not preliminarily and permanently enjoined.

The Company would have no adequate remedy at law because the loss of the Trade Secret Materials would deprive the Company of the ability to finish *Ashes of Creation*, the project it has pursued for the past decade.

106.   Accordingly, Plaintiff requests on behalf of the Company that the Court enjoin Defendants from accessing, using, or selling the Company's Trade Secret Materials.

107.   The Board Defendants agreed to deprive the Company of its intellectual property and Trade Secret Materials via the wrongful foreclosure. In furtherance of this agreement, Defendant Ogden created a list of Intrepid's pre-foreclosure assets as described *supra* ¶ 60. When the Board Defendants' plan failed and they shuttered Intrepid by laying off all employees, they pivoted and instead are seeking to obtain imminent access to the Company's intellectual property and Trade Secret Materials from former employees in order to sell it, causing the Company harm and posing an imminent threat of further irreparable harm to the Company.

## THIRD CLAIM FOR RELIEF

(Violations of California Commercial Code §§ 9101, *et seq.*)

AGAINST ALL DEFENDANTS

108.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

109.   This cause of action is brought by the Company as a derivative claim.

110.   Defendant Robert Dawson held a valid security agreement against Intrepid securitized by Intrepid's assets. (*See* Exhibit B.) In January 2026, he transferred his secured interest to a company he created, TFE. (*See* Exhibit E.) Beginning in 2025, Dawson, in concert with the other Board Defendants, coordinated to manufacture a default allowing for foreclosure of Intrepid's assets pursuant to California Commercial Code §§ 9610.

111.   Dawson and TFE intentionally did not notify other secured parties prior to effecting the disposition of the Company's assets, as required by California

Commercial Code § 9611, including senior secured party CommerceWest Bank, whose loan was secured by the same Company assets. Instead, they declared a default by Intrepid and engaged in a non-judicial, private disposition of the Company's assets.

112.    Dawson and TFE did not pursue disposition of the Company assets in a commercially reasonable manner, as required under California Commercial Code § 9610. Instead, they transferred the Company's assets, including valuable intellectual property and Trade Secret Materials, to a new entity, TFE, which was created and controlled by Dawson. This transfer was not commercially reasonable under California Commercial Code § 9627. Transferring assets to a company created for the sole purpose of receiving assets via an unnoticed, self-interested disposition is not the usual manner of asset disposition recognized in any relevant recognized market. Transferring assets to a company created for the sole purpose of receiving assets via an unnoticed, self-interested disposition did not lead to the disposition being made at the price current in any relevant recognized market at the time of the disposition. Transferring assets to a company created for the sole purpose of receiving assets via an unnoticed, self-interested disposition is not a disposition that is in conformity with reasonable commercial practices among dealers in the MMORPG or video game market.

113.    The collateral consisting of the Company's assets, including specifically the intellectual property and Trade Secrets Materials, are not of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations; accordingly, under California Commercial Code § 9610, Dawson and TFE were not at liberty to dispose of the collateral at a private disposition.

114.    As a direct and proximate cause of Dawson's and TFE's unlawful actions, and the Board Defendants' unlawful actions in ratifying this transaction, the Company is entitled to damages and injunctive relief. Intrepid and its shareholders have and will continue to be irreparably harmed should the Board Defendants' unlawful foreclosure efforts in violation of the law succeed.

## FOURTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty)

AGAINST BOARD DEFENDANTS

114.  Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

115.  This cause of action is brought by the Company as a derivative claim.

116.  At all relevant times, the Board Defendants served on Intrepid's Board.

117.  As directors of Intrepid, the Board Defendants owed fiduciary duties of loyalty, care, candor, and independence to Intrepid and Derivative Plaintiffs, including Plaintiff Sharif. Those duties required the Board Defendants, among other things, to act in good faith; to place the interests of the Company and its shareholders above their own personal interests; to avoid self-dealing and conflicts of interest; to exercise independent judgment; and to refrain from using their positions as directors and officers to appropriate corporate assets, opportunities, or confidential information for their own benefit.

118.  The Board Defendants knowingly acted against the Company's interests by engaging in self-dealing, including by engineering and approving a wrongful Article 9 foreclosure in favor of Defendant TFE's junior secured lien; diverting or attempting to divert Company revenues to Defendant Dawson's affiliated entity, Defendant TFE; concealing their identities and misconduct through false regulatory filings; and positioning themselves to personally profit from the continued exploitation or sale of *Ashes of Creation* and its underlying intellectual property following the destruction of Intrepid.

119.  The Board Defendants further breached their fiduciary duties by failing to act independently or in good faith, by rubber-stamping Defendant Dawson's directives despite obvious conflicts of interest, by disregarding the interests of Intrepid's shareholders, creditors, and employees, by exposing the Company to substantial legal and financial liability, and by knowingly participating in or

facilitating unlawful conduct, including wrongful foreclosure, wage violations, and the misappropriation of intellectual property.

120.   As a result of the Board Defendants' misconduct, Intrepid was stripped of valuable assets, deprived of revenue, rendered insolvent, exposed to significant creditor and employee claims, and effectively destroyed, all while Board Defendants sought to preserve or enhance their own financial positions at the Company's expense.

121.   As a direct and proximate result of Board Defendants' breaches of fiduciary duty, substantial harm was caused to the Company, Plaintiff, and Derivative Plaintiffs, including the loss of shareholder value, the misappropriation of corporate intellectual property and trade secrets, the forfeiture of legitimate business opportunities, reputational damage, and the incurrence of significant legal and remedial costs.

## FIFTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty)

### AGAINST DEFENDANT TFE

122.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

123.   This cause of action is brought by the Company as a derivative claim.

124.   Defendant TFE is controlled by Defendant Dawson. Defendant TFE was created by Defendant Dawson for the sole purpose of receiving, exploiting, and monetizing Intrepid's trade secrets and intellectual property. Defendant TFE had no independent or legitimate business purpose apart from the wrongful conduct alleged herein, functioning solely as an instrumentality and vehicle through which Board Defendants consummated their illicit scheme.

125.   At all relevant times, the Board Defendants owed fiduciary duties of loyalty, care, candor, and good faith to Intrepid and Derivative Plaintiffs, including Plaintiff Sharif. Those fiduciary duties were knowingly breached through, among other things, self-dealing, wrongful foreclosure, diversion of corporate revenues,

misappropriation of intellectual property and trade secrets, and destruction of the Company, as alleged herein.

126.   At all relevant times, Defendant TFE had actual knowledge of the Board Defendants' breaches of fiduciary duty. Defendant TFE was formed for the express purpose of receiving assets, intellectual property, and trade secrets wrongfully taken from Intrepid, and its existence and anticipated benefit depended entirely on the Board Defendants' unlawful conduct.

127.   Defendant TFE knowingly and substantially assisted the Board Defendants' breaches of fiduciary duty by, among other things, accepting and attempting to accept ownership, possession, or control over Intrepid's assets, including intellectual property and trade secrets; participating in the planning and execution of the wrongful Article 9 foreclosure; and serving as the intended recipient of diverted revenues and misappropriated property.

128.   Through its knowing participation and substantial assistance, Defendant TFE aided and abetted the Board Defendants' breaches of fiduciary duty and directly benefitted from those breaches, including by seeking to acquire valuable intellectual property, trade secrets, and business opportunities without compensation and free of Intrepid's liabilities.

129.   As a direct and proximate result of TFE's aiding and abetting of fiduciary breaches, Intrepid has suffered substantial harm, including the loss of assets, loss of revenue, exposure to significant legal and financial liabilities, and destruction of corporate value.

## SIXTH CLAIM FOR RELIEF

(Corporate Waste)

AGAINST BOARD DEFENDANTS

130.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

131.   This cause of action is brought by the Company as a derivative claim.

132.   As directors of Intrepid, Board Defendants owed the Company and its shareholders fiduciary duties, including duties of care, loyalty, and good faith.

133.   Those duties required Board Defendants to act prudently, in good faith, and in the best interests of the Company and its shareholders, and to refrain from squandering corporate assets or exposing the Company to unnecessary and foreseeable harm.

134.   Board Defendants' decision to seize Intrepid's assets through a wrongful Article 9 foreclosure process was so egregious, reckless, and devoid of legitimate business purpose that it could not have been the product of a rational or good-faith exercise of business judgment on behalf of the Company.

135.   By, among other things, deliberately starving the Company of cash, allowing substantial unpaid obligations to accrue to vendors and service providers, engineering and approving a wrongful foreclosure designed to transfer Company assets to an affiliated entity, and terminating the entire workforce in violation of state and federal law, Board Defendants caused Intrepid to waste and destroy valuable corporate assets and business opportunities.

136.   Under these circumstances, no reasonable businessperson could conclude that the foregoing actions were undertaken for the benefit of Intrepid or were otherwise consistent with Intrepid's best interests. Rather, the actions constituted a wasteful dissipation of corporate assets undertaken to advance Board Defendants' personal and affiliated interests at the Company's expense.

137.   Board Defendants are therefore guilty of committing corporate waste and are liable to Intrepid for all damages sustained as a result of their misconduct.

## **SEVENTH CLAIM FOR RELIEF**

(Intentional Infliction of Emotional Distress)

AGAINST BOARD DEFENDANTS

138.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

139.  This cause of action is brought as a direct claim by Plaintiff Sharif.

140.  The Board Defendants engaged in extreme and outrageous conduct directed at Sharif by directing Defendant Ogden to file a false Statement of Information in order to shield the Board Defendants from any public fallout arising from their illicit foreclosure and subsequent illegal firing of all Intrepid employees, and instead to pin the blame wrongfully on Plaintiff. Their premeditated plan to shield their identities from the public, and let Plaintiff take the fall, has ruined Plaintiff's reputation in the community he has devoted his professional life to, destroyed his sense of safety and wellbeing, and has put him directly in the way of harm.

141.  Board Defendants intended to cause Plaintiff severe emotional distress, or acted with reckless disregard of the probability that Plaintiff would suffer such distress.

142.  As a direct and proximate result of Board Defendants' conduct, Plaintiff has suffered and continues to suffer severe emotional distress, including anxiety, fear, humiliation, loss of sleep, disturbance of daily functioning, and other symptoms of mental anguish.

## **EIGHTH CLAIM FOR RELIEF**

### (Civil Conspiracy)

### AGAINST ALL DEFENDANTS

143.  Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

144.  This cause of action is brought as a derivative claim on behalf of the Company and as a direct claim by Sharif.

145.  Throughout the duration of Board Defendants' membership on the board of directors at Intrepid, Defendants knowingly and willfully conspired and agreed among themselves and TFE to directly or indirectly misappropriate and disclose the Company's confidential and proprietary business information, trade secrets, and intellectual property to Defendant TFE, and/or the organizers, officers, managers, or

employees of Defendant TFE, and to use the Company's trade secrets and intellectual property for the benefit of Defendants, and with a deliberate intent to injure the Company. They also agreed to hide their identities in anticipation of public fallout and leave Plaintiff Sharif to take the blame for the failure of the Company and the project *Ashes of Creation*.

146. Each Defendant knowingly performed the actions herein alleged pursuant to, and in furtherance of, the conspiracy.

147. As a direct and proximate result of this misconduct, the Company, Derivative Plaintiffs and Plaintiff Sharif have suffered and continue to suffer substantial money damages in an amount to be proven at trial.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief as follows:

1.    An order enjoining Defendants from accessing, using, or selling the Company's Trade Secret Materials;

2.    Voidance of any corporate acts taken in violation of fiduciary duties or applicable law, including the wrongful foreclosure;

3.    Compensatory damages in an amount to be proven at trial;

4.    Consequential damages;

5.    Punitive damages;

6.    An order requiring the Company to adopt and implement appropriate corporate governance, compliance, and oversight reforms, including, but not limited to:

      a. Removal of the Board Defendants from the Board of Intrepid;

      b. Enhanced board-level oversight mechanisms;

      c. Revised policies governing risk management, internal controls, or compliance;

      d. Changes to executive compensation, clawback, or incentive structures;

e.  Board or committee reconstitution and independence measures;

7.    Constructive trust;

8.    Disgorgement of profits;

9.    Attorney's fees, costs, and expenses;

10.    Costs of suit herein;

11.    Pre-judgment and post-judgment interest;

12.    Preliminary and permanent injunctive relief prohibiting Defendants from continuing the wrongful acts alleged herein, including from continued misappropriation of the Company's trade secrets and from engaging in similar misconduct in the future;

13.    Such other and further relief as the Court deems just and proper.

DATED:  February 15, 2026            WITHERS BERGMAN LLP


By:  */s/ Conte Cicala*
Conte Cicala (SBN 173554)
conte.cicala@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Jordan W. Garman (*pro hac vice*
forthcoming)
jordan.garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone: 212.848.9882

*Attorneys for Plaintiff Steven Sharif as an individual and derivatively on behalf of Intrepid Studios, Inc.*

## **VERIFICATION**

I, Steven Sharif, am the plaintiff in this proceeding. I have reviewed the allegations made in this Shareholder Derivative Complaint know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___2 - 15 -___, 2026

