Jessica Nall (SBN 215149)
Jessica.Nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Leslie Evans (SBN 173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone:  619.329.6454

Jordan W. Garman (*pro hac vice* pending)
Jordan.Garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone:  212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDING LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-JLB <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> *Filed concurrently with Notice of Ex Parte Motion for Temporary Restraining Order; Declaration of Steven Sharif; Declaration of Jordan W. Garman; Request for Hearing* <br><br> Judge:          Hon. Linda Lopez <br> Hearing Date:  TBD <br><br> Action Filed:  February 14, 2026 <br> Trial Date:     Not Set |

WITHERS
BERGMAN LLP

Case No. 3:26-cv-00965-LL-JLB

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................... 1

II.   STATEMENT OF FACTS ....................................................................... 2

    A.    Plaintiff Founds Intrepid, Fosters Intrepid's Creation of Intellectual Property, and Acquires Debt Financing .............................. 2

    B.    Dawson's Campaign of Control and Coercion ....................................... 4

    C.    Dawson, TFE, and the Dawson-controlled Board Execute a Wrongful Foreclosure to Steal Intrepid's Trade Secrets ....................... 5

    D.    Plaintiff Brings Suit to Enjoin the Theft of Intrepid's Trade Secrets and Intellectual Property .............................................................. 8

    E.    Defendants Continue to Pursue Intrepid's Intellectual Property through a Lawsuit in Nevada, Which is Not a Court of Competent Jurisdiction Over This Dispute .............................................. 8

    F.    Defendants Refused to Enter an Agreement Maintaining the Status Quo such that this Motion Could be brought on Notice ....................... 10

III.  ARGUMENT ........................................................................................ 11

    A.    This Court Should Exercise Jurisdiction because *Colorado River* Abstention is not Applicable .............................................................. 12

    B.    Plaintiff, on Intrepid's Behalf, is Likely to Succeed on his Article 9 and Trade Secret Misappropriation Claims .................................... 13

        1.    Plaintiff is Likely to Succeed on his Article 9 Claim ................ 13

        2.    Plaintiff is Likely to Succeed on his DTSA and CUTSA Claims ................................................................................ 16

    C.    Intrepid Will Be Irreparably Harmed Through Irreversible Loss of Its Trade Secrets Without a Temporary Restraining Order or Preliminary Injunction .............................................................. 20

    D.    The Balance of the Equities Supports Issuing a Temporary Restraining Order and Preliminary Injunction ..................................... 23

    E.    A Temporary Restraining Order and Preliminary Injunction Are in the Public Interest .............................................................. 24

    F.    Appointment of a Neutral IP Custodian is Necessary to Preserve the Status Quo and Prevent Irreparable Harm ................................... 25

IV.   CONCLUSION ..................................................................................... 25

WITHERS
BERGMAN LLP

i

Case No. 3:26-cv-00965-LL-JLB

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AEG Holdco LLC v. Vazquez*,
2021 WL 4859975 (C.D. Cal., Sept. 22, 2021)......................................................12

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)..............................................................................12

*Ascentium Capital LLC v. Littell*,
583 F. Supp. 3d 1234 (W.D. Mo. 2022)................................................................15

*Beluca Ventures LLC v. Einride Aktiebolag*,
660 F. Supp. 3d 898 (N.D. Cal. 2023)............................................................17, 19

*Bemis Company Inc. v. Summers*,
2019 WL 1004853 (E.D. Cal. Feb. 28, 2019) ......................................................20

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) .............................................................................................12

*Consolidated Electrical Distributors, Inc. v. United Renewable Energy Co., Ltd.*,
717 F. Supp. 3d 970 (S.D. Cal. 2024) ..................................................................11

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
444 F. Supp. 3d 1198 (E.D. Cal. 2020)..................................................21, 22, 23

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) .............................................................................................23

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .............................................................................................21

*Farmers Ins. Exchange v. Steele Ins. Agency, Inc.*,
2013 WL 2151553 (E.D. Cal. May 16, 2013)......................................................24

*Gallagher Benefits Services, Inc. v. De La Torre*,
2007 WL 4106821 (N.D. Cal. Nov. 16, 2007), *aff'd in relevant part*,
283 F. App'x 543 (9th Cir. 2008)........................................................................20

*Gemcap Lending I LLC v. Crop USA Insurance Agency Inc.*,
2015 WL 12746212 (C.D. Cal. Aug. 17, 2015) ....................................................14

*Implicit Conversions, Inc. v. Stine*,
2024 WL 4112335 (N.D. Cal. Sept. 6, 2024).......................................................18

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) ...............................................................................16, 17

*Lilith Games (Shanghai) Co. Ltd. v. UCool, Inc.*,
2015 WL 5591612 (N.D. Cal. Sept. 23, 2015)..............................................18, 19

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) ..............................................................................12, 13

*North Atlantic Instruments Inc. v. Haber*,
188 F.3d 38 (2d Cir. 1999) ....................................................................................19

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) ................................................................................23

*Stuhlbarg International Sales Co., Inc. v. John D. Brush and Co., Inc.*,
240 F.3d 832 (9th Cir. 2001) ................................................................................22

*Teleflora, LLC v. Florists' Transworld Delivery, Inc.*,
2004 WL 1844847 (N.D. Cal. Aug. 18, 2004).....................................................20

*Waymo LLC v. Uber Technologies, Inc.,*
2017 WL 2123560 (N.D. Cal. May 15, 2017)  ...............................................21, 24

*Xsolla (USA), Inc. v. Aghanim, Inc.*,
2024 WL 4139615 (C.D. Cal. Sept. 10, 2024)....................................................18

**State Cases**

*Ford & Vlahos v. ITT Commercial Finance Corp.*,
8 Cal. 4th 1220 (Cal. 1994) (en banc) ................................................................15

**Federal Statutes**

18 U.S.C. § 1836(b)(1) ...............................................................................................17

**State Statutes**

California Commercial Code § 9610...........................................................................14, 15

WITHERS
BERGMAN LLP

Case No. 3:26-cv-00965-LL-JLB

Cal. Com. Code § 9611(c) ................................................................................ 13, 14

Cal. Com. Code § 9625(a) ..................................................................................... 13

Cal. Com. Code § 9627(b) ............................................................................... 15, 16

**Rules**

Fed. R. Civ. P. 65 ................................................................................................... 25

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This is an emergency motion to prevent the imminent and irreversible loss of Intrepid Studios, Inc.'s ("Intrepid" or the "Company") most valuable assets—its confidential trade secrets and proprietary intellectual property—before this Court can adjudicate their lawful ownership. Defendants Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels (collectively, the "Board Defendants"), along with TFE Games Holdings LLC (collectively, "Defendants") orchestrated a clandestine and unlawful foreclosure to seize Intrepid's intellectual property and now stand on the brink of obtaining unfettered access to the trade secrets at the center of this dispute. Once accessed, disclosed, or transferred, Intrepid's trade secrets will lose their secrecy and economic value forever, which is harm that no monetary award could remedy.

Plaintiff seeks a narrowly tailored temporary restraining order preserving the status quo pending adjudication on the merits. Specifically, Plaintiff asks this Court to immediately enjoin Defendants, and anyone acting in concert with them, from accessing, using, selling, transferring, or disseminating Intrepid's trade secrets. This relief is necessary because Defendants are actively pursuing possession of Intrepid's confidential source code, backend systems, and other proprietary materials, including through a recent Nevada state court order compelling turnover of credentials while imposing no obligation to preserve or refrain from exploiting the trade secrets once obtained. Plaintiff also seeks appointment of a neutral intellectual property custodian or escrow agent to control access to these materials during the pendency of this action.

The risk of harm is immediate and concrete. Defendants have already asserted wrongful ownership of Intrepid's intellectual property based on an unlawful Article 9 foreclosure, taken steps to seize control of the platforms where the trade secrets reside, and openly sought to sell both *Ashes of Creation*—*i.e.*, the videogame Intrepid developed over more than a decade—and the proprietary technology underlying it. Disclosure to even a single buyer or developer would permanently destroy the secrecy

WITHERS
BERGMAN LLP

Case No. 3:26-cv-00965-LL-JLB

that gives these assets their value, eliminate Intrepid's business, and moot this Court's ability to grant meaningful relief. Emergency intervention is therefore essential to prevent Defendants from achieving through self-help and collateral proceedings what they cannot lawfully obtain on the merits.

Because Plaintiff is likely to succeed, faces imminent and irreparable harm absent relief, and seeks only to prevent the permanent destruction of disputed trade secrets and maintain the status quo, the Court should grant the requested relief.

## II.    STATEMENT OF FACTS

### A.    Plaintiff Founds Intrepid, Fosters Intrepid's Creation of Intellectual Property, and Acquires Debt Financing

In 2015, Plaintiff Steven Sharif co-founded Intrepid alongside his husband, John Moore, to develop a visionary Massively Multiplayer Online Role Playing Game ("MMORPG"), *Ashes of Creation*. (Verified Shareholder Derivative Complaint and Direct Complaint, ECF No. 1 ("Verified Compl.") ¶ 22.) Plaintiff surrounded himself with seasoned game developers to help bring his vision to life, whom he closely directed and supervised. (*Id.*) What began as a passion project quickly gained industry-wide recognition, earning "Most Anticipated MMO" awards in 2017, 2020, and 2022. (Verified Compl. ¶ 23.) Plaintiff's innovative, community-driven development approach—which included regular live webinars on the *Ashes of Creation* YouTube channel to share progress and solicit player feedback—further drove public excitement. (*Id.*) Before the game's public Early Access release in 2025, *Ashes of Creation* underwent three separate player testing phases. (*Id.* ¶ 24.) Following this extensive development, the December 2025 Early Access release on the popular gaming platform, Steam, achieved a remarkable Day 30 player retention rate of approximately 76%. (*Id.* ¶¶ 24, 49.)

Throughout the last decade, Intrepid developed the following intellectual property and trade secrets underlying *Ashes of Creation*: (1) Audio/visual effects; (2) Models for characters, monsters, the environment, visual effects, text narrative, sound

WITHERS
BERGMAN LLP

Case No. 3:26-cv-00965-LL-JLB

effects, and animations (*i.e.*, production assets created by employees/contractors and incorporated into builds); (3) The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies; (4) Designs and implementations of server meshing technology and distributed networking systems; (5) Proprietary Player versus Player risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems; (6) The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture; (7) Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools); (8) The event tool used to create open world events, wars, and caravan systems; (9) The implemented seasonal environmental systems as built into the engine; (10) The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic; (11) Class implementation logic and stat balancing systems as embodied in the Company's codebase; (12) Compiled builds, deployment pipelines, infrastructure configurations, and production environments. (Verified Compl. ¶ 25.)

Intrepid's intellectual property and trade secrets are not publicly known and derive independent economic value from their secrecy, as reflected by investor interest in Intrepid and revenue generated during the December 2025 Early Access release. (Verified Compl. ¶¶ 26, 30, 81.) Intrepid took extensive measures to protect this information, including strict confidentiality obligations for employees, mandatory nondisclosure agreements for contractors and vendors, and comprehensive internal access controls limiting trade-secret access to authorized personnel on a need-to-know basis. (*Id.* ¶¶ 27-29; Sharif Decl. ¶¶ 6–7, Ex. 1 § 2, Ex. 2 at 42-43.) These safeguards ensured that the intellectual property and trade secrets remained confidential and

accessible only to those with legitimate development responsibilities. (*Id.*)

Plaintiff initially funded Intrepid with his personal resources. (Verified Compl. ¶ 30.) In 2017, the Company raised approximately $3 million through a Kickstarter campaign, demonstrating early commercial value in its intellectual property and trade secrets that comprised *Ashes of Creation*. (*Id.*) Beginning in 2017, Intrepid took on debt financing, much of it personally guaranteed by Plaintiff and Moore, including a $6 million CommerceWest Bank loan in 2020 secured by all of the Company assets, including specifically its intellectual property. (*Id.* ¶ 32.)

A year later, in 2021, one of the Company's existing lenders introduced Plaintiff and the Company to claimed billionaire Robert Dawson as a potential lender. (*Id.* ¶ 33). From 2021 to 2025, Dawson continuously extended debt to the Company. Dawson was originally cooperative and supportive of Plaintiff's vision. (*Id.*)

### B. Dawson's Campaign of Control and Coercion

In late 2022 and early 2023, a major game developer expressed interest in acquiring Intrepid for hundreds of millions of dollars. (Verified Compl. ¶ 34.) Dawson persuaded Plaintiff to reject the offer and continue developing *Ashes of Creation* under Dawson's financing. (*Id.*) That offer crystallized for Dawson the magnitude of Intrepid's potential, after which he began aggressively seeking control of the Company to monetize value as quickly as possible, disregarding the complexities and extended timeframes of MMORPG development. (*Id.* ¶ 35.)

From early 2023 through May 2024, despite having agreed to finance operations, Dawson repeatedly held Plaintiff and the then-board hostage by threatening to withhold funding for employee payroll and health-insurance obligations days before payroll deadlines, to shut down the Company through litigation, and to cause Plaintiff financial ruin and physical harm, unless Plaintiff signed documents granting Dawson greater and greater amounts of equity and control, ultimately making him the majority shareholder. (*Id.* ¶ 36.)

### C.    Dawson, TFE, and the Dawson-controlled Board Execute a Wrongful Foreclosure to Steal Intrepid's Trade Secrets

On May 13, 2024, Dawson securitized his debt against all assets and all personal property of the Company, including its intellectual property and trade secrets. (Verified Compl. ¶ 44; Ex. B.) CommerceWest Bank, whose loan is also collateralized by all assets and personal property of the Company, including its intellectual property and trade secrets, holds a senior priority position to Dawson and all other lenders. (Verified Compl. ¶ 44; *id.* Exs. C, D.) Dawson knew or should have known of this senior lien because it is publicly available.

As majority shareholder, Dawson voted himself and his close business associate, Ryan Ogden, onto the board of directors. (Verified Compl. ¶ 45.) Dawson thereafter was elected Chairman of the Board and Ogden was elected CFO. (*Id.*) As majority shareholder, primary lender, and Chairperson, Dawson held both de jure and de facto control of the Company's finances and governance. (*Id.* ¶¶ 43, 45.) By August 2025, Dawson elected his close associates, Theresa Fette, also a Company creditor, and Aaron Bartels, to the board. (*Id.* ¶ 46.) Plaintiff also occupied a board seat and was Intrepid's CEO. (*Id.* ¶ 10.)

In or around September 2025, the Board directed that Intrepid undertake an Early Access launch of *Ashes of Creation* in partnership with the online gaming platform, Steam, owned by Valve Corporation ("Valve"). (*Id.* ¶ 49.) The Early Access launch occurred on December 11, 2025. (*Id.*) Ogden specifically assured CommerceWest Bank that the revenue owing to the Company from Valve under the revenue share agreement relating to the Steam Early Access launch would cover outstanding obligations on the CommerceWest Bank loan. (*Id.* ¶ 50.)

In 2025, the Board Defendants collectively devised a plan and agreement to take possession of Intrepid's assets via a wrongful Article 9 foreclosure process using Dawson's junior secured lien against Intrepid's assets. (*Id.* ¶ 51.) They intentionally planned to do so without providing proper and legally required notice to senior

secured lender CommerceWest Bank, and they intended to transfer Intrepid's assets to a new company created and controlled by Dawson, TFE Games Holdings LLC ("TFE"), in order to wipe out equity holders and prior creditors in Intrepid. (*Id.*) All of the Board Defendants, who are likely members of TFE, (*id.*), at all times acted in concert with one another and TFE, in furtherance of their agreement, (*id.* ¶¶ 143-147.) The Board Defendants also intended to lay off the vast majority of the Intrepid workforce without required wages, PTO, and severance because those obligations would remain with Intrepid, while bringing a proportion of the employee base over to TFE to finish development of the *Ashes of Creation* project in order to monetize it for their own personal benefit. (*Id.* ¶ 51.) This agreement was undertaken with the intent that TFE would take purported ownership of all of the Company's assets, including specifically the Company's intellectual property and trade secrets. (*Id.* ¶ 52.)

In furtherance of their wrongful foreclosure scheme, the Board Defendants deliberately allowed Intrepid to accumulate unpaid vendor and service-provider obligations in order to manufacture a default and justify an Article 9 foreclosure under Dawson's junior lien. (*Id.* ¶ 53.) Also in furtherance of the scheme, Dawson directed CFO Ogden to open bank accounts at Pathway Bank—which is controlled by Dawson—for TFE, the new entity created to receive the wrongfully foreclosed assets. (*Id.* ¶ 54.) Despite his prior assurances to CommerceWest Bank, Ogden attempted to divert to TFE's new Pathway Bank accounts the funds Valve owed to Intrepid for the Early Access release of the game on Steam ("Valve Funds"). (*Id.* ¶ 55.)

In advance of the wrongful foreclosure, and in furtherance of the Board Defendants' scheme to steal the Company's intellectual property and trade secrets, Ogden prepared a Company asset list on December 31, 2025. (Verified Compl. ¶ 60.) That list specifically references components of *Ashes of Creation* that comprise the Company's intellectual property and trade secrets. The list references: "*Ashes of Creation* Codebase" (e.g., the game design and other systems identified *supra* Section II.A. and in the Verified Complaint (¶ 25)); "Game content," (e.g., models for

characters, monsters, the environment, visual effects, text narrative, sound effects, and animations); "Customized Game Play: Audio Effects, Visual effects"; and "Other Special Effects." It also includes a list titled "from ChatGPT" that includes "Software & Game Code," (e.g., source code); "Game Engine & Technical Frameworks," (e.g., all tool or game code); "Gameplay Systems & Trade Secrets," (e.g., the systems and trade secrets identified *supra* Section II.A. and in the Verified Complaint (¶ 25)); and "Creative Content & Copyrighted Works." (Verified Compl. ¶ 60.)

Between January 3 and his resignation as both CEO and board member on January 19, 2026, Plaintiff repeatedly objected at numerous board meetings to the Board Defendants' foreclosure scheme, the attempted diversion of the Valve Funds to TFE, and plans to terminate large numbers of employees without paying wages owed, accrued PTO and severance. (Verified Compl. ¶ 61.)

On January 7, 2026, in advance of the wrongful foreclosure, and in furtherance of the Board Defendants' scheme to steal the Company's intellectual property and trade secrets, Dawson changed the secured party on his secured party financing statement from himself to TFE. (Verified Compl. ¶ 62; *id.* Ex. E.)

On January 16, 2026, Dawson caused Intrepid to declare default, on the one hand, and caused TFE to foreclose on the Company's assets, on the other hand. (Verified Compl. ¶ 65.) Dawson caused TFE to engage in a non-judicial disposition and private sale of Intrepid's assets to TFE. (*Id.*) Dawson, TFE, and the Board Defendants did not give notice to CommerceWest Bank, a senior secured creditor of Intrepid. (*See Id.* ¶¶ 64, 69.) Nor did they advertise the sale in industry-standard publications or platforms, involve a broker or auctioneer, or publish any marketing of the sale in any manner. (*Id.* ¶ 66.) The intellectual property and trade secrets of an MMORPG are not customarily sold on a recognized market, but Dawson, TFE, and the Board Defendants pursued a self-serving private sale anyway in violation of the California Commercial Code. (*Id.* ¶¶ 67, 113.) This self-interested transaction between Dawson, who controlled Intrepid, on the one hand, and Dawson, who

WITHERS
BERGMAN LLP

7

Case No. 3:26-cv-00965-LL-JLB

controlled TFE on the other hand, was completed at the specific design of Dawson and the Board Defendants, who blessed the sale for their own personal gain. (*Id.*) This foreclosure and disposition proximately and directly caused Intrepid harm in the form of the loss of its most valuable assets—its intellectual property and trade secrets—through a commercially unreasonable sale. (*Id.* ¶ 68.)

Dawson and the Board Defendants executed their agreement over Plaintiff's objections and in violation of the rights of senior secured creditors and other shareholders. (Verified Compl. ¶ 69.) Dawson performed the foreclosure in an intentionally clandestine manner, and he specifically ignored his counsel's advice that Dawson must provide notice to senior secured creditors, including CommerceWest Bank. (*Id.*)

**D.    Plaintiff Brings Suit to Enjoin the Theft of Intrepid's Trade Secrets and Intellectual Property**

On February 14, 2026, Plaintiff filed the instant suit, directly and derivatively on behalf of Intrepid, to prevent TFE's and the Board Defendants' misappropriation of Intrepid's core asset—its trade secrets and intellectual property—through the unlawful foreclosure. Plaintiff brings, among others, claims for trade secret misappropriation under both the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, *et seq.* and the California Uniform Trade Secret Act ("CUTSA"), Cal. Civ. Code §§ 3426, *et seq.*, and for violation of the California Commercial Code (the "Article 9 Claim"). (Verified Compl. ¶¶ 85-114.)

**E.    Defendants Continue to Pursue Intrepid's Intellectual Property through a Lawsuit in Nevada, Which is Not a Court of Competent Jurisdiction Over This Dispute**

Although TFE continues to wrongfully maintain it owns Intrepid's assets pursuant to the foreclosure and disposition, it does not have actual possession of most of Intrepid's assets because the Board Defendants wrongfully terminated all Intrepid employees who could give them that access. (Verified Compl. ¶¶ 71-72.) On February

WITHERS BERGMAN LLP

Case No. 3:26-cv-00965-LL-JLB

9, 2026, Defendant TFE filed suit in the District Court of Clark County Nevada, which lacks jurisdiction over both Plaintiff and relevant former employees, alleging, in part, that Plaintiff has "refused to turnover" certain Intrepid records to TFE as Intrepid's purported successor-in-interest, including "the account information for numerous Technology Platforms" and the passwords for those platforms. (Garman Decl., Ex. 1, ¶¶ 15, 17.) Crucially, certain of those Technology Platforms contain the very trade secrets and intellectual property at issue in this lawsuit. (Sharif Decl., ¶ 9, Ex. 3.)

Just last week, the Nevada court entered a mandatory temporary restraining order (the "Nevada TRO"), upon TFE's application, "restrain[ing] [Steven Sharif's purported agents] from withholding" records and passwords from TFE. (Garman Decl., Ex. 4 at 5.) As framed, the order, rather than simply maintaining the status quo, instead **compels** the purported agents to provide to TFE the records that include the passwords to platforms containing the trade secrets and intellectual property. In its application, TFE conveniently omitted that the records it seeks will provide it the keys to the intellectual property and trade secrets. (Garman Decl., Ex. 3.) Accordingly, the TRO does **not** order TFE to maintain the status quo once it obtains access to the accounts. (Garman Decl., ¶ 5, Ex. 4.) Thus, despite the ongoing dispute over the legality of Defendants' foreclosure and TFE's claimed ownership of Intrepid's intellectual property and trade secrets, TFE and Board Defendants are attempting to receive unfettered access to them, and to do so without any obligation to maintain the status quo with respect to those assets. Even if TFE were unable to obtain access to the intellectual property and trade secrets through the Nevada action, TFE, through its agents the Board Defendants, have been actively soliciting former Intrepid employees to obtain such access. (Verified Compl. ¶ 82; Sharif Decl. ¶ 10.)

This is especially problematic because Defendants are actively seeking to sell Intrepid's trade secrets and intellectual property. (Verified Complaint ¶ 82; Sharif Decl. ¶ 10.) In fact, TFE's counsel confirmed that TFE has already found at least one potential buyer who is willing to purchase *Ashes of Creation—i.e.*, its underlying

intellectual property and trade secrets—in the near term. (Garman Decl. ¶ 6.) Given the emergent nature of the situation, Plaintiff, on Intrepid's behalf, seeks a temporary restraining order from this Court enjoining Defendants from accessing, using, selling, dissipating, or distributing Intrepid's trade secrets and intellectual property.

The parties to TFE's lawsuit—which include only TFE, Steven Sharif, and John Moore—differ from the parties in the instant suit. Moreover, the Nevada action is not a trade-secret ownership case and does not protect Intrepid's trade secrets. It seeks turnover of books and records, including credentials and passwords, and proceeds on the assumption that TFE is entitled to whatever proprietary information it will ultimately access through that compelled production as Intrepid's purported successor-in-interest. But the Nevada TRO does not address Intrepid's trade secrets, does not adjudicate ownership of those trade secrets, and imposes no preservation or non-use restrictions once access is obtained. This case, by contrast, concerns the core dispute of who owns the trade secrets, and this TRO is necessary to preserve those trade secrets from irreparable dissipation before the Court can adjudicate ownership.

The order that Plaintiff seeks here would not undercut or prohibit compliance with the Nevada TRO, but rather it would maintain the status quo and prevent the imminent, irreparable harm and further misappropriation of Intrepid's intellectual property and trade secrets once Defendants obtain access to them.

**F.    Defendants Refused to Enter an Agreement Maintaining the Status Quo such that this Motion Could be brought on Notice**

In accordance with Federal Rule of Civil Procedure 65(b)(1)(B), Local Rule 83.3(g), and Rules 5 and 8 of this Court's Civil Chambers Rules, Plaintiff's counsel met and conferred with TFE's counsel on February 25, 2026 to suggest that the parties enter into a stipulation to maintain the status quo in the near term such that Plaintiff could bring a fully noticed motion for preliminary injunction, rather than for a temporary restraining order. (Garman Decl. ¶ 6.) To that end, Plaintiff's counsel proposed written terms of that agreement on February 27, 2026 and requested

WITHERS
BERGMAN LLP

10

Case No. 3:26-cv-00965-LL-JLB

Defendants' position by end of day February 28, 2026. (Garman Decl., Ex. 5.) Counsel has not substantively responded, (*id.;* Garman Decl. ¶ 6), thus necessitating this emergency motion.

## III.    **ARGUMENT**

Plaintiff seeks a narrow temporary restraining order maintaining the status quo by enjoining Defendants and any of their agents from accessing, using, selling, distributing, dissipating, or causing anyone to access, use, sell, dissipate or distribute Intrepid's trade secrets, including within any accounts or applications containing the trade secrets.[1]  Plaintiff seeks this order because Defendant TFE, in concert with the Board Defendants, is primed to take possession of the disputed intellectual property and trade secrets through the Nevada TRO and then to sell them. Plaintiff also requests appointment of a neutral intellectual-property custodian or escrow agent to hold and control, on a temporary and limited basis, the credentials, administrative privileges, and source-control access to the accounts, platforms, and repositories that contain Intrepid's trade secrets, for the sole purpose of preventing any access, use, sale, or dissemination of those trade secrets pending adjudication of the parties' ownership dispute. Plaintiff seeks this relief to prevent imminent, irreparable harm to Intrepid, and imminent further misappropriation of Intrepid's trade secrets.

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Consolidated Electrical Distributors, Inc. v. United Renewable Energy Co., Ltd.*, 717 F. Supp. 3d 970, 974 (S.D. Cal. 2024). A plaintiff must show he is "likely to succeed on the merits" of his claims, he is "likely to suffer irreparable harm" absent a temporary restraining order, that the "the balance of [the] equities" tip in Plaintiff's favor, and that a temporary restraining order "is in

---

[1] The requested relief does not require any turnover, any operational interference, any ownership determination, or any restriction on access records or platforms that do not impact the trade secrets.

the public interest." *Matsumoto v. Labrador*, 122 F.4th 787, 804 (9th Cir. 2024). Plaintiff meets that standard here. Moreover, at a minimum, Plaintiff has demonstrated "that serious questions going to the merits" of this case have been "raised," and that "the balance of hardships tips sharply" in the favor of Plaintiff on Intrepid's behalf. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-1135 (9th Cir. 2011).

### A.   This Court Should Exercise Jurisdiction because *Colorado River* Abstention is not Applicable

At the outset, Defendants cannot invoke *Colorado River* based on the Nevada Action to sidestep this Court's jurisdiction because the actions are not sufficiently parallel and do not seek the same relief. *Colorado River* abstention applies only in "exceptional circumstances" involving truly parallel litigation where abstention would promote "wise judicial administration." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-818 (1976). Here, no such exceptional circumstances exist as the two actions lack direct parallelism. First, the two cases do not involve the same parties, and this lawsuit involves the broadest set of related parties. Moreover, the Nevada court appears to lack jurisdiction over Mr. Sharif and Mr. Moore, as well as Intrepid's former employees whom the Nevada TRO seeks to bind. Second, the claims alleged in each case are distinct, as described *supra* Section II.E., and the claims before this Court are broader and predicate: the Nevada action merely presumes TFE is the owner of Intrepid's assets and brings state claims on that basis; this action seeks affirmative adjudication of that core question—a question subject to the *California* Commercial Code. This Court is also best suited to adjudicate Plaintiff's federal and California trade secret claims. Abstention in this matter, therefore, would result in only a piecemeal resolution in Nevada, which is counter to judicial efficiency. *See AEG Holdco LLC v. Vazquez*, 2021 WL 4859975, at *7-8 (C.D. Cal. Sept. 22, 2021) (holding that *Colorado River* abstention was improper because the state and federal actions were not parallel, as the state case

12

would resolve only a non-compete issue and would not adjudicate trade-secrets claims or independent contractual claims involving additional parties).

### B. Plaintiff, on Intrepid's Behalf, is Likely to Succeed on his Article 9 and Trade Secret Misappropriation Claims

Plaintiff is likely to succeed on his underlying claims, thus supporting the grant of a temporary restraining order. The Ninth Circuit has "long recognized that likelihood of success on the merits is the most important factor" for granting a preliminary injunction or, here, a temporary restraining order. *Matsumoto*, 122 F.4th at 804.

### 1. *Plaintiff is Likely to Succeed on his Article 9 Claim*

Plaintiff is likely to succeed in demonstrating that TFE's and the Board Defendants'[2] purported Article 9 foreclosure violated numerous statutory rules, thus entitling Intrepid to a permanent injunction against TFE. TFE maintains it owns Intrepid's assets—including Intrepid's intellectual property and trade secrets—based on a foreclosure under Article 9 of the Uniform Commercial Code. But TFE and the Board Defendants blatantly flouted the requirements for an Article 9 foreclosure and related disposition, as codified in California Commercial Code § 9101 *et seq*., and the transfer should therefore be enjoined. Cal. Com. Code § 9625(a) ("If it is established that a secured party is not proceeding in accordance with this division, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions.").

Under California Commercial Code § 9611, Defendant TFE, as a secured party, was required to "send a signed notification of disposition" of any of Intrepid's assets

---

[2] The Board Defendants and TFE collectively engaged in a civil conspiracy to misappropriate and disclose Intrepid's trade secrets and to use those trade secrets for their benefit, posing the risk of imminent and irreparable harm to Intrepid. (Verified Compl. ¶¶ 143-147.) Therefore, preliminary injunctive relief is proper as to all Defendants and any parties operating under their control.

to, among others, (1) the debtor and (2) "[a]ny other secured party" in the collateral. Cal. Com. Code § 9611(c). Notably absent from Defendants' Notice of Disposition of Collateral at Private Sale, (*see* Garman Decl., Ex. 3 at PDF pp. 25-26), is: (1) the debtor itself (Intrepid), and (2) CommerceWest Bank, the senior secured lienholder. This omission was no mistake. Defendant Dawson specifically ignored advice from his counsel that he needed to notify CommerceWest Bank, (Verified Compl. ¶ 69), because doing so would have likely foiled his takeover plan. Defendants deliberately disregarded this statutory notice requirement intended to protect interested parties and ensure a fair and lawful disposition of collateral.

The inequities resulting from Defendants' failure to provide notice to CommerceWest Bank are illustrated by Defendants' self-interested disposition of Intrepid's assets, which was not commercially reasonable. California Commercial Code § 9610(b) required TFE, as secured lienholder, to pursue "[e]very aspect of [its] disposition of collateral" in a "commercially reasonable" manner, including, the "method, manner, time, place, and other terms" of any disposition. TFE did not do so. Instead, in concert with the Board Defendants, it purported to conduct a clandestine fire sale of Intrepid's assets to itself. (*See* Verified Complaint ¶ 68 ("TFE obtained Intrepid's assets via a self-interested transaction between Dawson, who controlled Intrepid on the one hand, and Dawson, who controlled TFE on the other hand.").) A sale fails the "commercially reasonable" test when it is "not made between two sophisticated parties, but between [the selling party] and itself." *Gemcap Lending I LLC v. Crop USA Insurance Agency Inc.*, 2015 WL 12746212, at *7 (C.D. Cal. Aug. 17, 2015). A sale further fails that test when the selling party "appears to have provided notice of the sale in a way that was calculated to reach only" itself and aligned parties, but not "other potential bidders" of which the seller "was aware." *Id.* As discussed above, TFE in concert with the Board Defendants conveniently omitted (1) the senior secured party, CommerceWest Bank, and (2) the debtor itself from the notice of its disposition. (Verified Compl. ¶ 69; Garman Decl., Ex. 3 at PDF p. 26.)

They also failed to advertise the sale in industry-standard publications or platforms, and they did not involve a broker or auctioneer or publish any marketing of the sale in any manner, (Verified Compl. ¶ 66), which is further evidence that the sale was not commercially reasonable. *See Ford & Vlahos v. ITT Commercial Finance Corp.*, 8 Cal. 4th 1220, 1229 (Cal. 1994) (en banc) ("A dealer in the type of property repossessed here—a valuable airplane—surely would advertise its auction in the relevant market by, for example, informing brokers, placing reasonably prominent announcements in recognized trade journals, or contacting individuals or entities known to be seeking an airplane of the type for sale."). Plaintiff is, therefore, likely to succeed on his Article 9 claim because TFE's and the Board Defendants' self-interested disposition was not commercially reasonable in violation of California Commercial Code § 9610.

Additional California Commercial Code provisions support that the disposition here was commercially unreasonable and, thus, unlawful. California Commercial Code § 9610(c)(2), for example, allows a "secured party" to "purchase collateral" "[a]t a private disposition" only if the "collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotation[s]." Cal. Com. Code § 9610. A "'recognized market' is 'a market[] in which there are standardized price quotations for property that is essentially fungible, such as stock exchanges.'" *Ascentium Capital LLC v. Littell*, 583 F. Supp. 3d 1234, 1238 (W.D. Mo. 2022) (quoting Cal. Com. Cod § 9627 cmt. 4)). Of course, the trade secrets and other intellectual property related to a groundbreaking MMORPG video game are not fungible assets that are sold at a standardized price. (Sharif Decl. ¶ 4.) The manner of sale itself, therefore, violates the California Commercial Code, further demonstrating Plaintiff's likelihood of success on his Article 9 claim.

Additionally, California Commercial Code § 9627(b) identifies three factors relevant to commercial reasonableness, none of which is present here. First, a disposition can be commercially reasonable if "[i]t is made in the usual manner on

15

any recognized market." *Id.* The private sale from an entity (TFE) to itself, especially when that entity failed to provide notice to multiple interested parties, is not the usual manner of the sale of trade secret and intellectual property rights associated with MMORPGs. (Sharif Decl. ¶ 5; Verified Compl. ¶ 112.) Second, a disposition can be commercially reasonable if "[i]t is made at the price current in any recognized market at the time of disposition." Cal. Com. Code § 9627(b)(2). The evidence will undoubtedly show that TFE, and by extension the Board Defendants, did not charge themselves a price that comports with the value of Intrepid's assets as part of the sale. Third, a disposition can be commercially reasonable if it "is made otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." *Id.* Selling valuable intellectual property rights to oneself does not conform to the reasonable practices for sale of assets in the MMORPG or video game market. (Sharif Decl. ¶ 5.)

For these reasons, Plaintiff is likely to succeed on his Article 9 claim based on TFE's and the Board Defendants' numerous violations of California Commercial Code §§ 9101, *et seq.*

2.      *Plaintiff is Likely to Succeed on his DTSA and CUTSA Claims*

Plaintiff is also likely to succeed on his DTSA and CUTSA claims because (1) Intrepid owned trade secrets that formed the core of the video game *Ashes of Creation*, including proprietary source code and other assets; (2) those trade secrets generated substantial economic value through investments and consumer interest; (3) Intrepid protected those trade secrets through robust internal controls and contractual agreements; (4) Defendants misappropriated those trade secrets through an unlawful Article 9 foreclosure and disposition; and (5) the misappropriation has harmed Intrepid.

DTSA and CUTSA claims are commonly "analyzed … together because the elements are substantially similar." *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "To succeed on a claim for misappropriation under

the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657-658; *see also Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907 (N.D. Cal. 2023) (identifying ownership of trade secret, misappropriation by defendant, and damage to plaintiff as elements for both DTSA and CUTSA claim).[3] Plaintiff is likely to prove each element.

*First*, Plaintiff is likely to demonstrate that Intrepid owned and possessed trade secrets. "[T]he definition of what may be considered a 'trade secret' is broad" and generally encompasses a broad range of "information … that is valuable because it is unknown to others" and "that the owner has attempted to keep secret." *InteliClear*, 978 F.3d at 657. Plaintiff has identified with particularity numerous pieces of information related to *Ashes of Creation* that constitute trade secrets, including but not limited to those identified *supra* Section II.A.

Plaintiff has also demonstrated that Intrepid's trade secrets, which relate to *Ashes of Creation*, provide significant economic value. Those trade secrets sit at the core of the game and are the key reason Intrepid obtained investment in the game's development (including the approximately $3 million raised in a Kickstarter campaign and loans for which intellectual property—including the trade secrets— served as collateral). (Verified Compl. ¶¶ 30, 32.) The trade secrets were also necessarily integral to the revenues generated from *Ashes of Creation*'s Early Access launch on the Steam platform, which featured an unusually high Day 30 player retention rate of approximately 76%. (*Id.* ¶ 24.)

Courts routinely find that confidential and proprietary source code and algorithms, including those related to video games, constitute trade secrets that

---

[3] The DTSA requirement that the trade secret be "related to a product or service used in … interstate or foreign commerce" is met. 18 U.S.C. § 1836(b)(1). The trade secrets relate to *Ashes of Creation*, which was offered globally via the Steam platform. (Verified Compl. ¶¶ 49, 92.)

provide economic value to their owners. *See, e.g.*, *Lilith Games (Shanghai) Co. Ltd. v. UCool, Inc.*, 2015 WL 5591612, at *9 (N.D. Cal. Sept. 23, 2015) ("Here, it cannot be questioned that Lilith derives independent economic value from *Sword and Tower* and by extension its protected source code."); *Implicit Conversions, Inc. v. Stine*, 2024 WL 4112335, at *1, *9 (N.D. Cal. Sept. 6, 2024) (finding that "source code and software tools" that form the "backbone" of "proprietary video game emulator" were "sufficient to show" possession of trade secret at the preliminary-injunction stage); *Xsolla (USA), Inc. v. Aghanim, Inc.*, 2024 WL 4139615, at *5-6 (C.D. Cal. Sept. 10, 2024) (finding allegations of trade secrets involving "research, development, testing, algorithms, specifications, and applications" related to "back-end technologies and information" and "internal, proprietary information" described trade secrets with particularity on motion to dismiss). Intrepid's trade secrets, which are the subject of this lawsuit, are back-end processes, algorithms, and source code that drive *Ashes of Creation*, (Verified Compl. ¶ 25), that fit squarely within the type of information protectable as trade secrets.

Plaintiff has also demonstrated that Intrepid took significant efforts to keep its trade secrets secret. The employment agreements for Intrepid employees and Intrepid's company handbook contained strict confidentiality provisions and only allowed access to trade-secret information on a need-to-know basis, with authorization from a supervisor. (Verified Compl. ¶ 27; Sharif Decl., Ex. 1 § 2; *id.* Ex. 2 at 42-44.) Intrepid similarly ensured that contractors and third-party vendors necessary to the business were subject to non-disclosure agreements or other contractual confidentiality provisions to protect secrecy. (Verified Compl. ¶ 28.) And Intrepid enacted robust internal access controls, including private, permission-based systems for each category of trade secret to restrict access to those in specific roles on a need-to-know basis, to further protect the trade secrets. (*Id.* ¶ 29.) "Reasonable efforts to maintain the secrecy of certain information include limiting access to the information, advising employees of the existence of a trade secret, requiring

employees to sign nondisclosure agreements, and keeping secret documents under lock." *Lilith Games*, 2015 WL 5591612, at \*9. Intrepid undertook precisely those efforts and implemented precisely those forms of security to protect its trade secrets here.

*Second*, Plaintiff is likely to demonstrate that TFE, in concert with the Board Defendants, have misappropriated Intrepid's trade secrets. Under both the DTSA and CUTSA, a party misappropriates a trade secret if it "improperly acquire[s], disclose[s], or use[s] the trade secret." *Beluca Ventures*, 660 F. Supp. 3d at 910. TFE, in concert with the Board Defendants, has purported to acquire and "sell … at a private sale" all Intrepid assets, including "intellectual property" and "software" (i.e., Intrepid's trade secrets) "pursuant to the terms of Section 9601 *et seq.* of the Uniform Commercial Code." (Garman Decl., Ex. 3 at PDF pp. 25-26.) But as discussed *supra* Section III.B.1, TFE's and Board Defendants' purported foreclosure and disposition of Intrepid's assets—including its trade secrets—were tainted through blatant violations of California Commercial Code §§ 9101, *et seq.* TFE, therefore, improperly acquired Intrepid's trade secrets by virtue of the unlawful disposition, satisfying the requirements for misappropriation. *See* § 1. Definitions., Unif. Trade Secrets Act § 1 (misappropriation occurs when a trade secret is acquired through improper means).

*Third*, Plaintiff is likely to demonstrate that the misappropriation has caused, and will continue to cause, Intrepid harm. Intrepid is harmed by the primary misappropriation via the unlawful foreclosure because Intrepid has been stripped of its primary asset—the trade secrets and intellectual property that underlie Intrepid's main product: *Ashes of Creation*. *See. North Atlantic Instruments Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (stating that "'loss of trade secrets cannot be measured in money damages' because '[a] trade secret once lost is, of course, lost forever'"). The Nevada TRO, which purports to compel certain former Intrepid employees to provide TFE with access to platforms containing the trade secrets, puts the trade secrets at even greater risk. Once TFE and Board Defendants obtain possession of the trade

19

secrets, they can sell or otherwise dissipate them, as they have been threatening to do. (Verified Compl. ¶ 82; Sharif Decl. ¶ 10.) Indeed, that is exactly what Defendants are poised to do—TFE's counsel represented that TFE has already procured at least one potential partner who is poised to buy Intrepid's trade secrets and intellectual property assets in the near term. (Garman Decl. ¶ 6.) Consummation of such a sale would make the harm Intrepid has already experienced from the unlawful foreclosure and sale irreversible.

*    *    *

Plaintiff is likely to succeed on both his Article 9 claim and his trade secrets misappropriation claims, thus warranting temporary and/or preliminary injunctive relief. Given Plaintiff's likelihood of success, he has also raised serious questions as to the merits of its suit. *See Bemis Company Inc. v. Summers*, 2019 WL 1004853, at *4 & n.1 (E.D. Cal. Feb. 28, 2019) (requiring plaintiff only show "that there are serious questions as to the merits" in granting TRO).

### C.    Intrepid Will Be Irreparably Harmed Through Irreversible Loss of Its Trade Secrets Without a Temporary Restraining Order or Preliminary Injunction

Intrepid will be irreparably harmed by Defendants' imminent and ongoing efforts to access, use, and sell the trade secrets they misappropriated from Plaintiff via the unlawful Article 9 foreclosure. Misappropriation of a trade secret has long been viewed as a paradigmatic irreparable injury warranting preliminary injunctive relief. *See, e.g.*, *Gallagher Benefits Services, Inc. v. De La Torre*, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007), *aff'd in relevant part*, 283 F. App'x 543 (9th Cir. 2008) ("In general, the imminent use of a trade secret constitutes irreparable harm"); *Teleflora, LLC v. Florists' Transworld Delivery, Inc.*, 2004 WL 1844847, at *6 (N.D. Cal. Aug. 18, 2004) ("Use or disclosure of trade secrets is an irreparable harm which will support the granting of a preliminary injunction."). While Plaintiff recognizes that a strict *presumption* of irreparable harm from misappropriation of trade secrets

likely has not survived the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), *see Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1208 (E.D. Cal. 2020), it is still true that misappropriation of trade secrets is likely to cause the types of harm that courts have found as irreparable, so long as those harms are demonstrated through a factual showing, *see id.* (finding plaintiff had "met its burden of showing a likelihood of irreparable harm" "[e]ven without relying on the presumption").

Here, the factors demonstrating irreparable harm are readily apparent. TFE already wrongfully claims legal ownership and is further poised to take actual possession of Intrepid's trade secrets and intellectual property, despite the ongoing ownership dispute. This is clear in light of the Nevada TRO, which purports to compel former Intrepid employees to turnover passwords to accounts that house Intrepid's trade secrets and intellectual property. (Garman Decl. Ex. 4; Sharif Decl. ¶ 9.) Absent immediate injunctive relief, there is an imminent and "ever-present danger" that TFE, in concert with the Board Defendants, can use, sell, dissipate, or disclose Intrepid's trade secrets "wholly at [their] whim." *Waymo LLC v. Uber Technologies, Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017). Indeed, Defendants are already trying to sell *Ashes of Creation*, and necessarily, the trade secrets that comprise it, (Verified Complaint ¶ 82), and have already lined up at least one buyer for the game and its trade secrets. (Garman Decl. ¶ 6.) Trade secrets must, of course, remain secret; disclosure to one or more parties as part of Defendants' fire sale efforts substantially risks destroying the trade secrets entirely. *See Waymo*, 2017 WL 2123560, at *11 ("It would likely be futile to attempt, after the fact, to estimate the monetary value of injury suffered either from the loss of Waymo's competitive position … or the destruction of its trade secrets… . Monetary damages would thus be unavailable to compensate for the irreparable harm threatened here."). Should this Court refrain from issuing an order requiring TFE and the Board Defendants to maintain the status quo and prevent them from accessing, using, selling, dissipating or distributing Intrepid's

trade secrets, "it may"—and likely would—"prove impossible to fully restore the parties to their respective competitive positions as if no misappropriation had occurred," and Intrepid stands to be irreparably harmed. *Id.*

Even if Defendants do not sell the trade secrets but merely use them to finish the game themselves and make it available to consumers while this ownership dispute is pending, Intrepid will have lost over a decade of work on *Ashes of Creation*, thus causing Plaintiff significant and irreparable competitive harm. *See Cutera*, 444 F. Supp. 3d at 1209 (evidence that competitor "will continue to use the information without an injunction" demonstrates that plaintiff "will suffer competitive harm" justifying temporary restraining order).

Defendants' actions have had and will, if not enjoined, continue to cause irreparable harm to Plaintiff's goodwill within the gaming community. *See Stuhlbarg International Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."). Already, Defendants' actions in seizing Plaintiff's trade secrets through the purported foreclosure, which caused an ostensible shut down of Intrepid, (Verified Complaint ¶¶ 65-72), have caused significant damage to Intrepid's reputation within the gaming community, generating substantial backlash and leading to numerous refund requests for the Early Access version of *Ashes of Creation* Intrepid launched on Steam. (Verified Compl. ¶ 81; Sharif Decl. ¶ 8.) Should TFE and Board Defendants either sell Intrepid's trade secrets or launch *Ashes of Creation* under a different marquee—both of which would permanently strip Intrepid of its primary asset—the damage to Intrepid's goodwill would be irreparable.

Finally, Defendants' misappropriation of Intrepid's trade secrets and intellectual property is likely to destroy Intrepid's business, causing irreparable harm absent injunctive relief. Intrepid's trade secrets and intellectual property, which comprise *Ashes of Creation*, are its primary valuable assets. Without those assets,

22

Intrepid has all but shuttered, (*see* Verified Compl. ¶¶ 71-73 (describing mass layoffs)), and the company has no ostensible value. A "substantial loss of business and perhaps even bankruptcy" is the type of injury that "meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *see also Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 719 (4th Cir. 2021) ("The permanent loss of a business, with its corresponding goodwill, is a well-recognized form of irreparable injury."). Injunctive relief preventing Defendants from wrongfully misappropriating Plaintiff's trade secrets leaves open the possibility that—if the Court determines Intrepid is the rightful owner of the trade secrets—Intrepid can rebuild and bring *Ashes of Creation* to market. In contrast, if Defendants' scheme is allowed to persist, even in the interim, Intrepid will lose all chance of continuing as a going concern, a paradigmatic irreparable injury.

For these reasons, Intrepid will be irreparably harmed absent immediate injunctive relief.

### D. The Balance of the Equities Supports Issuing a Temporary Restraining Order and Preliminary Injunction

The balance of the equities supports immediate injunctive relief to prevent Defendants from further accessing, using, selling, dissipating, or distributing Intrepid's trade secrets, which Defendants have already misappropriated through the unlawful Article 9 foreclosure and sale. "An injunction will prevent [Defendants] from using any misappropriated information and thereby minimize the competitive harm suffered by [Plaintiff] as a result." *Cutera*, 444 F. Supp. 3d at 1209. As discussed above, Defendants are actively seeking to sell Intrepid's trade secrets based on TFE's false ownership claims. (Verified Complaint ¶ 82; Garman Decl. ¶ 6.) Plaintiff is likely to succeed in demonstrating that Defendants misappropriated Intrepid's trade secrets and Plaintiff stands to be irreparably injured from any sale of those trade secrets to a third party or use by TFE to bring the game to market. In contrast,

Defendants cannot claim hardship should they be enjoined from exploiting trade secrets they do not legally own and should not possess. *See Farmers Ins. Exchange v. Steele Ins. Agency, Inc.*, 2013 WL 2151553, at *14 (E.D. Cal. May 16, 2013) ("Courts have found that the balance of hardships tips in favor of a plaintiff seeking an injunction which would 'merely prohibit [the d]efendants from misappropriating the trade secrets of [the p]laintiff.'").

Moreover, Defendants cannot demonstrate a compelling need to immediately use or access Intrepid's trade secrets. Although Defendants may assert they need imminent access to records and platforms to purportedly wind down Intrepid's affairs, that argument is wrong for two reasons. First, as described *supra* Section III.B.1, TFE is not the rightful owner of any of Intrepid's assets. Second, and crucially, Defendants have no need for the limited category of *trade secret* assets to engage in routine bookkeeping, accounting, or wind down affairs, or to effectuate their (unlawful) attempt to summarily fire the vast majority of Intrepid's staff without pay, benefits, or access to their retirement funds. While Plaintiff maintains that Defendants' entire endeavor is unlawful, this motion is limited specifically to prevent Defendants' access, use, sale, or dissemination of the trade secret assets. The only reason Defendants could need the trade secrets specifically is to use or sell (*i.e.*, to misappropriate) those assets in violation of the law, causing irreparable harm.

Accordingly, the balance of the equities strongly supports Plaintiff.

### E.    A Temporary Restraining Order and Preliminary Injunction Are in the Public Interest

Granting injunctive relief here also serves the public interest. "[T]he public has an interest in vindicating intellectual property rights." *Waymo*, 2017 WL 2123560, at *11. That interest will be served by preventing Defendants from misappropriating and unlawfully selling or using Intrepid's intellectual property and trade secrets.

\*    \*    \*

For the above reasons, the Court should issue a temporary restraining order

enjoining Defendants, as well as any of their agents, from accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute the trade secrets, including through accounts or applications containing the trade secrets.

### F.   Appointment of a Neutral IP Custodian is Necessary to Preserve the Status Quo and Prevent Irreparable Harm

Plaintiff respectfully requests that the Court order the appointment of a neutral intellectual-property custodian or escrow agent for the limited purpose of safeguarding Intrepid's trade secrets pending adjudication on the merits of the parties' ownership dispute. Specifically, the custodian would hold and control credentials and access keys only, such as passwords, administrative privileges, and source-control access, to the platforms, repositories, and systems that house Intrepid's trade secrets, as identified in Exhibit 3 to the Sharif Declaration, would ensure continued operation of those platforms as necessarily to preserve the intellectual property resident thereon, and would ensure that no party accesses, uses, sells, or disseminates those trade secrets absent further order of the Court. This narrowly tailored relief falls squarely within the Court's equitable authority under Federal Rule 65 and its inherent power to fashion remedies necessary to preserve disputed property and maintain the status quo. This relief would prevent the irreversible loss or misuse of trade secrets during the pendency of this action, particularly where Defendants are poised, through collateral proceedings, to obtain access to the very assets they claim to own and are actively seeking to sell. Because trade secrets derive their value from secrecy, and because disclosure or use would permanently destroy that value, a neutral custodial arrangement is the least intrusive and most effective means of ensuring that this Court's ultimate judgment is not rendered meaningless by interim misappropriation

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant his motion for a temporary restraining order and/or preliminary injunction and appointment of a neutral intellectual-property custodian or escrow agent.

DATED:  March 2, 2026                    RESPECTFULLY SUBMITTED,


By:   */s/ Jessica Nall*

Jessica Nall (SBN 215149)
Jessica.Nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Leslie Evans (SBN 173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone:  619.329.6454

Jordan W. Garman (*pro hac vice* pending)
Jordan.Garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone:  212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*