# EXHIBIT 1

| **From:** | Garman, Jordan |
| **Sent:** | Thursday, March 5, 2026 12:37 PM |
| **To:** | samid@nvfirm.com |
| **Cc:** | Samuel A. Schwartz; Emily Anderson; Susan Roman; Jason Thomas; LaVigne, Christopher; Nall, Jessica |
| **Subject:** | Sharif v. Dawson et al. - 3:26-cv-00965-LL-JLB (S.D. Cal.) |
| **Attachments:** | Sharif TRO Order.pdf |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | samid@nvfirm.com | | |
| | Samuel A. Schwartz | | |
| | Emily Anderson | | |
| | Susan Roman | | |
| | Jason Thomas | | |
| | LaVigne, Christopher | Delivered: 3/5/2026 12:37 PM | Read: 3/5/2026 4:20 PM |
| | Nall, Jessica | Delivered: 3/5/2026 12:37 PM | Read: 3/5/2026 12:38 PM |

Counsel,

Please find attached a Temporary Restraining Order issued by the Court in the above captioned matter. We will be in touch shortly with respect to the requirement to jointly propose an IP Custodian.

Best,
Jordan

**Jordan Garman**
Partner
Dispute Resolution
t +1 617 613 9705
withersworldwide.com | my profile

Withers Bergman LLP
100 Federal Street, Suite 1902, Boston, MA 02110*
430 Park Avenue, 10th Floor, New York, New York 10022-3505



Singapore: where successful businesses and families thrive

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., | Case No.:  26cv965-LL-JLB |
| Plaintiff, | **ORDER GRANTING EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | [ECF No. 10] |
| ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDINGS LLC, | |
| Defendants, | |
| And | |
| INTREPID STUDIOS, INC., | |
| Nominal Defendant. | |

Before the Court is Plaintiff Steven Sharif's Ex Parte Motion for Temporary Restraining Order ("Motion"). ECF No. 10. Plaintiff's counsel attests to meeting and confer with counsel for TFE Games Holdings LLC ("TFE") on February 25, 2026 to discuss this Motion, and to serving the Motion via email to TFE's counsel on March 3,

1

2026.[1] ECF No. 10-6, Declaration of Jordan W. Garman ("Garman Decl."), ¶ 6; ECF No. 18 ¶ 3. Having reviewed the Motion and the record, the Court **GRANTS** the Motion.

## I.      BACKGROUND

The following factual allegations are from Plaintiff's verified complaint [ECF No. 1], which includes claims of misappropriation of trade secrets and violation of section 9610 of the California Commercial Code, and declarations in support of the Motion.

Plaintiff is a co-founder and former CEO of Intrepid Studios, Inc. ("Intrepid") who served on its board of directors from the company's inception in 2015 until his resignation on January 19, 2026. ECF No. 10-2, Declaration of Steven Sharif ("Sharif Decl."), ¶ 1; ECF No. 1 ¶ 22. Plaintiff invented or was directly involved in creating Intrepid's most valuable assets: its intellectual property and trade secrets developed for its Massively Multiplayer Online Role Playing Game (MMORPG) *Ashes of Creation*. ECF No. 1 ¶¶ 1, 10.

Intrepid's intellectual property and trade secrets ("Trade Secrets Materials") include the following:

        a. Audio/visual effects;
        b. Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (i.e., production assets created by employees/contractors and incorporated into builds);
        c. The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;
        d. Designs and implementations of server meshing technology and distributed networking systems;
        e. Proprietary Player versus Player risk-reward scaling algorithms

---

[1] Plaintiff's counsel attests that TFE's counsel's firm obtained waivers of service on behalf of the remaining defendants, and so believes they have received notice of this Motion through TFE's counsel. ECF No. 18 ¶ 3.

and conditional reward-modification logic implemented within the combat and flagging systems;

f. The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

g. Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

h. The event tool used to create open world events, wars, and caravan systems;

i. The implemented seasonal environmental systems as built into the engine;

j. The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

k. Class implementation logic and stat balancing systems as embodied in the Company's codebase;

l. Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

ECF No. 1 ¶ 25.

Intrepid began acquiring debt financing in 2017, much of which Plaintiff and his co-founder and husband John Moore personally guaranteed. *Id.* ¶¶ 22, 32. In 2020, Intrepid acquired a $6 million loan from CommerceWest Bank pursuant to the Federal Reserve's Main Street Lending Program. *Id.* ¶ 32. The loan was personally guaranteed by Moore and was collateralized by all of Intrepid's assets, including its Trade Secrets Materials. *Id.*

From 2021 to 2025, Defendant Richard Dawson became a lender for Intrepid and continuously extended debt to the company. *Id.* ¶ 33. Plaintiff alleges that Dawson was able to gain greater amounts of equity and control by coercion such as threatening to withhold financing for payroll days before payroll deadlines. *Id.* ¶¶ 36–37. Dawson eventually became the majority shareholder of Intrepid and remained the primary provider of "crucial debt financing." *Id.* ¶ 43.

In May 2024, Dawson securitized his debt against all assets and all personal property of Intrepid, including intellectual property, which includes the Trade Secrets Materials. *Id.* ¶ 44. Lenders that hold senior priority positions to Dawson are the Small Business

26cv965-LL-JLB

Administration and CommerceWest Bank. *Id.* Plaintiff alleges that Dawson knew or should have known of these senior liens because they are publicly available. *Id.*

Dawson voted himself and Ryan Ogden, his close business associate, onto the board of directors. *Id.* ¶ 45. In September 2024, the board appointed Dawson as Chairman of the Board and Ogden as CFO. *Id.* Plaintiff ceased to have access to active company bank accounts after Dawson directed Ogden to open new bank accounts for Intrepid at Pathway Bank. *Id.* By August 2025, Dawson elected to the Board close associates Theresa Fette, who was also a substantial creditor to Intrepid, and Aaron Bartels. *Id.* ¶ 46.

In December 2025, Intrepid partnered with online gaming platform Steam, owned by Valve Corporation ("Valve"), to do an early access launch of *Ashes of Creation. Id.* ¶ 49. Plaintiff alleges that Ogden assured CommerceWest Bank that the revenue from the early access launch owed to Intrepid would cover outstanding obligations on CommerceWest Bank's loan. *Id.* ¶ 50.

In 2025, Dawson, Ogden, Fette, and Bartels (collectively the "Board Defendants") devised a plan to take possession of Intrepid's assets "via a wrongful Article 9 foreclosure process" using Dawson's junior secured lien to declare default, without providing legally required notice to senior secured lenders, so that they could transfer Intrepid assets to TFE—the new company created and controlled by Dawson—"and wipe out equity holders and prior creditors in Intrepid." *Id.* ¶¶ 51–53, 63. Plaintiff unsuccessfully tried to convince the Board to abandon its foreclosure scheme, and on January 15, 2026, he informed senior secured lender CommerceWest Bank of the plan. *Id.* ¶¶ 56–64.

On January 16, 2026, Dawson caused Intrepid to declare default, and caused TFE to foreclose on Intrepid's assets and engage in a private sale as a non-judicial disposition. *Id.* ¶ 65. The Board Defendants and TFE did not advertise the sale in industry-standard publications or platforms, or involve a broker or auctioneer, and did not publish any marketing of the sale in any manner. *Id.* ¶ 66.

After CommerceWest Bank learned of the wrongful foreclosure and contacted Valve to intercept the funds due to Intrepid from its early access launch, the Board Defendants

26cv965-LL-JLB

caused Intrepid to terminate all Intrepid employees in violation of the federal WARN Act and California's WARN Act. *Id.* ¶¶ 71–73. On February 3, 2026, Valve terminated Intrepid's partnership with Steam. *Id.* ¶ 81.

TFE and Board Defendants are soliciting former employees to provide them access to *Ashes of Creation*, along with its intellectual property and Trade Secrets Materials, and attempting to sell *Ashes of Creation*, along with its intellectual property and Trade Secrets Materials—"the lifeblood of the Company and key to the value of shares owned by Sharif and the Derivative Shareholders"— to competitor game developers in order to recoup their own investments. *Id.* ¶ 82.

On February 14, 2026, Plaintiff filed a complaint alleging derivative and direct claims against Defendants for violations of the Defend Trade Secrets Act (DTSA) and California's Uniform Trade Secrets Act (CUTSA), violation of section 9101 *et seq.* of the California Commercial Code ("Article 9 claim"), as well as other claims. ECF No. 1. On March 2, 2026, Plaintiff filed the instant Motion for a temporary restraining order and order to show cause why a preliminary injunction should not issue that (1) enjoins Defendants and their agents from "accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute Intrepid's trade secrets, including any accounts or applications containing the trade secrets," and (2) appoints "a neutral intellectual-property custodian or escrow agent to hold and control, on a temporary and limited basis, the credentials, administrative privileges, and source-control access to the accounts, platforms, and repositories that contain Intrepid's trade secrets, for the sole purpose of preventing any access, use, sale, or dissemination of those trade secrets pending adjudication of the parties' ownership dispute." ECF No. 10 at 2.

## II. LEGAL STANDARD

The purpose of a temporary restraining order (TRO) is to preserve the status quo and prevent irreparable harm until a preliminary injunction may be held. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974). The legal standard for a TRO and a preliminary injunction is "substantially

26cv965-LL-JLB

identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The party seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *City & Cty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In the Ninth Circuit, the court may apply a sliding scale test in which "serious questions going to the merits" and a balance of hardships that tips sharply toward the moving party can support the issuance of a preliminary injunction, as long as there is also a showing of a likelihood of irreparable injury and that the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "The Court is permitted to consider inadmissible evidence in deciding a motion for a preliminary injunction." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (citation omitted). "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Id.* (citation omitted).

## III.  DISCUSSION

### A.  Likelihood of Success of the Merits

Plaintiff alleges that because the Article 9 foreclosure that transferred Intrepid's Trade Secrets Materials to TFE was unlawful, any use by Defendants' of the Trade Secrets Materials is misappropriation. ECF No. 10-1 at 24.

#### 1.  Article 9 Claim

Plaintiff has established "serious questions going to the merits" on his Article 9 claim. Plaintiff alleges that TFE and Board Defendants knowingly violated the

26cv965-LL-JLB

requirements for foreclosure and disposition of collateral under Article 9 of the Uniform Commercial Code, codified in section 9101 *et seq.* of the California Commercial Code. ECF No. 10-1 at 18. By failing to "send a signed notification of disposition" of any of Intrepid's assets to Intrepid as "the debtor" and CommerceWest Bank as "any other secured party," TFE violated section 9611(c) of the California Commercial Code. Cal. Com. Code § 9611(c); ECF No. 10-9 at 26–27 ("Notice of Disposition of Collateral at Private Sale"). Also, by conducting a sale of Intrepid's assets to TFE—both controlled by Dawson— and calculated in a way to limit notice of the sale to itself and not other potential bidders, TFE failed to pursue "disposition of collateral" in a "commercially reasonable" manner, as required by section 9610(b) of the California Commercial Code. *See* Cal. Com. Code §§ 9611(b)–(c), 9627(b); *Gemcap Lending I LLC v. Crop USA Ins. Agency Inc.*, No. CV1305504SJOMANX, 2015 WL 12746212, at *7 (C.D. Cal. Aug. 17, 2015), *aff'd,* 643 F. App'x 647 (9th Cir. 2016) (finding foreclosure sale was not commercially reasonable when it was made between a party and itself and when notice was calculated to reach only certain parties and not other potential bidders); *Ford & Vlahos v. ITT Com. Fin. Corp.*, 8 Cal. 4th 1220, 1229, 885 P.2d 877 (1994) (noting that a sale of valuable collateral in a commercially reasonable manner would include advertising the auction "in the relevant market by, for example, informing brokers, placing reasonably prominent announcements in recognized trade journals, or contacting individuals or entities known to be seeking [this type of collateral]").\

### 2. Misappropriation of Trade Secrets Claims

Courts may analyze misappropriation claims under DTSA and CUTSA together because the elements are substantially similar. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed, the moving party must prove "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58. To show misappropriation, "a plaintiff must show one of two categories: (1) wrongful acquisition, or (2) disclosure or use of the trade secret without consent." *Implicit*

*Conversions, Inc. v. Stine*, No. 24-CV-03744-WHO, 2024 WL 4112335, at *9 (N.D. Cal. Sept. 6, 2024).

The Court finds Plaintiff has established "serious questions going to the merits" on his misappropriation of trade secrets claims. Intrepid's Trade Secrets Materials include, *inter alia*, source code, algorithms, and technical implementation architecture that are not generally known to the public and kept confidential. ECF No. 1 ¶¶ 25–29; *see Implicit Conversions, Inc.*, 2024 WL 4112335, at *9 (finding proprietary and confidential source code and software tools to be trade secrets). By showing that TFE acquired the Trade Secrets Materials through an unlawful Article 9 foreclosure, Plaintiff has shown misappropriation through wrongful acquisition. *See Implicit Conversions, Inc.*, 2024 WL 4112335, at *9. This misappropriation has caused damage to Intrepid because it has been stripped of its primary assets that make up its main product, *Ashes of Creation*.

## B. Irreparable Harm

The Court finds irreparable harm is likely in the absence of an injunction to preserve the status quo. Defendants are trying to sell *Ashes of Creation* and the Trade Secrets Materials that comprise it, and have identified at least one buyer. Garman Decl. ¶ 6 ("[C]ounsel for TFE acknowledged that TFE is engaged in discussions with at least one potential buyer of Intrepid and its assets."). Disclosure of the trade secrets through a sale irreparably harms Intrepid through the destruction of their secrecy. *See N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) ("We have held that 'loss of trade secrets cannot be measured in money damages' because '[a] trade secret once lost is, of course, lost forever.'" (citation omitted)). And stripping Intrepid of its primary valuable assets is also likely to destroy its business and goodwill. Sharif Decl. ¶ 8 (foreclosure has led to substantial backlash within the gaming community and numerous refund requests for the early access version of *Ashes of Creation*).

Plaintiff and TFE have both notified the Court of a related case in Nevada state court that shows the likelihood of irreparable harm in the absence of an injunction to preserve the status quo. Garman Decl. ¶¶ 3–5; ECF No. 19. The Nevada court issued a temporary

restraining order on February 24, 2026 that temporarily enjoins Sharif's "agents" from, *inter alia*, withholding usernames and passwords for Intrepid's technology platforms, which contain its Trade Secrets Materials and intellectual property. ECF No. 19-1 at 6; Garman Decl. ¶ 5. The Court notes that although the Nevada case is similar to this one, there are fundamental differences in that the Nevada case does not involve trade secrets, and it presumes that TFE is the lawful owner of Intrepid's assets. This case involves a dispute over who is the lawful owner of Intrepid's assets and is primarily focused on trade secret misappropriation. However, the Court notes the parties have raised potential issues such as first-to-file and abstention and will invite briefing on these. At this procedural posture, the Court finds that preserving the status quo for a limited time is the best way to prevent irreparable harm, should all the elements be met.

### C.   Public Interest

The Court finds the public's interest in vindicating intellectual property rights is served by preventing misappropriation by unlawfully obtaining and using trade secrets. *See Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016) (finding misappropriation of trade secrets is "harmful not only to the individual or entity whose secrets are purloined, but also to the public" because it "undermines business development and stability; preventing such conduct is in the public's interest").

### D.   Balance of Hardships

The Court finds the balance of hardships tips sharply toward Plaintiff. Intrepid has already suffered harm to its business and reputation from the likely unlawful Article 9 foreclosure and sale of its assets to TFE. TFE is poised to access the Trade Secrets Materials and then sell them to a third party with *Ashes of Creation*. Even if TFE keeps *Ashes of Creation* to develop itself, Intrepid will have lost its primary valuable asset and any chance of bringing *Ashes of Creation* to market itself. A TRO to preserve the status quo while the ownership of the assets is determined will not harm Defendants and will prevent the destruction of their secrecy or their complete loss in a sale to a third-party. *See*

9

26cv965-LL-JLB

*Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, No. 2:13-CV-00784-MCE, 2013 WL 2151553, at *14 (E.D. Cal. May 16, 2013) ("Courts have found that the balance of hardships tips in favor of a plaintiff seeking an injunction which would 'merely prohibit [the d]efendants from misappropriating the trade secrets of [the p]laintiff.'" (citation omitted)). To the extent that Defendants need access to "wind up Intrepid's business and fulfill its obligations under the WARN act," there does not appear to be a need for access to Trade Secrets Materials to do so. *See* ECF No. 19-1 at 5.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's ex parte application for a temporary restraining order and **ORDERS** as follows:

1. Defendants Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels, and TFE Games Holdings LLC (collectively, "Defendants"), along with any of their agents, are enjoined from accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute the trade secrets of Intrepid, defined as:

    a. Audio/visual effects;

    b. Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (i.e., production assets created by employees/contractors and incorporated into builds);

    c. The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;

    d. Designs and implementations of server meshing technology and distributed networking systems;

26cv965-LL-JLB

e. Proprietary Player versus Player risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems;

f. The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

g. Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

h. The event tool used to create open world events, wars, and caravan systems;

i. The implemented seasonal environmental systems as built into the engine;

j. The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

k. Class implementation logic and stat balancing systems as embodied in the Company's codebase; and

l. Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

2. Defendants, and any of their agents, are enjoined from accessing the following accounts of Intrepid, for the purpose of accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute the trade secrets of Intrepid:

a. AWS;

b. Perforce;

c. Github;

d. Miro;

e. MongoDB;

f. g-suite — Google;

g. Google workspace;

26cv965-LL-JLB

h. Microsoft;

i. Slack;

j. Boomlibrary;

k. Waves;

l. Bitwarden;

m. Resemble.ai;

n. DB Scheme;

o. GitKraken;

p. JetBrains;

q. incident.io;

r. Lens;

s. Autodesk;

t. Adobe;

u. Docker;

v. ScaleMatrix;

w. CDW | HPE; and

x. Universal Foundry.

3. A neutral intellectual property custodian or escrow agent ("Intellectual Property Custodian") shall be appointed. The Intellectual Property Custodian shall hold and control, on a temporary and limited basis, the credentials, administrative privileges, and source-control access to the accounts, platforms, and repositories that contain Intrepid's trade secrets, for the sole purpose of preventing any access, use, sale, or dissemination of Intrepid's trade secrets until such further order of this Court.

4. The parties shall meet and confer and jointly propose an Intellectual Property Custodian for appointment by this Court by **March 9, 2026**.

5. The Intellectual Property Custodian shall have control of the passwords to any of the above-listed Intrepid accounts and access to the above-listed Intrepid

12

26cv965-LL-JLB

accounts, and shall be empowered to grant access to Defendants on a limited basis should just cause be shown that access to the above-listed accounts is required for a reason other than access to Intrepid's trade secrets.

6. Defendants are enjoined from accessing any accounts or other systems belonging to any former employee or contractor of Intrepid for the purpose of accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute the trade secrets.

7. Defendants are **ORDERED TO SHOW CAUSE** why a preliminary injunction should not issue pursuant to Federal Rule of Civil Procedure 65 that enjoins Defendants from the above-listed conduct during the pendency of this action.[2] Defendant must file a written response, if any, on or before **March 11, 2026**. Plaintiff may file a reply to Defendant's response on or before **March 13, 2026**.

8. The Court sets a preliminary injunction hearing for **March 18, 2026,** at **4:30 p.m. PST** in Courtroom 14B.

9. This temporary restraining order is effective on the date and time of filing and remains in effect until the date and time of the preliminary injunction hearing specified above, absent further order from the Court.

10. Plaintiff shall post a bond in the amount of $1,000. *See* Fed. R. Civ. P. 65(c).

11. Plaintiff shall serve a copy of this order on Defendants.

**IT IS SO ORDERED.**

Dated: March 4, 2026

_____

Honorable Linda Lopez
United States District Judge

_____

[2] The parties may also address in their briefing any potential impact of the Nevada state court case.

26cv965-LL-JLB