Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for Defendant*
*TFE Games Holdings, LLC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT DAWSON; RYAN OGDEN; THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDINGS, LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-JLB |

## <u>REQUEST FOR JUDICIAL NOTCE</u>

Pursuant to Rule 201 of the Federal Rules of Evidence, Defendant TFE Games Holdings, LLC ("**TFE**"), hereby requests that the Court take judicial notice of the following documents and attached public records, filed in the related Nevada case, *TFE Games Holdings, LLC v. Steven Sharif, et al.*, Case No. A-26-939022-B, pending in the Eighth Judicial District of Nevada:

**Exhibit A – Amended Complaint;**

**Exhibit B – Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction; and**

**Exhibit C – Amended Notice of Filing Exhibits to Reply to Defendants' Opposition to**

1

**Plaintiff's Motion for Preliminary Injunction.**

Dated: March 6, 2026.

SCHWARTZ, PLLC

By: /s/ *Sasha Aliakbar-Amid*
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
601 East Bridger Avenue
Las Vegas, Nevada  89101

*Attorneys for Defendant*
*TFE Games Holding, LLC*

2

Exhibit A

Electronically Filed
2/11/2026 10:30 AM
Steven D. Grierson
CLERK OF THE COURT

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for Plaintiff*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX, <br><br> Defendants. | Case No.: A-26-939022-B <br><br> Dept No.: 13 <br><br><br> **EXEMPT FROM ARBITRATION PURSUANT TO ADR RULE 5(a)(1)(J)** |

## AMENDED COMPLAINT

Plaintiff TFE GAMES HOLDINGS, LLC, a Delaware limited liability company ("**TFE**" or the "**Plaintiff**"), by and through its counsel of record, Schwartz, PLLC, alleges and complains as follows:

## JURISDICTION AND VENUE

1.     This Court possesses subject matter jurisdiction over this matter pursuant to NRS § 4.370 because the Plaintiff alleges damages in excess of $15,000.

2.     Venue is proper in this Court pursuant to NRS §§ 13.010 and 13.040, in that this is the county in which the obligations of the parties hereto were to be performed or occurred and a substantial part of the events or omissions giving rise to the claims set forth herein occurred.

1

## PARTIES

3.    Plaintiff TFE Games Holdings, LLC, a Delaware limited liability company, was, at all times relevant to the claims herein, harmed by the conduct of residents of Clark County, Nevada.

4.    Defendant Steven Sharif ("**Defendant Sharif**"), an individual, was, at all times relevant to the claims herein, a resident of Clark County, Nevada.

5.    Defendant John Moore ("**Defendant Moore**"), an individual, was, at all times relevant to the claims herein, a resident of Clark County, Nevada.

6.    The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named herein as DOES I through X, inclusive, and ROE BUSINESS ENTITIES XI through XX, inclusive, and each of them, are unknown to Plaintiff who therefore sues such Defendants by such fictitious names. Plaintiff is informed, believes and thereon alleges that each of the Defendants designated herein as a "DOE" or "ROE BUSINESS ENTITY" are agents, employees, servants and representatives of the named Defendants or persons and entities answering in concert with the named Defendants with respect to the agreement herein pled, who are liable to Plaintiff by reason thereof, and Plaintiff prays leave to amend this Complaint to insert their true names or identities with appropriate allegations when same become known.

## FACTUAL HISTORY

7.    The Plaintiff is successor-in-interest to non-party Intrepid Studios, Inc. ("**Intrepid**").

8.    The Plaintiff became successor-in-interest to Intrepid through a private sale of collateral pursuant to section 9601 *et seq.* of the Uniform Commercial Code.

9.    Through the private sale of collateral ("**Article 9 Sale**"), the Plaintiff foreclosed on Intrepid's assets including but not limited to (collectively, "**Intrepid Assets**"):

All assets and all personal property of Debtor, wherever located and whenever acquired, including, but no [sic] limited to:

Equipment, Inventory, Fixture, Goods, Instruments, Chattel paper (including without limitation Electronic Chattel Paper), General Intangibles, payment Intangibles, Accounts and all other obligations now or hereafter owing to Grantor, all Deposit Accounts, cash, and money, certificates of deposit, Investment Property, Financial Assets, Letters of Credit Rights, all Commercial Tort Claims and any other causes of action against third parties (excluding only claims for death or personal Injury), As-

2

Extracted Collateral, Intellectual property, copyrights, trademarks trade names, all Supporting Obligations for any of the foregoing, all Proceeds (including without limitation insurance proceeds) from and products of and accessions to any of the foregoing and all books and records relating to any of the foregoing. Terms and used herein shall have the meaning provided in the applicable Uniform Commercial Code.

10.  Defendant Sharif is the former Chief Executive Officer of Intrepid.

11.  Defendant Sharif is a current shareholder of Intrepid.

12.  Defendant Moore was an employee or independent contractor for Intrepid.

13.  Defendant Moore was a shareholder of Intrepid.

14.  Defendant Moore transferred all, of a portion, of his shares in Intrepid to Defendant Sharif.

15.  Defendant Sharif is in possession of certain Intrepid Assets, including but not limited to certain books and records of Intrepid, including all receipts and invoices from the past three (3) years and payroll records going back to 2016, as well as the account information for numerous Technology Platforms,[1] Bank and Credit Card Accounts,[2] and miscellaneous Third-Party Vendors[3] (collectively, the "**Company Records**").

16.  Due to his position as Chief Executive Officer, Defendant Sharif was entrusted with Intrepid's Company Records.

17.  Defendant Sharif has refused to turnover the Company Records to the Plaintiff despite request.

18.  On January 31, 2026, Intrepid issued Notifications Under the Worker Adjustment and Re-Training Notification Act ("**WARN Act**") to its employees that "[Intrepid] has no alternative other than to undertake an entire and permanent 'plant closing' within the meaning of the WARN Act by close of business on January 31, 2026" (the "**WARN Act Notices**").

---

[1]  *See* **Exhibit 1** for a non-exhaustive list of technology platforms for which the Defendant maintains and has refused to turn over the passwords (the "**Technology Platforms**").

[2]  *See* **Exhibit 2** for a non-exhaustive list of bank and credit card accounts for which the Defendant maintains and has refused to turn over the passwords (the "**Bank and Credit Card Accounts**").

[3]  *See* **Exhibit 3** for a non-exhaustive list of miscellaneous Third-Party Vendors for which the Defendant maintains and has refused to turn over the passwords ("**Third-Party Vendors**").

3

19.    Without the Company Records, the Plaintiff cannot wind up Intrepid's business and fulfill its obligations under the WARN Act, among other obligations.

### FIRST CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY
**(Against Defendant Sharif)**

20.    The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

21.    Defendant Sharif owes fiduciary duties to Intrepid as its former Chief Executive Officer.

22.    As an officer of Intrepid, Defendant Sharif was required to perform his duties in good faith, in a manner he believed to be in the best interests of the corporation and its shareholders, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

23.    As an officer of Intrepid, Defendant Sharif has control and management over Intrepid's book and records.

24.    Defendant Sharif has breached his fiduciary duties to Intrepid by withholding and refusing to turnover the Company Records, despite the Plaintiff's rightful ownership of such records pursuant to the Article 9 Sale.

25.    Defendant Sharif's refusal to turn over the Company Records has prevented Plaintiff from (a) timely paying former Intrepid employees now employed by the Plaintiff, resulting in employees being terminated; and (b) making required payments under numerous third-party contracts.

26.    Defendant Sharif's refusal to turnover the Company Records has caused damage to Plaintiff as Plaintiff has not been able to make certain payments required pursuant to numerous third-party contracts.

27.    The Plaintiff took ownership of Intrepid's assets which included "all [of Intrepid's] Commercial Tort Claims and any other causes of action against third parties."

4

28. Defendant Sharif's refusal to turnover the Company Records to the Plaintiff is intentional misconduct and a knowing violation of law as the Plaintiff is the rightful owner of the Company Records pursuant to the Article 9 Sale.

29. Defendant Sharif received a notice from [Steam/Valve/Commerce?] on January 18, 2026, that provided Intrepid's secured creditor would be taking the $3,500,000 receivable (the "**Steam Notice**") that the Plaintiff was relying on to pay Intrepid's employees and creditors.

30. Defendant Sharif failed to share the Steam Notice with Intrepid or the Plaintiff.

31. Defendant Sharif resigned as Chief Executive Officer the following day, on January 19, 2026.

32. Defendant Sharif has breached his fiduciary duties to Intrepid by authorizing and causing the payment of approximately $17,400,000 in unauthorized, personal, and/or excessive expenses from January 1, 2016, through January 31, 2026 (the "**Misappropriations**").

33. The Misappropriations include, but are not limited to: (a) excessive personal loans to certain shareholders with no documentation and no repayment; (b) direct transfers to shareholders with no stated business purpose; (c) direct transfers to miscellaneous accounts with no stated business purpose; and (d) miscellaneous personal expenses charged to Intrepid's credit card(s) and/or Defendant Sharif's personal credit card that was then reimbursed by Intrepid.

34. Defendant Sharif allowed bank accounts owned by Intrepid to be comingled with his personal accounts in the QuickBooks file owned by Intrepid.

35. Defendant Sharif allowed bank accounts owned by Intrepid to be comingled with Defendant Moore's personal accounts in the QuickBooks file owned by Intrepid.

36. Defendant Sharif's Misappropriations constituted intentional misconduct and a knowing violation of law because they were unlawful and, upon information and belief, Mr. Sharif knew the Misappropriations were unlawful.

37. These Misappropriations left Intrepid unable to pay its debts as they became due in the ordinary course of business leading to the Article 9 Sale

38. Defendant Sharif has breached his fiduciary duties by permitting Intrepid bank accounts to be commingled with his personal accounts and with Defendant Moore's personal

5

accounts in Intrepid's QuickBooks file.

39. Defendant Sharif has breached his fiduciary duties by taking money from Intrepid in excess of his salary and earnings, without company or board approval, including payments to himself, Defendant Moore, other investors, employees, and friends and family.

40. Defendant Sharif has breached his fiduciary duties by misrepresenting the investments made into Intrepid to Intrepid's shareholders, performance targets, launch dates, money required to complete Intrepid's primary asset and bring it to market – the Ashes of Creation video game ("**AOC**").

41. Defendant Sharif disregarded advice from advisors relating to financial and business decisions.

42. Defendant Sharif caused Intrepid to issue reimbursements for approximately $12,000,000 in purported business expenses but has refused to provide documentation to support the business nature of these expenses.

43. Defendant Sharif's foregoing conduct constituted intentional misconduct and a knowing violation of law.

44. Defendant Sharif's breaches of fiduciary duty rendered Intrepid unable to pay its debts as they became due in the ordinary course of business, resulting in cessation of operations as described in the WARN Act Notices.

45. Defendant Sharif failed to manage Intrepid's finances at a time when he knew Intrepid could not pay its bills as they became due.

46. Defendant Sharif took money out of Intrepid in excess of his salary and earnings, without company or board approval, in breach of his fiduciary duties, by paying himself, Defendant Moore, friends and family.

47. Upon information and belief, between $10,000,000 to 20,000,000 of the $130,000,000 raised by Defendant Sharif for the development of AOC was not used by Defendant Sharif to develop AOC, and was instead used for personal expenses, among other unlawful uses.

48. As a direct and proximate result of Defendant Sharif's breaches of fiduciary duty, Plaintiff has suffered damages, including the loss and misappropriation of corporate assets.

49.    As a further direct, natural, and proximate result of this conduct, the Plaintiff has been compelled to retain the services of an attorney to prosecute this action on its behalf, and, as such, is entitled to attorney's fees and costs incurred in prosecuting this matter.

50.    It has become necessary for the Plaintiff to retain the services of an attorney to commence this action and, the Plaintiff is therefore entitled to reasonable attorney's fees and the costs of this action.

## SECOND CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (Against Defendant Sharif)

51.    The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

52.    The financial records of Intrepid identify certain shareholder loans to Defendant Sharif in the approximate total amount of $362,524.15 (collectively, the "**Sharif Loans**").

53.    The financial records of Intrepid were maintained, in part, by Defendant Moore so there may be additional Sharif Loans yet to be discovered by Plaintiff.

54.    The Sharif Loans are valid, enforceable contracts.

55.    The duties and obligations of the Sharif Loans are binding upon the Plaintiff and Defendant Sharif.

56.    The financial records of Intrepid identifying the Sharif Loans evidence the parties' intent to be bound to each other.

57.    The Plaintiff performed under the Sharif Loans by, among other things, delivering the funds to Defendant Sharif.

58.    Defendant Sharif breached its obligations pursuant to the Sharif Loans by failing to re-pay the amounts loaned.

59.    To date, Defendant Sharif has failed to pay the Plaintiff the total amount of $362,524.15 owed to re-pay the Sharif Loans.

60.    Defendant Sharif's conduct has caused and continues to directly and proximately cause injury and damage to the Plaintiff, including loss of the reasonably expected benefits of its

7

bargain, loss of business opportunities, and other such losses.

61.    It has become necessary for the Plaintiff to retain the services of an attorney to commence this action and, the Plaintiff is therefore entitled to reasonable attorney's fees and the costs of this action.

## THIRD CLAIM FOR RELIEF
### BREACH OF CONTRACT
**(Against Defendant Moore)**

62.    The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

63.    The financial records of Intrepid identify certain shareholder loans to Defendant Moore in the total amount of $6,680,396.98 (collectively, the "**Moore Loans**").

64.    The financial records of Intrepid were maintained, in part, by Defendant Moore so there may be additional Moore Loans yet to be discovered by Plaintiff.

65.    The Moore Loans are valid, enforceable contracts.

66.    The duties and obligations of the Moore Loans are binding upon the Plaintiff and Defendant Moore.

67.    The financial records of Intrepid identifying the Moore Loans evidence the parties' intent to be bound to each other.

68.    The Plaintiff performed under the Moore Loans by, among other things, delivering the funds to Defendant Moore.

69.    Defendant Moore breached its obligations pursuant to the Moore Loans by failing to re-pay the amounts loaned.

70.    To date, Defendant Moore has failed to pay the Plaintiff the total amount of $6,680,396.98 owed to re-pay the Moore Loans.

71.    Defendant Moore's conduct has caused and continues to directly and proximately cause injury and damage to the Plaintiff, including loss of the reasonably expected benefits of its bargain, loss of business opportunities, and other such losses.

8

72.    It has become necessary for the Plaintiff to retain the services of an attorney to commence this action and, the Plaintiff is therefore entitled to reasonable attorney's fees and the costs of this action.

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against Defendant Sharif)

73.    The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

74.    Defendant Sharif made, or caused to be made, certain unauthorized transfers to himself totaling $4,864,316, with no documentation or indication that such transfers whether such transfers were a loan, salary, fee, reimbursements, shareholder distribution, or gift (the "**Sharif Transfers**").

75.    The Plaintiff asserts there was an agreement between the parties, i.e. Sharif as CEO and Sharif (in whatever capacity he received the Sharif Transfers) constituting each as a quasi-contract.

76.    The Sharif Transfers were received and enjoyed by the Defendant Sharif.

77.    Defendant Sharif received a benefit from the Sharif Transfers.

78.    The Plaintiff has a reasonable expectation of repayment from Defendant Sharif.

79.    Defendant Sharif has not repaid any portion of the Sharif Transfers despite receiving and benefiting from the Sharif Transfers.

80.    Defendant Sharif received the Sharif Transfers from the Plaintiff, which is unjust for Defendant Sharif to retain without repayment.

81.    To date, Defendant Sharif has failed to dispute the total amount of $4,864,316 owed for the Sharif Transfers.

82.    Upon information and belief, Defendant Sharif also caused Intrepid to take out a loan to purchase real property located in San Diego, California (the "**Property**").

83.    Upon information and belief, Defendant Sharif identified Intrepid's investments as revenue in order to obtain the loan to purchase the Property.

9

84. Defendant Sharif sold the Property for $8,500,000.00, did not repay Intrepid for the loan, and retained the profits from the sale of the Property for himself.

85. As such, the Plaintiff conferred benefits on Defendant Sharif, Defendant Sharif appreciated such benefits, and there was acceptance and retention by Defendant Sharif of such benefits under circumstances such that it would be inequitable for Defendant Sharif to retain the benefits without payment of the value thereof.

86. It has become necessary for the Plaintiff to retain the services of an attorney to commence this action and, the Plaintiff is therefore entitled to reasonable attorney's fees and the costs of this action.

## FIFTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(Against Defendant Moore)**

87. The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

88. Defendant Sharif made certain unauthorized transfers to Defendant Moore totaling $5,954,318, with no documentation or indication that such transfers whether such transfers were a loan, salary, fee, reimbursements, shareholder distribution, or gift (the "**Moore Transfers**").

89. Defendant Sharif authorized Defendant Moore to be paid for the same services pursuant to two separate contracts.

90. The Plaintiff asserts there was an agreement between Defendant Sharif and Defendant Moore relating to the Moore Transfers constituting each as a quasi-contract.

91. The Moore Transfers were received and enjoyed by Defendant Moore.

92. Defendant Moore received a benefit from the Moore Transfers.

93. The Plaintiff has a reasonable expectation of repayment from Defendant Moore.

94. Defendant Moore has not re-paid any portion of the Moore Transfers despite receiving and benefiting from the Moore Transfers.

95. Defendant Moore received the Moore Transfers from the Plaintiff, which is unjust for Defendant Moore to retain without repayment.

96. To date, Defendant Moore has failed to dispute the total amount of $5,954,318 owed to repay the Moore Transfers.

97. Upon information and belief, Defendant Moore is aware that Defendant Sharif caused Intrepid to take out a loan to purchase the Property.

98. Defendant Moore is aware that Defendant Sharif sold the Property for $8,500,000.00, did not repay Intrepid for the loan, and retained the profit from the sale of the Property.

99. As the spouse of Defendant Sharif, Defendant Moore has also received and retained the profit from the sale of the Property.

100. As such, the Plaintiff conferred benefits on Defendant Moore, Defendant Moore appreciated such benefits, and there was acceptance and retention by Defendant Moore of such benefits under circumstances such that it would be inequitable for Defendant Moore to retain the benefits without payment of the value thereof.

101. It has become necessary for the Plaintiff to retain the services of an attorney to commence this action and, the Plaintiff is therefore entitled to reasonable attorney's fees and the costs of this action.

## SIXTH CLAIM FOR RELIEF
### INJUNCTIVE RELIEF/CLAIM AND DELIVERY
**(Against Defendant Sharif)**

102. The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

103. The Plaintiff is the owner of the Company Records.

104. The Defendant is wrongfully withholding the Company Records from the Plaintiff.

105. Based on the Plaintiff's knowledge, information and belief, the Defendant refuses to recognize the Plaintiff's ownership of the Company Records despite the Article 9 Sale.

106. The Company Records have not been taken for a tax, assessment or fine pursuant to a statute, or seized under an execution or an attachment against the property of the Plaintiff, or, if so seized, that it is by statute exempt from such seizure

107. The Company Records are of no value to Defendant Sharif.

11

108. The Company Records are invaluable to the Plaintiff as the Plaintiff cannot continue to operate and protect the value of the Intrepid Assets without the Company Records.

109. Without the Company Records, the Plaintiff will be unable to timely pay the former Intrepid employees now employed by the Plaintiff, so the value of the Company Records to the Plaintiff is in excess of the payroll due to the employees.

110. The Plaintiff is entitled to injunctive relief to obtain the Company Records.

111. Without the Company Records, the Plaintiff cannot wind up Intrepid's business and fulfill its obligations under the WARN Act, among other obligations.

112. The Plaintiff's inability to wind up the business is an injury that will be irreparable as monetary damages will be inadequate to compensate the Plaintiff.

113. It has become necessary for the Plaintiff to retain the services of an attorney to commence this action and, the Plaintiff is therefore entitled to reasonable attorney's fees and the costs of this action.

**SEVENTH CLAIM FOR RELIEF**

**CONVERSION**
**(Against Defendant Sharif)**

114. The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

115. Through the Article 9 Sale, the Plaintiff owned, possessed, and had the right to possess the Company Records of Intrepid that Defendant Sharif has in his possession, custody, or control.

116. Defendant Sharif substantially interfered with the Company Records owned by the Plaintiff by knowingly and intentionally taking possession of the Company Records, preventing the Plaintiff from having access thereto, and refusing to remit the same after the Plaintiff's demand.

117. Defendant Sharif wrongfully exerted a distinct and intentional act of dominion over the Company Records.

12

118.   Defendant Sharif acted in denial of or inconsistent with the Plaintiff's use and enjoyment of the Company Records, or in derogation, exclusion, or defiance of the Plaintiff's rights or title in the Company Records.

119.   The Plaintiff did not consent to Defendant Sharif's conduct relating to the Company Records.

120.   The Plaintiff was harmed by Defendant Sharif's conduct relating to the Company Records.

121.   Defendant Sharif's conduct was a substantial factor in causing the Plaintiff harm.

122.   Defendant Sharif's conduct has caused and continues to directly and proximately cause injury and damage to the Plaintiff, including loss of the reasonably expected benefits of its bargain, loss of business opportunities, and other such losses.

123.   It has become necessary for the Plaintiff to retain the services of an attorney to commence this action and the Plaintiff is therefore entitled to reasonable attorney's fees and the costs of this action.

## EIGHTH CLAIM FOR RELIEF
### ATTORNEYS FEES AND COSTS AS SPECIAL DAMAGES
**(Against Defendant Sharif)**

124.   The Plaintiff repeats and realleges the foregoing paragraphs as though fully stated herein.

125.   The Plaintiff has been compelled to retain the services of an attorney to prosecute this action on its behalf and, as a result, has incurred attorney fees as special damages as the fees incurred here are a direct, natural and proximate consequence of Defendant Sharif's wrongful conduct, including, but not limited to refusal to, turnover of the Company Records.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests judgment from the Court as follows:

A.   For general, special, and compensatory damages in excess of $15,000 against the Defendants, in an amount to be proven;

B.   For reimbursement of the Plaintiff's reasonable attorneys' fees, expenses and costs

13

incurred herein;

    C.    For injunctive relief;

    D.    For pre and post-judgment interest on the amounts awarded at the highest rate permitted by law; and

    E.    For any further relief as the Court deems to be just and proper.

Dated: February 11, 2026.

SCHWARTZ, PLLC

*/s/ Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
Emily D. Anderson, Esq.
601 East Bridger Avenue
Las Vegas, Nevada 89101

*Attorneys for Plaintiff*

14

# Exhibit B

Electronically Filed
3/6/2026 11:42 AM
Steven D. Grierson
CLERK OF THE COURT

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for the Plaintiff*

## DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company, | Case No. A-26-939022-B |
| Plaintiff, | Dept. No. 13 |
| vs. | **REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX, | |
| Defendants. | |

Plaintiff TFE Games Holdings, LLC (the "**Plaintiff**" or "**TFE**"), by and through its undersigned counsel, hereby files this reply (the "**Reply**") to *Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction* (the "**Opposition**") filed by Defendants Steven Sharif ("**Sharif**") and John Moore ("**Moore**" and together with Sharif, the "**Defendants**") to Plaintiff's *Ex Parte Motion for Temporary Restraining Order Pursuant to NRCP 65(B)(1) or NRS 31.859; Alternatively, Ex Parte Application for Order Shortening Time on Motion for Temporary Restraining Order Pursuant to NRCP 65(B)(1) or NRS 31.859* (the "**Motion**").[1]

This Reply is made and based on the below memorandum of points and authorities, the Declaration of Robert D. Dawson (the "**Dawson Declaration**"), filed concurrently herewith as

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

**Exhibit 1**, the Declaration of Theresa Fette (the "**Fette Declaration**"), filed concurrently herewith as **Exhibit 2**, the Declaration of Aaron Bartles (the "**Bartles Declaration**"), filed concurrently herewith as **Exhibit 3**, the Declaration of Joe Micatrotto, (the "**Micatrotto Declaration**"), filed concurrently herewith as **Exhibit 4**, the Declaration of Samuel A. Schwartz, Esq., (the "**Schwartz Declaration**"), filed concurrently herewith as **Exhibit 5**, and any other exhibits hereto, the papers and pleadings on file herein, and any oral arguments the Court may consider at the hearing on this matter.

**MEMORANDUM OF POINT AND AUTHORITIES**

**I.      PRELIMINARY STATEMENT.**

The Opposition begins with a rosy summary of Defendant Sharif's efforts over "more than a decade of his life" to create and bring to market Intrepid Studios, Inc.'s ("**Intrepid**") main product: the massive multiplayer online role-playing game *Ashes of Creation*. The Opposition's emphasis on Sharif's personal efforts done "through *his* company" is in line with how Sharif viewed Intrepid and conducted himself in relation to it. That is, it was *his* company and he could do as he wished with its assets without regard for proper corporate governance or waste. This mindset led to the commingling of personal and corporate accounts; to the hiring of a full-time personal chef for Sharif's residence paid for with Intrepid funds; to the unjustified disbursements of cash to himself, to co-defendant Moore and to family and friends; and, most egregiously, to the use of Intrepid funds to purchase Nazi uniforms at auction which were then displayed at Sharif's personal residence.[2] Dawson Declaration, ¶ 22. Sharif and Moore cannot be left in control of Company Records in light of such disregard for the use of corporate resources and the related waste.

In reality, though Sharif may have first conceived of the virtual world of *Ashes of Creation*, Intrepid was not "his" company- he owns less than 5%. Robert Dawson, on the other hand, is the sole owner of Plaintiff TFE, and has over 64% ownership of Intrepid. Nevada-based investors in Intrepid, meanwhile, have just over a 5% ownership stake. *See* Intrepid Capitalization Table, Exhibit

---

[2]      Plaintiff is not alone in bringing allegations like these against Sharif. On March 3, 2026, Intrepid investor Jason Caramanis filed suit against Sharif in the Superior Court of the State of California, County of San Diego (the "**Caramanis Suit**"). A copy of the complaint filed in the Caramanis Suit is attached as Exhibit 1 to the Schwartz Declaration.

2

1 to the Dawson Declaration. Dawson and Nevada-based lenders hold over 72% of the company's $120,000,000 of debt. *See* chart of Intrepid Note Holders, Exhibit 2 to the Dawson Declaration. All of which is to say that Sharif's attempts to claim Intrepid as "his" company and to use that as a basis for arguing against this case staying in Nevada are an instance of "the tail wagging the dog". A supermajority of the ownership of Intrepid wants this matter decided in Nevada and/or are Nevada residents. Similarly, a substantial majority of the company's debtholders, those directly hurt by Sharif's misappropriations, want Nevada to be the forum for this matter and/or are domiciled here.

This case was filed before the California Case (defined below). This Court has jurisdiction over this matter and there is no valid basis for dismissal on forum non conveniens, abstention or any other grounds urged by Defendants. This matter should stay in this Court and, as more fully set out below, the grounds for the issuance of a preliminary injunction against Defendants have been met and a preliminary injunction is needed to avoid irreparable harm due to the Defendants' refusal to turnover Company Records.

## II. RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY.

### A. History of Intrepid Studios, Inc.

Intrepid was a startup video game development company founded in or about 2015 by the Defendants. Sharif was the Chief Executive Officer and a director of Intrepid, and was the primary point of contact who solicited and obtained loans and investments for the company. Moore was the Chief Financial Officer and, was and is, Sharif's business partner and spouse. Moore worked closely with Sharif in managing Intrepid's finances and dealings with investors.

Intrepid's flagship project was an online role-playing video game called *Ashes of Creation*. During its early years, Intrepid generated little to no meaningful revenue and relied almost entirely on outside financing to fund its development and operations. Throughout its history, Intrepid raised at least $120,000,000 from various sources, including private investments and loans. Sharif publicly portrayed himself as heavily invested in the company and its flagship game, both financially and as the driving force behind its development. At all relevant times, Sharif exercised dominant control over Intrepid's fundraising activities, the disbursement of capital, and communications with investors. Major financial decisions - including whether loan proceeds would be used for operations,

3

insider compensation, or other purposes - required Sharif's approval or occurred with his knowledge. Moore, in his role as Chief Financial Officer, implemented and recorded the financial treatment of transactions directed or approved by Sharif.

In or about February 2022, Sharif met with Robert Dawson at the Bellagio in Las Vegas to solicit funding for Intrepid. Dawson Declaration, ¶5. On or about March 23, 2022, Dawson agreed to extend a line of credit of up to $8,000,000. In connection with that transaction, Intrepid executed a written Convertible Line of Credit Promissory Note dated March 23, 2022 (the "**2022 Note**") in favor of Dawson in the principal amount of $8,000,000. To secure repayment of the 2022 Note plus all amounts in future notes and advances from Dawson to Intrepid, Intrepid executed a Pledge and Security Agreement dated March 23, 2022 (the "**Security Agreement**"), granting Dawson a security interest and lien in and to substantially all assets of Intrepid (the "**Collateral**"). Dawson Declaration, ¶12. Dawson extended a series of loans to Intrepid between 2023 and 2025 in the aggregate principal amount of $78,480,831.54, as evidenced by multiple written promissory notes (collectively, the "**Notes**"). Dawson Declaration, ¶11. Each of the Notes was secured by the Security Agreement. Dawson also owns in excess of sixty-four (64%) of the equity of Intrepid. *See* Exhibit 1 to Dawson Declaration.

In or about January 2022, Sharif approached Theresa Fette, a Nevada resident, to solicit funding for Intrepid. Fette Declaration, ¶6. On or about January 24, 2022, Fette agreed to loan up to $1,000,000 to Intrepid. In connection with that transaction, Intrepid executed a written Convertible Promissory Note dated January 24, 2022, in favor of Fette Holdings, LLC, her investment vehicle, in the principal amount of $1,000,000. Fette Declaration, ¶15.

On or before March 5, 2020, Sharif solicited investment in Intrepid from Joseph P. Micatratto, II, a Nevada resident. Micatratto agreed to help Sharif solicit investments in Nevada and formed two entities for that purpose: KR-Games, LLC and KR-AOC II LLC, each of which is a Nevada entity. KR-Games, LLC, the owners of which include Micatratto and three other Nevada residents, loaned a total of $1,350,000 to Intrepid. Similarly, Micatratto manages KR-AOC II, LLC, the owners of which include Micatratto and eight other Nevada residents, which loaned $5,000,000 to Intrepid. Micatratto Declaration, ¶¶ 6-11.

4

From July through September 2021, Aaron Bartels, a Nevada resident, met regularly in-person in Nevada with Tim Sharif, a Nevada resident and Defendant Sharif's brother, who acted as a liaison or "deal broker" in connection with Intrepid investment opportunities. Bartels Declaration, ¶ 6. On or around August or September 2021, Defendant Sharif personally solicited Bartels' investment in Intrepid. Bartels Declaration, ¶ 7. Bartels invested $500,000 directly into Intrepid and another $4,000,000 through Tim and Steven Sharif, which was intended for Intrepid. Bartels Declaration, ¶ 12.

During the same period that Dawson, Fette, Micatratto, Bartels and other investors were funding Intrepid's operations, Intrepid accounting records reflect substantial payments to insiders, family members, or related individuals, including but not limited to Sharron Sharif, Defendant Sharif's mother, totaling approximately $1,345,000 or more. Sharif and Moore were systematically withdrawing substantial sums from Intrepid for the benefit of themselves and family members under the guise of shareholder loans, compensation, or other insider payments. In effect, Sharif and Moore treated investor capital, including loan proceeds from Dawson, Fette, Micatratto and Bartels as a source of funds for personal use.

**B.    Attempts to Find a Buyer; the Article 9 Sale.**

During 2025, Intrepid ran a process to identify a buyer or investor with Aream & Co., a well-known video gaming investment banker. A copy of the offering declaration is attached as Exhibit 2 to the Fette Declaration. Theresa Fette personally participated in and oversaw the investment process with Aream & Co., and spoke to at least ten (10) potential investors and buyers. Not one party was willing to either invest in or purchase Intrepid's assets. Fette Declaration, ¶¶17-18.

Dawson and the Plaintiff enter into a Loan Sale Agreement, dated January 6, 2026, pursuant to which Dawson sold and transferred $40,372,831.54 of the principal amount of his loans to the Plaintiff, including the related lien rights in the Collateral under the Security Agreement. A true and correct copy of the Loan Sale Agreement is attached as Exhibit 2 to the Schwartz Declaration. The Plaintiff's rights in and to the Collateral, and the security interest granted pursuant to the Security Agreement, are evidenced by that certain UCC Financing Statement filed on May 13, 2025, File Number U240040960326, as amended by that certain UCC Financing Statement Amendment, File

5

Number U260001403217, which amended the secured party of record to the Plaintiff. The Collateral identified in the UCC Financing Statement includes:

> All assets and all personal property of Debtor, wherever located and whenever acquired, including, but not limited to: Equipment, Inventory, Fixture, Goods, Instruments, Chattel paper (including without limitation Electronic Chattel Paper), General Intangibles, payment Intangibles, Accounts and all other obligations now or hereafter owing to Grantor, all Deposit Accounts, cash, and money, certificates of deposit, Investment Property, Financial Assets, Letters of Credit Rights, all Commercial Tort Claims and any other causes of action against third parties (excluding only claims for death or personal Injury), As-Extracted Collateral, Intellectual property, copyrights, trademarks trade names, all Supporting Obligations for any of the foregoing, all Proceeds (including without limitation insurance proceeds) from and products of and accessions to any of the foregoing and all books and records relating to any of the foregoing. Terms and used herein shall have the meaning provided in the applicable Uniform Commercial Code.

On or about January 6, 2026, the Plaintiff sent a Notice of Disposition of Collateral at Private Sale (the "**Notice of Disposition**"). A true and correct copy of the Notice of Disposition is attached as Exhibit 3 to the Schwartz Declaration. The Notice of Disposition provides notice of the Plaintiff's sale of the Collateral to be conducted pursuant to the terms of §§ 9-601 *et seq.* of the Uniform Commercial Code via private auction on January 16, 2026.

**C.     This Action is Filed; the California Case is Filed Five Days Later**

The Complaint in this matter was filed February 9, 2026, and Amended Complaint was filed February 11, 2026. The Motion was filed on February 17, 2026, and the initial hearing on the Motion took place on February 19, 2026. This Court's Findings of Fact, Conclusions of Law and Temporary Restraining Order ("**FOFCOL and TRO**"), was issued on February 24, 2026, which, in part, scheduled a continued hearing on March 9, 2026, and ordered, pursuant to a stipulation of the parties, that Defendants maintain the status quo concerning Company Records through the time of the continued hearing.

On February 14, 2026, Steven Sharif as an individual and derivatively on behalf of Intrepid filed suit against Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels and TFE in the United States District Court for the Southern District of California (the "**California Case**"). Sharif filed an

6

*ex parte* motion for temporary restraining order in the California Case late on March 2, 2026. The court in the California Case issued its Order Granting Ex Parte Motion for Temporary Restraining Order on March 4, 2026 which, among other things, enjoined the named defendants in that action from accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute the trade secrets of Intrepid and set a preliminary injunction hearing for March 18, 2026. The California District Court made clear in its ruling that these cases involve separate immediate concerns about the recrods, however, the claims, facts, witnesses, the Article 9 sale, and the Company Records are substantively the same. Accordingly, the immediate matters will be resolved, after which, the Southern District of California was clear the turnover matters here can go forward, and again, as the first to file, this case will proceed.

## III. LEGAL ARGUMENT.

### A. The Court Has Specific Personal Jurisdiction Over the Defendants.

To establish personal jurisdiction over a non-resident defendant, a plaintiff must show that the requirements of the state's long-arm statute have been satisfied, and that due process is not offended by the exercise of jurisdiction. *Arbella Mut. Ins. Co. v. Eighth Judicial Dist. Ct.*, 122 Nev. 509, 512, 134 P.3d 710, 712 (2006). Because Nevada's long-arm statute, NRS 14.065, "has been construed to extend to the outer reaches of due process, the two inquiries . . . may be collapsed into one." *Trump v. Eighth Judicial Dist. Ct.*, 109 Nev. 687, 698, 857 P.2d 740, 747 (1993). Due process requires a nonresident defendant to have "minimum contacts with the forum state sufficient to ensure that exercising personal jurisdiction over him would not offend traditional notions of fair play and substantial justice." *Arbella*, 122 Nev. at 512, 999 P.2d at 712 (internal quotation marks omitted). The defendant must have sufficient contacts with the forum such that the defendant "could reasonably anticipate being haled into court there." *Id.* (internal quotation marks omitted). A defendant's contacts with a forum state satisfy due process requirement if either general or specific personal jurisdiction exists. *Id.*

A state may exercise specific personal jurisdiction where: (1) the defendant purposefully

7

avails itself of the privilege of acting in the forum, enjoying the protection of the laws of the forum, or affirmatively directs conduct toward the forum state; (2) the cause of action arises from the defendant's purposeful contact with the forum or conduct targeting the forum; and (3) exercising jurisdiction would be reasonable. *Arbella*, 122 Nev. at 513, 134 P.3d at 712-13.

        1.     The Defendants Intentionally Directed Their Activities into Nevada.

The "purposeful availment" requirement may be satisfied if the defendant intentionally directed his activities into the forum. *Brainerd v. Governors of the University of Alberta*, 873 F.2d 1257, 1259 (9th Cir. 1989). "While the defendant's contacts with the forum must be more than random, fortuitous, or attenuated, it is the quality of the contacts and not the quantity that confers personal jurisdiction." *Firouzabadi v. First Judicial Dist. Court*, 110 Nev. 1348, 1354, 885 P.2d 616, 619 (1994) (internal quotation marks omitted).

Here, Defendant Sharif knowingly directed substantial activity relating to Intrepid into the State of Nevada which goes well beyond merely "random, fortuitous, or attenuated" and which is directly related to the claims in this case. Sharif's contacts with Nevada include those set out below.

**Robert Dawson**

Dawson made a series of loans to Intrepid between 2022 and 2025 totaling $78,480,831.54 of principal. Dawson separately invested approximately $9,000,000 into Intrepid in the same time period. He owns in excess of 64% of the equity. Dawson's involvement with Intrepid began with an in-person presentation made by Sharif to Dawson concerning investment in Intrepid and the Ashes of Creation video game at the Bellagio in Las Vegas. Dawson Declaration, ¶¶ 6, 11 and 15. After the meeting at the Bellagio and after Dawson began investing in Intrepid, Sharif requested that Dawson solicit additional funds from Nevada-based investors. Sharif knew these individuals were Nevada residents and understood that Intrepid's continued operations depended, in part, on Nevada-sourced capital. Dawson Declaration, ¶ 9. In or about February 2025, Dawson and Sharif attended the D.I.C.E. Summit, a video game networking conference, at the ARIA Resort & Casino in Las Vegas, Nevada, where Intrepid and the Ashes of Creation video game were promoted to consumers and investors.

**Aaron Bartels**

8

Bartels is a Nevada resident whose investment in Intrepid arose directly from Sharif's solicitation. Bartels Declaration, ¶¶ 4-5. From July through September 2021, Bartels met regularly in-person in Nevada with Tim Sharif, a Nevada resident and Defendant Sharif's brother, who acted as a liaison or "deal broker" in connection with the Intrepid investment opportunity. Bartels Declaration, ¶ 6. On or around August or September 2021, Defendant Sharif personally solicited Bartels' investment remotely on a conference call with Bartels and Tim Sharif while Tim Sharif and Bartels were physically located in Nevada and Sharif was aware that Bartels was a Nevada resident. Bartels Declaration, ¶ 7. Bartels invested $500,000 directly into Intrepid and another $4,000,000 through Tim and Steven Sharif, which was intended for Intrepid. Bartels Declaration, ¶ 12. Bartels became an Intrepid board member and Sharif engaged in governance communications with Bartels while Bartels was in Nevada. Bartels Declaration, ¶ 9.

### *Theresa Fette*

Fette is a Nevada resident whose involvement in Intrepid arose directly from Sharif's solicitation. Fette Declaration, ¶ 5. On or around January 2022, Sharif personally solicited Fette's investment by telephone while she was physically located in Nevada. At the time of that solicitation, Sharif knew that Fette was a Nevada resident and intentionally sought investment capital from her in Nevada. Fette Declaration, ¶ 6. Fette later loaned a total of $1 million to Intrepid. Fette Declaration, ¶ 16. On multiple occasions, Sharif contacted Fette while she was physically present in Nevada requesting additional investment capital. Fette Declaration, ¶ 7.

Sharif also requested that Fette solicit additional funds from other Nevada-based investors. Fette Declaration, ¶ 8. Sharif knew these individuals were Nevada residents and understood that Intrepid's continued operations depended, in part, on Nevada-sourced capital. *Id.* Throughout the relevant time period, Sharif conducted remote board governance meetings in which two directors, including Fette, were located in Nevada. Fette Declaration, ¶ 9. Sharif knowingly directed governance discussions and funding matters toward Nevada-based stakeholders *Id.* As set forth in the Fette Declaration, Sharif approved Intrepid's expenditures and operational decisions with knowledge that Nevada residents had invested substantial capital and would bear the financial consequences of those decisions. Fette Declaration, ¶ 10.

9

*Joeseph P. Micatrotto*

On or before March 5, 2020, Sharif solicited investment in Intrepid from Joseph P. Micatratto, II, a Nevada resident. Micatratto agreed to help Sharif solicit investments in Nevada and formed two entities for that purpose: KR-Games, LLC and KR-AOC II LLC, each of which is a Nevada entity. KR-Games, LLC, the owners of which include Micatratto and three other Nevada residents, loaned a total of $1,350,000 to Intrepid. Similarly, Micatratto manages KR-AOC II, LLC, the owners of which include Micatratto and eight other Nevada residents, which loaned $5,000,000 to Intrepid. Micatratto Declaration, ¶¶ 6-11.

*Tim Sharif*

As noted above, Tim Sharif is Defendant Sharif's brother and is a Nevada resident. With Defendant Sharif's knowledge and approval, he actively solicited investment in Intrepid in Nevada. This included, in addition to the activity already discussed above, the solicitation of Nevada-based members of the "YPO Forum". Tim Sharif is the managing member and, upon information and belief, sole owner of 310 Nutrition LLC, a Nevada limited liability company ("**310 Nutrition**"). For unknown reasons, Intrepid loaned $1,300,000 to 310 Nutrition in March 2021. Intrepid was never repaid in full for the loan.

*Sharron Sharif*

Sharron Sharif is a Nevada resident and is Defendant Sharif's mother. Between October 2015 and June 2022, disbursements to Sharron Sharif totaling $1,345,000 were made by Intrepid. The disbursements are described as loans in the company's limited records but, the company's records show no payments ever being made on the loans.

*Bethany Alkazin*

Bethany Alkazin is a Nevada resident and, upon information and belief, a relation or close friend of Defendant Sharif. Between May and August 2024, disbursements totaling $40,000 were made to Bethany Alkazin by Intrepid. The disbursements are described as "shareholder loans" in the company's records but the company's records show no payments ever being made on the loans.

The foregoing contacts with the forum conclusively support the exercise of specific personal jurisdiction over the Defendants in Nevada.

10

2.    The Cause Of Action Arises Out Of The Defendants' Contacts With Nevada.

"[T]he cause of action must have a specific and direct relationship or be intimately related to the forum contacts. *Munley v. District Court*, 104 Nev. 492, 495-96, 761 P.2d 414, 416 (1988).

At the heart of the breach of fiduciary duty claim against Sharif is the misappropriation of Intrepid funds. As detailed above, Nevada was central to the process of misappropriation in several ways: (1) Sharif targeted and successfully solicited investments in Intrepid by numerous Nevada residents; (2) Defendant Sharif and, with Defendant Sharif's knowledge and approval, his brother Tim Sharif used Las Vegas as a base for soliciting investment; and (3) much of the money drawn out of investors in Nevada was impermissibly funneled back into the state to Sharif's relatives who are domiciled in Nevada.

Nevada was involved at each stage of the misappropriation. Sharif's brother, who acted as a deal broker for Defendant Sharif, is a Nevada resident, as is his mother who was the recipient of $1,345,000 in "loans" from the company which were never paid back. Further, when Sharif made his misrepresentations to the Intrepid board and failed to make adequate disclosures to the board, as alleged in the Amended Complaint, the board included two members who are Nevada residents: Aaron Bartels and Theresa Fette.

Accordingly, Sharif's intentional and extensive contacts with the State of Nevada are directly related to the claims at issue in this case.

3.    It Is Reasonable To Require The Defendants To Litigate in Nevada.

In determining whether it is reasonable to require the defendant to defend the particular lawsuit in Nevada, courts consider several factors including "the burden that the defendant will face in defending claims in Nevada, Nevada's interest in adjudicating those claims, the plaintiffs' interests in obtaining expedited relief, along with interstate considerations such as efficiency and social policy." *Arbella*, 122 Nev. at 516, 134 P.3d at 714.

The burden on the Defendants to defend this lawsuit in Nevada is minimal. The Defendants are residents of the adjacent portion of a neighboring state. Defendant Sharif, in addition to the Nevada contacts discussed above, is the manager of Network Pro, LLC, a Nevada limited liability company. All of which shows that Sharif regularly conducts business in Nevada, in addition to

having close family in the state, who also have been involved in Intrepid's business.

Nevada's interest in adjudicating this dispute is significant. Nevada is the Plaintiff's chosen forum for this matter. As detailed above, Nevada was used as a base for solicitation of funds, and money was siphoned by Sharif from Nevada residents and then funneled back into Nevada, impermissibly, to other Nevada residents. Nevada was used as a base for solicitation of funds.

The Plaintiff's interest in obtaining prompt and effective relief strongly favors proceeding in Nevada. The Defendants are withholding critical Company Records that are necessary for the Plaintiff to operate its business. The urgent need to recover those records supports resolving the matter expeditiously in this Court, Plaintiff's chosen forum. Prompt intervention by this Court is therefore necessary to preserve and recover those records.

Finally, interstate considerations such as efficiency and judicial economy favor allowing this action to proceed in Nevada and dismissing or staying the later-filed action pending in the United States District Court for the Southern District of California (the "**California Case**"). To the contrary, Defendants argue that this action should be dismissed or stayed in favor of the California Case. *See* Opposition, at pg. 14 of 66. Pursuant to the "first-to-file rule," however, it is the later-filed action— not the earlier one—that typically yields.

In *Mesi v. Mesi*, 136 Nev. 748, 478 P.3d 366 (2020), the Nevada Supreme Court stated:

> The first-to-file rule is a "generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district"...

> Although the doctrine was originally developed in federal court, state courts have applied it as well...The rule is grounded in principles of efficiency and "[w]ise judicial administration."

*Mesi v. Mesi*, 136 Nev. 748, 752, 478 P.3d 366, 370 (2020) (internal citations omitted).

The Nevada Supreme Court adopted the three-part test for the first-to-file rule set forth by the Ninth Circuit in *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622 (9th Cir. 1991): (1) does the rule apply in the first instance; (2) if so, is there some equitable reason not to apply the rule; and (3) if the rule applies, whether the second-filed action should be dismissed or stayed. *Id.*

For the rule to apply in the first instance, the parties and issues in the two suits must be

12

substantially the same, even if not strictly identical. *Mesi*, 136 Nev. at 752, 478 P.3d at 370. The court should also consider the suits chronology. *Id.*

Here, this case and the California Case assert claims stemming from the Article 9 Sale of Intrepid's assets. This action seeks injunctive relief compelling the turnover of Company Records that Plaintiff acquired through the Article 9 sale. The California Case challenges the validity of the Article 9 Sale and seeks relief relating to the ownership and control of those assets. TFE and Steven Sharif are parties in both actions, and the California Case merely adds additional individuals associated with TFE's management. Looking at the chronology of the two actions, it is undisputed that this action was filed first. Because the parties and issues in this case and the California Case are substantially similar, the first-to-file rule applies.

Under the second step of the *Mesi* test, the first-filed action should have priority unless "special circumstances" weigh in favor of the second action. *Mesi*, 136 Nev. at 752, 478 P.3d at 370. However, very few second suits meet this standard because virtually all arguments regarding the propriety of the two lawsuits, such as jurisdiction or the doctrine of forum non conveniens, should be addressed by the court in the first suit. *Mesi*, 136 Nev. at 752-53, 478 P.3d at 370-71; *see also Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 131 Nev. 296, 301, 350 P.3d 392, 396 (2015) (noting that "a plaintiff's choice of forum is entitled to great deference").

Here, Defendants identify no circumstances that would justify departing from the first-in-time rule including but not limited to their claims of lack of jurisdiction and forum non conveniens. Rather, principles of equity support Nevada maintaining jurisdiction in accordance with the first-to-file rule. Accordingly, because no circumstances exist to justify an exception to the first-to-file rule, the second part of the test is satisfied.

Lastly, unlike the first two parts of the test, which address whether the first-to-file rule applies, the third part considers the appropriate disposition of the second-filed action. Specifically, the third part of the test asks whether the second-filed action should be dismissed or stayed.

Here, Defendants argue that this case should be dismissed or stayed pending resolution of the California Case. However, because the first-to-file rule applies, and because the California Case is the second-filed suit, the California Case—not this action—is the case that should be dismissed

or stayed. *Mesi*, 136 Nev. at 753, 478 P.3d at 371.

Accordingly, the exercise of personal jurisdiction over the Defendants comports with traditional notions of fair play and substantial justice because (1) the Defendants purposefully directed their conduct toward Nevada, (2) the Plaintiff's claims arise out of those Nevada-related activities, and (3) the exercise of jurisdiction is reasonable. At an absolute minimum, Plaintiff has established that further discovery is appropriate concerning jurisdiction before this matter is dismissed on that basis.

**B.    Dismissal For Forum Non Conveniens Is Not Appropriate.**

When deciding a motion to dismiss for forum non conveniens, a district court must first determine the level of deference owed to the plaintiff's forum choice, then determine whether an adequate alternative forum exists, and, finally, if an adequate alternative forum does exist, the court must weigh public and private interest factors to determine whether dismissal is warranted. *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 131 Nev. 296, 300-01, 350 P.3d 392, 396 (2015) (citations omitted). Dismissal for forum non conveniens is appropriate only in exceptional circumstances when the factors weigh strongly in favor of another forum. *Provincial Gov't of Marinduque,* 131 Nev. at 300-01, 350 P. 3d at 396 (citations omitted). A plaintiff's choice of forum is entitled to great deference. *Id.*

Public interest factors to be considered include the local interest in the case, the district court's familiarity with applicable law, the burdens on local courts and jurors, court congestion, and the costs of resolving a dispute unrelated to the plaintiff's chosen forum. *Provincial Gov't of Marinduque,* 131 Nev. at 302, 350 P. 3d at 397. Relevant private interest factors include the location of a defendant corporation, access to proof, the availability of compulsory process for unwilling witnesses, the cost of obtaining testimony from willing witnesses, and the enforceability of a judgment. *Provincial Gov't of Marinduque,* 131 Nev. at 304, 350 P. 3d at 398.

Here, the Defendants argue that the United States District Court for the Southern District of California, where the California Case is pending, is the appropriate forum. However, the Defendants have made no showing of "exceptional circumstances" which justify overcoming the "great deference" afforded to the Plaintiff's choice of forum and warranting dismissal of this action.

14

Rather, the Defendants' argument focuses merely on the fact that Intrepid was incorporated and headquartered in California and that the Defendants are California residents but makes no showing (nor could they) that such considerations as access to proof, the availability of compulsory process for unwilling witnesses or the cost of obtaining testimony from willing witnesses "weigh strongly in favor" of the case proceeding in California.

The Opposition also ignores the fact that two of the named defendants in the California Case, Bartels and Fette, are Nevada residents and another, Dawson, as sole owner of Plaintiff TFE Games Holdings, LLC, has chosen Nevada as the forum for this dispute. Moreover, as shown above in the argument concerning jurisdiction, there are numerous Nevada-based witnesses for this matter, including Bartels, Fette, Joseph Micatratto, Tim Sharif and Sharron Sharif, and Defendant Sharif has had frequent and numerous contacts with Nevada.

This case simply does not fit the usual mold of a case where dismissal for forum non conveniens is appropriate because the "matter has no bona fide connection" to the State of Nevada. *Provincial Gov't of Marinduque,* 131 Nev. at 299, 350 P. 3d at 392 (dismissal on forum non conveniens affirmed where a provincial government in the Republic of the Philippines sued a British Columbia, Canada entity whose only connection to Nevada was that a subsidiary of that company operated a mine in Nevada which subsidiary had no connection to the events in the Philippines on which the lawsuit was based). The "exceptional circumstances" justifying a dismissal based on forum non conveniens are not present here.

C.     **Neither Abstention Under *Colorado River* Nor A Stay Under *Landis* Is Appropriate Here.**

The Opposition's argument on abstention begins from a false premise: namely, that the civil action pending before this Court cannot be adjudicated until the California Case is litigated to conclusion. That is simply not the case. There is no reason the Defendants' claims and causes of action asserted in the California Case could not be asserted here (tabling, for a moment, their lack of merit). Defendants' arguments amount to little more than a tautology: the parties seeking a stay of proceedings before a Nevada state court (here, Defendants) initiate a separate civil action (the California Case) and, predominately on that basis, seek a stay of judicial proceedings in Nevada on

15

the basis that doing so purportedly advances the interests of judicial economy, avoids the possibility of inconsistent rulings, and allegedly saves the parties time and expense. If the arguments advanced in Defendants' Opposition were sufficient to obtain a discretionary stay of proceedings, then it would be altogether too easy for disaffected litigants to evade the jurisdiction of Nevada courts through the issuance of discretionary stays. At bottom, the Defendants have not made a legally sufficient case for a stay.

First, the Defendants' arguments regarding the alleged "predicate" nature of the California Case fall flat. Specifically, the Defendants argue their new case in California should go first because allowing the Nevada case to go first "presupposes" the Plaintiff will triumph here to the detriment of the Defendants' claims. As a matter of basic logic, litigants can always make these types of arguments. If the Defendants' view of the law was correct, however, a plaintiff's choice of forum would no longer be given its great weight and deference, which in turn would allow Nevada defendants to be in the venue driver's seat. Such a regime would make it altogether too easy to evade the jurisdiction of the Nevada state courts. This is simply not the law.

Defendants' second argument for a stay under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) is addressed incorrectly to this Court.[3] *Colorado River* abstention is a discretionary doctrine invoked to restrict the exercise of jurisdiction by federal, not Nevada state, courts. Unsurprisingly, Defendants have not cited any Nevada state law authorities applying the federal abstention doctrine set forth in *Colorado River*. Indeed, given the general stance of the various state courts of all fifty states in our federal system as courts of last resort, it would be odd for a state court to apply *Colorado River* abstention absent a clear and unequivocal instruction to do so by either the Nevada State Legislature or the Supreme Court of Nevada. Defendants' Opposition, indeed, cites no clear and unequivocal instruction to that effect. Plaintiff respectfully submits that further analysis here of the *Colorado River* factors is not necessary;

---

[3] Plaintiff intends to address abstention arguments under *Colorado River* to the California federal district court in the California Case as Plaintiff contends – and Defendants here admit – that the doctrine certainly applies in that forum – Defendants have simply addressed the application of *Colorado River* abstention to the courts of the wrong sovereign in our federal system.

however, solely out of an abundance of caution, Plaintiff will briefly address each of Defendants' referenced factors without waiving the foregoing arguments.

With respect to Defendants' arguments regarding alleged piecemeal litigation, the possibility of inconsistent rulings, and the alleged broader scope of the California Case, Plaintiff respectfully submits that such arguments fail. The prospect of purported piecemeal litigation and inconsistent rulings was caused by Defendants' reactive litigation, and the mere existence of such reactive litigation cannot and should not be construed as sufficient for this Court to enter a stay under the federal *Colorado River* abstention doctrine. Similarly unpersuasive is Defendants' argument regarding under its "Order of Jurisdiction" subheading. (*See Opposition* at pg. 16, lines 2 – 9). This argument gives too little weight to the policy of Nevada state courts' in connection with the first-to-file rule. Moreover, Plaintiff respectfully submits that restricting the first-to-file rule on the basis when particular claims happen to be joined in a given civil action in the Nevada state courts or collateral litigation in federal court would effectively render the rule a nullity as Defendants' argument is simply another way of arguing that the first-to-file rule simply should not apply. Again, that is not the law in Nevada, and that helps explain Defendants' reliance on federal theories, standards, and authorities in the Opposition.

Defendants' arguments under the subheading, "Jurisdiction Over Property" are similarly without merit. Plaintiff's request to turnover records is simply a demand for relief aimed at Defendants and commanding them to turnover Plaintiff's requested documents. Plaintiff is the master of its Complaint. And Defendants' efforts to misconstrue or recharacterize Plaintiff's claims as *in rem* are also without merit.

Plaintiff respectfully submits that the factor subheading addressed to the convenience of the forum weighs in Plaintiff's favor for the reasons set forth above as part of Plaintiff's arguments on the forum non conveniens doctrine, and this federal factor (although, again, inapplicable here) weighs decidedly in Plaintiff's favor.

Finally, as to the alleged adequacy of the federal forum invoked by Defendants in the California Case, Plaintiff again notes Defendants' admission here regarding the application and vitality of *Colorado River* abstention makes the federal forum presented by the California Case

17

inappropriate. In the very near term, Plaintiff shall call upon the California federal court, pursuant to Defendants' admission and invitation, to apply vigorously the *Colorado River* federal abstention doctrine. Simply put, because Nevada was first-filed and has strong local interests, comity favors the California federal court staying the federal action.

Defendants' arguments based on a discretionary stay under the decision of the Supreme Court of the United States in *Landis v. N. Am. Co.*. 299 U.S. 248 (1936) are similarly misplaced. Defendants' error here is based on their rote application of the federal factors identified in the *Landis* decision, as if those factors were directly applicable here. Although Nevada authorities have cited *Landis* for the application of discretionary stays of civil actions, the focus of the Nevada court, and certainly the Supreme Court of Nevada, has had a different focus than that generated by the three-part test cited in rote progression by Defendants. As the Supreme Court of Nevada has explained, "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes of its docket with the economy of time and effort for itself, for counsel, and for the litigants. How this can best be done calls for the exercise of judgment *which must weight competing interests and maintain an even balance.*" *Maheu v. Eighth Judicial Dist. Court*, 89 Nev. 214, 510 P.2d 627, 628(Nev. 1973) (emphasis added); *accord State Comm'r of Ins. v. Eighth Judicial Dist. Court*, 504 P.3d 524, 2022 Nev. Unpub. LEXIS 147, *5 (Nev. Feb. 18, 2022). Defendants err in this aspect of the Opposition by assuming that the focal points of *Landis* remain the same and pass through without any alteration to the Nevada state courts. Again, this is not correct.

To be clear, the wisdom of a *Landis* stay is not at issue. What is at issue, however, is how one goes about obtaining such a stay in the Nevada state courts. The Defendants' failure to cite and apply those aspects of *Landis* upon which the Supreme Court of Nevada has focused amounts to error, and Defendants' ensuing analysis and argument in the Opposition suffers as a result. Plaintiff respectfully submits that further analysis here of the federal *Landis* factors is not necessary; however, solely out of an abundance of caution, Plaintiff will briefly address each of Defendants' referenced factors without waiving the foregoing arguments. Defendants requested stay will not promote judicial economy, obviate any alleged hardship on Defendants' part, or avoid prejudice to

18

Plaintiff because Defendants have already admitted that the California Case is appropriately the subject of *Colorado River* abstention, and Defendants' requested stay will do nothing more than unnecessarily delay further prosecution of this Case. Indeed, the issuance of a discretionary *Landis* stay will only prejudice the Plaintiff here.

Defendants' arguments under both *Landis* and *Colorado River* are without merit.

**D.      A Preliminary Injunction Is Necessary to Prevent Irreparable Harm.**

A preliminary injunction may be issued to preserve the status quo if the party seeking it can show (1) a likelihood of success on the merits, and (2) a reasonable probability that the non-moving party's conduct, if allowed to continue, will result in irreparable harm. *Dixon v. Thatcher*, 103 Nev. 414, 415, 742 P.2d 1029 (1987). In considering preliminary injunctions, courts also weigh the potential hardships to the relative parties and others, and the public interest. *Univ. & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

1.      The Plaintiff Is Likely to Succeed on the Merits.

The Defendants contend that the Plaintiff cannot demonstrate a likelihood of success because the validity of the Article 9 Sale is disputed. *See* Opposition, at pg. 19 of 66. That argument fails for two reasons.

First, the Article 9 Sale was conducted pursuant to the governing loan documents and the Uniform Commercial Code. Article 9 does not require a public auction, the retention of an investment banker, or an extensive marketing process before collateral may be disposed of. To the contrary, the Uniform Commercial Code expressly permits a secured party to dispose of collateral through either a public or private sale, provided the disposition is conducted in a commercially reasonable manner. UCC § 9-610(b). A disposition is commercially reasonable if it is made: "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." UCC § 9-627(b). The fact that a secured party purchases the collateral itself does not render the sale improper. UCC § 9-610(c).

Here, the secured party exercised its rights under the Security Agreement after Intrepid defaulted and conducted a private disposition of the collateral pursuant to Article 9. *See* Security

19

Agreement, § 10. Notice of the disposition was provided in accordance with Article 9. *See* Notice of Disposition. As a result of that sale, the Plaintiff became the successor-in-interest to Intrepid with respect to the collateral and related rights under Article 9.

Second, as set forth in the declarations filed concurrently herewith, Intrepid consented to the Article 9 Sale. It was and is in default under its secured loan obligations. It cannot pay its bills as they come due. No party disputes those facts. As such, the Defendants' arguments to the contrary fall flat, as the Defendants together own less than five percent of Intrepid and are owed no money. They should not be heard now to complain of the Article 9 sale that arose because of their inability to manage Intrepid's finances.

Third, Defendant Sharif, challenges the validity of the Article 9 sale. Put aside for now that Intrepid hired an investment banker who could not identify a buyer or investor (and with whom Sharif participated), the validity of the sale is an issue for another day. The only query now is Plaintiff's immediate right to the records as a purchaser of collateral.

Indeed, the question here is whether the Plaintiff, who acquired the collateral through the Article 9 Sale, has the right to obtain control over the Company Records and accounts necessary to administer those assets. The undisputed evidence demonstrates that Defendant Sharif continues to withhold those records despite repeated demands. Critically, Dawson is the majority owner of Intrepid. The balance of Intrepid's ownership and debt (minus Sharif) support TFE's actions. To the extent the Court were to find Sharif could challenge the Article 9 sale, the Court could not overcome the support of the transaction from the higher priority secured creditors and investors. Sharif's efforts in this regard fail – Intrepid could not pay its bills as they came due and was over $100,000,000 in debt.

Because the Plaintiff is the successor-in-interest to Intrepid with respect to the collateral and related rights under Article 9, and the Defendants refuse to turn over the Company Records necessary to operate and preserve the assets, the Plaintiff has shown a likelihood of success.

        2.      The Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief.

The threat of irreparable harm is not speculative; it has already been recognized by this Court. The Court expressly found that the evidence demonstrated that "immediate and irreparable

20

injury, loss, or damage" would result if the Company Records were not preserved, and that destruction or loss of the Company Records records "would be irreparable because the data could not be recreated." *See* FOFCOL and TRO, pg. 3 of 18, ¶ 2 and pg. 4 of 18, ¶ 4.

The Defendants' Opposition does nothing to undermine those findings. Instead, the Defendants acknowledge that the assets at issue include highly valuable intellectual property, trade secrets, and account access across more than 100 platforms. *See* Opposition, at pg. 24 of 66. The Defendants further warn that transferring credentials could expose those systems to "unauthorized access" or infrastructure compromise. *Id.* However, that argument is backward. The Plaintiff, as the lawful successor to the collateral under Article 9, is the party authorized to access those systems. The real risk arises from allowing former employees and agents to retain control over critical infrastructure and proprietary data.

The risk of loss is not hypothetical. The Plaintiff has obtained video evidence showing former Intrepid personnel removing equipment from the Intrepid server facility. This conduct underscores the urgency of securing control over Intrepid's systems and data before additional assets are removed, deleted, or compromised.

The Defendants attempt to minimize this risk by arguing that (i) no destruction has yet been proven, (ii) certain SaaS platforms maintain backups, and (iii) they have stipulated to preserve records. None of those arguments eliminates the threat of irreparable harm. Courts routinely recognize that the loss of proprietary data, intellectual property, and trade secrets constitutes irreparable injury because such information cannot be fully restored through monetary damages.

Accordingly, allowing the Defendants to retain control over Intrepid's systems and records creates an ongoing and unacceptable risk that Intrepid's intellectual property and operational infrastructure will be lost or compromised, all to the detriment of TFE.

> 3. The Balance of Hardships Favors the Plaintiff.

The balance of hardships strongly favors the Plaintiff. Absent an injunction, the Plaintiff faces the loss of irreplaceable intellectual property, operational records, and infrastructure necessary to preserve the value of the assets acquired through the Article 9 Sale. Without access to the Company Records, the Plaintiff cannot administer Intrepid's accounts, maintain its technology

platforms, or wind down operations in compliance with legal obligations such as the WARN Act.

By contrast, the injunction imposes minimal hardship on the Defendants. The requested relief merely requires the Defendants to relinquish control over Company Records and systems that belong to Intrepid and its Article 9 successor. Any burden imposed by the injunction therefore results solely from the Defendants' refusal to comply with their obligation under the Security Agreement.

Accordingly, the balance of hardships weighs in favor of the Plaintiff as the injunction requires the Defendants to relinquish control over property rightfully belonging to the Plaintiff while protecting the Plaintiff from irreparable loss.

4.    An Injunction is in the Public Interest.

Finally, the requested injunction serves the public interest as it promotes compliance with statutory obligations. As this Court has already recognized, without access to the Company Records, the Plaintiff cannot properly wind up Intrepid's business and fulfill its obligations under the WARN Act, among other obligations. *See* FOFCOL and TRO, pg. 4 of 18, ¶ 5(b).

The requested injunction also advances the public interest by ensuring that assets transferred through a lawful foreclosure process remain under the control of the party that acquired them rather than individuals who no longer have any legal right to possess or control them.

**E.    The Bond Should Remain Nominal.**

NRCP 65(c) requires a movant seeking injunctive relief to provide security "in an amount that the court considers proper" to cover potential damages sustained by a party wrongfully enjoined. NRCP 65(c) grants district courts wide discretion in setting the amount of the bond, and the bond may be nominal if there is no evidence the enjoined party will suffer damages from the injunction. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

Here, the requested injunction prevents the Defendants from exercising control over assets that the Plaintiff acquired through the Article 9 Sale. As such, the Defendants cannot claim any cognizable damages from being prevented from exercising control over property that does not belong to them. If the Plaintiff ultimately prevails—as the evidence strongly indicates—it is the Defendants, not the Plaintiff, who will have been wrongfully withholding assets. It cannot be stated

22

too often either that Intrepid, through its ownership, supports the transactions at issue here. Either way the Court views the assets, they are going to end up in the hands of the Plaintiff. Therefore, the Defendants will not suffer recoverable damages if later found wrongfully enjoined.

Because the injunction protects the Plaintiff's ownership interest in the assets and prevents their destruction, coupled with the fact that the Defendants will suffer no harm from being required to comply with their existing legal obligations, a nominal bond is appropriate.

Accordingly, the Plaintiff respectfully requests that the Court deny Defendants' request for a heightened bond.

## IV.    CONCLUSION.

WHEREFORE, for the reasons set forth above and in the Motion, the Plaintiff respectfully requests that the Court (i) issue injunctive relief to ensure the Company Records are returned and (ii) grant such further relief as the Court may deem is appropriate under the circumstances.

Dated: March 6, 2026.

SCHWARTZ, PLLC

Signed by:

By /s/ _Samuel A. Schwartz_
  Samuel A. Schwartz, Esq.
  Nevada Bar No. 10985
  601 East Bridger Avenue
  Las Vegas, Nevada 89101

  *Attorneys for Plaintiff*

23

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**, was submitted electronically for filing and/or service with the Eighth Judicial District Court on the 6th day of March, 2026. Electronic service of the foregoing document shall be made in accordance with all listed parties on the Odyssey eFileNV service contact list.[4]

I further certify that on the 6th day of March, 2026, the foregoing was served via electronic mail to the following:

K.C. Maxwell, Esq.
Maxwell Law, P.C.
21 Forrest Street
Mill Valley, CA 94941
kcm@kcmaxlaw.com
*Attorneys for Jason Zimmerman,*
*Avery-John Kucan, and Matthew Rhoades*

Timothy Baker
Tim.l3aker@gmail.com

/s/ Susan Roman
Susan Roman, an employee of
Schwartz, PLLC

---

[4]   Pursuant to EDCR 8.05(a), each party who submits an E-Filed document through the E-Filing System consents to electronic service in accordance with NRCP 5(b)(2)(D).

24

# Exhibit C

Electronically Filed
3/6/2026 2:31 PM
Steven D. Grierson
CLERK OF THE COURT

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887
*Attorneys for the Plaintiff*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company, | Case No. A-26-939022-B |
| Plaintiff, | Dept. No. 13 |
| vs. | |
| STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX, | |
| Defendants. | |

**AMENDED NOTICE OF FILING EXHIBITS TO REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELMINARY INJUNCTION**

Plaintiff TFE Games Holdings, LLC, by and through its counsel of record, hereby files the following exhibits to its Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction filed on March 6, 2026:

- **Exhibit 1 – Declaration of Robert D. Dawson in Support of Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction;**

- **Exhibit 2 – Declaration of Theresa Fette in Support of Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction;**

- **Exhibit 3 – Declaration of Aaron Bartels in Support of Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction;**

1

- **Exhibit 4 – Declaration of Joseph D. Micatratto, II in Support of Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction; and**

- **Exhibit 5 - Declaration of Samuel A. Schwartz, Esq. in Support of Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.**

Dated March 6, 2026.

Respectfully Submitted,

*/s/ Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **AMENDED NOTICE OF FILING EXHIBITS TO REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**, was submitted electronically for filing and/or service with the Eighth Judicial District Court on the 6th day of March, 2026. Electronic service of the foregoing document shall be made in accordance with all listed parties on the Odyssey eFileNV service contact list [1].

I further certify that on the 6th day of March, 2026, the foregoing was served via electronic mail to the following:

K.C. Maxwell, Esq.
Maxwell Law, P.C.
21 Forrest Street
Mill Valley, CA 94941
kcm@kcmaxlaw.com
*Attorneys for Jason Zimmerman,*
*Avery-John Kucan, and Matthew Rhoades*

Timothy Baker
Tim.l3aker@gmail.com

*/s/ Susan Roman*
Susan Roman, an employee of
Schwartz, PLLC

---

[1] Pursuant to EDCR 8.05(a), each party who submits an E-Filed document through the E-Filing System consents to electronic service in accordance with NRCP 5(b)(2)(D).

2

Exhibit 1

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for Plaintiff*

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company, | Case No.: A-26-939022-B |
| Plaintiff, | Dept No.: 13 |
| vs. | |
| STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX, | |
| Defendants. | |

**DECLARATION OF ROBERT DAWSON IN**
**SUPPORT OF REPLY TO DEFENDANTS' OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Robert Dawson, hereby declare as follows:

1.     I was an investor in, and a board member of, Intrepid Studios, Inc. ("**Intrepid**"). I am over the age of 18 and competent to make this declaration.

2.     I submit this declaration in support of TFE Games Holding, LLC's ("**TFE**") *Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction* (the "**Reply**").[1]

3.     Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge. To the best of my knowledge, the assertions made herein are true and

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Reply.

1

Docusign Envelope ID: ...

correct. If called upon to testify as to the contents of this declaration, I could and would do so.

4. My involvement in Intrepid arose directly from Steven Sharif's solicitation of my investment and lending in Nevada.

5. In or about February 2022, I met with Steven Sharif in person at Prime Steakhouse at the Bellagio in Las Vegas, Nevada.

6. During that meeting in Las Vegas, Steven Sharif presented and pitched the investment opportunity to me related to Intrepid Studios and the video game Ashes of Creation. This meeting was a direct, in-person solicitation of investment capital within the State of Nevada.

7. In or about February 2025, I attended the D.I.C.E. Summit at the ARIA Resort & Casino in Las Vegas, Nevada, where Steven Sharif was also present, reflecting continued in-person contact in Nevada in connection with company-related matters.

8. Steven Sharif purposefully directed repeated commercial and governance-related activities into Nevada and knew that the foreseeable financial impact of his decisions would be incurred by Nevada residents.

9. Steven Sharif also requested that I approach other existing Nevada-based investors. He knew these individuals were Nevada residents and understood that Intrepid's continued operations depended, in part, on Nevada-sourced capital.

10. Steven Sharif approved Intrepid's expenditures and operational decisions with knowledge that Nevada residents had invested substantial capital and would bear the financial consequences of those decisions.

11. After that first meeting with Steven Sharif at the Bellagio, I made a series of loans to Intrepid between 2022 and 2025 totaling $78,480,831.54 of principal. None of the principal, interest, fees or costs of the loans have been repaid.

12. As security for Intrepid's obligations under the Notes, Intrepid granted to me a security interest and lien in and to substantially all of its assets (collectively, the "**Collateral**"), as more particularly described in that certain Pledge and Security Agreement dated March 23, 2022 (the "**Security Agreement**").

13. In 2025, I sold and transferred $40,372,831.54 of the principal amount of the loans

2

to TFE, including the related lien rights in the Collateral under the Security Agreement. TFE's rights in and to the Collateral, and the security interest granted pursuant to the Security Agreement, are evidenced by that certain UCC Financing Statement filed on May 13, 2025, File Number U240040960326, as amended by that certain UCC Financing Statement Amendment, File Number U260001403217, which amended the secured party of record to TFE Games Holdings, LLC.

14. The Collateral identified in the UCC Financing Statement includes "All assets and all personal property of Debtor, wherever located and whenever acquired, including, but not limited to: Equipment, Inventory, Fixture, Goods, Instruments, Chattel paper (including without limitation Electronic Chattel Paper), General Intangibles, payment Intangibles, Accounts and all other obligations now or hereafter owing to Grantor, all Deposit Accounts, cash, and money, certificates of deposit, Investment Property, Financial Assets, Letters of Credit Rights, all Commercial Tort Claims and any other causes of action against third parties (excluding only claims for death or personal Injury), As-Extracted Collateral, Intellectual property, copyrights, trademarks trade names, all Supporting Obligations for any of the foregoing, all Proceeds (including without limitation insurance proceeds) from and products of and accessions to any of the foregoing and all books and records relating to any of the foregoing. Terms and used herein shall have the meaning provided in the applicable Uniform Commercial Code."

15. I own in excess of sixty four percent (64.8%) of the equity of Intrepid.

16. Steven Sharif owns less than five percent (5%) of Intrepid.

17. Nevada-based investors in Intrepid have just over a five percent (5%) ownership stake. *See* Intrepid Capitalization Table, attached hereto as **Exhibit 1**.

18. I, along with the other Nevada-based lenders hold over 72% of Intrepid's $120,000,000 of debt. *See* chart of Intrepid Note Holders, attached hereto as **Exhibit 2**.

19. I am the one hundred percent (100%) owner of TFE.

20. Steven Sharif participated in board discussions concerning the Article IX sale of Intrepid's assets.

21. As the super majority owner of Intrepid and the sole owner of TFE, I authorized the Article IX sale of Intrepid's assets to TFE. At the time of the sale, I understood the other owners

3

and management of Intrepid approved the transaction. The balance of the factual allegations in the Reply related to my underlying loans, security agreement, and UCC filings are true and correct.

22. Based on my review of Intrepid's books and records, Sharif: commingled personal and corporate accounts; hired a full-time personal chef for his residence paid for with Intrepid funds in an amount of approximately $364,000; made unjustified disbursements to himself, to co-defendant Moore and to family and friends in the sum of millions of dollars; and used Intrepid funds to purchase Nazi uniforms at auction which were then displayed at his personal residence.

23. As of the date hereof, Sharif and Moore have refused to return or provide access to the Company Records.

4

Docusign Envelope ID: ...

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated: March 6, 2026

/s/ Robert Dawson

Robert Dawson

5

Exhibit 1

| Name | Address | Total Shares | Ownership % |
|------|---------|-------------:|------------:|
|  | Las Vegas, NV 89144 | 40.00 | 0.044% |
|  | Las Vegas, NV 89102 | 3,458.38 | 3.815% |
|  | Woodland Hills, CA 91364 | 7,120.40 | 7.854% |
|  | Alpine, UT 84004 | 38.77 | 0.043% |
| Robert D. Dawson | Longwood, FL 32779 | 58,754.43 | 64.805% |
|  | The Villages, FL 32163 | 8,964.15 | 9.887% |
|  | Orlando, FL 32804 | 701.41 | 0.774% |
|  | Cozad, NE 69130 | 4,895.28 | 5.399% |
|  | Sanford, FL 32771 | 1,051.88 | 1.160% |
| Steven Sharif |  | 4,452.32 | 4.911% |
| Theresa Fette | Las Vegas, NV 89141 | 539.42 | 0.595% |
| Aaron Bartels | Las Vegas, NV 89117 | 539.42 | 0.595% |
|  | Lake Mary, FL 32746 | 107.88 | 0.119% |
| TOTAL |  | $ 90,663.74 | 100.000% |

# Exhibit 2

| Entity | Adress | Principal Note Amounts Total |
|---|---|---|
| | Las Vegas, NV 89102 | $ 5,300,000.00 |
| | Woodland Hills, CA 91364 | $ 2,000,000.00 |
| Robert D. Dawson | Longwood, FL 32779 | $ 71,376,481.54 |
| | The Villages, FL 32163 | $ 8,294,000.00 |
| Intrepid Creations | Longwood, FL 32779 | $ 14,000,000.00 |
| | Orlando, FL 32804 | $ 650,000.00 |
| | Cozad, NE 69130 | $ 4,500,000.00 |
| | Sanford, FL 32771 | $ 975,000.00 |
| KR Games, LLC | Las Vegas, NV 89135 | $ 1,350,000.00 |
| | Oceanside, CA 92056 | $ 425,000.00 |
| | Scottsdale, AZ 85259 | $ 2,000,000.00 |
| Fette Holdings | Las Vegas, NV 89141 | $ 1,000,000.00 |
| KR-AOC II, LLC | Las Vegas, NV 89135 | $ 5,000,000.00 |
| Theresa Fette | Las Vegas, NV 89141 | $ 500,000.00 |
| Aaron Bartels | Las Vegas, NV 89117 | $ 500,000.00 |
| | Lake Mary, FL 32746 | $ 100,000.00 |
| TOTAL | | $ 117,970,481.54 |

Exhibit 2

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for Plaintiff*

## DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company, | Case No.: A-26-939022-B |
| Plaintiff, | Dept No.: 13 |
| vs. | |
| STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX, | |
| Defendants. | |

## DECLARATION OF THERESA FETTE IN SUPPORT OF REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Theresa Fette, hereby declare as follows:

1.     I was an investor in, and board member of, Intrepid Studios, Inc. ("**Intrepid**"). I am over the age of 18 and competent to make this declaration.

2.     I submit this declaration in support of TFE Games Holding, LLC's ("**TFE**") *Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction* (the "**Reply**").[1]

3.     Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge. To the best of my knowledge, the assertions made herein are true and correct. If called upon to testify as to the contents of this declaration, I could and would do so.

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Reply.

1

4.     I am, and at all relevant times was, a resident of the State of Nevada. During the time periods described below, I was physically present in Nevada.

5.     My involvement in Intrepid arose directly from Steven Sharif's solicitation of my investment.

6.     On or around late 2021 and early 2022, Steven Sharif personally solicited my investment by telephone while I was physically located in Nevada. At the time of that solicitation, Steven Sharif knew that I was a Nevada resident and intentionally sought investment capital from me in Nevada.

7.     Steven Sharif also requested that I solicit additional funds from other Nevada-based investors. He knew these individuals were Nevada residents and understood that Intrepid's continued operations depended, in part, on Nevada-sourced capital.

8.     Throughout the relevant time period, Steven Sharif conducted remote board governance meetings in which two directors, including myself, were located in Nevada. He knowingly directed governance discussions and funding matters toward Nevada-based stakeholders.

9.     Steven Sharif approved Intrepid's expenditures and operational decisions with knowledge that Nevada residents had invested substantial capital and would bear the financial consequences of those decisions.

10.     Steven Sharif participated in board discussions concerning the Article IX sale of Intrepid's assets and the formation of its successor entity, TFE.

11.     Steven Sharif purposefully directed repeated commercial and governance-related activities into Nevada and knew that the foreseeable financial impact of his decisions would be incurred by Nevada residents.

12.     Steven Sharif is not a lender or secured creditor to Intrepid or TFE.

13.     Steven Sharif owns less than five percent (5%) of Intrepid.

14.     Steven Sharif is not an owner, officer, or director of TFE.

15.     I loaned $1,000,000.00 to Intrepid through my entity Fette Holdings, LLC, and a true and correct copy of the promissory note is attached hereto as **Exhibit 1**.

16.     I own approximately six tenths of one percent (0.6%) of Intrepid.

17. During 2025, Intrepid ran a process to identify a buyer or investor with Aream & Co., a well-known video gaming investment banker. A copy of the offering declaration is attached hereto as **Exhibit 2**.

18. I personally participated in and oversaw the investment process with Aream & Co., and spoke to at least ten (10) potential investors and buyers. Not one party was willing to either invest in or purchase Intrepid's assets.

19. I reviewed and approved the Article IX transaction between Intrepid and TFE.

3

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated: March 6, 2026

/s/ *Theresa Fette*
Theresa Fette

4

Exhibit 1

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## INTREPID STUDIOS, INC.

## CONVERTIBLE PROMISSORY NOTE

Date of Note:  January 24, 2022

Principal Amount of Note:   $1,000,000.00

FOR VALUE RECEIVED, Intrepid Studios, Inc., a California corporation (the "**Company**"), hereby promises to pay to the order of FETTE HOLDINGS, LLC (the "**Holder**") the principal amount of one million dollars ($1,000,000.00) upon the terms and subject to the conditions set forth in this Convertible Promissory Note (the "**Note**").

1.    **Maturity; Payment**. If not sooner paid or converted according to the terms hereof, the outstanding principal amount of the Note, and all accrued and unpaid interest thereunder, shall be due and payable upon the written demand by the Holder at any time after the earlier of: (a) the date that is two (2) years after the date on which this Note is issued, (b) the closing date of an Acquisition (as defined below), or (c) the date of an Event of Default (as defined in Section 5 below) (the "**Maturity Date**"). All payments shall be made in lawful money of the United States at such place as the Holder may from time to time designate in writing to the Company. Payment shall be credited first to any fees and expenses due and payable under this Note, then to the accrued interest and the remainder applied to principal. At any time prior to or after the Maturity Date, in lieu of demanding repayment of the outstanding principal amount and accrued and unpaid interest in cash as otherwise required under the Note, the Holder may elect in writing to extend the Maturity Date to a date mutually agreed between the Parties. "**Acquisition**" shall mean (i) a sale, lease or other disposition (or a series of sales, leases or other dispositions) of fifty-one percent (51%) or more assets or properties of the Company (and its subsidiaries, if any, calculated on a consolidated basis), in each case other than sales of inventory in the ordinary course of business, consistent with past practices, or (ii) any transaction, or series of transactions, in which any Person (defined below) shall directly or indirectly acquire from the holders thereof, by purchase or in a merger, consolidation or other transfer or exchange of outstanding capital stock, ownership of or control over capital stock of the Company (or securities exchangeable for or convertible into such stock or interests) entitled to elect a majority of the Company's Board of Directors or representing at least fifty-one percent (51%) of the number of shares of Common Stock outstanding. "**Person**"

1

means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

2.    **Interest.** Interest shall accrue on the outstanding principal amount of this Note from the date hereof until the earlier of: (i) the date this Note is paid in full; or (ii) the Maturity Date, at the rate of ten percent (10%) per annum or the maximum rate permissible by law, whichever is less. Interest shall be due and payable on the Maturity Date, unless earlier paid in full, and shall be calculated on the basis of a 365-day year for the actual number of days elapsed. The Company shall pay all accrued interest in cash upon repayment of the principal amount of this Note, provided that upon the conversion of this Note pursuant to Section 4 below all accrued interest shall be converted into the shares of Common Stock of the Company into which the Note is converted, at the same conversion price. In connection with such conversion, the Company shall have the right to set a reference date for the conversion of accrued interest that is within ten (10) days of the conversion date, such that interest accrued through such reference date will be converted and the balance of such accrued interest through the conversion date will be paid in cash, provided that Holder may elect to waive any such remaining accrued interest that is not converted.

3.    **Prepayment.** Prior to the Maturity Date, the Company may not prepay the Note, in whole or in part, without written approval by the Holder, except in the event of an Acquisition.

4.    **Limited Conversion.**

(a)    **Optional Maturity Date Conversion.** Upon the Maturity Date, Holder may elect, in its sole discretion, by written notice to the Company ("**Conversion Notice**"), to convert up to fifty percent (50%) of the outstanding principal amount of the Note and accrued interest thereon (such amount, the "**Conversion Amount**") into shares of the Company's common stock ("**Common Stock**") at the Conversion Price (defined below). The number of shares of Common Stock issuable upon such conversion ("**Conversion Shares**") shall be rounded down to the nearest whole share (no fractional shares shall be issued) and the Company shall pay to Holder cash in lieu of any such fraction as set forth herein. The date on which such conversion shall be effected shall be the date of the Company's receipt of the Conversion Notice unless the Company and the Holder agree in writing to another date (such date, the "**Conversion Date**"). The Company shall take all action necessary to ensure that it has sufficient authorized shares of Common Stock to accommodate such conversion and the issuance of the Conversion Shares. In lieu of issuing a fraction of a share of Common Stock upon the conversion of this Note, the Company shall pay the Holder of this Note for any fraction of a share of Common Stock otherwise issuable upon the conversion of this Note, cash equal to the same fraction of the then current per share Conversion Price. For the avoidance of doubt, upon such conversion, the Holder hereof shall cease to have any right to repayment of the Conversion Amount or conversion hereof under Section 4.

(b)    **Procedure for Limited Conversion.** Upon conversion of this Note in accordance with Section 4(a) above, (i) the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company to evidence the conversion, and (ii) the Company shall issue and deliver to Holder (w) a stock certificate representing the Conversion Shares, (x) a new promissory note (substantially in the form and

2

substance of this Note) dated as of the Conversion Date to the Holder in the principal amount of the outstanding principal amount of the Note and accrued interest thereon *less* the Conversion Amount ("**New Note**"), (y) any documentation reasonably required by the Holder to evidence the conversion, and (z) in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by Conversion Price. Notwithstanding anything to the contrary in the immediately preceding sentence, the Company shall not be required to issue or deliver the Conversion Shares or the New Note until the Holder has surrendered (or destroyed and certified such destruction to the Company) this Note to the Company and delivered to the Company any such documentation described in the immediately preceding clause (i). To secure the Holder's obligations to execute and deliver the documentation required by this Section, the Holder hereby appoints the Chief Executive Officer of the Company as the Holder's true and lawful attorney, with the power to act alone and with full power of substitution, to execute and deliver all such documentation required by this Section if, and only if, the Holder fails to execute or deliver such documentation as required by this Section within thirty (30) days of written notice from the Company. The power granted by the Holder pursuant to this Section is coupled with an interest and is given to secure the performance of the Holder's duties under this Note, and is irrevocable and will survive the death, incompetency, disability, merger or reorganization of the Holder.

(c)     **Conversion Price.** For purposes of this Note, "**Conversion Price**" means, subject to adjustment, if any, pursuant to the immediately subsequent sentence, an amount (rounded to the nearest tenth of a cent) equal to the quotient resulting from dividing $1,000,000,000 by the number of outstanding shares of Common Stock of the Company as of the Conversion Date (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes). In the event the Company: (i) pays a dividend in Common Stock or makes a distribution in Common Stock, (ii) subdivides its outstanding Common Stock into a greater number of shares, (iii) combines its outstanding Common Stock into a smaller number of shares or (iv) increases or decreases the number of shares of Common Stock outstanding by reclassification of its Common Stock (including a recapitalization in connection with a consolidation or merger in which the Company is the continuing corporation), then the Conversion Price on the record date of such division or distribution or the effective date of such action shall be adjusted by multiplying such Conversion Price by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately before such event and the denominator of which is the number of shares of Common Stock outstanding immediately after such event. Whenever the Conversion Price is adjusted, as herein provided, the Company shall deliver to the Holder a certificate of the Company's Chief Financial Officer setting forth, in reasonable detail, the event requiring the adjustment and the method by which such adjustment was calculated (including, without limitation, a description of the basis on which the Company's Board of Directors determined the fair value of any evidences of indebtedness, other securities or property or warrants, options or other subscription or purchase rights) and specifying the Conversion Price after giving effect to such adjustment. Until the Maturity Date, the Company shall not create any class of stock with greater preferences or rights than those attributable to the holders of Common Stock.

3

5.    **Event of Default**. For purposes of this Note, an "**Event of Default**" shall be deemed to have occurred if: (a) the Company fails to pay this Note in full when due, provided the parties have not otherwise mutually agreed to extend the Maturity Date; (b) the Company breaches any representation, warranty or covenant contained in this Note which breach (to the extent of a nature that is capable of being cured) continues for fifteen (15) days after notice of breach from the Holder; (c) an default or event of default occurs under the terms of or in respect of Senior Indebtedness; (d) the Company voluntarily files for bankruptcy protection or makes a general assignment for the benefit of creditors, or (e) the Company is the subject of an involuntary bankruptcy petition and such petition is not dismissed within ninety (90) days. If an Event of Default occurs and is continuing, the Holder may by written notice to the Company declare the outstanding principal amount of, and all unpaid accrued interest under, this Note in default and immediately due and payable.

6.    **Unsecured Obligation; Senior Indebtedness**. The indebtedness represented by this Note is unsecured and subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date of this Note or hereafter incurred. "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with: (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor. Nothing in this paragraph shall preclude or prohibit the Holder from receiving any payment or converting this Note into Company's Common Stock hereunder unless and until the Holder has received a default notice from any lender of Senior Indebtedness.

7.    **Representations and Warranties**. As a material inducement to the Holder, the Company hereby makes the representations and warranties contained in Exhibit A attached hereto and incorporated herein by this reference. As a material inducement to the Company, the Holder hereby makes the representations and warranties contained in Exhibit B attached hereto and incorporated herein by this reference.

8.    **Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) five (5) calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iii) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the other party hereto at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may notify the other party pursuant hereto. If notice is given to Company, a copy (which copy shall not constitute notice) shall also be given to Interactive Entertainment Law Group, Attn: Patrick Sweeney, 3868 Carson Street, Suite 110, Torrance, CA 90503.

9.    **Governing Law**. This Note shall be governed by and construed under the laws of the State of California, without giving effect to its choice of law rules.

4

10.    **Transfer; Successors and Assigns**. The rights and obligations of the Company and the Holder shall be binding upon and shall inure to the benefit of their successors, assigns and transferees. Notwithstanding the foregoing, (i) the Holder may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Company; provided that this Note may be assigned, conveyed or transferred without the prior written consent of the Company to any wholly-owned affiliate of Holder or any trust of Holder that executes and delivers to the Company an acknowledgement that such wholly-owned affiliate or trust agrees to be subject to, and bound by, all the terms and conditions of this Note, and (ii) the Company may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Holder. Subject to the immediately preceding sentence, this Note may be transferred only in compliance with any applicable laws, and upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company, a new note for the same principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of this Note.

11.    **Modification; Waiver**. Any term of this Note may be amended or waived only upon the written consent of the Company and the Holder.

12.    **Expenses**. Company and Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein; provided that if any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party will be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

13.    **Stockholders, Officers and Directors Not Liable**. In no event shall any stockholder, officer or director of the Company be liable for any amounts due or payable pursuant to this Note.

14.    **No Rights of a Stockholder**. Nothing contained in this Note shall be construed as conferring upon the Holder or any other person the right to vote or consent or to receive notice as a stockholder in respect of meetings of stockholders for the election of directors of the Company or any other matters or any rights whatsoever as a stockholder of the Company prior to the time that this Note is converted in accordance with the terms of this Note.

15.    **Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

16.    **Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

17.    **Interpretation**. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under all applicable laws and regulations. If, however, any provision of this Note shall be prohibited by or invalid under any such law or regulation in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such law or regulation, or, if for any reason it is not deemed so modified, it shall be ineffective and invalid only to the extent of such prohibition or invalidity without affecting the remaining provision of this Note, or the validity or effectiveness of such provision in any other jurisdiction.

18.    **Entire Agreement**. This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

19.    **Counterparts**. This Note may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

20.    **California Corporate Securities Law**. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

*[signature page follows]*

6

The parties have executed this Convertible Promissory Note as of the date first written above.

**COMPANY:**

**Intrepid Studios, Inc.**

By: *Steven Sharif*

Name: Steven Sharif
Title: Chief Executive Officer

E-mail: StevenSharif@IntrepidStudios.com

Address: 3721 Valley Centre Dr. Ste. 200
San Diego, CA 92130

**HOLDER:**

**FETTE HOLDINGS LLC**

By: *Theresa Fette*

Name: Theresa Fette
Title: Manager

E-mail: theresa@nevadataxgroup.com

Address: 7336 W. Post Rd. #111
Las Vegas, NV, 89113, USA

7

## EXHIBIT A

The Company hereby represents and warrants to the Holder, as of the date of this Note, as follows:

1. *Organization and Good Standing.* The Company is a corporation duly organized and validly existing under the laws of the State of California. The Company has the requisite corporate power and authority to own its properties and assets and to carry on its business as presently conducted. The Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's financial condition or business.

2. *Authorization.* The Company has all right, power and authority necessary to issue this Note, and all required corporate action on the part of the Company and its directors necessary for issuance of this Note and the performance of the Company's obligations under this Note has been taken. This Note is the valid, binding and enforceable obligation of the Company, subject to the laws of general application relating to bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. Shares of equity securities of the Company issued upon conversion of this Note, when issued in compliance with the provisions of this Note, will be validly issued, fully paid and nonassessable, and will be free of any liens or encumbrances.

3. *Non-Contravention.* The issuance by the Company of this Note and the performance and consummation of the transaction contemplated hereunder does not and will not: (i) violate the Company's Certificate of Incorporation or Bylaws, each as amended to date or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other person or entity to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

4. *Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person is required in connection with the issuance of this Note and the performance and consummation of the transactions contemplated hereby except as may be necessary to increase approved shares for the purpose of Conversion or to otherwise comply with the terms of this Note.

5. *No Violation or Default.* The Company is not in violation of or in default with respect to: (i) any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound.

6. *Intellectual Property.* The Company owns (or possesses sufficient legal rights to) all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information,

8

processes and other intellectual property rights necessary for its business without any conflict with, or infringement of the rights of, others.

7. *Litigation.* There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened in writing (i) against the Company that would reasonably be expected to be material to the Company; or (ii) that questions the validity of this Note or the right of the Company to enter into this Note, or to consummate the transactions contemplated by this Note.

8. *Use of Proceeds.* The Company will use the proceeds of this Note solely for the operations of its business in the ordinary course of business, consistent with past practices, and not for any personal, family or household purpose.

## EXHIBIT B

The Holder hereby represents and warrants to the Company, as of the date of this Note, as follows:

1. *Securities Law Compliance.* Holder has been advised that the Note and the underlying securities have not been registered under federal and state securities laws and cannot be resold unless they are registered under applicable securities laws or unless an exemption from such registration requirements is available. Holder is aware that the Company is under no obligation to effect any such registration or to file for or comply with any exemption from registration. Holder has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Holder has no present intention of selling, granting any participation in, or otherwise distributing the Note. Holder has such knowledge and experience in financial and business matters that Holder is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Holder's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Holder is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and will submit to the Company such further assurances of such status as may be reasonably requested by the Company.

2. *Access to Information.* Holder acknowledges that the Company has given Holder access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by Holder, and has furnished Holder with all documents and other information required for Holder to make an informed decision with respect to the purchase of the Note.

3. *Forward-Looking Statements.* With respect to any forecasts, projections of results and other forward-looking statements and information provided to the Holder, the Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

4. *Restrictions on Resales.* Holder acknowledges that the securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. Holder is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at

10

the time Holder wishes to sell the Securities and that, in such event, Holder may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. Holder acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities.

5. *No Public Market.* Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

6. *Brokers or Finders.* Holder has not engaged any brokers, finders or agents, and the Company has not incurred and will not incur, directly or indirectly, as a result of any action taken by Holder, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the transactions contemplated by this Note.

7. *Tax Advisors.* Holder has reviewed with his, her or its own tax advisors the U.S. federal, state and local and non-U.S. tax consequences of this investment and the transactions contemplated by this Agreement. With respect to such matters, Holder relies solely on any such advisors and not on any statements or representations of the Company or any of its agents, written or oral. Holder understands that he, she or it (and not the Company) will be responsible for his, her or its own tax liability that may arise as a result of this investment and the transactions contemplated by this Agreement.

Exhibit 2





COMPANY OVERVIEW



## Intrepid AT-A-GLANCE

1. Developer behind the **upcoming highly anticipated MMORPG** title, **Ashes of Creation**

2. Set in a world of **high fantasy** and **built in UE5**, AoC aims to **reshape the traditional MMO player experience**

3. **7m+ registered users and $25m+ in pre-order revenue** to date driven by community excitement and market anticipation

4. **Transparent development process** with **consistent community interactions** across social media channels to further drive engagement

5. Founded in **2015** in **San Diego, now a 200+ strong team** with extensive **experience in AAA and MMORPG** development

# EXPERIENCED SENIOR LEADERSHIP TEAM



**STEVEN SHARIF**
Founder / Creative Director

- Serial entrepreneur and founder of multi-billion-dollar revenue company, and top online marketing company.
- Avid 27-year MMORPG guild leader and player, first-hand experience and understanding of veteran MMO-player desires
- Brings a player-centric view of evolving the genre whilst serving core audience

games

SOE
- EverQuest II, Creative Director
- EverQuest, Lead Game Designer

**BRYAN LANGFORD**
Executive Producer

nc
- Blade & Soul, Lead Producer
- Lineage Eternal, Lead Producer
- MXM, Senior Producer
- Wildstar, Senior Producer

BLIZZARD
- Manager of Global E-Commerce
- Sr. Producer

**MARK STORCH**
Lead Architect

Qualcomm
- Senior Staff Engineer, Manager

- Chief Technology Director

SOE
- HIZ1, Technical Director
- Everquest II, Technical Director
- FreeRealms, Technical Director

**KEVIN MCPHERSON**
Lead Programmer

- Creative Director working on titles such as New World

SOE
- Planetside II Senior Programmer III
- Everquest II, Senior Programmer II
- Planetside Next, Senior Programmer II
- Vanguard Saga of Heroes, Senior Programmer

**RUSSELL PELTZ**
Senior Gameplay Engineer

**BILL TROST**
Director of Design

# INVESTMENT HIGHLIGHTS

**A unique opportunity to invest in the final stage of next big MMORPG IP production**

**Untapped market potential**
A genre suffering from gameplay and graphical stagnation and dominated by incumbents is hungry for the next big game

**Pushing the boundaries of player experience**
Well-balanced PvX experience in a dynamic world structure built to react to players actions

**Vetted by a passionate community**
Over 7m pre-registered users and $25m pre-order revenue with no active marketing spend to-date

**Experienced development team**
Team of veterans who have worked on some of the most notable MMORPG and AAA titles in the industry

Intrepid
STUDIOS

5





ASHES OF CREATION

**One of the most anticipated MMORPG titles in years** [1]
**Intrepid Studios is reshaping the traditional player experience**

- Open-world **high fantasy** MMORPG
- **Dynamic world structure** built to react to players actions
- **PvX game** with foundational **principle of risk vs. reward**
- **Highly successful Alpha 2 (A2) playtest**
- **Breathing new life** to a genre suffering from **gameplay and graphical stagnation**

| **San Diego** | **Nov-25** | **$25M+** | **$14.99** |
| HQ | Early Access | Revenue to-date | p/m subscription |
| **68K+** | **80%** | **140K+** | **7M+** |
| Playtest Passes Sold | D60 Retention | Pre-orders | Registrations |

Source: (1) Game list from: MMORPG, Game Rant, NerdMuch









# MASTERING PRE-LAUNCH COMMUNITY-BUILDING THROUGH TRANSPARENT DEVELOPMENT AND ENGAGEMENT

## TRANSPARENT DEVELOPMENT PROCESS

- Development focused on on long-desired features by fans of the genre
- Interaction with players across media channels
- Developer interviews with prominent creators
- Monthly development updates

## PRE-LAUNCH COMMUNITY BUILDING

- **$0** spent on marketing
- Organic virality and community engagement
- Dominating twitch viewership, more hours than all other top MMOs
- **1m+** subscribers across all socials

**Unrivalled pre-launch validation** with players already engaged and spending ahead of full launch

## PAID PLAYTESTING AND PRE-ORDERS

- **140k+** preorders of monthly subscription time and in-game items
- **68k** playtest passes sold ($100+ each)
- **80%** retention after **60** days of playtesting
- **$25m+** revenue to date
- **7m+** registrations

Source: Company data

Intrepid

12



# GO-TO-MARKET STRATEGY TO ENSURE SUCCESSFUL LAUNCH

## EXECUTING OUR GTM STRATEGY

- Use A2 to **build momentum through large-scale testing** and strengthen community

- **Sustain engagement with Phase Three updates and Early Access,** expanding reach while deepening player investment

- Drive awareness with a **multi-channel marketing push alongside Early Access** combining paid media, organic content, and creator-led campaigns

- **Focus on bug burndown** and polish to improve stability, reinforce player trust, and prepare for broader rollout

- Prepare for global launch in 2026 by **applying phased learnings to optimize retention, monetization, and long-term scale**

## TIMELINE TO LAUNCH

**Q3-25**
*Phase 3 A2*

**Q1-26**
*Full Launch*

**OCT-24**
*A2 Launch*

**NOV-25**
*Steam Early Access Launch*

Source: Company data

13







# Exhibit 3

Docusign Envelope ID: 6622D4FB-E7F9-35D5-80DF-606FD68F9469

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for Plaintiff*

## DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company,<br><br>                              Plaintiff,<br><br>vs.<br><br>STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX,<br><br>                              Defendants. | Case No.: A-26-939022-B<br><br>Dept No.: 13 |

## DECLARATION OF AARON BARTELS IN SUPPORT OF REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Aaron Bartels, hereby declare as follows:

1.    I am an investor in, and board member of, Intrepid Studios, Inc. ("**Intrepid**"). I am over the age of 18 and competent to make this declaration.

2.    I submit this declaration in support of TFE Games Holding, LLC's ("**TFE**") *Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction* (the "**Reply**").[1]

3.    Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge. To the best of my knowledge, the assertions made herein are true and correct. If called upon to testify as to the contents of this declaration, I could and would do so.

---
[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Reply.

1

Docusign Envelope ID: 6622D4FB-B7F5-85D6-80DE-6057D68F94C9

4. I am, and at all relevant times was, a resident of the State of Nevada. During the time periods described below, I was physically present in Nevada.

5. My involvement in Intrepid arose directly from Steven Sharif's solicitation of my investment.

6. From July through September 2021, I met almost weekly in person in Nevada with Tim Sharif, Steven Sharif's brother, who acted as a deal broker in connection with the investment opportunity. These meetings occurred in Nevada and were part of the pre-investment process.

7. On or around August or September 2021, Steven Sharif personally solicited my investment by telephone/zoom while I was physically located in Nevada. At that time, Steven Sharif knew I was a Nevada resident and intentionally sought capital from me in Nevada. I was with Steven's brother Tim at the time of this communication.

8. Steven Sharif was aware that Nevada residents, including myself, were providing substantial capital to fund company operations.

9. Steven Sharif engaged in governance communications with board members, including Nevada-based directors, while knowing that we were located in Nevada.

10. Steven Sharif's contacts with me were purposeful, repeated, and directed into Nevada in order to obtain and maintain Nevada-based investment capital.

11. Steven Sharif intentionally directed business activities into Nevada and knowingly relied upon Nevada-sourced capital.

12. I invested $500,000 in Intrepid and an additional $4,000,000 with Tim Sharif to be invested in Intrepid with Steven Sharif. A copy of the promissory note is attached as **Exhibit 1**.

13. I own half a percent (0.5%) of Intrepid; however, I should own approximately three and one-half percent of Intrepid pursuant to my $4,000,000 promissory note with Tim Sharif and the Irrevocable Proxy and Personal Guaranty, each signed by Steven Sherif attached hereto as **Exhibits 2 and 3**.

14. I reviewed and approved the Article IX transaction between Intrepid and TFE.

2

Docusign Envelope ID: 6622D4FB-B7F5-85D6-80DE-6057D68F94C9

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated: March 6, 2026

/s/

Aaron Bartels

3

Exhibit 1

**PROMISSORY NOTE**

$4,000,000.00

September 23, 2021

FOR VALUE RECEIVED, Tim Sharif ("Borrower") hereby promises to pay to the order of Aaron Bartels and his, heirs, successors, and assigns ("Lender"), at the address set forth in Section 9(g), or such other address as Lender may direct in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of $4,000,000.00, together with accrued and unpaid interest on the unpaid outstanding principal amount hereof from and after the date hereof, and otherwise in strict accordance with the terms and provisions of this Promissory Note (this "Note").

1.       Interest. This Note shall bear interest at a rate of 10% per annum on the then outstanding principal amount of this Note and shall be payable pursuant to Section 2, provided, however, that following the occurrence and during the continuance of any Event of Default (as hereinafter defined), the applicable annual interest rate shall be "Prime Rate" plus 20% per annum. As used herein, "Prime Rate" means the per annum interest rate established by JPMorgan Chase Bank, N.A. as its prime rate for its borrowers, as such rate may vary from time to time, which rate is not necessarily the lowest rate on loans made by JPMorgan Chase Bank, N.A. at any such time.

2.       Term; Payment. The principal balance of this Note, together with all accrued interest thereon, shall be due and payable on September 21, 2023. Payments made hereunder shall be applied first, to accrued and unpaid interest on the unpaid principal balance of this Note and the remainder, if any, to the unpaid principal balance of this Note. Notwithstanding any other provision of this Note, if any payment under this Note would otherwise be due on a date that is not a Business Day (as hereinafter defined), such payment shall be due on the next succeeding Business Day. As used herein, "Business Day" means any day except Saturday, Sunday, or any other day on which the Federal Reserve Bank located in Dallas, Texas is closed. Borrower may prepay this Note, in whole or in part, at any time or from time to time, without premium or penalty. Any prepayment shall be applied first to any accrued and unpaid interest and then to reduce the outstanding principal of this Note.

3.       Security. This Note is secured by the Collateral, as defined in that certain Pledge Agreement, dated as of the date hereof, by Steven Sharif, as pledgor, in favor of Lender.

4.       Guaranty. The obligations of Borrower under this Note are guaranteed pursuant to that certain Personal Guaranty of Promissory Note, dated as of the date hereof, by Steven Sharif, as guarantor, in favor of Lender.

5.       Representations and Warranties of Borrower. Borrower hereby represents, warrants and covenants to Lender that this Note has been duly and validly executed and delivered and constitutes the valid and legally binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity.

6.       Representations and Warranties of Lender. Lender hereby represents and warrants to Borrower that this Note has been duly and validly executed and delivered and constitutes the valid and legally binding obligation of Lender, enforceable against Lender in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity.

7.       Events of Default. An event of default ("Event of Default") shall exist if:

(a)       Borrower fails to pay when due any principal amount of, or interest accrued under, this Note or any other payment due under this Note in accordance with the terms hereof;

(b)       Borrower shall be in breach of any provision of this Note other than as described in Section 7(a) and such breach shall not be cured within 30 days of the delivery to Borrower of written notice of such breach;

1

(c)     Borrower shall (i) make an assignment for the benefit of creditors, (ii) admit in writing his inability to pay his debts as they become due, (iii) file a voluntary petition for bankruptcy, (iv) file any petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, dissolution, or similar relief under any present or future statute, law or regulation, (v) file any answer admitting the material allegations of a petition filed against him in any such proceeding, or (vi) seek, consent to, or acquiesce in the appointment of any trustee, receiver, or liquidator of him, or of all or any substantial part of his assets; or

(d)     Within 30 days after the commencement of any proceeding against Borrower seeking any bankruptcy, reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute, law, or regulation, such proceeding shall not have been dismissed or, within 30 days after the appointment without the consent or acquiescence of Borrower of any trustee, receiver, or liquidator of Borrower, or of all or any substantial part of his assets, such appointment shall not have been vacated.

8.     Remedies Upon an Event of Default. Upon the occurrence of an Event of Default, at the option and upon the declaration of Lender, an amount equal to the entire unpaid principal of and accrued and unpaid interest on this Note, shall, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived, be forthwith due and payable, and Lender may, immediately and without expiration of any period of grace, enforce payment of all amounts due and owing under this Note and exercise any and all other remedies granted to it at law, in equity or otherwise.

9.     Miscellaneous.

(a)     Successors and Assigns. This Note and all covenants, promises, and agreements contained herein shall be binding upon and inure to the benefit of Lender and Borrower and their respective heirs, successors, and assigns. This Note is not assignable by either party hereto without the prior written consent of the other party, and any attempted assignment without such consent shall be null and void.

(b)     Choice of Forum: Consent to Jurisdiction. This Note shall be governed by and construed in accordance with the laws of the State of Nevada. Any suit, action, or proceeding arising with respect to the validity, construction, enforcement, or interpretation of this Note, and all issues relating in any manner hereto, may be brought exclusively in the federal and state courts located in the State of Nevada. Each of the parties hereto hereby submits and consents to the exclusive jurisdiction of such courts for the purpose of any such suit, action, or proceeding and hereby irrevocably waives (i) any objection which either of them may now or hereafter have to the laying of venue in such courts, and (ii) any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

(c)     Expenses. If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable, documented, and out-of-pocket attorneys' fees, costs, and reasonably necessary disbursements in addition to any other relief to which such party may be entitled.

(d)     Severability. If any provision of this Note is held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING ARISING UNDER OR WITH RESPECT TO THIS NOTE, OR IN ANY WAY CONNECTED WITH, OR RELATED OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS NOTE OR ANY TRANSACTIONS RELATED HERETO, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND IRRESPECTIVE OF WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE. EACH PARTY HERETO HEREBY AGREES THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT EITHER PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS NOTE WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY HERETO TO

THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

(f)     Entire Agreement. This Note constitutes the full and entire understanding and agreement between the parties hereto with regard to the subject matter hereof and thereof.

(g)     Notices. All notices and other communications under this Note shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), or (iii) provided that it is actually received by the recipient, when sent by electronic mail, in each case at the following addresses and email addresses (or to such other address, facsimile number, or email address as a party hereto may have specified by notice given to the other party hereto pursuant to this Section 9(g)):

If to Borrower:

3722 S. Las Vegas Blvd., Unit 3305
Las Vegas, NV 89158
Email: tim@timsharif.com

If to Lender:

Aaron Bartels
9101 Alta Drive 1206
Las Vegas, NV 89145
Email: aaron.bartels@gmail.com

(h)     Captions. The titles and captions used in this Note are used for convenience only and shall not be considered in construing or interpreting this Note.

(i)     Usury Savings Provision. It is expressly stipulated and agreed to be the intent of the parties hereto at all times to comply strictly with the applicable law governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Note. If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved, or received pursuant to this Note or any other communication or writing by or between the parties hereto related to the transaction or transactions that are the subject matter of this Note, (ii) contracted for, charged, taken, reserved, or received by reason of Lender's exercise of the option to accelerate the maturity of this Note, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Lawful Rate (as hereinafter defined) shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Lender shall be credited against the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, that if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Borrower and/or credit such excess interest against the principal of this Note then owing by Borrower to Lender. All sums contracted for, charged, taken, reserved, or received by Lender for the use, forbearance, or detention of any debt evidenced by this Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note does not exceed the Maximum Lawful Rate from time to time in effect and applicable to this Note for so long as debt hereunder is outstanding. As used herein, "Maximum Lawful Rate" means the maximum lawful rate of interest which may be contracted for, charged, taken, received, or reserved by Lender in accordance with the applicable laws.

3

(j)    Counterparts. This Note may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which shall be considered one and the same instrument and shall become effective when the counterparts have been signed by and delivered to both parties hereto. If any signature to this Note is delivered by e-mail delivery of a ".pdf" data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such ".pdf" signature page were an original thereof.

(k)    No Presumption Against Drafting Party. Each party hereto acknowledges that such party has been represented by legal counsel in connection with this Note and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Note against the drafting party has no application and is expressly waived.

IN WITNESS WHEREOF, the parties hereto have duly executed this Note as of the date first written above.

**BORROWER:**

Tim Sharif

**LENDER:**

Aaron Bartels

(j)    Counterparts. This Note may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which shall be considered one and the same instrument and shall become effective when the counterparts have been signed by and delivered to both parties hereto. If any signature to this Note is delivered by e-mail delivery of a ".pdf" data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such ".pdf" signature page were an original thereof.

(k)    No Presumption Against Drafting Party. Each party hereto acknowledges that such party has been represented by legal counsel in connection with this Note and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Note against the drafting party has no application and is expressly waived.

IN WITNESS WHEREOF, the parties hereto have duly executed this Note as of the date first written above.

**BORROWER:**

Tim Shariff

**LENDER:**

Aaron Bartels

4

Exhibit 2

# IRREVOCABLE PROXY

## (Interests of Intrepid Studios, Inc.)

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby irrevocably (to the fullest extent permitted by law) appoints and constitutes Aaron Bartels (the "Proxy Holder"), the attorney and proxy of the undersigned with full power of substitution and resubstitution, to the full extent of the undersigned's rights with respect to all of the Pledged Equity (as defined in the Pledge Agreement, defined below) which constitute the shares or other equity interests (the "Interests") of Intrepid Studios, Inc., a California corporation (the "Company"). Upon the execution hereof, all prior proxies given by the undersigned with respect to any of the Interests are hereby revoked, and no subsequent proxies will be given with respect to any of the Interests.

This proxy is irrevocable, is coupled with an interest and is granted pursuant to that certain Pledge Agreement dated as of September 23, 2021 (as amended, restated, modified or supplemented from time to time, the "Pledge Agreement") for the benefit of the Proxy Holder in consideration of the credit extended pursuant to that certain Promissory Note dated as of September 23, 2021 by and between the Proxy Holder and Tim Sharif, as amended, restated, modified or supplemented from time to time (the "Promissory Note"). Capitalized terms used herein but not otherwise defined in this irrevocable proxy have the meanings ascribed to such terms in the Pledge Agreement.

The Proxy Holder named above will be empowered and may exercise this irrevocable proxy to vote the Interests at any and all times after the occurrence and during the continuation of an Event of Default, including but not limited to, at any meeting of the shareholders of the Company, however called, and at any adjournment thereof, or in any written action by consent of the shareholders of the Company. This proxy shall remain in effect with respect to the Interests until the payment in full of the Secured Obligations and the termination of all obligations under the Promissory Note, and will continue to be effective or automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by Proxy Holder as a preference, fraudulent conveyance or otherwise under any bankruptcy, insolvency or similar law, all as though such payment had not been made (provided, that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable and documented out-of-pocket costs and expenses (including reasonable out-of-pocket attorneys' fees and disbursements) incurred by the Proxy Holder in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations), notwithstanding any time limitations set forth in the organizational documents of the Company or applicable law.

Any obligation of the undersigned hereunder shall be binding upon the heirs, successors and assigns of the undersigned (including any transferee of any of the Interests).

IN WITNESS WHEREOF, the undersigned has executed this irrevocable proxy as of the date first written above.

By _____

Print Name: Steven Sharif

Exhibit 3

## PERSONAL GUARANTY OF PROMISSORY NOTE

### Dated as of September 23, 2021

In order to induce Aaron Bartels and his heirs, successors, and assigns ("Lender") to make a loan in an aggregate principal amount of $4,000,000.00 to Tim Sharif ("Borrower") evidenced by that certain Promissory Note, dated as of the date hereof (the "Note"), the undersigned Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all payments and performance owed to Lender pursuant to the Note (the "Guaranteed Obligations").

Guarantor hereby guaranties that payments hereunder will be paid to Lender without set-off or counterclaim in US Dollars at the address of Lender specified in the Note. Guarantor understands and agrees that the obligations of Guarantor hereunder shall be construed as a continuing, absolute and unconditional without regard to: (a) the validity or enforceability of the Note, any of the Guaranteed Obligations or any right of offset with respect thereto at any time or from time to time held by Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by Guarantor against Lender, (c) any other circumstance whatsoever (with or without notice to or knowledge of Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of Guarantor for the Guaranteed Obligations, in bankruptcy or in any other instance, (d) whether Lender has made any demand on Borrower or taken any action of any nature against Borrower; or (e) whether Lender has pursued any rights which it has against any other person who may be liable for the Guaranteed Obligations. This Personal Guaranty (and the guarantee contained herein) (this "Guaranty") is an unconditional guarantee of payment and not of collection.

The obligations of Guarantor are limited to the maximum amount that would not render Guarantor's obligations hereunder subject to avoidance under applicable fraudulent conveyance or fraudulent transfer provisions of the United States Bankruptcy Code or any comparable or other provision of foreign, federal or state law.

To the fullest extent permitted by law, Guarantor hereby expressly waives any and all rights or defenses arising by reason of any law. To the fullest extent permitted by law, Guarantor hereby (a) waives notice of presentment, demand, notice of nonpayment, protest and notice of protest as to the Guaranteed Obligations and any other demands and notices required by law, (b) consents to the provisions of the Note, (c) consents and agrees that Lender may waive or delay the exercise of any rights or remedies against Borrower or any surety or guarantor, and may (i) release or enter into compromises with Borrower, or any surety or guarantor of the Guaranteed Obligations, and (ii) renew, extend, waive or modify the terms of the Note or any Guaranteed Obligations or any other instrument or agreement evidencing the same, and assign its claims thereunder to other persons, (d) waives all defenses which may be available by virtue of any law now or hereafter in effect, and (e) waives all suretyship defenses generally. Guarantor represents and warrants to Lender that: (a) no other agreement, representation or special condition exists between Guarantor and Lender regarding the liability of Guarantor hereunder; and (b) Guarantor has no defense whatsoever (including any suretyship defense) to any action or proceeding that may be brought to enforce this Guaranty.

Guarantor, for the benefit of Lender, waives and agrees not to enforce any of the rights of Guarantor against Borrower, including: (a) any right of Guarantor to be subrogated in whole or in part to any right or claim with respect to any Guaranteed Obligations or any portion thereof to Lender which might otherwise arise from payment by Guarantor to Lender on the account of the Guaranteed Obligations or any portion thereof, any right of contribution or indemnification against Borrower, and any right to participate in any claim or remedy of Lender against Borrower in connection with the Guaranteed Obligations or any portion

thereof, in each case, until the Note is paid in full; and (b) any right of Guarantor to require the marshalling of assets of Borrower which might otherwise arise from payment by Guarantor to Lender on account of the Guaranteed Obligations or any portion thereof. Guarantor acknowledges that it will receive direct and indirect benefits from the Note and that the waivers set forth in this Guaranty are knowingly made in contemplation of such benefits.

Guarantor agrees that the provisions of this Guaranty are severable, and in an action or proceeding involving any state or federal bankruptcy, insolvency or other law affecting the rights of creditors generally, if any clause or provision shall be held invalid or unenforceable in whole or in part against Guarantor in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Guaranty in any jurisdiction.

Guarantor agrees that this Guaranty shall be binding upon Guarantor and its successors and assigns; provided, however, that Guarantor may not assign or transfer any of its rights and obligations hereunder or any interest herein. Guarantor further agrees that (a) this Guaranty is freely assignable and transferable by Lender in connection with any assignment or transfer of the Note and (b) this Guaranty shall inure to the benefit of Lender, and its successors and assigns.

Guarantor further agrees that no amendment, waiver or modification of this Guaranty or of any rights of Lender under this Guaranty shall be effective as to Lender unless in writing and signed by Lender.

This Guaranty shall be governed by and construed in accordance with the laws of the State of Nevada. Any suit, action, or proceeding arising with respect to the validity, construction, enforcement, or interpretation of this Guaranty, and all issues relating in any manner hereto, may be brought exclusively in the federal and state courts located in the State of Nevada. Each of the parties hereto hereby irrevocably submits and consents to the exclusive jurisdiction of such courts for the purpose of any such suit, action, or proceeding and hereby irrevocably waives (i) any objection which either of them may now or hereafter have to the laying of venue in such courts, and (ii) any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.

EACH PARTY HERETO HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING ARISING UNDER OR WITH RESPECT TO THIS GUARANTY, OR IN ANY WAY CONNECTED WITH, OR RELATED OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS GUARANTY OR ANY TRANSACTIONS RELATED HERETO, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND IRRESPECTIVE OF WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE. EACH PARTY HERETO HEREBY AGREES THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT EITHER PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS GUARANTY WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY HERETO TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be duly executed and duly delivered as of the day and year first above written.

GUARANTOR:

By:

Name:   Steven Sharif

Exhibit 4

Docusign Envelope ID: 0AA699DE-7795-6FBF-8045-E04CB600570C

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for Plaintiff*

## DISTRICT COURT
## CLARK COUNTY, NEVADA

|  |  |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>vs.<br><br>STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX,<br><br>    Defendants. | Case No.: A-26-939022-B<br><br>Dept No.: 13 |

## DECLARATION OF JOSEPH P. MICATROTTO, II IN SUPPORT OF REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Joseph P. Micatrotto, II, hereby declare as follows:

1. I own and manage two limited liability companies that invested in Intrepid Studios, Inc. ("**Intrepid**"). I am over the age of 18 and competent to make this declaration.

2. I submit this declaration in support of TFE Games Holding, LLC's ("**TFE**") *Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction* (the "**Reply**").[1]

3. Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge. To the best of my knowledge, the assertions made herein are true and correct. If called upon to testify as to the contents of this declaration, I could and would do so.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Reply.

1

4. I am, and at all relevant times was, a resident of the State of Nevada. During the time periods described below, I was physically present in Nevada.

5. My involvement in Intrepid arose directly from Steven Sharif's solicitation of my investment.

6. On or before March 5, 2020, Steven Sharif personally started to solicit my investment while I was physically located in Nevada. At the time of that solicitation, Steven Sharif knew that I was a Nevada resident and intentionally sought investment capital from me in Nevada.

7. On multiple occasions after March 5, 2020, Steven Sharif contacted me while I was physically present in Nevada requesting additional investment capital.

8. Steven Sharif also requested that I introduce him to other Nevada-based investors. He knew these individuals were Nevada residents and understood that Intrepid's continued operations depended, in part, on Nevada-sourced capital.

9. I agreed to introduce Mr. Sharif to investors in Nevada and formed two entities for that purpose. The entities are named KR-Games, LLC and KR-AOC II LLC, each of which is a Nevada entity.

10. I manage KR-Games, LLC, the owners of whom include me and 3 other Nevada residents, each of whom invested in Intrepid through this limited liability company. On March 5, 2020, KR-Games, LLC loaned a total of $1,350,000 to Intrepid. The entirety of this loan, including fees and costs, remains unpaid.

11. Separately, I manage KR-AOC II, LLC, the owners of whom include me and 8 separate Nevada residents, who together on May 19, 2022, loaned $5,000,000 in Intrepid through this second limited liability company. The entirety of this second loan, including fees and costs, remains unpaid by Intrepid.

12. Each of KR-Games, LLC and KR-AOC II, LLC support the litigation being conducted here in Nevada.

2

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated: March 5, 2026

/s/ Joseph P. Micatrotto, II
Joseph P. Micatrotto, II

3

Exhibit 5

Docusign Envelope ID: 8346E6F2-F2B7-8781-8396-4A90D03294DB

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Emily D. Anderson, Esq.
Nevada Bar No. 13814
eanderson@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Attorneys for Plaintiff*

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| TFE GAMES HOLDINGS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN SHARIF, a Nevada resident; JOHN MOORE, a Nevada resident; DOES I through X; and ROE CORPORATE DEFENDANTS XI through XX,<br><br>Defendants. | Case No.: A-26-939022-B<br><br>Dept No.: 13 |

**DECLARATION OF SAMUEL A. SCHWARTZ, ESQ. IN SUPPORT OF REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Samuel A. Schwartz, hereby declare as follows:

1. I am over the age of 18, mentally competent and unless otherwise stated, I have personal knowledge of the facts set forth herein. If called upon to testify as to the contents of this declaration, I could and would do so.

2. I am an attorney with Schwartz, PLLC ("**Plaintiff**"), counsel for Plaintiff TFE Games Holdings, LLC in the above-referenced matter. I am admitted to practice in the Supreme Court of Nevada and the United States District Court for the District of Nevada, among others. I make this declaration in support of Plaintiff's *Reply to Defendants' Opposition to Plaintiff;s Motion for*

1

*Preliminary Injunction* (the "**Reply**") which has been filed in the above-referenced matter.

3.    Attached hereto as Exhibit 1 is a true and correct copy of the complaint filed in the Caramanis Suit[1].

4.    Attached hereto as Exhibit 2 is a true and correct copy of the Loan Sale Agreement.

5.    Attached hereto as Exhibit 3 is a true and correct copy of the Notice of Disposition.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated: March 6, 2026

Signed by:

/s/ Samuel A. Schwartz

2CBBF2AC9F984BF

Samuel A. Schwartz, Esq.

---

[1]    All capitalized terms not defined herein shall have the meaning ascribed to them in the Reply.

2

Exhibit 1

BEVERLY HILLS LAW CORP., PC
Sagar Parikh, Esq. (SBN 282655)
9777 Wilshire Blvd., Suite 400
Beverly Hills, CA 90212
Telephone:   (424) 340-6471
Facsimile:   (310) 982-2603
Email:       SP@BeverlyHillsLawCorp.com

Attorneys for Plaintiffs

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
3/3/2026 11:32:22 AM

Clerk of the Superior Court
By M. Alvarez        ,Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO – CIVIL UNLIMITED**

| | |
|---|---|
| JASON CARAMANIS, individually, and as Trustee of the YA-YA LEGACY TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN SHARIF, an individual; JOHN MOORE, an individual; INTREPID STUDIOS, INC., a California corporation; and DOES 1 through 20, inclusive, <br><br> Defendants | Case No.:   26CU011902C <br><br> **COMPLAINT FOR:** <br><br> 1.  INTENTIONAL MISREPRESENTATION (FRAUD) <br> 2.  FRAUDULENT CONCEALMENT <br> 3.  AIDING AND ABETTING FRAUD <br> 4.  RESCISSION FOR FRAUD <br> 5.  NEGLIGENT MISREPRESENTATION |

COME NOW, Plaintiffs JASON CARAMANIS, individually, and as Trustee of the YA-YA LEGACY TRUST (collectively, "Plaintiffs") and hereby submits their Complaint and allege as follows:

**GENERAL ALLEGATIONS**

1.     Plaintiff Jason Caramanis is an individual and at all relevant times was an investor in and lender to Intrepid Studios, Inc. ("Intrepid").

2.     Mr. Caramanis is also the trustee of Plaintiff Ya-Ya Legacy Trust, a trust which provided funding to Intrepid.

3.     Plaintiffs were the lenders and investors under the promissory notes and security agreements described below.

- 1 -
COMPLAINT

4.    Defendant STEVEN SHARIF ("Sharif") is an individual and was at all relevant times the co-founder, Chief Executive Officer, and a director of Intrepid.  Sharif was the primary point of contact who solicited and obtained Plaintiffs' loans and investments.   Sharif also personally guaranteed repayment of certain loans at issue (as described in the loan documents).

5.    Defendant JOHN MOORE ("Moore") is an individual and was at all relevant times a co-founder and the Chief Financial Officer of Intrepid, as well as a business partner and the husband of Sharif.  Moore worked closely with Sharif in managing Intrepid's finances and dealings with investors. Plaintiffs are informed and believe that Moore was also a shareholder of Intrepid.

6.    Defendant INTREPID STUDIOS, INC. ("Intrepid") is a California corporation, with its principal place of business in San Diego County, California.

7.    Plaintiffs are ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, and, therefore, sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe and thereon allege that each of these fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages, as herein alleged, were proximately caused by such Defendants.

8.    Plaintiffs are informed, believe and thereupon allege that Defendants, including those sued herein as DOES 1 through 20, inclusive, and each of them, were and are the tenants, agents, employees, officers, directors, principals, managing agents, managers, members, subsidiaries, affiliates, joint ventures, partners, subcontractors, alter egos, co-conspirators or representatives of each other with respect to the events and transactions alleged herein.

9.    Plaintiffs are informed, believe and thereupon allege that Defendants, including those sued herein as DOES 1 through 20, inclusive, and each of them, were involved in the acts, transactions, and omissions alleged herein below and are responsible in whole or in part for the injuries and damages herein alleged.

10.    Plaintiffs are informed, believe and thereupon allege that, at all times herein mentioned, each of the Defendants, including those named herein as DOES 1 through 20, in addition

COMPLAINT

to action for herself and itself at all material times was acting as the agent, servant, employee and representative of each of the other defendants, and in doing the things herein after alleged, was acting within the course and scope of such relationship and with the permission, consent and ratification of each and every other Defendant. All of the references made herein below to Defendants, and each of them, include a reference to the fictitiously named Defendants. Defendants DOES 1 through 20 identified in the complaint are fictitiously named Defendants, and Plaintiffs reserve the right to amend this complaint to identify those parties true names once discovered.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action as it is a civil action asserting causes of action under California law and the amount in controversy exceeds the jurisdictional minimum of this Court.

12.    Venue is proper in the Superior Court of California, County of San Diego, because a substantial part of the events or omissions giving rise to the claims occurred in San Diego County. Intrepid Studios, Inc. maintained its principal place of business in San Diego County, and the loans and investments at issue were intended to fund a business operating in San Diego County. Furthermore, certain Defendants reside in California (including within San Diego County) or conducted business here related to the claims.

13.    Intrepid Studios, Inc. ("Intrepid") is a California corporation that was the borrower on the loans described below. Plaintiffs are informed and believe that Intrepid has ceased active business operations.

14.    At all relevant times, Defendant Sharif dominated and controlled Intrepid such that it operated as his alter ego. Sharif commingled Intrepid's funds with personal accounts, disregarded corporate formalities, and used Intrepid's assets for personal benefit, and an inequitable result will follow if the acts in question are treated as those of Intrepid alone. Accordingly, wherever this Complaint refers to acts or knowledge of Intrepid, such references include the acts or knowledge of Sharif, and vice versa, under alter ego principles.

//
//

- 3 -
COMPLAINT

## FACTUAL ALLEGATIONS

## COMMON TO ALL CAUSES OF ACTION

15.     Intrepid Studios, Inc. was a startup video game development company founded in or about 2015 by Steven Sharif, with John Moore as a partner. Intrepid's flagship project was an online role-playing game called "Ashes of Creation." Intrepid had no significant revenue in its early years and relied almost entirely on funding from outside investors to pay for development and operations.

16.     Intrepid, throughout its history, has raised at least $120 million, from various sources, including crowdfunding, bank loans, and private investments/loans.

17.     Throughout Intrepid's operation, Sharif portrayed himself as heavily personally invested in the project, both financially and as the leader of the company.

18.     At all relevant times, Sharif exercised dominant control over Intrepid's fundraising, disbursement of capital, and investor communications. Major financial decisions, including whether loan proceeds would be used for operations, insider compensation, or other purposes, required Sharif's approval or occurred with his knowledge.

19.     Moore, as CFO, at all relevant times, implemented or recorded the financial treatment of transactions directed or approved by Sharif.

20.     In early 2017, Sharif approached Jason Caramanis to solicit funding for Intrepid.

21.     In or about January 2017, Sharif represented to Caramanis orally that as of that time, Sharif had personally invested approximately $10 million into Intrepid. This was not true and not discovered until years later, as further discussed below.

22.     On or about February 20, 2017, Plaintiff Jason Caramanis agreed to extend a line of credit loan of up to $2,000,000 to Intrepid.

23.     Intrepid executed a written Line of Credit Convertible Promissory Note dated February 20, 2017 (the "2017 Note") in favor of Mr. Caramanis (or his designated assignee) in the principal amount of $2,000,000.

24.     A true and correct copy of the 2017 Note (executed on or about Feb. 20, 2017) is attached hereto as Exhibit A and incorporated herein by reference. To secure the 2017 Note,

- 4 -

COMPLAINT

Intrepid and Sharif concurrently executed a Pledge and Security Agreement dated February 20, 2017 granting Mr. Caramanis a security interest in all assets of Intrepid as collateral.

25.    A true and correct copy of the February 20, 2017 Pledge and Security Agreement is attached hereto as Exhibit B and incorporated herein by reference.

26.    Under the February 20 2017 Note, Intrepid could draw up to $2,000,000 from Plaintiffs' funding, with interest at 20% per annum. The Note also contained equity participation features: upon the initial funding, Mr. Caramanis was to receive a 15% equity ownership stake in Intrepid, and if the loan was not repaid by the one-year maturity, Mr. Caramanis would receive an additional 15% equity (for a total potential stake of 30%).

27.    The 2017 Note further provided that Mr. Caramanis (or his designee) would be given a position on Intrepid's Board of Directors and that Intrepid would consult with him on major decisions, formalizing these rights in corporate governance documents.

28.    Defendant Sharif signed the 2017 Note both on behalf of Intrepid and as a personal guarantor of Intrepid's obligations.

29.    By this guaranty, Sharif became personally liable to repay the loan if Intrepid failed to do so. The Pledge and Security Agreement likewise identifies Sharif as "Personal Guarantor" and confirms the collateral for the loan as all assets of Intrepid.

30.    On or about February 23, 2017, a Convertible Promissory Note was entered into between Ya-Ya Legacy Trust and Intrepid, for another $2,000,000 to be borrowed from Ya-Ya Legacy Trust. A true and correct copy of this is attached hereto as Exhibit C.

31.    In 2018, Intrepid continued to seek funding from Mr. Caramanis and his affiliated entities.

32.    Between the end of 2017 and throughout 2019, at various points, Sharif now claimed to have invested a total of approximately $30 million into Intrepid.

33.    On or about June 13, 2018, Intrepid executed a convertible promissory note for an additional loan of approximately $2,138,000 (which represented further advances from Plaintiffs to Intrepid). Rather than have that short-term note repaid in cash, the parties agreed to roll it into a larger financing in 2019.

34. Accordingly, on or about March 4, 2019, Intrepid (through Sharif) executed a Convertible Promissory Note dated March 4, 2019 in favor of Plaintiff Ya-Ya Legacy Trust in the principal amount of $5,138,000.00 (the "2019 Note").

35. This 2019 Note explicitly consolidated the prior June 2018 loan of $2,138,000 with new funding commitments from the Trust totaling an additional $3,000,000.

36. Specifically, under the 2019 Note, the Trust agreed to immediately fund $1,000,000 and to fund four monthly installments of $500,000 thereafter (April through July 2019), resulting in $3,000,000 new dollars, which combined with the rolled over $2,138,000 made a total of $5,138,000.

37. A true and correct copy of the March 4, 2019 Convertible Promissory Note is attached hereto as Exhibit D and incorporated by reference.

38. To secure the 2019 Note, Intrepid and Sharif executed a Pledge and Security Agreement dated March 5, 2019 in favor of Ya-Ya Legacy Trust, again pledging all assets of Intrepid as collateral for the loan.

39. A true and correct copy of the March 5, 2019 Pledge and Security Agreement is attached hereto as Exhibit E and incorporated by reference.

40. Defendant Sharif also personally guaranteed the 2019 Note, making himself liable for its repayment.

41. The 2019 Note carried a 20% annual interest rate and was set to mature on July 1, 2020, unless extended or converted to equity at the Trust's election. It also provided a conversion feature whereby the Trust could convert the debt into an equity stake (up to 7.7% non-dilutable preferred stock) valued at an $80 million company valuation.

42. In or about August 2019, Sharif needed a $300,000 bridge loan for two months, so yet another Promissory Note was executed. A true and correct copy of this is attached hereto as Exhibit F.

43. In total, between 2017 and 2019, Plaintiffs invested $9.438 million into Intrepid in the form of loans (Exhibits A-F) and received minority equity stakes pursuant to the loan agreements (e.g. the 15%+ equity from the Line of Credit 2017 Note, the 4.4% equity from the

2017 Convertible Note and up to 7.7% via conversion of the 2019 Note).

44. Sharif repeatedly assured Mr. Caramanis during this period that these funds were critically needed to develop *Ashes of Creation* and would be used for legitimate business purposes (game development, employee (i.e. developers) salaries, marketing, and related items.). Sharif also created the clear impression that he himself had "skin in the game" by investing significant personal funds into Intrepid alongside Plaintiffs.

45. In reliance on Sharif's representations and the contractual rights he was promised (board seat, etc.), Mr. Caramanis expected to be kept informed and involved in high-level decision-making at Intrepid.

46. Almost immediately after Plaintiffs' funding was in place, Defendant Sharif began stonewalling Plaintiffs' attempts to exercise oversight. Despite the promise to appoint Mr. Caramanis to the Board of Directors in the 2017 Note, Sharif never convened a single board meeting from 2017 through 2024 (at least none involving Caramanis).

47. Plaintiffs are informed and believe that Sharif never formally added Mr. Caramanis to Intrepid's board or, if he did so on paper, he disregarded any corporate governance by failing to hold meetings or provide meaningful financial updates.

48. Moreover, Sharif refused to provide Plaintiffs with basic financial documents and records of Intrepid, even when requested.

49. For nine years, Sharif did not allow access to Intrepid's completed and detailed books, records, or tax returns, despite contractual and statutory obligations to do so. Sporadically, over the years, Plaintiffs were given high level profit and loss statements that did not contain any details about insider compensation.

50. By providing only generalized summary statements while withholding material details regarding payments to insiders and related parties, Defendants created a misleading impression concerning how Plaintiffs' funding was being used.

51. Defendants' provision of summary-level financial statements created a duty to disclose additional material facts necessary to make those disclosures not misleading. By selectively disclosing generalized expense categories while omitting material information

- 7 -

concerning insider compensation, related-party transfers, and payments to affiliates and family members, Defendants conveyed a materially incomplete and misleading picture of Intrepid's financial activities.

52. As the company's CEO and majority owner, Sharif kept Intrepid's finances opaque. When Mr. Caramanis inquired about the use of funds or requested financial statements, he was given excuses or incomplete information. This lack of transparency was a breach of Sharif's agreements with Plaintiffs (which required meaningful consultation on major financial decisions) and a breach of Sharif's fiduciary duties, and it prevented Plaintiffs from discovering how their money was actually being used.

53. Notwithstanding the lack of information, Sharif continued to seek more money from Plaintiffs and other investors as Intrepid's cash needs grew.

54. In or around 2020, Sharif arranged for Plaintiff Caramanis to take over another $1,000,000 loan that had been made by a third party: specifically, on January 16, 2020, an amendment was executed transferring the $1,000,000 principal of a note (originally held by CTB Rise International, Inc.) to Mr. Caramanis, effectively making him the lender for that debt (with Sharif still owing interest and a small equity kicker to the original holder).

55. A true and correct copy of this is attached hereto as Exhibit G.

56. And later, in or about March 2025, Sharif urgently requested additional bridge financing to keep Intrepid afloat.

57. Relying on Sharif's pleas and still not having full insight into Intrepid's finances, Plaintiff Ya-Ya Legacy Trust loaned Intrepid another $2,000,000 on or about March 28, 2025 (evidenced by a Promissory Note of that date) (the "2025 Note").

58. A true and correct copy of the March 28, 2025 Promissory Note is attached hereto as Exhibit H and incorporated by reference.

59. The 2025 Note was a line-of-credit promissory note for $2,000,000 at 12% interest, which Sharif executed on behalf of Intrepid. By the time of this 2025 Note, Intrepid was in a precarious financial condition, but Sharif represented that the additional $2 million infusion would allow the company to continue operating and generating revenue (for example, through an early

access launch of *Ashes of Creation* on the Steam platform in late 2025).

60. Unknown to Plaintiffs at the time they provided all these loans and investments, Sharif was misusing a substantial portion of the invested funds to enrich himself, Defendant Moore, and other insiders.

61. Only in early 2026 were Plaintiffs able to finally obtain Intrepid's internal accounting records (the QuickBooks files), which immediately revealed the fraudulent scheme.

62. Contrary to Sharif's prior representations, Sharif had never invested any significant amount of his own money into Intrepid.

63. Instead, he and Defendant Moore were systematically withdrawing large sums from the company under the guise of shareholder loans, or other compensation.

64. Based on recently obtained payroll records from Intrepid (obtained at the same time the other financials were obtain – in early February 2026), Moore and Sharif are believed to have paid themselves approximately $3 million or more in W2 wages between the years 2021-2025. Plaintiffs were never made aware of this.

65. These payments were taken directly from the investment monies that Plaintiffs were supplying.

66. Plaintiffs also learned in or about early February 2026 that based on their review of the Intrepid QuickBooks file, John Moore had received at least $9,000,000 in undocumented transfers from Intrepid's accounts over the years, with labels such as "shareholder loan", "distributions", or "John Moore Acct. 6009". In any event, for a start-up such as Intrepid, this was not appropriate compensation for a CFO, nor was it disclosed at any time to Plaintiffs.

67. Additionally, numerous "business expenses" (to the tune of approximately $3.1 million) were charged to Intrepid by Moore, but upon closer look, many of these expenses do not appear to be valid business charges and are instead personal expenses paid for with company funds.

68. Sharif, beyond his W2 wages discussed above, also took out over $600,000 in monies, under categories such as "shareholder loan."

69. In essence, Sharif and Moore were treating Plaintiffs' invested capital as a personal piggy bank.

70. Sharif's public narrative that he was personally "all in" and had put in millions of dollars of his own funds was a lie; in reality, he was taking money *out* of the company for himself and Moore at every opportunity.

71. During the period Plaintiffs were funding Intrepid's operations, company accounting records reflect substantial payments to certain insiders, family members, or related individuals, including payments categorized as "shareholder loans" or "subcontracted services."

72. The total amounts of these payments are approximately $2,000,000 or more.

73. These third-party recipients include, but are not limited to, Sharron Sharif, Thomas Alkazin, and Bethany Alkazin.

74. Plaintiffs presently do not assert claims against those third-party recipients. Plaintiffs allege these facts solely to show the manner in which Intrepid funds were used and to support their claims against Defendants Sharif and Moore.

75. Plaintiffs reserve the right to amend this Complaint to add additional parties if discovery establishes a proper legal and factual basis.

76. Had Plaintiffs known that these third-parties were receiving substantial sums of money, Plaintiffs would not have continued to fund Intrepid.

77. At the time Sharif solicited each of Plaintiffs' loans/investments, he intentionally failed to disclose the foregoing insider/third-party payments and in fact affirmatively misrepresented the financial situation of Intrepid.

78. Sharif led Plaintiffs to believe that: (a) all of Plaintiffs' funds would be used to develop *Ashes of Creation* and grow Intrepid (and *not* diverted to personal use); (b) Sharif himself was investing or had invested substantial personal funds (millions of dollars) into Intrepid, demonstrating his commitment; (c) other early investors like the Alkazins were likewise fully committed and had their funds at risk in the venture; and (d) Intrepid's budget for salaries and expenses was reasonable and in service of the game development, with Sharif allegedly drawing only a modest salary (or deferring compensation) while the game was in development.

79. These representations were either explicitly stated by Sharif or implied by the circumstances and Sharif's assurances.

COMPLAINT

80. In truth, Sharif knew that he was funneling large amounts of company money to himself and Moore (under the radar) and that he intended to use new investor money to cover any paybacks or perks promised to earlier investors (like the Alkazins).

81. Sharif's failure to disclose the insider withdrawals was a material omission. Plaintiffs, as lenders and minority stakeholders, would have found it critically important to know that hundreds of thousands of dollars per year were being skimmed off by Sharif and Moore as "salaries," especially given Intrepid's lack of profits.

82. Plaintiffs did not discover the true facts until early 2026.

83. Sharif continued to stonewall Plaintiffs' requests for books and records and financials over the years. Plaintiffs only received limited, high-level financial summaries that omitted material details, including insider compensation and related-party transfers.

84. In an effort to appease Plaintiffs, Sharif would sometimes provide false or misleading information.

85. As one example, in or about August 2019, Sharif emailed Mr. Caramanis and counsel for Plaintiffs, purportedly attaching the current Intrepid capitalization table. A true and correct copy of this email and the attached cap table is attached hereto as Exhibit I and fully incorporated herein by reference.

86. As shown in Exhibit I, the cap table provided by Sharif showed that he had invested $9,550,000 into Intrepid.

87. In or about late April 2023, in multiple phone conversations with Jason Caramanis and Robert Dawson (another major investor in Intrepid), as well as in emails with them, Sharif now kept mentioning that he had invested an additional $4,000,000 into Intrepid. This was understood by Caramanis to mean that this was $4,000,000 on top of all the millions of dollars that Sharif had purportedly invested in prior years.

88. In or about January 2025, Sharif pivoted yet again, and now claimed on an interview with Asmongold on YouTube (who is a famous gamer with 4.44 million subscribers on YouTube), that he put in over $55 million of his "own money" into the development of the game. He further added in the interview that there was never a "dime or a profit taken from the company in eight

- 11 -

years." The interview is available at the following link. The portion quoted herein is found at approximately the 2:32:00 mark. https://www.youtube.com/watch?v=TtKFY-4BDj8

89. However, Plaintiffs discovered in early 2026, once they received access to the complete and detailed financials, based on the Intrepid QuickBooks file, it does not appear that Sharif invested *any* money into Intrepid.

90. Only then did Plaintiffs see the extensive insider payments and mismanagement that had been concealed. Plaintiffs learned, to their shock, that Sharif had never "lost everything" on the project as he had claimed – instead he had paid himself and his husband Moore (also the CFO of Intrepid) extravagantly from investor funds while claiming to be financially invested.

91. In or about April/May 2024, Plaintiffs and other equity holders of Intrepid entered into a document titled "Master Settlement Agreement" (the "MSA") for the stated purpose of resolving disputes concerning capitalization, governance, and rights under various notes and security agreements.

92. The MSA includes broad release language purporting to release claims arising out of disputes concerning the agreements and capitalization, including unknown claims, and contains a California Civil Code section 1542 waiver.

93. Plaintiffs entered into the MSA based upon representations and omissions by Sharif and Moore concerning the financial condition of Intrepid, the use of investor and loan funds, and the absence of undisclosed insider payments.

94. At the time Plaintiffs executed the MSA, Plaintiffs had not been provided accounting records and did not know, and could not reasonably have known, the facts concerning insider payments and accounting classifications later revealed.

95. The facts underlying the fraud claims in this action, including substantial payments to insiders and family members, and accounting classifications reflecting such payments, were concealed from Plaintiffs and discovered only after execution of the MSA through later-obtained accounting records.

96. Had Plaintiffs known those concealed facts, Plaintiffs would not have entered into the MSA or agreed to release claims.

- 12 -

COMPLAINT

97.     As further outlined below, Plaintiffs hereby provide notice that they elect rescission of the MSA on the grounds of fraud, concealment, and mistake.

98.     By early 2026, Intrepid Studios collapsed under the weight of its financial improprieties and inability to raise further capital once the truth emerged.

99.     The game *Ashes of Creation* was pulled from release and Intrepid shut down operations, with all employees laid off.

100.    As a direct result of Defendants' conduct, Plaintiffs have suffered substantial harm. Plaintiffs provided $12.3 million in funding to Intrepid over several years (including the loans evidenced by Exhibits A–H and additional contributions to bail out the company), relying on Defendants' representations and good faith.

101.    The vast majority of these funds have been lost or misappropriated. Intrepid has failed to repay the principal and interest owed under the Notes, and the company is insolvent. Plaintiffs' equity interests in Intrepid have been rendered virtually worthless. Plaintiffs have also incurred costs in attempting to recover their investment and uncover the truth (including legal fees).

102.    Furthermore, Defendants' fraud has caused Plaintiffs reputational injury and the lost opportunity to invest these funds elsewhere.

103.    Plaintiffs estimate their compensatory damages to be in the tens of millions of dollars, subject to proof at trial.

104.    In addition, Plaintiffs seek rescission of the loan agreements as an alternative remedy, so that all amounts paid can be restored to Plaintiffs and any obligations or equity positions unwound.

105.    At all relevant times, Defendant Sharif acted intentionally and with the purpose of deceiving Plaintiffs to obtain their money. Sharif's knowledge is established by, inter alia, his direct involvement in authorizing payments to himself, Moore, his mother Sharron Sharif, and the Alkazins, and his active steps to conceal those payments and block Plaintiffs' inquiries.

106.    Defendant Moore knew of and assisted in the fraud. As Intrepid's CFO, Moore maintained the financial records and was aware that Plaintiffs were being given false information or no information. Moore concealed his knowledge and directly benefited by receiving a large

- 13 -

salary/withdrawals and reimbursed business expenses that were never disclosed to Plaintiffs nor appropriate for a company like Intrepid (with minimal to no revenue and with substantial payroll and other direct business expenses)

107. Regarding the various loan agreements, Plaintiffs could have declared defaults and enforced security rights but refrained from doing so in reliance on Sharif's ongoing reassurances regarding company finances and use of funds.

108. Plaintiffs reasonably relied because Sharif maintained exclusive control over operational and financial information and repeatedly assured Plaintiffs that funds were being used for development and that no undisclosed insider distributions were occurring.

109. The truth concerning insider payments and accounting classifications was uniquely within Defendants' knowledge and could not reasonably be discovered by Plaintiffs without access to internal accounting records.

110. Had Plaintiffs known the true facts, they would not have made additional loans, extended maturities, or refrained from enforcement.

111. Sharif's representations were intended not only to induce initial funding but to maintain Plaintiffs' confidence so that Plaintiffs would continue supporting Intrepid rather than enforcing their rights.

112. Many of the operative facts concerning the approval, authorization, classification, and purpose of insider payments, including supporting invoices, bank statements, contracts, board approvals, internal communications, and accounting decisions, are uniquely within Defendants' possession and control.

113. Plaintiffs have pleaded the facts presently available to them through limited records obtained, and allege on information and belief that additional discovery will further establish the circumstances surrounding these transactions and Defendants' knowledge and intent.

114. Plaintiffs assert only direct, individual claims arising from representations made personally to Plaintiffs and from agreements entered into directly with Plaintiffs. Plaintiffs do not assert derivative claims on behalf of Intrepid Studios, Inc. The injuries alleged herein are personal to Plaintiffs, including the loss of funds personally loaned or invested and decisions made in

- 14 -

COMPLAINT

reliance on Defendants' representations.

## FIRST CAUSE OF ACTION

### (Fraud Against Sharif)

115.   Plaintiffs adopt and incorporate each of the foregoing paragraphs by reference as though fully set forth herein.

116.   Defendant Steven Sharif engaged in fraud by knowingly making false representations and concealing material facts in order to induce Plaintiffs to provide the loans and investments described above. Sharif's fraudulent acts include, but are not limited to, the following:

    a.   misrepresentation of his personal investment into Intrepid (which was stated on a cap table provided by him as $9.550mm, amongst numerous others figures stated orally, and in writing, but turned out to be zero based on the detailed financials Plaintiffs have seen).

    b.   misrepresentation of use of funds, which were to be used solely for legitimate business purposes such as game development, operating expenses for Intrepid, and other expenses to advance the project, but were instead diverted to pay himself, Moore, and other insiders such as the Alkazins and his mother Sharron Sharif millions of dollars. These payments were concealed from Plaintiffs.

    c.   withholding Intrepid's complete and detailed financial information and books despite Plaintiffs' requests, in order to prevent Plaintiffs from discovering the truth

    d.   making false promises without any intention to perform, including promising to hold board meetings and keep Plaintiffs involved in major decisions (knowing he would actually exclude them), and promising to repay Plaintiffs' loans on the agreed schedule (knowing that he intended to string Plaintiffs along and potentially convert their debt to equity while continuing to misappropriate funds).

117.   Sharif knew that his representations were false and that he was concealing the true facts. Sharif had full knowledge of Intrepid's finances and of the payments he and others took, as he was the CEO and founder of the company.

118.   For example, Sharif personally authorized his and Moore's large withdrawals each

- 15 -

COMPLAINT

year and authorized transfers of company money for his personal benefit. He knew he had not contributed his own money despite claiming or implying otherwise. Sharif's knowledge is further evidenced by his refusal to allow Plaintiffs access to financial records – a strong indication that he was aware of wrongdoing that needed to be hidden.

119.    Sharif made the above misrepresentations and omissions with the intent to induce Plaintiffs to act to their detriment, specifically, to convince Plaintiffs to continue providing loans and investments to Intrepid.

120.    Sharif understood that Plaintiffs would not have given millions of dollars had they known the truth that he was siphoning off funds and not investing alongside them.

121.    Sharif's fraudulent intent is demonstrated by the fact that he repeatedly solicited funds under false pretenses, misled Plaintiffs about how prior funds had been used, and immediately used new funds to cover personal or unrelated payouts.

122.    His intent is also shown by the pattern of lies over multiple years, such as continuously assuring Plaintiffs of good stewardship while secretly enriching himself.

123.    Plaintiffs justifiably and reasonably relied on Sharif's representations and omissions. At the time of each loan or investment, Plaintiffs had no practical way to verify Intrepid's internal finances because Sharif controlled that information and refused transparency.

124.    Plaintiffs trusted Sharif due to his position as CEO and the charismatic front he presented as a passionate entrepreneur who had allegedly risked his own fortune on the project.

125.    Plaintiffs also relied on the written contracts and the notion that Sharif would follow those contracts in good faith.

126.    Plaintiffs had no reason to suspect that Sharif would blatantly misuse the funds because doing so would obviously jeopardize the very project he was championing.

127.    Furthermore, Sharif's concealment of material facts (like the insider withdrawals) prevented Plaintiffs from discovering the fraud through ordinary diligence.

128.    In sum, Plaintiffs' reliance on Sharif's honesty and on the false financial picture he painted was reasonable under the circumstances.

129.    Sharif's fraudulent inducement and concealment continued through the negotiation

- 16 -

COMPLAINT

and execution of the MSA, and Plaintiffs' agreement to the release was itself induced by Defendants' concealment of material financial facts.

130.    As a direct and proximate result of Sharif's fraud, Plaintiffs have been harmed in an amount to be proven at trial, but exceeding $12.3 million, plus interest, attorney's fees (to the extent available under the law) and costs. Plaintiffs have discovered Sharif's fraud in the last 3 years.

131.    Sharif's conduct was intentional, willful, wanton, and carried out with malice and a conscious disregard of Plaintiffs' rights. Sharif abused a position of trust and engaged in a systematic fraud over many years, effectively embezzling funds that Plaintiffs provided in trust for the company's use. He concealed his actions and continued the deception even as Plaintiffs tried to exercise their rights. Such egregious conduct was despicable and intended to enrich Sharif at Plaintiffs' expense. Accordingly, Plaintiffs seek an award of exemplary and punitive damages against Steven Sharif in an amount sufficient to punish him and to deter such conduct in the future, according to proof at trial.

## SECOND CAUSE OF ACTION

### (Fraudulent Concealment Against Sharif and Moore)

132.    Plaintiffs adopt and incorporate each of the foregoing paragraphs by reference as though fully set forth herein.

133.    Defendants concealed and suppressed material facts concerning Intrepid's financial condition and use of funds, including but not limited to: (a) substantial insider payments and transfers made to family members, insiders, and related parties; (b) accounting classifications and bookkeeping entries reflecting such payments; (c) the true extent and nature of compensation, reimbursements, and so-called "shareholder loans" paid to themselves and third parties; (d) the diversion or use of company funds for purposes not disclosed to Plaintiffs; and (e) financial information inconsistent with representations made to Plaintiffs regarding the use and status of their funding.

134.    Defendant Sharif had a duty to disclose these facts to Plaintiffs because: (a) Sharif directly solicited Plaintiffs' loans and investments; (b) Sharif made partial representations regarding the company's financial condition and use of funds while omitting material contrary facts; (c) As the CEO of Intrepid, Sharif possessed exclusive knowledge of material financial information not

- 17 -

reasonably available to Plaintiffs; and (d) Sharif knew Plaintiffs were relying on him as the principal decision-maker and source of truthful information regarding Intrepid's finances.

135.    Defendant Moore, as Chief Financial Officer, participated in the concealment of material facts by managing, preparing, or approving accounting records and financial information while failing to disclose insider payments and related transactions known to him.

136.    Plaintiffs are informed and believe that Moore knew Plaintiffs were providing substantial funding and relying on financial information controlled by Intrepid's leadership, and Moore nonetheless failed to disclose material facts concerning insider payments and financial transactions.

137.    Defendants concealed these facts with the intent to induce Plaintiffs to: (a) provide and continue providing funding; (b) refrain from enforcing contractual rights; (c) continue forbearance; and (d) enter into subsequent agreements, including settlement arrangements, without knowledge of the concealed facts.

138.    Plaintiffs reasonably relied upon Defendants' concealment because: (a) Defendants controlled all internal financial information; (b) Plaintiffs were not provided complete transaction-level financial records; and (c) the concealed facts were not discoverable through reasonable diligence prior to obtaining later accounting materials.

139.    As a direct and proximate result of Defendants' concealment, Plaintiffs suffered damages in amounts to be proven at trial, including loss of funds loaned and invested, lost opportunities, and other consequential damages.

140.    Plaintiffs did not discover, and could not reasonably have discovered, the concealed facts until obtaining access to financial and accounting records at a later time. Defendants' concealment delayed discovery of the wrongdoing, and this cause of action is therefore timely under the delayed discovery rule.

141.    Defendants' concealment was intentional, willful, and carried out with conscious disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages under California Civil Code section 3294.

//

- 18 -

## THIRD CAUSE OF ACTION

### (Aiding and Abetting Fraud Against Moore)

142. Plaintiffs adopt and incorporate each of the foregoing paragraphs by reference as though fully set forth herein.

143. Defendant John Moore knowingly aided and abetted the fraudulent scheme carried out by Sharif.

144. Moore, as Intrepid's CFO and Sharif's long-time business partner (as well as husband), was fully aware that Sharif was defrauding Plaintiffs by concealing insider payments and misuse of funds.

145. Moore had actual knowledge of the primary fraud as he knew that neither Sharif nor himself had invested personal funds as claimed, and he knew that both of them were taking large sums of money out of Intrepid (despite the company's dependence on investor money).

146. Moore reviewed or managed Intrepid's QuickBooks and financial records, as the CFO, so he directly saw the flow of funds and the false accounting.

147. With this knowledge, Moore provided substantial assistance and encouragement to Sharif in the commission of the fraud.

148. Such assistance by Moore included, but is not limited to: (a) participating in the diversion of funds by accepting millions of dollars in payments to himself which were not disclosed to Plaintiffs; (b) helping to create false financial narratives – for example, Moore, as CFO, did not disclose to Plaintiffs the true financial state and went along with Sharif's refusal to produce records, thereby reinforcing the concealment; and (c) generally acting in concert with Sharif to keep Plaintiffs uninformed (Moore never corrected Sharif's lies or informed Plaintiffs of the truth, despite a duty to do so as an officer handling investor funds).

149. By these actions, Moore substantially assisted the accomplishment of Sharif's fraud and lent it an air of legitimacy (since Moore's title as CFO would assure investors that finances were properly handled, when in fact they were not).

150. The actions of Moore as described above proximately caused harm to Plaintiffs by enabling Sharif's fraud to succeed and continue. If Moore had not cooperated and instead refused to

make or accept the illicit payments (or if he had disclosed them to Plaintiffs), Sharif's scheme would likely have been exposed or curtailed earlier, saving Plaintiffs from further losses.

151.   By aiding Sharif, Moore allowed the fraud to go unchecked, thereby causing Plaintiffs to continue to rely on false pretenses and suffer greater damages.

152.   Moore acted with knowledge that Sharif's conduct was wrongful and likely to defraud Plaintiffs, and gave assistance with the intent to facilitate that wrongful conduct.

153.   Moore, as CFO, had no legitimate excuse to not disclose massive withdrawals to the company's primary funder (Plaintiffs) other than to assist Sharif in keeping Plaintiffs uninformed.

154.   His acceptance of the fraudulent benefits (money he wasn't entitled to) shows his intentional participation.

155.   As a result of Defendants Moore's aiding and abetting of the fraud, Plaintiffs have been damaged in an amount according to proof, as described in the First Cause of Action.

156.   Moore is jointly and severally liable with Sharif for all damages resulting from the fraud.

157.   The Court should also award punitive damages against Moore as his aiding and abetting was done with oppression, fraud, and malice.  As the CFO, he breached the trust of his financial role, in conscious disregard of Plaintiffs' rights by allowing Plaintiffs to be defrauded when he could have prevented it.  Punitive damages are justified to punish such conduct and deter others from similar participation in fraud.

### FOURTH CAUSE OF ACTION

### (Rescission for Fraud Against Intrepid and Sharif)

158.   Plaintiffs adopt and incorporate each of the foregoing paragraphs by reference as though fully set forth herein.

159.   This cause of action is pled in the alternative, to the extent that Plaintiffs may elect rescission as a remedy.

160.   Plaintiffs seek to rescind all contracts between Plaintiffs and Defendants pertaining to Plaintiffs' investment in and lending to Intrepid, on the grounds that Plaintiffs were induced to enter into those contracts by fraud.

161. The contracts to be rescinded include, without limitation, those contained in Exhibit A through H; and any related amendments, guaranties, or equity agreements executed in connection with those transactions (collectively, the "Loan Agreements").

162. As alleged in detail above, Defendant Sharif's fraudulent misrepresentations and concealments were material to Plaintiffs' decision to enter into the Loan Agreements.

163. Plaintiffs would not have agreed to lend money, extend maturity dates, convert debt to equity, or provide additional funding had they known the true facts about Defendants' misuse of funds and false statements.

164. The very foundation of the bargain, that Plaintiffs' money would be used to build a game company with Sharif acting in good faith, was shattered by the concealed truth that Sharif was in fact misappropriating the funds.

165. Therefore, Plaintiffs' consent to the contracts was obtained by fraud and was not real or mutual.

166. Plaintiffs are entitled under California Civil Code §§1689(b)(1) and 1572 et seq. to rescind the agreements.

167. Plaintiffs hereby give notice of rescission to Defendants.

168. Plaintiffs offer to restore to Defendants everything of value which Plaintiffs received under the contracts.

169. Specifically, upon rescission, Plaintiffs will relinquish any stock or equity interest in Intrepid that Plaintiffs acquired as a result of the loans (to the extent such stock has any remaining nominal value).

170. If and to the extent any further act of restoration is required, Plaintiffs will comply as ordered by the Court. Plaintiffs allege, however, that the nature of Defendants' fraud and subsequent collapse of the business has left nothing to restore on Plaintiffs' end beyond the return of stock certificates, or negation of any debt that is outstanding, whereas Defendants must restore the money obtained.

171. In addition or as an alternative to rescission itself, Plaintiffs seek rescissory damages or restitution.

COMPLAINT

172. This includes a return of all funds Plaintiffs paid or lent (totaling $12.3 million or an amount according to proof), plus interest, in exchange for returning any shares or extinguishing any obligations.

173. Plaintiffs also seek any consequential damages allowed in connection with rescission, such as any loss in value of money due to delay or other expenditures incurred as a result of the contracts.

174. Plaintiffs note did not discover the fraud until early 2026 and promptly took action thereafter (including the filing of this lawsuit).

175. Any delays in giving notice of rescission were due to Defendants' concealment of the facts. Once the fraud was uncovered, continuing to enforce or perform under the contracts (for example, converting more debt to equity or attempting further collection through contractual means alone) was futile, and rescission was promptly sought.

176. Plaintiffs have therefore timely exercised their right to rescind.

177. Accordingly, Plaintiffs request that the Court enter an order rescinding the Loan Agreements and requiring Defendants Sharif and Intrepid (and any other necessary parties) to return to Plaintiffs all consideration paid by Plaintiffs under those agreements.

178. In effect, Plaintiffs seek to be put in the position they were in before they ever agreed to fund Intrepid.

179. Should the Court for any reason determine that complete rescission is impractical, Plaintiffs seek alternative relief of equivalent effect (such as judgment for rescissory damages as noted).

180. This cause of action is pled against Sharif individually (as he was a direct party via guaranties and as alter ego of Intrepid) and against Intrepid (nominally, as the corporate contracting party). To the extent any of the other Defendants received direct benefits from the contracts (e.g. Moore's salary drawn from the loan funds), Plaintiffs seek to have those benefits disgorged as part of the rescission and restitution.

181. Finally, Plaintiffs seek rescission of the MSA because consent to the release was obtained through fraud and concealment, including the failure to disclose insider payments and

- 22 -

accounting classifications material to Plaintiffs' decision to settle.

182.    Plaintiffs seek restoration and equitable adjustment as determined by the Court pursuant to Civil Code section 1693.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation Against Sharif)

183.    Plaintiffs adopt and incorporate each of the foregoing paragraphs by reference as though fully set forth herein.

184.    In connection with soliciting Plaintiffs' loans and investments into Intrepid, Defendant Steven Sharif made numerous representations of material fact to Plaintiffs concerning, among other things: (a) the financial condition of Intrepid; (b) the intended use of loan and investor funds; (c) the extent of Sharif's personal investment and financial commitment; (d) the absence of undisclosed insider payments or extraordinary compensation; and (e) the manner in which company funds were being used for legitimate development and operational purposes.

185.    These representations were made in the course of business transactions in which Sharif intended and expected Plaintiffs to rely, including execution of promissory notes, pledge and security agreements, extensions of funding, and continued forbearance.

186.    At the time Sharif made these representations, he lacked reasonable grounds for believing them to be true, including because: (a) he controlled or had access to company financial information showing insider payments and related transactions; (b) he failed to verify the accuracy or completeness of statements provided to Plaintiffs; and (c) he made representations concerning financial conditions and use of funds without exercising reasonable care to ensure their truth or accuracy.

187.    Sharif intended that Plaintiffs rely upon these representations for the purpose of obtaining and maintaining Plaintiffs' continued financial support of Intrepid.

188.    Plaintiffs reasonably relied upon these representations because: (a) Sharif maintained exclusive control over the company's internal financial information; (b) Plaintiffs were not provided full transaction-level accounting records; and (c) Sharif held himself out as the CEO when accurately describing company finances.

- 23 -

189. In reliance upon these representations, Plaintiffs (a) provided substantial funding; (b) entered into and extended loan agreements; (c) refrained from enforcing contractual rights; and (d) entered into subsequent agreements that they would not otherwise have entered.

190. As a direct and proximate result of Sharif's negligent misrepresentations, Plaintiffs suffered damages in an amount to be proven at trial, including loss of principal, lost opportunity costs, and other consequential damages.

## PRAYER FOR JUDGMENT

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For general damages in the amount of at least $12,300,000;

2. For punitive and exemplary damages;

3. For restitutionary damages in an amount to be proven at trial;

4. For recission of the Loan Agreements outlined above;

5. For special and consequential damages in a sum according to proof at the time of trial;

6. For interest according to law and the agreements between the parties;

7. For reasonable attorneys' fees pursuant to the agreements between the parties; and

8. For such other and further relief as this Court deems just and proper.

DATED: March 2, 2026

BEVERLY HILLS LAW CORP., PC

By: _____

SAGAR PARIKH, ESQ.
Attorneys for Plaintiffs

COMPLAINT

# EXHIBIT A - 2/20/17 Note

## LINE OF CREDIT CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED, Intrepid Studios, Inc., (the "Company") hereby makes this Note on February 20th, 2017 ("Effective Date") and promises to pay within one year of funding (the "Maturity Date"), to the order of Jason Caramanis or Assignee ("Holder"), the principal amount of Two Million Dollars ($2,000,000.00), or as much of that sum as may be advanced under this Line of Credit Promissory Note, with interest on such amount until paid at a rate of twenty percent (20%) compounded annually. This Note is secured by the concurrently executed Pledge and Security Agreement.

This Note is be subject to the following terms and conditions:

**1. Payment.** At any point from the Effective Date going forward, Company shall draw upon the $2,000,000 line of credit from Holder, who at its sole and absolute discretion shall advance such funds or portion thereof that it determines.

**2. Equity Issuance/Conversion Rights/Rights of Holder.**

(a) Initial Issuance of Equity. Immediately upon any funds being advanced by Holder hereunder, Common Stock of the Company shall be transferred to Holder, such that Holder shall have a 15% ownership/equity stake in the Company, with equivalent share ownership. If the monies advanced by Holder hereunder are not fully repaid by the Maturity Date, including any and all applicable interest, an additional 15% ownership/equity stake in the Company with equivalent share ownership/Common Stock shall be immediately transferred to Holder at that time. Additionally, in the event any additional class of stock is created or any additional stock benefits are added, Holder's rights with regards to such stock shall be parri passu with the rights of Steven Sharif, such that, by way of example, if Sharif is issued an additional class of stock (i.e. preferred stock), Holder shall also be issued the same class of stock and pro-rata number of shares of such stock.

(b) In case the Company shall: (i) effect a reorganization; (ii) consolidate with or merge with any other person; or (iii) transfer all or substantially all of its properties or assets to any other person under any plan or arrangement contemplating the dissolution of the Company, the registered Holder of this Note shall be entitled to receive, in lieu of the Common Stock issuable upon the exercise prior to the consummation or the effective date, the stock and other securities and property to which the Holder would have been entitled upon the consummation or in connection with the dissolution, as the case may be, if the registered Holder had so exercised his or her conversion privilege immediately prior thereto. Upon any reorganization, consolidation, merger, transfer or any dissolution, this Note shall continue in full force and effect and the terms thereof shall be applicable to the shares of stock and other securities and property receivable upon exercise of the conversion privilege after consummation of the reorganization, consolidation, merger, transfer, or dissolution, as the case may be, and shall be binding upon the issuer of any such stock or other securities including, the person acquiring all or substantially all of the properties or assets of the Company, whether or not that person shall have expressly assumed the terms of this Note.

(c) Concurrently upon execution of this Note, the Company shall effectuate legal documents (i.e. Shareholders Agreement, Bylaws, and Resolutions/Meeting Minutes) which formalize the following: the creation of a Board with Jason Caramanis (or his assignee) as one of the Board Members, having one vote; the Company shall engage in meaningful consultation with Caramanis or his assignee for all major financial and operational decisions of the Company, as further defined in the Shareholder Agreement

and/or Bylaws to be created.

### 3. Transferability.

(a) Subject to the restrictions contained in the legend set forth below, this Note is transferable only by the registered Holder hereof in person or by his or her attorney duly authorized in writing on a register maintained by the Company, upon the surrender of this Note, duly endorsed without recourse, and the Company shall not be required to make any transfer unless and until it receives this Note duly and properly endorsed without recourse by the registered Holder. Upon the surrender of this Note for transfer of registration hereof, the Company shall issue a new Note in place hereof, and shall cause that Note to be delivered to the transferee.

(b) By the acceptance of this Note, the Holder represents and warrants that the Holder is purchasing this Note for investment for the Holder's own account and with no present intention of dividing the Holder's participation with others, or reselling or otherwise distributing the same. The Holder understands and acknowledges that the Company has advised the Holder that this Note has not been registered under the Securities Act of 1933, as amended, qualified under the securities laws of any state on the grounds that this transaction is exempt from registration and qualification requirements, and that the Company's reliance on the exemption is predicated in part on the Holder's representation and warranty herein set forth.

(c) By the acceptance of this Note, the Holder agrees that the transfer of this Note and the transfer of any shares of Common Stock of the Company into which this Note may be converted shall be subject to the restriction that no such transfer shall be effected until either: (i) the Holder has obtained an opinion of counsel satisfactory to the Company and its counsel to the effect that the proposed transfer will not result in a violation of the Securities Act of 1933, as then amended; or (ii) a registration statement with respect to this Note, or the shares of Common Stock of the Company into which this Note may be converted, shall then be effective in current form under the Securities Act of 1933, as then amended. This provision shall be binding upon all subsequent transferees of this Note or the shares of Common Stock into which this Note may be converted.

### 4. Personal Guarantee.

The performance and payment hereunder shall be personally guaranteed by Steven Sharif.   Mr. Sharif agrees to be personally responsible for the prompt, full and complete performance of any and all present and future duties, obligations and indebtedness due to the Holder hereunder, including the prompt payment of principal and interest in accordance with the terms and conditions provided by this Note.

### 5. Notices.

Any communication or notices may be delivered or mailed to the offices of the Company at 11558 Sorrento Valley Rd. Suite 7, San Diego, California 92121 and to the registered Holder at 4504 San Blas Avenue, Los Angeles, California 91364, or to such other addresses as either the Company or the registered Holder may designate by notice in writing to the other from time-to-time.   Notices may also be given by email.

### 6. Governing Law and Venue.

The validity, interpretation, and performance of this Note shall be construed under and controlled by the

laws of the State of California. Venue for any dispute arising hereunder shall be Los Angeles County, California.

### 7. Attorneys' Fees.

If any legal action or other proceeding is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred in the action or proceeding, in addition to any other permitted relief.

### 8. Securities Warning.

THE SECURITIES REPRESENTED BY THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED ("THE ACT") OR QUALIFIED UNDER ANY STATE SECURITIES LAW. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE TRANSFERRED, SOLD, OR OFFERED FOR SALE UNLESS: (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE ACT AND QUALIFICATION UNDER STATE LAW; (2) THE TRANSFER IS MADE IN COMPLIANCE WITH RULE 144 UNDER THE ACT AND PURSUANT TO QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAW OR EXEMPTION THEREFROM; OR (3) THERE IS AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION AND QUALIFICATION ARE NOT REQUIRED AS TO THE TRANSFER, SALE, OR OFFER.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF. the Company has caused this Note to be duly executed by its duly authorized officer or agent as of the date first written above.

_____
Jason Caramanis

Intrepid Studios, Inc.

_____
Steven Sharif        CEO

Personal Guarantor

_____
Steven Sharif

# EXHIBIT B - 2/20/17 PSA

COMPLAINT

PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT ("**Agreement**"), dated as of February 20, 2017, is made by Intrepid Studios, Inc. ("**Borrower**"), in favor of Jason Caramanis (the "**Secured Party**"), with reference to the following facts:

## RECITALS

A.    Intrepid Studios, Inc. is the borrower in the concurrently executed Promissory Note ("Note") dated February 20, 2017 by and between Borrower, Personal Guarantor Steven Sharif and Secured Party. As collateral for all sums borrowed by Borrower under the Note from Secured Party, the Borrower pledges a lien and security interest in certain assets belonging to Borrower. The Borrower warrants and represents that he has the power and authority to pledge an ownership/lien interest in Borrower's assets to Secured Party.

B.    Pursuant to the Note, Borrower owes Secured Party a total of $2m ("Loan").

C.    Secured Party requires that, as security for repayment of the Note, Borrower, by and through the Borrower, pledges to Secured Party a lien and ownership interest in the following assets that may be perfected and executed upon in the event of default under the Note. Such lien and security interest shall allow Secured Party the full right to sell any and all assets that are listed as collateral below in order to satisfy any amounts owing to Secured Party by Borrower and/or Borrower.

D.    Secured Party shall be allowed to file a UCC-1 Financing Statement against the Borrower pursuant to this Agreement.

E.    NOW, THEREFORE, in order to induce Secured Party to enter into the Note, and for other good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, Borrower hereby represents, warrants, covenants, agrees, pledges and grants as follows:

1.    Definitions. Terms used in this Agreement and not otherwise defined in this Agreement shall have the meanings given those terms in the Note.

2.    Grant of Security Interest. As security for the payment and performance of the Obligations (as hereinafter defined), Borrower hereby pledges to the Secured Party, and grants to Secured Party a security interest and lien in and to, all of the following (collectively, the "**Pledged Collateral**"):

(a)    All assets belonging to the Borrower, including, but not limited to, shares intellectual property, software, all real property, personal property, trademarks, licenses, cash, accounts and notes receivable, inventory, and any and all other assets, intangible or tangible, belonging to Borrower.

(b)    All proceeds of the foregoing, whether voluntary or involuntary.

3.    Obligations Secured. The security interest granted hereunder secures the prompt payment and performance of each of the following (collectively, the "**Obligations**"):

(a)    All obligations of the Borrower under the Note;

(b)    Each of Borrower's obligations under this Agreement;

(c)    All other obligations owing by Borrower and Borrower to the Secured Party, but only to the extent that any such obligation is described or referred to in a document, executed by Borrower and Borrower at the request of the Secured Party, which states that such obligation is secured hereby;

(d)    All interest that accrues on all or any part of any of the Obligations including without limitation interest that accrues after the filing of any petition or pleading by or against Borrower or Borrower any other person or entity for a proceeding under any bankruptcy or debtor relief law;

(e)    Any and all amendments, extensions and other modifications of any of the foregoing, including, without limitation, amendments, extensions and other modifications that are evidenced by new or additional documents or that change the rate of interest on any Obligation.

4.    Representations and Warranties of Borrower. Borrower represents, warrants and agrees to and with the Secured Party that:

(a)    Borrower has good title to the Pledged Collateral, free from any liens, encumbrances, defenses or other claims or restrictions whatsoever;

(b)    The security interest in the Pledged Collateral created hereby constitutes a first, prior and indefeasible security interest;

(c)    Borrower has the right to grant a security interest in the Pledged Collateral pursuant to this Agreement without restriction, and the Pledged Collateral has been duly and validly pledged with the Secured Party in accordance with all applicable laws;

(d)    Borrower has all requisite power and authority to execute and deliver, and to perform all of its obligations under, this Agreement;

(e)    The execution and delivery by Borrower of, and the performance by Borrower of each of its obligations under, this Agreement have been duly authorized by all necessary action and do not and will not:

(i)    require any consent or approval not heretofore obtained of any beneficiary or creditor of Borrower;

(ii)    result in or require the creation or imposition of any lien or right of others upon or with respect try the Pledged Collateral, other than as provided in this Agreement;

-2-

(iii)    violate any provision of any law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower; or

(iv)    result in a breach of or constitute a default under, or cause or permit the acceleration of any obligation owed under, any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected;

(f)    No authorization, consent, approval, order, license, permit or exemption from, or filing with, registration or qualification with, any governmental agency is or will be required under applicable law to authorize or permit the execution and delivery by Borrower of, and the performance by Borrower of all of its obligations under, this Agreement; and

(g)    This Agreement constitutes the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

5.    Further Assurances. Borrower agrees that at any time, and from time to time, at its own expense Borrower will promptly execute, deliver and file or record all further instruments and documents, and will take all further actions, including, without limitation, executing, delivering, filing or taking other actions, that Secured Party may reasonably request in order to perfect and protect any pledge or security interest granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral and to preserve, protect and maintain the Pledged Collateral and the value thereof, including, without limitation, payment of all taxes, assessments and other charges imposed on or relating to the Pledged Collateral. Borrower hereby consents and agrees that the issuers of, or obligors on, the Pledged Collateral, or any registrar, transfer agent, depository or trustee for any of the Pledged Collateral, shall be entitled to accept the provisions of this Agreement as evidence of the right of the Secured Party to effect any transfer or exercise any right hereunder, notwithstanding any other notice Borrower or any other Person to such issuers or such obligors or to any such registrar or transfer agent or trustee. Borrower hereby agrees that the Secured Party may, without further notice to, consent or authorization by or signature of Borrower, file financing statements with respect to the security interest granted pursuant to this Agreement.

6.    Release of Collateral. So long as there is no Event of Default, and once all sums due under the Note are paid, Secured Party will no longer have any rights under this Agreement.

7.    Secured Party May Perform Obligations: If Borrower fails to perform any obligation contained herein, Secured Party may, but without any obligation to do so and without notice to or demand upon Borrower, perform the same and take such other action as Secured Party may deem necessary or desirable to protect the Pledged Collateral or Secured Party's security interests therein, Secured Party being hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest and compromise any lien which in the reasonable judgment of Secured Party appears to be prior or superior to the Secured Party's security interests, and in exercising any such powers and authority to pay necessary expenses, employ counsel and pay reasonable attorneys' fees. In any such event, Borrower hereby agrees to repay immediately upon demand all sums so expended by Secured Party,

together with interest from the date of expenditure at the default rate provided for in the Note. Secured Party shall not be under any duty or obligation to (i) preserve, maintain or protect the Pledged Collateral or any of any Borrower's rights or interest therein, (ii) exercise any rights, powers and elections with respect to the Pledged Collateral, or (iii) except as provided to the contrary herein, make or give any notices of default, presentments, demands for performance, notices of nonperformance or dishonor, protests, notices of protest or notice of any other nature whatsoever in connection with the Pledged Collateral on behalf of Borrower or any other Person having any interest therein; and the Secured Party does not assume and shall not be obligated to perform the obligations of Borrower, if any, with respect to the Pledged Collateral.

8.    Transfers and Other Liens. Borrower agrees that it shall not (i) assign, exchange, transfer or otherwise dispose of, or contract to assign, exchange, transfer or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral, (ii) create or permit to exist any lien upon or with respect to any of the Pledged Collateral, except for liens created hereunder in favor of the Secured Party, or (iii) take any action with respect to the Pledged Collateral which would materially impair the Secured Party's rights hereunder. Borrower shall, at Borrower's sole cost and expense, defend any claim that may be made against the Pledged Collateral or the Secured Party's security interests therein.

9.    INTENTIONALLY DELETED

10.    Events of Default and Remedies.

(a)    Events of Default. The occurrence of any of the following, whatever the reason therefor, shall constitute an Event of Default:

(i)    the occurrence of an "Event of Default" under the Note; or

(ii)    failure by Borrower to perform any obligation under this Agreement or

(iii)    any representation or warranty in this Agreement proves to be incorrect in any material respect when made.

(b)    Rights Upon Event of Default. Upon the occurrence of an Event of Default under this Agreement, the Secured Party shall have all rights and remedies that are available to the Secured Party under this Agreement, under applicable law and/or in equity in any jurisdiction where enforcement is sought. In addition, the Secured Party shall have all rights and remedies of a secured party under the Uniform Commercial Code as enacted in any such jurisdiction, and shall also have the following rights and remedies, all of which may be exercised with or without further notice to Borrower:

(i)    to enforce payment and prosecute any action or proceeding with respect to any and all of the Pledged Collateral and take or bring, in the Secured Party's name or in the name of Borrower, all steps, actions, suits or proceedings reasonably deemed by the Secured Party to be necessary or desirable to effect collection of or to realize upon the Pledged Collateral;

-4-

(ii)    in accordance with applicable law, to take possession of the Pledged Collateral with or without judicial process;

(iii)    to transfer any or all of the Pledged Collateral into the name of the Secured Party or its nominee or nominees; and

(iv)    in accordance with applicable law, to foreclose the liens and security interests created under this Agreement or under any other agreement relating to the Pledged Collateral by any available judicial procedure or without judicial process, and, in accordance with the terms of this Agreement, to assign or otherwise dispose of the Pledged Collateral or any part thereof, with or without representations or warranties, and upon such terms as shall be acceptable to Secured Party;

all at the sole option of and in the sole discretion of Secured Party.

11.    Reserved.

12.    Notice. All notices, requests and other communications required or permitted to be given hereunder shall be in writing and shall be deemed given (i) upon receipt, if given by personal delivery, (ii) upon confirmation of delivery, if given by electronic mail and (iii) upon the third business day following mailing, if mailed by deposit in the United States mail, with certification and postal charges prepaid.

Any party may change the address or telecopy number or email address to which notices are to be sent to it by giving written notice of such change of address or telephone number to the other parties in the manner above provided for giving notice.

13.    Other Agreements. Nothing in this Agreement shall in any way modify or limit the effect or terms or conditions set forth in any other security or other agreement executed by Borrower in connection with the Obligations, but each and every term and condition hereof shall be in addition thereto.

14.    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition of unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

15.    No Waivers; Cumulative Remedies. The Secured Party shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder and no waiver shall be valid unless in writing, signed by Secured Party, and then only to the extent therein set forth. A waiver by the Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Secured Party would otherwise have on any future occasion. No failure to exercise nor any delay in exercising any right, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein

provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights or remedies provided by law.

16.  Amendments: Applicable Law: Successors and Assigns. None of the terms or provisions of this Agreement may be altered, modified or amended except by an instrument in writing, duly executed by Secured Party and Borrower. This Agreement and all obligations of Borrower hereunder shall be binding upon the permitted successors and assigns of Borrower, and shall, together with the rights and remedies of the Secured Party hereunder, inure to the benefit of the Secured Party and its successors and assigns. This Agreement shall be governed by, and be construed, enforced and interpreted in accordance with, the internal laws of the State of California. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

17.  Costs. Expenses and Attorneys Fees. All payments, advances, charges, costs and expenses, including reasonable attorneys' fees, made or incurred by the Secured Party in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof shall be paid to the Secured Party by Borrower immediately and without demand, together with interest at the default rate per annum specified in the Note.

**[Remainder of Page Intentionally Left Blank]**

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, Borrower has caused this Agreement to be duly executed as of the date first above written.

**BORROWER:**

By:  _____

Steven Sharif, CEO/President of Intrepid Studios, Inc.

S-1

EXHIBIT C - 2/23/17 Note

COMPLAINT

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED, Intrepid Studios, Inc., (the "Company") hereby makes this Note on February 23rd, 2017 and promises to pay, on or before February 20th, 2019 (the "Maturity Date"), to the order of Ya-Ya Legacy Trust. ("Holder"), the principal amount of One Million Dollars ($1,000,000.00), with interest on such amount until paid at a rate of 5 percent (5%) compounded annually.

This Note is be subject to the following terms and conditions:

### 1. Payment.

Payment shall be made on or before the 15th of every three (3) month period following the execution of this Note, with the first payment due May 15th 2017 in the sum of One Hundred Thirty-Seven Thousand Eight Hundred Twelve Dollars and Fifty Cents ($137,812.50) in accordance with Schedule A unless the Holder chooses to either postpone payment or convert all or any portion of the amount of this Note into authorized shares of Company's common stock as set forth in Section 2.

Payments shall be made to;

Account Name: Beverly Hills Law Corp., PC IOLTA Account

Bank Name: Chase Bank N.A.

Routing Number: 322271627

Account Number: 400335407

SWIFT: CHASUS33

### 2. Conversion.

(a) Right to Convert. At the conclusion of each three (3) month period following the execution of this Note, subject to the terms and conditions of this Note, Holder shall have the right to convert all or any portion of the amount of this Note and any accrued and unpaid interest thereon (collectively, "Note Obligations") into authorized shares of Company's common stock which constitutes 0.275% percent, up to a maximum of 2.2 percent of the common stock of Company, assessed at the valuation of Company as of the date of this Note.

(b)  Procedure for Conversion. In order to convert all or any portion of the Note Obligations, Holder shall: (i) notify the Company in writing of its election to convert all or a portion of the Note Obligations, which notice shall specify the amount of principal and interest included in the Note Obligations to be so converted. The date on which the Note is surrendered for conversion is referred to herein as the "Conversion Date." As soon as practicable after the Conversion Date, Holder shall be entitled to receive a certificate registered in such name as Holder may direct, representing the shares of common stock issuable upon conversion of the applicable Note Obligations, along with a new promissory note, in the same form as this Note, reflecting any Note Obligations that have not been so converted; provided that Holder shall be treated for all purposes as the record holder of such shares of common stock as of the Conversion Date.

61491.00001\29571974.3

(c) In case the Company shall: (i) effect a reorganization; (ii) consolidate with or merge with any other person; or (iii) transfer all or substantially all of its properties or assets to any other person under any plan or arrangement contemplating the dissolution of the Company within twenty-four (24) months from the date of the transfer, the registered Holder of this Note shall be entitled to receive, in lieu of the Common Stock issuable upon the exercise prior to the consummation or the effective date, the stock and other securities and property to which the Holder would have been entitled upon the consummation or in connection with the dissolution, as the case may be, if the registered Holder had so exercised his or her conversion privilege immediately prior thereto. Upon any reorganization, consolidation, merger, transfer or any dissolution, this Note shall continue in full force and effect and the terms thereof shall be applicable to the shares of stock and other securities and property receivable upon exercise of the conversion privilege after consummation of the reorganization, consolidation, merger, transfer, or dissolution, as the case may be, and shall be binding upon the issuer of any such stock or other securities including, the person acquiring all or substantially all of the properties or assets of the Company, whether or not that person shall have expressly assumed the terms of this Note.

**3. Subsequent Investment.**

The Holder shall have the option to invest an additional one million dollars ($1,000,000) within twelve (12) months of the execution of this Note, subject to the same terms and valuation.

**4. Transferability.**

(a) Subject to the restrictions contained in the legend set forth below, this Note is transferable only by the registered Holder hereof in person or by his or her attorney duly authorized in writing on a register maintained by the Company, upon the surrender of this Note, duly endorsed without recourse, and the Company shall not be required to make any transfer unless and until it receives this Note duly and properly endorsed without recourse by the registered Holder. Upon the surrender of this Note for transfer of registration hereof, the Company shall issue a new Note in place hereof, and shall cause that Note to be delivered to the transferee.

(b) By the acceptance of this Note, the Holder represents and warrants that the Holder is purchasing this Note for investment for the Holder's own account and with no present intention of dividing the Holder's participation with others, or reselling or otherwise distributing the same. The Holder understands and acknowledges that the Company has advised the Holder that this Note has not been registered under the Securities Act of 1933, as amended, qualified under the securities laws of any state on the grounds that this transaction is exempt from registration and qualification requirements, and that the Company's reliance on the exemption is predicated in part on the Holder's representation and warranty herein set forth.

(c) By the acceptance of this Note, the Holder agrees that the transfer of this Note and the transfer of any shares of Common Stock of the Company into which this Note may be converted shall be subject to the restriction that no such transfer shall be effected until either: (i) the Holder has obtained an opinion of counsel satisfactory to the Company and its counsel to the effect that the proposed transfer will not result in a violation of the Securities Act of 1933, as then amended; or (ii) a registration statement with respect to this Note, or the shares of Common Stock of the Company into which this Note may be converted, shall then be effective in current form under the Securities Act of 1933, as then amended. This provision shall be binding upon all subsequent transferees of this Note or the shares of Common

Stock into which this Note may be converted.

## 5. Personal Guarantee.

The performance and payment hereunder shall be personally guaranteed by Steven Sharif.   Mr. Sharif agrees to be personally responsible for the prompt, full and complete performance of any and all present and future duties, obligations and indebtedness due to the Holder hereunder, including the prompt payment of principal and interest constituting the Note Obligations in accordance with the terms and conditions provided by this Note.

## 6. Notices.

Any communication or notices may be delivered or mailed to the offices of the Company at 11558 Sorrento Valley Rd. Suite 7, San Diego, California 92121 and to the registered Holder at 4504 San Blas Avenue, Los Angeles, California 91364, or to such other addresses as either the Company or the registered Holder may designate by notice in writing to the other from time-to-time.

## 7. Governing Law and Venue.

The validity, interpretation, and performance of this Note shall be construed under and controlled by the laws of the State of California. Venue for any dispute arising hereunder shall be Los Angeles County, California.

## 8. Attorneys' Fees.

If any legal action or other proceeding is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred in the action or proceeding, in addition to any other permitted relief.

## 9. Securities Warning.

THE SECURITIES REPRESENTED BY THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED ("THE ACT") OR QUALIFIED UNDER ANY STATE SECURITIES LAW. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE TRANSFERRED, SOLD, OR OFFERED FOR SALE UNLESS: (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE ACT AND QUALIFICATION UNDER STATE LAW; (2) THE TRANSFER IS MADE IN COMPLIANCE WITH RULE 144 UNDER THE ACT AND PURSUANT TO QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAW OR EXEMPTION THEREFROM; OR (3) THERE IS AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION AND QUALIFICATION ARE NOT REQUIRED AS TO THE TRANSFER, SALE, OR OFFER.

[SIGNATURES ON FOLLOWING PAGE]

61491.00001\29571974.3

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by its duly authorized officer or agent as of the date first written above.

Ya-Ya Legacy Trust

_____
Jason Caramanis        Trustee

Intrepid Studios, Inc.

_____
Steven Sharif        CEO/President

Personal Guarantor

_____
Steven Sharif

61491.00001\29571974.3

## SCHEDULE A
## PAYMENT SCHEDULE

|  | Payment Amount | Equity Conversion |
|---|---|---|
| 3rd Month | $137,812.50 | .275% |
| 6th Month | $137,812.50 | .275% |
| 9th Month | $137,812.50 | .275% |
| 12th Month | $137,812.50 | .275% |
| 15th Month | $137,812.50 | .275% |
| 18th Month | $137,812.50 | .275% |
| 21st Month | $137,812.50 | .275% |
| 24th Month | $137,812.50 | .275% |
| Total: | $1,102,500.00 | 2.2% |

61491.00001\29571974.3

# EXHIBIT D - 3/4/19 Note

## CONVERTIBLE PROMISSORY NOTE 2

FOR VALUE RECEIVED, Intrepid Studios, Inc., (the "Company") hereby makes this Convertible Promissory Note ("Note") on March 4th, 2019 and promises to pay, on or before July 1st, 2020 (the "Maturity Date"), to the order of Ya-Ya Legacy Trust. ("Holder"), the principal amount of Five Million One Hundred and Thirty-Eight Thousand Dollars ($5,138,000.00), with interest on such amount until paid at a rate of Twenty percent (20%) compounded annually.

This Note is subject to the following terms and conditions:

### 1. Loan.

Upon execution of the agreement Holder shall lend to Company One Million Dollars ($1,000,000). Furthermore, Holder shall agree to lend to Company Five Hundred Thousand ($500,000) on the 1st of each month for a total of four (4) consecutive months following the execution of this Note. Holder and Company agree to roll the sum total amount from the Promissory Note dated June 13th, 2018 of Two Million One Hundred and Thirty-Eight Thousand Dollars ($2,138,000) into this Note to constitute a total sum loaned to Company of Five Million One Hundred and Thirty-Eight Thousand Dollars ($5,138,000.00), by July 1st, 2019.    The loan shall be secured with UCC-1 filings against the Company and the Company's assets. as further outlined in the concurrently executed Pledge and Security Agreement.

Loan shall be sent to;

| | |
|---|---|
| Bank Name: | JPMorgan Chase Bank NA |
| Account Name: | Intrepid Studios, Inc. |
| Account Number: | 777385332 |
| Routing Number: | 322271627 |
| Wire Transfer Routing Number: | 021000021 |

### 2. Repayment.

Repayment shall be made on or before the 1st of July, 2020 in the sum of Five Million One Hundred Thirty-Eight Thousand Dollars ($5,138,000.00) plus 20% interest from the date of this Agreement, compounded annually. unless the Holder chooses to either postpone payment or convert all or any portion of the amount of this Note into authorized shares of Company's preferred stock as set forth in Section 2.

Payment shall be made to;

Account Name: Beverly Hills Law Corp., PC IOLTA Account

Bank Name: Chase Bank N.A.

Routing Number: 322271627

61491.00001\29571974.3

Account Number: 400335407

SWIFT: CHASUS33

## 3. Conversion.

(a) <u>Right to Convert</u>. At the Maturity Date of this Note, subject to the terms and conditions of this Note, Holder shall have the right to convert all or any portion of the amount of this Note and any accrued and unpaid interest thereon (collectively, "Note Obligations") into authorized shares of Company's common stock which constitutes up to a maximum of 7.7 percent of preferred stock of Company, assessed at the valuation of Company at Eighty Million Dollars ($80,000,000) as of the date of this Note. If converted, the entire 7.7% interest of preferred stock shall be non-dilutable.

(b) <u>Procedure for Conversion</u>. In order to convert all or any portion of the Note Obligations, Holder shall: (i) notify the Company in writing of its election to convert all or a portion of the Note Obligations, which notice shall specify the amount of principal and interest included in the Note Obligations to be so converted. The date on which the Note is surrendered for conversion is referred to herein as the "Conversion Date." As soon as practicable after the Conversion Date, Holder shall be entitled to receive a certificate registered in such name as Holder may direct, representing the shares of common stock issuable upon conversion of the applicable Note Obligations, along with a new promissory note, in the same form as this Note, reflecting any Note Obligations that have not been so converted; provided that Holder shall be treated for all purposes as the record holder of such shares of common stock as of the Conversion Date.

(c) In case the Company shall: (i) effect a reorganization; (ii) consolidate with or merge with any other person; or (iii) transfer all or substantially all of its properties or assets to any other person under any plan or arrangement contemplating the dissolution of the Company within twenty-four (24) months from the date of the transfer, the registered Holder of this Note shall be entitled to receive, in lieu of the Common Stock issuable upon the exercise prior to the consummation or the effective date, the stock and other securities and property to which the Holder would have been entitled upon the consummation or in connection with the dissolution, as the case may be. if the registered Holder had so exercised his or her conversion privilege immediately prior thereto. Upon any reorganization. consolidation, merger, transfer or any dissolution. this Note shall continue in full force and effect and the terms thereof shall be applicable to the shares of stock and other securities and property receivable upon exercise of the conversion privilege after consummation of the reorganization. consolidation, merger, transfer, or dissolution. as the case may be, and shall be binding upon the issuer of any such stock or other securities including, the person acquiring all or substantially all of the properties or assets of the Company, whether or not that person shall have expressly assumed the terms of this Note.

## 4. Transferability.

(a) Subject to the restrictions contained in the legend set forth below, this Note is transferable only by the registered Holder hereof in person or by his or her attorney duly authorized in writing on a register maintained by the Company, upon the surrender of this Note. duly endorsed without recourse, and the Company shall not be required to make any transfer unless and until it receives this Note duly and properly endorsed without recourse by the registered Holder. Upon the surrender of this Note for transfer of registration hereof, the Company shall issue a new Note in place hereof and shall cause that

61491.00001\29571974.3

Note to be delivered to the transferee.

(b) By the acceptance of this Note, the Holder represents and warrants that the Holder is purchasing this Note for investment for the Holder's own account and with no present intention of dividing the Holder's participation with others or reselling or otherwise distributing the same. The Holder understands and acknowledges that the Company has advised the Holder that this Note has not been registered under the Securities Act of 1933, as amended, qualified under the securities laws of any state on the grounds that this transaction is exempt from registration and qualification requirements, and that the Company's reliance on the exemption is predicated in part on the Holder's representation and warranty herein set forth.

(c) By the acceptance of this Note, the Holder agrees that the transfer of this Note and the transfer of any shares of Common Stock of the Company into which this Note may be converted shall be subject to the restriction that no such transfer shall be effected until either: (i) the Holder has obtained an opinion of counsel satisfactory to the Company and its counsel to the effect that the proposed transfer will not result in a violation of the Securities Act of 1933, as then amended; or (ii) a registration statement with respect to this Note, or the shares of Common Stock of the Company into which this Note may be converted, shall then be effective in current form under the Securities Act of 1933, as then amended. This provision shall be binding upon all subsequent transferees of this Note or the shares of Common Stock into which this Note may be converted.

## 5. Personal Guarantee.

The performance and payment hereunder shall be personally guaranteed by Steven Sharif.   Mr. Sharif agrees to be personally responsible for the prompt, full and complete performance of any and all present and future duties, obligations and indebtedness due to the Holder hereunder, including the prompt payment of principal and interest constituting the Note Obligations in accordance with the terms and conditions provided by this Note.

## 6. Notices.

Any communication or notices may be delivered or mailed to the offices of the Company at 11558 Sorrento Valley Rd. Suite 7, San Diego, California 92121 and to the registered Holder at 4504 San Blas Avenue, Los Angeles, California 91364, or to such other addresses as either the Company or the registered Holder may designate by notice in writing to the other from time-to-time.

## 7. Governing Law and Venue.

The validity, interpretation, and performance of this Note shall be construed under and controlled by the laws of the State of California. Venue for any dispute arising hereunder shall be Los Angeles County, California.

## 8. Attorneys' Fees.

If any legal action or other proceeding is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred in the action or proceeding, in addition to any other permitted relief.

61491.00001\29571974.3

**9. Securities Warning.**

THE SECURITIES REPRESENTED BY THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED ("THE ACT") OR QUALIFIED UNDER ANY STATE SECURITIES LAW. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE TRANSFERRED, SOLD, OR OFFERED FOR SALE UNLESS: (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE ACT AND QUALIFICATION UNDER STATE LAW; (2) THE TRANSFER IS MADE IN COMPLIANCE WITH RULE 144 UNDER THE ACT AND PURSUANT TO QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAW OR EXEMPTION THEREFROM; OR (3) THERE IS AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION AND QUALIFICATION ARE NOT REQUIRED AS TO THE TRANSFER, SALE, OR OFFER.

[SIGNATURES ON FOLLOWING PAGE]

61491.00001\29571974.3

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by its duly authorized officer or agent as of the date first written above.

Ya-Ya Legacy Trust

_____
Jason Caramanis      Trustee

Intrepid Studios, Inc.

_____
Steven Sharif      CEO/President

Personal Guarantor

_____
Steven Sharif

61491.00001\29571974.3

# EXHIBIT E - 3/5/19 PSA

COMPLAINT

## PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT ("**Agreement**"), dated as of March 5, 2019, is made by Intrepid Studios, Inc. ("**Borrower**"), in favor of Ya-Ya Legacy Trust (the "**Secured Party**"), with reference to the following facts:

## RECITALS

A.     Intrepid Studios, Inc. is the borrower in the concurrently executed Promissory Note ("Note") dated March 5, 2019 by and between Borrower, Personal Guarantor Steven Sharif and Secured Party. As collateral for all sums borrowed by Borrower under the Note from Secured Party, the Borrower pledges a lien and security interest in certain assets belonging to Borrower. The Borrower warrants and represents that he has the power and authority to pledge an ownership/lien interest in Borrower's assets to Secured Party.

B.     Pursuant to the Note, Borrower owes Secured Party a total of $5.138m ("Loan").

C.     Secured Party requires that, as security for repayment of the Note, Borrower, by and through the Borrower, pledges to Secured Party a lien and ownership interest in the following assets that may be perfected and executed upon in the event of default under the Note. Such lien and security interest shall allow Secured Party the full right to sell any and all assets that are listed as collateral below in order to satisfy any amounts owing to Secured Party by Borrower and/or Borrower.

D.     Secured Party shall be allowed to file a UCC-1 Financing Statement against the Borrower pursuant to this Agreement.

E.     NOW, THEREFORE, in order to induce Secured Party to enter into the Note, and for other good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, Borrower hereby represents, warrants, covenants, agrees, pledges and grants as follows:

1.     Definitions. Terms used in this Agreement and not otherwise defined in this Agreement shall have the meanings given those terms in the Note.

2.     Grant of Security Interest. As security for the payment and performance of the Obligations (as hereinafter defined), Borrower hereby pledges to the Secured Party, and grants to Secured Party a security interest and lien in and to, all of the following (collectively, the "**Pledged Collateral**"):

(a)     All assets belonging to the Borrower, including, but not limited to, shares intellectual property, software, all real property, personal property, trademarks, licenses, cash, accounts and notes receivable, inventory, and any and all other assets, intangible or tangible, belonging to Borrower.

(b)     All proceeds of the foregoing, whether voluntary or involuntary.

3. Obligations Secured. The security interest granted hereunder secures the prompt payment and performance of each of the following (collectively. the "**Obligations**"):

(a) All obligations of the Borrower under the Note;

(b) Each of Borrower's obligations under this Agreement;

(c) All other obligations owing by Borrower and Borrower to the Secured Party. but only to the extent that any such obligation is described or referred to in a document, executed by Borrower and Borrower at the request of the Secured Party. which states that such obligation is secured hereby;

(d) All interest that accrues on all or any part of any of the Obligations including without limitation interest that accrues after the filing of any petition or pleading by or against Borrower or Borrower any other person or entity for a proceeding under any bankruptcy or debtor relief law;

(e) Any and all amendments, extensions and other modifications of any of the foregoing, including, without limitation, amendments, extensions and other modifications that are evidenced by new or additional documents or that change the rate of interest on any Obligation.

4. Representations and Warranties of Borrower. Borrower represents, warrants and agrees to and with the Secured Party that:

(a) Borrower has good title to the Pledged Collateral, free from any liens, encumbrances, defenses or other claims or restrictions whatsoever;

(b) The security interest in the Pledged Collateral created hereby constitutes a first, prior and indefeasible security interest;

(c) Borrower has the right to grant a security interest in the Pledged Collateral pursuant to this Agreement without restriction, and the Pledged Collateral has been duly and validly pledged with the Secured Party in accordance with all applicable laws;

(d) Borrower has all requisite power and authority to execute and deliver, and to perform all of its obligations under. this Agreement;

(e) The execution and delivery by Borrower of. and the performance by Borrower of each of its obligations under. this Agreement have been duly authorized by all necessary action and do not and will not:

(i) require any consent or approval not heretofore obtained of any beneficiary or creditor of Borrower:

(ii) result in or require the creation or imposition of any lien or right of others upon or with respect try the Pledged Collateral, other than as provided in this Agreement;

-2-

(iii)    violate any provision of any law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower; or

(iv)    result in a breach of or constitute a default under, or cause or permit the acceleration of any obligation owed under, any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected;

(f)    No authorization, consent, approval, order, license, permit or exemption from, or filing with, registration or qualification with, any governmental agency is or will be required under applicable law to authorize or permit the execution and delivery by Borrower of, and the performance by Borrower of all of its obligations under, this Agreement; and

(g)    This Agreement constitutes the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

5.    Further Assurances.  Borrower agrees that at any time, and from time to time, at its own expense Borrower will promptly execute, deliver and file or record all further instruments and documents, and will take all further actions, including, without limitation, executing, delivering, filing or taking other actions, that Secured Party may reasonably request in order to perfect and protect any pledge or security interest granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral and to preserve, protect and maintain the Pledged Collateral and the value thereof, including, without limitation, payment of all taxes, assessments and other charges imposed on or relating to the Pledged Collateral.  Borrower hereby consents and agrees that the issuers of, or obligors on, the Pledged Collateral, or any registrar, transfer agent, depository or trustee for any of the Pledged Collateral, shall be entitled to accept the provisions of this Agreement as evidence of the right of the Secured Party to effect any transfer or exercise any right hereunder, notwithstanding any other notice Borrower or any other Person to such issuers or such obligors or to any such registrar or transfer agent or trustee.  Borrower hereby agrees that the Secured Party may, without further notice to, consent or authorization by or signature of Borrower, file financing statements with respect to the security interest granted pursuant to this Agreement.

6.    Release of Collateral. So long as there is no Event of Default, and once all sums due under the Note are paid, Secured Party will no longer have any rights under this Agreement.

7.    Secured Party May Perform Obligations:  If Borrower fails to perform any obligation contained herein, Secured Party may, but without any obligation to do so and without notice to or demand upon Borrower, perform the same and take such other action as Secured Party may deem necessary or desirable to protect the Pledged Collateral or Secured Party's security interests therein, Secured Party being hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest and compromise any lien which in the reasonable judgment of Secured Party appears to be prior or superior to the Secured Party's security interests, and in exercising any such powers and authority to pay necessary expenses, employ counsel and pay reasonable attorneys' fees. In any such event, Borrower hereby agrees to repay immediately upon demand all sums so expended by Secured Party,

together with interest from the date of expenditure at the default rate provided for in the Note. Secured Party shall not be under any duty or obligation to (i) preserve, maintain or protect the Pledged Collateral or any of any Borrower's rights or interest therein, (ii) exercise any rights, powers and elections with respect to the Pledged Collateral, or (iii) except as provided to the contrary herein, make or give any notices of default, presentments, demands for performance, notices of nonperformance or dishonor, protests, notices of protest or notice of any other nature whatsoever in connection with the Pledged Collateral on behalf of Borrower or any other Person having any interest therein; and the Secured Party does not assume and shall not be obligated to perform the obligations of Borrower, if any, with respect to the Pledged Collateral.

8.      Transfers and Other Liens. Borrower agrees that it shall not (i) assign, exchange, transfer or otherwise dispose of, or contract to assign, exchange, transfer or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral, (ii) create or permit to exist any lien upon or with respect to any of the Pledged Collateral, except for liens created hereunder in favor of the Secured Party, or (iii) take any action with respect to the Pledged Collateral which would materially impair the Secured Party's rights hereunder. Borrower shall, at Borrower's sole cost and expense, defend any claim that may be made against the Pledged Collateral or the Secured Party's security interests therein.

9.      INTENTIONALLY DELETED

10.     Events of Default and Remedies.

(a)      Events of Default. The occurrence of any of the following, whatever the reason therefor, shall constitute an Event of Default:

(i)      the occurrence of an "Event of Default" under the Note; or

(ii)      failure by Borrower to perform any obligation under this Agreement or

(iii)      any representation or warranty in this Agreement proves to be incorrect in any material respect when made.

(b)      Rights Upon Event of Default. Upon the occurrence of an Event of Default under this Agreement, the Secured Party shall have all rights and remedies that are available to the Secured Party under this Agreement, under applicable law and/or in equity in any jurisdiction where enforcement is sought. In addition, the Secured Party shall have all rights and remedies of a secured party under the Uniform Commercial Code as enacted in any such jurisdiction, and shall also have the following rights and remedies, all of which may be exercised with or without further notice to Borrower:

(i)      to enforce payment and prosecute any action or proceeding with respect to any and all of the Pledged Collateral and take or bring, in the Secured Party's name or in the name of Borrower, all steps, actions, suits or proceedings reasonably deemed by the Secured Party to be necessary or desirable to effect collection of or to realize upon the Pledged Collateral;

-4-

(ii)     in accordance with applicable law. to take possession of the Pledged Collateral with or without judicial process:

(iii)    to transfer any or all of the Pledged Collateral into the name of the Secured Party or its nominee or nominees; and

(iv)     in accordance with applicable law, to foreclose the liens and security interests created under this Agreement or under any other agreement relating to the Pledged Collateral by any available judicial procedure or without judicial process, and, in accordance with the terms of this Agreement, to assign or otherwise dispose of the Pledged Collateral or any part thereof, with or without representations or warranties, and upon such terms as shall be acceptable to Secured Party;

all at the sole option of and in the sole discretion of Secured Party.

11.    Reserved.

12.    Notice. All notices, requests and other communications required or permitted to be given hereunder shall be in writing and shall be deemed given (i) upon receipt. if given by personal delivery, (ii) upon confirmation of delivery, if given by electronic mail and (iii) upon the third business day following mailing, if mailed by deposit in the United States mail, with certification and postal charges prepaid.

Any party may change the address or telecopy number or email address to which notices are to be sent to it by giving written notice of such change of address or telephone number to the other parties in the manner above provided for giving notice.

13.    Other Agreements. Nothing in this Agreement shall in any way modify or limit the effect or terms or conditions set forth in any other security or other agreement executed by Borrower in connection with the Obligations, but each and every term and condition hereof shall be in addition thereto.

14.    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition of unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

15.    No Waivers: Cumulative Remedies. The Secured Party shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder and no waiver shall be valid unless in writing. signed by Secured Party, and then only to the extent therein set forth. A waiver by the Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Secured Party would otherwise have on any future occasion. No failure to exercise nor any delay in exercising any right, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein

provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights or remedies provided by law.

16.     Amendments: Applicable Law: Successors and Assigns.  None of the terms or provisions of this Agreement may be altered, modified or amended except by an instrument in writing, duly executed by Secured Party and Borrower.  This Agreement and all obligations of Borrower hereunder shall be binding upon the permitted successors and assigns of Borrower, and shall, together with the rights and remedies of the Secured Party hereunder. inure to the benefit of the Secured Party and its successors and assigns.  This Agreement shall be governed by, and be construed, enforced and interpreted in accordance with, the internal laws of the State of California.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

17.     Costs. Expenses and Attorneys Fees.  All payments, advances, charges, costs and expenses, including reasonable attorneys' fees, made or incurred by the Secured Party in exercising any right, power or remedy conferred by this Agreement or in the enforcement thereof shall be paid to the Secured Party by Borrower immediately and without demand, together with interest at the default rate per annum specified in the Note.

**[Remainder of Page Intentionally Left Blank]**

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, Borrower has caused this Agreement to be duly executed as of the date first above written.

**BORROWER:**

By:  _Steven Sharif_

Steven Sharif, CEO/President of Intrepid Studios, Inc.

S-1

EXHIBIT F - 8/22/19 Note

COMPLAINT

## *PROMISSORY NOTE*

$300,000.00    Date: August 22, 2019

For value received, the undersigned Intrepid Studios, Inc of 11558 Sorrento Valley Rd. STE 7, San Diego, California 92121 (the "Borrower"), promises to pay to the order of Jason Caramanis of 4504 San Blas Avenue, Los Angeles, California 91364 (the "Lender"), the sum of $300,000.00 with interest from August 22, 2019, on the unpaid principal at the rate of 20% per annum.

### I. TERMS OF REPAYMENT

### A. Payments

The unpaid principal and accrued interest shall be payable in full on October 07, 2019 (the "Due Date").

### B. Application of Payments

All payments on this Note shall be applied first in payment of accrued interest and any remainder in payment of principal.

### C. Acceleration of Debt

If any payment obligation under this Note is not paid when due, the remaining unpaid principal balance and any accrued interest shall become due immediately at the option of the Lender.

### D. Additional Consideration

In addition to the repayment of the $300.000 plus 20% interest, Borrower agrees that upon execution of this Note, Lender shall be issued 0.9% equity/stock ownership in Borrower and Borrower and Lender shall work together to execute such the documents that are necessary to effectuate this issuance.

### II. COLLECTION COSTS

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

### III. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

1) the failure of the Borrower to pay the principal and any accrued interest when due;

2) the liquidation, dissolution, incompetency or death of the Borrower;

3) the filing of bankruptcy proceedings involving the Borrower as a debtor;

4) the application for the appointment of a receiver for the Borrower;

5) the making of a general assignment for the benefit of the Borrower's creditors;

6) the insolvency of the Borrower;

7) a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit; or

8) the sale of a material portion of the business or assets of the Borrower.

## IV. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## V. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and demand of this Note.

No delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note, or failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment or the acceptance of a past-due installment shall be construed as a waiver of the right of Lender to thereafter insist upon strict compliance with the terms of this Note without notice being given to Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This note may not be amended without the written approval of the holder.

## VI. GOVERNING LAW

This Note shall be construed in accordance with the laws of the State of California. Any legal dispute arising hereunder shall be venued in the Los Angeles Superior Court.

## VII. SIGNATURES

This Note shall be signed by Steven Sharif, CEO on behalf of Intrepid Studios, Inc, and Jason Caramanis.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered in the manner prescribed by law as of the date first written above.


Borrower:
Intrepid Studios, Inc

By: _____
Steven Sharif, CEO

Lender:

By: _____
Jason Caramanis

# EXHIBIT G - 1/16/20 Amendment

## FIRST AMENDMENT TO PROMISSORY NOTE

This First Amendment to the Promissory Note ("**Note**") dated August 22, 2019 between CTB Rise International, Inc. ("**Holder**") and Intrepid Studios, Inc. ("**Borrower**") (the "**Amendment**"), dated as of January 16, 2020 ("**Effective Date**"), is agreed to and adopted by the aforementioned parties, as well as Jason Caramanis ("**Assignee**"):

I.      The right to repayment of the $1,000,000 principal under the Note shall be fully transferred and assigned to Assignee or an entity of his choosing, such that Borrower shall now be indebted to Assignee in the amount of $1,000,000, which shall be paid to Assignee no later than August 22, 2020. Assignee shall take over as Holder under the Note and shall be assigned and transferred all rights and benefits conferred to Holder under the Note, except as stated below.

II.     Holder shall have no further rights to the $1,000,000 repayment. However, Borrower shall still pay to Holder a 20% interest payment based off of the $1,000,000 principal, as well as issue to Holder a 1% ownership stake in Borrower by August 22, 2020.

III.    The accrued interest from August 22, 2019 through January 9, 2020, $76,713, shall be paid to Holder by August 22, 2020. The interest that will accrue from January 10, 2020 through August 22, 2020, $123,836.70, shall be paid to Assignee by August 22, 2020.

IV.     Any legal dispute arising under the Note shall be governed by California law and venued in the Los Angeles Superior Court.

All other terms of the Note shall remain in full force and effect and shall be binding upon Assignee and Borrower.

IN WITNESS WHEREOF, the undersigned parties have adopted and executed this Amendment as of the Effective Date first set forth above.

**BORROWER:**

_Steven Sharif_

Steven Sharif, CEO of Intrepid Studios, Inc.

**HOLDER:**

Travis Bott, Owner, CTB Rise International Inc.

**ASSIGNEE:**

Jason Caramanis

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On January 17, 2020 before me, Jordyn Jackson / Notary Public
(Date)                         (Here insert Name and Title of the officer)

personally appeared Jason Caramanis
(Name(s) of Signer(s))

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct

WITNESS my hand and official seal

Signature _____
(Signature of Notary Public)

2

# EXHIBIT H - 3/28/25 Note

COMPLAINT

THIS NOTE AND THE SECURITIES ISSUED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## INTREPID STUDIOS, INC.

### PROMISSORY NOTE

Date of Note:  March 28, 2025
Principal Amount of Note:  $2,000,000.00

FOR VALUE RECEIVED, Intrepid Studios, Inc., a California corporation (the **"Company"**), hereby promises to pay to the order of Ya-Ya Legacy Trust (the **"Holder"**) the principal amount of Two Million Dollars ($2,000,000.00) plus twelve percent (12%) interest under the terms and subject to the conditions set forth in this Line of Credit Promissory Note (the **"Note"**).

1.  **Maturity; Payment.** If not sooner paid according to the terms hereof, the outstanding principal amount of the Note, and all accrued and unpaid interest thereunder, shall be due and payable upon the written demand by the Holder at any time after the earlier of: (a) December 15, 2025, (b) the closing date of an Acquisition (as defined below), or (c) the date of an Event of Default (as defined in Section 5 below) (the **"Maturity Date"**). All payments shall be made in lawful money of the United States at such place as the Holder may from time to time designate in writing to the Company. Payment shall be credited first to any fees and expenses due and payable under this Note, then to the accrued interest and the remainder applied to principal. At any time prior to or after the Maturity Date, in lieu of demanding repayment of the outstanding principal amount and accrued and unpaid interest in cash as otherwise required under the Note, the Holder may elect in writing to extend the Maturity Date to a date mutually agreed between the Parties. **"Acquisition"** shall mean (i) a sale, lease or other disposition (or a series of sales, leases or other dispositions) of fifty-one percent (51%) or more assets or properties of the Company (and its subsidiaries, if any, calculated on a consolidated basis), in each case other than sales of inventory in the ordinary course of business, consistent with past practices, or (ii) any transaction, or series of transactions, in which any Person (defined below) shall directly or indirectly acquire from the holders thereof, by purchase or in a merger, consolidation or other transfer or exchange of outstanding capital stock, ownership of or control over capital stock of the Company (or securities exchangeable for or convertible into such stock or interests) entitled to elect a majority of the Company's Board of Directors or representing at least fifty-one percent (51%) of the number of shares of Common Stock outstanding. **"Person"** means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

O4096797.v1

2.     **Interest.** Interest shall accrue on the outstanding principal amount of this Note from the date hereof until the date this Note is paid in full at the rate of twelve percent (12%) per annum (subject to the default rate set forth below) or the maximum rate permissible by law, whichever is less. Interest shall be due and payable on the Maturity Date, unless earlier paid in full, and shall be calculated on the basis of a 365-day year for the actual number of days elapsed. The Company shall pay all accrued interest in cash upon repayment of the principal amount of this Note.  In the Event of Default, as defined in Section 5 below, default interest shall accrue on the outstanding principal and accrued but unpaid interest at a rate of eighteen percent (18%) per annum or the maximum permissible rate by law, wherever is less, compounded annually.

3.     **Prepayment.** Prior to the Maturity Date, the Company may not prepay the Note, in whole or in part, without written approval by the Holder, except in the event of an Acquisition.

4.     This paragraph is intentionally left blank.

5.     **Event of Default.** For purposes of this Note, an **"Event of Default"** shall be deemed to have occurred if: (a) the Company fails to pay this Note in full when due, provided the parties have not otherwise mutually agreed to extend the Maturity Date; (b) the Company breaches any representation, warranty or covenant contained in this Note which breach (to the extent of a nature that is capable of being cured) continues for fifteen (15) days after notice of breach from the Holder; (c) an default or event of default occurs under the terms of or in respect of Senior Indebtedness; (d) the Company voluntarily files for bankruptcy protection or makes a general assignment for the benefit of creditors, or (e) the Company is the subject of an involuntary bankruptcy petition and such petition is not dismissed within ninety (90) days. If an Event of Default occurs and is continuing, the Holder may by written notice to the Company declare the outstanding principal amount of, and all unpaid accrued interest under, this Note in default and immediately due and payable.  In the event of a claim or allegation of default in respect of any Senior Indebtedness, the Company will notify Holder within ten (10) days after notice of such claim or allegation of default is received by the Company.

6.     **Stock Grant.**  As an additional inducement to extend the loan set forth herein, the Company shall issue to Holder (or its designee) a non-dilutable ownership in the company in the form of Class A Shares equal to 2.50% of the Company's outstanding total stock, to be issued at direction of Holder. Company shall protect this non-dilutable ownership percentage by issuing the necessary number of additional shares to Holder necessary to maintain the above ownership percentage whenever other new shares are issued for any reason.

7.     **Unsecured Obligation; Senior Indebtedness.** The indebtedness represented by this Note is unsecured and subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date of this Note or hereafter incurred. **"Senior Indebtedness"** shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with: (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any

such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor. Nothing in this paragraph shall preclude or prohibit the Holder from receiving any payment unless and until the Holder has received a default notice from any lender of Senior Indebtedness.

8. **Representations and Warranties.** As a material inducement to the Holder, the Company hereby makes the representations and warranties contained in Exhibit A attached hereto and incorporated herein by this reference. As a material inducement to the Company, the Holder hereby makes the representations and warranties contained in Exhibit B attached hereto and incorporated herein by this reference.

9. **Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) five (5) calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iii) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the other party hereto at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may notify the other party pursuant hereto.

10. **Governing Law.** This Note shall be governed by and construed under the laws of the State of California, without giving effect to its choice of law rules.

11. **Transfer; Successors and Assigns.** The rights and obligations of the Company and the Holder shall be binding upon and shall inure to the benefit of their successors, assigns and transferees. Notwithstanding the foregoing, (i) the Holder may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Company; provided that this Note may be assigned, conveyed or transferred without the prior written consent of the Company to any wholly-owned affiliate of Holder or any trust of Holder that executes and delivers to the Company an acknowledgement that such wholly-owned affiliate or trust agrees to be subject to, and bound by, all the terms and conditions of this Note, and (ii) the Company may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Holder. Subject to the immediately preceding sentence, this Note may be transferred only in compliance with any applicable laws, and upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company, a new note for the same principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of this Note.

12. **Modification; Waiver.** Any term of this Note may be amended or waived only upon the written consent of the Company and the Holder.

13. **Expenses.** Company and Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein; provided that if any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party will be entitled to reasonable

O4096797.v1

attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

14. **Stockholders, Officers and Directors Not Liable.** In no event shall any stockholder, officer or director of the Company be liable for any amounts due or payable pursuant to this Note.

15. This paragraph is intentionally left blank.

16. **Further Assurances.** The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

17. **Titles and Subtitles.** The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

18. **Interpretation.** Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under all applicable laws and regulations. If, however, any provision of this Note shall be prohibited by or invalid under any such law or regulation in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such law or regulation, or, if for any reason it is not deemed so modified, it shall be ineffective and invalid only to the extent of such prohibition or invalidity without affecting the remaining provision of this Note, or the validity or effectiveness of such provision in any other jurisdiction.

19. **Entire Agreement.** This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

20. **Counterparts.** This Note may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

21. **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

O4096797.v1

*[signature page follows]*

O4096797.v1

The parties have executed this Promissory Note as of the date first written above.

**COMPANY:**
**Intrepid Studios, Inc.**

*Steven Sharif*

By: _____

       Name: Steven Sharif
       Title: President

E-mail: _____

Address:    3721 Valley Centre Dr. Ste. 200
           San Diego, CA 92130

**HOLDER:**
**Ya-Ya Legacy Trust**

*Jason Caramanis Trustee*
Jason Caramanis Trustee (Jul 17, 2025 13:56 PDT)

    Jason Caramanis, Trustee

E-mail: dutchtrust@yahoo.com

Address: 4504 San Blas Ave, Woodland Hills, CA 91364

O4096797.v1

# Jason Caramanis Promissory Note III

**Final Audit Report**                                                      2025-08-09

| | |
|---|---|
| Created: | 2025-07-17 |
| By: | Ryan Ogden (ryan_ogden@hotmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhQkMp-wHp653wcCe3VKrhMJvdluGalxm |

## "Jason Caramanis Promissory Note III" History

📄 Document created by Ryan Ogden (ryan_ogden@hotmail.com)
2025-07-17 - 6:22:36 PM GMT

✉️ Document emailed to Jason Caramanis (dutchtrust@yahoo.com) for signature
2025-07-17 - 6:22:41 PM GMT

✉️ Document emailed to Steven Sharif (stevensharif@intrepidstudios.com) for signature
2025-07-17 - 6:22:42 PM GMT

📄 Email viewed by Jason Caramanis (dutchtrust@yahoo.com)
2025-07-17 - 7:49:27 PM GMT

✏️ Signer Jason Caramanis (dutchtrust@yahoo.com) entered name at signing as Jason Caramanis Trustee
2025-07-17 - 8:56:01 PM GMT

✏️ Document e-signed by Jason Caramanis Trustee (dutchtrust@yahoo.com)
Signature Date: 2025-07-17 - 8:56:03 PM GMT - Time Source: server

📄 Email viewed by Steven Sharif (stevensharif@intrepidstudios.com)
2025-08-09 - 9:39:26 PM GMT

✏️ Document e-signed by Steven Sharif (stevensharif@intrepidstudios.com)
Signature Date: 2025-08-09 - 9:39:40 PM GMT - Time Source: server

✅ Agreement completed.
2025-08-09 - 9:39:40 PM GMT

📕 **Adobe Acrobat Sign**

# EXHIBIT I - 8/21/19 Email

**Gmail**

## w: Intrepid
messages

----- Forwarded Message -----
**From:** Steven Sharif <stevensharif@intrepidstudios.com>
**To:** Sagar Parikh <sp@beverlyhillslawcorp.com>
**Cc:** Jason Caramanis <dutchtrust@yahoo.com>
**Sent:** Wednesday, August 21, 2019 at 08:59:20 PM PDT
**Subject:** Re: Intrepid

Gentlemen,

Attached below is Intrepid's Cap table, that I just made 😎
(We didn't have one apparently)

On Wed, Aug 21, 2019 at 8:28 PM Steven Sharif <stevensharif@intrepidstudios.com> wrote:
Gentlemen,

I've attached the investor doc and will get you a Cap Table shortly as well. Feel free to review and make any changes you see fit.

Thanks!

On Wed, Aug 21, 2019 at 7:12 PM Sagar Parikh <sp@beverlyhillslawcorp.com> wrote:
Steven,

Can we get a Shareholders Agreement and Cap Table for the company that currently shows what Jason currently owns?

We believe it should be 4.4% of the outstanding stock, non-dilutable.

See my March 5, 2019 letter attached for reference.

Please advise.

Sagar Parikh, Esq.

## Beverly Hills Law Corp., PC
433 N. Camden Drive, 6th Floor
Beverly Hills, CA 90210
Tel |    (310) 887-1338
Fax|    (310) 982-2603
Email | SP@BeverlyHillsLawCorp.com
Web |   www.BeverlyHillsLawCorp.com

CONFIDENTIALITY NOTICE: This message and any attachments are intended solely for the person or entity to which it is addressed and may contain confidential or privileged information, the disclosure of which is governed by applicable law. If the recipient of this message is not the addressee or employee or agent responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message in error, please call the sender of this message and destroy the related message immediately.



Steven Sharif

*Founder / Creative Director*
**Intrepid Studios Inc.**
w: www.intrepidstudios.com
e: StevenSharif@IntrepidStudios.com

 

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

--
--



Steven Sharif

*Founder / Creative Director*
**Intrepid Studios Inc.**
w: www.intrepidstudios.com
e: StevenSharif@IntrepidStudios.com

  

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

 **Intrepid Cap Table.pdf**
73K

| Number of Shares | | 1,000 | | | | | | | Percent |
|---|---|---|---|---|---|---|---|---|---|
| | | Shareholder | Date of Transaction | Preferred | Invested (USD) | | | | |
| | | | | | | | | | |
| | Shareholders | | | | | | | | |
| | | | | | | | | | 93.40% |
| Board/Investor | | Steven Sharif | May-15 | 934 | $9,550,000 | | | | 93.40% |
| Board/Investor | | Ya-Ya Legacy Trust | Aug-19 | 44 | $2,205,000 | | | | 4.40% |
| Board/Investor | | Thomas and Bethany Alkazin | Aug-15 | 22 | $2,000,000 | | | | 2.20% |
| TOTALS | | | | 1,000 | $13,755,000 | | | | 100.00% |

Intrepid Studios, Inc. Company Capitalization Table

# Exhibit 2

# LOAN SALE AGREEMENT

This LOAN SALE AGREEMENT (the "**Agreement**") is made and entered into as of January 6, 2026 (the "**Effective Date**"), by and between ROBERT D. DAWSON ("**Lender**"), and INTREPID CREATIONS, LLC ("**Creations**," and together with Lender, the "**Seller**") and TFE GAMES HOLDINGS, LLC, a Delaware limited liability company, and/or its nominee ("**Buyer**"). Buyer and Seller are each referred to herein as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.      Intrepid Studios, Inc. ("**Borrower**") is indebted to Seller pursuant to those certain Convertible Promissory Notes as more particularly described on <u>Exhibit A</u>, attached hereto (the "**Notes**"). The Notes evidence a series of fifty-five (55) loans made by Lender to Borrower (the "**Loans**"). The principal amounts of Notes total Forty Million Three Hundred Seventy-Two Thousand Eight Hundred Thirty-One Dollars and 54/100 ($40,372,831.54).

B.      The Notes are secured by that certain Pledge and Security Agreement dated March 23, 2022, between Borrower, Lender, and Creations (the "**Security Agreement**"), and thereafter perfected by the filing of a corresponding UCC Financing Statement in the Office of the Secretary of State of California, on May 13, 2025, as Document Number U240040960326) (the "**Financing Statement**").

C.      The Collateral identified on the Financing Statement is described, in part, as "[a]ll assets and all personal property of Debtor [Borrower]..."

D.      The Notes, the Security Agreement, and the Financing Statement are collectively referred to herein as the "**Loan Documents**," copies of which are attached hereto as <u>Exhibit B</u>.

E.      Seller wishes to sell and assign, and Buyer wishes to purchase the Loan and the Loan Documents from Seller, and take an assignment of Seller's liens and security interests under the Loan Documents pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the promises and agreements set forth below and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties incorporate the above recitals by this reference and agree as follows:

## AGREEMENT

1.      **Agreement to Buy and Sell**. Buyer agrees to buy, and Seller agrees to sell all its rights, title, and interest in, the Loan and the Loan Documents at the price and on the terms and conditions set forth in this Agreement.

2.      **Consideration**. The consideration for the sale of the Loan and the Loan Documents (the "**Consideration**") is the Buyer shall assume, at its sole discretion, the commercially reasonable responsibility for the operation, upkeep and maintenance of the collateral underlying the Loan Documents.

1

Docusign Envelope ID: 39E36C5F-752F-49A8-B3D5-60707A08FA19

3.    <u>Closing</u>.

(a)    **Closing Date**. The closing of the purchase and sale under this Agreement ("**Closing**") shall occur at a location mutually agreed upon by Buyer and Seller, on January 6, 2026, or such other date as may be agreed upon by Seller and Buyer.

(b)    **Seller's Closing Deliverables**. Seller shall make the following deliveries to to Buyer, each of which is a condition to Closing:

(i)    The Loan Documents;

(ii)    An originally signed allonge, affixed to the original Note signed by Seller and made payable to the order of Buyer, without recourse or warranty, in the form of **Exhibit C**, attached hereto;

(iii)    A signed Assignment of Loan Documents, in the form of **Exhibit D**, attached hereto ("**Assignment of Loan Documents**"); and

(iv)    Such other documents as Buyer may reasonably require to carry out the transactions contemplated by this Agreement.

(c)    <u>**Buyer's Closing Deliverables**</u>. Buyer shall make the following deliveries to Seller, each of which is a condition to Closing:

i.    A duly executed Assignment of Loan Documents for the Loan; and

ii.    Such other documents as Seller may reasonably require to carry out the transactions contemplated by this Agreement.

(d)    <u>**Representations and Warranties of Seller**</u>. It is a condition to Closing that all of the representations and warranties set forth in Sections 7 and 8 below are true and correct as of Closing.

(e)    **Closing Costs**. Seller shall be responsible at its sole cost and expense for any costs and expenses related to the transactions contemplated by this Agreement (the "**Transaction Costs**"), including, but not limited to, Buyer's attorneys' fees and costs, Escrow Agents fees and costs, the recording and/or filing of all assignments, and for Buyer obtaining an assignment of the Loan Policy. Escrow Agent shall pay all Transaction Costs from the Cash at Closing, prior to distributing the remaining Cash proceeds to Seller.

4.    <u>**Due Diligence Period**</u>. If, prior to Closing, Buyer delivers to Seller written notice of termination (which termination may be made for any reason or no reason in Buyer's sole discretion), then this Agreement shall terminate and neither Buyer nor Seller shall have any further obligations hereunder with respect to the purchase and sale of the Loan. Immediately following termination pursuant to this subsection, Buyer shall return all due diligence materials to Seller.

2

5.    **Loan Payments Received by Seller**. All payments on the Loan received by Seller prior to Closing shall belong to Seller. Any payments on the Loan received by Seller after Closing shall belong to Buyer, and Seller shall remit any such payments to Buyer within ten (10) business days after actual receipt, with any checks or other instruments endorsed by Seller to Buyer without recourse or warranty.

6.    **Covenants of Buyer**.

(a)    Buyer shall use its best efforts to satisfy each of the conditions to Closing.

(b)    After Closing, Buyer shall, as successor to Seller, assume Seller's obligations under and be bound by and perform and comply with all of the terms and conditions of the Loan and Loan Documents and applicable law with respect to the Loan, including without limitation all applicable laws relating to collection practices. Seller and Seller's counsel shall cooperate with Buyer and Buyer's counsel in any collection or enforcement action.

7.    **Covenants of Seller**.

(a)    Seller shall use its commercially reasonable efforts to satisfy each of the conditions to Closing.

(b)    Within five (5) business days following Closing, Seller shall deliver to Buyer any of the documents and instruments related to the Loan and contained within Seller's loan file ("**Loan File**") that Seller has not previously delivered to Buyer.

(c)    Seller shall notify Buyer promptly if any of the representations set forth in Section 8 hereof shall become inaccurate in any material respect prior to Closing or if any of such representations is discovered to be inaccurate in any material respect prior to Closing.

(d)    As part of the sale and assignment of the Note and other Loan Documents, Seller shall assign to Buyer all recourse rights and remedies that Seller presently has or may have against Borrower or other obligors under the Note or Loan Documents with respect to any existing or prior unresolved disputes or defaults, including, without limitation, payment defaults.

8.    **Seller's Representations and Warranties**. Seller represents and warrants to Buyer as follows:

(a)    Creations is a limited liability company validly existing and in good standing under the laws of the State of |Florida    | with powers adequate for the making and performing of this Agreement;

(b)    All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority, required on the part of the Creations in connection with the valid execution and delivery of this Agreement hereby have been obtained to enable Seller to carry out and perform its obligations under the terms of this Agreement;

3

Docusign Envelope ID: 39E36C5F-732F-49A8-B3B5-60707A08FA19

(c)    Lender is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended;

(d)    The Notes and Loan Documents relate to obligations owed to Seller and Seller has not assigned, transferred, encumbered or hypothecated to any third party any portion of its interest in the Notes or Loan Documents;

(e)    As of January 6, 2026, the following net amounts are due and owing to Seller pursuant to the Loan Documents:

| | |
|---|---|
| Principal: | $40,372,831.54 |
| Interest: | $3,353,183.17 |
| Costs and Expenses: | $[ 50000 ] |
| Total: | $[ 43776014.7 ] + Per Diem |
| Per Diem after January 6, 2026: | $[ 16104.18 ] |

(f)    Seller has the right to sell and assign the Loan and the related Loan Documents to Buyer;

(g)    The Notes and Loan Documents are true, genuine and correct and to Seller's actual knowledge are valid and enforceable in accordance with their terms;

(h)    The Seller not aware of any bankruptcy, or insolvency of any party to the Notes and Loan Documents, and no party to the Notes have requested a reduction in a Note principal amount or payment amount, or otherwise requested a revision to a Note, except as reflected in the Loan Documents or as otherwise set forth in this Agreement;

(i)    To its actual knowledge, the Seller is not in violation of any applicable statute, rule, regulation, order or restriction of any government or instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation would materially and adversely affect the business, assets, liabilities, financial condition or operations of the Seller; and

(j)    The representations of Seller are true and correct.

The representations and warranties set forth in this Section 8 shall survive Closing.

9.    **Buyer's Representations and Warranties**.  Buyer represents and warrants to Seller as follows:

(a)    Buyer is a duly formed or organized corporation, validly existing and in good standing under the laws of the State of Delaware with powers adequate for the making and performing of this Agreement;

4

Docusign Envelope ID: 39E30C5F-752F-49A6-B3D5-40707A08FA16

(b)     Buyer has all requisite power and authority to execute and deliver, and to perform all of its obligations under, this Agreement and all instruments and other documents executed and delivered by Buyer in connection herewith;

(c)     The execution, delivery and performance of this Agreement has been duly authorized by all necessary action on the part of Buyer and does not require any consent or approval of any party that has not been obtained. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority, required on the part of the Buyer in connection with the valid execution and delivery of this Agreement hereby have been obtained to enable Buyer to carry out and perform its obligations under the terms of this Agreement; and

(d)     The representations of Buyer are true and correct.

10.     **Seller Default and Buyer Remedies**. If Seller is in material default under this Agreement, and such default is not cured within five (5) days of written notice from Buyer of said default, in addition to all other remedies as may be provided for hereunder or under law: (i) Buyer may terminate this Agreement by notice to Seller and the Escrow Agent, and Seller shall, within fifteen (15) days of receipt of an invoice and commercially reasonable supporting documentation, reimburse Buyer for all reasonable costs and expenses, including attorney fees, incurred by Buyer in connection with or related to this Agreement, the Property and/or Buyer's investigation of the Property, the Loan or the Loan Documents, in an amount not to exceed Twenty-Five Thousand Dollars ($25,000), and thereafter this Agreement shall terminate and the Parties shall be released from all obligations hereunder; or (ii) Buyer may elect to treat this Agreement as being in full force and effect and Buyer shall have the right to an action for specific performance provided that such an action is filed for within thirty (30) days from the notice of Seller default. No remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

11.     **Indemnification**. Seller agrees to indemnify, hold harmless, protect and defend the Buyer, its subsidiaries, affiliates, officers, directors, shareholders, employees, agents, representatives and attorneys (each, a "**Buyer Indemnified Party**"), from and against any and all loss, liability, claim, damage and expense whatsoever (including attorneys' fees) directly or indirectly arising out of, based upon, resulting from or otherwise relating to (a) any material act of the Seller or any of its affiliates before or after the Closing in connection with the Loan Documents, the Loan or otherwise, including, but not limited to any act or omission by the Seller or any of its affiliates before the Closing in connection with any Loan Document which causes a breach of this Agreement, (b) the material inaccuracy of any of the Seller's representations or warranties herein, (c) the material breach of any of the Seller's covenants herein, (d) any commissions, finder's fees or similar fees due or claimed by any broker, agent or salesperson claimed directly against a Buyer Indemnified Party as a result of an agreement entered into by the Seller, and (e) actions taken by a Buyer Indemnified Party which are specifically requested by the Seller or its affiliates. This Section shall survive Closing.

12.     **Entire Agreement; Modifications**. This Agreement constitutes the entire agreement between the Parties with respect to Buyer's purchase of the Loan and the Loan

5

Documents, and supersedes all prior discussions and negotiations between the Parties and their representatives. This Agreement cannot be modified, amended or terminated except by written agreement signed by the Party against whom enforcement of any modification, amendment or termination is sought.

13.     **Time of the Essence**. Time is of the essence is this Agreement, and in every part hereof.

14.     **Notices**. All communications provided for in this Agreement shall be in writing and shall be deemed delivered upon: (a) personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (b) as of the third business day after mailing by United States certified mail, postage prepaid, return receipt requested; (c) by a nationally recognized overnight delivery service, marked for next- business-day delivery; (d) or by email transmission with back-up copy mailed the same day. All notices will be addressed to the appropriate Party at its address as follows or such other addresses as may be designated by notice given in compliance with this Section:

**If to Seller:**
Robert D. Dawson
1740 Greystone Ct
Longwood, FL 32779
Attn: Robert D. Dawson
Email: robert.d.dawson@outlook.com

Intrepid Creations, LLC
1740 Greystone Ct., Longwood, FL 32779
Attn: Robert D. Dawson
Email: robert.d.dawson@outlook.com

**If to Buyer:**
TFE Games Holdings, LLC
7336 W. Post Rd. Ste. 111
Las Vegas, Nevada 89113

Email: robert.d.dawson@outlook.com

with a copy to:

Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Attention: Samuel A. Schwartz, Esq.
Email: saschwartz@nvfirm.com

15.     **Governing Law**. Except to the extent preempted by federal law, Delaware law governs all matters arising under or related to this Agreement. The Parties hereby consent to the exclusive jurisdiction of any Federal or State court within the County of Clark, State of Nevada and agree that any dispute between the Parties related to this Agreement, the Loan, or the Loan Documents shall be resolved by the Federal or State courts within Clark County, Nevada.

6

16.     **Waiver of Trial by Jury**. EACH PARTY HEREBY WAIVES, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR THE PROPERTY OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO OR TO ANY OF THE FOREGOING. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of the transactions contemplated by this Agreement, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

17.     **Successors and Assigns**. This Agreement shall bind and inure to the benefit of each Party, its successors and assigns. Notwithstanding anything herein to the contrary, however, Buyer may assign its rights or interest under this Agreement without the prior written consent of Seller if such assignment is to an entity wholly owned by Buyer's principals.

18.     **Attorneys' Fees and Costs**. In the event it becomes necessary for any Party to utilize legal counsel for the enforcement or prevention of a breach of this Agreement, if such Party is successful in such enforcement by legal proceedings or otherwise, whether or not suit is filed, such Party shall be reimbursed immediately by the Party(ies) against whom enforcement was sought for reasonably- incurred attorneys' fees and other costs and expenses.

19.     **Partial Invalidity**. In the event any one or more of the provisions of this Agreement is held to be invalid, illegal, unenforceable or avoidable in any respect, no other provision of this Agreement shall be affected thereby, and such other provisions shall remain binding and enforceable.

20.     **Headings**. Headings are used for convenience of reference only and do not define or limit the scope of this Agreement.

21.     **Recitals**.     The Parties represent and warrant to each other that the Recitals contained in this Agreement are true and correct and shall be incorporated into this Agreement.

22.     **Interpretation**. Whenever the context hereof shall so require, the singular shall include the plural, the male gender shall include the female gender and neuter, and vice versa. The Parties acknowledge that each Party has reviewed this Agreement and had the opportunity to have legal counsel and investment advisors review the Agreement on behalf of each Party and that the normal rule of construction that any ambiguities are to be resolved against the drafting Party shall not be resorted to in the interpretation of this Agreement.

23.     **Signatures: Counterparts**. Signatures to this Agreement transmitted by electronic mail shall be valid and effective to bind the Party so signing. Each Party agrees to promptly deliver an executed original of this Agreement with its actual signature to the other Party, but failure to do so shall not affect the enforceability of this Agreement, it being expressly agreed that each Party to this Agreement shall be bound by its own electronic signature and shall accept the electronic signature of the other Party to this Agreement. This Agreement may be executed in counterparts,

7

each of when so executed and delivered shall be deemed an original and all of which when taken together constitute one and same instrument.

24.    **Further Assurances**. Seller and Buyer shall each execute and deliver to the other all further documents or instruments reasonably requested by either of them in order to effect the intent of this Agreement and to obtain the full benefit of this Agreement. Any request by either Party under this Section shall be accompanied by the document proposed for signature by the Party requesting it, in form and substance satisfactory to the Party of whom the request is made and its attorneys. The Party making the request shall bear and discharge any fees or expenses incident to the preparation, filing or recording of documents requested pursuant to this Section.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**SELLER:**

ROBERT D. DAWSON

By: *Robert D. Dawson*

Title: Member

INTREPID CREATIONS, LLC

By: *Robert D. Dawson*

Name: Robert D. Dawson

Title:   Manager

**BUYER:**

TFE GAMES HOLDINGS, LLC

By: *Robert D. Dawson*

Name: Robert D. Dawson

Title:   Member

8

Docusign Envelope ID: 39E36C5F-752F-49A8-B3E5-60707A08FA13

## EXHIBIT A

## Schedule of Promissory Notes

# EXHIBIT B

## Loan Documents

[See Attached]

# EXHIBIT C

## Form of Allonge

[Attached]

# EXHIBIT D

## Form of Assignment of Loan Documents

[Attached]

Exhibit 3

REPORT OF DISPOSITION OF COLLATERAL AT PRIVATE SALE

TFE Games Holdings, LLC is secured party (the "**Secured Party**") with respect to certain indebtedness owed by Intrepid Studios, Inc. (the "**Debtor**"), pursuant to the terms of that certain Pledge and Security Agreement dated March 23, 2022, by and between the Debtor and an assignor Secured Party, and related documents (collectively, the "**Loan Documents**"). Debtor's obligations under the Loan Documents are secured by the following (the "**Collateral**"):

All assets belonging to the Debtor, including but not limited to, shares, intellectual property, software, all real property, personal property, trademarks, licenses, cash, accounts and notes receivable, inventory, equipment, and any and all other assets, intangible or tangible, belonging to the Debtor. All proceeds of the foregoing, whether voluntary or involuntary.

The Debtor defaulted in its obligations to the Secured Party under the Loan Documents. The applicable balance of the obligations owed to the Secured Party under the Loan Documents as of January 6, 2026, is in excess of $40,372,831.54 (exclusive of interest, attorney fees and expenses). Secured Party's liens are junior to those of U.S. Small Business Administration and Commerce West Bank, which were not affected by this sale.

Pursuant to that certain Notice of Disposition of Collateral at Private Sale, which was delivered to you on or around January 6, 2025, the Secured Party indicated that the Collateral would be sold at a private sale, conducted pursuant to the terms of Section 9601 et seq. of the Uniform Commercial Code, via private auction conducted at 601 East Bridger Ave, Las Vegas, Nevada 89101, on January 16, 2026, at 1:00 p.m. (Pacific Time) (the "**Sale**").

Please take notice that on January 16, 2026, at 1:00 p.m. (Pacific Time), the Secured Party conducted the Sale of the Collateral. Only the Secured Party and its counsel were present at the Sale. No other parties submitted bids for the Collateral or otherwise attended or participated in the Sale.

Please take further notice that the only offer, and the highest and best offer for the Collateral was submitted by the Secured Party. As a result, the Secured Party is the wining bidder for the Collateral at the Sale and is now the lawful owner of the Collateral, free and clear of all junior liens, claims and encumbrances in accordance with applicable law.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the Report of Disposition of Collateral at Private Sale was served via Certified U.S. Mail, on this 16th day of January, 2026, to the following Secured Parties:

Ya-Ya Legacy Trust
4504 San Blas Avenue
Woodland, CA 91364

Jason Caramanis
4504 San Blas Avenue
Woodland, CA 91364

Ya-Ya Holdings, LLC
4504 San Blas Avenue
Woodland, CA 91364

U.S. Small Business Administration
1545 Hawkins Boulevard
Suite 202
El Paso, TX 79925

*/s/ Susan Roman*
Susan Romman, an employee of
Schwartz, PLLC