Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for Defendant*
*TFE Games Holdings, LLC*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., | Case No.: 3:26-cv-00965-LL-JLB |
| Plaintiff, | **DEFENDANT TFE GAMES HOLDINGS, LLC'S NOTICE OF MOTION AND MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER PURSUANT TO FRCP 65(b)(4); MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| ROBERT DAWSON; RYAN OGDEN; THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDINGS, LLC, | *Filed concurrently with Ex Parte Application for Order Shortening Time and Declaration of Samuel A. Schwartz, Esq. in Support Thereof; Request for Oral Argument; Request for Judicial Notice pursuant to FRE 201* |
| Defendants, | |
| and | |
| INTREPID STUDIOS, INC., | **PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** |
| Nominal Defendant. | |
| | Judicial Officer: Hon. Linda Lopez |
| | Courtroom: 14B (14th Floor) |
| | Hearing Date: April 10, 2026 |
| | Hearing Time: N/A |
| | Action Filed: February 14, 2026 |
| | Trial Date: Not Set |

/ / /

/ / /

/ / /

1

**NOTICE OF MOTION**

**TO: THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on April 10, 2026, Defendant TFE Games Holdings, LLC, pursuant to FRCP 65(b)(4), will move this Court for an order to dissolve the Temporary Restraining Order issued in the above-captioned action on March 4, 2026.

This Motion is made following the conference of counsel that took place on March 6, 2026.[1]

This Motion is made and based on this Notice of Motion, the accompanying Memorandum of Points and Authorities in support thereof, the declarations referenced within the Motion, all pleadings and papers on file with the Clerk of the Court in the above-captioned action, judicial notice of which is respectfully requested pursuant to Federal Rules of Evidence 201 and 1101, any further evidence or argument as the Court may deem appropriate to consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Intrepid Studios, Inc. ("**Intrepid**") does not own *Ashes of Creation* because it was included in the assets that TFE Games Holdings, LLC ("**TFE**") foreclosed on through the private sale of collateral on January 16, 2026 ("**Article 9 Sale**"). TFE took ownership of the following (collectively, "**Intrepid Assets**"):

> All assets and all personal property of Debtor, wherever located and whenever acquired, including, but no [sic] limited to:
>
> Equipment, Inventory, Fixture, Goods, Instruments, Chattel paper

---

[1]    Due to the exigencies of this matter, TFE respectfully requests that the Court waive Civil Chambers Rule 3(A) such that the Motion may be filed sooner than the seven (7) day waiting period after the date the conference of counsel was held. Specifically, TFE is being restrained from restarting *Ashes of Creation* and maximizing value for all parties, including Mr. Sharif. Contemporaneously with the filing of these papers, TFE is also filing an *ex parte* application for order shortening time on the Motion.

(including without limitation Electronic Chattel Paper), General Intangibles, payment Intangibles, Accounts and all other obligations now or hereafter owing to Grantor, all Deposit Accounts, cash, and money, certificates of deposit, Investment Property, Financial Assets, Letters of Credit Rights, **all Commercial Tort Claims and any other causes of action against third parties** (excluding only claims for death or personal Injury), As Extracted Collateral, **Intellectual property, copyrights**, trademarks trade names, all Supporting Obligations for any of the foregoing, all Proceeds (including without limitation insurance proceeds) from and products of and accessions to any of the foregoing and all books and records relating to any of the foregoing. Terms and [sic] used herein shall have the meaning provided in the applicable Uniform Commercial Code.

*See* Notice of Disposition of Collateral at Private Sale, Exhibit 1 to the Schwartz Declaration, included within Exhibit B to the Request for Judicial Notice.[2] The Article 9 Sale was held on January 16, 2026 – and this instant lawsuit was filed 29 days later. The Article 9 Sale is closed, and the Complaint does not attempt to challenge the Article 9 Sale through an actionable claim for relief.

Instead, the Complaint purports to assert eight derivative claims that focus on the actions of TFE and Intrepid's directors and majority shareholders Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels (the "**Directors**") before and after the Article 9 Sale. The Complaint, however, ignores that Intrepid does not own these tort claims against its directors and officers because TFE took ownership of them through the Article 9 Sale. Together, the Directors own 67.155% of Intrepid while Steven Sharif owns less than 5%.

Steven Sharif, who is a small minority shareholder and the former Chief Executive Officer of Intrepid, has limited standing to object to the Article 9 Sale. He also does not put forward any evidence whatsoever that the Article 9 Sale was improper – because he cannot. On the contrary, Intrepid, with Sharif, thoroughly investigated alternatives to the foreclosure. During 2025, Intrepid ran a process to identify a buyer or investor with Aream & Co., a well-known video gaming investment banker. *See* Offering Declaration, attached as Exhibit 2 to the Fette

---

[2]    TFE's Request for Judicial Notice pursuant to FRE 201 is filed concurrently herewith (the "**Request for Judicial Notice**").

Declaration, included within Exhibit B to the Request for Judicial Notice. Theresa Fette personally participated in and oversaw the investment process with Aream & Co., and spoke to at least ten (10) potential investors and buyers. Not one party was willing to either invest in or purchase Intrepid's assets. *See* Fette Declaration, ¶¶17-18, attached to the Request for Judicial Notice. The assets were marketed and were not salable.

Lastly, Mr. Sharif greatly exaggerates his financial role in *Ashes of Creation*. Indeed, Intrepid was not "his" company - he owns less than 5%. Robert Dawson, on the other hand, is the sole owner of Plaintiff TFE, and has over 64% ownership of Intrepid. Nevada-based investors in Intrepid, meanwhile, have just over a 5% ownership stake. *See* Intrepid Capitalization Table, Exhibit 1 to the Dawson Declaration, included within Exhibit B to the Request for Judicial Notice. Dawson and Nevada-based lenders hold over 72% of the company's $120,000,000 of debt. *See* chart of Intrepid Note Holders, Exhibit 2 to the Dawson Declaration, included within Exhibit B to the Request for Judicial Notice. Thus, there are a myriad of reasons why Mr. Sharif's misguided derivative lawsuit will fail, particularly because the supermajority of the ownership and debt want him out of the company. Therefore, the Court should dissolve the *ex parte* Temporary Restraining Order issued on March 4, 2026 (the "**TRO**").

## II.    FACTUAL HISTORY AND PROCEDURAL BACKGROUND

This Motion to Dissolve Temporary Restraining Order Pursuant to FRCP 65(b)(4) (the "**Motion**") incorporates the Request for Judicial Notice filed concurrently therewith that attaches, as Exhibit A, the Reply to [Steven Sharif and John Moore]'s Opposition to Plaintiff's Motion for Preliminary Injunction.

## III.   LEGAL STANDARD

A temporary restraining order is extraordinary relief that is justified only in very few circumstances. As the Supreme Court recognizes, "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an

opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 438-39 (1974). The Ninth Circuit has held that there are "very few circumstances justifying the issuance of an ex parte TRO." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). They are permitted only when notice is impossible or when notice would "'render fruitless the further prosecution of the action.'" *Id*. (quoting *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984)).

For that reason, Federal Rule of Civil Procedure 65 imposes "stringent restrictions" that must be satisfied before any temporary restraining order may be issued. *Granny Goose*, 415 U.S. at 438. A TRO may be issued without notice to the adverse party *only* if specific facts sworn to in an affidavit "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" *and* "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1); *see also Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1093-94 (N.D. Cal. 2012) (denying *ex parte* TRO). The movant must also post security sufficient to compensate a party that has been "wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Rule 65 expressly authorizes a party subject to a temporary restraining order issued *ex parte* to "move to dissolve or modify the order" on 2 days' notice to the opposing party. Fed. R. Civ. P. 65(b)(4). An *ex parte* TRO is properly dissolved when the defendant appears and shows a basis for dissolution. *See Alpha Theta of Alpha Delta Pi Bldg. Ass'n v. Pac. Nw. Reg'l Council of Carpenters*, 2009 WL 3064688, at *4 (W.D. Wash. Sept. 23, 2009).

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Consolidated Electrical Distributors, Inc. v. United Renewable Energy Co., Ltd.*, 717 F. Supp. 3d 970, 974 (S.D. Cal. 2024). A plaintiff must show he is "likely to succeed on the merits" of his claims, he is "likely

26cv00965-LL-JLB

to suffer irreparable harm" absent a temporary restraining order, that the "the balance of [the] equities" tip in Plaintiff's favor, and that a temporary restraining order "is in the public interest." *Matsumoto v. Labrador*, 122 F.4th 787, 804 (9th Cir. 2024).

Plaintiff cannot meet that standard because Mr. Sharif has no likelihood of success on the merits of any claim that would give Intrepid ownership of *Ashes of Creation* or any other Intrepid Assets that were foreclosed upon by TFE pursuant to the Article 9 Sale. Accordingly, TFE has demonstrated "that serious questions going to the merits" of this case have been "raised," and that "the balance of hardships tips sharply" in the favor of TFE. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-1135 (9th Cir. 2011).

## IV.   LEGAL ARGUMENT

### A.   THE NEVADA COURT HAS SPECIFIC PERSONAL JURISDICTION OVER MR. SHARIF.

To establish personal jurisdiction over a non-resident defendant, a plaintiff must show that the requirements of the state's long-arm statute have been satisfied, and that due process is not offended by the exercise of jurisdiction. *Arbella Mut. Ins. Co. v. Eighth Judicial Dist. Ct.*, 122 Nev. 509, 512, 134 P.3d 710, 712 (2006). Because Nevada's long-arm statute, NRS 14.065, "has been construed to extend to the outer reaches of due process, the two inquiries . . . may be collapsed into one." *Trump v. Eighth Judicial Dist. Ct.*, 109 Nev. 687, 698, 857 P.2d 740, 747 (1993). Due process requires a nonresident defendant to have "minimum contacts with the forum state sufficient to ensure that exercising personal jurisdiction over him would not offend traditional notions of fair play and substantial justice." *Arbella*, 122 Nev. at 512, 999 P.2d at 712 (internal quotation marks omitted). The defendant must have sufficient contacts with the forum such that the defendant "could reasonably anticipate being haled into court there." *Id.* (internal quotation marks omitted). A defendant's contacts with a forum state satisfy due process requirement if either general or specific personal jurisdiction exists. *Id.*

26cv00965-LL-JLB

A state may exercise specific personal jurisdiction where: (1) the defendant purposefully avails itself of the privilege of acting in the forum, enjoying the protection of the laws of the forum, or affirmatively directs conduct toward the forum state; (2) the cause of action arises from the defendant's purposeful contact with the forum or conduct targeting the forum; and (3) exercising jurisdiction would be reasonable. *Arbella*, 122 Nev. at 513, 134 P.3d at 712-13.

> 1. <u>Steven Sharif and John Moore Intentionally Directed Their Activities into Nevada.</u>

The "purposeful availment" requirement may be satisfied if the defendant intentionally directed his activities into the forum. *Brainerd v. Governors of the University of Alberta*, 873 F.2d 1257, 1259 (9th Cir. 1989). "While the defendant's contacts with the forum must be more than random, fortuitous, or attenuated, it is the quality of the contacts and not the quantity that confers personal jurisdiction." *Firouzabadi v. First Judicial Dist. Court*, 110 Nev. 1348, 1354, 885 P.2d 616, 619 (1994) (internal quotation marks omitted).

Here, Mr. Sharif knowingly directed substantial activity relating to Intrepid into the State of Nevada which goes well beyond merely "random, fortuitous, or attenuated" and which is directly related to the claims in this case. Mr. Sharif's contacts with Nevada include those set out below.

### Robert Dawson

Dawson made a series of loans to Intrepid between 2022 and 2025 totaling $78,480,831.54 of principal. Dawson separately invested approximately $9,000,000 into Intrepid in the same time period. He owns in excess of 64% of the equity. Dawson's involvement with Intrepid began with an in-person presentation made by Sharif to Dawson concerning investment in Intrepid and the Ashes of Creation video game at the Bellagio in Las Vegas. Dawson Declaration, ¶¶ 6, 11 and 15. After the meeting at the Bellagio and after Dawson began investing in Intrepid, Sharif requested that Dawson solicit additional funds from Nevada-based investors. Sharif knew these

individuals were Nevada residents and understood that Intrepid's continued operations depended, in part, on Nevada-sourced capital. Dawson Declaration, ¶ 9. In or about February 2025, Dawson and Sharif attended the D.I.C.E. Summit, a video game networking conference, at the ARIA Resort & Casino in Las Vegas, Nevada, where Intrepid and the Ashes of Creation video game were promoted to consumers and investors.

### *Aaron Bartels*

Bartels is a Nevada resident whose investment in Intrepid arose directly from Sharif's solicitation. Bartels Declaration, ¶¶ 4-5. From July through September 2021, Bartels met regularly in-person in Nevada with Tim Sharif, a Nevada resident and Mr. Sharif's brother, who acted as a liaison or "deal broker" in connection with the Intrepid investment opportunity. Bartels Declaration, ¶ 6. On or around August or September 2021, Mr. Sharif personally solicited Bartels' investment remotely on a conference call with Bartels and Tim Sharif while Tim Sharif and Bartels were physically located in Nevada and Sharif was aware that Bartels was a Nevada resident. Bartels Declaration, ¶ 7. Bartels invested $500,000 directly into Intrepid and another $4,000,000 through Tim and Steven Sharif, which was intended for Intrepid. Bartels Declaration, ¶ 12. Bartels became an Intrepid board member and Sharif engaged in governance communications with Bartels while Bartels was in Nevada. Bartels Declaration, ¶ 9.

### *Theresa Fette*

Fette is a Nevada resident whose involvement in Intrepid arose directly from Sharif's solicitation. Fette Declaration, ¶ 5. On or around January 2022, Sharif personally solicited Fette's investment by telephone while she was physically located in Nevada. At the time of that solicitation, Sharif knew that Fette was a Nevada resident and intentionally sought investment capital from her in Nevada. Fette Declaration, ¶ 6. Fette later loaned a total of $1 million to Intrepid. Fette Declaration, ¶ 16. On multiple occasions, Sharif contacted Fette while she was physically present

26cv00965-LL-JLB

in Nevada requesting additional investment capital. Fette Declaration, ¶ 7.

Sharif also requested that Fette solicit additional funds from other Nevada-based investors. Fette Declaration, ¶ 8. Sharif knew these individuals were Nevada residents and understood that Intrepid's continued operations depended, in part, on Nevada-sourced capital. *Id*. Throughout the relevant time period, Sharif conducted remote board governance meetings in which two directors, including Fette, were located in Nevada. Fette Declaration, ¶ 9. Sharif knowingly directed governance discussions and funding matters toward Nevada-based stakeholders *Id*. As set forth in the Fette Declaration, Sharif approved Intrepid's expenditures and operational decisions with knowledge that Nevada residents had invested substantial capital and would bear the financial consequences of those decisions. Fette Declaration, ¶ 10.

### *Joeseph P. Micatrotto*

On or before March 5, 2020, Sharif solicited investment in Intrepid from Joseph P. Micatratto, II, a Nevada resident. Micatratto agreed to help Sharif solicit investments in Nevada and formed two entities for that purpose: KR-Games, LLC and KR-AOC II LLC, each of which is a Nevada entity. KR-Games, LLC, the owners of which include Micatratto and three other Nevada residents, loaned a total of $1,350,000 to Intrepid. Similarly, Micatratto manages KR-AOC II, LLC, the owners of which include Micatratto and eight other Nevada residents, which loaned $5,000,000 to Intrepid. Micatratto Declaration, ¶¶ 6-11.

### *Tim Sharif*

As noted above, Tim Sharif is Mr. Sharif's brother and is a Nevada resident. With Mr. Sharif's knowledge and approval, he actively solicited investment in Intrepid in Nevada. This included, in addition to the activity already discussed above, the solicitation of Nevada-based members of the "YPO Forum". Tim Sharif is the managing member and, upon information and belief, sole owner of 310 Nutrition LLC, a Nevada limited liability company ("**310 Nutrition**"). For unknown reasons, Intrepid loaned $1,300,000 to 310 Nutrition in March 2021. Intrepid was never repaid

in full for the loan.

### Sharron Sharif

Sharron Sharif is a Nevada resident and is Mr. Sharif's mother. Between October 2015 and June 2022, disbursements to Sharron Sharif totaling $1,345,000 were made by Intrepid. The disbursements are described as loans in the company's limited records but, the company's records show no payments ever being made on the loans.

### Bethany Alkazin

Bethany Alkazin is a Nevada resident and, upon information and belief, a relation or close friend of Mr. Sharif. Between May and August 2024, disbursements totaling $40,000 were made to Bethany Alkazin by Intrepid. The disbursements are described as "shareholder loans" in the company's records but the company's records show no payments ever being made on the loans.

The foregoing contacts with the forum conclusively support the exercise of specific personal jurisdiction over Mr. Sharif in Nevada.

> 2.    The Cause Of Action in the Nevada Amended Complaint Arise Out Of The Mr. Sharif's Contacts With Nevada.

"[T]he cause of action must have a specific and direct relationship or be intimately related to the forum contacts. *Munley v. District Court*, 104 Nev. 492, 495-96, 761 P.2d 414, 416 (1988).

At the heart of the breach of fiduciary duty claim against Sharif is the misappropriation of Intrepid funds. As detailed above, Nevada was central to the process of misappropriation in several ways: (1) Sharif targeted and successfully solicited investments in Intrepid by numerous Nevada residents; (2) Mr. Sharif and, with Mr. Sharif's knowledge and approval, his brother Tim Sharif used Las Vegas as a base for soliciting investment; and (3) much of the money drawn out of investors in Nevada was impermissibly funneled back into the state to Sharif's relatives who are domiciled in Nevada.

Nevada was involved at each stage of the misappropriation. Sharif's brother, who acted as a deal broker for Mr. Sharif, is a Nevada resident, as is his mother who was the recipient of $1,345,000 in "loans" from the company which were never paid back. Further, when Sharif made his misrepresentations to the Intrepid board and failed to make adequate disclosures to the board, as alleged in the Amended Complaint, the board included two members who are Nevada residents: Aaron Bartels and Theresa Fette. *See* the Amended Complaint, at Case No. A-26-939022-B (the "**Nevada Case**"), attached as Exhibit A to the Request for Judicial Notice.

Accordingly, Sharif's intentional and extensive contacts with the State of Nevada are directly related to the claims at issue in this case.

3.    It Is Reasonable to Require Mr. Sharif to Litigate in Nevada.

In determining whether it is reasonable to require the defendant to defend the particular lawsuit in Nevada, courts consider several factors including "the burden that the defendant will face in defending claims in Nevada, Nevada's interest in adjudicating those claims, the plaintiffs' interests in obtaining expedited relief, along with interstate considerations such as efficiency and social policy." *Arbella*, 122 Nev. at 516, 134 P.3d at 714.

The burden on Mr. Sharif to defend this lawsuit in Nevada is minimal. Mr. Sharif was formerly a resident of California, and may be returning to live with his mother in Las Vegas. Mr. Sharif, in addition to the Nevada contacts discussed above, is the manager of Network Pro, LLC, a Nevada limited liability company. All of which shows that Sharif regularly conducts business in Nevada, in addition to having close family in the state, who also have been involved in Intrepid's business.

Nevada's interest in adjudicating this dispute is significant. Nevada is the Plaintiff's chosen forum for this matter. As detailed above, Nevada was used as a base for solicitation of funds, and money was siphoned by Sharif from Nevada residents and then funneled back into Nevada, impermissibly, to other Nevada residents. Nevada was used as a base for solicitation of funds.

26cv00965-LL-JLB

The Plaintiff's interest in obtaining prompt and effective relief strongly favors proceeding in Nevada. Mr. Sharif is withholding critical Company Records that are necessary for TFE to operate its business. The urgent need to recover those records supports resolving the matter expeditiously in this Court, Plaintiff's chosen forum.

Finally, interstate considerations such as efficiency and judicial economy favor allowing the Nevada case to proceed in Nevada and dismissing or staying the later-filed instant action. To the contrary, Mr. Sharif argues that this Court should exercise jurisdiction contrary to the Nevada TRO. *See* ECF 10-1, motion, at pg. 17 of 21. Pursuant to the "first-to-file rule," however, it is the later-filed action—not the earlier one—that typically yields.

In *Mesi v. Mesi*, 136 Nev. 748, 478 P.3d 366 (2020), the Nevada Supreme Court stated:

> The first-to-file rule is a "generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district"…
>
> Although the doctrine was originally developed in federal court, state courts have applied it as well…The rule is grounded in principles of efficiency and "[w]ise judicial administration."

*Mesi v. Mesi*, 136 Nev. 748, 752, 478 P.3d 366, 370 (2020) (internal citations omitted).

The Nevada Supreme Court adopted the three-part test for the first-to-file rule set forth by the Ninth Circuit in *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622 (9th Cir. 1991): (1) does the rule apply in the first instance; (2) if so, is there some equitable reason not to apply the rule; and (3) if the rule applies, whether the second-filed action should be dismissed or stayed. *Id.*

For the rule to apply in the first instance, the parties and issues in the two suits must be substantially the same, even if not strictly identical. *Mesi*, 136 Nev. at 752, 478 P.3d at 370. The court should also consider the suits chronology. *Id.*

Here, this case and the Nevada Case assert claims stemming from the Article 9

Sale of Intrepid's assets. This action seeks injunctive relief compelling the turnover of Company Records that Plaintiff acquired through the Article 9 sale. This case purports to challenge the validity of the Article 9 Sale and seeks relief relating to the ownership and control of those assets. TFE and Steven Sharif are parties in both actions, and the instant case merely adds additional individuals associated with TFE's management. Looking at the chronology of the two actions, it is undisputed that Nevada Case was filed first. Because the parties and issues in this case and the Nevada Case are substantially similar, the first-to-file rule applies.

Under the second step of the *Mesi* test, the first-filed action should have priority unless "special circumstances" weigh in favor of the second action. *Mesi*, 136 Nev. at 752, 478 P.3d at 370. However, very few second suits meet this standard because virtually all arguments regarding the propriety of the two lawsuits, such as jurisdiction or the doctrine of forum non conveniens, should be addressed by the court in the first suit. *Mesi*, 136 Nev. at 752-53, 478 P.3d at 370-71; *see also Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 131 Nev. 296, 301, 350 P.3d 392, 396 (2015) (noting that "a plaintiff's choice of forum is entitled to great deference").

Here, Defendants identify no circumstances that would justify departing from the first-in-time rule including but not limited to their claims of lack of jurisdiction and forum non conveniens. Rather, principles of equity support Nevada maintaining jurisdiction in accordance with the first-to-file rule. Accordingly, because no circumstances exist to justify an exception to the first-to-file rule, the second part of the test is satisfied.

Lastly, unlike the first two parts of the test, which address whether the first-to-file rule applies, the third part considers the appropriate disposition of the second-filed action. Specifically, the third part of the test asks whether the second-filed action should be dismissed or stayed.

Here, Mr. Sharif argues that this case should be dismissed or stayed pending resolution of the Nevada Case. However, because the first-to-file rule applies, and

26cv00965-LL-JLB

because the instant case is the second-filed suit, the instant case—not the Nevada Case—is the case that should be dismissed or stayed. *Mesi*, 136 Nev. at 753, 478 P.3d at 371.

Accordingly, the exercise of personal jurisdiction over Mr. Sharif comports with traditional notions of fair play and substantial justice because (1) Mr. Sharif purposefully directed their conduct toward Nevada, (2) the Plaintiff's claims arise out of those Nevada-related activities, and (3) the exercise of jurisdiction is reasonable. At an absolute minimum, Plaintiff has established that further discovery is appropriate concerning jurisdiction before this matter is dismissed on that basis.

**B.    THE TRO IS NOT NECESSARY TO PREVENT IRREPARABLE HARM.**

In order to obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits. *White v. Davis*, 30 Cal. 4th 528, 554, 68 P.3d 74, 91 (2003). Further, the question whether a preliminary injunction should be granted involves consideration of two interrelated factors: (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief. *Id.*

1.    The Plaintiff Will Not Succeed on the Merits.

Mr. Sharif cannot demonstrate a likelihood of success due to his misguided assertions that the validity of the Article 9 Sale is disputed. That argument fails for two reasons. First, the Article 9 Sale was conducted pursuant to the governing loan documents and the Uniform Commercial Code. Article 9 does not require a public auction, the retention of an investment banker, or an extensive marketing process before collateral may be disposed. On the contrary, the Uniform Commercial Code expressly permits a secured party to dispose of collateral through either a public or private sale, provided the disposition is conducted in a commercially reasonable

14                                              26cv00965-LL-JLB

manner. UCC § 9-610(b).

A disposition is commercially reasonable if it is made: "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." UCC § 9-627(b). The fact that a secured party purchases the collateral itself does not render the sale improper. UCC § 9-610(c).

Here, the secured party exercised its rights under the Security Agreement after Intrepid defaulted and conducted a private disposition of the collateral pursuant to Article 9. *See* Security Agreement, § 10. Notice of the disposition was provided in accordance with Article 9. *See* Notice of Disposition. As a result of that sale, TFE became the successor-in-interest to Intrepid with respect to the collateral and related rights under Article 9.

Second, as set forth in the declarations filed concurrently herewith, Intrepid consented to the Article 9 Sale. It was and is in default under its secured loan obligations. It cannot pay its bills as they come due. No party disputes those facts. As such, Mr. Sharif's arguments to the contrary fall flat, as Mr. Sharif owns less than five percent of Intrepid and is owed no money. He should not be heard now to complain of the Article 9 sale that arose because of his inability to manage Intrepid's finances.

Third, Mr. Sharif, challenges the validity of the Article 9 sale. Put aside for now that Intrepid hired an investment banker who could not identify a buyer or investor (and with whom Sharif participated), the validity of the sale is an issue for another day. The only query now is Plaintiff's immediate right to the records as a purchaser of collateral.

Indeed, the question here is whether TFE, who acquired the collateral through the Article 9 Sale, has the right to obtain control over the Company Records and accounts necessary to administer those assets. The undisputed evidence demonstrates

26cv00965-LL-JLB

that Mr. Sharif continues to withhold those records despite repeated demands. Critically, Dawson is the majority owner of Intrepid. The balance of Intrepid's ownership and debt (minus Sharif) support TFE's actions. To the extent the Court were to find Sharif could challenge the Article 9 sale, the Court could not overcome the support of the transaction from the higher priority secured creditors and investors. Sharif's efforts in this regard fail.

Because TFE is the successor-in-interest to Intrepid with respect to the collateral and related rights under Article 9, and Mr. Sharif refuse to turn over the Company Records necessary to operate and preserve the assets, cannot and will not demonstrate a likelihood of success.

2. No Irreparable Harm Will Occur To Mr. Sharif or to Intrepid Should the TRO be Dissolved.

Despite Mr. Sharif's assertions that TFE will cause irreparable harm to *Ashes of Creation* (it will not), it is actually Mr. Sharif's actions causing irreparable harm preventing TFE from accessing, maintaining, and completing development of *Ashes of Creation*. Additionally, the Court in Nevada has already issued injunctive relief related to the Intrepid Assets. *See* Findings of Fact, Conclusions of Law and Temporary Restraining Order Pursuant to Plaintiff's Ex Parte Motion for Temporary Restraining Order Pursuant to NRCP 65(b)(1) or NRS 31.859, (the "**Nevada TRO**") at ECF No. 19 as Exhibit A to Notice of Entry Of Temporary Restraining Order In Related Nevada Case (Case No. A-26-939022-B). Indeed, the Nevada Court expressly found that the evidence demonstrated that "immediate and irreparable injury, loss, or damage" would result if the Company Records (a subset of the Intrepid Assets) were not preserved, and that destruction or loss of the Company Records "would be irreparable because the data could not be recreated." *See* Nevada TRO, pg. 3 of 18, ¶ 2 and pg. 4 of 18, ¶ 4.

Mr. Sharif does nothing to undermine the findings of the Nevada TRO. Instead, he acknowledges that the assets at issue include highly valuable intellectual property

and trade secrets, among other assets. *See* Motion, at pg. 13 of 31. Mr. Sharif implies that allowing TFE to access its property could expose those systems to unauthorized access or infrastructure compromise. However, that argument is backward. TFE, as the lawful successor to the collateral under Article 9, is the party authorized to access those systems.

### 3.    The Balance of Hardships Favors TFE.

The balance of hardships strongly favors TFE. Maintaining the TRO would prevent TFE from preserving the value of the assets acquired through the Article 9 Sale. Without access to the Company Records, TFE cannot administer Intrepid's accounts, maintain its technology platforms, continue development of *Ashes of Creation*, and wind down operations of Intrepid.

By contrast, dissolving the injunction imposes minimal hardship on Mr. Sharif and Intrepid because the Intrepid Assets will be preserved through the Nevada TRO and TFE is the lawful owner of the Intrepid Assets pursuant to the Article 9 Sale. Accordingly, the balance of hardships weighs in favor of TFE as the Nevada TRO requires Mr. Sharif to relinquish control over property rightfully belonging to TFE while protecting TFE from irreparable loss. Accordingly, the TRO in this matter should be dissolved.

### 4.    The TRO entered in this Matter is not in the Public Interest.

Finally, dissolution of the TRO serves the public interest (not its maintenance) as it promotes compliance with statutory obligations. Without access to the Company Records, TFE cannot properly wind up Intrepid's business and fulfill its obligations under the WARN Act, among other obligations. *See* Nevad TRO, pg. 4 of 18, ¶ 5(b).

Dissolving the TRO also advances the public interest by ensuring that assets transferred through a lawful foreclosure process remain under the control of the party that acquired them rather than individuals who no longer have any legal right to possess or control them.

/ / /

17                                    26cv00965-LL-JLB

## V.   CONCLUSION

TFE respectfully requests the Court dissolve the Temporary Restraining Order entered on March 4, 2026, pursuant to FRCP 65(b)(4).

Dated: March 6, 2026.

SCHWARTZ, PLLC

By: /s/ Sasha Aliakbar-Amid
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
601 East Bridger Avenue
Las Vegas, Nevada  89101

*Attorneys for Defendant*
*TFE Games Holding, LLC*

18                                    26cv00965-LL-JLB