Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for Defendant*
*TFE Games Holdings, LLC*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT DAWSON; RYAN OGDEN; THERESA FETTE; AARON BARTELS; and TFE GAMES HOLDINGS, LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-JLB <br><br> **REPLY IN SUPPORT OF DEFENDANT TFE GAMES HOLDINGS, LLC'S MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER PURSUANT TO FRCP 65(b)(4)** <br><br> *Filed concurrently with Second Declaration of Theresa Fette; Declaration of Samuel A. Schwartz, Esq.; and Declaration of Liam Brennan* <br><br> Judicial Officer: Hon. Linda Lopez <br> Courtroom: 14B (14th Floor) <br> Hearing Date: March 18, 2026 <br> Hearing Time: 4:30 PM PDT <br><br> Action Filed: February 14, 2026 <br> Trial Date: Not Set |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Mr. Sharif's central theme in opposition to the dissolution of this Court's TRO is the argument that TFE did not use commercially reasonable efforts to market and sell Intrepid's assets. This argument fails because as set forth in the Motion and as further outlined here, Intrepid, through its majority owner and largest secured creditor, Robert Dawson, ran a robust sale process led by an investment banker, which process

netted no investors or buyers.

First, it must be noted that over its 10 years of operation, Intrepid was never profitable. It incurred in excess of $120,000,000 of investment and lending and was never able to pay its bills as they came due absent financing and investment. Intrepid had over 200 employees when it failed (because of Mr. Sharif as he admits in his declaration) and simply could not make payroll when the willingness of its individual private lenders and investors to fund came to an end.

Specifically, prior to the Article 9 foreclosure, Intrepid, led by its Board of Directors, hired Aream & Co. ("**Aream**"). *See* Second Declaration of Theresa Fette (the "**Second Fette Declaration**"), ¶ 5. Aream is a well-respected boutique video game investment banker, with offices in London, Berlin, Singapore, and San Francisco, which frequently advises on mid-market gaming transactions. Aream ran a process to locate an investor or buyer for *Ashes of Creation*. As set forth in the Second Fette Declaration, over roughly one year, Aream contacted no less than 42 individual parties, ten of whom interviewed Intrepid (including Mr. Sharif), 2 of whom accessed a data room, but none of whom offered to buy or invest in *Ashes of Creation*. *Id.*, ¶¶ 6-7.

Put another way, Mr. Dawson funded a sustained market test through Aream. This process included the active marketing and solicitation of buyers and investors and the attempt to create a market for *Ashes of Creation*, which is the most commercially reasonably and aggressive step a party can take to market test the value of any asset, especially intellectual property. Rather than accept the market testing failure, Mr. Sharif argues for a different sale format. Mr. Sharif, however, fails to identify what more or different could have been done or what likely bidders would have been uncovered. From top to bottom and beginning to end, Aream's efforts exemplified and embodied what sections 9610 and 9627 command: commercially reasonable sale efforts. The opposition is vague on this point for a reason – there is nothing more that could be done.

26cv00965-LL-JLB

With the Dawson and investment banker led process now complete, and the commercially reasonable efforts to market *Ashes of Creation* now over, Mr. Dawson transferred part of his secured debt to TFE and performed the Article 9 private sale. TFE, as Dawson's successor, followed Article 9, but only after targeted, pre-sale marketing to likely industry and financial buyers yielded no offers did TFE proceed with a private foreclosure sale.

Once the Aream process ended, Mr. Sharif and Intrepid both received written notice of the intended Article 9 Sale, which Mr. Sharif had already been aware of through oral conversations with the Board. Indeed, on December 31, 2025, Mr. Sharif was advised:

> Good afternoon and happy new year. We are gearing up to get the Article IX private foreclosure sale notice out early next week (ideally Monday). In connection with serving the notice, we need the list of assets that are subject to Rob's lien for the notice. Please do send the list once it is ready.

*See* Exhibit A attached to the Declaration of Samuel A. Schwartz, Esq. (the "**Schwartz Declaration**"), filed concurrently herewith. Mr. Sharif responded about one hour later with the following:

> Good afternoon all,
> I've attached the list provided by our CFO, Ryan. I've reviewed it and it seems comprehensive. Let me know if you have any questions.

*See* Exhibit B attached to the Schwartz Declaration. Mr. Sharif attached to his email a list of all Intrepid Assets to be included in the Article 9 Sale. As the foregoing demonstrates, the argument that Intrepid did not have notice is false. The Article 9 Sale occurred on January 16, 2026, and Mr. Sharif had over two weeks to attempt to prevent the Article 9 sale of the list of assets **he reviewed and approved**. This never occurred because Mr. Sharif supported the restructuring at the time. Rather, Mr. Sharif waited until after the Article 9 Sale to voluntarily resign as Chief Executive Officer.

Not only did Mr. Sharif resign without attempting to prevent the Article 9 Sale, but he next caused one of Intrepid's vendors, Valve Corporation, to withhold a receivable worth in excess of $3,500,000 (the "**Valve Receivable**"); specifically:

> On or about January 15, 2026, I blew the whistle by notifying the secured lender, CommerceWest Bank, whose six million dollar secured interest in Intrepid and its assets is senior to Dawson's/TFE's, that Dawson and TFE were purported to improperly conduct a foreclosure without notice to CommerceWest Bank. I did so to prevent bank fraud and other violations of law by Dawson/TFE in conducting a secretive foreclosure designed to strip Intrepid's assets (including the Valve Revenues) and thus to evade the Bank's superior security interest. I did not receive any personal benefit from doing so.

*See* Exhibit C, Sharif Declaration, ¶ 42, attached to the Schwartz Declaration. Importantly, putting aside for a moment Mr. Sharif's blatant disregard for his fiduciary duties as an officer and director of Intrepid in interfering with the company's collection of its accounts, his last sentence above is a knowing fabrication.  Mr. Sharif is a guarantor of the CommerceWest Bank debt. Mr. Sharif recently sold his personal residence, against which CommerceWest Bank held a lien. As part of the sale, CommerceWest Bank is holding approximately $1,100,000 of the proceeds of the sale of Mr. Sharif's former residence. *See* Second Fette Declaration, ¶ 13. Mr. Sharif did not blow the whistle out of a concern for a secured lender – he blew the whistle to protect his own balance sheet.

Importantly, the Valve Receivable was expected by Intrepid and intended for employee payroll. Intrepid did not know the receivable was the subject of a collection action, and as a result, Intrepid was forced to shut down with almost no notice, lay off over 200 employees, and is no longer operating. As noted above, Intrepid could not pay its bills without investment and financing from its supporters and it was only starting to generate revenue (not profit). Mr. Sharif knew of Intrepid's precarious financial condition, yet he admittedly torpedoed the company's finances on his way out the door.

Next, Mr. Sharif argues the notice to CommerceWest Bank was insufficient. This is also untrue. The Article 9 Sale notice expressly states it remains subject to the interest of CommerceWest Bank; specifically: "Please note that the Collateral will be sold subject to the liens of U.S. Small Business Administration and CommerceWest Bank." *See* Notice of Disposition of Collateral at Private Sale in Exhibit E attached to

the Schwartz Declaration. Accordingly, CommerceWest Bank's interest in the Valve Receivable was never in danger. Moreover, TFE is in direct contact with CommerceWest Bank. *See* Exhibit D attached to the Schwartz Declaration. The lender is aware of the foreclosure and this litigation, and the first lien holder is not taking more aggressive steps to collect its debt (like intervening in this case or pursuing its own foreclosure). This argument is merely a red herring.

It is also important to note that TFE, as the successor to Mr. Dawson, is the owner of Intrepid's commercial tort claims. *See* Loan Sale Agreement, ECF No. 23 at pgs. 193-204 of 207. If the Court were to allow Mr. Sharif to derivatively prosecute Intrepid's commercial tort claims, the activities Mr. Sharif claims to be pursuing – it will all be for the benefit of TFE – not the shareholders. Mr. Sharif's arguments and standing to pursue any derivative claims should be rejected because he does not own them on the first hand, or they are entirely the collateral of TFE on the other (if the Article 9 Sale is unwound).

The writing is on the wall in this case. Mr. Sharif makes no attempt to dispute the investments and loans made by the Directors to Intrepid. He does not dispute that 70% of the ownership and 72% of the debt support the Article 9 Sale and a restructuring of *Ashes of Creation*. He does not dispute that Intrepid's commercial tort claims are either the property of TFE or TFE's collateral, nor does he dispute that Intrepid cannot pay its bills as they come due.

Mr. Sharif does admit that he resigned as the CEO and as a Director. In other words, Mr. Sharif is out of Intrepid – 70% of the ownership is not letting him back in, and his small minority ownership is behind over $120,000,000 of debt. He does not represent ownership, cannot pursue the commercial tort claims, and as a former officer and director, he no longer has any trade secrets to protect – he can only continue to breach his fiduciary duties to the company he abandoned.

For these reasons and those set forth in the Motion, the TRO should be dissolved. Once the TRO is dissolved, the Nevada District Court can rule on whether

it has jurisdiction over Mr. Sharif (it does – he raised tens of millions of dollars in Nevada for Intrepid). At that point, and as this Court noted in the TRO, TFE will address the arguments relating to the *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) through a motion to dismiss and/or a motion to stay. The argument regarding dismissal or a stay of this case under *Colorado River* is not waived merely because it was not included in the Motion to Dissolve Temporary Restraining Order Pursuant to FRCP 65(b)(4).

## II.   LEGAL ARGUMENT

### A.   MR. SHARIF IS THE ONLY OBJECTOR TO THE ARTICLE 9 SALE. HE DOES NOT REPRESENT ALL SIMILARLY SITUATED SHAREHOLDERS FOR PURPOSES OF A DERIVATIVE COMPLAINT.

Of the shareholders, Mr. Sharif is the only objector to the Article 9 Sale. Mr. Sharif is the only shareholder refusing to allow TFE to maintain the servers and complete development of *Ashes of Creation*.[1] Although he argues that he is doing this on behalf of Intrepid, he is preventing Intrepid and TFE from realizing the value of the game. Mr. Sharif owns 4.9% of Intrepid, so he is effectively holding the remaining shareholders of Intrepid hostage with his refusal to allow TFE access to *Ashes of Creation*.

### B.   THE LAWSUIT HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE ARTICLE 9 FORECLOSURE WAS PROPER.

The touchstone of TFE's and Aream's efforts to market, sell, and raise capital with respect to *Ashes of Creation* is whether such efforts were commercially reasonable. *See, e.g.*, Cal. Com. Code §§ 9610 and 9627. As TFE will demonstrate

---

[1]   This affects his derivative standing pursuant to Cal Corp. Code § 800. TFE reserves its right to bring a motion to dismiss based on Mr. Sharif's failures under Sec. 800 to plead demand futility with particularity, among other issues.

below, the combined efforts of TFE and Aream far surpassed what would be considered commercially reasonable in every sense – from the most technical to the most general – efforts to market, sell, and raise capital for *Ashes of Creation*.

The explanation and motivation for this outcome are clear: although Mr. Sharif's papers discuss at length his purported contributions to the *Ashes of Creation* enterprise, it was TFE and the other named defendants here that had invested, by a long chalk, the lion's share of capital that made *Ashes of Creation* anything more than a figment of the imagination. Indeed, TFE and the other defendants here have tens upon tens of millions of dollars on the line, and the maximization of the value of the Intrepid Assets was the primary and overarching goal of all of their efforts. Contrary to the arguments advanced by Mr. Sharif, neither TFE nor the other defendants expected or wished to find themselves in the position they are in now – attempting to obtain the return *of,* rather than a return *on*, their substantial capital investments into Intrepid and *Ashes of Creation*. Simply put, TFE's and Aream's efforts exemplified commercial reasonableness, and the sale at issue here is simply unassailable under the operative provisions of California's version of Article 9.

## 1.    THE ARTICLE 9 SALE DID NOT VIOLATE APPLICABLE LAW, AND MR. SHARIF'S ARTICLE 9 ARGUMENTS FAIL ON THE MERITS.

Mr. Sharif's arguments under Cal. Com. Code §§ 9610 fail before they even begin. (*See* ECF No. 35, pgs. 11-13 of 20). It is important to note that Mr. Sharif cannot take head on TFE's commercial reasonableness arguments – indeed, the Opposition makes no such attempt. Nor could it. Aream's extensive marketing, sales, and capital-raising efforts are practically unimpeachable with respect to establishing the commercial reasonableness of the Article 9 sale. Mr. Sharif's argument, therefore, veers in a far more audacious direction – he appears to argue that TFE's sale efforts fail as a matter of law under Cal. Com. Code § 9610. This is a mountain far too high and steep for Mr. Sharif to climb.

The only evidence cited by Mr. Sharif in the Opposition in support of the argument that a portion of the collateral sold at TFE's private sale does not purportedly satisfy Cal. Com. Code § 9610(c)'s requirements is the declaration of Mr. Sharif himself – the very person who ran Intrepid's operations into the ground and rendered the company insolvent is now apparently an authority on what constitutes commercially reasonable sale efforts in the Article 9 context. (ECF No. 35, pgs. 11 (lines 22-25) - 12 (lines 1-4)). With all due respect, reliance on Mr. Sharif's testimony alone (and not that of an outside, independent, and disinterested expert) falls far short of the mark in terms of establishing the requisite probably of success on the merits for purposes of Rule 65.

Mr. Sharif's reliance upon *Ascentium Capital v. Littell*, 583 F. Supp. 3d 1234 (W.D. Mo. 2022), is likewise misplaced. Plaintiff cites *Ascentium Capital* (a decision rendered by a federal court outside of California) for the proposition that "[a] recognized market is a market in which there are standardized price quotations for property that essentially fungible, such as stock exchanges." (ECF No. 35, pg. 12 of 20, lines 5-7) (internal quotation marks omitted). Mr. Sharif's argument here overlooks authority issued from the California courts themselves, such as *Clark, v. EZN*, 57 Cal.App.4th 852 (1997). Relying on the prior decision of *Ford & Vlahos v. ITT Commercial Finance Corp.*, 8 Cal. 4th 1220 (1994), the *Clark* Court noted that, "[w]here the market is specialized, the creditor must advertise before the sale. The purpose of requiring adequate advertising of a foreclosure sale is to force the secured party to ensure the auction is well attended by legitimate bidders, so that the highest commercially reasonable price for the collateral will be obtained." *Clark,* 57 Cal.App.4th at 856.

*Clark* explains that, in specialized markets,[2] commercial reasonableness turns

---

[2]    *See also* Assembly Comments to section 9610(b) and (c) – "In considering the recognized market exceptions, it is important to appreciate that recognized markets and other systems that produce equivalent 'widely distributed standard price quotations' are not limited to traditional exchanges . . . ."

on adequate advertising to reach likely buyers. 57 Cal.App.4th at 856-57. Here, Aream's targeted outreach to the specialized universe of potential buyers functioned as the advertising required in a specialized market. The commercial reasonableness standard does not require the presence of multiple live bidders at a foreclosure sale; it requires reasonable steps to generate bidding interest among the recognized buyer universe – which Aream's process accomplished. Similarly here, the record shows robust buyer outreach calibrated to this specialized market. The absence of firm offers after year-long solicitation supports, rather than undermines, the conclusion that the process achieved market-tested value without prejudice to Intrepid. *See id.* ("Creditor's distributorship, EZN Ramps of California, Inc. was not only a recognized market but the only market for most of California. The sale was commercially reasonable and *did not prejudice Debtor*.") (emphasis added).

Mr. Sharif cannot show Intrepid was somehow prejudiced by TFE's sale efforts. Aream ran an extensive sales, marketing and capital-raising process. There were simply no takers. Intrepid was (and is) insolvent. No amount of process or procedure was going to change the mathematical and financial realities facing Intrepid. Notice of the foreclosure sale was given to Intrepid and Mr. Sharif, as well as CommerceWest Bank. All of the foregoing demonstrates that Mr. Sharif has fallen far short of demonstrating a likelihood of success on the merits for purposes of Rule 65. The TRO should, therefore, be dissolved.

### C.     MR. SHARIF IS CAUSING IRREPARABLE HARM TO *ASHES OF CREATION*.

The TRO inflicts ongoing, non-compensable harm on the *Ashes of Creation* ecosystem: live-service downtime, loss of community momentum, brand dilution, and degradation of vendor and developer relationships—harms not readily reducible to a damages figure. *See* Declaration of Liam Brennan (the "**Brennan Declaration**"), ¶¶ 9-10 (describing time-sensitive market conditions). Although some consequences (e.g., incremental refunds) are quantifiable, the core losses—community attrition and

reputational decline in a network-driven gaming market—are not. By contrast, any alleged defect in the Article 9 process, if established, is compensable in damages. The balance of non-compensable harms therefore favors dissolution of the TRO.

### D. THE BALANCE OF EQUITIES TILTS IN FAVOR OF TFE.

As set forth above, the harm to TFE and *Ashes of Creation* by Mr. Sharif's intentional interference is significant. Moreover, after the full context of the Article 9 Sale is examined, it is apparent it was commercially reasonable and Mr. Sharif's arguments to the contrary improperly elevate form (public sale) over substance (robust marketing by a specialized investment banker). After a year of marketing *Ashes of Creation*, the Directors of Intrepid, as well as 70% of the shareholders, consented to the Article 9 Sale. Mr. Sharif's manufactured arguments about trade secrets and intellectual property fail to acknowledge he is not seeking to protect anyone but himself. TFE, as the purchaser at the Article 9 foreclosure, is best positioned to preserve and grow the value of *Ashes of Creation* – an asset no longer owned by Intrepid. Therefore, the equities cannot tip in favor of Mr. Sharif when Intrepid has no cognizable claim to ownership of *Ashes of Creation*.

### E. THE PUBLIC INTEREST SUPPORTS ALLOWING SECURED CREDITORS ACCESS TO THE ASSETS UPON WHICH THEY FORECLOSED.

The public interest favors respecting commercially reasonable foreclosures in specialized markets. Here, Aream's process reached the recognized buyer universe (over 40 contacts; 10 meetings; 2 data-room reviews) with no offers, making it unlikely that a formal auction would have produced additional bidders or better price discovery. The public interest, therefore, supports allowing TFE, as purchaser at the commercially reasonable Article 9 foreclosure, to operate the assets it acquired.

### F. THE MOTION TO DISSOLVE WAS FILED WITH AS MUCH NOTICE AS POSSIBLE UNDER THE CIRCUMSTANCES.

FRCP 65(b)(4) requires that motions to dissolve ex parte TROs do so "[o]n 2

26cv00965-LL-JLB

days' notice to the party who obtained the order without notice—or on shorter notice set by the court[.]" This requirement is satisfied because the Court ordered the hearing on the Motion set for March 18, 2026, which is longer than 2 days after the filing of the Motion on March 6, 2026. Therefore, there is no procedural flaw, and it does not prevent the Court from dissolving the TRO.

Dated: March 12, 2026.

SCHWARTZ, PLLC

By: /s/ Sasha Aliakbar-Amid
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
601 East Bridger Avenue
Las Vegas, Nevada  89101

*Attorneys for Defendant*
*TFE Games Holdings, LLC*