# EXHIBIT 5

Docusign Envelope ID: E84BDA73-759C-8597-8026-D066D170966B

Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
Samuel A. Schwartz, Esq. (admitted *pro hac vice*)
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for Defendant*
*TFE Games Holdings, LLC*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., | Case No.: 3:26-cv-00965-LL-JLB |
| Plaintiff, | **DECLARATION OF THERESA FETTE IN SUPPORT OF MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65** |
| vs. | |
| ROBERT DAWSON; RYAN OGDEN; THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDINGS, LLC, | |
| Defendants, | |
| and | |
| INTREPID STUDIOS, INC., | Judicial Officer: Hon. Linda Lopez |
| Nominal Defendant. | Courtroom: 14B (14th Floor)<br>Hearing Date:<br>Hearing Time:<br><br>Action Filed: February 14, 2026<br>Trial Date: Not Set |

1

Docusign Envelope ID: E84BDA73-759C-8597-8026-D966D170966B

I, Theresa Fette, hereby declare as follows:

1.    I am over the age of 18, mentally competent and unless otherwise stated, I have personal knowledge of the facts set forth herein. If called upon to testify as to the contents of this declaration, I could and would do so.

2.    I make this declaration in support of the Response.

3.    The Response contains an accurate recitation of TFE's view of the background of this matter.

4.    True and correct copies of Intrepid's 2023, 2024, and 2025 Balance Sheets and Income Statements are attached hereto as **Exhibit C**.

5.    A true and correct copy of the December 7, 2020 Loan Agreement between Intrepid Studios, Inc. and CommerceWest Bank is attached hereto as **Exhibit D**. I previously testified that Steven Sharif guaranteed the Loan Agreement, however, that is incorrect. John Moore, Mr. Sharif's husband and the former Chief Financial Officer of Intrepid Studios, Inc., is the guarantor of the CommerceWest Bank loan.

6.    The Loan Agreement was secured, in part, by a second lien on Mr. Sharif's and Mr. Moore's residence.

Pursuant to 18 U.S.C. § 1623, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 25, 2026

DocuSigned by:

/s/ Theresa Fette
48B4103522AA440...

Theresa Fette

# EXHIBIT C











Case 3:26-cv-00965-LL-MMP     Document 58-2     Filed 03/25/26     PageID.993     Page 9 of 38



Case 3:26-cv-00965-LL-MMP     Document 58-2     Filed 03/25/26     PageID.993     Page 9 of 38

# EXHIBIT D

DocuSign Envelope ID: C314E439-FBDF-4FA8-9E24-FA3B123E1147

## LOAN AGREEMENT

IN CONSIDERATION of the covenants contained in this Agreement, Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, up to the full amount of the Loan hereinafter described, on the following terms and conditions:

### ARTICLE 1. FUNDAMENTAL DEFINITIONS

1.1    Purpose. This Article 1 sets forth certain fundamental provisions for purposes of this Agreement. The captions of this Article are used as defined terms in this Agreement.

1.2    Effective Date. December 7, 2020.

1.3    Lender. COMMERCEWEST BANK.

1.4    Borrower. INTREPID STUDIOS, INC., a California corporation.

1.5    Loan. A loan to be made by Lender to Borrower, in the principal amount of Six Million Dollars ($6,000,000), together with any additional advances related thereto, subject to the terms of this Agreement and the other Loan Documents.

1.6    Guarantor. John Moore, who is sometimes referred to in this Agreement as "Non-Borrower Trustor".

1.7    Maturity Date. The fifth anniversary of the Effective Date.

1.8    MSNLF Transaction Fee. A fee in the amount of Sixty Thousand Dollars ($60,000).

1.9    Loan Fee. A fee in the amount of Forty-Eight Thousand Five Hundred Dollars ($48,500).

1.10    MSNLF. The "Main Street New Loan Facility" that constitutes a loan program established by the Board of Governors of the Federal Reserve System of the United States under and as part of the Main Street Lending Program.

1.11    Maximum Debt to EBITDA Ratio. For the measurement periods ending December 31, 2021 and December 31, 2022, 4.00:1.00; for each measurement period thereafter, 3.00:1.00.

1.12    Minimum Current Ratio. 2.50:1.00.

1.13    UCC Filing State. California.

1.14    Property. That certain real property addressed at 4955 Rancho Del Mar Trail, San Diego, California 92130. The Property is owned by Non-Borrower Trustor. The Deed of Trust will encumber by the Property on a second-priority basis, junior to the Residential Mortgage.

1.15    Address for Notices to Lender.

> CommerceWest Bank
> 2111 Business Center Drive, Suite 100
> Irvine, California  92612
> Attention: Corporate Lending Group

DocuSign Envelope ID: C314E439-FBDF-4FA8-9E24-FA3B123E1147

1.16    Address for Notices to Borrower.

> Intrepid Studios, Inc.
> 11558 Sorrento Valley Rd. Suite 7
> San Diego, CA 92121
> Attention: John Moore

## ARTICLE 2. ADDITIONAL DEFINITIONS

2.1    Captions as Defined Terms. The captions appearing in the balance of this Article 2 will be used as defined terms in this Agreement (in addition to terms defined in any Recitals above or elsewhere in this Agreement).

2.2    Affiliate. A Person controlling, controlled by, or under common control with the Person in question whether such control is direct or indirect or through one or more intermediaries. The terms "controlling", "controlled" or "control", as used herein, mean (i) with respect to a Person that is a corporation, the right to exercise, directly or indirectly, more than ten percent (10%) of the voting rights attributable to the shares of the controlled corporation, including without limitation, the voting power for the election of the directors of such Person or the direct management or policies of such Person, whether through the ownership of voting securities by contract or otherwise, and (ii) with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

2.3    Agreement. This Loan Agreement, as the same may from time to time be amended or supplemented.

2.4    Anti-Terrorism Laws. Any laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the laws comprising or implementing the Lender Secrecy Act, and the laws administered by OFAC.

2.5    Blocked Person. Any Person: (i) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (ii) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (iii) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (iv) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (v) that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list or is named as a "listed person" or "listed entity" on other lists made under any Anti-Terrorism Law.

2.6    Borrower Certifications and Covenants. The MSNLF Form of Borrower Certifications and Covenants executed by Borrower in connection with the Loan and the parties participation in the MSNLF.

2.7    Business Day. Any day other than a Saturday or Sunday, which is not a legal holiday in the State of California and which is not a date on which national banks in the State of California are authorized to close.

2.8    Collateral. All of the property and assets in which Liens are granted pursuant to the Security Agreement as security for the Loan, including, without limitation, the Intellectual Property.

2.9    Computation Period. At any time of measurement, a period of four (4) consecutive calendar quarters.

2.10    Copyright. Any copyright, any copyrightable work, any registration or recording of any copyright or copyrightable work, and any application in connection with any copyright or copyrightable work, including, without limitation, any such registration, recording, or application in the United States Copyright

DocuSign Envelope ID: C314E439-FBDF-4FA8-9E24-FA3B123E1147

Office or in any similar office or agency of the United States, any State thereof, or any other country or political subdivision of such other country, and any renewal of any of the foregoing

2.11    Copyright License. Any agreement granting any right in any copyright, copyrightable work, or copyright registration, as the same may from time to time be amended, restated or otherwise modified.

2.12    Current Assets. At a particular date, all amounts that would, in conformity with GAAP, be included under current assets on a balance sheet of the Person in question as of such date.

2.13    Current Liabilities. At a particular date, all amounts that would, in conformity with GAAP, be included under current liabilities on a balance sheet of the Person in question as of such date.

2.14    Current Ratio. The ratio, on the date of measurement, for Borrower, of total Current Assets divided by total Current Liabilities.

2.15    Debt to EBITDA Ratio. The ratio, as of the date of measurement, of (i) the funded Indebtedness of Borrower minus the principal amount of all Indebtedness of Borrower which has been subordinated to the Loan, all as of the date of measurement, to (ii) EBITDA of Borrower, all over the Computation Period ending as of the date of measurement.

2.16    Deed of Trust. The Deed of Trust With Assignment of Rents of even date herewith made by Non-Borrower Trustor as Trustor in favor of Lender as Beneficiary, encumbering the Property, given to secure the Note, and other obligations of Borrower related thereto.

2.17    Disbursement. The payment of the Loan proceeds to Borrower, to be made after Lender's receipt of all items, and satisfaction of all conditions precedent, described in Paragraph 3.5.

2.18    Distributions. All payments made by a Person to its members or other beneficial owners, for any reason, whether as dividends, distributions, loans, advances, return of capital, preferred return on capital, salaries, bonuses or otherwise.

2.19    EBITDA. For any period for the Person in question, based on Financial Statements of the Person in question, an amount equal to: (i) Net Income for such period; plus (ii) the following, to the extent deducted in calculating such Net Income, without duplication: (A) interest expense for such period, (B) the provision for federal, state, local and foreign income taxes payable by such Person for such period, and (C) the amount of depreciation and amortization expense for such period; all as determined in accordance with GAAP.

2.20    Environmental Indemnity. The Unsecured Environmental Indemnity of even date herewith signed by Borrower in favor of Lender.

2.21    Environmental Laws. Any and all present and future federal, state and local laws, statutes, ordinances, rules, regulations, permits, orders, guidance documents, policies, and any other requirements of Governmental Authorities relating to health, safety, the environment or to any Hazardous Substances.

2.22    Event of Default. Any event described in Paragraph 6.1 of this Agreement.

2.23    Financial Statements. With respect to any quarterly, annual or other accounting or reporting period for any Person, statements of income, shareholders' equity and cash flows of such Person for such period, and a balance sheet of such Person as of the end of such period, setting forth in each case in comparative form figures for the corresponding period in the preceding fiscal year if such period is less than a full fiscal year or, if such period is a full fiscal year, corresponding figures from the preceding annual audit, all prepared in reasonable detail and in accordance with GAAP.

DocuSign Envelope ID: C314E439-FBDF-4FA8-9E24-FA3B123E1147

2.24    <u>GAAP</u>. Generally accepted accounting principles as in effect in the United States of America from time to time, consistently applied.

2.25    <u>Governmental Authority</u>. Any federal, state, municipal, national or other government, governmental or quasi-governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States of America, the United States of America, or a foreign entity or government.

2.26    <u>Governmental Requirements</u>. All existing and future laws, ordinance, order, rule, regulation or requirement of all Governmental Authorities.

2.27    <u>Guarantor</u>. Each Guarantor identified in Article 1 of this Agreement, and such other the Person or Persons, if any, hereafter guaranteeing the performance of all or any portion of Borrower's obligations under this Agreement or any of the other Loan Documents.

2.28    <u>Guaranty</u>. Each guaranty now or hereafter signed and delivered by a Guarantor in favor of Lender, guaranteeing the performance of all or any portion of Borrower's obligations under this Agreement, the Note, or any of the other Loan Documents, as the same may from time to time be amended, supplemented, restated or replaced.

2.29    <u>Hazardous Substances</u>. Any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, or under any other Governmental Requirement, including without limitation petroleum or natural gas.

2.30    <u>Indebtedness</u>. As applied to any Person, all indebtedness for borrowed money, whether owed to Lender or owed to any other Person, that portion of obligations with respect to capital leases that is properly classified as a liability on a balance sheet in conformity with GAAP, notes payable and drafts accepted representing extensions of credit, any obligation owed for all or any part of the deferred purchase price of property or services, the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, and all other debts, liabilities, obligations, covenants and duties of such Person, whether now or hereafter made, incurred, covenanted or created, whether voluntary or involuntary, and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, regardless of whether such Person may be liable individually or jointly with others, or whether recovery upon any of the same may be or hereafter become barred by any statute of limitations, and whether any of the same may be or hereafter become otherwise unenforceable. The term "<u>Indebtedness</u>" also includes all renewals and extensions of any and all such loans, advances, debts, obligations and liabilities.

2.31    <u>Intellectual Property</u>. Any intellectual property, including, without limitation, Copyright, any Copyright License, any Patent, any Patent License, any Trademark, any Trademark License, any customer list, any trade secret, any confidential or proprietary information, any invention (whether or not patented or patentable), any technical information, procedure, design, knowledge, know how, skill, expertise, experience, process, model, drawing, or record, and any work (whether or not copyrighted or copyrightable).

2.32    <u>Lien</u>. With respect to any asset or property, any security interest, mortgage, pledge, lien, charge or other encumbrance of any kind in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the UCC or comparable law of any jurisdiction, or (with respect to real property) a mortgage or deed of trust.

DocuSign Envelope ID: C314E439-FBDF-4FA8-9E24-FA3B123E1147

2.33    <u>Loan Documents</u>. This Agreement, the Note, Security Agreement, Environmental Indemnity and all other documents, if any, now or hereafter signed by Borrower (but not by Guarantor or Non-Borrower Trustor) in connection with or to evidence or secure the payment of the Loan, any interest, costs and other charges associated therewith, or any performance required by this Agreement or any other such document.

2.34    <u>Margin Stock</u>. Margin stock as defined in Regulation U issued by the Federal Reserve Board, as amended from time to time, and any successor regulation thereto.

2.35    <u>Material Adverse Effect</u>. A material adverse effect, whether individually or in the aggregate, on: (i) the business, assets, cash flow, expenses, income, properties, operations, or financial or other condition of Borrower or Guarantor; (ii) the ability of Borrower to pay or perform its obligations in accordance with the terms of this Agreement and the other Loan Documents; (iii) the rights and remedies of Lender under this Agreement, the other Loan Documents or any related document, instrument or agreement; or (iv) the value of the Collateral, Lender's Liens in the Collateral or the perfection or priority of such Liens.

2.36    <u>Material Contract</u>. Any contract or other arrangement to which the Borrower or any of its affiliates or subsidiaries is a party (other than this Agreement and the other Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

2.37    <u>MSNLF Rules</u>. The FAQs, rules and regulations, pronouncements or procedures from time to time promulgated by the Federal Reserve Bank of Boston, the U.S. Department of Treasury or any other Governmental Authority in respect of the Main Street Lending Program.

2.38    <u>Net Income</u>. For any period of measurement, the net income (or loss) of the Person in question for such period taken as a single accounting period determined in conformity with GAAP.

2.39    <u>Note</u>. The Promissory Note of even date herewith evidencing the Loan signed and delivered by Borrower in favor of Lender in the principal amount of the Loan, as the same may from time to time be amended, supplemented, restated or replaced.

2.40    <u>OFAC Lists</u>. Collectively, the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Department of Treasury Office of Foreign Assets Control ("<u>OFAC</u>") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

2.41    <u>Patent</u>. Any letters patent of the United States or any other country, any registration or recording of any letters patent, any application for letters patent in the United States or any other country, including, without limitation, any such registration, recording, or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other country or political subdivision of such other country, and all reissues, continuations, continuations in part, or extensions of any of the foregoing.

2.42    <u>Patent License</u>. Any agreement granting any right to practice any invention on which any Patent is in existence, as the same may from time to time be amended, restated or otherwise modified.

2.43    <u>Permitted Indebtedness</u>. Each of the following with respect to a Person:

2.43.1    Indebtedness owed to Lender, and any obligations of Borrower to Lender, including, without limitation, any such obligations under this Agreement or the other Loan Documents.

2.43.2    Intercompany loans and advances approved by Lender.

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-FA3B12351147

2.43.3   Trade payables or accrued expenses incurred in the ordinary course of business of Borrower.

2.43.4   Indebtedness owed to UCC Subordinate Lenders, so long as the Liens securing such Indebtedness are the subject of a UCC Subordination Agreement.

2.43.5   Other Indebtedness approved by Lender.

2.44    Permitted Liens. Each of the following with respect to a Person:

2.44.1   Liens in favor of Lender or any Affiliate of Lender.

2.44.2   Liens for taxes, assessments and other governmental charges due but not yet payable or being contested in good faith by appropriate proceedings effectively staying any action or proceeding to foreclose any such Liens.

2.44.3   Liens in respect of pledges or deposits under worker's compensation laws, unemployment insurance or similar legislation and in respect of pledges or deposits to secure bids, tenders, contracts (other than contracts for the payment of money).

2.44.4   Statutory Liens of landlords, materialmen, mechanics, warehousemen, or carriers, or other like Liens arising in the ordinary course of business and for amounts not yet overdue or delinquent.

2.44.5   Liens existing on property at the time of the acquisition thereof by the Borrower to the extent the secured Indebtedness is permitted by this Agreement and the other Loan Documents.

2.44.6   Precautionary Liens granted to lessors in operating lease transactions entered into in the ordinary course of business.

2.44.7   Liens in favor of a UCC Subordinate Lender, so long as such Liens are the subject of a UCC Subordination Agreement.

2.44.8   Other Liens approved by Lender.

2.45    Person. Any individual, general partnership, limited partnership, limited liability company, joint venture, trust, estate, corporation, association or other entity.

2.46    Residential Mortgage. That certain Short Form Deed of Trust and Assignment of Rents dated November 2, 2020 made by Non-Borrower Trustor in favor of 4955 RDMT, LLC, a Nevada limited liability company ("Residential Mortgage Lender"), to secure a promissory note dated November 2, 2020 made by Non-Borrower Trustor in the principal amount of $4,500,000 ("Residential Mortgage Loan").

2.47    Security Agreement. The Security Agreement (Business Assets) of even date herewith, made by Borrower in favor of Lender, granting Lender a security interest in the Collateral, as the same may from time to time be amended, supplemented, restated or replaced.

2.48    Trademark. Any trademark, trade name, corporate name, business name, domain name, trade style, service mark, logo, source identifier, business identifier, design, or intangible thing of like nature, any registration or recording of the foregoing or any thereof, and any application in connection therewith, including, without limitation, any such registration, recording, or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other country or political subdivision of such other country, and all reissues, extensions, or renewals of any of the foregoing.

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12251147

2.49    <u>Trademark License</u>. Any agreement granting any right to use any Trademark or Trademark registration, as the same may from time to time be amended, restated or otherwise modified.

2.50    <u>UCC</u>. The California COMMERCIAL CODE as amended or recodified from time to time.

2.51    <u>UCC Subordinate Lender</u>. Each Person to whom Borrower owes Indebtedness which is secured by a Liens perfected by the filing of a financing statement, and which in the absence of a UCC Subordination Agreement would be prior to the Liens granted to Lender in the Security Agreement, all as reasonably determined by Lender. UCC Subordinate Lenders initially include the following Persons holding Liens in the Collateral as evidenced by financing statements: SPG Advance, LLC; United States Small Business Administration; JP Morgan Chase; First Corporate Solutions; Forward Financing, LLC, CT Corporation System, CHTD Company, and Carmanis Jason/YA-YA Holdings, LLC/YA-YA Legacy Trust.

2.52    <u>UCC Subordination Agreement</u>. A Subordination Agreement [Uniform Commercial Code] between Lender and a UCC Subordinate Lender to establish a first priority Lien under the Security Agreement with respect to the Collateral.

### ARTICLE 3. TERMS OF THE LOAN

3.1    <u>The Loan</u>.

3.1.1    Subject to the terms and conditions of this Agreement, Lender agrees to lend to Borrower, and Borrower hereby agrees to borrow from Lender, up to the full amount of the Loan, for business or investment purposes not otherwise prohibited by the MSNLF Rules (and not for personal, family or household purposes), upon the terms, conditions, representations, warranties and covenants contained in this Agreement.

3.1.2    The Loan is a term loan with a maturity of five years. Any amounts repaid or prepaid under the Loan may not be reborrowed. On the Maturity Date, Borrower shall pay all outstanding principal plus accrued unpaid interest on the Loan in full. Borrower acknowledges and agrees that Borrower is and shall be solely responsible for arranging funds necessary to pay Lender in full on or before the Maturity Date.

3.2    <u>Loan Fee</u>. In consideration of Lender's agreement to make the Loan, Borrower shall pay Lender the Loan Fee and the MSNLF Transaction Fee, which shall all be due and payable to Lender upon Borrower and Lender signing this Agreement. Lender's agreement to defer collection of the Loan Fee and the MSNLF Transaction Fee until the Disbursement shall in no way limit Borrower's obligation to pay the Loan Fee and the MSNLF Transaction Fee. Borrower and Lender acknowledge and confirm that the entire proceeds of the MSNLF Transaction Fee will in turn be paid by Lender to MS Facilities LLC in accordance with the participation of the Loan with the Main Street Lending Program.

3.3    <u>Payment of Costs</u>. Borrower shall bear all costs and expenses required to satisfy the terms and conditions of this Agreement, including, without limitation, the costs and expenses of Lender's counsel in connection with the Loan. Lender is hereby authorized to disburse the same concurrently with the Disbursement and from time to time thereafter, directly to such Persons, including Lender, as may be entitled thereto pursuant to this Agreement.

3.4    <u>Security for Loan</u>. The Loan and the performance by Borrower of all of its obligations hereunder and under the other Loan Documents shall be secured by, among other things, the Security Agreement and the Deed of Trust.

3.5    <u>Conditions Precedent to Disbursement</u>. Lender's obligation to make the Disbursement is subject to satisfaction of the following conditions precedent in Lender's sole and absolute discretion:

3.5.1    Lender shall have received and approved the following:

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12251147

(a)    The Note.

(b)    The Security Agreement.

(c)    A Guaranty signed by Guarantor.

(d)    The Borrower Certifications and Covenants.

(e)    The Assignment and Assumption for the Main Street Lending Program signed by Borrower.

(f)    The Co-Lender Agreement under the Main Street Lending Program signed by Borrower and Guarantor.

(g)    Any additional documents or evidence reasonably required by Lender in connection with the Loan and the parties' participation in the MSNLF.

(h)    The Financial Statements of Borrower.

(i)    The Financial Statements of Guarantor.

(j)    A UCC-1 financing statement for filing in the UCC Filing State, naming Borrower as debtor.

(k)    A UCC Subordination Agreement signed by each UCC Subordinate Lender as determined by Lender in its sole discretion.

(l)    UCC termination statements (appropriately completed and executed) for filing in such jurisdictions as Lender may request to terminate any financing statement evidencing Liens of other Persons in the Collateral which are prior to the Liens granted to Lender in the Security Agreement.

(m)    UCC search certificates reflecting no other financing statements or filings which evidence Liens of other Persons in the Collateral, except for any such prior Liens for which Lender has received a termination statement pursuant to the preceding Subparagraph and for Permitted Liens.

(n)    Original insurance policies or certificates satisfactory to Lender for the insurance required by this Agreement or any of the other Loan Documents.

(o)    Certified copies of Borrower's organizational documents and any amendments thereto, evidence satisfactory to Lender that Borrower has been duly organized and is validly existing and in good standing, and borrowing authorizations and/or resolutions as specified by Lender.

(p)    A flood certification dated at least ten (10) days before the Effective Date, if the Property is located in an area considered a flood risk by the United States Department of Housing and Urban Development.

(q)    If requires by Lender a preliminary title report issued by a title insurance company acceptable to Lender ("Title Insurer") showing the condition of title to the Property, with the Property's legal description and a copy of all documents listed as exceptions therein, and showing that title to the Property is vested solely in Non-Borrower Trustor.

Loan No.: 10019349                    8                    4847-8866-3507 v.1

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12251147

(r)      If required by Lender, an appraisal of the Property from an appraiser acceptable to Lender, documenting a value for the Property acceptable to Lender in its sole and absolute.

3.5.2    The Deed of Trust shall have recorded in the Official Records of San Diego County.

3.5.3    If required by Lender, title Insurer shall have issued (or be irrevocably committed to issue) a loan policy of title insurance with respect to the Property with exceptions and on other terms acceptable to Lender ("Title Policy").

3.5.4    There shall exist no event or omission which has resulted in, or likely to result in, a Material Adverse Effect.

3.5.5    All of Borrower's representations and warranties in this Agreement and the other Loan Documents shall be true and correct in all material respects.

3.5.6    There shall exist no material adverse change in Borrower's or any Guarantor's financial condition.

3.5.7    No Event of Default shall have occurred, and no event or condition shall have occurred or exist which with notice or the lapse of time or both would constitute an Event of Default.

3.5.8    No default shall have occurred, and no event or condition shall have occurred or exist which with notice or the lapse of time or both would constitute a default, as to any Indebtedness owed by Borrower, any Guarantor, or any Affiliate of Borrower or Guarantor, in each case owed to Lender.

3.5.9    Borrower shall have paid all accrued and unpaid costs, fees, and expenses incurred by Lender as provided for by the Loan Documents.

3.5.10   Borrower shall have delivered to Lender all other funds, documents, instruments, policies, evidence of satisfaction of conditions and other materials required by Lender under the terms of this Agreement and any of the other Loan Documents.

3.5.11   Any additional documents or evidence reasonably required by Lender in connection with the Loan and the parties' participation in the MSNLF.

3.5.12   Lender shall have received a commitment letter from MS Facilities LLC that it will purchase a participation interest in 95% of the aggregate principal amount of the Loan under the Main Street Lending Program ("Participation Commitment Letter").

Borrower acknowledges and agrees that Lender has no obligation to disburse any Loan proceeds unless and until Lender receives the Participation Commitment Letter.

3.6      Termination. This Agreement (other than the covenants, representations, warranties and undertakings of Borrower which by their express terms survive the termination hereof) and the commitment of Lender to provide the Loan shall terminate in full immediately and without further action if (i) MS Facilities LLC indicates that it will not, otherwise refuses to, or does not provide the Participation Commitment Letter, (ii) Lender has not received the Participation Commitment Letter within 30 days after the Effective Date, (iii) the Loan has not been disbursed on or prior to the date that is three (3) Business Days following the date of the Participation Commitment Letter, (iv) the Main Street Lending Program exhausts or loses access to its available funding prior to the Disbursement, or (v) the Main Street Lending Program expires prior to the Disbursement. Borrower acknowledges and agrees that the issuance of the Participation Commitment Letter, the ongoing operation and existence of the Main Street Lending Program, and the purchase of a participation interest in the Loan by MS Facilities LLC through the Main Street Lending  Program are dependent on many factors outside Lender's control, including factors both anticipated and unanticipated.

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12251147

Regardless of such constraints, Borrower has entered into this Agreement on the terms and conditions stated herein and is fully aware of the possibility that this Agreement and the commitment of Lender to provide the Loan may terminate as a result of the terms of this Paragraph. Should such termination occur, Borrower agrees that Lender shall have no resulting liability whatsoever to Borrower, and Borrower waives any and all claims, demands, controversies, causes of action, damages, losses, rights, liabilities and obligations of all kinds which it may have against Lender resulting from such termination.

3.7     Mandatory Prepayment. If MS Facilities LLC fails to purchase the participation in accordance with the Participation Commitment Letter within the period set forth therein, then Lender shall promptly notify Borrower and Borrower shall prepay the Loan in full together with all other amounts under this Agreement and the other Loan Documents.

3.8     MSNLF Mandatory Prepayment Provision. If, on any date (such date, a "Trigger Date"), the Board of Governors of the Federal Reserve System or a designee thereof has, after consultation with Lender, notified Lender in writing that the Borrower has materially breached, made a material misrepresentation with respect to or otherwise failed to comply with certifications in Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) or Section 3 (FRA and Regulation A Borrower Eligibility Certifications) of the Borrower Certifications and Covenants in any material respect or that any such certification has failed to be true and correct in any material respect, then Lender shall promptly so notify the Borrower and the Borrower shall, no later than two (2) Business Days after such Trigger Date, prepay the Loan in full, along with any accrued and unpaid interest thereon.

3.9     Recovery of Additional Costs. If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any Governmental Authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (i) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (ii) reduce the amounts payable to Lender under this Agreement or the other Loan Documents, or (iii) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender to enter into this Agreement and to make the Loan to Borrower, Borrower hereby unconditionally makes the following representations and warranties, which shall be deemed to be continuing representations and warranties so long as any credit hereunder shall be available and until payment in full of the Loan.

4.1     Due Organization, Qualification and Power. Borrower is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Borrower has full power and adequate authority and rights to own its property and to carry on its business as now conducted, and is duly qualified and in good standing in each State in which where its operations or conduct of its business makes such qualification necessary.

4.2     Authorization. Borrower has full power and authority to sign and enter into the Loan Documents, to undertake and consummate the transactions contemplated thereby, and to pay, perform and observe all of the conditions, covenants, agreements and obligations contained therein. The execution, delivery and performance by Borrower of and under the Loan Documents have been duly authorized by all necessary action.

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-FA3B12251147

4.3     Binding Effect. This Agreement, the Note, each of the other Loan Documents and the Deed of Trust and Guaranty constitutes a legal and binding obligation of, and is valid and enforceable against, each party thereto other than Lender, in accordance with the terms thereof, except as such enforceability may be limited by bankruptcy, insolvency, debtor relief or other similar laws affecting the enforcement of creditors' rights generally or by equitable principles.

4.4     No Violation. The execution, delivery and performance of this Agreement, the other Loan Documents and the Deed of Trust and Guaranty and consummation of the transaction contemplated thereby, will not conflict with, result in any breach of, or constitute a default under, any Governmental Requirement, agreement, contract, mortgage, deed of trust, lease, contract, loan or credit agreement, corporate charter, bylaws, partnership agreement, trust agreement, operating agreement or other instrument to which Borrower or any Guarantor is a party or by which Borrower, any Guarantor or the Collateral may be bound or affected.

4.5     Other Consents. No consent or approval of any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Borrower of any of the Loan Documents.

4.6     Guarantor. The Guaranty and Deed of Trust and have been duly authorized, executed and delivered by Guarantor.

4.7     No Default. There is no default on the part of Borrower under this Agreement or any of the other Loan Documents, and no event has occurred and is continuing which with notice or the lapse of time or both would constitute a default thereunder.

4.8     Litigation. Except as otherwise disclosed to Lender, there is no litigation, suits, proceedings, claims or disputes pending or, to the knowledge of Borrower, threatened against or affecting Borrower, any Guarantor or any of assets of Borrower or any Guarantor which, if determined adversely to Borrower or any Guarantor, would have a Material Adverse Effect, and neither Borrower, nor any Guarantor is in default with respect to any order, writ, injunction, decree or demand of any court or other Governmental Authority.

4.9     Financial Statements. All Financial Statements of Borrower and Guarantor delivered to Lender are true and correct in all material respects, have been prepared in accordance with GAAP unless otherwise noted therein, and fairly present the financial condition of Borrower as of their respective dates. No material adverse change has occurred in the financial condition of Borrower or any Guarantor from that reflected in the Financial Statements, and no additional borrowings have been made by Borrower or any Guarantor, other than borrowings approved by Lender, since their respective dates. Borrower understands and acknowledges that there are criminal penalties for giving false financial information to federally insured financial institutions.

4.10     Solvent. For Borrower and for Guarantor: (i) the fair value of the assets of such Person exceeds such Person's debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of such Person is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of such Person's debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person is able to pay such Person's debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured, and (d) such Person is not engaged in, and are not about to engage in, business for which they have unreasonably small capital. The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

4.11     Title. Borrower has good, sufficient and legal title to, valid leasehold interests in, valid licensed rights in, and good title to, all of their respective properties and assets, as reflected in the most recent Financial Statements delivered to Lender, and all assets and properties acquired by Borrower since the date of such Financial Statements delivered to Lender, in each case except those assets and properties

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12351147

disposed of in the ordinary course of business or otherwise in compliance with this Agreement since the date of such Financial Statements.

4.12    No Agreement to Sell Assets or Merge. Borrower has no legal obligation, absolute or contingent, to any Person to sell the assets of Borrower other than in the ordinary course of Borrower's business, or to effect any merger, consolidation or other reorganization of Borrower or to enter into any agreement to do so.

4.13    Liens. Except for the Liens granted to Lender under the Security Agreement and Permitted Liens, there are no Liens outstanding or perfected against the Collateral that would not be terminated prior to the disbursement of any Loan proceeds. Without limiting the generality of the foregoing, Borrower specifically represents and warrants that during the past thirty (30) days, Borrower has not granted any Liens in any inventory, or accepted any inventory subject to any such existing security interest, as to which perfection by UCC filing has not yet occurred. There has in the past twelve (12) months been no levy against any of the Collateral.

4.14    Indebtedness. As of the Effective Date, Borrower owes no Indebtedness to any Person other than Indebtedness owed to Lender and other than the Permitted Indebtedness.

4.15    Compliance with Laws. Except as could not reasonably be expected to result in a Material Adverse Effect, Borrower holds all permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from Governmental Authorities necessary for the conduct of its business and is in compliance with all applicable laws relating thereto. Borrower is in compliance with any and all Environmental Laws including, without limitation, all Environmental Laws in all jurisdictions in which Borrower owns or operates, or has owned or operated, a facility or site, arranges or has arranged for disposal or treatment of Hazardous Substances, accepts or has accepted for transport any Hazardous Substances or holds or has held any interest in real property or otherwise except where the failure to comply with such Environmental Laws does not and could not reasonably be expected to cause or result in a Material Adverse Effect. No litigation or proceeding arising under, relating to or in connection with any Environmental Law is pending or, to Borrower's knowledge, threatened against Borrower, any real property in which Borrower holds or has held an interest or any past or present operation of Borrower except for such litigation or proceedings that do not or could not reasonably be expected to cause or result in a Material Adverse Effect. No release, threatened release or disposal of Hazardous Substances is occurring, or has occurred, on, under or to any real property in which Borrower holds any interest or performs any of its operations, in violation of any Environmental Law except for such releases or disposals that do not or could not reasonably be expected to result in a Material Adverse Effect. As used in this Paragraph, "litigation or proceeding" means any demand, claim, notice, suit, suit in equity, action, administrative action, investigation or inquiry whether brought by any Governmental Authority, private person or entity or otherwise.

4.16    Taxes. Borrower has filed all required Federal, State and local tax returns and has paid all taxes due and payable. Borrower knows of no basis for additional material assessments with respect to any taxes.

4.17    Insurance. Borrower is insured with responsible, financially sound and reputable insurance carriers against such risks and in such amounts as is customarily carried by similar businesses, including, without limitation, commercial general liability, business personal property, fire, public liability, property damage, workers' compensation and interruption of business insurance. Borrower is in compliance with the terms and conditions of such insurance policies.

4.18    No ERISA Plan. Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974, as amended, or any successor act or code and the regulations in effect from time to time thereunder ("ERISA").

4.19    Margin Stock. Borrower owns no Margin Stock which, in the aggregate, would constitute a substantial part of the assets of Borrower, and no proceeds of the Loan will be used to purchase or carry,

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12251147

directly or indirectly, any Margin Stock or to extend credit, directly or indirectly, to any Person for the purpose of purchasing or carrying any Margin Stock.

4.20    Catastrophic Events. Neither Borrower nor any of its properties is or has been affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or other casualty that is reasonably likely to have a Material Adverse Effect. There are no disputes presently subject to grievance procedure, arbitration or litigation under any of the collective bargaining agreements, employment contracts or employee welfare or incentive plans to which Borrower is a party, and there are no strikes, lockouts, work stoppages or slowdowns, or, to the best knowledge of Borrower, jurisdictional disputes or organizing activities occurring or threatened which alone or in the aggregate are reasonably likely to have a Material Adverse Effect.

4.21    No Material Adverse Effect. No event or omission has occurred and no condition exists which has resulted, or is reasonably likely to result, in a Material Adverse Effect.

4.22    Material Contracts. Except as specifically identified and disclosed to Lender in writing, Borrower is not is a party to any Material Contract.

4.23    Broker's Fees. Borrower has not dealt with any person or entity who is or may be entitled to any brokerage commission, finder's fee, loan commission or other sum in connection with signing and entering into this Agreement, the consummation of the transaction contemplated hereby or the making of the Loan by Lender to Borrower, and Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all losses, costs, liabilities and expenses, including attorneys' fees, that Lender may suffer or sustain should such representation or warranty prove to be inaccurate in whole or in part.

4.24    Accuracy. All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or required by this Agreement or any of the other Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any untrue statement of a material fact or omit any material fact necessary to make the same not misleading.

4.25    Anti-Terrorism Laws. Borrower and, to the knowledge of the Borrower, none of its Affiliates (i) is in violation of any Anti-Terrorism Law, (ii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) is a Blocked Person, or is controlled by a Blocked Person, (iv) is acting or will act for or on behalf of a Blocked Person, (v) is associated with, or will become associated with, a Blocked Person or (vi) is providing, or will provide, material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person. Borrower nor, to the knowledge of Borrower, any of its Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

4.26    Nature of Representations and Warranties. Borrower certifies to Lender that all representations and warranties made in this Agreement and all other Loan Documents are true and correct in all material respects and do not contain any untrue statement of a material fact or omit any material fact necessary to make such representations and warranties not misleading. Any such representations and warranties shall remain true and correct in all material respects and shall survive so long as any of Borrower's obligations under this Agreement have not been satisfied or the Loan or any part thereof remains outstanding, and for any applicable statute of limitations period thereafter. Each representation and warranty made in this Agreement, in any other Loan Documents, and in any other document delivered to Lender by Borrower shall be deemed to have been relied upon by Lender, notwithstanding any investigation, inspection or inquiry theretofore or thereafter made by or on behalf of Lender, or any disbursement made by Lender related thereto. The representations and warranties contained in this

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B122E1147

Agreement which are made to the best knowledge of Borrower have been made after diligent inquiry calculated to ascertain the truth and accuracy of the subject matter of each such representation and warranty.

## ARTICLE 5. COVENANTS

Borrower covenants and agrees that so long as any credit hereunder shall be available and until payment in full of the Loan:

5.1 <u>Maintain Records</u>. Borrower shall keep and maintain full and accurate accounts and records of the operations of Borrower according to GAAP and customary practices for Borrower's type of business.

5.2 <u>Notices to Lender</u>. Borrower shall promptly notify Lender in writing of: (i) all material adverse changes in the financial condition of Borrower or any Guarantor; (ii) all litigation and claims and all threatened litigation and claims affecting Borrower or any Guarantor; (iii) the occurrence of any Event of Default, or of any facts then in existence that could become an Event of Default upon the giving of notice or the lapse of time or both; (iv) any Material Adverse Effect; and (v) any change in Borrower's name, place of business or chief executive office.

5.3 <u>Taxes</u>. Borrower shall pay and discharge all lawful claims, including taxes, assessments and governmental charges or levies, imposed upon Borrower, Borrower's income or profits and upon all properties belonging to Borrower, before the date upon which penalties attach thereto.

5.4 <u>Payment of Costs</u>. Borrower shall bear all costs and expenses required to satisfy the terms and conditions of this Agreement, including, without limitation, the reasonable costs and expenses for Lender's counsel in connection with the Loan.

5.5 <u>Insurance</u>. Borrower shall maintain insurance in form, substance and amounts (including deductibles) acceptable to Lender with responsible, financially sound and reputable insurance carriers against such risks and in such amounts as is customarily carried by similar businesses, including, without limitation, commercial general liability, fire, public liability, property damage, workers' compensation and interruption of business insurance, and as may be reasonably requested by Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a Lien as security for the Loan, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require. Borrower shall furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request. If Lender receives any insurance proceeds respecting any loss, damage or destruction of any insured Collateral, Lender at its sole discretion may (A) hold and disburse the proceeds, or a portion thereof, to fund the costs of such repair, rebuilding or replacement as Borrower may elect, subject to such conditions as Lender may establish, or (B) apply the proceeds, or any remaining balance, to reduce the Loan, which application shall be treated as a mandatory prepayment.

5.6 <u>Compliance</u>. Borrower shall comply promptly with all Governmental Requirements applicable to Borrower, Borrower's business activities, and the Collateral and shall cause all conditions in this Agreement to be satisfied at the time and in the manner provided in this Agreement.

5.7 <u>Environmental Compliance</u>. Borrower shall comply in all material respects with any and all Environmental Laws including, without limitation, all Environmental Laws in jurisdictions in which Borrower owns or operates a facility or site, arranges for disposal or treatment of Hazardous Substances, accepts for transport any Hazardous Substances or holds any interest in real property or otherwise, in each case the

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12251147

failure to comply with which could be reasonably expected to have a Material Adverse Effect. Borrower shall furnish to Lender, promptly after receipt thereof, a copy of any notice that Borrower may receive from any Governmental Authority, private Person or otherwise that any material litigation or proceeding pertaining to any environmental, health or safety matter has been filed or is threatened against Borrower, or with respect to any real property in which Borrower holds any interest or any past or present operation of Borrower. Borrower shall not allow the release or disposal of Hazardous Substances on, under or to any real property in which Borrower holds any interest or performs any of its operations, in violation of any Environmental Law the failure to comply with which could be reasonably expected to result in a Material Adverse Effect. Borrower shall defend, indemnify and hold Lender harmless against all costs, expenses, claims, losses, damages, penalties and liabilities of every kind or nature whatsoever (including reasonable attorneys' fees) arising out of or resulting from the noncompliance of Borrower with any Environmental Law or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a Hazardous Substance in connection with any of the Collateral. Such indemnification shall survive any termination of this Agreement.

5.8     Use of Proceeds. Borrower shall not use any part of the proceeds of the Loan, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock or for the purpose of purchasing or carrying or trading in any securities under such circumstances as to involve Borrower or Lender in a violation of Regulations G, T, U or X issued by the Federal Reserve Board.

5.9     Material Contracts. Borrower shall comply with all terms and conditions of all Material Contracts, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any such Material Contracts.

5.10     General Business Operations. Borrower shall (i) preserve and maintain its entity existence and all of its rights, privileges and franchises reasonably necessary to the conduct of its business, (ii) conduct its business activities in compliance with all applicable Governmental Requirements, and (iii) keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted. Without Lender's written consent, Borrower shall not (i) engagement in any business activities substantially different from Borrower's present business, or (ii) liquidate or dissolve Borrower's business. Borrower shall maintain its chief executive office and principal place of business in the United States.

5.11     Maintenance of Assets. Except in the ordinary course of its business as now conducted or as conducted by any business hereafter acquired, Borrower shall not sell, convey, lease, assign, or transfer any part of Borrower's business, assets, or property necessary for the continuance of its business as now conducted or as conducted by any business hereafter acquired, including, without limitation, the selling of any property or other asset accompanied by the leasing back of the same. Borrower shall not merge or consolidate with any other Person.

5.12     Liens. Borrower will not, nor will it permit any subsidiary to, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, securing any debt for borrowed money or any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, or any guarantee of the foregoing, other than the following: Liens securing obligations under the Loan; or Permitted Liens.

5.13     Indebtedness. Borrower shall not directly or indirectly, create, incur, assume, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except for Permitted Indebtedness. Borrower shall not prepay, acquire or otherwise satisfy, in whole or in part, any of its Indebtedness prior to when due, except for Indebtedness owed to Lender.

5.14     Guaranties and other Credit Support. Borrower shall not directly or indirectly make, create, incur, assume, permit to exist, increase, renew or extend any guaranty or other credit support on its part of any Indebtedness or other obligation of any other Person, excluding, any guaranty or other credit support for Indebtedness owed to Lender.

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12351147

    5.15    <u>Prohibited Distributions</u>. Borrower shall make no Distribution if, either before or after giving effect to such Distribution, an Event of Default would occur or has occurred and is continuing.

    5.16    <u>Additional Financial Information</u>. Borrower shall deliver to Lender the following:

    5.16.1  Financial Statement (Accrual Based) for Borrower (Reviewed by a Certified Public Accountant) to be provided annually, as soon as available, but in no event later than one hundred twenty (120) days of fiscal year end.

    5.16.2  Business Tax Returns with all Schedules and applicable K-1's and/or Proof of Extension for Borrower to be provided annually, as soon as available, but in no event later than fifteen (15) days of filing.

    5.16.3  Interim Financial Statements (Accrual Based) for Borrower (Compiled by a Certified Public Accountant) to be provided quarterly, as soon as available but in no event later than forty-five (45) days of quarter end.

    5.16.4  Accounts Receivable and Accounts Payable Aging Reports for Borrower to be provided quarterly, as soon as available but in no event later than forty-five (45) days of quarter end.

    5.16.5  Debt Schedule for Borrower to be provided annually, as soon as available but in no later than thirty-five (35) days of year end.

    5.16.6  Personal Tax Returns with all Schedules and applicable K-1's and/or Proof of Extension for Guarantor to be provided annually, as soon as available, but in no event later than fifteen (15) days of filing.

    5.16.7  Personal Financial Statement for Guarantor to be provided annually no later than April 30 of each year.

    5.16.8  Within thirty (30) days after request, such additional information and statements regarding Borrower, Guarantor or other Persons as Lender may reasonably require.

Borrower shall also deliver the financial reporting required in Paragraph below captioned "MSNLF Required Affirmative Covenant—Additional Reporting Requirements". All such Financial Statements and other financial information shall be prepared in accordance with GAAP, certified by Borrower as being true and correct, in a form acceptable to Lender, and the most recent that has been prepared by or for the subjects thereof. Lender may rely thereon until otherwise notified in writing by Borrower, and may, but shall not be obligated to, verify the information contained therein. From time to time, Lender may receive financial information about Borrower from others, and may answer questions and requests from others seeking credit and experience information about Borrower and its relationships with Lender.

    5.17    <u>Financial Covenants</u>.

    5.17.1  <u>Debt to EBITDA Ratio</u>. No later than one hundred twenty (120) days after the end of each of Borrower's fiscal years beginning with the fiscal year ending December 31, 2021, Borrower shall demonstrate to Lender's reasonable satisfaction, using the Financial Statements and other financial reporting provided pursuant to Paragraph above captioned "Additional Financial Information", that the Debt to EBITDA Ratio measured on the last day of each such fiscal year does not exceed the Maximum Debt to EBITDA Ratio.

    5.17.2  <u>Current Ratio</u>. Borrower shall at all times maintain a Current Ratio of at least the Minimum Current Ratio, which shall be demonstrated to Lender to Lender's reasonable satisfaction no later than one hundred twenty (120) days after the end of each of Borrower's fiscal years beginning with the fiscal year ending December 31, 2021, using the Financial Statements and other financial reporting

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12251147

provided pursuant to Paragraph above captioned "Additional Financial Information", and at such other times within fifteen (15) days after request by Lender.

5.17.3 <u>Minimum Deposit Requirement</u>. Borrower shall at all times maintain primary Deposit Accounts and Cash Management products with Lender up to 15% of the outstanding principal amount of the Loan. Deposit balances are based on average collected balances. The accounts must be opened and funded no later than five (5) days prior to Disbursement, and active no later than thirty (30) days following Disbursement.

5.17.4 <u>Banking Products</u>. Borrower shall at all times maintain a minimum of ten (10) banking products during the term of the Loan. Banking products include, but are not limited to: Deposit Accounts, Remote Deposit Systems, and NetBanker.

5.18    <u>Conveyance or Encumbrance</u>. Without the prior written consent of Lender, Borrower shall not permit Non-Borrower Trustor to sell, convey, transfer, dispose of or further encumber the Property or any portion thereof or interest therein, , in each case either voluntarily, involuntarily or otherwise, or enter into an agreement to do any of the foregoing.

5.19    <u>Title Insurance</u>. If required by Lender, Borrower shall at its expense deliver or cause to be delivered to Lender a Title Policy, which shall be an ALTA lender's policy of title insurance or its equivalent (extended coverage), with a liability limit of not less than the principal amount of the Note, issued by Title Insurer, insuring Lender as to the validity and priority of the Deed of Trust as a second-priority lien (junior only to the Residential Mortgage) on the Property, together with such endorsements and reinsurance or co-insurance agreements as Lender may require. The Title Policy shall contain only such exceptions from its coverage as shall have been approved in writing by Lender. Borrower shall, at its expense, deliver or cause to be delivered to Lender from time to time, within five (5) Business Days after Lender's request therefor, such additional endorsements to the Title Policy as Lender may require.

5.20    <u>Borrower Acknowledgment</u>. California CIVIL CODE Section 2955.5(a) provides as follows: "No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property." For purposes of the foregoing, (i) the term "hazard insurance coverage" means insurance against losses caused by perils which are commonly covered in policies described as a "Homeowner's Policy," "General Property Form," "Guaranteed Replacement Cost Insurance," "Special Building Form," "Standard Fire," "Standard Fire with Extended Coverage," "Standard Fire with Special Form Endorsement," or comparable insurance coverage to protect the real property against loss or damage from fire and other perils covered within the scope of a standard extended coverage endorsement, and (ii) the term "improvements" means buildings or structures attached to the real property. Borrower acknowledges having received this disclosure prior to Non-Borrower Trustor's execution of the Deed of Trust.

5.21    <u>Waiver</u>. Because the Deed of Trust encumbers the Property as security for the note, Borrower gives the following voluntary waiver: to the extent such laws may otherwise apply, Borrower expressly waives any and all laws governing dwellings of one to four units, including but not limited to California Civil Code Section 2898, California Code of Civil Procedure 580(b)(a)(3) and any other law for which the legislative intent was to provide certain protection to owners of residential property as opposed to commercial property, including multi-family property of more than four units, regardless of whether a borrower occupied any unit for any purpose.

5.22    <u>UCC Subordination Agreement</u>. To the extent Lender waives in its sole discretion the condition precedent in Paragraph 3.5.1 relating to the delivery of a UCC Subordination Agreement signed by each UCC Subordination Lender as determined by Lender in its sole discretion, Borrower shall deliver or caused to be delivered to Lender each such waived UCC Subordination Agreement no later than a date after Disbursement determined by Lender and communicated to Borrower.

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12351147

5.23    <u>Beneficial Ownership and Regulatory Compliance</u>. Following any request by Lender, Borrower shall immediately provide information and documentation reasonably requested by the Lender for purposes of compliance with rules and regulations applicable to Lender, including, without limitation, "know your customer", anti-money-laundering, the PATRIOT Act, and beneficial ownership.

5.24    <u>Compliance with Anti-Terrorism Laws</u>. Borrower shall not directly or indirectly, knowingly enter into any agreement or contract with any Blocked Person or any Person listed on the OFAC Lists. Borrower shall immediately notify Lender if Borrower has knowledge that Borrower, any Guarantor or any of their respective Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement is or becomes a Blocked Person or (a) is convicted on, (b) pleads nolo contendere to, (c) is indicted on, or (d) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering. Borrower will not, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

5.25    <u>Additional Provisions Regarding Collateral</u>.

5.25.1    Borrower shall permit any Person designated by Lender, upon reasonable notice and during normal business hours, to visit and inspect any of the properties and offices of Borrower, to conduct audits of any or all of the Collateral, to examine the books and records of Borrower and make copies thereof and to discuss the affairs, finances and business of Borrower with, and to be advised as to the same by, their officers, auditors and accountants, all at such times and intervals as Lender may reasonably request. Borrower shall be responsible for reasonable costs of any such Collateral audits or inspections.

5.25.2    Borrower shall from time to time sign documents to take whatever other actions are requested by Lender to perfect and continue Lender's security interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Borrower appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any security interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination and the continuation of the perfection of Lender's security interest in the Collateral. Borrower shall promptly notify Lender before any change in Borrower's name, including any change to the assumed business names of Borrower. Borrower shall also promptly notify Lender before any change in Borrower's employer identification number, or any change in address or location of Borrower's principal governance office.

5.25.3    Borrower shall keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense. With respect to the accounts receivable, Borrower agrees to keep and maintain such records as Lender may reasonably require, including without limitation information concerning accounts receivable balances and agings. Records related to accounts receivable are or will be located at Borrower's principal place of business as set forth herein.

Loan No.: 10019349                              18                              4847-8866-3507 v.1

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12251147

5.25.4  With respect to the accounts receivable, Borrower represents and warrants to Lender: (i) all account receivable information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (ii) Lender, its assigns or agents, shall have the right at Borrower's expense upon reasonable prior notice (which means at least 24 hours' advance telephonic notice) to inspect, examine and audit Borrower's records, and to confirm with account debtors the accuracy of such accounts receivable. Borrower shall be responsible for reasonable costs of any such accounts receivable audits or inspections conducted during each twelve (12)-month period following Lender's declaration of an Event of Default, and shall be responsible for reasonable costs for up to two accounts receivable audits or inspections conducted at such other times.

5.26    MSNLF Required Affirmative Covenant—Additional Reporting Requirements.

5.26.1  Annual Reporting Requirements. As soon as available, but in any event within 60 days after the end of each fiscal year of the Borrower, the Borrower shall deliver to Lender, financial reporting in a form and substance reasonably acceptable to Lender setting forth the financial information, and where applicable reasonably detailed calculations of the required data, set forth in Table I of Appendix C attached hereto as Exhibit A, as at the end of such fiscal year of the Borrower, which financial reporting and calculations, in each case, shall be true and accurate in all material respects and, where applicable, present fairly in all material respects the financial condition of the Borrower for the period covered thereby in accordance with GAAP, consistently applied.

5.26.2  Quarterly Reporting Requirements. As soon as available, but in any event within 60 days after the end of each fiscal quarter of the Borrower, the Borrower shall deliver to Lender, financial reporting in a form and substance reasonably acceptable to Lender setting forth the financial information, and where applicable reasonably detailed calculations of the required data, set forth in Table II of Appendix C attached hereto as Exhibit A, as at the end of such fiscal quarter of the Borrower, which financial reporting and calculations, in each case, shall be true and accurate in all material respects and, where applicable, present fairly in all material respects the financial condition of the Borrower for the period covered thereby in accordance with GAAP, consistently applied.

### ARTICLE 6. DEFAULT; REMEDIES

6.1    Events of Default. At the option of Lender in its sole discretion, any one or more of the following events shall be an Event of Default:

6.1.1    Failure of Borrower to pay when due any sum payable under the Note or Borrower's failure to pay, within the time specified, any other sum payable under any of the other Loan Documents.

6.1.2    Failure of Borrower to perform any of its obligations under any covenant, condition or agreement set forth in this Agreement, if such failure is not cured within ten (10) days after written notice from Lender if such failure is susceptible to cure (or such longer period as is reasonably determined by Lender to be necessary for completion of the cure, so long as the failure is susceptible to being cured and Borrower begins promptly and thereafter diligently continues to cure the failure).

6.1.3    Failure of Borrower to perform any of its obligations under any covenant, condition or agreement set forth in the Note or any of the other Loan Documents, if such failure is an event of default thereunder and is not cured within the applicable cure period (if any).

6.1.4    Failure of Borrower to timely demonstrate compliance with the financial covenants set forth in the Paragraph of this Agreement captioned "Financial Covenants".

6.1.5    Any representations or warranties made herein or any statement or certificate at any time given in writing by Borrower pursuant hereto or in connection herewith shall be false or misleading in any material respect.

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12251147

6.1.6    Regardless of whether there has been any separate Event of Default relating to the Note and any of the other Loan Documents and regardless of whether the Loan is performing, failure of Borrower to pay, or any default on the payment of, any principal of or any interest on any Indebtedness of Borrower owed to Lender, or any breach with respect to any term of any evidence of such Indebtedness, or of any loan agreement, note, deed of trust, mortgage, indenture or other agreement relating thereto, whether or not waived by Lender.

6.1.7    Regardless of whether there has been any separate Event of Default relating to the Note and any of the other Loan Documents and regardless of whether the Loan is performing, failure of Borrower to pay, or any default on the payment of, any principal of or any interest on any Indebtedness of Borrower owed to any other Person, or any breach with respect to any term of any evidence of such Indebtedness, or of any loan agreement, note, deed of trust mortgage, indenture or other agreement relating thereto, whether or not waived by such Person.

6.1.8    Any material adverse change in the financial condition of Borrower from the financial condition represented to Lender as of the Effective Date.

6.1.9    A judgment, arbitration award, decree or order for the payment of money in excess of $50,000 and not covered by insurance shall be rendered against Borrower that remains unpaid or unstayed and undischarged for a period (during which execution shall not be effectively stayed) of thirty (30) days. Any nonmonetary judgment, arbitration award, decree or order shall be rendered against Borrower that could reasonably expected to have a Material Adverse Effect and either (i) enforcement proceedings shall have been commenced by any person upon such judgment or order, or (ii) there is a period of thirty (30) days during which a stay of enforcement of such nonmonetary judgment or order, by reason of a pending appeal or otherwise, is not in effect.

6.1.10    A court having jurisdiction shall enter a decree or order for relief in respect of Borrower in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Borrower, or for any substantial part of the properties of Borrower, or ordering the winding up or liquidation of the affairs of Borrower; or Borrower shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of Borrower, or for any substantial part of the properties of Borrower, or shall make any general assignment for the benefit of creditors, or shall fail generally to pay its debts as they come due or shall take any action in furtherance of any of the foregoing.

6.1.11    The attachment, levy, execution or other judicial seizure of any Collateral provided under any of the Loan Documents which is not released, expunged, discharged or dismissed before the earlier of (i) thirty (30) days after such attachment, levy, execution or seizure, or (ii) five (5) days prior to the date of any proposed sale of the assets affected thereby, if Lender reasonably determines that such attachment, levy, execution or other judicial seizure of Collateral would have a Material Adverse Effect.

6.1.12    The issuance, sale, assignment, pledge, hypothecation, mortgage or transfer of more than ten percent (10%) of any class of corporate stock or assets of Borrower, or if Borrower is a limited liability company, partnership, joint venture or trust, of more than ten percent (10%) of the beneficial interests, capital, profits, losses or assets thereof, without the prior written consent of Lender; or the occurrence of any material management, organizational or other such change in Borrower, including, without limitation, the occurrence of any material partnership or joint venture dispute, which Lender determines, in its reasonable discretion, will have a Material Adverse Effect; or any amendment or modification of the articles of incorporation, bylaws, operating agreement, partnership agreement, trust agreement or other charter document of Borrower, which Lender determines, in its reasonable discretion, will have a Material Adverse Effect.

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12351147

6.1.13   This Agreement or any of other Loan Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected Lien) at any time and for any reason.

6.1.14   Lender in good faith believes itself insecure.

6.1.15   The occurrence of any of the events enumerated in Paragraphs 6.1.8 through 6.1.11 with respect to any Guarantor. The occurrence of any of the events enumerated in Paragraph 6.1.12 with respect to any Guarantor which is entity.

6.1.16   Any individual Guarantor dies or becomes legally incompetent unless Borrower provides a substitute or replacement guarantor that is of adequate financial strength and otherwise acceptable to Lender, in Lender's reasonable discretion, within sixty (60) days after such death or incompetency.

6.1.17   The occurrence of an Event of Default under the Deed of Trust.

6.1.18   The occurrence of a default or breach under the Residential Mortgage or Residential Mortgage Loan.

6.1.19   The demolition, destruction or substantial damage of the improvements on the Property, if Lender determines that such improvements cannot be restored or rebuilt within a reasonable time, at a cost not exceeding the aggregate amount of the available insurance proceeds and additional funds (if any) advanced by Borrower.

6.1.20   The occurrence of an uninsured casualty with respect to any material portion of the Property, unless (i) Lender determines that the Property so affected can be restored or rebuilt within a reasonable time, and (ii) Borrower promptly following the casualty delivers to Lender funds in the amount necessary to pay all costs and expenses associated with such restoration or rebuilding, to be held by Lender for disbursement on the same basis as insurance proceeds under the applicable provisions of the Deed of Trust.

6.1.21   The filing of any mechanic's lien against the Property, if the claim of lien continues for twenty (20) days without discharge, satisfaction or the making of provision for payment to the satisfaction of Lender.

6.1.22   Without limiting anything in Paragraph 6.1.6, (i) the Borrower or any subsidiary shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness under this Agreement and the other Loan Documents) owing to Lender or any commonly controlled Affiliate of Lender, in each case beyond the applicable grace period with respect thereto, if any; or (ii) the Borrower or any subsidiary shall fail to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure to make a payment, default or other event described in clause (i) or (ii) is to cause such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness; provided that, as used in this clause, the term "Indebtedness" shall mean all debt for borrowed money and any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, and any guarantee of any of the foregoing.

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12351147

6.2     <u>Remedies Upon Default</u>. Upon the occurrence of an Event of Default, Lender may at its option, without demand, presentment or notice, all of which hereby are expressly waived, exercise one or more of the following remedies:

6.2.1    Terminate all credit hereunder and all obligations of Lender to make any further advances or disbursement of Loan proceeds.

6.2.2    Declare the Note and all other sums owing to Lender with respect to the other Loan Documents to be immediately due and payable, whereupon the same shall be due and payable in full.

6.2.3    Exercise its remedies under this Agreement and/or the other Loan Documents.

6.2.4    Exercise any and all other rights and remedies as it shall deem appropriate at law, in equity, or otherwise.

6.3     <u>Lender's Expenditures</u>. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any of the other Loan Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any of the other Loan Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes, together with any other funds spent in exercising or enforcing any of its rights or remedies under the Loan Documents, will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses shall be payable to Lender upon demand.

6.4     <u>Right of Setoff</u>. In addition to any rights and remedies of Lender provided by law, Lender shall have the right, with the prior reasonable consent of Lender but without prior notice to or consent of Borrower (any such notice and consent being expressly waived by Borrower to the extent permitted by applicable law), upon the occurrence and during the continuance of an Event of Default, to setoff and apply any amount owing from Lender to Borrower against the amounts due from Borrower to Lender. The right of setoff may be exercised by Lender against Borrower or against any trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of Borrower or against anyone else claiming through or against Borrower or such trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of setoff may not have been exercised by Lender at any prior time. Lender agrees promptly to notify Borrower after any such setoff and application made by Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

6.5     <u>Remedies Cumulative</u>. Lender shall have the right to enforce one or more remedies hereunder successively or concurrently, and any such action shall not stop or prevent Lender from pursuing any further remedy which it may have hereunder or by law.

6.6     <u>Jury Waiver</u>. To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

6.7     <u>Application of Proceeds</u>. Upon the occurrence and during the continuance of an Event of Default, Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Lender on account of the Loan Documents. Any money collected by Lender pursuant to this Article (whether by means of voluntary payment, foreclosure or otherwise) shall be promptly applied as follows unless otherwise required by provision of applicable law:

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-FA3B12351147

6.7.1    First, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Lender with respect to this Agreement, the other Loan Documents or the Collateral, including, without limitation, all costs and expenses of collection, attorneys' fees, court costs and foreclosure expenses.

6.7.2    Next, to the payment of all accrued interest on the Note.

6.7.3    Next, to the payment of all principal on the Note.

6.7.4    Next, to the payment of any other amounts owed by Borrower to Lender under this Agreement or the other Loan Documents.

6.7.5    Next, to Borrower or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.

## ARTICLE 7. MISCELLANEOUS

7.1    <u>Subsidiaries and Affiliates of Borrower</u>. To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

7.2    <u>Authorization to Pull Credit</u>. The undersigned specifically acknowledges and agrees that: (i) one or more credit reports may be obtained on each of the undersigned, without further notice, in connection with the Loan, any renewal, modification, extension, review or collection thereof; (ii) the undersigned has a continuing obligation to (a) amend and /or supplement the information provided in or given in connection with this Agreement or any Guaranty if any of the material facts which have been given in connection with the Loan change, and (b) immediately update all financial information should more current information become available; (ii) in the event payments on the Loan become delinquent, the Lender may report the names and account information of the undersigned to a credit reporting agency; and (iv) ownership, administration, or servicing of the Loan may be transferred without notice.

7.3    <u>Patriot Act Notification</u>. Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrower, which information includes the name and address of Borrower and such other information that will allow Lender to identify Borrower in accordance with the USA PATRIOT Act.

7.4    <u>Survival of Warranties</u>. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and the Note and disbursement(s) of the Loan.

7.5    <u>Indemnity</u>. Borrower hereby agrees to defend, indemnify, protect and hold Lender and its directors, officers, employees, partners, attorneys, agents, participants, successors and assigns harmless from and against all losses, damages, liabilities, claims, actions, judgments, costs and attorneys' fees which Lender may incur arising out of this Agreement or any of the other Loan Documents or the transactions contemplated hereby, including, without limitation: (i) the making of the Loan and the use of the Loan proceeds, except for violations of banking laws or regulations by Lender; (ii) Borrower's failure to perform any obligations as and when required by this Agreement or any of the other Loan Documents; (iii) the failure at any time of any of Borrower's representations or warranties to be true and correct in all material respects; (iv) any Lien or claim which may be alleged to have arisen on or against the Collateral or any part thereof under the laws of the local or state government or any other Governmental Authority or quasi-Governmental Authority or any liability asserted against Lender with respect thereto; (v) any tax attributable to the execution, delivery, filing or recording of this Agreement or the Note; or (vi) any act or omission by Borrower or other Person (other than Lender or its agents) with respect to the Collateral, the Property, or any portion

DocuSign Envelope ID: C314F439-FBDF-4FA8-9E24-5A3B12251147

thereof. Borrower shall pay immediately upon demand any amounts owing under this indemnity, together with interest from the date the indebtedness arises until paid at the rate of interest applicable to the principal balance of the Note. Borrower's duty to defend, indemnify, protect and hold Lender harmless shall survive the termination of this Agreement and release and cancellation of the Note.

7.6     Further Assurances. At Lender's reasonable request and at Borrower's expense, Borrower shall execute, acknowledge and deliver all other instruments and perform all other acts necessary, desirable or proper to carry out the purposes of the Loan Documents or to perfect and preserve any Liens created by the Loan Documents.

7.7     Form of Documents. The form and substance of all documents, instruments and forms of evidence to be delivered to Lender under the terms of any of the Loan Documents shall be subject to Lender's approval, and shall not be modified, superseded or terminated in any respect without Lender's prior written approval.

7.8     Not Assignable. Neither this Agreement nor any rights of Borrower to receive any sums, proceeds or disbursements under this Agreement or under the Note may be assigned, pledged, hypothecated or otherwise encumbered by Borrower, without the prior written consent of Lender. Subject to the foregoing restrictions, this Agreement shall inure to the benefit of Lender, its successors and assigns, and shall bind Borrower and its permitted heirs, executors, administrators, successors and assigns.

7.9     Participations and Pledges. Subject to the applicable limitations and restrictions set forth in the MSNLF Lender Transaction Specific Certifications and Covenants signed by Lender in connection with the MSNLF, Lender may at any time sell or grant participations in, or otherwise dispose of in any way, all or any part of the Loan. Lender need not provide Borrower with notice of any such participations or dispositions. Borrower shall, on Lender's request, sign and deliver such further instruments as may in Lender's reasonable opinion be necessary or advisable to effect such disposition, including, without limitation, new notes to be issued in exchange for any note(s) required under this Agreement. If Lender does elect to sell participations in the Loan, Lender may forward to each participant and prospective participant all documents and information related to the Loan in Lender's possession, including, without limitation, all Financial Statements, whether furnished by Borrower or otherwise, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. In addition to the foregoing, Lender shall at all times have the right to grant security interests in, to pledge and/or to hypothecate all or any portion of its interest in the Loan, including without limitation as collateral in connection with discount window advances, extensions of daylight credit or master account activity, or other programs of the Federal Reserve System or any Federal Reserve Lender.

7.10     Attorneys' Fees. Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement or any of the other Loan Documents. Lender may hire or pay someone else to help enforce this Agreement and any of the other Loan Documents, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

7.11     Governing Law. The Loan Documents shall be governed by and construed in accordance with the laws of the State of California, except to the extent preempted by Federal law. Borrower and all Persons and entities in any manner obligated to Lender under the Loan Documents hereby consent to the jurisdiction of any Federal or State court within the State of California and also consent to service of process by any means authorized by California or Federal law.

7.12     Choice of Venue. If there is a lawsuit in connection with this Agreement or any of the other Loan Documents, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-FA3B12351147

7.13     <u>No Third Parties Benefited</u>. No Person other than Lender and Borrower and their permitted successors and assigns shall have any right of action under any of the Loan Documents.

7.14     <u>Time of the Essence</u>. Time is hereby declared to be of the essence of this Agreement and of every part of this Agreement.

7.15     <u>Severability</u>. If any provision of the Loan Documents is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from the Loan Documents, and all remaining parts shall continue in full force as though the invalid, illegal or unenforceable portion had never been part of the Loan Documents.

7.16     <u>Joint and Several Obligations</u>. The obligations of Borrower shall be the joint and several obligations of all Persons comprising Borrower.

7.17     <u>Gender</u>. When the context and construction so require, all words used in the singular in this Agreement shall be deemed to have been used in the plural, the masculine shall include the feminine and neuter, and vice versa.

7.18     <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of Lender or any holder of any of the Note in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. All rights and remedies existing under this Agreement and the Note are cumulative to, and not exclusive of, any rights or remedies otherwise available.

7.19     <u>Modification</u>. This Agreement may not be amended, waived or modified in any manner without the written consent of Lender and Borrower.

7.20     <u>Integration and Interpretation</u>. The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated in this Agreement and supersede all prior negotiations. The Loan Documents shall not be modified except by written instrument signed by Borrower and Lender. Any reference to the Loan Documents themselves in any of the Loan Documents shall include all amendments, renewals or extensions approved by Lender.

7.21     <u>Notices</u>. Unless otherwise specifically provided herein, all notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered upon confirmed personal delivery, or by Federal Express (or similar reputable express delivery service), or as of the second business day after mailing by United States certified mail, return receipt requested, postage prepaid, addressed to the address of Borrower or Lender appearing in Article 1 (until notice of a change thereof served as provided in this Paragraph). In any case where this Agreement authorizes notices, requests, demands or other communications by Borrower to Lender to be made by telephone or other, Lender may conclusively presume that anyone purporting to be a Person designated in any incumbency certificate or other similar document received by Lender is such a Person.

7.22     <u>Paragraph Headings</u>. The various headings used in this Agreement are inserted for convenience only and shall not affect the meaning or interpretations of this Agreement or any provision hereof.

7.23     <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

7.24     <u>Conflicts with Borrower Certifications and Covenants</u>. It is the intent of the parties that Borrower shall at all times be in compliance with the Borrower Certifications and Covenants. In the event and to the extent this Agreement or any of the other Loan Documents provides that Borrower may take or fail to take some action which is contrary to the Borrower Certifications and Covenants, the contrary provision in this Agreement or in any of the other Loan Document shall be superseded by the relevant

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-FA3B12251147

provision of the Borrower Certifications and Covenants and shall be interpreted in a manner so at to ensure Borrower is in compliance with the Borrower Certifications and Covenants. To the extent (i) any term or condition in this Agreement or any of the other Loan Document is more restrictive as to the Borrower than any similar term or condition in the Borrower Certifications and Covenants, or (ii) any term or condition in the Borrower Certifications and Covenants is more restrictive as to Borrower than any similar term or condition in this Agreement or any of the other Loan Documents, then in either case the more restrictive term and condition shall apply.

[*Signature page follows*]

Loan No.: 10019349                                    26                                    4847-8866-3507 v.1

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-FA3B122E1147

**IN WITNESS WHEREOF**, the parties have signed and entered into this Agreement as of the day and year first above written.

**BORROWER:**              INTREPID STUDIOS, INC., a California corporation

By _____              12/9/2020 | 6:33:32 PM PST
    78F53B82AA934F6...
    John Moore, President


**LENDER:**                COMMERCEWEST BANK

By _____              12/10/2020 | 8:16:07 AM PST
    6A2795FDDD56407...
Name _Eddie Sung_____
Title___AVP/Credit Analyst Manager____

Signature Page to Loan Agreement                                    4847-8866-3507

DocuSign Envelope ID: C314F439-EBDF-4FA8-9E24-5A3B12351147

**EXHIBIT A**

**Appendix C: Required Financial Reporting**

**See attached.**

4847-8866-3507 v.1