# EXHIBIT 3

Samuel A. Schwartz, Esq.
  (admitted *pro hac vice*)
Nevada Bar No. 10985
saschwartz@nvfirm.com
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

Samuel B. Strohbehn, Esq.
California Bar No. 257697
sstrohbehn@rosinglaw.com
Irean Z. Swan, Esq.
California Bar No. 313175
iswan@rosinglaw.com
Maddie Rudge, Esq.
California Bar No. 362727
mrudge@rosinglaw.com
ROSING POTT & STROHBEHN LLP
770 1st Avenue, Suite 200
San Diego, California  92101
Telephone: (619) 235-6000

*Attorneys for Defendants Robert Dawson,
Ryan Ogden, Theresa Fette, Aaron Bartels,
and TFE Games Holdings, LLC*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT DAWSON; RYAN OGDEN; THERESA FETTE; AARON BARTELS; and TFE GAMES HOLDINGS, LLC,<br><br>Defendants,<br><br>and<br><br>INTREPID STUDIOS, INC.,<br><br>Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65**<br><br>*Filed concurrently with Declaration of Robert Dawson and Declaration of Theresa Fette*<br><br>Judicial Officer: Hon. Linda Lopez<br>Courtroom: 14B (14th Floor)<br>Hearing Date: April 2, 2026<br>Hearing Time: 10:00 AM PDT<br><br>Action Filed: February 14, 2026<br>Trial Date: Not Set |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.     INTRODUCTION**

The facts of this matter have changed materially since the hearing on March 18, 2026. Indeed, on March 25, 2026, Defendant TFE Games Holdings, LLC ("**TFE**") set aside the Article 9 Sale (defined herein) and returned the Collateral (defined

herein), including *Ashes of Creation*, to Intrepid Studios, Inc. ("**Intrepid**"). (*See* Declaration of Robert Dawson (the "**Dawson Declaration**"), ¶¶ 4-5; Exhibit A). As such, Intrepid (not TFE) now owns and controls the Collateral, including *Ashes of Creation,* subject to TFE's extant and legally enforceable security interests in the same (collectively, the "**TFE Lien**").

Based on the foregoing, Steven Sharif's (the "**Plaintiff**" or "**Sharif**") request for a preliminary injunction is moot as the crux of Sharif's argument was the need to protect Intrepid's trade secrets from disclosure by TFE based on the flawed Article 9 Sale. Moreover, consistent with the mandate set forth in FRCP 65(d)(1)(C), the Court's *Order Granting Ex Parte Motion for Temporary Restraining Order* [ECF No. 20] (the "**TRO**") sets forth the specific acts with respect to which Defendants are currently proscribed and enjoined from engaging – and none of such adverse acts can now be accomplished in light of the Collateral's restoration to Intrepid. (*See* ECF No. 20, pgs. 10-13 of 13; ¶¶ 1-6).

The Court's TRO is consistent with Plaintiff's claims for injunctive relief set forth in his Complaint. (*See, e.g.,* ECF No. 1, pgs. 26-27 of 39, ¶¶ 94-95; pgs. 29-30 of 39, ¶¶ 105-106). Plaintiff argues in his Complaint, in relevant part, as follows:

94. As a direct and proximate result of Defendants' wrongful acts *alleged herein*, the Company has been harmed, *and is at imminent risk of being further irreparably harmed by the loss of access to and use of its intellectual property and its Trade Secret Materials if Defendants are not preliminarily and permanently enjoined. The Company has no adequate remedy at law because the loss of the Trade Secret Materials would deprive the Company of the ability to finish Ashes of Creation, the project it has pursued for the past decade.*

95. Accordingly, Plaintiff requests that the Court enjoin Defendants from accessing, using, or selling the Company's Trade Secret Materials.

*** *

105. As a direct and proximate result of Defendants' wrongful acts *alleged herein*, the Company has been harmed, *and is at imminent risk of being further irreparably harmed by the loss of access to and use of its intellectual property and its Trade Secret Materials if Defendants are not preliminarily and permanently enjoined. The Company would have no adequate remedy at law because the loss of the Trade Secret*

> *Materials would deprive the Company of the ability to finish Ashes of Creation, the project it has pursued for the past decade.*
>
> 106. Accordingly, Plaintiff requests . . . that the Court enjoin Defendants from accessing, using, or selling the Company's Trade Secret Materials.

(*See id.*) (emphasis added).

In addition to similar requests for entry of an order enjoining certain conduct stemming from Defendants' foreclosure of the Collateral, Plaintiff's Complaint also "…seeks injunctive and equitable relief to remedy harm to Intrepid and Derivative Plaintiffs from Defendants' continued efforts to irrevocably destroy the Company in pursuit of their own greed." (*Id.* at pg. 4 of 39, ¶ 7). Plaintiff's requests for injunctive relief in the Complaint also include the following:

> As a direct and proximate cause of Dawson's and TFE"s unlawful actions, and the Board Defendants' unlawful actions in ratifying *this transaction*, the Company is entitled to damages and injunctive relief. *Intrepid and its shareholders have and will continue to be irreparably harmed should the Board Defendants' unlawful foreclosure efforts in violation of the law succeed.*

(*Id.* at pg. 31 of 39, ¶ 114).

In the Complaint's prayer for relief, Plaintiff requests, "An order enjoining Defendants from accessing, using, or selling the Company's Trade Secret Materials[.]" (*Id.* at pg. 37 of 39, ¶ 1). The Complaint effectively closes with the following request from Plaintiff for, "Preliminary and permanent injunctive relief prohibiting Defendants from *continuing the wrongful acts alleged herein, including from continued misappropriation of the Company's trade secrets and from engaging in similar misconduct in the future[.]*" (*Id.* at pg. 38 of 39, ¶ 12) (emphasis added).

As the language quoted above and taken directly from the TRO and Plaintiff's Complaint demonstrates, Plaintiff's request for injunctive relief through the issuance of a preliminary injunction has been rendered moot by TFE's restoration of the Collateral to Intrepid. With the Collateral returned, TFE can now lawfully conduct a public disposition of the Collateral pursuant to section 9610(c) of the California Commercial Code, as admitted by Sharif. (*See* ECF No. 53, pg. 3 of 7, lines 6-9 and

17-25; pg. 4 of 7, lines 9-17). Accordingly, there is no longer a need to enjoin Defendants as they intend to proceed going forward in pursuit of a public foreclosure sale as Plaintiff himself contends should have been pursued here. Sharif requested a public disposition of the Collateral, so Intrepid must be permitted to pursue that course of action to maximize the value of *Ashes of Creation*, among the other Collateral.

Not only can Plaintiff no longer make any showing of irreparable harm (let alone a showing sufficient to justify preliminary injunctive relief), but Sharif cannot demonstrate a likelihood of success on the merits because Defendants neither misappropriated any trade secrets of, or breached any fiduciary duties to, Intrepid; again, the Collateral has been restored to Intrepid without any purported unlawful disclosure or undue delay. To the contrary, it was Sharif who breached his duties to Intrepid when he misappropriated millions of dollars for his personal benefit and ran Intrepid's operations into the ground. Sharif's mismanagement and (perhaps) malfeasance rendered Intrepid hopelessly insolvent well before any of Defendants' alleged wrongful foreclosure activities took place.

The purpose of injunctive relief is to prevent future harm, not to punish conduct committed in the past and long-since completed. In light of the Collateral's restoration to Intrepid, Plaintiff lacks standing to seek further injunctive relief from this Court as he can no longer demonstrate what future harms such injunctive relief is intended or designed to prevent. Therefore, Plaintiff's request for preliminary injunctive relief should be denied, because he cannot satisfy FRCP 65's requirements for such relief.

## II.    FACTUAL BACKGROUND[1]

### A.    SHARIF DEVISES AND DEEPENS INTREPID'S INSOLVENCY.

Intrepid was a startup video game development company founded in or about

---

[1]    To avoid redundancy, Defendants incorporate the requested judicial notice of the amended complaint and a reply brief with exhibits regarding a motion for preliminary injunction in the Nevada state court case of *TFE Games Holdings, LLC v. Sharif, et al.*, Case No. A-26-939022-B [ECF No. 23] and the Order granting that request [ECF No. 55].

2015 by Plaintiff. Sharif was the Chief Executive Officer and a director of Intrepid and was the primary point of contact who solicited and obtained loans and investments for the company. Non-party John Moore ("**Moore**") served as Intrepid's Chief Financial Officer and was Sharif's business partner, as well as his spouse. Moore worked closely with Sharif in managing Intrepid's finances and dealings with investors.[2]

Intrepid's main operational focus was an online role-playing video game called *Ashes of Creation.* During its early years, Intrepid generated little to no meaningful revenue and relied almost entirely on outside financing to fund its development and operations. Throughout its history, Intrepid raised at least $120,000,000 from various sources, including private investments and loans. Sharif publicly portrayed himself as heavily invested in Intrepid and *Ashes of Creation*, both financially and as the driving force behind its development. At all relevant times, Sharif exercised dominant control over Intrepid's fundraising activities, the disbursement of capital, and communications with investors. Major financial decisions – including whether loan proceeds would be used for operations, insider compensation, or other purposes – required Sharif's approval or occurred with his knowledge. Moore, in his role as Chief Financial Officer, implemented and recorded the financial treatment of transactions directed or approved by Sharif.

Defendant Robert Dawson extended a series of loans to Intrepid between 2022 and 2025 in the aggregate principal amount of $78,480,831.54, as evidenced by multiple written promissory notes (collectively, the "**Notes**"). (*See* ECF No 23). To secure repayment of the Notes, Intrepid executed a Pledge and Security Agreement

---

[2]    Notably, in a prior submission, Defendants indicated that Sharif personally guaranteed the CommerceWest Bank loan to Intrepid, but this has since been determined to be incorrect. It was Moore who personally guaranteed the CommerceWest Bank loan to Intrepid. Moore is Sharif's spouse, so contrary to his declaration (ECF 36-2, Exhibit C, ¶ 42), Sharif (or his community estate) received a benefit from directing CommerceWest Bank to the Valve receivable. (*See* Declaration of Theresa Fette (the "**Fette Declaration**"), ¶¶ 5-6; Exhibit D).

dated March 23, 2022 (the "**Security Agreement**"), granting Dawson a security interest and lien in and to substantially all assets of Intrepid (the "**Collateral**"). (*See id.)*. Each of the Notes was secured by the Security Agreement. (Dawson Declaration, ¶ 7). Dawson also owns more than sixty-four percent (64%) of the equity of Intrepid while Sharif owns less than five percent (5%). (*See* ECF No 23).

On or about January 24, 2022, Defendant Theresa Fette agreed to loan up to $1,000,000 to Intrepid. In connection with that transaction, Intrepid executed a written Convertible Promissory Note dated January 24, 2022, in favor of Fette Holdings, LLC, her investment vehicle, in the principal amount of $1,000,000. (*See id.*).

During the same period that Dawson, Fette, and other investors were funding Intrepid's operations, Intrepid accounting records reflect Intrepid being run as a quasi-grant program for Plaintiff's family and friends, with substantial payments to insiders, family members, or related individuals, including but not limited to Sharron Sharif, Sharif's mother, totaling approximately $1,345,000 or more. It has since become clear that Sharif and Moore systematically withdrew substantial sums from Intrepid for the benefit of themselves and family members under the guise of shareholder loans, inflated compensation, or other insider payments. In effect, Sharif and Moore used Intrepid and its investor funds as a personal slush fund.

## B.    ATTEMPTS TO FIND A BUYER; THE ARTICLE 9 SALE.

During 2025, Intrepid ran a process to identify a buyer or investor with Aream & Co. ("**Aream**"), a well-known video gaming investment banker. Fette personally participated in and oversaw the investment process with Aream, and spoke to at least ten (10) potential investors and buyers. Not one party was willing to either invest in Intrepid or purchase its assets. (*See* ECF No 23). In addition, there was a marked divergence between the financial picture Plaintiff presented[3] investors comprising

---

[3]    Plaintiff presented the Projected Monthly Cash Flow for 2022 and 2023 to the Individual Defendants to solicit their investments. The Projected Monthly Cash Flow for 2022 and 2023 look nothing like the financial reality of Intrepid presented in the

Defendants here versus what was actually reflected in Intrepid's balance sheets. (*See* Dawson Declaration, Exhibit B; *see also* Fette Declaration, Exhibit C). As this evidence demonstrates, Plaintiff had irreparably damaged Intrepid financially well in advance of Defendants' alleged unlawful foreclosure of the Collateral – an act that has now, in any event, been voluntarily set aside by Defendants in favor of pursuing a public foreclosure.

On March 25, 2026, TFE returned the Collateral to Intrepid through an Assignment Agreement and Bill of Sale, which stopped the conduct complained of by Plaintiff. (*See* Dawson Declaration, Exhibit A).

## III.    PROCEDURAL HISTORY

The complaint in the Nevada state court case was filed first on February 9, 2026, and the amended complaint was filed on February 11, 2026. The Nevada TRO Motion[4] was filed on February 17, 2026, and the initial hearing took place on February 19, 2026. The Nevada Court's Findings of Fact, Conclusions of Law and Temporary Restraining Order was issued on February 24, 2026, which, in part, scheduled a continued hearing on March 9, 2026, and ordered, pursuant to a stipulation of the parties, that the status quo be maintained through the time of the continued hearing. A further continued hearing is currently set for April 9, 2026.

On February 14, 2026, Sharif, as an individual and derivatively on behalf of Intrepid, filed suit against Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels (collectively, the "**Individual Defendants**") and TFE before this Court for:

1.  Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq. (derivative; against

_____

Balance Sheets and Income Statements for those same years. (*See* Dawson Declaration, Exhibit B; *see also* Fette Declaration, Exhibit C). For example, Sharif projected Intrepid to have $██████████ cash position at the end of 2023; in reality, Intrepid was negative by $█████████ at the end of 2023. *Id.* This is a negative swing of approximately $██ million. *Id.*

[4]    Plaintiff's *Ex Parte Motion for Temporary Restraining Order Pursuant to NRCP 65(b)(1) or NRS 31.859; Alternatively, Ex Parte Application for Order Shortening Time on Motion for Temporary Restraining Order Pursuant to NRCP 65(b)(1) or NRS 31.859* (the "**Nevada TRO Motion**").

all Defendants);

2. Misappropriation of Trade Secrets under California's Uniform Trade Secret Act, Cal. Civ. Code §§ 3426, et seq. (derivative; against all Defendants);

3. Violations of California Commercial Code §§ 9101, et seq. (derivative; against all Defendants);

4. Breach of Fiduciary Duty (derivative; against all Individual Defendants);

5. Aiding and Abetting Breach of Fiduciary Duty (derivative; against TFE);

6. Corporate Waste (derivative; against all Individual Defendants);

7. Intentional Infliction of Emotional Distress (direct; against all Individual Defendants); and

8. Civil Conspiracy (direct and derivative; against all Defendants).

(*See* ECF No. 1).

On March 2, 2026, Sharif filed an *ex parte* motion for temporary restraining order which the Court granted on March 4, 2026, that, among other things, enjoined Defendants from accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute the trade secrets of Intrepid and set a preliminary injunction hearing for March 18, 2026, which was taken off calendar as a result of the Motion to Dissolve that was filed by TFE. On March 18, 2026, the Court denied the Motion to Dissolve and re-set the briefing schedule and the hearing on the preliminary injunction to April 2, 2026. On March 25, 2026, TFE voluntarily set aside the Article 9 Sale in favor of pursuing the route Plaintiff has admitted is the lawful and proper route for TFE to realize upon the Collateral: a public foreclosure sale conducted in strict compliance with the California Commercial Code.

## IV.   LEGAL STANDARD

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20,

129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The plaintiff "must establish that irreparable harm is *likely*, not just possible[.]" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.*

Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four required elements set forth above. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (per curiam); *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion") (quoting *Mazurek*, 520 U.S. at 972) (emphasis in original).

"Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). Therefore, in deciding a motion for a preliminary injunction, the Court has broad discretion to consider all arguments and evidence, including hearsay and other inadmissible evidence, declarations from interested parties, and arguments raised for the first time in a reply. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008).

Defendants respectfully call upon the Court to bear in mind that injunctive relief is aimed at preventing future harms and/or continuing or recurring harms, not punishing prior and completed acts. *See, e.g., United States v. Oregon Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations

by indictment or action for damages by those injured."). Indeed, injunctive relief must be denied if conduct alleged as harmful has been discontinued. *See, e.g., Swanigan v. City of Chi.*, 881 F.3d 577, 583 (7th Cir. 2018) ("Because an injunction is a forward-looking remedy, a plaintiff seeking this form of relief has standing to sue for an alleged future injury only if the threatened injury is certainly impending or there is a substantial risk that the harm will occur." (internal quotation marks and citations omitted).

## V.    LEGAL ARGUMENT[5]

### A.    THE COLLATERAL'S RESTORATION NEGATES INJUNCTIVE RELIEF.

The only claims for relief upon which the temporary restraining order is based are (a) the "Article 9 Claim" and (b) the "Misappropriation of Trade Secrets Claims." *See* TRO, pgs. 6-8 of 13. The Court found that TFE's decision not to hold a public disposition of the Collateral was not justified or excused by the great lengths that Intrepid went to in order to market *Ashes of Creation*, so TFE returned the Collateral to Intrepid.

California law permits TFE to return the Collateral and redo and rectify a foreclosure sale. Indeed, a secured creditor who initially conducted a deficient Article 9 sale may mitigate damages by conducting a subsequent compliant sale. *See Pws, Inc. v. Ban*, 234 Cal. App. 3d 223 (1991). In *Pws, Inc. v. Ban*, the secured lender initially conducted a foreclosure sale with an improper notice. *Id.* Recognizing the defect, the secured creditor held a new sale with a proper notice and purchased the collateral again. *Id.* The Court held that a secured creditor may pursue a deficiency judgment after a foreclosure sale under California Uniform Commercial Code § 9504, provided the creditor strictly complies with the statute in conducting the sale. *Id.* The

---

[5]    Defendants will address *Colorado River* abstention and the Anti-Injunction Act, separately, in motion to stay which Defendants expect to file before the hearing on April 2, 2026.

10                                    26cv00965-LL-MMP

Court held:

> Where, as here, the secured creditor has noticed the sale, purchased the collateral and not yet disposed of the collateral to some third party, we see no reason why the creditor cannot treat the proceedings as null and void and start over. It may be stretching things a bit to term this conduct a rescission but the analogy is apt. A contract may be rescinded if all the parties to it consent.

*Pws, Inc. v. Ban*, 234 Cal. App. 3d 223, 228, 285 Cal. Rptr. 598, 600 (1991). Thus, *Pws, Inc. v. Ban* demonstrates that a secured party can mitigate damages by rectifying procedural defects in a subsequent sale that complies with the statutory requirements of notice and commercial reasonableness. Because TFE has restored the Collateral to Intrepid, both of these claims are moot, no threatened injury exists any longer requiring injunctive relief – let alone harm that is certainly impending or has a substantial risk of occurring.

Sharif's remaining tort claims against Defendants will also fail because the Individual Defendants did not breach their fiduciary duties to Intrepid. Before the Article 9 Sale, Intrepid hired Aream to locate an investor or buyer for *Ashes of Creation*. Over roughly one year, Aream contacted no less than 42 individual parties, ten of whom interviewed Intrepid (including Sharif), two of whom accessed a data room, but none of whom offered to buy or invest in *Ashes of Creation*.[6] Sharif has offered no evidence demonstrating that Defendants did not act within the parameters of the business judgment rule when deciding to pursue the Article 9 Sale after the Aream process failed to produce a buyer or investor or that such a decision was entirely fair. Sharif has similarly offered no evidence that TFE's credit bid of $40,372,831.54 for the Collateral, including *Ashes of Creation*, was too low or that Sharif had a ready, willing, and able buyer to purchase Intrepid or *Ashes of Creation*. Likewise, Sharif will be unable to show Defendants committed corporate waste, nor

---

[6]    This process run by Aream and funded by Defendant Dawson was discussed at length in the Reply in Support of the Motion to Dissolve [ECF No. 36] and is hereby incorporated herein.

that there was a conspiracy against Intrepid. The Individual Defendants undertook a very thorough process before allowing TFE to proceed with the Article 9 Sale. Despite the procedural issue, Defendants are confident that no stone was left unturned. At no point since the Aream process failed has Sharif presented a viable alternate plan to salvage Intrepid's operations, complete work on *Ashes of Creation*, and finally bring that game to market. Tellingly, he does not have one now. Defendants, however, have always worked towards the goal of maximizing the value of the Collateral, especially *Ashes of Creation*. Thus, Sharif will not succeed in the merits of the claims because (i) the Article 9 and Trade Secrets Claims are moot, (ii) the Individual Defendants discharged their fiduciary duties to Intrepid in good faith and within the parameters of the business judgment rule or in a manner that was entirely fair, and (iii) Sharif will fail to show any damages to Intrepid following the conclusion of the public disposition. Therefore, the Court must deny the request for a preliminary injunction as an injunction cannot issue without a showing of a likelihood of success on the merits.

**B.   NO IRREPARABLE HARM WILL OCCUR TO INTREPID.**

Now that TFE has restored the Collateral, there is no irreparable harm that can come to Intrepid's trade secrets. TFE can no longer misappropriate *Ashes of Creation* based on the flawed Article 9 Sale as it does not own or control the assets any longer. Under *Alliance for the Wild Rockies*, Sharif is required to show that irreparable harm is likely to occur; this is a showing he simply can no longer make as the Collateral has been restored to Intrepid. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). As Sharif requested, TFE will pursue its foreclosure remedies by way of a public auction under the California Commercial Code to maximize the value of the Collateral. Accordingly, an injunction cannot be issued without a showing of irreparable harm, so the Court must deny the request for a preliminary injunction.

/ / /

### C.      THE BALANCE OF HARDSHIPS FAVORS DEFENDANTS.

The balance of hardships strongly favors Defendants because TFE has returned the Collateral to Intrepid for TFE to undertake a public disposition pursuant to Cal. Com. Code § 9610(c) to maximize value of *Ashes of Creation*, among the other Collateral. Indeed, much of the TRO's analysis of this factor stemmed from (1) the allegedly unlawful Article 9 sale and (2) the fear that Intrepid's trade secrets stood to be dissipated. The restoration of the Collateral to Intrepid dispenses with these considerations. Instead, what remains is the very grim financial reality and bleak future prospects facing Intrepid.

At no point have either Intrepid or Plaintiff contested the validity, amount, or priority of the outstanding indebtedness owed by Intrepid to Defendants; nor has there been any legal challenge to Defendants' asserted lien rights. No party here disputes that Intrepid no longer has any employees and, while the TRO and further injunctive relief are maneuvered by Plaintiff here like pieces on a chess board, such maneuvers cannot and do not recapitalize Intrepid, restore Intrepid's employees to their prior posts, or instill confidence in the game-playing public or investor community. The capital stack facing Intrepid is a testimony to its hopeless insolvency. Continued legal maneuvering in the form of injunctive relief only forestalls the inevitable. And here is a point on which Plaintiff and Defendants agree: *Ashes of Creation* and the Collateral must be placed in the hands of another entity to maximize its value. Here, the Court need only recall that one of the alleged injuries about which Plaintiff complained during the course of this litigation is the alleged freezing out of a potential investor purportedly identified by Plaintiff from the foreclosure sale process. In that allegation of injury lies the tacit admission that even Plaintiff is forced to acknowledge: again, that *Ashes of Creation* and the Collateral must be placed in the hands of another entity to maximize its value.

Further injunctive relief only positions the market to move on and for value to dissipate. Defendants extended massive amounts of credit. That credit is now in

default. Intrepid lacks the means to solve this problem. The balance of the equities clearly and sharply tilts in favor of Defendants and against the issuance of any further injunctive relief here.

If the preliminary injunction is issued, the hardship to both Intrepid and the Individual Defendants would be significant because (arguably) the Individual Defendants would be enjoined from causing Intrepid to pursue the public disposition of the Collateral. This outcome would be contrary to Sharif's request for a public disposition and would stifle the value remaining in *Ashes of Creation*. By contrast, if the preliminary injunction is not issued, there is minimal hardship to Sharif as he has advocated for a public disposition. Thus, without ownership of the Collateral, there is no reason to enjoin Defendants, and thus, the hardships are borne entirely by Defendants. Therefore, a preliminary injunction should not be issued.

**D.   A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST.**

Lastly, rejecting the preliminary injunction serves the public interest as it promotes preserving and maximizing the value of assets such as *Ashes of Creation* that have a diminishing value and a small window of time for a third-party to rehabilitate and relaunch the game before the customers and developers move on to other games permanently. Losing the value of the Collateral would be the worst outcome and is the reason that TFE set aside the Article 9 Sale and transferred back the Collateral. Thus, it is not in the public interest to prevent TFE from conducting the public disposition of the Collateral or from precluding the Individual Defendants from running Intrepid. Therefore, the request for preliminary injunction should be denied.

/ / /

/ / /

/ / /

/ / /

## VI.    CONCLUSION

Defendants respectfully request the Court reject the preliminary injunction and allow the temporary restraining order to expire on April 2, 2026, pursuant to FRCP 65(b)(2).[7]

Dated: March 25, 2026.

By: */s/ Sasha Aliakbar-Amid*
Samuel A. Schwartz, Esq.
  (admitted *pro hac vice*)
Nevada Bar No. 10985
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101

Samuel B. Strohbehn, Esq.
California Bar No. 257697
Irean Z. Swan, Esq.
California Bar No. 313175
Maddie Rudge, Esq.
California Bar No. 362727
ROSING POTT & STROHBEHN LLP
770 1st Avenue, Suite 200
San Diego, California  92101

*Attorneys for Defendants Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels, and TFE Games Holdings, LLC*

---

[7] *See* FRCP 65(b)(2) ("The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension.").