Jessica Nall (SBN 215149)
Jessica.Nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Leslie Evans (SBN 173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone:  619.329.6454

Jordan W. Garman (admitted *pro hac vice*)
Jordan.Garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone:  212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDING LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER** <br><br> *Filed concurrently with Notice of Motion; Declaration of Steven Sharif; Declaration of Jessica Nall; Witness Declarations; Request for Hearing* <br><br> **PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** <br><br> Judge:　　　Hon. Linda Lopez <br> Hearing Date: May 19, 2026 <br><br> Action Filed:　February 14, 2026 <br> Trial Date:　　Not Set |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND ...................................................................................................2

    A. Mr. Dawson's Predatory Loan-to-Own Scheme Imposed Fiduciary Duties on him that he Repeatedly Breached ..........................2

        1. Mr. Dawson Used Coercive Tactics to Extract Governance Control ...................................................................................2

        2. Mr. Dawson Converted Predatory Debt into Equity Control, Making Him a Fiduciary...........................................................4

        3. Mr. Dawson Self-Dealt by "Reinstating" Debt while Retaining Equity and Poisoning the Company for Potential Outside Investors ....................................................................5

    B. This Predatory Loan-to-Own Scheme is Consistent with Mr. Dawson's Modus Operandi as Alleged in Prior Cases ..........................7

    C. Mr. Dawson Used his Personally Owned Bank to Engage in Self-Interested Transactions Harmful to Intrepid and to Exact Concessions from Mr. Sharif and Intrepid..............................................8

    D. Mr. Dawson and the Board Breached their Fiduciary Duties by Conducting an Unlawful, Self-Interested Foreclosure ..........................9

    E. Mr. Dawson and the Board Breached their Fiduciary Duties by Exposing Intrepid to Foreseeable and Unnecessary Liabilities While Concealing Their Identities and Roles from Regulators............11

    F. Mr. Dawson (through TFE) Purports to "Unwind" the Unlawful Article 9 Foreclosure Sale Via a Subsequent Assignment of Assets to Intrepid ......................................................................................13

    G. Mr. Dawson, TFE, and the Board Defendants Lack a Secured Interest on which to Conduct Any Further Foreclosure .......................14

    H. Mr. Dawson, Through Mr. Caramanis, Has Engaged in a Campaign to Depress Intrepid's Value and Deter Third-Party Interest ..................................................................................................15

III. LEGAL STANDARD .........................................................................................16

IV. ARGUMENT ......................................................................................................17

    A. Plaintiff is Likely to Succeed on His Claims......................................17

        1. Plaintiff Is Likely to Succeed on his Article 9 and Misappropriation of Trade Secrets Claims................................18

        2. Plaintiff is Likely to Succeed on his Breach of Fiduciary Duty Claims ...................................................................19

B.    Plaintiff Will Suffer Irreparable Harm Absent a Receiver ................... 20

C.    Defendants Engaged in Fraudulent Conduct ......................................... 23

D.    The Balance of the Equities Support Appointing a Receiver, Which Will Benefit Intrepid Without Undue Harm to Defendants ...... 24

V.    CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Canada Life Assur. Co. v. LaPeter*,
    563 F.3d 837 (9th Cir. 2009) ................................................................*passim*

*Friedman v. Wahrsager*,
    848 F. Supp. 2d 278 (E.D.N.Y. 2012) .............................................................20

*Baliga on behalf of Link Motion Inc. v. Link Motion Inc.*,
    385 F. Supp. 3d 212 (S.D.N.Y. 2019) ........................................................22, 23

*Single Box, LP v. Del Valle*,
    2022 WL 1694776 (C.D. Cal. Apr. 6, 2022) .....................................................16

**State Cases**

*PWS Inc. v. Ban*,
    234 Cal.App.3d 223 (Cal. App. 1991) .........................................................21, 22

**State Statutes**

California Commercial Code
    § 9617(a) ....................................................................................................15, 21
    § 9625(a) .........................................................................................................21
    § 9625(b) .........................................................................................................18

California Corporations Code § 310(a) ...................................................................6, 8

**Regulations**

Acquisitions of Shares of a Bank or Bank Holding Company, 84 Fed.
    Reg. 5436 (Feb. 15, 2019) ...................................................................................7

WITHERS
BERGMAN LLP

Case No. 3:26-cv-00965-LL-MMP

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This case presents a clear example of why courts appoint receivers to protect corporate assets from conflicted fiduciaries who cannot be trusted to act in the company's best interests. Defendant Robert Dawson, acting through a hand-picked and beholden board, has repeatedly prioritized his own financial objectives over those of Intrepid Studios, Inc. ("Intrepid" or "the Company"), its flagship product *Ashes of Creation*, and its employees, creditors, and community. Existing legal and fiduciary safeguards have failed to restrain his and Defendants' misconduct. Although Intrepid is a development-stage video game company whose primary value lies in its intellectual property and community goodwill, Defendants lack experience in the video game industry and have shown persistent impatience with the long development timelines inherent to MMORPGs. Mr. Dawson's frustration with development led to a deliberate loan-to-own strategy designed to seize control of Intrepid's assets at a depressed valuation and force the game to market on his own terms. Multiple lawsuits allege Dawson has employed similar tactics in other business ventures.

Defendants' most brazen act was the January 2026 self-interested Article 9 foreclosure, which this Court found likely unlawful. Acting as both creditor and buyer, and based on a questionable lien driven by Mr. Dawson's ever-shifting debt-to-equity restructuring, Defendants privately transferred Intrepid's core assets to Mr. Dawson's wholly owned entity without notice and in a commercially unreasonable manner. Relying on that foreclosure, they abruptly destabilized the Company by terminating employees en masse, exposing Intrepid to WARN Act litigation and regulatory scrutiny, and allowing unpaid platform invoices and default judgments to accrue, all just days after telling investors there was months of runway. Only after their misconduct was exposed did Defendants purport to "unwind" the sale, a maneuver that appears legally impermissible. They now threaten a second Article 9 disposition under conditions again designed to suppress third-party participation. To

further depress the asset and ensure only Mr. Dawson can acquire it, Dawson has acted through close associate Jason Caramanis to publicly and falsely disparage Intrepid and its founder, including by disclosing confidential Company financial documents in hours of online interviews. In an industry driven by user trust, this conduct predictably chills competing buyer interest.

Defendants' coercive tactics have continued even during this litigation. Without basis, Defendants' counsel falsely accused Plaintiff's counsel of accepting misappropriated Company funds, an apparent attempt to intimidate Plaintiff, interfere with his choice of counsel, and chill this litigation. (April 14, 2026 Declaration of Jessica Nall ("Nall Decl."), Ex. 3.)

Defendants have shown they will manipulate transactions, misrepresent facts to regulators and the public, and interfere with counsel if it advances their self-interest. Left in control of Intrepid and its valuable assets, they pose an ongoing risk of unlawful conduct and irreparable destruction of the market for Intrepid's assets. Legal remedies after the fact will be inadequate. A neutral receiver with full equitable authority is necessary to preserve and control the assets, investigate lien validity, stabilize the business, and ensure that any disposition is fair, lawful, and beneficial to all stakeholders, not just Defendants.[1]

## II.  BACKGROUND

### A.  Mr. Dawson's Predatory Loan-to-Own Scheme Imposed Fiduciary Duties on him that he Repeatedly Breached

#### 1.  Mr. Dawson Used Coercive Tactics to Extract Governance Control

In 2020, Mr. Caramanis, existing lender to Intrepid and a longtime business

---

[1] Plaintiff is not alone in seeking a receiver. Numerous creditors, investors, and former employees harmed by Defendants' conduct support appointment of a receiver. (*See infra* n.11.) And even Defendants do not object to a limited purpose receiver to resuscitate and organize the IP. (Nall Decl. ¶ 5.)

2

Case No. 3:26-cv-00965-LL-MMP

associate of Mr. Dawson, introduced Mr. Sharif and Intrepid to Mr. Dawson as a potential source of financing. (April 13, 2026 Declaration of Steven Sharif ("Sharif Decl.") ¶ 3.) Mr. Dawson first invested in March 2022, but he backdated his investment documentation to November 2020 to inflate the value of his investment.[2] (Sharif Decl. ¶ 4.) Although initially cooperative, Mr. Dawson's posture changed after a proposed transaction from leading video game developer Riot Games, reflecting multiple hundreds of millions of dollars in potential asset value. (*Id.* ¶ 5, Ex. 3; April 12, 2026 Declaration of Tom Alkazin ("Alkazin Decl.") ¶ 6.) In early 2023, after Mr. Dawson dissuaded Mr. Sharif from accepting the Riot Games offer, (Sharif Decl. ¶ 6, Ex. 4), he began to pursue a deliberate loan-to-own strategy aimed at seizing control of Intrepid. When it became apparent the project would not generate returns as rapidly as he liked, Mr. Dawson worked to monetize Intrepid's assets as quickly as possible, disregarding the realities of MMORPG development and the threat that his timeline posed to Intrepid's value. (Verified Compl. ¶ 35; April 13, 2026 Declaration of Bryan Langford ("Langford Decl.") ¶ 8.)

Pretending to be a supportive ally, Mr. Dawson deployed a Trojan Horse strategy, gaining entry through early essential funding only to unleash the predatory scheme that dismantled the Company from within. Beginning in 2022, Mr. Dawson began extending a series of loans to the Company through convertible promissory notes (the "Notes"). (Sharif Decl. ¶ 7; *see, e.g.*, *id.*, Exs. 5-7). Despite having committed to funding the Company, and at the same time assuring Mr. Sharif that he had no intention of taking control of Intrepid, (*id.* ¶ 8, Ex. 8), he began working to expand his control through strong-arm tactics. Mr. Dawson (and his agent Mr. Caramanis) repeatedly coerced Mr. Sharif and the then-board by threatening to withhold funding days before payroll and employee health-insurance funding deadlines (*id.* ¶ 9, Exs. 9, 10, 21); to shut the Company down through litigation (*id.*,

_____

[2] This was a practice of Mr. Dawson's. (Sharif Decl. ¶ 4.)

Ex. 11); to subject Plaintiff to criminal prosecution (*id.*, Ex. 12); and to cause Plaintiff financial ruin, homelessness, and even physical harm (*id.*, Exs. 13-16), unless Plaintiff signed documents granting Dawson ever-increasing leverage and control. (*Id.* ¶ 10; Verified Compl. ¶ 36.) Under duress and fearing harm to Intrepid's stakeholders, Mr. Sharif felt he had no choice but to grant Mr. Dawson the extraordinary concessions he demanded, including a warrant for 10% of the Company for $10 and zero-cost, "non-dilutable" equity options lurking in the fine print of Mr. Dawson's convertible notes. (*See* Sharif Decl. ¶ 11, Ex. 17, Exs. 5-7 § 6; Verified Compl. ¶ 36.)

> 2.  <u>Mr. Dawson Converted Predatory Debt into Equity Control, Making Him a Fiduciary</u>

Although Mr. Dawson has claimed in court filings that his debt was secured by substantially all of Intrepid's assets via a March 23, 2022 Pledge and Security Agreement (*see, e.g.*, Dkt. 23 at 22, 48 (¶ 12)), he has yet to file that agreement despite incorporating it by reference in those filings. Every convertible note executed from that point to present, as far as Plaintiff is aware, expressly states—in direct contradiction to that supposed security agreement—that Mr. Dawson's debt is "unsecured and subordinated" to senior debt. (*See, e.g.*, Sharif Decl. ¶ 12, Exs. 5-7 § 7.) Nonetheless, Mr. Dawson filed a UCC-1 financing statement on May 13, 2024, purporting to perfect his purported security interest. (Verified Compl., Ex. B.)[3]

In spring 2024, the parties, ███████████████████████████ ███████████████████████████████████████████ ███████████████████ (Verified Compl. Ex. A.) ██████████████████ ███████████████████████████████████ (*id.* at 1), Mr. Dawson exploited it to entrench control over the Company by converting his and other

---

[3] Mr. Dawson's purported lien is junior to a lien securing a $6 million loan from CommerceWest Bank and a $150,000 loan from the Small Business Administration. (Verified Compl. ¶ 44; *id.*, Exs. C, D.)

lienholders' notes into equity shares. Despite being an adverse party, he directed Intrepid's counsel in ███████████ and even signed the engagement letter as Intrepid's purported "agent," without authority. (Sharif Decl. ¶ 13, Ex. 18.)

Under ██████ and related Conversion Agreements, Mr. Dawson converted all of his outstanding debt to equity, expressly cancelling $49,594,000 in notes and terminating all debt obligations underlying the very UCC-1 he had just filed. (*See, e.g.*, Sharif Decl. ¶ 14, Exs. 19-20 § 4 ("[T]he Holder hereby . . . agrees that upon the Conversion, the Note shall be cancelled in its entirety and shall be of no further force or effect and all obligations set forth in the Note will be terminated and shall be of no further force or effect.").) Following conversion, Dawson held ██████ shares out of a total of ██████ shares, making him Intrepid's majority shareholder at approximately 58%. (Verified Compl., Ex. A at 12.) Mr. Dawson promptly used that status to appoint himself and his associate, Ryan Ogden, to the board in or around July 2024. (Sharif Decl. ¶ 14.) By September 2024, Mr. Dawson was Chairman, and Mr. Ogden CFO. (Verified Compl. ¶ 45.) Thereafter, Dawson exercised complete de facto and de jure control over Intrepid's finances and governance. Though CEO, Mr. Sharif effectively lost all access and visibility to Company finances. (*Id.* ¶¶ 43, 45.) By August 2025, Dawson had populated the board with additional loyalists, including Theresa Fette and Aaron Bartels. (*Id.* ¶ 46.) When Mr. Dawson became a director, he indisputably owed fiduciary duties to Intrepid and its shareholders.

        3.     <u>Mr. Dawson Self-Dealt by "Reinstating" Debt while Retaining Equity and Poisoning the Company for Potential Outside Investors</u>

In April and July 2025, in furtherance of his loan-to-own scheme, Mr. Dawson executed amendments to the Conversion Agreements (with a retroactive effective date of June 1, 2024—*i.e.*, the time of the original conversions to equity) purporting to unwind the equity conversions and reinstate his prior purportedly secured debt on the original terms of the Notes, (Sharif Decl. ¶ 16, Exs. 22-23), including that Mr. Dawson's debt was ***unsecured and subordinated***, (*id.*, Exs., 5-7 § 7), thus making

Mr. Dawson's claims to have reinstated "secured" debt highly questionable. Among other reasons to doubt the validity of this transaction, Mr. Dawson apparently did not return all of the equity he had received under the Conversion Agreements. One amendment reflects the return of only 975.68 Class B shares, while Dawson retained more than 3,200 Class A shares. (*id.*, Ex. 23.) Troublingly, a capitalization table dated April 30, 2025—the same date of the first supposed equity unwinding (*id.*, Ex. 22)— shows Dawson's holdings inexplicably *increasing*, from ██████ shares to ██████ shares out of ██████ or to 70%. (*Id.* ¶ 19, Ex 25.) Because this transaction involved equity and debt of a financially interested director, it required approval by disinterested directors or shareholders under California Corporations Code § 310(a). No such formal approval occurred at Mr. Dawson's direction. (*Id.* ¶ 17, Ex. 24.)[4]

In addition to rendering Mr. Dawson's purported secured interest highly questionable, these coercive and self-interested transactions appear intended to, and effectively did, poison Intrepid's ability to attract any alternative investors. During 2025, investment bank Aream & Co. contacted purportedly over 40 potential investors and strategic partners; none made an offer. (Dkt. 36-1 ¶¶ 5-7.) Several interested parties engaged in weeks of diligence and ultimately declined to proceed, citing, among other factors, the Company's high level of outstanding debt. (Sharif Decl. ¶ 20.) Thus, because of Mr. Dawson's 8-figure reinstated debt along with his inflated percentage of shares, Intrepid was unable to secure third-party investment or partnership. (*Id.*) Mr. Dawson appears to have placed this black mark on the Company by design: to fulfill his objective to consolidate control and extract value solely for himself. The effort culminated in the unlawful foreclosure and self-interested transfer

---

[4] On December 15, 2025, Mr. Dawson forced Plaintiff to sign a two-inch thick stack of solely signature pages by physically intimidating Mr. Sharif and telling Mr. Sharif that he "did not want any shit." (Sharif Decl. ¶ 18; *see also* Langford Decl. ¶ 7.) It is possible a purported "approval" was included in that stack, but that would be presumptively invalid due to coercion.

of Intrepid's assets to himself, discussed *infra* Section II.D.

**B.    This Predatory Loan-to-Own Scheme is Consistent with Mr. Dawson's Modus Operandi as Alleged in Prior Cases**

Mr. Dawson's coercive, loan-to-own conduct at Intrepid is not an isolated incident. It is instead consistent with a broader pattern of conduct described in other litigation arising out of his involvement with Jeunesse Global LLC and related entities, where Mr. Dawson is alleged to have used financial leverage, insider positioning, threats against key personnel, and sham transactions to extract value from vulnerable principals and seize control of assets for personal gain. (Nall Decl., Ex. 4.)

In October 2024, Ogale "Randy" Ray, co-founder of Jeunesse, a multi-level marketing company, filed suit against Mr. Dawson and others in Florida state court, alleging that Mr. Dawson and his co-conspirators inserted themselves into positions of trust and control while orchestrating large-scale financial theft and self-dealing. (*See generally id.*) Mr. Ray alleged that after he suffered a debilitating stroke and stepped back from day-to-day management, Mr. Dawson and his confederates deliberately inserted themselves into Mr. Ray's financial and personal affairs with Jeunesse to "drain [him] of his personal wealth," stealing tens of millions of dollars through sham entities, manipulated internal systems, and fraudulent transactions designed solely to benefit Mr. Dawson and his affiliates. (*Id.* at 2-7.) Similarly, consistent with Mr. Dawson's use of his personally-owned bank, Pathway Bank, in coordination with his conduct relating to Intrepid and Mr. Sharif (*see infra* Section II.C.; Sharif Decl. ¶ 21),[5] the complaint alleges that Mr. Dawson used Pathway to structure and issue loans secured by Mr. Ray's personal assets, reflecting the same use of controlled financial channels to facilitate coercive and unlawful transactions.

[5] Change in Bank Control Notices; Acquisitions of Shares of a Bank or Bank Holding Company, 84 Fed. Reg. 5436 (Feb. 15, 2019) https://www.federalregister.gov/documents/2019/02/21/2019-02969/change-in-bank-control-notices-acquisitions-of-shares-of-a-bank-or-bank-holding-company.

(Nall Decl., Ex. 4 at 10-11, 16, 20-21.) Notably, Mr. Ray further alleges that Mr. Dawson acted with Mr. Ogden to carry out these schemes, mirroring the coordinated conduct alleged in this action, *e.g.*, by deceiving Mr. Ray about his exposure to criminal liability if he did not comply with the defendants' demands. (*Id.* at 3,10, 27.) Although some claims have been voluntarily dismissed without prejudice, the case remains active and reflects allegations of a familiar playbook: targeting a vulnerable counterparty, gaining control, and using opaque financial mechanisms to extract value under the guise of legitimate business dealings.

In March 2026, Wendy Lewis, an incapacitated individual acting through her court-appointed guardian, also sued Mr. Dawson and others in Florida state court, alleging that Mr. Dawson exploited a position of trust to execute self-interested transactions, including a "back-to-back" asset sale that generated undisclosed millions in profit at Ms. Lewis's expense. (Nall Decl., Ex. 5.) The complaint further alleges that Mr. Dawson used entities he controlled, including Pathway Bank, to facilitate and profit from the transactions. (*Id.* at 3-4.) This pattern mirrors Mr. Dawson's alleged bad faith conduct at both Intrepid and Jeunesse Global.

## C.    Mr. Dawson Used his Personally Owned Bank to Engage in Self-Interested Transactions Harmful to Intrepid and to Exact Concessions from Mr. Sharif and Intrepid

Mr. Dawson used his personally owned bank, Pathway Bank, to harm Intrepid in several ways. After securing majority control of Intrepid and installing a Dawson-aligned board, Mr. Dawson directed Intrepid's CFO, Ryan Ogden, to open an Intrepid account at Pathway Bank. (Sharif Decl. ¶ 21, Ex. 26.) To Plaintiff's knowledge, Mr. Dawson did obtain the approvals required by California Corporations Code § 310(a) for this interested transaction. (*Id.* ¶ 21.)

Mr. Dawson thereafter used Pathway Bank in an attempt to divert millions of dollars owed to Intrepid even before the unlawful foreclosure. In December 2025, Intrepid launched Early Access for *Ashes of Creation* through gaming platform

Steam, owned by Valve Corporation, resulting in a receivable to Intrepid of approximately $4 million. (Verified Compl. ¶ 49; Sharif Decl. ¶ 22, Ex. 27.) Despite prior assurances to Intrepid's senior secured lender, CommerceWest Bank, that these funds would be used to satisfy Intrepid's loan obligations (Verified Compl. ¶ 50; Sharif Decl. ¶¶ 23-24, Exs. 28 at 9, 29), Mr. Ogden (at Mr. Dawson's direction) instructed Valve to divert the funds to a Pathway Bank account held by Defendant TFE, Mr. Dawson's wholly owned entity. (Sharif Decl. ¶ 25, Exs. 30-31.) Although Valve ultimately refused because TFE was not a known account, (April 13, 2026 Declaration of Jason Zimmerman ("Zimmerman Decl.") ¶ 10), this conduct constitutes attempted misappropriation of Intrepid's funds by its own fiduciaries, using Mr. Dawson's bank as the vehicle.

Mr. Dawson also used his bank to exert additional pressure on Mr. Sharif and his husband, John Moore. In 2024, Mr. Moore sought to refinance an existing mortgage on his and Mr. Sharif's personal residence, which had separately served as collateral for CommerceWest Bank's loan to Intrepid. (Sharif Decl. ¶ 26.) Mr. Dawson offered refinancing through Pathway Bank to ensure no adverse effect on CommerceWest's loan. (*Id*.) Days before the final balloon payment on the existing mortgage came due, Mr. Dawson changed the promised Pathway mortgage terms by raising the mortgage rate from 6% to 10%, well above prevailing rates. (*Id*.) At the same time, knowing that by then they had no realistic alternative options, Mr. Dawson coerced Mr. Moore to execute a forbearance agreement containing strict foreclosure provisions, stripping him of rights and protections typically afforded California mortgage holders. (*Id*.) Mr. Dawson subsequently used his dual roles as owner of Pathway Bank, (holder of the new mortgage), and Chairman of Intrepid's board, to threaten Mr. Sharif with eviction to obtain increasing control of Intrepid. (*Id*.)

**D. Mr. Dawson and the Board Breached their Fiduciary Duties by Conducting an Unlawful, Self-Interested Foreclosure**

After burdening Intrepid with highly questionable debt and equity percentages,

and periodically, and deliberately, starving the Company of liquidity throughout 2025 (Verified Compl. ¶ 53; Langford Decl. ¶ 18), Mr. Dawson and the Dawson-controlled Board leveraged Mr. Dawson's purported "secured" debt to execute a January 16, 2026 foreclosure and transfer all of Intrepid's assets to TFE, Mr. Dawson's wholly owned entity. (Verified Compl. ¶ 65; Sharif Decl. ¶ 27, Ex. 32.) This occurred just days after Mr. Dawson and the Board told Intrepid's shareholders and creditors that he had committed approximately $9 million (to TFE) to complete the game, and that they were on track for launching the game in September 2026. (Sharif Decl. ¶ 28, Ex. 33; April 12, 2026 Declaration of Karen Boreyko ("Boreyko Decl.") ¶¶ 2-3; April 12, 2026 Declaration of Zac Schuster ("Schuster Decl.") ¶ 6; Alkazin Decl ¶ 14.) Though Intrepid's lead developers, along with Mr. Sharif, offered multiple options for finishing the project, Mr. Dawson and the Board Defendants grew increasingly impatient and decided to execute the final step of the loan-to-own scheme, (April 13, 2026 Declaration of Jacob Beucler ("Beucler Decl") ¶¶ 6-7; Langford Decl. ¶¶ 8-9; Zimmerman Decl. ¶¶ 7-8), by pulling the plug, improperly wiping out the cap table, and seizing the now-depressed assets at the expense of all employees and every other lender and investor, all while attempting to pin blame publicly on Mr. Sharif. (Zimmerman Decl. ¶ 10; Beucler Decl. ¶¶ 12-15; Langford Decl. ¶¶ 26-29.) Mr. Dawson engineered the private foreclosure so that his sale of Intrepid's assets to himself would go unchallenged. He deliberately chose not to provide notice to Intrepid's senior secured lender, CommerceWest Bank, and not to make the sale public despite advice to the contrary from TFE's counsel. (Sharif Decl. ¶ 29.)

At the same time, Mr. Dawson and his aligned Board members engaged in a pattern of coercive conduct designed to eliminate internal resistance to his plan from Mr. Sharif, Mr. Moore and other senior leadership at the Company. This included threats of not paying Intrepid employees what they were lawfully owed upon planned terminations if Mr. Sharif and other senior management did not acquiesce to their unlawful foreclosure scheme and company shut down. (Sharif Decl. ¶ 30, Ex. 34-35;

Langford Decl. ¶¶ 10-17, 29-30; Beucler Decl. ¶¶ 8-11.) Faced with these conditions, Mr. Sharif was forced to resign rather than ratify the unlawful conduct. (Sharif Decl. ¶ 30, Ex. 36.)[6] Even after resigning, Mr. Sharif continued to act in the Company's best interests, attempting to ensure that employee health benefits did not lapse, (*id.* ¶ 32, Ex. 41; Langford Decl. ¶ 20), and ultimately filing the current derivative suit to protect the Company's interests.[7] The Board refused to change course, and Mr. Dawson's coercive conduct, through his counsel, has only continued into the present litigation. (Nall Decl., Ex. 3.)

### E.    Mr. Dawson and the Board Breached their Fiduciary Duties by Exposing Intrepid to Foreseeable and Unnecessary Liabilities While Concealing Their Identities and Roles from Regulators

Defendants' wrongful foreclosure, predictably, cascaded into additional liabilities for Intrepid. Valve flagged the request by the Board to transfer the Steam receivable to TFE as suspicious and froze the funds, leaving Intrepid's promises and obligations to senior secured lender CommerceWest unmet. (Sharif Decl. ¶ 25; Zimmerman Decl. ¶ 10.) Rather than stabilizing the Company or using the financial

---

[6] After his resignation, the Board requested Mr. Sharif return as Chief Executive Officer, offering additional equity if he would support the foreclosure strategy. (Sharif Decl. ¶ 32; Langford Decl. ¶ 20.) Mr. Sharif made clear that he would only consider returning under conditions designed to protect the Company and its stakeholders, including the reinstatement of independent corporate counsel rather than conflict-tainted advice from TFE-aligned counsel Mr. Schwartz, the lawful treatment of employees, and the end of coercive practices within the Company in pursuit of their unlawful foreclosure strategy. (Sharif Decl., Exs. 39-41; Langford Decl. ¶ 20.) The Board rejected Mr. Sharif's conditions and made clear that if no agreement were reached, they would shut the Company down entirely, which they subsequently did. (Sharif Decl., Ex. 39.)

[7] The day before his resignation, Mr. Sharif also contacted senior secured lender CommerceWest Bank to prevent fraud on the bank via the unlawful foreclosure without notice to them and the diversion of the Steam receivable the Board had promised the bank. (Sharif Decl. ¶ 30, Ex. 37.)

runway they represented to investors they had, the Board Defendants abruptly demanded Intrepid's entire workforce be terminated on just two days' notice, which violated both the federal WARN Act and California's WARN Act. (Verified Compl. ¶¶ 71-73; Beucler Decl. ¶¶ 8-9, 13, 17; Langford ¶¶ 10-12, 29.) It was this action in particular, which the Board had proposed as early as December 2025, which largely drove Mr. Sharif's resignation. (Sharif Decl., Ex. 36 ("First, I fundamentally disagree with the Board's repeated attempts to terminate employees without paying wages and compensation legally owed to them, including accrued PTO.").[8]

As a direct result, former Intrepid employees filed a putative class action against, among others, Intrepid, alleging an unlawful mass layoff without the required 60 days' notice and without payment of final wages and accrued benefits. (Dkt. 60-6.) The complaint alleges that the layoffs were a foreseeable and avoidable consequence of Defendants' unlawful Article 9 foreclosure and their failure to manage Intrepid's finances in good faith or to mitigate harm to employees and creditors. (*Id.* ¶¶ 133-35.) The California Department of Industrial Relations has also opened a regulatory inquiry into suspected wage theft based on these actions, which is ongoing. (Sharif Decl. ¶ 33.) Defendants contend that the loss of Steam funds necessitated the mass layoffs. But the Board had previously promised that receivable to pay down the CommerceWest loan, (*Id.* ¶ 25, Exs. 30, 31), and Defendants had been planning substantial workforce reductions for weeks. (*Id.*, Ex. 35; Beucler Decl. ¶¶ 8-9; Langford Decl. ¶¶ 10-16.)

Defendants have also allowed Intrepid to incur default judgments. On December 2, 2025, a vendor sued Intrepid for breach of contract, alleging nearly $1 million in unpaid platform-usage fees. (Nall Decl, Ex. 6.) Defendants permitted Intrepid to default by failing to respond or participate in the litigation, and the vendor

---

[8] Mr. Sharif was not the only employee to resign based on these actions. (*See e.g.*, Sharif Decl. ¶ 31, Ex. 38.)

has moved for entry of a default judgment. (*Id.,* Exs. 7.) Similarly, dozens of other technology platforms that hold valuable Company IP remain unpaid, leaving the status of the asset in limbo. (Nall Decl. ¶ 13.) This harm to the asset is only compounded by the fact that Defendants failed to enable any orderly offboarding process for Intrepid employees, with the result that many former employees may still have access to the IP. (Zimmerman Decl. ¶¶ 8-9.)

To shield themselves from the litigation fallout and public approbation, Defendants deliberately tried to conceal their roles at Intrepid by falsifying regulatory filings in an effort to frame Mr. Sharif and Mr. Moore as the parties in control. Days before Defendants' unlawful foreclosure and resulting mass layoffs, CFO Ryan Ogden caused Intrepid to file a deliberately false Statement of Information with the State of California that inaccurately identified Mr. Sharif as the sole director and Mr. Moore as CFO, and omitted altogether mention of Mr. Dawson, Mr. Ogden, and the rest of the Board, who were in fact exercising full operational authority over the Intrepid and its disposition. (Sharif Decl. ¶ 34, Ex. 43.) Plaintiff promptly notified Defendants that the filing was inaccurate, unauthorized, and should be corrected. (*Id.*, Ex. 45.) Unsurprisingly, Defendants refused, leaving in place a public record that misidentified Intrepid's control persons while they executed the mass termination and wrongful foreclosure. (*Id.*; Beucler Decl. ¶ 15.)

**F.    Mr. Dawson (through TFE) Purports to "Unwind" the Unlawful Article 9 Foreclosure Sale Via a Subsequent Assignment of Assets to Intrepid**

On March 25, 2026, Defendants purportedly "set aside" the Article 9 sale to TFE and "returned" Intrepid's assets. (Dkt. 58 at 1-2.) Defendants characterize their actions as a mere "undoing" of the unlawful Article 9 transaction. But Defendants did not actually unwind anything; instead, they purported to gift Intrepid's trade secrets back to the Company through an "Assignment and Assumption of Assets" and a Bill of Sale for no consideration. (Dkt. 58 at 7-8.)

Tellingly, Mr. Dawson executed the Bill of Sale on behalf of both purported buyer (TFE) and purported seller (Intrepid), underscoring the self-dealing nature of both the original illicit foreclosure, and the after-the-fact "unwinding". (Dkt. 58-1 ¶ 5.) Indeed, on April 2, 2026, hours after the Court dissolved the TRO, the exact individuals who had acted on behalf of TFE in stealing Intrepid's assets via the wrongful foreclosure (*i.e.*, Mr. Dawson as both TFE's owner and Intrepid's chairperson) began to take control of Intrepid's assets on behalf of "Intrepid," using the same counsel who had assisted with the unlawful foreclosure.[9] Permitting these individuals to regain control the assets through "Intrepid" elevates form over substance and should not be permitted given their misconduct to date.

## G.    Mr. Dawson, TFE, and the Board Defendants Lack a Secured Interest on which to Conduct Any Further Foreclosure

Defendants now claim they will conduct a new, "lawful" foreclosure sale by public auction. (Dkt. 58 at 12.) This Court has already found that TFE likely violated the California Commercial Code through its first foreclosure by failing to provide required notice and by conducting a disposition that was not commercially reasonable. (Dkt. 20 at 7, Dkt. 74 at 5:3-6, 5:25-6:11.) Having ignored statutory safeguards when they mattered, Defendants cannot now be trusted to conduct any renewed disposition in good faith or in Intrepid's best interests—particularly given their long-standing pattern of abusive, predatory conduct outlined above.

More fundamentally, Defendants no longer possess any legal right to foreclose, if they ever had such a right in the first place.[10] As discussed further *infra* Section

---

[9] Mere hours after this Court ruled that Schwartz, PLLC could not represent Intrepid due to an unwaivable conflict, Defendants' counsel nonetheless contacted a third party while purporting to act on behalf of "Intrepid Studios." (Nall Decl. ¶ 12, Ex. 8.)

[10] And indeed, given the many problematic aspects of Mr. Dawson's debt-to-equity-to-debt transactions explained *supra* Section II.A., it is highly questionable

IV.B., the January 16, 2026 disposition extinguished any security interest TFE claims. Cal. Com. Code § 9617(a). Any attempt to "redo" the foreclosure would, therefore, be unlawful, not curative. Defendants' belated "unwinding" of their unlawful foreclosure is not evidence of compliance or good faith; rather, it is a litigation tactic designed to retroactively sanitize misconduct only after it was exposed and to avoid a preliminary injunction.

### H. Mr. Dawson, Through Mr. Caramanis, Has Engaged in a Campaign to Depress Intrepid's Value and Deter Third-Party Interest

Since the unlawful foreclosure, Mr. Dawson has also acted through his close associate Jason Caramanis to deliberately damage Intrepid's value in the marketplace. Mr. Caramanis has embarked on a sustained public campaign, spanning dozens of hours of live YouTube interviews and social-media appearances, attacking Intrepid and Mr. Sharif and disparaging the Company and the game. (Sharif Decl. ¶ 35.) In those public statements, Mr. Caramanis, implying he acts on behalf of the Board, has also disclosed highly sensitive internal and confidential Company documents, which appear to be designed to place Intrepid in a negative light. (*Id.*) This conduct has no legitimate purpose. In an industry where public sentiment, community trust, and developer goodwill are critical drivers of asset value, such calculated public disparagement, defamation, and leakage of confidential materials can only depress interest from potential investors or strategic buyers. This campaign is another mechanism by which Mr. Dawson has sought to artificially shrink the value of Intrepid so that no third party will step forward, conveniently leaving himself as the only viable acquirer of the Company's assets to the detriment of Intrepid and its other stakeholders.

*     *     *

The record establishes a consistent pattern: Defendants disregard legal limits

whether Dawson and TFE *ever* had a secured interest on which to foreclose.

and fiduciary duties whenever those constraints interfere with their self-interest. Under these circumstances, only a neutral, Court-appointed receiver can protect Intrepid's trade secrets, determine the parties' rights, preserve value for stakeholders, and ensure that any disposition of assets is conducted lawfully and in the Company's best interests.[11]

## III.    LEGAL STANDARD

A court "has broad discretion in appointing a receiver" and "may consider a host of relevant factors," with "no one factor [being] dispositive." *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009). The Ninth Circuit has identified several factors relevant to appointing a receiver: "(1) 'whether [the party] seeking the appointment has a valid claim'; (2) 'whether there is fraudulent conduct or the probability of fraudulent conduct,' by the defendant; (3) whether the property is in imminent danger of 'being lost, concealed, injured, diminished in value, or squandered'; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) 'the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property'; and, (7) 'whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership.'" *Id.* at 844. While these factors are relevant to a court's determination, there is ultimately "no precise formula for determining when a receiver may be appointed." *Id.* "Further, the "availability of other remedies does not, in and of itself, preclude the use of a receivership." *Single Box, LP v. Del Valle*, 2022 WL 1694776, at *3 (C.D. Cal. Apr. 6, 2022).

---

[11] Other Intrepid shareholders, creditors, and former employees support appointment of a receiver (Boreyko Decl. ¶ 7; Schuster Decl. ¶ 11; Alkazin Decl ¶ 20; Zimmerman Decl. ¶ 3; Beucler Decl. ¶ 19; Langford Decl. ¶ 32.)

## IV.    <u>ARGUMENT</u>

All seven *Canada Life* factors support appointing a receiver with broad equitable powers, including to possess, control, preserve, or sell the assets as necessary; operate and manage the business; conduct financial administration and accounting; litigate claims; and ensure legal and court compliance. As detailed above, Defendants—while owing fiduciary duties to Intrepid—have repeatedly used their control to advance their own self-interest at the Company's expense, culminating not only in unlawful conduct, but in the systematic impairment of any fair market process for disposing of Intrepid's assets. Plaintiff is likely to succeed on his claims challenging Defendants' original wrongful foreclosure, misappropriation of trade secrets, and pervasive breaches of fiduciary duty. Defendants' conduct has already inflicted severe and concrete harm on Intrepid, including exposure to litigation, default judgments, unpaid technology partners, and leaving the IP unprotected in the hands of former employees. Defendants now pose an imminent risk of further irreparable harm by threatening a second asset disposition under conditions that are again designed to chill all legitimate third-party participation—*i.e.*, through asserted credit-bidding power of dubious validity and a clouded lien position. As further explained below, Defendants' pattern of self-dealing, financial manipulation, and disregard for statutory and fiduciary constraints establishes both past and probable future misconduct, rendering legal remedies inadequate and the current market for Intrepid's assets fundamentally unreliable. Under these circumstances, only a neutral receiver with full equitable powers—including to investigate and determine the validity of Mr. Dawson's/TFE's lien, which is something Mr. Dawson will not do if left in control—can protect Intrepid's assets during the pendency of this action and ensure that any disposition is conducted in a fair, lawful, and commercially reasonable manner for the benefit of Intrepid and all stakeholders, not just Defendants.

### A.    **Plaintiff is Likely to Succeed on His Claims**

Plaintiff, who has brought claims on behalf of Intrepid, is likely to succeed on

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

his derivative claims against the Board Defendants, including but not limited to those based on (1) misappropriation of trade secrets, (*see* Verified Compl. ¶¶ 85-107); (2) wrongful (original) foreclosure under California Commercial Code §§ 9101, *et seq.*, (*see id.* ¶¶ 108-113); and (3) breach of fiduciary duty, (*see id.* ¶¶ 114-121). This satisfies the first *Canada Life* factor (whether plaintiff has a valid claim) and the first half of the sixth *Canada Life* factor (plaintiff's probable success). *See Canada Life*, 563 F.3d at 844.

1. <u>Plaintiff Is Likely to Succeed on his Article 9 and Misappropriation of Trade Secrets Claims</u>

Plaintiff is likely to succeed on his Article 9 and misappropriation of trade secret claims. As this Court stated during the March 18, 2026 hearing on Defendants' motion to dissolve the TRO, the original Article 9 sale "violated the California Commercial Code in a few ways" including: (1) the fact that Defendants conducted "a private sale" despite the fact that "the collateral in this case, the trade secrets could not be sold at a private sale"; (2) because "[n]otice was not given to the CommerceWest Bank, a senior secured lender, pursuant to Section 9611(c)"; and (3) because "[t]he sale was not … 'commercially reasonable' … as required by Section 9610 because it was not advertised in the relevant market[.]" (Dkt. 74 at 5:2-6:15.)

That Defendants purport to have unwound that sale does not change the fact that Plaintiff is likely to succeed on this claim because Defendants ***did*** engage in this unlawful conduct and ***did*** damage Intrepid in doing so. (*See supra* Section II.E., describing the concrete harm Defendants caused Intrepid, including litigation exposure and default judgments, while acting on the assumption that the Article 9 sale was final). *See* Cal. Com. Code § 9625(b) ("[A] person is liable for damages in the amount of any loss caused by a failure to comply with" the Article 9 requirements). The same is true for Plaintiff's trade secret claims, where this Court credited Plaintiff's "misappropriation of trade secret claims through wrongful acquisition based on TFE acquiring the trade secrets material through an unlawful Article 9

foreclosure sale." (Dkt. 74 at 4:24-5:1.) Thus, any purported unwinding does not erase Defendants' unlawful conduct to date or their liability for the severe damage to Intrepid stemming from it, and Plaintiff is likely to succeed on these claims.

### 2. Plaintiff is Likely to Succeed on his Breach of Fiduciary Duty Claims

Relatedly, Plaintiff is likely to succeed on his claim for breach of fiduciary duty. Once in control of Intrepid, Defendant Dawson and the Board Defendants consistently breached their fiduciary duties to Intrepid by acting for their own personal benefit. Mr. Dawson (in concert with the Board Defendants) caused Intrepid to open an account with his personally-owned bank without the proper corporate approvals for that interested transaction, and then used his bank to attempt to divert millions owed to Intrepid to his wholly owned entity, TFE, in furtherance of the foreclosure scheme, (*supra* Section II.C), and exert pressure on Intrepid's founders including threatening them with violence and homelessness in order to further bend them to his will. (*Id.*; *supra* Section II.A.) He and the Board Defendants then intentionally allowed Intrepid to accumulate substantial debts to manufacture the circumstances to support a foreclosure sale of Intrepid's assets ***to Mr. Dawson*** (via TFE), despite expressly telling investors there was at least nine months' worth of financial runway. (*Supra* Section II.D.) Not only that, Defendants conducted that foreclosure sale in a purposefully illegal way so as to ensure the assets would land with them, even if Intrepid and its investors and creditors would have benefited from sale to a third party. (*Id.*) Those actions have led to at least one million-dollar lawsuit in which the Board Defendants either purposefully or neglectfully caused Intrepid's default, and have subjected Intrepid to likely liability from an employee class action lawsuit and related regulatory complaint challenging Defendants' mass layoffs and wage theft in violation of the WARN Act (*Supra* Section II.E.) By deliberately failing to pay the technology platforms holding Intrepid's trade secrets, and leaving dozens of developers with access to the trade secrets by summarily firing and failing to

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

offboard them, Defendants have put the survival of the Company's key assets in doubt. (*Id.*) Each of these actions represents a breach of the Board Defendants' fiduciary duties to the Company. *See Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 285-86, 288 (E.D.N.Y. 2012) (finding sufficient allegations on motion to dismiss for breach of fiduciary duty where receiver alleged defendants "took several steps . . . to intentionally sabotage" business by, *inter alia*, missing necessary payments, forming "new corporate entities [to] . . . 'hide and conceal the acts of sabotage' and transferring assets to self-interested entities).

## B.   Plaintiff Will Suffer Irreparable Harm Absent a Receiver

Absent a receiver, Intrepid will suffer irreparable harm because Defendants are poised to conduct an asset disposition that is not only likely not legal, but also that no rational third party could fairly participate in. This satisfies *Canada Life* factors three (property being in imminent danger), four (inadequate legal remedies), and the second half of six (possibility of irreparable harm to Plaintiff). Defendants have announced an intent to proceed with another Article 9 sale while simultaneously claiming the right to credit bid tens of millions of dollars in purported secured debt. If that claimed credit is invalid or overstated as Plaintiff argues (*supra* Section II.A.), then the mere assertion of such bidding power will wrongfully chill all legitimate third-party interest and suppress sale value well before this Court can adjudicate the lien dispute.

The resulting harm is concrete. If TFE proceeds with a foreclosure based on a nonexistent or overstated lien, numerous parties could later claim standing to challenge the sale: potential third-party bidders deterred by the false appearance of unbeatable credit bidding power, the true senior secured lender whose collateral position was impaired, or Intrepid itself. But post-hoc litigation by a patchwork of injured parties will not restore lost competition or resuscitate depressed asset value. The absence of any neutral gatekeeper—who can sort through the legality of Mr. Dawson's and TFE's original purported lien ahead of any sale and otherwise shepherd a commercially reasonable sale—at the moment of disposition is precisely what

makes the harm irreparable.

This risk is compounded by Defendants' theory that they may simply "undo" a completed foreclosure, revive the very security interest they enforced (assuming it was valid in the first place), and then "redo" the Article 9 sale lawfully. Article 9 provides no mechanism by which a secured party may do so. Instead, California Commercial Code § 9617(a) provides that a foreclosure sale "[d]ischarges the security interest under which the disposition is made," along with any junior liens. Defendants' post-foreclosure assignment of the assets back to Intrepid, purportedly "subject to" the liens that § 9617(a) extinguished, cannot contractually resuscitate TFE's statutorily extinguished lien.[12] That means that when TFE forecloses a second time, as planned, it will be foreclosing without any secured interest on which to do so—thus, again, foreclosing unlawfully and illegally misappropriating Intrepid's assets and trade secrets. The imminent irreparable harm is, therefore, more present than ever.

Defendants' sole 34-year-old case cited in support does not save their argument, (Dkt. 58 at 10-11; Dkt. 77 at 22:5-8), because *PWS Inc. v. Ban*, 234 Cal.App.3d 223 (Cal. App. 1991) does not stand for the proposition that a secured creditor has a general right to unilaterally unwind a completed UCC foreclosure. In *PWS,* the secured creditor conducted a foreclosure sale on the wrong date, rendering its notice defective. *Id*. at 226. Upon realizing the mistake, the creditor immediately conducted a second sale with proper notice. *Id*. The court permitted the creditor, which had credit bid at both sales, to pursue a deficiency judgment based on the second sale, emphasizing that the initial error was inadvertent, promptly corrected, and caused no prejudice to the debtor. *Id*. at 229.

---

[12] The fact that the first Article 9 sale was unlawful does not change this conclusion. California Commercial Code § 9625(a) permits a Court to exercise remedies for an unlawful sale. Available remedies do not include that the foreclosed upon lien otherwise remains in effect, or that the wrongfully foreclosing party can engage in unilateral, contractual self-help to revert the situation.

21    Case No. 3:26-cv-00965-LL-MMP

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

The *PWS* court expressly relied on the secured creditor's good faith, explaining that "PWS should not suffer the same fate as a creditor which does not rectify its error or attempts to sweep it under the rug," and noting that "PWS could have remained silent about the mistake it made in the hope [that the debtor] would not discover it." *Id.* at 230. Defendants did exactly what the *PWS* court cautioned against: they attempted to sweep purposeful noncompliance under the rug and are now invoking a belated "redo" only because their conduct was exposed. *PWS* also turned on the "absence of prejudice to [the debtor]," which the court described as "a critical factor" in its holding. *Id.* at 229. Indeed, the second sale affirmatively cured any prejudice the first sale had caused to the debtor. *Id*. Here, by contrast, the prejudice from the original improper Article 9 sale cannot be undone by a second sale: in reliance on the first Article 9 sale, the Board Defendants terminated all of Intrepid's employees in violation of the WARN Act and repudiated all obligations to safeguard its IP assets, thus crippling the company, exposing it to liability, and devaluing the assets ahead of a second foreclosure. (*Supra* Section II.E.) That sudden mass termination, among other things, destroyed goodwill within the gaming community and inflicted irreversible reputational harm on the Company and the game.

Even if the Court determines that Defendants' assigning the assets back to Intrepid reverts all of the parties to their pre-foreclosure status (*i.e.*, revives Defendants' purported lien, which was questionable *ab initio*), and mitigates the harm from the first sale, the assets going back to Intrepid means they have problematically wound up in the hands of the ***very same individuals*** who executed the illegal creditor foreclosure on behalf of TFE—Intrepid's board members who were on both sides of the transaction. As outlined extensively *supra* Section II, these individuals have repeatedly and spectacularly breached their fiduciary duties to Intrepid, and they can be counted on to handle the assets going forward for only their self-interest as opposed to Intrepid's, creating independent risk of imminent harm. *See Baliga on behalf of Link Motion Inc. v. Link Motion Inc.*, 385 F. Supp. 3d 212, 222 (S.D.N.Y. 2019)

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

(quoting Wright & Miller, Fed. Prac. & Proc. § 2983 (3d ed. 2019)) ("'[P]erhaps one of the most frequent of settings in which federal equity receivers have been employed … is as an incident to a stockholder suit to prevent the impairment of corporate assets.'").[13]

## C.     Defendants Engaged in Fraudulent Conduct

Defendants have plainly engaged in fraudulent conduct to date, fulfilling the second *Canada Life* factor (fraudulent conduct or probability of fraudulent conduct by defendants), *Canada Life*, 563 F.3d at 844, thus necessitating the appointment of a receiver. The clandestine and unlawful Article 9 foreclosure and self-dealing of assets described above is part of a broader pattern.

As outlined above, Mr. Dawson's predatory lending practices also involved, among other things: (1) making unlawful, extortionate threats against Mr. Sharif as Intrepid's founder; (2) playing fast-and-loose with company books and finances—apparently double counting his debt versus equity interests in Intrepid (*see supra* Section II.A.)—in such a way as to make Intrepid purposefully unattractive to investors or partners without making the appropriate disclosures to shareholders and board members and obtaining appropriate approvals (*id.*); (3) attempting to divert the approximately $4 million in Steam funds, owed to Intrepid and promised to CommerceWest, to TFE (again via Mr. Dawson's personally-owned bank) to further the unlawful foreclosure, likely constituting attempted bank fraud; and (4) deliberately filing false documents with the California Secretary of State to hide their culpability from the public. (*Supra* Section II.E.)

---

[13] In *Baliga*, the court found receivership necessary based on evidence of (1) "transfer[] [of] substantial assets without notice to the Board"; (2) "fail[ure] to make required filings with the SEC"; (3) "employees hav[ing] gone without pay"; and (4) the "fir[ing] [of] employees[.]" *Baliga*, 385 F. Supp. 3d at 222. "These behaviors are precisely the kind of actions that warrant the appointment of a receiver." *Id.* And they precisely track Defendants' actions here.

Taken together, their conduct to date plainly shows Defendants have no qualms about engaging in fraudulent and self-interested conduct when it suits them, rendering a receiver a necessary safeguard for Intrepid.

**D.      The Balance of the Equities Support Appointing a Receiver, Which Will Benefit Intrepid Without Undue Harm to Defendants**

Finally, a receiver should be appointed because "the harm to plaintiff" absent a receiver will far "outweigh injury to" Defendants, and Plaintiff's interests will be "well-served by receivership," whether by safeguarding Intrepid's assists during the pendency of this lawsuit, investigating whether Mr. Dawson/TFE have a valid lien, or overseeing a fair, orderly, and commercially reasonable sale, thus satisfying *Canada Life* elements five (balance of the harms) and seven (whether plaintiff's interests will be well-served by a receiver). 563 F.3d at 844.

As discussed above, Defendants' pattern of self-interested behavior and efforts to take control of and sell Intrepid's assets, including its intellectual property, shows the severe harm Intrepid is facing should Defendants (who remain the Board of Intrepid) be given unfettered control of Intrepid's assets. In contrast, Defendants face no real risk of harm. Should any sale of Intrepid's assets occur, a receiver will be able to ensure that such a sale is commercially reasonable and beneficial to all parties maintaining an interest in Intrepid—including the interests held by Defendants. The only risk to Defendants if a receiver is appointed is that they will not be able to pursue a ***self-interested*** sale at the expense of Intrepid, which is not cognizable harm.

Moreover, a receiver with broad equitable powers, as outlined above, will serve Intrepid's interests well: that person can conduct an orderly untangling of the various asserted loans, equity, and liens related to Intrepid, including determining the validity of Mr. Dawson's/TFE's lien both before their original Article 9 sale, and following the purported "unwinding" of that sale.

*      *      *

Because all of the *Canada Life* factors support appointing a receiver to ensure

that Intrepid's assets are protected—either through a receiver's oversight during the pendency of this case, or through a commercially reasonable, valid, and impartial sale that will protect the interests of all parties with an interest in Intrepid—the Court should appoint a neutral receiver over Intrepid with full equitable and exclusive power to possess, control, preserve, or sell the assets as necessary; operate and manage the business; conduct financial administration and accounting; litigate claims; and ensure legal and court compliance.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant this motion and appoint a neutral receiver over Intrepid with full equitable and exclusive powers to possess, control, preserve, or sell the assets as necessary; operate and manage the business; conduct financial administration and accounting; litigate claims; and ensure legal and court compliance.

DATED:  April 14, 2026                Respectfully submitted,

                                      WITHERS BERGMAN LLP


                                      By:  */s/ Jordan W. Garman*
                                           Jessica Nall (SBN 215149)
                                           Jessica.Nall@withersworldwide.com
                                           Withers Bergman LLP
                                           909 Montgomery Street, Suite 300
                                           San Francisco, California 94133
                                           Telephone:  415.872.3200

                                           Leslie Evans (SBN 173010)
                                           Leslie.Evans@withersworldwide.com
                                           4250 Executive Square, Suite 540
                                           La Jolla, CA 92037
                                           Telephone:  619.329.6454

                                           Jordan W. Garman (admitted *pro hac vice*)
                                           Jordan.Garman@withersworldwide.com
                                           430 Park Avenue, 10th Floor
                                           New York, NY 10022
                                           Telephone:  212.848.9882

                                           *Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*