Jessica Nall (SBN 215149)
Jessica.Nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Leslie Evans (SBN 173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone:  619.329.6454

Jordan W. Garman (admitted *pro hac vice*)
Jordan.Garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone:  212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDING LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP <br><br> **DECLARATION OF STEVEN SHARIF IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER** <br><br> *Filed concurrently with Notice of Motion; MPA; Declaration of Jessica Nall; Witness Declarations; Request for Hearing* <br><br> **PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** <br><br> Judge:        Hon. Linda Lopez <br> Hearing Date: May 19, 2026 <br><br> Action Filed:  February 14, 2026 <br> Trial Date:     Not Set |

## DECLARATION OF STEVEN SHARIF

I, STEVEN SHARIF, declare as follows:

1.    I am the former Chief Executive Officer and former member of the Board of Directors of Intrepid Studios, Inc. ("Intrepid" or the "Company"), and I am currently a shareholder of Intrepid. I have brought this lawsuit both on my own behalf and derivatively on behalf of Intrepid as a shareholder. All facts set forth in this declaration are of my own personal knowledge or are believed by me to be true. If called as a witness, I could and would testify competently as to all facts set forth herein.

2.    I submit this declaration in support of Plaintiff's Motion to Appoint Receiver.

### I.    Mr. Dawson's Introduction to Intrepid and Ensuing Loan-to-Own Scheme

3.    In October 2020, Jason Caramanis, one of Intrepid's existing lenders and a longtime business associate of Robert Dawson, introduced Intrepid and me to Mr. Dawson as a potential financing source.

4.    On March 23, 2022, Mr. Dawson executed a convertible promissory note to Intrepid in the amount of $8,000,000, which was unsecured. This was Mr. Dawson's first investment in Intrepid.  Even though the note was executed on March 23, 2022, Mr. Dawson requested that the note be backdated to November 23, 2020. Attached hereto as **Exhibit 1** is a true and correct copy of an email thread dated March 23, 2022 to March 25, 2022 between, among others, Mr. Dawson and me, concerning that initial investment. Attached hereto as **Exhibit 2** is a true and correct copy of the backdated note. This was not the only instance of Mr. Dawson requesting that documents be backdated. Many of Mr. Dawson's loan and investment documents were backdated—sometimes by several years—as part of Mr. Dawson's predatory lending scheme.

5.    On December 20, 2022, Riot Games' Chief Financial Officer sent an initial proposal for Riot to potentially acquire Intrepid, contemplating a total Riot

investment of approximately $250–$500 million, a true and correct copy of which is attached hereto as **Exhibit 3.**

6.     Mr. Dawson advised me against accepting the offer by Riot Games. A true and correct transcription of a voicemail from Mr. Dawson to me is attached hereto as **Exhibit 4**.

7.     Beginning shortly after the Riot offer, in early 2023, Mr. Dawson began extending a series of additional loans to the Company through convertible promissory notes (the "Notes"). True and correct copies of three representative examples of the Notes are attached as **Exhibits 5, 6, and 7**. The terms for all were substantially the same. As noted above, Mr. Dawson had a practice of backdating these notes because he wanted to justify the lower valuation at which he had issued debt by claiming he had provided it earlier than he had. I understood that he wished to do this to improve his position relative to any other investors and lenders whose notes might be valued at the actual, high 2023 valuation.

8.     When Mr. Dawson committed funding to Intrepid, he assured me that he had no intention of taking control of the Company. A true and correct copy of his July 31, 2023 message assuring me of this is attached hereto as **Exhibit 8.**

9.     Despite that assurance, beginning in 2023 and 2024, Mr. Dawson began working to expand his control through strong-arm tactics. I observed that Mr. Dawson would frequently request Mr. Caramanis, who is known to be a violent individual with multiple prior arrests including a conviction in or around 2009 for "inflict[ing] corporal injury resulting in a traumatic condition," to yell at and threaten me in his stead, acting as an "enforcer," when Mr. Dawson wanted me to take certain actions that advanced his efforts to seize control of Intrepid.  Mr. Dawson and his agent Jason Caramanis consistently threatened, most often through phone calls but occasionally with text messages and in person meetings, to:

- (A) Withhold funding days or sometimes hours before payroll and health-insurance deadlines.

- o A true and correct copy of a December 16, 2024 text message from Mr. Dawson to me threatening to withhold payroll funding unless amended articles were filed is attached hereto as **Exhibit 9**.
- o A true and correct copy of a June 10, 2024 text message to me threatening to withhold funding until I signed certain documents is attached hereto as **Exhibit 10.**
- (B) Shut Intrepid down through litigation.
    - o A true and correct copy of an April 26, 2024 text message from Mr. Caramanis to me threatening that if my husband did not exit the company, Mr. Dawson would push a "Nuclear war button," and Mr. Caramanis would "start suing [me] and start aggressively attacking [me] and the company and simultaneously put [the company] [into] involuntary Bankruptcy, and then also [file] a TRO removing [me] and [my husband] from the company" during which time Mr. Dawson would cease all funding thereby "obliterat[ing]" "payroll," is attached hereto as **Exhibit 11**;
- (C) Subject me to criminal prosecution.
    - o A true and correct copy of a June 13, 2024 text message from Mr. Dawson to me threatening to file a complaint with the California AG for securities fraud if Mr. Moore and I didn't exercise and issue warrants for our stock is attached hereto as **Exhibit 12**.
- (D) Cause my husband and me financial ruin, homelessness, and physical harm.
    - o A true and correct copy of an April 29, 2023 string of threatening text messages from Mr. Caramanis to me, in which he called me a "MOTher fucker," and stated "i [sic] am talking to you like you need to understand who your [sic] fucking with," "push [me] more asshole," and "keep it up bitch," is attached hereto as **Exhibit 13.**

Withers
Bergman LLP

4

Case No. 3:26-cv-00965-LL-MMP

DECLARATION OF STEVEN SHARIF IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

o A true and correct copy of a May 1, 2024 text message to me from Mr. Dawson, in his capacity as Director and owner of Pathway Bank, threatening to evict my husband from his home unless he received signatures on various items furthering his takeover of Intrepid is attached hereto as **Exhibit 14.**

o A true and correct copy of a May 23, 2024 text message from Mr. Caramanis to me stating that "my life is over[,]" that he was "NOT fucking around" and that he "would fuck [my] entire world up" if I didn't sign the documents is attached hereto as **Exhibit 15.**

o A true and correct copy of a May 14, 2024 text message from me to Mr. Dawson contemporaneously memorializing a call in which Mr. Caramanis threatened to break my jaw, to which Mr. Dawson responded that he was "done," directed me to send him stock certificates, and stated that he was preparing default notices is attached hereto as **Exhibit 16.**

10. Mr. Dawson and his agent Mr. Caramanis made those threats to pressure and compel me to execute documents that would grant him ever-increasing leverage and control over Intrepid and to ensure complete compliance and submission to their control and efforts to take control of Intrepid.

11. Under this coercive pressure and for fear of harm to Intrepid's employees and the other creditors and investors, I approved extraordinary, one-sided concessions to Mr. Dawson, including (among other things) a warrant providing Mr. Dawson 10% of the Company for $10, and non-dilutable zero-cost equity options embedded in the Notes. Attached is a true and correct copy of the agreement for the warrant as **Exhibit 17.**

12. All of the convertible notes executed after that date (through 2025) of which I have record of expressly state that the debt is "unsecured and subordinated" to senior debt. (*See, e.g.*, Exhibits 5-7 § 7.)

13.    In May 2024, I entered into a ███████████████ ████████████████████████████████████████████ Despite being an adverse party to the transaction, Mr. Dawson directed Intrepid's counsel regarding ████████████ and even signed an engagement letter as Intrepid's purported "agent," without Intrepid's authority, attached hereto as **Exhibit 18.**

14.    Under ████████ and related Conversion Agreements, Mr. Dawson converted all outstanding debt to equity, expressly cancelling $49,594,000 in notes and terminating all debt obligations underlying the very UCC-1 he had just filed on May 13, 2024. True and correct copies of those Conversion Agreements are attached hereto as **Exhibits 19 and 20.** Mr. Dawson's UCC-1 filing is attached to the Complaint as Exhibit B. (Dkt 1-3.) The May 13, 2024 UCC-1 filing describes the collateral as: "All assets and all personal property of Debtor, wherever located and whenever acquired, including, but no limited to: Equipment, Inventory, Fixture, Goods, Instruments, Chattel paper (including without limitation Electronic Chattel Paper), General Intangibles, payment Intangibles, Accounts and all other obligations now or hereafter owing to Grantor, all Deposit Accounts, cash, and money, certificates of deposit, Investment Property, Financial Assets, Letters of Credit Rights, all Commercial Tort Claims and any other causes of action against third parties (excluding only claims for death or personal Injury), As-Extracted Collateral, Intellectual property, copyrights, trademarks trade names, all Supporting Obligations for any of the foregoing, all Proceeds (including without limitation insurance proceeds) from and products of and accessions to any of the foregoing and all books and records relating to any of the foregoing. Terms and used herein shall have the meaning provided in the applicable Uniform Commercial Code." Following this conversion, Mr. Dawson became Intrepid's majority shareholder holding approximately 58% of the shares. Mr. Dawson promptly used his position to appoint himself and his close associate, Ryan Ogden, to the board on or around July 2024.

Withers Bergman LLP

6    Case No. 3:26-cv-00965-LL-MMP
DECLARATION OF STEVEN SHARIF IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

15. Even after Mr. Dawson obtained this control, he continued to threaten me and the Company. A true and correct copy of a March 24, 2025 text message from Mr. Dawson to me, in which he threatened to withhold funding because I did not respond to a prior text message, is attached hereto as **Exhibit 21**.

16. In April and July 2025, in furtherance of his loan-to-own scheme, Mr. Dawson executed amendments to the Conversion Agreements (with a retroactive effective date of June 1, 2024—*i.e.*, the time of the original conversions to equity) purporting to unwind the equity conversion (held individually and through his wholly owned entity Intrepid Creations, LLC) and reinstate his prior purportedly secured debt on the original terms of the Notes. This purported "unwinding" included the original language in the Notes that stated that all of Mr. Dawson's debt was unsecured and subordinated. True and correct copies of those amendments are attached hereto as **Exhibits 22 and 23.** Notably, under the terms of the July 15, 2025 amendment, by and between, Mr. Dawson, Intrepid, and Ya-Ya Legacy Trust (Exhibit 23), Mr. Dawson did not actually return all of the equity he had received under the Conversion Agreements. That amendment reflects the return of only 975.68 Class B shares, while Dawson retained more than 3,200 Class A shares.

17. Neither I nor any other disinterested director or shareholder approved this transaction. On May 21, 2025, when I asked Mr. Dawson if the board should approve these amendments, Mr. Dawson responded "The board is not a party to the amendments." A true and correct copy of that correspondence is attached hereto as **Exhibit 24.**

18. On December 15, 2025, following a meeting of Intrepid's Board, Mr. Dawson grabbed me forcefully by the arm and physically forced me to sit down. Thereafter, he stood over me and forced me to sign a two-inch thick stack of signature pages without allowing me to see the substance of what I was signing by physically intimidating me and telling me that he "did not want any shit." It is possible that a purported "approval" of this transaction was included in that stack. I did not at any

time formally approve Mr. Dawson's "unwinding" transaction purporting to re-convert Mr. Dawson's equity back to debt, nor, as far as I am aware, did any other disinterested board member.

19.     After the supposed equity unwinding, a capitalization table, dated April 30, 2025—*i.e.*, after the time Mr. Dawson had entrenched his control— shows Mr. Dawson's holdings inexplicably increased from ███████ shares to ███████ shares out of ████████, or 70%. A true and correct copy of the capitalization table is attached hereto as **Exhibit 25.**

20.     I was involved in Intrepid's 2025 search for a strategic partner through the investment bank Aream & Co. The parties who were interested and accessed a diligence data room ultimately declined to move forward due to, among other factors, Intrepid's high level of outstanding debt.

**II.     Mr. Dawson's Use of Personally Owned Pathway Bank to Harm Intrepid**

21.     I am aware that Mr. Dawson personally owns Pathway Bank, a Nebraska-based financial institution. After Mr. Dawson secured majority control of Intrepid and installed a board that was aligned with his interests, Mr. Dawson directed Intrepid's then CFO and board member, Mr. Ogden, to open an Intrepid account at Pathway Bank. A true and correct copy of a March-April 2025 text message thread between Mr. Dawson and Mr. Ogden on which I was cc'd showing Mr. Dawson directing Mr. Ogden to open a Pathway account for Intrepid and to ensure Intrepid deposits are directed to those accounts is attached hereto as **Exhibit 26.** To my knowledge, Mr. Dawson did not seek and did not receive approval from any other disinterested director or shareholder for this financial activity involving his bank.

22.     In or around December 2025, Intrepid launched Early Access to gamers to play *Ashes of Creation* through a platform called Steam, owned by Valve Corporation. This partnership resulted in a receivable (after a revenue share) to Intrepid of approximately $4 million ("Steam Funds"). Attached hereto as **Exhibit 27** is a true and correct screenshot of the Steam revenue dashboard as of January 14,

2026, showing total revenue of approximately $8,200,000.

23.    Throughout 2025, Intrepid and Mr. Ogden made assurances to CommerceWest Bank that the Steam Funds owed to Intrepid would be used to satisfy CommerceWest Bank's loan to Intrepid. Attached hereto as **Exhibit 28** is a true and correct copy of a July 7, 2025 to July 24, 2025 email thread between Mr. Ogden and Aaron Schweizer at CommerceWest Bank, copying me and others in which Mr. Ogden told CommerceWest Bank: "we should receive the early access revenue by the first part of December and then we will be in a great position to pay all accrued interest and principal payments," (at 9) and "Of course, CWBK is in the most senior position on that list of notes, so it will be paid before any of the other notes are paid off." (at 1).

24.    CommerceWest Bank understood that the Steam Funds would be used to pay down its loan. Attached hereto as **Exhibit 29** is a true and correct copy of a letter from Executive Vice President of CommerceWest Bank to Valve Corporation, sent in or around January 2026, notifying Valve Corporation that Intrepid assigned to CommerceWest Bank the Steam receivable.

25.    Despite having committed to pay the Steam Funds to CommerceWest in satisfaction of its senior secured lien, which was overdue, at Mr. Dawson's direction, Mr. Ogden instead instructed Valve to send the Steam receivable to a new account at Pathway Bank that Defendants had opened for TFE Games Holding, LLC ("TFE"). A true and correct copy of a January 7, 2026 text message from Mr. Dawson evidencing his intent to collect the Steam funds for TFE in furtherance of the foreclosure, on which I was cc'd, is attached hereto as **Exhibit 30.** A true and correct copy of a January 8, 2026 email from Mr. Ogden to Mr. Moore and myself, copying Mr. Dawson requesting assistance to "figure out how to transfer the ownership of the [Steam] account to the new entity" and noting it was "urgent" is attached hereto as **Exhibit 31.** Steam ultimately flagged the request as suspicious and froze the funds.

26.    In 2024, Mr. Moore sought to refinance the mortgage for our primary

residence (held by the existing owners under a rent-to-own structure), which was coming due pursuant to its terms. This property served as collateral for CommerceWest Bank's loan to Intrepid. Mr. Dawson offered to assist with the refinance, through Pathway Bank, to ensure the refinance would not adversely affect CommerceWest's loan. Days before the final balloon payment on the pre-existing mortgage came due, Mr. Dawson changed the promised Pathway mortgage terms by raising the mortgage rate from 6% to 10%. Mr. Dawson knew we had no realistic other options to obtain a mortgage on short notice, and so he coerced Mr. Moore to execute a forbearance agreement containing strict foreclosure provisions, stripping us of rights and protections usually afforded to California mortgage holders. Mr. Dawson frequently used his position as our mortgage holder to exert additional pressure on me and threaten my husband and me with eviction to obtain increasing control of Intrepid. (*See* Ex. 12.)

### III.     Mr. Dawson and the Board Execute an Unlawful Foreclosure

27.    On January 16, 2026, Mr. Dawson and the Dawson-controlled Board leveraged his purported secured lien to execute a foreclosure and transfer all of Intrepid's assets to TFE, Mr. Dawson's wholly owned entity, after months of purposefully accruing vendor debts. A true and correct copy of a January 16, 2026 text message from Mr. Dawson on thread on which I am a participant stating "It's offficial [sic]. The foreclosure is complete. TFE holdings owns all of the assets," is attached hereto as **Exhibit 32**.

28.    Days prior to this foreclosure, Mr. Dawson and the Board had represented to Intrepid's shareholders and creditors on an investor meeting call on which I was a participant that he had committed approximately $9 million (to TFE) to complete the game. Similarly, approximately an hour *after* the foreclosure, Ms. Fette confirmed that the Board had $12 million to get to the end of the game, attached hereto as **Exhibit 33**.

29.    On December 29, 2025, I had been an invited third party on a phone call

between Mr. Dawson (as owner of TFE) and TFE's counsel, Samuel Schwartz, even though I had no role with TFE and the interests of Intrepid, of which I was CEO, were in direct conflict with TFE's interests. On that phone call, Mr. Schwartz expressly advised Mr. Dawson he would need to notify CommerceWest Bank of the foreclosure as senior secured lender and that by intentionally not doing so would potentially expose Mr. Dawson to claims of fraudulent conveyance against a banking institution. Following this exchange, Mr. Schwartz informed Mr. Dawson that he would do what he was asking, but that he would need to send him an email advising against this course of action. Mr. Schwartz also advised Mr. Dawson that best practice would be to advertise the sale. Mr. Dawson said that he did not want to, and would not, do so.

30.    During this time, Mr. Dawson's and the Board's coercive behavior towards me continued in an effort to convince me and other senior management at Intrepid to go along with the foreclosure plan. Attached hereto as **Exhibit 34** is a true and correct copy of an email that was forwarded to me by Director of Production Jacob Beucler on March 28, 2026, forwarding Mr. Beucler's January 31, 2026 resignation email to the board, citing concerns that the Board's requests to him caused him ethical and professional concerns, and noting that the Board used threats to not pay Intrepid employees in an effort to make Mr. Beucler "play ball." Faced with these conditions, which I felt to be untenable, in addition to the Board's plan with respect to firing employees without paying them worked wages or PTO, I resigned in protest on January 19, 2026. A true and correct copy of a January 8, 2026 email from Defendant Aaron Bartels regarding Defendants' plan not to pay employees severance or accrued PTO is attached hereto as **Exhibit 35**. A true and correct copy of my January 19, 2026 resignation letter to the Board is attached hereto as **Exhibit 36.** My final act as Intrepid CEO was to advise CommerceWest Bank about the planned foreclosure on January 15, 2026, which had not been noticed to them and which involved a plan to take the Steam Funds that had been promised to them in satisfaction of their senior lien, in an effort to prevent what I felt would be bank fraud. A true and

correct copy an email contemporaneously evidencing my call with CommerceWest Bank on January 15, 2026 is attached hereto as **Exhibit 37.**

31. I was not the only person to resign due to these conditions. On January 16, 2026, Intrepid's senior HR generalist, Midori Roecks, resigned explaining that she could not participate in or facilitate actions she reasonably believed violated the law and that, given the Board's repeated disregard of her concerns, she could not continue in her role without being asked to compromise her legal obligations and her professional and personal integrity. A true and correct copy of her January 16, 2026 resignation letter to the Board is attached hereto as **Exhibit 38**.

32. After my resignation, the Board requested I return as Chief Executive Officer, offering me additional equity if I would go along with the foreclosure. For example, Ms. Fette threatened that employee health benefits would be cut off or that the Company would be shut down without paying employees unless I agreed to return to work as Chief Executive Officer and assisted in diverting the Steam Funds to Mr. Dawson's entity. A true and correct copy of relevant correspondence is attached hereto as **Exhibit 39.** I made clear I would only return under conditions designed to protect the Company and its stakeholders, including the reinstatement of independent corporate counsel rather than conflict-tainted advice from TFE-aligned counsel Mr. Schwartz, the lawful treatment of employees, and the end of coercive practices within the Company in pursuit of their unlawful foreclosure strategy. A true and correct copy of my conditions, as sent to Ms. Fette on January 21, 2026, is attached hereto as **Exhibit 40**. I also urged the Board to ensure employee health coverage would not lapse. A true and correct copy of a January 23, 2026 email from me to the Board doing so is attached hereto as **Exhibit 41.** I also made clear I did not approve of the foreclosure or the attempt to secretly divert the Steam Funds out from under CommerceWest Bank and into TFE. A true and correct copy of a January 23, 2026-January 30, 2026 text message threat between myself and Ms. Fette evidencing my contemporaneous disagreement is attached hereto as **Exhibit 42.**

## IV. Mr. Dawson and the Board Expose Intrepid to Liabilities and Publicly Conceal their Identities and Roles in Intrepid

33. On February 6, 2026, I received notice from the California Department of Industrial Relations that the agency had opened a regulatory inquiry into suspected wage theft based on the way in which the Board had summarily terminated all Intrepid employees without pay, benefits, or accrued PTO in early January 2026.

34. Just days prior to Defendants' unlawful foreclosure and associated mass layoffs, Mr. Ogden at the direction of Mr. Dawson and the Board, caused Intrepid to file a materially and intentionally false Statement of Information, attached, a true and correct copy of which is attached hereto as **Exhibit 43**, with the State of California that inaccurately identified me as the sole director and Mr. Moore as CFO. The Statement of Information purposely omitted the true identities of the Dawson-controlled Board, who was in fact exercising full operational authority over the Company, and hid the fact that Mr. Ogden was, in fact, CFO. This omission was consistent with Mr. Dawson's deliberate efforts to conceal his control over Intrepid in furtherance of his unlawful activity. As reflected in a true and correct copy of a July 28, 2024 message from Mr. Dawson attached hereto as **Exhibit 44**, Mr. Dawson expressly directed that he remain "hidden in the background as ownership" and not be in the forefront of the Company's operations. In line with this directive, Mr. Dawson threatened me on multiple occasions not to publicly disclose his involvement, reinforcing his intent to obscure his role. After discovering the false filing, I promptly notified Defendants that the filing was inaccurate, unauthorized, and should be corrected, yet Defendants refused to amend it, leaving in place a public record that misidentified who governed the Company during the period of Defendants' control. A true and correct copy of correspondence is attached hereto as **Exhibit 45.** Mr. Moore likewise addressed and objected to this false filing in his resignation letter, a true and correct copy of which is attached hereto as **Exhibit 46.** It is my belief that Defendants refused to amend this false filing because they wished to pin public blame

for Intrepid's collapse and their unlawful activity on me and my husband Mr. Moore, who had not acted as Intrepid's CFO for nearly two years at the point this false statement was filed.

## V. Mr. Dawson's Agent, Mr. Caramanis, has Deliberately Sought to Devalue Intrepid

35. After Defendants' unlawful foreclosure, Mr. Dawson's agent Mr. Caramanis has worked tirelessly to damage Intrepid's value in the marketplace through a sustained public defamation campaign, spanning dozens of hours of live YouTube interviews and social-media appearances, attacking Intrepid and me and disparaging the Company. In those public statements, Mr. Caramanis has also repeatedly disclosed and misrepresented highly sensitive internal and confidential Company documents, which he has represented he obtained from members of the Board. My understanding based on Mr. Caramanis's longstanding close connection to and actions at the direction of Mr. Dawson from 2020 to 2026 is that Mr. Caramanis has been directed to undertake this defamatory publicity campaign on Defendants' behalf. For example, in one YouTube video entitled "Ashes of Creation Investor RESPONDS to Steven Sharif's 'Legal Victory'", posted on March 7, 2026, available at **https://youtu.be/khc0mBkI92A?si=9JK4hvtfoNxgV-XW&t=1722**, timestamp 28:43, Mr. Caramanis states, "I'm looking at the QuickBooks files that were turned over to me by Ryan Ogden." Similarly, in another YouTube video entitled "Steven Sharif's WORST Nightmare Comes True," posted on February 14, 2026, available at **https://youtu.be/IQOTjfCIS3g?si=MKyLT6u3ZtjHLCcQ&t=1212**, timestamp 1:23:42, Mr. Caramanis states: "It wasn't until three days ago that I got them and I got them from Rob's guy Ryan Ogden who's been going through the books for the last six to nine months." Mr. Caramanis's defamation campaign has resulted in severe negative reputational damage to Intrepid and Ashes of Creation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2026 at Harrisonburg, Virginia.

By: _____

Steven Sharif