Jessica Nall (SBN 215149)
Jessica.Nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Leslie Evans (SBN 173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone:  619.329.6454

Jordan W. Garman (admitted *pro hac vice*)
Jordan.Garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone:  212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDING LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP <br><br> **DECLARATION OF BRYAN LANGFORD IN SUPPORT OF PLAINITFF STEVEN SHARIF'S MOTION FOR RECEIVER** <br><br> *Filed concurrently with Plaintiff's Motion for Appointment of Receiver* <br><br> Judge:          Hon. Linda Lopez <br> Hearing Date:  May 19, 2026 <br><br> **PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** <br><br> Action Filed:  February 14, 2026 <br> Trial Date:     Not Set |

Withers
Bergman LLP

Case No. 3:26-cv-00965-LL-MMP

DECLARATION OF BRYAN LANGFORD IN SUPPORT OF PLAINITFF STEVEN SHARIF'S MOTION FOR RECEIVER

# DECLARATION OF BRYAN LANGFORD

I, BRYAN LANGFORD, declare as follows:

1.     I am the former Executive Producer and Head of Studio at Intrepid Studios, Inc. ("Intrepid'). I make this declaration voluntarily based on my personal knowledge, and if called as a witness, I could and would testify competently to the facts stated herein.

2.     I worked for Intrepid from February 2019 to late January 2026. Prior to working for Intrepid, I worked for other video game development companies NC Soft and Blizzard.

3.     In December 2024, Intrepid released an Alpha Two version of *Ashes of Creation*. By January 2025, it was the most successful version of the game to-date based on daily engagement metrics and feedback from players. It was my belief at that time that if we broadened our player base, we could have generated even stronger numbers down the road.

4.     In early September 2025, Mr. Sharif started mentioning that he was getting pressure from the company's investors and started to include Jacob Beucler, former Director of Production, and me in strategic decision-making to keep Intrepid financially viable.

5.     In October 2025, Mr. Sharif wrote to me and an in-house HR representative that he had been advised by his doctors to take a step back from running Intrepid for the sake of his health. In this email, Mr. Sharif requested to go on medical leave due to advice from his doctors who believed he was under too much stress. Mr. Sharif subsequently took a brief medical leave, returning a few weeks later on a remote basis.

6.     Over the last two years, I have observed Steven Sharif suffer from significant health issues. Approximately a year and a half ago, Mr. Sharif suffered a severe health emergency to the extent that I and others believed him to be on his death bed. At that time, his husband, John Moore, tearfully asked if Intrepid would finish

WITHERS
BERGMAN LLP

Case No. 3:26-cv-00965-LL-MMP

DECLARATION OF BRYAN LANGFORD  IN SUPPORT OF PLAINITFF STEVEN SHARIF'S MOTION FOR RECEIVER

*Ashes of Creation* in Mr. Sharif's honor in the event he passed away. Prior to these health issues, I observed Steven Sharif work closely with employees, taking calls from his desk in the Intrepid design studio and frequently hosting company barbeques and events to boost team morale. As a result of these health issues, he was forced to take a step back both professionally and socially. Employees started coming to me with questions they typically would have asked Mr. Sharif. I believe this was very challenging for Mr. Sharif, who was passionate about *Ashes of Creation* and wanted to be back in the trenches working with his team.

7.    On December 15, 2025, I witnessed unusual behavior by Robert Dawson toward Mr. Sharif. That day, Mr. Sharif and the board held an all-day in-person meeting at the Intrepid studio. I entered the conference room once the meeting ended and saw Mr. Sharif and Mr. Dawson alone in the room, huddled very close to each other, while Mr. Dawson pointed at documents. I found the close proximity of the two men to be unusual at the time, and I later understood from Mr. Sharif that it was an intense interaction he believed was meant to intimidate him.

8.    Around Thanksgiving 2025, the board suggested that they wanted to speak to Mr. Beucler and me directly without Mr. Sharif. This is when communications with the board became unreasonable in my opinion. We communicated to the board that we needed more time to develop the game, but they did not seem to care. Instead, they claimed that they could not afford to spend more money on development and therefore wanted to monetize the game immediately. They started to look toward cutting costs and initially considered giving up Intrepid's physical studio space. When they realized that this would only save about $1.5 million dollars per year, they decided to also start cutting employees. At that time, Intrepid was spending almost $4 million per month, $2.9 million of which went to employee salaries.

9.    Mr. Beucler and I suggested to the board that there were many indicators that the game was going very well, aside from money. We suggested pushing back

WITHERS
BERGMAN LLP

2                                        Case No. 3:26-cv-00965-LL-MMP
DECLARATION OF BRYAN LANGFORD IN SUPPORT OF PLAINITFF STEVEN SHARIF'S MOTION FOR RECEIVER

the launch from March 2026 to June, September, or even end-of-year 2026 with proposals to help offset the costs in the interim. Mr. Beucler told the board he would put together a corresponding roadmap to support our proposal, which he sent to the board in a PowerPoint presentation on December 23, 2025. In the gaming industry, studios typically close around the holidays from December 23rd through January 2nd. Mr. Beucler and I, however, spent our holiday time pitching additional cost-cutting proposals to the board.

10.    On December 29, 2025, I attended a call with the board where they directed me to fire 125 Intrepid employees by 5:00 PM on December 31, 2025. Despite the entire staff being on vacation, I was expected to find a way to contact employees on their holiday break, get them on the phone, and tell them their jobs were over on New Year's Eve. The board also communicated on this phone call that Intrepid would not be paying PTO or severance.

11.    I also objected to the directive because it would be a WARN Act violation. Interestingly, no one on the board had mentioned the WARN Act until I brought it up. Once I did, the board members suddenly began to discuss the law and seemed to be knowledgeable about it. Theresa Fette seemed particularly informed on the WARN Act. This suggested to me that they knew about the law when they were silent about it, but hoped it would not be brought up. I concluded that they were trying to set me up and were attempting to put me in a position where, if I followed their instructions, any liability would fall on me and management rather than on the board.

12.    I refused to comply and I communicated my objections to the plan to Mr. Sharif by email with my Intrepid email account on December 29, 2025. In that email, I told Mr. Sharif that I would not comply because (1) it was impractical in that the board gave me only two days' notice during a holiday break, and (2) it was illegal not to pay employees' PTO under California law and that this directive from the board would be a WARN Act violation because the layoffs involved more than 50 employees. I no longer have access to my Intrepid-issued email account in order to

3                                    Case No. 3:26-cv-00965-LL-MMP

Docusign Envelope ID: 9552953A-3F16-4EF5-A42F-4169BBFD4AA2

attach these e-mails here. I understood that Mr. Sharif subsequently spoke with the board and convinced them to delay further discussion of the layoffs until everyone had returned to the office around January 6, 2026.

13. Between January 1 and January 24, 2026, the board scheduled multiple meetings with me, Mr. Beucler, and others. There were at least three meetings during which I was told to fire substantial numbers of people and to stop making "legal claims" about why it was problematic. During two calls, board member Aaron Bartels used coercive language and what I consider to be strong-armed pressure tactics to pressure me to act according to the board's will. These calls caused me severe distress.

14. At one such meeting, Mr. Bartels told me to stop arguing about the WARN Act and legal issues because the board had "the absolute best" lawyers who told the board not to worry about their layoff plans. Mr. Bartels also told me to "stop citing laws" and to fire employees as instructed. I understood his comments to mean either that the board did not care about the legality of firing employees under the WARN Act or that, regardless of potential legal exposure, they believed their lawyers would take care of it.

15. On another call in January 2026, which included Aaron Bartels, Doug Bartels, Mr. Beucler and me, Aaron Bartels again threatened to fire employees without paying out their PTO. He said that if I "played good" with the board, they would consider paying out employees' PTO in cash. However, Mr. Bartels said that if I continued to protest that he "[did not] know what would happen to their PTO." I understood this to mean that the fate of employees' earned PTO depended on whether I complied with the board's demands. Many employees had banked substantial PTO, enough to give them a month or more of runway to find a new job. I felt as though, if I did not cooperate, this runway for employees might disappear. I was emotionally crushed with about 200 people's lives on my conscience.

16. After that call, I was in tears discussing it at home with my fiancée. I wrote to Mr. Sharif and told him I could not continue with the company and that I

wanted to quit.

17. The board subsequently began introducing the idea of creating a second company, TFE Games Holdings, LLC ("TFE"). I understood their plan to be to roll about 60 employees over to the new company, and to fire 49 people from one company and 49 from the other in furtherance of what I believed to be a scheme to avoid triggering WARN Act obligations at either entity. I understand that the board subsequently suggested to Mr. Sharif and Mr. Beucler that this was management's idea, including me, but my understanding is that is false.

18. At this time, the board had stopped paying bills, including those from external contractors who had already completed substantial work. Once the board formed its new company, TFE, and ceased paying Intrepid's bills, it appeared to me that the board was deliberately allowing obligations to accumulate at Intrepid while shifting its most valuable assets and operations to TFE, leaving creditors and employees behind with a shell of a company. In my experience, this kind of behavior is very damaging in the gaming industry. If you do not pay your server providers, you do not have servers to run your game and you ruin critical relationships that are necessary to run a live service game. The board did not seem to understand this or care.

19. The board's plan to move certain employees over to the new company was also flawed. In my experience, talent turnover is common in gaming—when one key person leaves, others follow. However, when this occurs, you are often left with a few junior and mid-level employees trying to execute work that directors and highly experienced staff had been coordinating for years. The board seemed to have no real understanding of what would be required of these employees to make the game actually shippable and failed to grasp the complexity of service stability, economy balancing, and high-level design. The board asked if I would serve as CEO to continue development, but I refused. I saw way too many problems with the way they were operating.

20.     At some point in January 2026, Mr. Sharif resigned. Even after his resignation, Mr. Sharif remained the key conduit between the board and senior Intrepid employees, like me and Mr. Beucler. Following his resignation, Mr. Sharif continued to pressure the board to pay employees' health insurance. At one point after his resignation, Mr. Sharif offered to return as CEO so long as the board agreed to pay employee health insurance, reformed how employees' shares in the company were structured, and ensured that certain employees receive work visas to remain in the country. Mr. Sharif documented these demands in a list which he showed to me, Mr. Beucler and Mr. Zimmerman. The board refused his offer outright. I believe this is because, at this point, the board was desperate and was not thinking their plan through.

21.     I also pressured the board to pay employee health insurance during this time. The board nonetheless failed to make required payments to the insurance companies in January 2026, causing all plans to terminate on February 1, 2026. Employees who had accrued health care bills in January were thus forced to pay them without the benefit of their health insurance plans.

22.     After Mr. Sharif resigned, Mr. Beucler and I tried to create a reasonable, legal plan for the first round of layoffs. We identified nine people to lay off. However, when one key HR employee saw how the board intended to handle PTO and severance, she decided she could not participate. She resigned and added her own name to the list of layoffs. We therefore initially identified 10 people for the board to lay off.

23.     Immediately following the layoffs, there was a small uproar in the gaming community. The board had never seen this sort of reaction before. They appeared to me to be used to other types of businesses—such as real estate, agriculture, or other businesses unrelated to gaming—where layoffs do not produce widespread online backlash. I warned the board that this reaction was only a small taste of what would happen if they proceeded with mass layoffs without considering

the WARN Act, PTO, or severance, and without the support of the face of our company, Mr. Sharif. I told them it would be like dropping Mount Everest in a lake.

24.     I understood that the board's lawyers told them that the backlash would fall on Intrepid as the dead shell company. This seemed to encourage them to continue with their plan of moving assets to the new company and framing the narrative in a way that villainized Sharif and the Intrepid team. In my view, they wanted to pin the blame on Intrepid's management and wanted to cast themselves the heroes trying to save whatever they could.

25.     On January 28, 2026, I attended a meeting with Jason Zimmerman and Doug Bartels. Mr. Bartels had been trying for some time to get access to Perforce and all of Intrepid's codebase. He was not an Intrepid employee and was not even an investor. I believe he was acting as a representative for Mr. Dawson, claiming he needed access to all these systems to do his finance-related work. Mr. Zimmerman and I refused to give him access as he was not part of the company. In response, I understood the board appointed Mr. Bartels as interim CEO through emails sent to Mr. Zimmerman and I saying that the access to Intrepid's codebase was "CEO approved." Mr. Zimmerman began onboarding Mr. Bartels, but the process was never completed.

26.     On January 30, 2026, at approximately 1:00 PM, I drove to Intrepid's offices to meet with the board in person. I attended this meeting with the intention of telling the board that I would stay and try to help because I believed it would be the right thing to do for the team. At this meeting the board allowed an outside person, who was apparently being considered as a potential new CEO, to sit in on the meeting, which I believed to be a confidential internal company meeting.

27.     When the game launched in December 2025 on an early access basis on the online gaming retail platform Steam, it generated revenue from sales and microtransactions. Steam did not pay this money immediately. Instead, there was usually a 30-day delay after the end of the month, which meant it could take 45 to 60

days before the studio actually received the funds. By that time approximately $4 million in Steam revenue was processed. Mr. Dawson and the board had already created TFE. I understood from Mr. Sharif at the time that Mr. Dawson pushed to have the $4 million from Steam deposited with TFE. Mr. Sharif told me that CommerceWest Bank held a priority lien on the company, so if he complied and arranged for the money to go to TFE without their knowledge or consent, he believed he would be violating the bank's rights and an accomplice to fraud.

28.    When I arrived at the meeting on January 30, 2026, the board told me that Sharif had "stolen" $4 million from them that morning by contacting CommerceWest Bank and blocking the money from being deposited with TFE. They told me they needed $4 million by 5:00 PM that day, and if they did not get it, they were going to shut the whole studio down in retaliation. The board claimed that they had been planning to use that $4 million to pay employee salaries and outstanding bills. I did not believe them and considered their statements to be a convenient excuse for not paying employees. I also had no idea how to get them $4 million by that deadline.

29.    The board also demanded that Intrepid send WARN notices the next day, on January 31, 2025, and then fire everyone by February 2, 2025. They demanded that I execute this plan. The draft WARN notice sent to me by email was signed by "Intrepid management." I asked the board whether this referred to Doug Bartels as interim CEO. They told me that any reference to Mr. Bartels as interim CEO had been a mistake and that he was never meant to have full CEO powers, despite their previous representation to me and Mr. Zimmerman that he had been appointed interim CEO in order to gain access to Intrepid's code base on January 28, 2026. In my view, this was the final confirmation that the board was trying to shift blame and legal exposure onto others while keeping themselves clean.

30.    Executing these layoffs was deeply personal to me. The board, whom I understood held very large sums of money, were willing to sacrifice the livelihoods

WITHERS
BERGMAN LLP

DECLARATION OF BRYAN LANGFORD IN SUPPORT OF PLAINITFF STEVEN SHARIF'S MOTION FOR RECEIVER

of around 200 people and kill a creative project that meant so much to thousands in the gaming industry, treating tens of millions of dollars like just another speculative position.

31.     Following these layoffs, I understood from the board that they intended to outsource the development of *Ashes of Creation* to a Philippines-based development company named Amber. They later decided to outsource development to Companion Group, a vendor Intrepid had previously worked with to outsource limited engineering work. In order to do so, Companion Group required Intrepid's code base. When requested, I understood from Mr. Zimmerman that he was not comfortable handing over Intrepid's assets to the board.

32.     In view of my observations of Defendants' conduct with respect to Intrepid, I support the appointment of a receiver to safeguard Intrepid's assets and act in the best interests of Intrepid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2026 at Oceanside, California.

By: _____
DocuSigned by:
*BRYAN LANGFORD*
99A34879DDBA4AB...
Bryan Langford