Jessica Nall (SBN 215149)
Jessica.Nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Leslie Evans (SBN 173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone:  619.329.6454

Jordan W. Garman (admitted *pro hac vice*)
Jordan.Garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone:  212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDING LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP <br><br> **DECLARATION OF TOM ALKAZIN IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S MOTION TO APPOINT RECEIVER** <br><br> *Filed concurrently with Plaintiffs' Motion for Appointment of Receiver* <br><br> Judge:            Hon. Linda Lopez <br> Hearing Date:  May 19, 2026 <br><br> **PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** <br><br> Action Filed:  February 14, 2026 <br> Trial Date:      Not Set |

## <u>DECLARATION OF TOM ALKAZIN</u>

I, TOM ALKAZIN, declare as follows:

1. I am an investor in Intrepid Studios, Inc. ("Intrepid'). I make this declaration voluntarily based on my personal knowledge, and if called as a witness, I could and would testify competently to the facts stated herein.

2. I was the earliest investor and a board member of Intrepid from its inception through mid-2024. I have known Steven Sharif since he was a child and our families have been close for many years.

3. In or around 2015, Mr. Sharif presented to my wife and me the concept for Intrepid and the game the company sought to develop, *Ashes of Creation*. At that time, neither my wife nor I had any background in gaming and did not consider ourselves to be sophisticated investors. Nonetheless, we were struck by Mr. Sharif's keen intelligence and his creative vision for creating a game that would be very unique in the marketplace.

4. My wife and I were the first investors in Intrepid, which we understood to be a startup endeavor. Development ultimately took quite a bit longer than we originally expected. However, by December 2025, the early-access launch of *Ashes of Creation* came to fruition. That launch produced sales somewhere over several million dollars in revenue, and the future of the game looked extremely bright at the end of 2025.

5. Over time, the company took on new investors, including Jason Caramanis, who introduced Mr. Sharif to Rob Dawson. Mr. Dawson subsequently became a majority investor in the company.

6. In or around December 2022, an outside buyer offered to purchase Intrepid. I understood from Mr. Sharif that Mr. Dawson did not want to accept the offer. My belief is that Mr. Dawson and Mr. Caramanis realized the potential value of Intrepid after receiving this offer and the two thereafter devised a plan for Mr. Dawson to acquire control of the company through a pressure campaign waged

against Mr. Sharif. After Intrepid declined the offer, Mr. Dawson's and Mr. Caramanis' tone completely changed and the two began a campaign of coercive calls and texts to Mr. Sharif. Mr. Sharif contemporaneously informed me of threats made by Mr. Dawson to stop funding, threats related to payroll, and threats implying that Mr. Caramanis would physically harm Mr. Sharif if he did not comply with demands being made of him.

7. I was made aware that, as early as April 30, 2023, Mr. Caramanis texted Mr. Sharif claiming that he and Mr. Dawson would destroy the company unless Mr. Dawson got what he wanted. I am also aware of threats by Mr. Dawson to withhold payroll funds at the last minute unless certain actions were taken or documents were signed. This was part of a broader pattern of using threats to withhold funding as a means to control Mr. Sharif. It is my understanding that Mr. Dawson would often wire payroll funding in the last hour contingent on performance of whatever was being demanded from Mr. Sharif at the time.

8. I also contemporaneously understood from Mr. Sharif that Mr. Caramanis threatened physical violence against Mr. Sharif, including threatening to break Mr. Sharif's jaw. Mr. Caramanis' communications with me were also quite animated and threatening. On one occasion, Mr. Caramanis contacted me saying that we needed to get on a call with Mr. Sharif or "this thing would blow up" and the money I had invested would be gone. Mr. Caramanis said to me that Mr. Sharif had to cooperate with Mr. Dawson and give him what he wanted, or else Mr. Dawson would stop funding and the company and the game would collapse. I believe Mr. Caramanis wanted me on these calls to use me as a pawn, that is, to use my influence and close relationship with Mr. Sharif to coerce him into doing what he and Mr. Dawson wanted.

9. By late 2023 and early 2024, Mr. Dawson's and Mr. Caramanis' plan to take over the company and to take control away from Mr. Sharif became clear, culminating in mid-2024, when Mr. Dawson made himself chairman of the board of

Intrepid conditioned on his continued funding of the company with increased control over its operations.

10. Throughout 2025, I communicated with Mr. Sharif weekly about what was happening with the then-board and Intrepid. It was clear to me through these communications that Mr. Sharif was consistently opposed to the board's demands but was also under constant pressure to acquiesce to the board's demands to keep Intrepid afloat. Mr. Sharif's strategy was to "keep the peace" with Mr. Dawson, due to the importance of his funding of the company's operations, until the company could launch its game. Mr. Sharif's primary desire was to protect the company and its employees and investors.

11. Mr. Sharif also opposed the board's plan to foreclose on Intrepid in late 2025. I understood from Mr. Sharif that he was doing everything he could to oppose it. The foreclosure plan was a clear attempt to avoid paying Intrepid's workers, ignoring its debts and transferring Intrepid's sole assets—its code and intellectual property—to a new company, TFE Games Holdings, LLC ("TFE").

12. In December 2025 and January 2026, I understood from Mr. Sharif and fellow investors that the board couldn't be stopped and that Mr. Sharif would pursue legal action if necessary.

13. On January 14, 2026, there was an investor Zoom call on which I and other investors were present. The call, which was recorded, was led by Mr. Dawson. On that call, Mr. Dawson and the board announced that despite having plenty of money to fund operations through launch, they had decided to foreclose on Intrepid and transfer the assets to a new company. All of the investors on the call were shocked. Minority investors were told they would be given a limited time to contribute an additional 25% of their original investment into the new company or else lose their entire existing investment.

14. Mr. Dawson and the board stated that they already had enough money to carry the game to launch. However, during the same call, they said that minority

3                    Case No. 3:26-cv-00965-LL-MMP

DECLARATION OF TOM ALKAZIN IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER

investors would be left behind with nothing if they did not put more money in. In other words, they indicated they did not strictly need additional funds to launch, but that if minority investors wanted their prior investments to carry over and be protected in the new entity, they still needed to come up with 25% more.

15.     To me, this appeared coercive and legally suspect. As a shareholder, I was never consulted about the Article 9 foreclosure, yet my investment was suddenly threatened with being devalued to zero unless I provided additional funds. It felt as though we were being coerced to give more money, or else.

16.     After the group call, I set up an individual call with Mr. Dawson to see if there was any other way to protect my wife's and my investment, given that we were not in a financial position to provide the additional 25%. Mr. Dawson told me that there was only one path: I had to fund 25% more of my original investment. If I could not, we would be out entirely and would lose what we had invested nearly a decade earlier.

17.     In February 2026, Mr. Caramanis sent me threatening text messages. I was surprised and deeply dismayed to receive these threatening messages from Mr. Caramanis.

18.     Intrepid and *Ashes of Creation* was not a scam. In fact, in December 2025, the game had just produced several million in Early Access revenue in approximately three weeks. The board nonetheless pursued the suspect Article 9 sale of the company for their own purposes.

19.     Before the preliminary injunction hearing in the instant case, I understand Mr. Dawson and the board transferred the assets back from TFE to Intrepid. I understand this reversal to be an admission that the Article 9 foreclosure had been faulty—like robbing a jewelry store and then running back to put all of the stolen goods in place. This appeared to me as an admission of guilt.

20.     In view of my observations of Defendants' conduct with respect to Intrepid, I support the appointment of a receiver to safeguard Intrepid's assets and act

in the best interests of Intrepid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 12, 2026 at Las Vegas, Nevada.

By: _____
Tom Alkazin

WITHERS
BERGMAN LLP

Case No. 3:26-cv-00965-LL-MMP

DECLARATION OF TOM ALKAZIN IN SUPPORT OF PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER