# EXHIBIT 4

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT IN AND FOR SEMINOLE COUNTY, FLORIDA

CASE NO.:     2024CA001934

OGALE ERANDAL RAY, individually,

       Plaintiff,

v.

KEVIN GIGUERE, individually, BAILEY GIGUERE, individually, AUSTIN GIGUERE, individually, B&G TEAM INC., a Florida corporation, BIG COUNTRY ACRES LLC, a Florida limited liability company, VT3 LLC, a Florida limited liability company, BET HIGH LLC, a Florida limited liability company, KNC ENTERPRISES INC., a Florida limited liability company, KALB ENTERPRISES INTERNATIONAL LLC, a Florida limited liability company, TEAM DESTINY LLC, a Florida limited liability company, GATO GRANDE LLC, a Florida limited liability company,

PAMELA R. MCKINNEY CPA, a Florida sole proprietorship, PAMELA MCKINNEY, individually, BROOKE MCKINNEY, individually, COURTNEY COOK, individually, WILLIAM MCKINNEY, individually,

ROBERT DAWSON, individually, CAROL DAWSON, individually, CD ASSET HOLDINGS LLC, a Florida limited liability company, BARBARA DAWSON, individually,

GERI DORMAN, individually, DEBBIE KURLEY, individually, JENNIFER LUCE, individually, SAID NACIRI, individually, TAYLOR NORVELL, individually, JOSELINE BUSCAMPELL, individually, ASHLEY FROST, individually,

UNITED STRONG LLC, a Florida limited liability company, CHRISTOPHER MUNIZZI, individually,

**JURY TRIAL DEMANDED**

K2 QUEST LLC, a Florida limited liability company, CANNA COPE WELLNESS LLC, a Florida limited liability company, COVENANT HOME SECURITY LLC, a Florida limited liability company, HOLLIE MANCINI, individually, YOUTH INSIDE OUT INC., a Florida corporation, RUTH NORVELL, individually, RICKETTS MANAGEMENT LLC, a Florida limited liability company, DOLAN RICKETTS, individually, BRENDA RICKETTS, individually, FOUBI CLEANING SERVICES LLC, a Florida limited liability company, MYRNA NASH, individually, and ALLEBAS AES, LLC, a Florida limited liability company.

　　　　　Defendants.

_____/

## COMPLAINT

Plaintiff, Ogale Erandal Ray ("Mr. Ray") sues the Defendants, Pamela R. McKinney CPA ("McKinney CPA"), Pamela McKinney ("Mrs. McKinney"), Kevin Giguere ("Mr. Giguere"), Robert Dawson ("Mr. Dawson") (collectively the "Kingpin Defendants"), and the various Operational and Network Defendants identified below, and states:

### Introduction

1.　　　This action seeks the recovery of millions of dollars that the Kingpin Defendants stole from Mr. Ray and laundered into their own pockets (or those of their close families, friends, or business associates – the Network Defendants).

2.　　　Mr. Ray is an 83-year old successful entrepreneur who co-founded Jeunesse LLC ("Jeunesse") in 2009. Jeunesse is a multi-level marketing company that distributes its products all over the world. In 2018, Mr. Ray took a backseat in the day-to-day activities of Jeunesse after suffering a stroke.

3.　　　The Kingpin Defendants inserted themselves into Mr. Ray's life and into positions of trust and confidence to drain Mr. Ray of his personal wealth. The Kingpin Defendants acted as

2

Mr. Ray's personal accountant (Mrs. McKinney/McKinney CPA), trusted business advisors (Mr. Giguere and Mr. Dawson), and legal counsel and trustee (Mr. Dawson).

4.      With their positions of trust, Mr. Ray looked to, and relied on the Kingpin Defendants to guide him in virtually every aspect of his financial life.

5.      The Kingpin Defendants abused Mr. Ray's trust, by, most egregiously, deceiving Mr. Ray about his exposure to criminal liability if he failed to personally, and immediately, infuse Jeunesse with cash to cover its payroll. Relying on their representations, tens of millions of dollars were infused into Jeunesse. In reality, this supposed need for payroll was a ploy by the Kingpin Defendants to launder the money through Jeunesse and then ultimately steal it for themselves and their co-conspirators.

6.      For example, in 2022 alone, the Kingpin Defendants effectuated the transfer of at least $35,000,000.00 out of *one* of Mr. Ray's accounts and into Jeunesse. As further explained below, the Kingpin Defendants also targeted, and liquidated, Mr. Ray's other personal assets in support of their scheme.

7.      The Kingpin Defendants recruited and conspired with key Jeunesse employees (the "Operational Defendants") to alter corporate documents and records in order to allocate these funds directly out of Jeunesse (the "Point Scheme") and into the hands of the Network Defendants (identified below).

8.      Ultimately, Mr. Ray, exhausted from the monthly multi-million dollar infusions into Jeunesse, relied on the advice of the Kingpin Defendants and sold his interest in Jeunesse for a loss. This, too, was a ploy as the sale was directed by Giguere, with the aid of McKinney, to steal Mr. Ray's company. In less than a year after the sale, the new "owner" of Jeunesse has been removed from corporate records and replaced with Mr. Giguere, the mastermind of the scheme. In

3

a matter of a few years, Mr. Giguere, with the help of his co-conspirators, drained millions from Mr. Ray and usurped control of the company he founded.

## Jurisdiction, Venue and Parties

9. This is an action for damages exceeding $50,000, exclusive of interest, costs and attorneys' fees.

10. Plaintiff, Mr. Ray is an individual residing in Florida and is *sui juris*.

### *The Kingpin Defendants*

11. Kingpin Defendant, Mr. Giguere is an individual residing in Seminole County, Florida and is *sui juris.*

12. Kingpin Defendant, Mrs. McKinney, is an individual residing in Citrus County, Florida and is *sui juris*.

13. Kingpin Defendant, Pamela R. McKinney CPA is a Florida sole proprietorship with its principal place of business in Citrus County, Florida.

14. Kingpin Defendant, Mr. Dawson is an individual residing in Seminole County, Florida and is *sui juris.*

### *The Operational Defendants*

15. Operational Defendant, Geri Dorman is an individual residing in Seminole County, Florida and is *sui juris*.

16. Operational Defendant, Debbie Kurley is an individual residing in Seminole County, Florida and is *sui juris*.

17. Operational Defendant, Jennifer Luce is an individual residing in Volusia County, Florida and is *sui juris*.

4

18.    Operational Defendant, Said Naciri is an individual residing in Seminole County, Florida and is *sui juris*.

19.    Operational Defendant, Taylor Norvell is an individual residing in Seminole County, Florida and is sui *juris*.

20.    Operational Defendant, Joseline Buscampell is an individual residing in Volusia County, Florida and is *sui juris*.

21.    Operational Defendant, Ashley Frost is an individual residing in Volusia County, Florida and is *sui juris*.

### *The Network Defendants*

22.    Due to the numerous Network Defendants, a list of the Network Defendants and their respective counties of residency are attached hereto as **Exhibit 1**. The Network Defendants are composed of individuals and corporate entities.

23.    Venue is properly before this Court pursuant to Florida Statute Section §§ 47.011, 47.021.

### **General Allegations**

I.    *Jeunesse Background and The Conspiracy Participants*

24.    Mr. Ray co-founded Jeunesse in 2009. He grew up poor, and dreamed of creating a successful business to better his life and the lives of those that came to work for him.

25.    Jeunesse develops and manufactures personal care and nutritional products. Jeunesse serves customers worldwide by offering health, wellness, and beauty products. In 2021, Jeunesse achieved $8 billion dollars in cumulative worldwide sales.

5

26. Jeunesse's worldwide success is attributable to its marketing model, which allows entrepreneurs to start their own companies and market and sell Jeunesse's products (the "Independent Distributors").

27. Jeunesse incentivizes the Independent Distributors, through commissions and bonuses, to not just sell Jeunesse products, but also recruit, develop, and maintain a team of other Independent Distributors.

28. Jeunesse internally tracks the Independent Distributors' performance and adds "points" to the Independent Distributors' accounts (the "Points Log") that are accumulated and can be redeemed as a bonus/commission or used to purchase additional Jeunesse products for retail.

29. An Independent Distributor's Points Log is associated with a unique username that does not necessarily match the Independent Distributor's entity name. For example, the Points Log for username "Frenzi" revealed the account was associated with a Florida entity called Bet High LLC, a named defendant in this suit.

30. As an internal control measure, Jeunesse granted only a handful of employees the authority to manage and add points onto the vast number of Independent Distributor accounts. This includes Operational Defendants Jennifer Luce, Geri Dorman, Debbie Kurley, Said Naciri, Taylor Norvel, Ashley Frost, and Joseline Buscampell.

31. As further detailed below, the Kingpin Defendants implemented the Point Scheme by recruiting and directing members of the Operational Defendants to fraudulently add millions of unearned points onto sham accounts—the Network Defendants' Jeunesse accounts. This resulted in the Network Defendants being paid commissions that represented exorbitant multiples of the amount of "sales" they recorded. For example, Network Defendant Youth Inside Out Inc., whose

6

corporate identity was shielded by username "Moxie1720", recorded total sales of approximately $10,000 in 2022 but received nearly $250,000 in commissions during the same period. In reality, many of the Network Defendants had no actual sales at all.

32.     The corporate Network Defendants were pass-through entities formed and managed by the individual Kingpin Defendants and their co-conspirators for the purpose of carrying out the Point Scheme. The Kingpin Defendants and their co-conspirators, including the individual Network Defendants, disregarded the corporate form of the corporate Network Defendants and utilized the sham entities to actively participate and advance their individual personal stake in the overall conspiracy. This allowed the Kingpin Defendants and their co-conspirators to launder the funds they extracted from Mr. Ray into the sham corporate Network Defendant entities they controlled. On occasions, the Kingpin Defendants, with help from the Operational Defendants, recycled inactive Independent Distributor accounts and repurposed those accounts in support of the Point Scheme.

33.     After being misled by the Kingpin Defendants to infuse millions of dollars into Jeunesse, the Kingpin Defendants offered Mr. Ray a "solution". This solution was for Mr. Ray to sell his interest in Jeunesse *at a loss* to stop the monthly multi-million-dollar infusions he was making into Jeunesse caused by the Kingpin Defendants' Point Scheme. The sale of Jeunesse was coordinated by the Kingpin Defendants to a third-party purchaser (the "Purchaser"). Within a year's time of the Purchaser's acquisition of Jeunesse, the Purchaser was removed from Jeunesse's corporate records. Today, Kingpin Defendant Kevin Giguere finds himself at the helm of Jeunesse.

II.     *The Kingpin Defendants Establish Their Close Relationship with Mr. Ray to Deploy The Point Scheme*

34.     The mastermind behind the Point Scheme was Mr. Giguere. Mr. Giguere spent years positioning himself as Mr. Ray's closest advisor and gaining Mr. Ray's trust. Once achieved,

7

Mr. Giguere abused the trust and confidence Mr. Ray placed in him by designing and recruiting other persons to join the Point Scheme to steal Mr. Ray's personal wealth.

35.     Mr. Giguere began his career with Jeunesse as an Independent Distributor over a decade ago. Mr. Giguere rose to the rank of Diamond Director and slowly injected himself into every aspect of Mr. Ray's life. Mr. Ray became completely dependent and reliant on Mr. Giguere's advice.  Mr. Giguere was so intimately involved in Mr. Ray's life that he coordinated the purchase of Christmas gifts for Mr. Ray's family and the purchase of Mr. Ray's vehicles. To keep control of Mr. Ray as Mr. Ray aged, Mr. Giguere purchased a home in the same neighborhood as Mr. Ray and would regularly, and unexpectedly, drop in on Mr. Ray at his home. As such, Mr. Ray relied on Mr. Giguere for assistance with Jeunesse's daily business operations and for Mr. Ray's own personal matters.

36.     For example, Mr. Giguere pushed to take the lead in renovating Mr. Ray's property in North Carolina. The below screenshot depicts Mr. Giguere providing the access code for Mr. Ray's own master bedroom (with redactions).

Kevin Giguere <3525840319>                                          ▶ 11/20/2021, 2:43 PM
Randy's master bedroom code does not require a fingerprint. The code to that door is ███████

The outside entry door codes are ███████

███████

37.     To further the scheme and take control of Mr. Ray's finances, Mr. Giguere introduced his accountant, Pamela McKinney to Mr. Ray. Pamela McKinney and her firm, Pamela R. McKinney CPA (collectively, "Mrs. McKinney"), held herself out as a trusted and licensed Certified Public Accountant ("CPA") located at 3433 E. Gulf to Lake Highway, Inverness, Florida in Seminole County that touts, according to her public website, the "strong and trusting relationships" she builds with her clients.

8

38.    As Mrs. McKinney came highly recommended by Mr. Giguere, Mr. Ray relied on Mr. Giguere and followed Mr. Giguere's instruction to engage Mrs. McKinney and let her have access to Mr. Ray's accounts for bookkeeping services, services that Mrs. McKinney publicly advertises on her website as part of her CPA practice:



39.    In reality, Mr. Giguere brought Mrs. McKinney into the scheme so that she would use her accounting skills to establish control over Mr. Ray's finances and develop a spider web of companies (the corporate Network Defendants) to launder Mr. Ray's stolen money and, ultimately, to assist with taking control of Jeunesse. In fact, Mr. Giguere personally paid Mrs. McKinney's monthly fees for her accounting services to Mr. Ray and did so as another means to exercise control over Mr. Ray's finances. Mrs. McKinney would take express instruction from Mr. Giguere to transfer money out of Mr. Ray's accounts and to place wherever Mr. Giguere directed.

---

[1] *See* Pamela R. McKinney CPA's website, https://www.pamelamckinneycpa.com/.

9

40.    Mr. Ray relied on Mrs. McKinney's CPA background, knowledge, and ability to manage his finances and even appointed Mrs. McKinney as the trustee to his irrevocable trust. Mrs. McKinney had access to multiple bank accounts for Mr. Ray. For example, in 2022, Mrs. McKinney was added onto Mr. Ray's PNC Bank accounts so she could handle all of Mr. Ray's direct living expenses. This gave Mrs. McKinney full ability to move and transfer money out of Mr. Ray's PNC Bank accounts – an ability she abused over and over to move millions of dollars out of Mr. Ray's accounts without his permission or under false pretenses. This money eventually ended up laundered to the Kingpin Defendants, including Mrs. McKinney's, her husband's and her children's, own pockets.

41.    The third Kingpin Defendant was Mr. Dawson. Mr. Dawson has been in business with Mr. Ray since at least 2005 and developed a relationship with Mr. Ray over the decades since. Mr. Dawson was also a co-founder/partial owner of Jeunesse and served as Jeunesse's Chief Legal Officer since its inception and until 2020. In addition to serving as Jeunesse's Chief Legal Officer, Mr. Dawson also oversaw Jeunesse's finances (along with Jeunesse's Chief Financial Officer, Ryan Ogden) and would monitor cash flow, domestic/international bank accounts, operating accounts, depository accounts, and merchant processing.

42.    Mr. Dawson is a licensed attorney in Nebraska who also owns a controlling interest in Pathway Bank, a community bank located in Cairo, Nebraska, that he used as a part of his scheme:

10

> 1. *Robert Dawson, Longwood, Florida*; to acquire voting shares of Pathway Bancorp, Cairo, Nebraska, and thereby indirectly acquire control of Pathway Bank, Cairo, Nebraska.

[2]

43.    Pathway Bank has five brick-and-mortar locations throughout Nebraska and touts its more than 110 year history serving local Nebraskans, generally in connection with the agricultural industry.[3] However, in January 2023, Pathway Bank was incorporated in Florida, with its principal address located at Mr. Dawson's personal residence in Longwood, Florida.

44.    Mr. Ray heavily relied on Mr. Dawson's experience and legal knowledge in managing Jeunesse's affairs, as well as his own private matters. Specifically, Mr. Ray relied on Mr. Dawson to act as Mr. Ray's trustee in his irrevocable trust, his personal attorney, and trusted advisor on real estate and investment advice.

45.    As with Mr. Giguere and Mrs. McKinney, Mr. Dawson had intimate knowledge of Mr. Ray's personal finances, trust accounts, and business dealings, and leveraged that information against Mr. Ray for his own benefit. Mr. Dawson's family members directly received payouts from the Point Scheme through various of the sham-entity Network Defendants.

46.    Mr. Dawson also directly helped to support the Point Scheme by offering a source of money to Mr. Ray in exchange for heavily discounted value on investments. Mr. Dawson did

---

[2] *See* Change in Bank Control Notices; Acquisitions of Shares of a Bank or Bank Holding Company, 84 C.F.R. § 5436 (Feb. 21, 2019), available at https://www.federalregister.gov/documents/2019/02/21/2019-02969/change-in-bank-control-notices-acquisitions-of-shares-of-a-bank-or-bank-holding-company.

[3] *See* Pathway Bank, *Our History*, available at https://www.pathwaybank.com/about/our-history (last accessed Jul. 24, 2024).

11

this to take advantage of Mr. Ray with full knowledge of the money he was supposedly paying to Mr. Ray was to be funneled through Jeunesse to the Defendants.

47.     Separate from the Point Scheme, Mr. Dawson also induced Mr. Ray to sell his interest in commercial property to Mr. Dawson for a steep discount and under false pretenses. Mr. Dawson also misled Mr. Ray to purchase Mr. Dawson's interest in Jeunesse for far below its actual value without disclosing the Point Scheme in which he was actively participating.

48.     At bottom, Mrs. McKinney/McKinney CPA, Mr. Giguere, and Mr. Dawson all acted as Mr. Ray's trusted personal advisors, whom he relied upon because of their individual expertise and skill set. Each of them enjoyed certain authority Mr. Ray entrusted to them. For example:

a) Mrs. McKinney/McKinney CPA obtained a comprehensive understanding of Mr. Ray's personal finances as well as those of Jeunesse through Mr. Giguere. Mrs. McKinney/McKinney CPA had the ability to transfer money to and from Mr. Ray's personal accounts and paid Mr. Ray's usual monthly bills and living expenses. Mr. Ray even appointed Mrs. McKinney as a trustee for his irrevocable trust;

b) Mr. Dawson, as Jeunesse's Chief Legal Officer and trusted advisor to Mr. Ray, knew the financial health of Jeunesse and understood Jeunesse's assets and liabilities (and market value), including Jeunesse's obligation to make payroll and the consequences for failing to do so. Mr. Dawson advised Mr. Ray on the process to open offshore accounts for asset protection measures and coordinated and advised Mr. Ray on investment strategies. Mr. Dawson advised Mr. Ray on the purchase of aircraft and international real estate. Mr. Dawson advised Mr. Ray on several vehicle purchases throughout the years, including as recently as July 2022. Mr. Ray even appointed Mr. Dawson as a trustee in Mr. Ray's irrevocable trust from 2012-2020; and

c) Mr. Ray entrusted Mr. Giguere to essentially run Jeunesse's daily business operations. This placed Mr. Giguere in a position of influence over key Jeunesse employees – namely the Operational Defendants, Geri Dorman, Debbie Kurley and their subordinates. Mr. Giguere also injected himself in the everyday life of Mr. Ray and inserted himself on "special projects," like overseeing the remodeling of Mr. Ray's properties.

12

49.     Collectively, the authority the Kingpin Defendants enjoyed allowed them to implement the Point Scheme, a scheme that required all of their skills and positions of authority to effectively execute against Mr. Ray. The Kingpin Defendants each agreed to leverage their influence over Mr. Ray and enrich themselves and their families in the process.

### III.     *The Operational Defendants*

50.     As an internal control measure, Jeunesse granted only a handful of employees the authority to manage and add points onto the vast number of Independent Distributor accounts.

51.     This included Operational Defendants Jennifer Luce, Geri Dorman, and Debbie Kurley. Both Geri Dorman and Debbie Kurley were given this trusted position because they are the nieces of Mr. Ray's wife/co-founder of Jeunesse.

52.     Geri Dorman is the niece of Mr. Ray's spouse and was hired to work at Jeunesse. Geri Dorman was entrusted with handling Jeunesse's Point Log and as such, was granted authority to add points to the accounts of Independent Distributors according to Jeunesse's compensation plan. When Geri Dorman would add points, Jeunesse's system would record her entries as "geri."

53.     Debbie Kurley is also the niece of Mr. Ray's spouse and was similarly employed at Jeunesse. Debbie Kurley was also authorized to add points to the accounts of Independent Distributors and her entries were recorded by Jeunesse's system as "dkurley."

54.     Geri Dorman and Debbie Kurley supervised, and directed, Operational Defendants Said Naciri (Jeunesse username "SNaciri"), Taylor Norvell (Jeunesse username "csTNorvell"), Ashley Frost (Jeunesse username "csafrost"), and Joseline Buscampell (Jeunesse username "csJBuscampell") to participate in the scheme.

55.     Operational Defendant Jennifer Luce (Jeunesse username "csjen") was Jeunesse's Director of Human Resources and a long-time, trusted employee of Jeunesse. Jennifer Luce also

13

participated in the scheme by adding unearned points to the Network Defendants and was compensated by Kingpin Defendant Kevin Giguere directly for doing so. Jennifer Luce also assisted the Kingpin Defendants' efforts to avoid legal liability for their Point Scheme once the Kingpin Defendants believed the Point Scheme was uncovered by notarizing sham releases for improper payments to the Network Defendants.

56.    The Kingpin Defendants depended on the Operational Defendants' Jeunesse access and close familial relationship with Mr. Ray to execute the Points Scheme detailed below. The Operational Defendants directly profited by helping to launder money taken from Mr. Ray.

IV.    *The Network Defendants*

57.    To accomplish their scheme to steal Mr. Ray's money, the Kingpin and Operational Defendants used straw companies and individuals—the Network Defendants— to look like actual Jeunesse Independent Distributors. In reality, they were sham entities used by the Kingpin and Operational Defendants to launder money taken from Mr. Ray. Notably, many of these entities' addresses listed with the Florida Department of State are the same as Pamela R. McKinney CPA, which is 3433 E. Gulf to Lake Highway, Inverness, Florida. *See* **Exhibit 1**.

58.    The Network Defendants either provided no legitimate services to Jeunesse at all, or only the most minimal of services, and, instead were used by the Kingpin Defendants to funnel the millions of dollars extracted from Mr. Ray throughout several years. The Network Defendants included a host of sham companies (setup or repurposed by Mrs. McKinney), as well as family members and/or confidants of the Kingpin Defendants, such as Mrs. McKinney's husband and children, Mr. Giguere's children, and Mr. Dawson's mother. As such, the Kingpin Defendants ignored corporate formalities to the extent that the corporate Network Defendants' independent existence was in fact non-existent.

14

V.  *The Kingpin Defendants' Implement the Point Scheme*

59.  The Kingpin Defendants' main avenue for stealing Mr. Ray's money was through the Jeunesse Point Scheme.

60.  First, Mr. Giguere and Mrs. McKinney: (i) formed, managed and/or utilized *at least* seven Florida entities included amongst the Network Defendants; (ii) formed, managed and/or utilized *at least* three Florida entities for the benefit of Mrs. McKinney's children (Defendants Courtney Cook and Brooke McKinney) and husband (Defendant William McKinney); (iii) formed, managed and/or utilized *at least* one Florida entity for the benefit of Mr. Giguere's children (Defendants Austin Giguere and Bailey Giguere); and (iv) assisted and/or advised their co-conspirators, including Mr. Dawson, and other business associates to form or utilize their own Florida entities to be included in the Point Scheme. *See* **Exhibit 2**.

61.  Next, the Kingpin Defendants recruited and conspired with Operational Defendants Geri Dorman, Debbie Kurley, Jennifer Luce, Said Naciri, Taylor Norvell, Joseline Buscampell, Ashley Frost, and others still being investigated, to implement the Point Scheme. As mentioned above, the Operational Defendants were key Jeunesse employees with the ability to add points to the accounts of Jeunesse's Independent Distributors.

62.  Between 2019 and 2022, the Operational Defendants, at the direction of the Kingpin Defendants, systematically added millions of unearned points or bonus money to the Network Defendants' Jeunesse accounts.

63.  For example, between November 2019 and September 2022, Geri Dorman (identified as "geri" in Jeunesse's system) added **56,000,000** total points to the Jeunesse username "ABKG." The payee of the ABKG account was Defendant Bailey Giguere—the daughter of Kevin Giguere, who was directly paid almost $2,000,000 to a Suncoast Bank account during the same

15

time period. Upon information and belief, Bailey Giguere never sold any Jeunesse products and was never a Jeunesse Independent Distributor. To support receiving $2,000,000 in commission payments, she would have had to be responsible for tens of millions of dollars of Jeunesse product sales.

64.    **Exhibit 2** details some of the currently known instances of fraudulently added points to the Network Defendants' accounts.  These points were then used to **pay** the corporate and individual Network Defendants millions in unearned bonuses and commissions, funded by money laundered through Jeunesse as a result of the misrepresentations and lies told by the Kingpin Defendants to induce Mr. Ray to give them access to the funds.

65.    Although Mr. Ray's funds flowed to the Network Defendants through several different banking institutions, one banking institution stands out amongst the rest – Mr. Dawson's very own Pathway Bank. Indeed, six Network Defendants[4], formed and managed by Mrs. McKinney, Mr. Giguere, and/or Mr. Dawson, were all paid commissions to banking accounts housed at the agriculturally-focused Nebraska bank where Mr. Dawson maintains a controlling interest – Pathway Bank.

VI.    *The Kingpin Defendants Fraudulently Induce, Steal, and Extract Mr. Ray's Wealth to Enrich Themselves and the Network Defendants Under the Point Scheme*

### A. Fraudulent Purchase of Mr. Ray's Investments and Depletion of Other Assets

66.    With Mr. Ray's trust and reliance in hand, and an intimate knowledge of Mr. Ray's and Jeunesse's financial condition, the Kingpin Defendants approached Mr. Ray and informed him of the urgent need to infuse Jeunesse with large amounts of money.

---

[4] Network Defendants Kalb Enterprises, Inc., Team Destiny LLC, VT3 LLC, Gato Grande LLC, CD Asset Holdings LLC, and Bet High LLC were collectively paid approximately $5,000,000.00 between 2019 and 2022.

67.    On several occasions, the Kingpin Defendants alerted Mr. Ray of the immediate and pressing need for an infusion of cash into Jeunesse. The Kingpin Defendants, Mr. Ray's most trusted advisors, justified the need by explaining that Jeunesse did not have adequate funds to cover its payroll obligations. Mr. Dawson, a trained and licensed attorney, went as far as telling Mr. Ray that if Jeunesse's payroll was not covered, Mr. Ray would be arrested, criminally charged, and sent to prison (the "Payroll Imprisonment Threat"). Throughout their relationship, Mr. Dawson suggested several means by which Mr. Ray could protect himself, including purchasing a residence in, and obtaining citizenship in, the country of Cyprus – a country Mr. Dawson advised Mr. Ray had no extradition treaty with the United States. Mr. Dawson told Mr. Ray he had purchased property in Cyprus for that same reason.

68.    Mr. Giguere, on June 23, 2022, echoed the Payroll Imprisonment Threat:



KG  Kevin Giguere <3525840319>

There getting 2 offers buy next week and they don't have any choice but to put money in because you can't bounce payroll checks it's federally against the law

69.    To Mr. Ray, an elderly Floridian, any potential imprisonment term meant he would likely spend the rest of his life behind bars, a situation the Kingpin Defendants knew would induce Mr. Ray to act upon their advice.

70.    But like all "good" advisors, the Kingpin Defendants presented Mr. Ray with a "solution" that would cover Jeunesse's payroll and relieve Mr. Ray from potential prison time. The solution was simple: Mr. Ray would sell to the Kingpin Defendants his shares in several investment funds, that were not readily dispensable on the market, for cents on the dollar. The Kingpin Defendants specifically targeted Mr. Ray's illiquid investment funds, coupled with the Payroll Imprisonment Threat, to induce Mr. Ray to sell the funds well below market value. In turn,

17

the Kingpin Defendants would handle liquidating the shares and infusing Jeunesse with the ill-gotten proceeds.

*Investment Accounts*

71.     For example, shortly after an instance of the Payroll Imprisonment Threat by the Kingpin Defendants, on or about June 30, 2022, a transfer was executed between Mr. Ray and Mr. Dawson that required Mr. Dawson to only pay – *into Jeunesse* and not to Mr. Ray directly – $2,500,000.00 for Mr. Ray's full interest in *seven* partnership investment funds managed by a wealth management firm that also managed Mr. Dawson's accounts. Mr. Ray's capital commitment to the aforementioned funds exceeded $3,800,000.00, meaning Mr. Ray experienced a huge loss from his initial commitment to these funds, let alone the true value of the funds at a real market sale. But for Mr. Dawson's and Mr. Giguere's use of the Payroll Imprisonment Threat, Mr. Ray would not have agreed to such a sale.

72.     Around the same time, another identical transfer was executed between Mr. Ray and Mr. Dawson. As before, Mr. Dawson was required to pay into Jeunesse $2,500,000.00 for Mr. Ray's full interest in another *five* partnership investment funds managed at the wealth management firm. Mr. Ray's capital commitment to the aforementioned funds exceeded $3,000,000.00, meaning Mr. Ray experienced a huge loss from his initial commitment to these funds, let alone the true value of the funds at a real market sale. But for Mr. Dawson's and Mr. Giguere's use of the Payroll Imprisonment Threat, Mr. Ray would not have agreed to such a sale.

73.      Believing his trusted advisors, Mr. Ray agreed to the transfer of his shares in the partnership investment funds. Mr. Ray never saw a single cent of the money owed to him by Mr. Dawson under either transfer; rather, Mr. Dawson paid that money over to Jeunesse knowing the

18

proceeds would be laundered through Jeunesse and paid out to the Kingpin Defendants and Network Defendants (including his own sham entity) through the Point Scheme.

74.    The Kingpin Defendants continued to induce Mr. Ray to transfer his interest in several other partnership investment funds in like manner. In fact, in a thirty-day period, between July 1, 2022 and August 1, 2022, the Kingpin Defendants induced Mr. Ray to transfer his interest in several other partnership investment funds housed at the same wealth management firm that were used to support the Kingpin Defendants' Point Scheme.

75.    The Kingpin Defendants also induced Mr. Ray, under the Payroll Imprisonment Threat, to leverage Mr. Ray's access to his Charles Schwab margin account. At least $700,000.00 was transferred out of Mr. Ray's Charles Schwab account and into Jeunesse in support of the Kingpin Defendants' Point Scheme.

*Personal Accounts*

76.    In other instances, the Kingpin Defendants continued to extract funds from Mr. Ray's domestic accounts between 2019 and 2022 and placed those funds into Jeunesse as part of the Point Scheme. The below depicts one such event wherein, on September 8, 2022, Mr. Giguere misrepresented Jeunesse's need for an immediate infusion of $2 million dollars:

> **KG**    Kevin Giguere <3525840319>                                      ▶ 9/8/2022, 4:01 PM
> I just got off the phone with Mike He does not have money for commissions on Monday for Tuesday we need 2 million tomorrow or they're gonna be bouncing commissions I've told everybody numerous times kym Phillip please communicate with Wendy and Randy

77.    In response to Mr. Giguere's September 8, 2022 misrepresentation, $2 million dollars were transferred out of Mr. Ray's PNC Bank Account by Mrs. McKinney on September 12, 2022.

19

78.    On that same date, September 12, 2022, some of the sham Independent Distributors/Network Defendants were paid approximately $322,810.28.[5]

79.    In fact, in 2022 alone, *at least* **$35,000,000.00** was transferred/paid out of Mr. Ray's PNC Bank Accounts alone and into Jeunesse to be misappropriated by the Defendants. Upon information and belief, Mrs. McKinney used her access to Mr. Ray's PNC Bank Accounts to make these transfers into Jeunesse so that they could be used by the Kingpin Defendants to support the Point Scheme. Mrs. McKinney continued to participate in the transfer of funds out of Mr. Ray's accounts at least up and through the latter half of October 2022.

80.    The Kingpin Defendants continued to misrepresent Jeunesse's financial position and need for capital infusions to Mr. Ray in order to reach Mr. Ray's other assets. As before, the Kingpin Defendants told Mr. Ray his failure to make payroll would lead to his arrest and imprisonment, the Payroll Imprisonment Threat.

### B.  The Fraudulent Jet Sale and Pathway Bank Loan

81.    The Kingpin Defendants also targeted Mr. Ray's personal property as a means to raise millions of dollars to infuse into Jeunesse under the Payroll Imprisonment Threat. For example, in early 2022, the Kingpin Defendants convinced Mr. Ray to sell a private jet (the "Challenger Jet") and upgrade to a bigger model (the "G550 Jet").

82.    The Kingpin Defendants convinced Mr. Ray that upgrading the Challenger Jet would allow for a greater chartering capacity and more income. The Kingpin Defendants also informed Mr. Ray that the proceeds of the Jet sale could be used to cover the purchase price of the G550 Jet. However, while Mr. Ray sought a buyer for the Challenger Jet, Mr. Dawson convinced

---

[5] This amount represents payments made to sham Independent Distributors/Network Defendants currently known to the Plaintiff. Upon information and belief, additional sham Independent Distributor accounts existed and would have been paid on the same date.

Mr. Ray to purchase the replacement G550 Jet through a loan from his Nebraska-based bank, Pathway Bank.

83.    To effectuate the approximately $21,000,000 purchase of the G550 Jet, Mr. Dawson caused multiple loans for millions of dollars to be issued by Pathway Bank. Moreover, the three loans were collateralized by Mr. Ray's real property.

84.    In April 2022, the Challenger Jet was sold for approximately $23,000,000.

85.    However, the proceeds of the Challenger Jet sale were not used to satisfy the three Pathway Bank loans. Rather, upon information and belief, the proceeds of the Jet sale were diverted into Jeunesse by the Kingpin Defendants to continue funding their Point Scheme and launder the money and steal it for themselves.

86.    As the Point Scheme progressed, Mr. Ray could no longer afford to maintain ownership of the G550 Jet and in less than a year of ownership, Mr. Ray sold the G550 Jet for approximately $15,000,000 – at a $6,000,000 loss from the purchase price.

87.    In this process, Mr. Ray was saddled with millions of dollars of fraudulently induced debt.

88.    During the same period detailed above, Mr. Dawson put in motion additional schemes designed to exploit Mr. Ray's trust and enrich himself in the process.

### VII.    *Mr. Dawson's Fraudulent HQ Building Takeover*

89.    In addition to his involvement in the Point Scheme, Mr. Dawson also had a host of other business dealings with Mr. Ray, including residential and commercial property acquisitions.

90.    Mr. Ray, his wife, and Mr. Dawson, through their other company, RWR Real Estate Holdings, LLC, owned the nearly-140,000 square foot building where Jeunesse was headquartered (the "HQ Building"):



[6]

91.    Prior to November 2022, Operational Defendant Debbie **Kurley** was listed as RWR Real Estate Holdings, LLC's registered agent and represented **Mr. Ray** and his wife's interest in RWR Real Estate Holdings, LLC.

92.    In 2022, upon information and belief, the HQ Building was valued at approximately $18 million dollars.

93.    In October 2022, Mr. Dawson induced Mr. Ray to sell his interest in RWR Real Estate Holdings, LLC to Mr. Dawson for substantially less than what Mr. Ray's membership interest in RWR Real Estate Holdings, LLC was valued.

94.    Mr. Dawson knew, because of his involvement in the Point Scheme, that Mr. Ray regularly required millions of dollars to infuse Jeunesse. Capitalizing on that knowledge, Mr. Dawson offered to buy Mr. Ray out of his interest in RWR Real Estate Holdings, LLC, necessitated by the Kingpin Defendant's Point Scheme from which Mr. Dawson and his family directly benefited, and which he failed to disclose to Mr. Ray when entering into the real estate transaction.

---

[6]    Photograph    of    HQ    Building,    dated    June    24,    2023,    available    at https://www.scpafl.org/search/parcels/details/?APPRID=4958632.

22

95. Mr. Dawson knew Mr. Ray was relying on the Kingpin Defendants' misrepresentations to infuse the funds back into Jeunesse to support the Point Scheme.

96. On November 14, 2022, Debbie Kurley was replaced on RWR Real Estate Holdings, LLC's corporate records with Mr. Dawson's wife, Kimberli Dawson.

VIII. *Mr. Dawson Manipulates Mr. Ray Into Purchasing Mr. Dawson's Wildly Inflated Jeunesse Shares*

97. Additionally, Mr. Dawson induced Mr. Ray to purchase Mr. Dawson's membership shares in Jeunesse well-above market value. In 2020, Mr. Dawson informed Mr. Ray he wanted to divest himself of his membership interest in Jeunesse.

98. Mr. Dawson falsely represented to Mr. Ray that Mr. Dawson's shares were worth approximately $60,000,000.00. This was false, and Mr. Dawson knew, or should have known, it was false, as he was Jeunesse's Chief Legal Officer and in charge of Jeunesse' finances. The Point Scheme devalued the company and sent Jeunesse on a downward spiral. Mr. Dawson failed to disclose the Point Scheme to Mr. Ray, and instead misrepresented the value of Jeunesse to induce Mr. Ray to enter into the transaction.

99. Mr. Ray relied on Mr. Dawson's representation and thus, on or about October 2, 2020, purchased Mr. Dawson's shares in Jeunesse for approximately $60,000,000.00, partial payment of which came out of Mr. Ray's accounts at a wealth management firm that also managed Mr. Dawson's accounts.

100. Mr. Giguere and Mr. Dawson stood watching over Mr. Ray and his spouse at the completion of the sale.



[7]

101.    Despite divesting himself of his Jeunesse shares, Mr. Dawson continued to advise Mr. Ray on several businesses/personal matters up and through Mr. Ray's sale of Jeunesse in early 2023.

## IX.    *The Point Scheme is Uncovered*

102.    The Kingpin Defendants continued to manipulate and exploit Mr. Ray's trust and confidence for as long as they could continue to find more avenues to steal his money and property. Finally, in 2022, Mr. Ray required additional help and appointed his grandson, Mr. Phillip Wallace ("Mr. Wallace) as his Power of Attorney.

---

[7] Red box added for emphasis (depicting sales agreement). Rob Dawson, wearing a black t-shirt, pictured left, standing over Wendy Lewis; Kevin Giguere, wearing multi-colored tropical shirt, picture right, standing over Randy Ray.

103.   Mr. Wallace then spent many months learning about his grandfather's financial position, business relationships, the numerous transactions that had been executed, and examining related documents.

104.   In the latter half of 2022, exhausted from the fraudulently induced multi-million dollar infusions, Mr. Ray decided to sell his interest in Jeunesse. During this period, Mr. Wallace began discovering the suspicious addition of points on the Network Defendants' Points Log.

105.   Mr. Wallace then spent several months trying to understand and vet the suspicious points added by the Operational Defendants and the subsequent commissions paid out utilizing Mr. Ray's funds, including requesting additional records from third-parties.

106.   As a result, by October 2022, Mr. Wallace began to piece together and slowly unravel the web of sham Network Defendants in Jeunesse's Independent Distributor list and the Point Scheme implemented by the Kingpin Defendants. However, this process remains on-going and the full extent of the Kingpin Defendants' conspiracy remains unknown even today. The investigation continues.

107.   As Mr. Wallace began asking questions, the Defendants became aware their Point Scheme was, or would soon be, uncovered. In a matter of mere days, Mr. Giguere mobilized and secured for himself and his co-conspirators, what he believed, were legitimate and enforceable releases from Jeunesse – and do not purport to be releases by Mr. Ray – from their scheme to steal money.

108.   Strikingly, the releases also include many of the Network Defendants herein and serve as additional proof of the Kingpin Defendants' and their co-conspirators' involvement in the Point Scheme. For example, one such release is for the benefit of Mr. Giguere, Mr. Giguere's daughter, Bailey Giguere, Mrs. McKinney, and their associated sham entities:



The undersigned, Jeunesse, LLC, a Florida limited liability company (hereinafter referred to as "Releasor") does hereby release Kevin Giguere, Pamela McKinney, & Bailey Giguere as individuals, and all entities in which Kevin Giguere, Pamela McKinney, & Bailey Giguere own interest, including but not limited to entities listed below (collectively referred to as Releasee"), from any and all claims including but not limited to claims regarding commission payments, claims regarding product payments, and claims regarding liability.

IN WITNESS WHEREOF, RELEASOR has executed this Release at Seminole County . Florida, on October 14, 2022.

JENNIFER LUCE
MY COMMISSION # HH 053221
EXPIRES: February 10, 2025
Bonded Thru Notary Public Underwriters

Entities:
B&G TEAM INC
DINOSAUR MARKETING LLC
TEAM DESTINY LLC
KALB ENTERPRISES INTERNATIONAL LLC
KNC ENTERPRISES INC
BIG COUNTRY ACRES LLC
GATO GRANDE LLC
SUMMIT QUEST INC
VT3 LLC
BET HIGH LLC

RELEASOR:
JEUNESSE, LLC

By: Wendy R Lewis
Its: Chief Operations Officer

109.    Indeed, once he secured a purported release from Jeunesse, Mr. Giguere admitted to his knowledge of the scheme, yet tried to distance his involvement by blaming ordinary and expected "gaming"[8] from Independent Distributors:

> **KG**  Kevin Giguere <3525840319>    ► 11/7/2022, 2:32 AM
> Philip I will meet you and Randy anytime anywhere you'd like to go over anything you would like to go over I have 1099s for people that got paid and want to get this behind us before this blows up in the something that nobody wants start with a five dollar cycle that cost the company $8.9 million a year that 44 people are getting once again you're gonna tell me you don't know anything about it or the 10 maxed out positions from Damien Eric worry Cliff Walker Teresa Gregory and 1000 other people and 6000 fake positions that Doug whitehead try to get you to terminate for two years I understand and you're pissed so let me know when you want to meet
> And no I didn't have anything to do with the $10 million loan on the Beverly Hills house and the $10 million loan on the plane that's been paying by Wendy's and Randy's account with money that got put there so let's talk

---

[8] The term "gaming" amongst Jeunesse's compliance team referred to methods deployed by Independent Distributors to create fake downlines or sales to boost their own commission payments. This "gaming" is ordinary and expected in the MLM industry which is precisely why Jeunesse maintained a compliance team, that, as detailed below, was upon information and belief, terminated by Mr. Giguere.

26

110.    Similarly, Ms. McKinney, when confronted on a suspicious transaction to unknown recipients from Mr. Ray's account, informed Mr. Wallace the recipient was Jeunesse and that Jeunesse's Chief Financial Officer, Ryan Ogden, could confirm:

> pamela mckinney <pam@pamelamckinneycpa.com>                                          Wed, Oct 19, 2022 at 9:53 AM
> To: Phillip Wallace <pmwallace08@gmail.com>
>
> $1,500,000 to Jeunesse
> You can contact Ryan Ogden for verification
>
> Pam McKinney, CPA

111.    Once portions of the Point Scheme were uncovered, the Kingpin Defendants and Operational Defendants, began covering their tracks. For example, at the end of 2022, members of Jeunesse's compliance team identified and reported the sham Network Defendants' accounts. Jeunesse's compliance team suspended the sham Network Defendants' accounts on a Friday. Within hours of the suspension, Kingpin Defendant Mr. Giguere ordered the suspended accounts to be reinstated. Then, that following Monday, Jeunesse's entire compliance team was terminated. Upon information and belief, Mr. Giguere orchestrated the firing of Jeunesse's compliance team to cover up further discovery of the Point Scheme and to allow it to continue.

112.    At or about the same time, Operational Defendant Debbie Kurley and the other Operational Defendants began deleting the points they added to the sham Network Defendants' accounts and to change associated usernames so as to hide their involvement.

113.    Mr. Giguere was also intimately involved in vetting and steering the offers presented to Mr. Ray for the sale of Jeunesse. Mr. Giguere concocted a plan to either take full control of Jeunesse directly or by manipulating the Purchaser Mr. Giguere steered Mr. Ray towards. Mr. Ray, unaware of the depth and breadth of the Kingpin Defendants' Point Scheme and Mr. Giguere's plan to usurp Jeunesse, sold his interest in Jeunesse for a loss. The sale to the Purchaser required Mr. Ray to infuse Jeunesse with a final payment of $5,000,000.00.

27

114.    With Mr. Ray out of the picture, Mr. Giguere executed the final stage of his plan and now enjoys full control of Jeunesse per Jeunesse's public corporate records[9]:

```
Changed: 01/04/2024
Mailing Address
650 DOUGLAS AVE
ALTAMONTE SPRINGS, FL 32714

Changed: 01/04/2024
Registered Agent Name & Address
GIGUERE, KEVIN VICTOR
650 DOUGLAS AVE
ALTAMONTE SPRINGS, FL 32714

Name Changed: 01/04/2024

Address Changed: 01/04/2024
Officer/Director Detail
Name & Address

Title D, P, CEO

GIGUERE, KEVIN
3545 LEGACY HILLS CT
LONGWOOD, FL 32779
```

115.    In fact, a December 15, 2023 amendment to Jeunesse's public corporate records[10] removed the Purchaser and added Kingpin Defendants Kevin Giguere and Pamela McKinney as Jeunesse Directors:

---

[9] Florida Dept. of Corp., *Detail by Entity Name - Jeunesse, Inc.*, available at https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityNam e&directionType=Initial&searchNameOrder=JEUNESSE%20P230000213230&aggregateId=do mp-p23000021323-b62549fd-7297-47f3-afad-79112decc6ce&searchTerm=jeunesse&listNameOrder=JEUNESSE%203583840.

[10] Florida Dept. of Corp., *Jeunesse, Inc. 12/15/2023 -- Amendment*, available at https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C 2023%5C1227%5C20655197.Tif&documentNumber=P23000021323 (composite excerpt).

COVER LETTER

TO: Amendment Section
Division of Corporations

NAME OF CORPORATION: Jeunesse, Inc.

DOCUMENT NUMBER: ~~L09000066774~~ P23000021323

| 3) ___ Change<br>x ___ Add<br>___ Remove | D | Kevin Giguere | 3433 E. Gulf to Lake Hwy.<br>Inverness, FL 34453 |
| 4) ___ Change<br>x ___ Add<br>___ Remove | D | Pamela McKinney | 3433 E. Gulf to Lake Hwy.<br>Inverness, FL 34453 |

116.    Plaintiff has retained undersigned counsel and has incurred attorneys' fees and costs as a result of Defendants' malfeasance.

117.    But for the appointment of a Power of Attorney and Mr. Wallace's diligent and on-going examination of multiple documents and complex transactions spanning for a period of four years, the Kingpin Defendants' conspiracy would have gone undetected.

118.    All condition precedents to the following causes of action have been met.

**COUNT I – FRAUDULENT INDUCEMENT**
**Point Scheme**
**(AGAINST Kingpin Defendants)**

119.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

120.    The Kingpin Defendants fraudulently induced Mr. Ray into depleting his personal assets and funding the Kingpin Defendants' Point Scheme by falsely representing to Mr. Ray:

a)  Jeunesse's need for an immediate infusion of cash in order to make payroll;

b)  Mr. Ray's failure to immediately and personally fund Jeunesse and make payroll would result in his arrest and imprisonment (and potentially that of his wife/Jeunesse co-founder); and

c)  The Kingpin Defendants would arrange for the sale of the Challenger Jet and use the proceeds to purchase the G550 Jet without Mr. Ray incurring additional debt.

29

121.    The Kingpin Defendants knew or should have known that the Payroll Imprisonment Threat and Jeunesse's need for cash were false, including because Defendants McKinney CPA and Mrs. McKinney were trained and licensed Florida public accountants; Defendant Mr. Dawson was a trained and licensed attorney and Jeunesse's Chief Legal Officer with intimate knowledge of Jeunesse's finances; Defendant Mr. Giguere was intimately involved in Jeunesse's affairs and financial position as well as Mr. Ray's affairs and financial position; and because of their collective involvement in the Point Scheme. Additionally, the Kingpin Defendants knew or should have known the jet sale representations were false because they planned all along to divert such proceeds into Jeunesse in support of the Point Scheme while saddling Mr. Ray with Pathway Bank loans covering the G550 Jet purchase. Further, the Kingpin Defendants knew the falsity of their statement as evidenced by the sham releases they obtained from Jeunesse after the Kingpin Defendants became aware the Point Scheme was uncovered.

122.    The Kingpin Defendants intended and knew the false statements described in paragraph 120 would induce Mr. Ray's reliance. Specifically, the Kingpin Defendants knew Mr. Ray would act on any advice they provided that would prevent his incarceration (or his wife's) at his elderly age.

123.    Mr. Ray, in fact, did justifiably rely on the Kingpin Defendants' statements which they represented were necessary for preventing Mr. Ray's (or his wife's) arrest and imprisonment.

124.    Mr. Ray's justifiable reliance on the Kingpin Defendants' misrepresentations were foreseeably to Mr. Ray's detriment. Specifically, Mr. Ray, because of the Kingpin Defendants' misrepresentations:

> a) Sold his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their

estimated market value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme;

b) Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and;

c) Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme; and

d) Sold his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Pamela McKinney, Pamela R. McKinney CPA, Kevin Giguere, and Robert Dawson, for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

<u>**COUNT II – TORTIOUS CONSPIRACY**</u>
<u>**Point Scheme**</u>
<u>**(AGAINST Kingpin Defendants)**</u>

125.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

126.    The Kingpin Defendants, by virtue of their individual peculiar power of coercion combination thereof, and their Payroll Imprisonment Threat, caused Mr. Ray to suffer millions of dollars in damages. Specifically, the Kingpin Defendants had peculiar powers of coercion over Mr. Ray, an elderly person, in that:

a) Mrs. McKinney/McKinney CPA obtained a comprehensive understanding of Mr. Ray's personal finances as well as those of Jeunesse. Mrs. McKinney/McKinney CPA had the ability to transfer money to and from Mr. Ray's financial accounts and paying Mr. Ray's usual monthly bills and living expenses. Mr. Ray even appointed Mrs. McKinney as a trustee for his irrevocable trust;

31

b) Mr. Dawson, as Jeunesse's Chief Legal Officer and trusted advisor to Mr. Ray, knew the financial health of Jeunesse and understood Jeunesse's assets and liabilities, including Jeunesse's obligation to make employee payroll and the consequences for failing to do so. Mr. Ray even appointed Mr. Dawson as a trustee in Mr. Ray's irrevocable trust. Mr. Dawson also setup international accounts to house Mr. Ray's assets that Mr. Dawson later depleted in furtherance of the Point Scheme; and

c) Mr. Ray entrusted Mr. Giguere to essentially run Jeunesse's daily business operations. This placed Mr. Giguere in a position of influence over key Jeunesse employees – namely the Operational Defendants, Geri Dorman and Debbie Kurley and their subordinates. Mr. Giguere also injected himself in the everyday life of Mr. Ray and inserted himself on "special projects," like overseeing the remodeling of Mr. Ray's North Carolina homes.

127.    But for the trust and confidence Mr. Ray placed in the Kingpin Defendants, and their collective malicious agreement to combine and weaponize such authority against Mr. Ray, the Kingpin Defendants could not have carried out the Point Scheme.

128.    The Kingpin Defendants coerced Mr. Ray both through their numbers and economic influence over Mr. Ray as delineated in paragraph 126 (a) – (c), above.

129.    As a result of the Kingpin Defendants' collective conspiracy over Mr. Ray, Mr. Ray's foreseeable damages include:

a) Sale of his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

b) Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and themselves;

c) Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme; and

d) Sale of his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Pamela McKinney, Pamela R. McKinney CPA, Kevin Giguere, and Robert Dawson, for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

## COUNT III – CONSPIRACY TO COMMIT FRAUDULENT INDUCEMENT
### Point Scheme
### (AGAINST All Defendants)

130. Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

131. The Operational Defendants and Network Defendants, together and at the direction of the Kingpin Defendants, agreed to aid the Kingpin Defendants in the Points Scheme.

132. The Points Scheme was an unlawful act designed to extract Mr. Ray's wealth, launder Mr. Ray's money through Jeunesse, and pay the Operational Defendants and Network Defendants millions in the process while remaining undetected.

133. The Operational Defendants took an overt act in pursuance of the conspiracy designed and directed by the Kingpin Defendants by:

a) As to Operational Defendants Geri Dorman, Debbie Kurley, Jennifer Luce, Said Naciri, Taylor Norvell, Joseline Buscampell, and Ashley Frost, they each agreed to with the Kingpin Defendants and amongst themselves, and in fact did, add millions of unearned points to the Network Defendants' Independent Distributor accounts which were used to pay the Network Defendants' millions of dollars in unearned bonuses and commissions funded by Mr. Ray's personal wealth, and;

134. The Network Defendants took an overt act in pursuance of the conspiracy designed and directed by the Kingpin Defendants by:

a) Agreeing to form, setup, and establish sham Florida entities and Jeunesse Independent Distributor accounts and/or agreeing to repurpose legitimate Florida entities and Jeunesse Independent Distributor accounts in support of the Point Scheme, and;

b) Agreeing to receive millions of dollars, extracted by the Kingpin Defendants from Mr. Ray, representing unearned bonuses and commissions from their sham and/or repurposed Jeunesse Independent Distributor accounts pursuant to the Point Scheme.

135. The Kingpin and Network Defendants then sought to insulate themselves from liability though the execution of sham releases.

136. As a result of the acts performed by the Kingpin Defendants, Operational Defendants and Network Defendants, Mr. Ray has suffered foreseeable damages in the amount of millions of dollars, representing the amount of money extracted from Mr. Ray by the Kingpin Defendants and funneled and laundered, through Jeunesse by the Operational Defendants, to the Network Defendants.

**WHEREFORE**, Plaintiff demands judgment against the Kingpin Defendants, Operational Defendants, and Network Defendants, for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

<u>**COUNT IV – AIDING AND ABETTING FRAUDULENT INDUCEMENT**</u>
<u>**Point Scheme**</u>
<u>**(AGAINST All Defendants for Aiding and Abetting Mr. Giguere)**</u>

137. Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

138. Mr. Giguere designed the Point Scheme to drain Mr. Ray of his personal assets and ultimately wrestle control of Jeunesse away from Mr. Ray. However, Mr. Giguere required the assistance of Mrs. McKinney/McKinney CPA, Mr. Dawson, the Operational Defendants, and the Network Defendants to implement the Point Scheme.

139.     Mr. Giguere recruited Mrs. McKinney and McKinney CPA to fill the shoes of Mr. Ray's CPA, with access to Mr. Ray's personal bank accounts. Mrs. McKinney/McKinney CPA was aware of the Point Scheme, the underlying fraud, as evidenced by her (and her families) personal gain in the form of millions of dollars received under the Point Scheme. Mrs. McKinney/McKinney CPA provided substantial assistance to Mr. Giguere's fraudulent scheme by facilitating the transfer of millions of dollars out of Mr. Ray's personal accounts and into Jeunesse to cover the unearned payments made under the Point Scheme. Mrs. McKinney also provided substantial assistance to Mr. Giguere's fraudulent scheme by creating a web of sham entities (the Network Defendants) that housed the money paid under the Point Scheme.

140.     Mr. Giguere recruited Mr. Dawson, Jeunesse's Chief Legal Officer and long-term business associate to Mr. Ray, to convince Mr. Ray that a large cash infusion to Jeunesse was immediately necessarily. Mr. Dawson knew of the Point Scheme as evidenced by payments made to him (and his family) under the Point Scheme and had intimate knowledge of Jeuneese's finances. Mr. Dawson provided substantial assistance to Mr. Giguere's fraudulent scheme by convincing Mr. Ray that without the large infusion of cash and timely payments to the Independent Distributors, Mr. Ray and potentially his wife would be arrested and imprisoned.

141.     Mr. Giguere also recruited the Operational Defendants, who had the authority to add and subtract points from the Independent Distributors'/Network Defendants' Points Log, to assist in the Point Scheme. The Operational Defendants knew of the Point Scheme as evidenced by the millions of points the Operational Defendants added to the Independent Distributors'/Network Defendants' and by the payments they received under the Point Scheme. The Operational Defendants provided substantial assistance to Mr. Giguere's scheme by agreeing

35

to add, and adding, millions of unearned commission points to the Points Log of the Independent Distributors/Network Defendants.

142.    The Network Defendants, many created or repurposed by Mr. Giguere and Mrs. McKinney, knew of Mr. Giguere's Point Scheme as evidenced by the unearned payments they received under the Point Scheme. The Network Defendants provided substantial assistance to Mr. Giguere's fraudulent scheme by agreeing to house the funds paid out under the Point Scheme.

143.    Operational Defendant Jennifer Luce went as far as aiding Mr. Giguere in securing sham releases from Jeunesse in attempts to insulate the liability of the Kingpin and Network Defendants.

144.    The individual acts of Mrs. McKinney/McKinney CPA, Mr. Dawson, The Operational Defendants, and the Network Defendants proximately caused the harm Mr. Ray sustained under the Point Scheme. Specifically, the Point Scheme caused Mr. Ray to regularly infuse Jeunesse with millions of dollars to sustain the Point Scheme and payments to Mr. Giguere, Mrs. McKinney/McKinney CPA, Mr. Dawson, The Operational Defendants, and the Network Defendants.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, the Operational Defendants, and the Network Defendants for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

### COUNT V – NEGLIGENT MISREPRESENTATION
**Point Scheme**
**(AGAINST Kingpin Defendants)**

145.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

36

146.    The Kingpin Defendants made a series of negligent misrepresentations designed to induce Mr. Ray into depleting his personal assets and funding the Kingpin Defendants' Point Scheme. The Kingpin Defendants' material misrepresentations included representing to Mr. Ray that:

a)  Jeunesse's need for an immediate infusion of cash in order to make payroll;

b)  Mr. Ray's failure to immediately and personally fund Jeunesse and make payroll would result in his arrest and imprisonment (and potentially that of his wife/Jeunesse co-founder); and

c)  The Kingpin Defendants would arrange for the sale of the Challenger Jet and use the proceeds to purchase the G550 Jet without Mr. Ray incurring additional debt.

147.    The material misrepresentations delineated above made by the Kingpin Defendants, even if they believed them to be true, were in fact false.

148.    The Kingpin Defendants were negligent in making the material misrepresentations, in paragraph 146, (a) – (c) above, because they knew, or should have known, their representations were false, including because Defendants McKinney CPA and Mrs. McKinney were trained and licensed Florida public accountants; Defendant Mr. Dawson was a trained and licensed attorney and Jeunesse's Chief Legal Officer with intimate knowledge of Jeunesse's finances; Defendant Mr. Giguere was intimately involved in Jeunesse's affairs and financial position as well as Mr. Ray's affairs and financial position; and because of their collective involvement in the Point Scheme.

149.    The Kingpin Defendants intended the material misrepresentations, described in paragraph 146, to induce Mr. Ray's reliance. Specifically, the Kingpin Defendants knew Mr. Ray would act on any advice they provided that would prevent his incarceration (and that of his wife) at his elderly age.

37

150.   Mr. Ray, in fact, did justifiably rely on the Kingpin Defendants' misrepresentations which they claimed were necessary for preventing Mr. Ray's (and his wife's) arrest and imprisonment.

151.   Mr. Ray's justifiable reliance on the Kingpin Defendants' misrepresentations foreseeably caused Mr. Ray damages. Specifically, Mr. Ray, because of the Kingpin Defendants misrepresentations:

a)   Sold his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

b)   Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and themselves;

c)   Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme; and

d)   Sold his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Pamela McKinney, Pamela R. McKinney CPA, Kevin Giguere, and Robert Dawson, for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

## COUNT VI – BREACH OF FIDUCIARY DUTY
### Point Scheme
### (AGAINST Kingpin Defendants)

152.   Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

38

153.   The Kingpin Defendants each owed a fiduciary duty to Mr. Ray based on the specific factual situation surrounding their relationship with Mr. Ray. Specifically:

a) Mr. Ray entrusted and provided Mrs. McKinney/McKinney CPA with access to Mr. Ray's personal finances as well as those of Jeunesse, which allowed Mrs. McKinney/McKinney CPA to obtain a comprehensive understanding of Mr. Ray's assets and finances. Mr. Ray granted Mrs. McKinney/McKinney CPA the ability to transfer money to and from Mr. Ray's personal accounts and trusted Mrs. McKinney to pay Mr. Ray's usual monthly bills and living expenses. Mr. Ray even appointed Mrs. McKinney as a trustee for his irrevocable trust, further evidencing the degree of trust, reliance, and dependency Mr. Ray held for Mrs. McKinney;

b) Mr. Dawson, as Jeunesse's Chief Legal Officer and trusted advisor to Mr. Ray, knew the financial health of Jeunesse and understood Jeunesse's assets and liabilities, including Jeunesse's obligation to make employee payroll and the consequences for failing to do so. Mr. Ray even appointed Mr. Dawson as a trustee in Mr. Ray's irrevocable trust, further evidencing the degree of trust, reliance, and dependency Mr. Ray held for Mr. Dawson. Mr. Dawson also setup international accounts to house Mr. Ray's assets that Mr. Dawson later depleted in furtherance of the Point Scheme; and

c) Mr. Ray entrusted Mr. Giguere to essentially run Jeunesse's daily business operations. This placed Mr. Giguere in a position of influence over key Jeunesse employees – namely the Operational Defendants, Geri Dorman and Debbie Kurley and their subordinates. Mr. Giguere also injected himself in the everyday life of Mr. Ray and inserted himself on "special projects," like overseeing the remodeling of Mr. Ray's Florida and North Carolina homes and, thus evidencing Mr. Ray's dependency on Mr. Giguere and Mr. Giguere's undertaking to benefit Mr. Ray.

154.   The Kingpin Defendants each breached, individually and collectively, their fiduciary duties to Mr. Ray in so much as:

a) Mrs. McKinney/McKinney CPA abused the trust and confidence Mr. Ray placed in Mrs. McKinney/McKinney to manage and access his personal assets and finances by utilizing such authority to execute unauthorized, fraudulently induced, or negligently misrepresented transfers out of Mr. Ray's financial accounts in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that directly benefited Mrs. McKinney/McKinney CPA, her children, and her husband, for millions of dollars;

39

b) Mr. Dawson abused the trust and confidence Mr. Ray placed in Mr. Dawson by fraudulently or negligently advising Mr. Ray of the Payroll Imprisonment Threat and inducing Mr. Ray to acquiesce to the transfers executed by Mrs. McKinney/McKinney CPA in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that directly benefited Mr. Dawson or his family for millions of dollars despite Mr. Dawson's role as an attorney; and

c) Mr. Giguere abused the trust and confidence Mr. Ray placed in Mr. Giguere by fraudulently or negligent advising Mr. Ray that he should go along with the Kingpin Defendants' recommendations and advice, all of which were against Mr. Ray's best interest, including the Payroll Imprisonment Threat, Jeunesse's need for cash flow, the consequents for failing to do so, and Mr. Giguere's development of the Point Scheme. Mr Giguere did so in order to support and further the Point Scheme, which ultimately benefited multiple sham Network Defendants, many of which directly benefited Mr. Giguere or his children for millions of dollars.

155.    The Kingpin Defendants' breach of fiduciary duty foreseeably caused Mr. Ray damages. Specifically, Mr. Ray, as a result of the Kingpin Defendants' breach of fiduciary duties:

a) Sold his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

b) Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and themselves;

c) Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme;

d) Sold his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Pamela McKinney, Pamela R. McKinney CPA, Kevin Giguere, and Robert Dawson, for damages, together

40

with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

## COUNT VII – CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY
### Point Scheme
### (AGAINST Kingpin Defendants)

156.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 and 152-155, above as if fully set forth herein.

157.    The Kingpin Defendants, each knowing their respective fiduciary relationships with Mr. Ray and the trust, confidence, and dependency Mr. Ray placed in each of them, did in fact agree with one another to conspire against Mr. Ray.

158.    Specifically, the Kingpin Defendants agreed amongst each other to breach their respective fiduciary duties to Mr. Ray and extract his wealth for personal gain through the Points Scheme.

159.    The Kingpin Defendants' conspiracy, to breach their respective fiduciary duties to Mr. Ray in order to carry out the Point Scheme and extract millions of dollars of Mr. Ray's wealth, was an unlawful act.

160.    The Kingpin Defendants each engaged in overt acts in furtherance of the conspiracy, namely:

   a) Mrs. McKinney/McKinney CPA executed unauthorized, fraudulently induced, or negligently misrepresented transfers out of Mr. Ray's financial accounts in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that directly benefited Mrs. McKinney/McKinney CPA, her children, and her husband, for millions of dollars;

   b) Mr. Dawson fraudulently or negligently advised Mr. Ray of the Payroll Imprisonment Threat and induced Mr. Ray to acquiesce to the transfers executed by Mrs. McKinney/McKinney CPA in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that directly benefited Mr. Dawson or his family for millions of dollars;

41

c) Mr. Giguere abused the trust and confidence Mr. Ray placed in Mr. Giguere by fraudulently or negligent advising Mr. Ray that he should go along with the Kingpin Defendants' recommendations and advice, all of which were against Mr. Ray's best interest, including the Payroll Imprisonment Threat, Jeunesse's need for cash flow, the consequents for failing to do so, and Mr. Giguere's development of the Point Scheme. Mr Giguere did so in order to support and further the Point Scheme, which ultimately benefited multiple sham Network Defendants, many of which directly benefited Mr. Giguere or his children for millions of dollars.

161.    The Kingpin Defendants' overt acts in furtherance of their conspiracy foreseeably damaged Mr. Ray and as a result of the Kingpin Defendants' conspiracy, Mr. Ray:

a) Sold his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

b) Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and themselves;

c) Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme;

d) Sold his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Pamela McKinney, Pamela R. McKinney CPA, Kevin Giguere, and Robert Dawson, for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

42

### COUNT VIII – PROFESSIONAL MALPRACTICE
### Point Scheme
### (AGAINST Defendants Pamela McKinney and Pamela R. McKinney CPA)

162.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-40, 48-115 above as if fully set forth herein.

163.    Kingpin Defendants Mrs. McKinney and McKinney CPA held themselves out to be Florida Certified Public Accountants, with all corresponding legal obligations and duties to their clients, including but not limited to, the standards imposed by the Florida Administrative Code.

164.    Mr. Ray entered into a professional relationship with Mrs. McKinney and McKinney CPA by virtue of Mrs. McKinney and McKinney CPA's agreement to provide bookkeeping services to Mr. Ray.

165.    The Florida Administrative Code imposes legal duties and obligations on CPAs vis-à-vis their clients, including "…**not knowingly misrepresent[ing] facts**, and, when engaged in the practice of public accounting, [CPAs] **shall not subordinate his/her judgment to others including but not limited to clients, employers or other third parties**." F.A.C. 61H1-21.002 (emphasis added).

166.    Mrs. McKinney and McKinney CPA breached their duty to Mr. Ray in that they: (i) subordinated their judgment to that of Mr. Giguere and Mr. Dawson; (ii) misrepresented facts to Mr. Ray about Mr. Ray's and Jeunesse's financial position; (iii) created and/or managed the sham Network Defendant entities to launder Mr. Ray's money for Mrs. McKinney, McKinney CPA and her families own benefit; and (iv) fell well below the standard of care imposed on Florida Certified Public Accountants by misappropriating Mr. Ray's funds.

167.    Specifically, Mrs. McKinney and McKinney CPA encouraged and supported the Payroll Imprisonment Threat by routinely transferring money out of Mr. Ray's personal accounts and into Jeunesse. Mrs. McKinney and McKinney CPA also took instructions from Mr. Giguere as to the transfer of Mr. Ray's funds under false pretenses without approval from Mr. Ray. Mrs. McKinney and McKinney CPA specifically did so in support of the Point Scheme they knew would benefit themselves, the other Kingpin Defendants, Network Defendants, and Operational Defendants.

168.    Mr. Ray adhered to and relied on Mrs. McKinney's and McKinney CPA's skill, knowledge, and professional advice in managing Mr. Ray's bank accounts and providing bookkeeping services. In turn, Mrs. McKinney and McKinney CPA, having access to Mr. Ray's finances, executed the fraudulently and/or negligently induced transfers out of Mr. Ray's personal accounts and/or assets and properties throughout the relationship and at least up to and including the latter half of October 2022.

169.    But for Mrs. McKinney's and McKinney CPA's breach, Mr. Ray would not have authorized the fraudulently and/or negligently induced transfers that infused Jeunesse with millions of dollars in support of the Kingpin Defendants' Point Scheme.

170.    As a foreseeable result of Mrs. McKinney's and McKinney CPA's breach, Mr. Ray has been damaged in that he:

 a) Sold his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

 b) Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and themselves;

44

c) Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme;

d) Sold his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

**WHEREFORE**, Plaintiff demands judgment against Pamela McKinney and Pamela R. McKinney CPA for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

<u>**COUNT IX – CIVIL THEFT**</u>
<u>**Point Scheme, Fla. Stat. Sec. 772.11, 812.014**</u>
<u>**(AGAINST Kingpin Defendants AND Operational Defendants Debbie Kurley, Geri Dorman)**</u>

171.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

172.    The Kingpin Defendants and Operational Defendants Debbie Kurley and Geri Dorman knowingly endeavored and obtained Mr. Ray's funds, assets, and property with felonious intent to permanently deprive Mr. Ray of the same so as to benefit themselves and/or other person(s), namely the Network Defendants.

173.    Specifically, through the Kingpin Defendants' Payroll Imprisonment Threat and Point Scheme, the Kingpin Defendants extracted Mr. Ray's personal assets and infused the same into Jeunesse.

174.    The Kingpin Defendants, with the aid of Operational Defendants Debbie Kurley and Geri Dorman, then funneled Mr. Ray's funds into segregated, identifiable bank accounts belonging to the sham Network Defendants (which the Kingpin Defendants themselves controlled a majority of the time).

175.    Mr. Ray has been foreseeably damaged by the Kingpin Defendants' and Operational Defendants, Debbie Kurley's and Geri Dorman's, theft in that the conduct caused Mr. Ray to:

a) Sell his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

b) Have millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme to enrich the Network Defendants, Operational Defendants, and themselves;

c) Incur millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme;

d) Sell his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

176.    Mr. Ray delivered pre-suit demand letters to the Kingpin Defendants and Operational Defendants Debbie Kurley and Geri Dorman.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Pamela McKinney, Pamela R. McKinney CPA, Kevin Giguere, and Robert Dawson, and Operational Defendants Debbie Kurley and Geri Dorman for damages, treble damages, and together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

46

**COUNT X – CONSPIRACY TO COMMIT CIVIL THEFT**
**Point Scheme, Fla. Stat. Sec. 772.11, 812.014**
**(AGAINST Kingpin Defendants AND Operational Defendants Debbie Kurley,**
**Geri Dorman)**

177.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 and 171-176, above as if fully set forth herein.

178.    The Kingpin Defendants and Operational Defendants, Debbie Kurley and Geri Dorman, each knowing their respective relationships with Mr. Ray, did in fact agree with one another to conspire against Mr. Ray.

179.    Specifically, the Kingpin Defendants and Operational Defendants, Debbie Kurley and Geri Dorman, agreed amongst each other to extract Mr. Ray's wealth for their own personal gain through the implementation of the Points Scheme.

180.    The conspiracy, to carry out the Point Scheme and extract millions of dollars of Mr. Ray's wealth, was an unlawful act.

181.    The Kingpin Defendants and Operational Defendants, Debbie Kurley and Geri Dorman, each engaged in overt acts in furtherance of the conspiracy, namely:

a) Mrs. McKinney/McKinney CPA executed unauthorized and fraudulently induced transfers out of Mr. Ray's financial accounts in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that directly benefited Mrs. McKinney/McKinney CPA, her children, and her husband, for millions of dollars;

b) Mr. Dawson fraudulently advised Mr. Ray of the Payroll Imprisonment Threat and induced Mr. Ray to acquiesce to the transfers executed by Mrs. McKinney/McKinney CPA in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that directly benefited Mr. Dawson or his family for millions of dollars;

c) Mr. Giguere crafted the Point Scheme and falsely advised Mr. Ray of Jeunesse's need for cash infusions and the Payroll Imprisonment Threat. Mr Giguere did so in order to support and further the Point Scheme, which ultimately benefited multiple sham Network Defendants, many of which directly benefited Mr. Giguere or his children for millions of dollars.

47

d) Ms. Debbie Kurley and Mrs. Geri Dorman, directly added millions of unearned commission points to the sham Network Defendants' Independent Distributor accounts or instructed the other members of the Operational Defendants that they supervised to do so.

182.    The Kingpin Defendants' and Operational Defendants, Debbie Kurley's and Geri Dorman's overt acts in furtherance of their conspiracy foreseeably damaged Mr. Ray and as a result of the Kingpin Defendants' conspiracy, Mr. Ray:

a) Sold his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

b) Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and themselves;

c) Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme; and

d) Sold his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

183.    Mr. Ray delivered pre-suit demand letters to the Kingpin Defendants and Operational Defendants Geri Dorman and Debbie Kurley.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Pamela McKinney, Pamela R. McKinney CPA, Kevin Giguere, and Robert Dawson, and Operational Defendants, Debbie Kurley and Geri Dorman for damages, treble damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

48

## COUNT XI – CONVERSION
### Point Scheme
### (AGAINST All Defendants)

184. Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

185. The Kingpin Defendants, Operational Defendants, and Network Defendants converted Mr. Ray's funds, assets, and property to launder (or liquidate and launder) such funds through Jeunesse and into their own dominion and control.

186. The Kingpin Defendants, Operational Defendants, and Network Defendants exercise of wrongful dominion or control over Mr. Ray's funds were to the detriment of Mr. Ray in the amount of millions of dollars.

187. Specifically, through the Kingpin Defendants' Payroll Imprisonment Threat and Point Scheme, the Kingpin Defendants extracted Mr. Ray's personal assets and infused the same into Jeunesse.

188. Mr. Ray has been foreseeably damaged by the Kingpin Defendants', Network Defendants', and Operational Defendants' conversion in that it caused Mr. Ray to:

a) Sell his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

b) Have millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and themselves;

c) Incur millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme; and

d) Sell his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

189. The funds converted by the Kingpin Defendants, Operational Defendants, and Network Defendants are specifically identifiable in that they were deposited into segregated accounts maintained by the Network Defendants as payment under the Point Scheme.

**WHEREFORE**, Plaintiff demands judgment against the Kingpin Defendants, Operational Defendants, and Network Defendants for damages and together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

## COUNT XII – CONSPIRACY TO COMMIT CONVERSION
### Point Scheme
### (AGAINST All Defendants)

190. Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 and 184-189, above as if fully set forth herein.

191. The Kingpin Defendants, Operational Defendants, and Network Defendants did in fact agree with one another to conspire against Mr. Ray.

192. Specifically, the Kingpin Defendants, Operational Defendants, and Network Defendants agreed amongst each other to convert Mr. Ray's wealth for their own personal gain through the implementation of the Points Scheme.

193. The conspiracy, to carry out the Point Scheme and convert millions of dollars of Mr. Ray's wealth, was an unlawful act.

194. The Kingpin Defendants each engaged in overt acts in furtherance of the conspiracy, namely:

a) Mrs. McKinney/McKinney CPA executed unauthorized and fraudulently induced transfers out of Mr. Ray's financial accounts in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that

50

directly benefited Mrs. McKinney/McKinney CPA, her children, and her husband, for millions of dollars;

b) Mr. Dawson fraudulently advised Mr. Ray of the Payroll Imprisonment Threat and induced Mr. Ray to acquiesce to the transfers executed by Mrs. McKinney/McKinney CPA in support and furtherance of the Point Scheme, which ultimately benefited sham Network Defendants that directly benefited Mr. Dawson or his family for millions of dollars; and

c) Mr. Giguere crafted the Point Scheme and falsely advised Mr. Ray of Jeunesse's need for cash infusions and the Payroll Imprisonment Threat. Mr Giguere did so in order to support and further the Point Scheme, which ultimately benefited multiple sham Network Defendants, many of which directly benefited Mr. Giguere or his children for millions of dollars.

195.    The Operational Defendants overt acts in furtherance of the conspiracy involved the Operational Defendants individually and/or collectively adding millions of unearned points to the sham Network Defendants' Independent Distributor accounts that generated millions of dollars in unearned commission payments to the Network Defendants. Further, Operational Defendant Jennifer Luce aided in obtaining sham releases from Jeunesse for the benefit of some of the Kingpin and Network Defendants.

196.    The Network Defendants overt acts in furtherance of the conspiracy involved the Network Defendants agreeing to house, retain, and distribute the millions of dollars in unearned commission payments received under the Point Scheme.

197.    The Kingpin Defendants', Operational Defendants', and Network Defendants' overt acts in furtherance of their conspiracy foreseeably damaged Mr. Ray and as a result of the Kingpin Defendants' conspiracy, Mr. Ray:

a) Sold his shares in RWR Real Estate Holdings LLC and several partnership investment funds to Kingpin Defendant Rob Dawson for a fraction of their estimated value. In turn the Kingpin Defendants infused Jeunesse with the value of the shares to support their Point Scheme, which such money was funneled out of Jeunesse for the benefit of the Kingpin Defendants;

51

b) Had millions of dollars depleted from his personal accounts that the Kingpin Defendants used to fund the Point Scheme and enrich the Network Defendants, and;

c) Incurred millions of dollars in debt through loans from Pathway Bank, collateralized by Mr. Ray's real property in California, for the purchase of the G550 Jet that Mr. Ray was told would be covered from the sale of the Challenger Jet, the proceeds of which were infused into Jeunesse to support the Kingpin Defendants' Point Scheme;

d) Sold his interest in Jeunesse for a loss of millions of dollars that ultimately resulted in Kingpin Defendant Kevin Giguere's control of Jeunesse.

**WHEREFORE**, Plaintiff demands judgment against Kingpin Defendants, Operational Defendants, and the Network Defendants for damages, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

## COUNT XIII – UNJUST ENRICHMENT
### (AGAINST All Defendants)

198. Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

199. Mr. Ray conferred a benefit upon the Kingpin, Operational, and Network Defendants in that Mr. Ray's personal funds were used to cover fraudulent and unearned commission payments to the Network Defendants.

200. The Kingpin, Operational, and Network Defendants had knowledge, or should have had knowledge, of the benefit conferred in that they received regular payments throughout several years adding up to millions of dollars for performing no legitimate services for such payments.

201. The Kingpin, Operational, and Network Defendants voluntarily accepted and retained the benefit of the unearned commission payments covered by Mr. Ray's personal funds.

202.    The circumstances are such that it would be inequitable for the Kingpin, Operational, and Network Defendants to retain the benefit conferred without paying Mr. Ray the value of that benefit.

**WHEREFORE**, Plaintiff demands judgment against the Kingpin, Operational, and Network Defendants for damages together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

<u>**COUNT XIV – FRAUDULENT INDUCEMENT**</u>
<u>**Fraudulent Headquarters Building Sale**</u>
<u>**(AGAINST Mr. Dawson)**</u>

203.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-106 above as if fully set forth herein.

204.    Mr. Dawson, by virtue of his involvement in the Point Scheme and as a close advisor to Mr. Ray, knew Mr. Ray needed liquid funds as he was regularly infusing Jeunesse with millions of dollars to cover the Point Scheme.

205.    Mr. Dawson, as a member in RWR Real Estate Holdings LLC along with Mr. Ray and his wife, knew that RWR Real Estate Holdings LLC owned the Jeunesse HQ Building.

206.    In the latter half of 2022, when Mr. Ray was in need of funds to infuse Jeunesse because of the Point Scheme, Mr. Dawson offered to buy Mr. Ray's interest in RWR Real Estate Holdings LLC at a steep discount.

207.    Specifically, the estimated value of RWR Real Estate Holdings LLC's assets was approximately $18 million dollars. However, Mr. Dawson offered to purchase Mr. Ray's one-third interest in RWR Real Estate Holdings LLC for substantially less than Mr. Ray's one-third market value.

53

208.    Mr. Dawson justified the below-market offer based on Mr. Ray's immediate need of cash – a need precipitated by the Point Scheme that Mr. Dawson was orchestrating with his co-conspirators and unknown to Mr. Ray – and a sluggish commercial real estate market wherein the HQ Building would not have sold quickly on the open market.

209.    Mr. Dawson intentionally omitted the existence of the Point Scheme in order to acquire Mr. Ray's membership interest in RWR Real Estate Holdings LLC because he knew Mr. Ray would not have sold his membership interest if the Point Scheme was disclosed.

210.    Mr. Ray, in fact, did justifiably rely on Mr. Dawson's representation given Mr. Ray's need for immediate funds caused by the omitted Point Scheme disclosure.

211.    Mr. Ray's justifiable reliance on Mr. Dawson's misrepresentation was foreseeably to Mr. Ray's detriment in that Mr. Ray did sell his membership interest in RWR Real Estate Holdings LLC to Mr. Dawson for well-under market value.

212.    Mr. Dawson continues to possess the Jeunesse Headquarters Building and collects rent payments for tenants, payments of which properly belong to Mr. Ray.

**WHEREFORE**, Plaintiff demands judgment against Robert Dawson, for rescission  of the fraudulently induced agreement, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

<u>**COUNT XV – FRAUDULENT INDUCEMENT**</u>
<u>**Fraudulent Jeunesse Membership Sale**</u>
<u>**(AGAINST Mr. Dawson)**</u>

213.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1-106 above as if fully set forth herein.

214.    Mr. Dawson, by virtue of his involvement in the Point Scheme and Jeunesse's Chief Legal Officer, knew that his shares in Jeunesse were worth substantially less than $60,000,000.00 in 2020.

215.    Nevertheless, in October 2020, Mr. Dawson informed Mr. Ray and his wife that he wanted to sell his shares in Jeunesse. Mr. Dawson misrepresented the value of his shares to Mr. Ray as worth approximately $60,000,000.00.

216.    However, Mr. Dawson did not disclose, and intentionally omitted, the on-going Point Scheme, which he himself was involved in, and benefiting from, to the detriment of Mr. Ray and Jeunesse.

217.    Mr. Dawson intended his false statement and omission of material fact to induce Mr. Ray's reliance in the purchase of Mr. Dawson's shares in Jeunesse.

218.    Mr. Ray justifiably relied on Mr. Dawson's representation that Mr. Dawson's shares in Jeunesse were valued at approximately $60,000,000.00 given the fact Mr. Dawson failed to disclose the Point Scheme to Mr. Ray.

219.    Mr. Ray and his wife agreed to, and did, purchase Mr. Dawson's shares in Jeunesse for $60,000,000.00.

220.    Mr. Ray's justifiable reliance on Mr. Dawson's misrepresentation was foreseeably to Mr. Ray's detriment in that Mr. Ray did purchase Mr. Dawson's shares in Jeunesse above Jeunesse's market value that did not properly take into account the Point Scheme implemented by Mr. Dawson and his co-conspirators.

**WHEREFORE**, Plaintiff demands judgment against Robert Dawson, for rescission of the fraudulently induced agreement, together with prejudgment and post-judgment interest, attorney's fees and costs, and other and further relief as the Court deems just and proper.

55

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands jury trial on all issues and causes of action so triable as a matter of law.

Dated this 1st day of October, 2024.

Respectfully submitted,

/s/ William N. Shepherd
William N. Shepherd (Fla. Bar No. 88668)
Jeffrey M. Schacknow (Fla. Bar No. 1004628)
Henry A. Moreno (Fla. Bar No. 1031432)
HOLLAND & KNIGHT LLP
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, FL 33401
Telephone: (561)650-8338
Facsimile: (561) 650-8399
William.Shepherd@hklaw.com
Jeffrey.schacknow@hklaw.com
henry.moreno@hklaw.com

# EXHIBIT 1

**Network Defendants**

| No. | Name/Entity | Business/Reg. Agent Address | County |
|-----|-------------|------------------------------|--------|
| **Corporate Network Defendants** | | | |
| 1 | B&G Team Inc. | 3433 E. Gulf to Lake Hwy, Inverness, FL[1] | Citrus |
| 2 | Big Country Acres LLC | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 3 | VT3 LLC | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 4 | Bet High LLC | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 5 | KNC Enterprises Inc. | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 6 | Kalb Enterprises International LLC | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 7 | Team Destiny LLC | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 8 | Gato Grande LLE | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 9 | United Strong LLC | 3433 E. Gulf to Lake Hwy, Inverness, FL | Citrus |
| 10 | CD Asset Holdings LLC | 3352 Eisenhower Way, The Villages, FL | Sumter |
| 11 | K2 Quest LLC | 3030 N. Rocky Point Dr., Tampa FL | Hillsborough |
| 12 | Canna Cope Wellness LLC | 6247 Neff Lake Rd, Brooksville, FL | Hernando |
| 13 | Covenant Home Security LLC | 6247 Neff Lake Rd, Brooksville, FL | Hernando |
| 14 | Youth Inside Out Inc. | 9 Trilby Branch, Longwood, FL | Seminole |
| 15 | Ricketts Management LLC | 1653 Sunnybrook Ln, Clearwater, FL | Pinellas |
| 16 | Foubi Cleaning Services LLC | 112 Spanish Bay Dr, Sandford, FL | Seminole |
| 17 | Allebas AES, LLC | 7901 4th St. N, Suite 300, St. Petersburg, FL | Pinellas |
| **Individual Network Defendants** | | | |
| 18 | Brooke McKinney | *Sui juris* individual | Citrus |
| 19 | Courtney Cook | *Sui juris* individual | Citrus |
| 20 | William McKinney | *Sui juris* individual | Citrus |
| 21 | Bailey Giguere | *Sui juris* individual | Seminole |
| 22 | Austin Giguere | *Sui juris* individual | Seminole |

[1] 3433 E. Gulf to Lake Highway, Inverness, Florida is the same address for Defendant Pamela R. McKinney CPA PA.

| 23 | Hollie Mancini | *Sui juris* individual | Hernando |
| 24 | Dolan Ricketts | *Sui juris* individual | Seminole |
| 25 | Brenda Ricketts | *Sui juris* individual | Seminole |
| 26 | Carol Dawson | *Sui juris* individual | Sumter |
| 27 | Barbara Dawson | *Sui juris* individual | Elwood, Nebraska |
| 28 | Christopher Munizzi | *Sui juris* individual | Hillsborough |
| 29 | Ruth Norvell | *Sui juris* individual | Seminole |
| 30 | Myrna Nash | *Sui juris* individual | Orange |

UNOFFICIAL

# EXHIBIT 2



**Network Defendants Points & Payments Chart**

| No. | Name/Entity | Total Points Added | Aprx. Payments |
|---|---|---|---|
| **Corporate Network Defendants** | | | |
| 1 | B&G Team Inc. | TBD | $2,513,111.75 |
| 2 | Big Country Acres LLC | 27,000,000 | $3,255,395.85 |
| 3 | VT3 LLC | TBD | $923,767.88 |
| 4 | Bet High LLC | 25,000,000 | $325,281.19 |
| 5 | KNC Enterprises Inc. | TBD | $1,154,476.77 |
| 6 | Kalb Enterprises International LLC | 40,069,608 (shared amongst CD Asset Holdings LLC) | $1,477,773.91 |
| 7 | Team Destiny LLC | TBD | $315,571.72 |
| 8 | Gato Grande LLE | TBD | $738,932.69 |
| 9 | United Strong LLC | TBD | $2,601,878.06 |
| 10 | CD Asset Holdings LLC | See Entry No. 6, above | $261,791.85 |
| 11 | K2 Quest LLC | 20,000,000 | $1,117,627.05 |
| 12 | Canna Cope Wellness LLC | 21,000,000 | $1,238,811.39 |
| 13 | Covenant Home Security LLC | TBD | $992,085.25 |
| 14 | Youth Inside Out Inc. | 79,596,438 | $542,833.49 |
| 15 | Ricketts Management LLC | 4,000,000 | $136,545.00 |
| 16 | Foubi Cleaning Services LLC | 1,675,200 | $89,017.50 |
| 17 | Allebas AES LLC | TBD | $299,407.77 |
| **Individual Network Defendants** | | | |
| 18 | Brooke McKinney | TBD | $1,216,662.09 |
| 19 | Courtney Cook | TBD | $187,264.25 |
| 20 | William McKinney | TBD | $877,831.79 |
| 21 | Bailey Giguere | 54,000,000 | $1,833,685.35 |
| 22 | Austin Giguere | See B & G Team, Inc. | -- |
| 23 | Hollie Mancini | TBD | $318,879.02 |
| 24 | Dolan Ricketts | See Ricketts Management LLC | -- |
| 25 | Brenda Ricketts | 300,000 | $17,635.00 |
| 26 | Carol Dawson | See CD Asset Holdings LLC | -- |
| 27 | Barbara Dawson | 571,775,795 | TBD |
| 28 | Christopher Munizzi | TBD | $42,136.14 |
| 29 | Ruth Norvell | See Youth Inside Out Inc. | -- |
| 30 | Myrna Nash | See Foubi Cleaning Services LLC | -- |
| | **Total Known Payments** | | $22,478,402.76 |