Samuel A. Schwartz, Esq.
  (admitted *pro hac vice*)
Nevada Bar No. 10985
saschwartz@nvfirm.com
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

Samuel B. Strohbehn, Esq.
California Bar No. 257697
sstrohbehn@rosinglaw.com
Maddie Rudge, Esq.
California Bar No. 362727
mrudge@rosinglaw.com
Amara S. Barbará, Esq.
California Bar No. 323332
abarbara@rosinglaw.com
ROSING POTT & STROHBEHN LLP
770 1st Avenue, Suite 200
San Diego, California 92101
Telephone: (619) 235-6000

*Attorneys for Defendants Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels, and TFE Games Holdings, LLC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT DAWSON; RYAN OGDEN; THERESA FETTE; AARON BARTELS; and TFE GAMES HOLDINGS, LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP <br><br> **DECLARATION OF THERESA FETTE IN SUPPORT OF THE OPPOSITION TO PLAINTIFF'S MOTION FOR APPOINTMENT OF RECEIVER** <br><br> Judicial Officer: Hon. Linda Lopez <br> Courtroom: 14B (14th Floor) <br> Hearing Date:  June 11, 2026 <br> Hearing Time: N/A <br><br> Action Filed: February 14, 2026 <br> Trial Date: Not Set |

I, THERESA FETTE, declare as follows:

1.    I am a named defendant in this action and a member of the Board of Directors of the entities involved in the development of the video game *Ashes of Creation*. I have personal knowledge of the facts set forth herein unless otherwise

stated. I am not and have never been a manager of the company's day-to-day operations. My role has been limited to board-level governance and oversight.

## I.    QUALIFICATIONS AND BACKGROUND

2.    I am a tax attorney by training with extensive experience in corporate governance, mergers and acquisitions, and financial structuring. I have served as CEO of three companies, completed three successful exits, led and sourced approximately nine M&A transactions, and built companies to institutional scale. I currently operate a family office. My professional background is directly relevant to the governance and financial oversight issues in this case.

3.    I was personally recruited by Steven Sharif to assist with the company. I was not, as Mr. Sharif's Complaint implies, a hostile outsider imposed upon the company.

4.    My financial involvement is significant. I invested $1,000,000 through Fette Holdings, LLC via a Convertible Promissory Note dated January 24, 2022, plus an additional $500,000 of personal capital directly into the company through a promissory note, for a total investment of $1,500,000. I am alleged to have conspired against a company I was personally recruited to help, into which I invested $1,500,000 of my own money, and for which I helped lead an extensive buyer/investor search, developed a restructuring plan, and attempted to mediate between the founder and investors.

5.    To my knowledge, from the Company's inception on May 20, 2015, through approximately October 2025, the Company operated without any formal board of directors or managers. During that entire period—over ten years—Mr. Sharif and his husband, John Moore, were the only C-level officers, collectively serving as CEO, COO, CFO, and CTO. They exercised exclusive and unilateral control over all corporate decisions, finances, and operations with no independent governance oversight whatsoever.

26cv00965-LL-MMP

6. After being introduced to Mr. Dawson by Mr. Sharif, Mr. Dawson welcomed and requested that Mr. Bartels and myself assist in forming a Board. Prior to that point, I had met Mr. Dawson only by phone in the context of co-investing. The Board met in August 2025 but formally convened for the first time in October 2025, and has remained active since that time.

## II.    MR. SHARIF'S FALSE REVENUE PROJECTIONS

7. Mr. Sharif made many requests for additional capital to me personally and often used dates and revenue projections that never materialized. Specifically on May 31, 2024, Mr. Sharif made specific, material revenue projections to me via text message. He stated that the Alpha Two launch date was "August" 2024 and that it would generate "Between 24-45m within 2 months of a2 launch." He further represented that "Our burn is 2.8. The margin on that revenue is like 88-90%. Server overhead is the only real cog." Attached hereto as **Exhibit A** are true and correct copies of these text messages. These projections were materially false. Alpha Two did not launch until the end of 2025. The $24–45 million in revenue never materialized. I now understand these to be misrepresentations made to induce continued investment.

8. Mr. Sharif engaged in a pattern of inducement by making false launch date representations and providing false budgets to convince investors and debtholders to continue funding the company. Based on my review of the available books and records, new investor capital was also used in part to repay earlier related-party loans to Mr. Sharif's family members and friends, while Mr. Sharif simultaneously extracted over $10 million in personal transfers from company funds. The game has never fully commercially launched despite approximately $120 million in total capital raised over multiple years. Mr. Sharif engaged in a pattern of continuous capital solicitation predicated on false promises, with funds flowing to the founder's personal accounts and related parties rather than to game development.

### III.   MR. SHARIF'S FINANCIAL EXTRACTION AND CONCEALED PAYMENTS

9.      On July 24, 2025, Mr. Sharif sent a spreadsheet showing financial transactions including: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to me and Mr. Bartels asking for help with these accounting transactions for an audit that Mr. Ogden was facilitating for the Company. These figures reveal commingling of personal and business funds. Despite repeated requests, Mr. Sharif was unable to present corroboration that any of these payments constituted valid business expenses. All of these transactions were recorded by an accountant hired by Mr. Sharif and managed by Mr. Sharif and his husband John Moore. There was no Board in place and no independent financial controls during this period.

10.      In January 2024, Mr. Sharif and Mr. Moore unilaterally raised Mr. Moore's salary to $480,000 per year, and in March 2024 raised Mr. Sharif's salary to $480,000 per year. I was told by Mr. Sharif that this raise was done in response to having to give up majority equity to Mr. Dawson in August 2025 when he was unable to find additional funding from any other investor. This compensation was not approved by any Board, was not industry standard for a pre-revenue company of this size and was implemented during a period of acute financial distress. The Board subsequently had me benchmark industry-standard CEO compensation for a company such as Intrepid. The benchmark came back at $250,000–$400,000 with a 2–3% equity kicker and exit bonus. Attached hereto as **Exhibit B** are true and correct copies of text messages regarding the compensation discussions with Mr. Sharif.

### IV.   MR. SHARIF SABOTAGED THE PLANNED RESTRUCTURING

11.      The Board's restructuring plan from that was contemplated in the fourth quarter of 2025 called for the reduction of approximately 100 employees, to be carried

out in phases. This phased approach was designed to minimize disruption and treat departing employees with dignity. Mr. Sharif's persistent insubordination and constant postponement of the layoffs, which he delayed from the originally planned timeline through repeated objections and counterproposals, reduced the planned reduction to only 10 employees. Each week of delay cost the company hundreds of thousands of dollars. Mr. Sharif's refusal to execute the Board's restructuring plan on a timely basis caused continuing and compounding financial harm to the company and the employees.

12.    The Motion alleges at Paragraphs 71–77 that the Board Defendants "unilaterally imposed" layoffs. This is false. Mr. Sharif was an active, knowing participant in workforce reduction planning. On December 26, 2025, Mr. Sharif acknowledged: "It's a rough expectation to terminate those people the day after Christmas. And with no PTO payout? How will we survive that backlash." He was not objecting to the layoffs themselves, he was negotiating timing, cost, and messaging. Due to Mr. Sharif's continued insubordination, the Company became increasingly unable to meet its financial obligations, which forced difficult business decisions in order to ensure the continued operation of the Company. On December 30, 2025, Mr. Sharif counter-proposed delaying layoffs until after the DICE conference (February 10–13, 2026), estimating that delay would "basically cost 600k above and beyond the current severance proposal." He was performing cost-benefit analysis on timing, the hallmark of a decision-maker, not a victim. On January 20, 2026, Mr. Sharif was "trying to write the layoff messaging for the studio." Attached hereto as Exhibit C are true and correct copies of text messages reflecting Mr. Sharif's participation in layoff planning.

13.    Throughout my tenure on the Board, I had repeated conversations with Mr. Sharif regarding the Company's deteriorating financial condition. I personally counseled Mr. Sharif on financial accountability. In July 2025, I communicated directly with Mr. Sharif about the need for proper financial controls. In those

5                                    26cv00965-LL-MMP

conversations, Mr. Sharif consistently minimized or dismissed the severity of the Company's insolvency. When presented with data showing the Company could not meet basic operating obligations — including payroll — Mr. Sharif's default position was that Mr. Dawson would provide additional capital. Mr. Sharif treated Mr. Dawson's personal wealth as though it were a corporate funding facility to which the Company had an ongoing right of access. On multiple occasions, I communicated to Mr. Sharif that Mr. Dawson had no ongoing contractual obligation to fund the Company, that it was neither fair nor reasonable to expect Mr. Dawson to continue writing checks indefinitely. Mr. Sharif would share with me that he understood and then have a conversation with Mr. Dawson, often alone, to induce him to provide additional investment. After the Company ceased operations, Mr. Sharif and others characterized Mr. Dawson to employees and vendors as a billionaire who simply chose not to fund the company because he did not care about people. That characterization is false. Mr. Dawson had invested more capital into this company than any other individual, had repeatedly funded emergency payroll shortfalls at the Board's request, and had expressly communicated his unwillingness and inability to continue funding at the levels Mr. Sharif demanded. The narrative Mr. Sharif promoted was designed to deflect accountability for the financial condition he created and to redirect blame toward the one individual who had done the most to keep the Company alive.

## V.    MR. SHARIF DELIBERATELY TRIGGERED THE COMMERCE BANK CRISIS

14.    In January 2026, when Mr. Sharif was unable to obtain the equity terms he demanded as a condition of continuing as CEO, he did not resign gracefully or act in the company's interest. Mr. Sharif notified CommerceWest Bank of the foreclosure proceedings, knowing that CommerceWest Bank would immediately commence seizing the company's funds. The Board had always intended to honor CommerceWest Bank's loan and had deliberately delayed formal notice to Commerce

Bank to preserve the company's ability to make payroll for its employees. Mr. Sharif's notification caused the seizure of all Steam revenue and the company's immediate inability to make payroll. Upon information and belief, Mr. Sharif was motivated not only by the failed equity negotiations but also by the fact that Commerce Bank held a $1.3 million escrow from the sale of his personal residence, which had been pledged as collateral for the loan. Mr. Sharif knowingly triggered the Commerce Bank crisis to protect his personal $1.3 million escrow, while simultaneously destroying the company's ability to make payroll for its employees. Mr. Sharif received via electronic mail CommerceWest Bank's default notice approximately two days before his resignation on January 19, 2026, and concealed that notice from the Board. Later the Board was informed that it was Mr. Sharif's notification to Commerce Bank that ultimately caused the financial collapse of the company in the first quarter of this year.

15.     On January 30, 2026, I discussed the CommerceWest Bank situation with Mr. Sharif. I stated: "Nothing the bank would naturally accelerate any seizure notice. That limited optionality. Perhaps there could have been room to negotiate, perhaps there still is, and we intend to explore that." Mr. Sharif personally text me that he was in receipt of the bank's default notice and it arrived "probably sometime around Jan 18th" and acknowledged it was "a default notice by email." Attached hereto as **Exhibit D** are true and correct copies of text messages reflecting the CommerceWest Bank timeline. Mr. Sharif resigned on January 19.

## VI.    THE BOARD OPERATED THROUGH PROPER GOVERNANCE

16.     The Board operated through formal processes with regular meetings, formal notices, and collective decision-making. Mr. Sharif participated fully. Attached hereto as **Exhibit E** are true and correct copies of board meeting notices and Mr. Sharif's responses.

17.     Mr. Sharif deliberately concealed the Board's governance authority from third parties. Text messages show Mr. Sharif discussing equity and governance

7                          26cv00965-LL-MMP

structures while simultaneously undermining the Board's authority. Attached hereto as **Exhibit F** are true and correct copies of text messages reflecting this concealment.

## VII.   MR. SHARIF'S REPUTATIONAL HARM TO DEFENDANTS

18.      Mr. Sharif's Complaint, verified under penalty of perjury, makes grave and defamatory allegations against each defendant, including allegations of conspiracy, fraud, self-dealing, and in Mr. Dawson's case, physical violence, and coercion. These allegations are not supported by the evidence but have been published, circulated online, and amplified through social media and gaming press coverage, causing severe reputational injury to each of us. Mr. Dawson has been publicly characterized as a violent predator despite having invested approximately $93 million.

19.      Aaron Bartels has invested approximately $5,000,000 through a loan and additional capital. Ryan Ogden invested approximately $1,600,000 and worked tirelessly to manage finances under impossible conditions. Each of us has professional reputations, businesses, and personal lives that have been materially damaged by these verified allegations.

## VIII. DAWSON ACTED WITH EXTRAORDINARY PATIENCE

20.      I have personal knowledge of Mr. Dawson's conduct. I have never witnessed Robert Dawson engage in any act of violence, threat of physical harm, or any physical act of aggression toward Steven Sharif or any other person. Mr. Dawson demonstrated patience throughout years of broken promises, missed milestones, and escalating financial losses.

## IX.    RELATED PARTIES

21.      The Motion relies on declarations from Tom Alkazin, Karen Boreyko, and Zac Schuster, whom Mr. Sharif characterizes as independent investors. In fact, Mr. Alkazin, Ms. Boreyko, and Mr. Schuster are Mr. Sharif's personal family members and friends who made loans to the company. Mr. Dawson's investment

capital was used in part to repay these related-party loans. No other investors received distributions or repayments.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on May 7, 2026

/s/  *Theresa Fette*

Theresa Fette