Samuel A. Schwartz, Esq.
  (admitted *pro hac vice*)
Nevada Bar No. 10985
saschwartz@nvfirm.com
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

Samuel B. Strohbehn, Esq.
California Bar No. 257697
sstrohbehn@rosinglaw.com
Maddie Rudge, Esq.
California Bar No. 362727
mrudge@rosinglaw.com
Amara S. Barbará, Esq.
California Bar No. 323332
abarbara@rosinglaw.com
ROSING POTT & STROHBEHN LLP
770 1st Avenue, Suite 200
San Diego, California 92101
Telephone: (619) 235-6000

*Attorneys for Defendants Robert Dawson,
Ryan Ogden, Theresa Fette, Aaron Bartels,
and TFE Games Holdings, LLC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT DAWSON; RYAN OGDEN; THERESA FETTE; AARON BARTELS; and TFE GAMES HOLDINGS, LLC, <br><br> Defendants, <br><br> and <br><br> INTREPID STUDIOS, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP <br><br> **DECLARATION OF RYAN OGDEN IN SUPPPORT OF THE OPPOSITION TO PLAINTIFF'S MOTION FOR APPOINTMENT OF RECEIVER** <br><br> Judicial Officer: Hon. Linda Lopez <br> Courtroom: 14B (14th Floor) <br> Hearing Date:  June 11, 2026 <br> Hearing Time: N/A <br><br> Action Filed: February 14, 2026 <br> Trial Date: Not Set |

I, RYAN OGDEN, declare as follows:

## I.   BACKGROUND AND INVESTMENT

1.    I make this declaration in opposition to Plaintiff Steven Sharif's Motion for Appointment of Receiver [ECF 78] (the "**Motion**").

2.      I am a Certified Public Accountant (CPA) with a master's degree in accounting and a background in Big Four public accounting. I have over fifteen years of experience as Chief Financial Officer of a billion-dollar company. I have been a Controller for both public and private companies with experience in global expansion, internal controls, and financial restructuring. I am also a small business owner. I served as Chief Financial Officer ("CFO") of Intrepid Studios, Inc. ("Intrepid") from late 2024 until December 30, 2025, but as discussed below, my role as CFO was undermined by Mr. Sharif's attempts to conceal his misappropriations. I still serve as a member of the Intrepid Board of Directors. I have invested approximately $1,625,000 of my personal money into the company. In my capacity as CFO, I had direct knowledge of the company's financial condition, cash flow, and capital structure.

3.      I was brought into the company as an employee in October 2024, and from that point forward I worked to improve the financial reporting and transparency of the company. My efforts were challenged nearly every step of the way by Mr. Sharif. When I was first hired by the company I coordinated with Mr. Sharif and flew to the office in San Diego to meet with the team and learn more about the company. Unfortunately, when I got there, I was not allowed inside the office. I was completely walled off from all other employees and had to work the whole time from my hotel room. I now know that this was because Mr. Sharif did not want anyone to know that there were any other investors or decision makers involved in the company. I was asked to guide the company through an independent financial audit. Despite working for several months and substantiating everything to the auditors' satisfaction, we were never able to complete the audit because Mr. Sharif refused to give an accounting of the personal funds that he and Mr. Moore had taken out of the company.  Mr. Sharif did everything that he could to prevent me from gaining access to the company's systems, information, and employees. Access to the Intrepid books and records required multiple requests and diligent follow up, and it took months before I had

access to basic financial information such as accounting records, bank accounts, payroll data, tax returns, and email. This pattern of hiding information and refusing me access to the systems continued throughout my tenure with the company.

## II.    SHARIF'S FINANCIAL EXTRACTION AND COMMINGLING

4.      As CFO, I eventually learned of the commingling of personal and business funds under Mr. Sharif's leadership. I sent a spreadsheet to Mr. Sharif from the QuickBooks file that I obtained from his prior accountant. On multiple occasions, Mr. Sharif acknowledged that he was aware of these financial transactions including:

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ Mr. Sharif subsequently sent this spreadsheet to Mr. Dawson and Ms. Fette. This is the spreadsheet attached to Mr. Dawson's Declaration, at Exhibit K (the "**Payments Spreadsheet**")

5.      Despite repeated requests, Mr. Sharif was unable to present corroboration that any of these payments constituted valid business expenses. All of these transactions were recorded by an accountant hired by Mr. Sharif and managed by Mr. Sharif and Mr. Moore. There was no Board in place and no independent financial controls during this period. Attached hereto as **Exhibit A** is a true and correct copy of emails showing multiple attempts to get explanations of the Payments Spreadsheet from Mr. Sharif.

## III.    SHARIF WITHHELD FINANCIAL SYSTEMS FROM THE CFO

6.      On multiple occasions, I requested full access to Gusto—the company's payroll and independent contractor payment system. Mr. Sharif provided me with limited access to the Gusto system. As late as December 2025 – over 1 year and 3 months since first starting with the company, I was still asking for full access to Gusto. Attached hereto as **Exhibit B** is a true and correct copy of text messages and evidence reflecting Mr. Sharif's refusal to grant access to Gusto.

## IV.    SHARIF MAKING PREFERENTIAL RETURN OF INVESTMENT

7.    Mr. Sharif selectively repaid investment capital to his personal friends and family with funds received from other investors. For example, over ███████ dollars in capital was returned to his mother, Sharron Sharif as either a loan or loan repayment, and over ████ was returned to his friends Thomas and Bethany Alkazin, either as loan repayments or disguised as 'outside services.' New investor capital was used in part to repay earlier related-party loans to Mr. Sharif's family members and friends, while Mr. Sharif simultaneously extracted over ██████ in personal transfers from company funds. *See* Payments Spreadsheet. Repaying Mr. Sharif's friends and family was not my understanding of the business purpose of the money raised from other investors.

8.    I received no offering documents when I made my investment—only promises and a sales pitch by Mr. Sharif to induce investment. I was personally told on several occasions that if he could just make it to one more milestone (i.e., Alpha II release) that the company would not need additional outside funding beyond that point.

## V.    WASTEFUL SPENDING UNDER SHARIF'S LEADERSHIP

9.    In my capacity as CFO, I became aware of prior, significant personal spending under Mr. Sharif's leadership. Among many other expenses, it came to light that Mr. Sharif used over ██████ in company funds to hire a personal chef, expensed a personal Cadillac Escalade, funded several luxury vacations, and made house payments on his multi-million-dollar house.

## VI.    THE BOARD AND SHARIF INITIALLY WORKED TOGETHER

10.    From the formation of the Board of Directors in approximately October 2025 through the closing of the company in January 2026, the Board and Mr. Sharif worked together to clean up the company. Mr. Sharif participated in Board meetings, submitted agenda items, responded to Board directives, and proposed restructure plans. We consulted with Aream & Associates—the premier investment bank in the

gaming industry—to find investors willing to buy or invest in the company. That process approached forty-three (43) prospective investors. The feedback was uniform across the prospective investors, their general, overall opinions coalesced that the game had taken twice as long to develop as it should have and had consumed twice as much capital as comparable projects. Not a single investor committed capital.

## VII.    VIII. SHARIF CONCEALED THE BOARD AND SABOTAGED OPERATIONS

11.    Mr. Sharif concealed the existence of investors and the Board of Directors from employees. When the Board was finally permitted to meet the executive team at the October 15, 2025 Board meeting, Mr. Sharif introduced Board members only as "friends of Steven."

12.    After the company ceased operations, Mr. Sharif denied the Board access to the credentials for over 200 systems necessary to operate the business and generate revenue. Mr. Sharif's years-long concealment that investors and a Board even existed had a direct and foreseeable consequence: employees refused to cooperate with the Board or provide access to systems after Mr. Sharif resigned.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## VIII.   <u>THE COMPANY'S CURRENT FINANCIAL CONDITION</u>

13.   As the Company's former CFO, I am uniquely qualified to describe its current financial condition. As of April 30, 2026, the Company has less than ██████ in available cash across all accounts—approximately ████ at Pathway Bank and ██████ at CommerceWest Bank. The Company has total liabilities of approximately ████████, including ████████ in accounts payable, ████████ in federal tax liabilities, ████████ owed to CommerceWest Bank, ████████ in accrued interest, and approximately ████████ in promissory notes payable to investors. Total equity is negative ████████.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on May 7, 2026.

/s/ *Ryan Ogden*

Ryan Ogden