Jessica Nall (SBN 215149)
Jessica.Nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone: 415.872.3200

Leslie Evans (SBN 173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone: 619.329.6454

Jordan W. Garman (admitted *pro hac vice*)
Jordan.Garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone: 212.848.9882

*Attorneys for Plaintiff Steven Sharif, as an individual and derivatively on behalf of Intrepid Studios, Inc.*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., | Case No. 3:26-cv-00965-LL-MMP |
| Plaintiff, | **AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT** |
| v. | |
| ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, TFE GAMES HOLDINGS LLC, and JASON CARAMANIS, | **JURY DEMAND** |
| Defendants, | |
| and | |
| INTREPID STUDIOS, INC., | |
| Nominal Defendant. | |

WITHERS
BERGMAN LLP

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

Plaintiff Steven Sharif, an individual, ("Sharif" or "Plaintiff") on behalf of himself and separately on behalf of all other shareholders of Intrepid Studios, Inc. (collectively, "Derivative Plaintiffs"), by his undersigned counsel, alleges as follows against Intrepid Studios, Inc. ("Intrepid" or the "Company"), Robert Dawson, Ryan Ogden, Theresa Fette, and Aaron Bartels (the "Board Defendants"), TFE Games Holdings LLC ("TFE"), and Jason Caramanis (collectively, the "Defendants"):

## NATURE OF THE ACTION

1.     This lawsuit seeks to hold Intrepid's rogue board of directors and its accomplices accountable for intentionally destroying the Company, including through layoffs of nearly its entire work force, through manufactured crises, and through bad faith foreclosures on purportedly secured loans. The Board Defendants intentionally sabotaged Intrepid to steal its assets, including its most valuable assets: its intellectual property and trade secrets. That intellectual property was developed under the leadership of Plaintiff Steven Sharif, a shareholder in Intrepid, its visionary founder, and creator of the MMORPG (Massively Multiplayer Online Role Playing Game), *Ashes of Creation*.

2.     Plaintiff has dedicated more than a decade to developing *Ashes of Creation*, including its world, lore, gameplay systems, software architecture, and proprietary development tools. The gaming community has been anxiously anticipating the full release of *Ashes of Creation* for years. Defendants well understood that the success—or failure—of *Ashes of Creation* would be exceedingly public and personal to Plaintiff. They also understood that its success would be exceedingly profitable. The Board Defendants and TFE took steps to ensure they alone profited from that success at the expense of Plaintiff, Derivative Plaintiffs, and Intrepid as a company.

3.     Beginning in early 2023, Defendant Rob Dawson, Intrepid's principal lender, embarked on a campaign to extort control of Intrepid from Plaintiff and, ultimately, to strip Intrepid of its assets, including its groundbreaking intellectual

property and trade secrets, for Dawson's own use and financial gain. Through a "loan-to-own" scheme, Dawson extended financing to Intrepid through a series of convertible promissory notes, while simultaneously leveraging recurring, manufactured cash-crunches to extract escalating governance and economic concessions. Consistent with that strategy, Dawson repeatedly "ping-ponged" the Company's capital structure by first treating his position as debt, then converting that debt into equity to secure majority control, and then later attempting to resurrect the very debt he had cancelled, while retaining substantial equity. Equally troubling, Dawson's current insistence that his debt is "secured" is highly questionable as the notes themselves expressly state that the obligations are unsecured and subordinated to senior indebtedness.[1]

4.　Additionally, through repeated threats to withhold funding for payroll, to shut Intrepid down, to financially ruin Plaintiff, and even to physically harm Plaintiff, Dawson and his close associate Jason Caramanis, another Intrepid lender, ███████████████████. Dawson elected himself to the board and cherry-picked additional board members who would do his bidding. Those board members are Defendants Ryan Ogden, who is also duly appointed Chief Financial Officer, Theresa Fette, and Aaron Bartels. The Board Defendants failed to fulfill their fiduciary duties to the Company; instead, they engineered and executed a plan to strip Intrepid of its assets and transfer those assets to a Dawson-created-and-owned entity (TFE), and to misappropriate and claim ownership over Intrepid's intellectual property, trade secrets, and other assets.

5.　The plan included, among other things: periodically and deliberately starving Intrepid of cash to manufacture justification for a foreclosure by TFE;

---

[1] While Board Defendants and TFE assert that "all of the [n]otes…are secured" (Dkt. 98 at 6), they cite to nothing in support, and their proposition is belied by the plain language of the notes themselves. (*See* **Exhibits A-T** at 5 ("this Note is unsecured and subordinated").)

WITHERS
BERGMAN LLP

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

attempting to divert revenues owed to Intrepid to accounts controlled by TFE and Dawson, and held at Dawson's personally-owned bank, Pathway Bank; and executing a wrongful Article 9 foreclosure in favor of TFE's purported junior secured lien without notice to senior secured creditor, CommerceWest Bank. This was all done with the goal of leaving unpaid debts and existing shareholders with Intrepid, while continuing to develop or sell, and profit from, *Ashes of Creation* through the new TFE entity. When Plaintiff objected to the foreclosure and alerted CommerceWest Bank to the Board Defendants' and TFE's scheme, the Board Defendants and TFE realized their plan had unraveled, and they abruptly and wrongfully terminated nearly Intrepid's entire workforce.

6.    The Board Defendants and TFE's actions signified to the public a complete collapse of Intrepid, and they triggered severe and intense public scrutiny regarding the apparent failure of the game, the treatment of employees, and Plaintiff's perceived role in both. The Board Defendants and TFE intentionally set up Plaintiff as the scapegoat to face this backlash alone, including by intentionally filing a false corporate disclosure listing Plaintiff as the sole board member, and Plaintiff's husband, John Moore, as Chief Financial Officer, even though all of the Board Defendants were board members and Ogden was the duly appointed Chief Financial Officer. They did this for no other reason than to conceal the identities of the Board Defendants and insulate themselves from the public fallout.

7.    After TFE wrongfully took possession of Intrepid's assets through the Article 9 foreclosure, the Board Defendants and TFE's, through TFE, actively solicited buyers for *Ashes of Creation*—inclusive of Intrepid's intellectual property and trade secrets—in an attempt to salvage their own financial exposure. They did so until a temporary restraining order issued by the U.S. District Court for the Southern District of California (the "Court") enjoined TFE's sale efforts in view of the likely unlawful transfer of assets to TFE through the Article 9 foreclosure.

8.    Acknowledging the unlawfulness of their original Article 9 foreclosure,

the Board Defendants and TFE purported to "unwind" the Article 9 transaction just days before a preliminary injunction hearing at which the Court was likely to convert the temporary restraining order into a preliminary injunction. But instead of actually rescinding the unlawful transaction, TFE merely gifted Intrepid's assets back to Intrepid in a *subsequent* assignment transaction. The Board Defendants and TFE now plan to execute a second Article 9 foreclosure, suggesting they will cause TFE to do so legally this time. But the secured nature of the debt on which TFE originally foreclosed is highly questionable, and even if TFE's debt was properly secured, the original foreclosure would have extinguished any liens TFE may have had and upon which it could foreclose under the California Commercial Code.

9. Since destroying Intrepid, Defendants have also been publicly defaming Plaintiff to the gaming community.

10. Defendants' conduct has harmed the Company and Plaintiff, and poses a continuing existential threat to the Company. Through this action, Plaintiff, both individually and on behalf of Intrepid, seeks damages based on Defendants' efforts to sabotage Intrepid and its work on one of the most ambitious gaming projects ever developed. Plaintiff also seeks injunctive and equitable relief to remedy harm to Intrepid and Derivative Plaintiffs from Defendants' continued efforts to irrevocably destroy the Company in pursuit of their own greed.

## JURISDICTION AND VENUE

11. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim under the Defend Trade Secrets Act, codified at 18 U.S.C. §§ 1836, *et seq*. The Court has supplemental jurisdiction over the related state law claims, which form part of the same case or controversy, under 28 U.S.C. § 1367(a).

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the Southern District of California, where Intrepid maintains its headquarters and where Defendants' acts

were directed.

## PARTIES

13. Plaintiff is the founder of Intrepid Studios, Inc. He is the former CEO of the Company, and he served on the board of directors from the Company's inception until his January 19, 2026 resignation. Plaintiff either himself invented or was directly involved in Intrepid's creation of the intellectual property and trade secrets that comprise the MMORPG *Ashes of Creation*.

14. Nominal defendant Intrepid Studios, Inc. is a California corporation headquartered in San Diego County, California. Plaintiff founded the Company to develop and sell *Ashes of Creation*.

15. Defendant Robert Dawson has served as Intrepid's Chairman of the Board since September 2024. He claims to be Intrepid's majority shareholder since July 2024 and a junior secured lender to Intrepid. He resides in Longwood, Florida. By virtue of his role as Intrepid's Chairman of the Board, purported majority shareholder, and purported junior secured lender, Dawson has purposefully availed himself of the benefits and protections of California's laws, including by conducting activities in California that target California residents—such as by causing Intrepid to fire the entirety of its employees, many of whom are California residents; conceiving and executing the wrongful foreclosure strategy described herein; and through his post-foreclosure efforts to solicit buyers and employees in California to exploit the Company's intellectual property and trade secrets, as alleged herein. Plaintiff's claim arises out of and relates to Dawson's contacts with California.

16. Defendant Ryan Ogden has served as Intrepid's Chief Financial Officer since September 2024 and as a board member since on or around August 2024. He is also a debtholder of the Company. He resides in Sanford, Florida. By virtue of his role as Intrepid's Chief Financial Officer and member of the board, Ogden has purposefully availed himself of the benefits and protections of California's laws, including by causing Intrepid to fire the entirety of its employees, many of whom are

California residents; conducting activities in California that target California residents—such as by voting to approve, ratifying, and participating in the wrongful foreclosure strategy described herein; personally participating in and directing the preparation of the foreclosure assets list; attempting to divert Company revenues; and submitting false regulatory filings in California. Plaintiff's claim arises out of and relates to Ogden's contacts with California.

17. Defendant Theresa Fette has served on Intrepid's board of directors since August 2025. She is a debtholder of the Company. She resides in Las Vegas, Nevada. By virtue of her role as a member of Intrepid's board and as a creditor of Intrepid, Fette has purposefully availed herself of the benefits and protections of California's laws, including by causing Intrepid to fire the entirety of its employees, many of whom are California residents; conducting activities in California that target California residents—such as by voting to approve, ratifying, and participating in the wrongful foreclosure strategy described herein, and through her post-foreclosure efforts to solicit buyers and employees in California to exploit the Company's intellectual property and trade secrets, as alleged herein. Plaintiff's claim arises out of and relates to Fette's contacts with California.

18. Defendant Aaron Bartels has served on Intrepid's board of directors since August 2025. He resides in Las Vegas, Nevada. By virtue of his role as a member of Intrepid's board, Bartels has purposefully availed himself of the benefits and protections of California's laws, including by causing Intrepid to fire the entirety of its employees, many of whom are California residents; conducting activities in California that target California residents—such as by voting as a board member to authorize and implement the wrongful foreclosure strategy described herein and related acts in California that form the basis of Plaintiff's claims. Plaintiff's claim arises out of and relates to Bartel's contacts with California.

19. Defendant TFE Games Holdings, LLC is a Delaware limited liability company that was created by and is wholly owned by Defendant Dawson. Dawson

created TFE for the sole purpose of receiving, exploiting, and monetizing the Company's trade secrets and intellectual property. TFE had no independent or legitimate business purpose apart from the wrongful conduct alleged herein, functioning solely as an instrumentality and vehicle through which Dawson and the Board Defendants consummated their wrongful foreclosure scheme. At all relevant times, Dawson and the Board Defendants acted within the scope of their authority as TFE's agents and for TFE's benefit, such that their California-based conduct is properly imputed to TFE. At all relevant times, TFE, through its agents, Dawson and the Board Defendants, participated in, benefitted from, and knowingly furthered a wrongful scheme that was conceived, planned, and executed in California and expressly aimed at Intrepid.

20. Defendant Jason Caramanis is a lender to and investor in Intrepid. He resides in Woodland Hills, California.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

21. Plaintiff brings certain claims derivatively on behalf of Intrepid pursuant to Federal Rule of Civil Procedure 23.1 to redress injuries suffered, and that continue to be suffered, by the Company as a direct and proximate result of the Board Defendants' unlawful conduct, including, without limitation, violation of the Defend Trade Secrets Act (18 U.S.C. §§ 1836, *et seq.*); violation of the California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426, *et seq.*); violations of California Commercial Code §§ 9101, *et seq.*; breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty; corporate waste; conversion of corporate assets; and civil conspiracy.

22. Plaintiff was a shareholder of Intrepid at the time of the relevant transactions, has continuously maintained that status, and remains a shareholder of Intrepid.

23. This action is not a collusive effort to confer jurisdiction on this Court. Instead, Plaintiff is the founder of Intrepid and a current shareholder with a vested

interest in the success of the Company and *Ashes of Creation*.

24.    Plaintiff will adequately and fairly represent the interests of Intrepid and Derivative Plaintiffs in enforcing and prosecuting their rights.

25.    Based on the facts alleged herein, demand upon Intrepid's Board of Directors (the "Board") to initiate this action would be futile pursuant to Federal Rule of Civil Procedure 23.1.

    a.    At all relevant times, the majority of the Board comprised the Board Defendants, each of whom participated in and approved the conduct and conspiracy giving rise to the claims asserted herein. Plaintiff was previously a member of the Board, but he was unable to prevent the illegal efforts undertaken by the Board Defendants and therefore resigned from both the Company and the Board.

    b.    The Board Defendants authorized, ratified, permitted, and/or knowingly failed to prevent the wrongful acts alleged herein, including breaches of fiduciary duty, violations of California Commercial Code §§ 9101, *et seq.*, and misappropriation of corporate assets and intellectual property. As a result, they lack the disinterestedness and independence required to evaluate a demand.

    c.    By virtue of their fiduciary roles and their direct involvement in the challenged conduct, the Board Defendants would be required to investigate and pursue claims arising from their own misconduct and face a substantial likelihood of liability.

    d.    Because each Board Defendant participated personally in the alleged wrongdoing, the Board cannot exercise independent or disinterested business judgment in deciding whether to bring this action or to prosecute it vigorously.

    e.    Any demand would, therefore, have required the Board

Defendants to authorize litigation against themselves, rendering any demand a useless and futile act. The requirement for a demand is thus excused under Rule 23.1.

## GENERAL ALLEGATIONS

### A.   Plaintiff Founds Intrepid, Fosters Intrepid's Creation of Intellectual Property and Trade Secrets, and Obtains Early Financing

26.    Sharif is a lifelong gamer and, prior to founding Intrepid, he participated in the gaming market as an avid consumer, taking a particular interest in MMO (Massively Multiplayer Online) and MMORPG games. After years of experience with MMOs and MMORPGs on the player-side, Sharif was inspired to create his own game that would upgrade the player experience beyond what was available on the market. Sharif's original idea for the game stemmed from a tabletop RPG (role-playing game) concept also created by Sharif, and also titled *Ashes of Creation*. In creating his own new and innovative MMORPG, Sharif sought to create a complex and dynamic virtual game universe based on popular fantasy and science fiction themes. To realize his vision for *Ashes of Creation*, Sharif and his team set out to build deep and intricate systems that would present players with a greater degree of circumstances in response to their actions, as well as provide a level of positive player-to-player interaction not achieved by any previous MMORPGs.

27.    In 2015, Sharif co-founded Intrepid alongside his husband, John Moore, to develop the MMORPG, *Ashes of Creation*.  Due to the novelty of Sharif's vision for *Ashes of Creation*, and despite Sharif's own familiarity with requirements for developing the game, Sharif surrounded himself with seasoned game developers to help bring his vision to life, whom he closely directed and supervised.

28.    What started as a passion project soon gained significant traction across the gaming industry, including an award for the "Most Anticipated MMO" in 2017,[2]

---

[2] *See* Suzie Ford, *MMORPG.com's Best of 2017 Awards*, MMORPG.com (Dec. 21,

2020, and 2022.[3]  Public excitement about the development of the game was further fueled by Sharif's innovative development approach, in which he fostered an open dialogue with *Ashes of Creation*'s potential user base.  In furtherance of this approach, Sharif would host live webinars on the *Ashes of Creation* YouTube channel to update players on the game's development and solicit player feedback and participation to a greater degree than any previous MMORPG.

29.    There were many concrete benefits to this novel development approach. However, an abundance of player feedback contributed to the already iterative and lengthy process that is typical of MMORPG development. Prior to the public Early Access release of the game in 2025, *Ashes of Creation* had been tested with players in three separate iterations. Following years of this iterative diligence, an Early Access version of the game was released to the public in 2025 through Steam, a popular gaming platform. Prior to the execution of Dawson's and the Board Defendants' illicit plan, *Ashes of Creation* boasted the highly unusual Day 30 player retention rate of approximately 76%.

30.    Throughout the last decade, Intrepid developed the following intellectual property and trade secrets (the "Trade Secret Materials"):

      a.    Audio/visual effects;

      b.    Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (*i.e.*, production assets created by employees/contractors and incorporated into builds);

---

2017, 4:00 AM), https://www.mmorpg.com/awards/mmorpgcoms-best-of-2017-awards-2000107055.

[3] *See* Bree Royce, *MassivelyOP's complete 2022 awards debrief and annual recap*, massivelyop.com (Jan. 6, 2023 12:00 PM), https://massivelyop.com/2023/01/06/massivelyops-complete-2022-awards-debrief-and-annual-recap/?utm_source=chatgpt.com#.

c.  The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;

d.  Designs and implementations of server meshing technology and distributed networking systems;

e.  Proprietary Player versus Player risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems;

f.  The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

g.  Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

h.  The event tool used to create open world events, wars, and caravan systems;

i.  The implemented seasonal environmental systems as built into the engine;

j.  The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

k.  Class implementation logic and stat balancing systems as embodied in the Company's codebase;

l.  Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

31.  The Trade Secret Materials are not generally known to the public, and

they derive competitive value from the fact that they are kept secret from the public, as shown by (1) the funding interest in Intrepid based upon the Trade Secret Materials, as described herein; and (2) the revenue generated during the Early Access event in December 2025, as described herein.

32.    Intrepid has kept the Trade Secret Materials a secret by subjecting its employees to strict confidentiality and protection of trade secrets obligations in their employment agreements, pursuant to which employees agreed to not publish or disclose any Company trade secrets or confidential information, and via the Company handbook, which requires employees to safeguard confidential and trade secret information and to access such information only on a need-to-know basis with authorization from a supervisor, and which informs employees that breach of the policy may result in legal action.

33.    Moreover, Intrepid ensured that contractors and third-party vendors were routinely required to sign non-disclosure agreements and/or were subject to contractual confidentiality obligations, in an effort to maintain the secrecy of the Trade Secret Materials.

34.    Intrepid further ensured there were internal access controls limiting those who had access to the Trade Secret Materials on a need-to-know basis. For example: source code repositories were maintained in private, permission-based version control systems (*e.g.*, restricted Git and P4 repositories), with role-based access controls limiting access to only those developers whose responsibilities required it; backend server architecture and production infrastructure credentials were restricted to designated engineering personnel and were not broadly accessible across the company; design documentation and internal development tools were maintained in secured internal systems (*e.g.*, restricted drives / internal platforms) with permission settings limiting access on a need-to-know basis; and external builds and public-facing materials did not expose backend logic, proprietary balancing formulas, node progression algorithms, or server-side systems. Access credentials were also revoked

upon termination or separation of personnel. These measures were implemented to ensure that the Trade Secret Materials were not publicly disclosed and were accessible only to individuals with legitimate development-related responsibilities.

35. Intrepid was Sharif's passion project: he provided early funding to the Company from his personal funds. Thereafter, in 2017, the Company raised approximately $3 million in a Kickstarter campaign, and obtained debt from sophisticated investor and businessman Caramanis and his trust, demonstrating from the outset the commercial value of Intrepid's intellectual property and Trade Secret Materials.

36. During this initial phase of the Company, its board of directors consisted of Sharif, Moore, and Thomas Alkazin. The Company's sole shareholders were Moore and Alkazin.

37. Starting in 2017, the Company began acquiring debt financing, much of which Sharif and Moore personally guaranteed. In 2020, the Company acquired a $6 million loan from CommerceWest Bank pursuant to the Federal Reserve's Main Street Lending Program. The loan carried a maturity term of five years, was personally guaranteed by Moore, and was collateralized by all of the Company's assets, including specifically its intellectual property, which includes the Trade Secret Materials, as well as Moore's house.

38. Against that backdrop of secured senior debt and ongoing cash needs typical of MMORPG development, Intrepid sought additional financing. A year later, in 2020, one of the Company's existing lenders, Jason Caramanis, a longtime business associate of claimed billionaire Robert Dawson, introduced Sharif and the Company to Dawson as a potential lender.

39. Dawson first invested in March 2022, but he backdated his investment documentation to November 2020 to inflate the value of his investment. Over time, it became clear that Dawson engaged in this practice as a matter of course. Dawson nonetheless positioned himself as a long-term partner to the Company and to Sharif

personally.

40.    Dawson was originally cooperative and supportive of Sharif and his vision, and he held himself out as a confidante for Sharif. That dynamic changed once a potential opportunity surfaced, described below, that implied a valuation in the hundreds of millions.

41.    Dawson came up in the multi-level marketing space, and he was not a gamer. When it became clear the project was not going to turn as quick a profit as he had hoped, his behavior toward Sharif changed dramatically starting in 2023.

**B.    Dawson's Campaign of Control and Coercion**

42.    In late 2022 and early 2023, Riot Games expressed interest in acquiring Intrepid for hundreds of millions of dollars. Dawson urged Sharif to reject the proposed deal, in favor of continuing to develop Intrepid from the ground up under his financing. Sharif heeded his advice and countered the acquisition bid with an offer so outlandish it was certain to result in termination of the deal; as anticipated, acquisition discussions unsurprisingly ended in early 2023.

43.    The acquisition offer, however, was the turning point in Sharif's and Dawson's relationship: Dawson saw that the Company had very real potential for providing extremely high returns, and Dawson began a ruthless campaign for control of the Company in order to realize those returns as quickly as possible, without consideration for the quality of the game and the typical development timeline of MMORPGs.

44.    After Dawson dissuaded Sharif from accepting the Riot Games offer, he began, with the assistance of Caramanis, to pursue a deliberate loan-to-own strategy aimed at seizing control of Intrepid.

45.    From 2022 to 2025, Dawson extended a series of loans to the Company through convertible promissory notes (the "Notes"). Dawson claims this financing is "secured" by a March 2022 security agreement. (Dkt. 23 at 22, 48 (¶ 12); Dkt. 99-2.) But other than securing the specific Note that the agreement references, that

instrument states that "other obligations owing by Borrower [] to the Secured Party," are secured "only to the extent that any such obligation is described or referred to in a document executed by Borrower at the request of the Secured Party, which states that such obligation is secured hereby." (Dkt. 99-2 at 3 (§ 3(c)).) Of the 20 executed Notes between Dawson and Intrepid that Plaintiff possesses, each (attached hereto as Exhibits A-T) *expressly disclaims* any secured status, stating that the obligations are "unsecured and subordinated" to senior indebtedness.[4] Therefore, the extent of Dawson's asserted security interest is, and always has been, substantially overstated.

46.    From early 2023 through May 2024, despite having committed to funding the Company, and at the same time assuring Sharif that he had no intention of taking control of Intrepid, Dawson began working to expand his control through strong-arm tactics.

47.    In furtherance of that campaign, Dawson frequently directed his co-conspirator and agent, Caramanis—an individual known to Sharif to be violent and to have multiple prior arrests, including a conviction in or around 2009 for inflicting corporal injury resulting in a traumatic condition—to verbally assault and threaten Sharif in Dawson's stead, acting as an "enforcer," when Dawson wanted Sharif to take actions that advanced Dawson's efforts to seize control of Intrepid.

48.    Dawson repeatedly held Sharif and the then-board hostage by threatening to withhold financing for employee payroll and health-insurance funding days before payroll deadlines, and Dawson and Caramanis consistently threatened to

---

[4] Although Dawson has filed versions of the November 23, 2020 Note and the March 21, 2023 Note that state they are secured (*see* Dkt. Nos. 99-1 § 7, 99-3 § 7), on information and belief, these Notes were two of the 30 to 40 signature pages Plaintiff was coerced into signing on December 15, 2025 discussed *infra* ¶ 84, as evidenced by Plaintiff's handwritten signature. Plaintiff rarely signs documents by hand and almost always digitally signs documents. (*Cf.* Exhibit A § 7 (digitally signed version of November 23, 2020 Note stating it is not secured); Exhibit B § 7 (digitally signed version of March 21, 2023 Note stating it is not secured).)

shut down the Company through litigation, to subject Sharif to criminal prosecution, and to cause Sharif financial ruin and physical harm, unless Sharif signed documents granting Dawson greater and greater amounts of equity and control.

49.     For example, on April 29 2023, Caramanis texted Sharif a string of threatening messages including calling Sharif a "MOTher [sic] fucker," and stated "i [sic] am talking to you like you need to understand who your [sic] fucking with," "push me more asshole," and "keep it up bitch." **(Exhibit U.)** A year later, on April 26, 2024, Caramanis texted Sharif, threatening to push a "[n]uclear war . . . button" if Moore did not exit the company, and that Dawson and Caramanis would "start suing [Sharif] and start aggressively attacking [Sharif] and the company and simultaneously put [Sharif] [into] involuntary Bankruptcy, and then also [file] a TRO removing [Sharif] and [Moore] from the company" during which time Dawson would cease all funding thereby "obliterat[ing]" "payroll." (**Exhibit V.**)

50.     In another example, on May 14, 2024, Sharif texted Dawson contemporaneously memorializing a call in which Caramanis threatened to "break [Sharif's] jaw," to which Dawson responded that he was "done," directed Sharif to send him stock certificates, and stated that he was preparing default notices. (**Exhibit W**.) On May 23, 2024, Caramanis texted Sharif that "your life is over," that he was "NOT fucking around," and that he "would fuck [Sharif's] whole world up" if Sharif did not sign certain documents. (**Exhibit X**.)

51.     Under this duress and fearing harm to Intrepid's stakeholders, Sharif felt he had no choice but to grant Dawson the extraordinary concessions he demanded, including a warrant for 10% of the Company for $10 and zero-cost, "non-dilutable" equity options lurking in the fine print of Dawson's convertible notes. Sharif and the then-board acquiesced to Dawson's demands because they believed Dawson would make good on his threats and that refusing would result in imminent catastrophe for employees and the Company. Dawson also required Sharif to involve him in all discussions with Company counsel, despite his outsider status, and even falsely

represented that he was an agent of the Company to retain Company counsel.

52.    As a direct result of this intentional and mounting pressure, Plaintiff suffered an extreme health crisis, including a hypertensive emergency and acute kidney failure, hospitalization, and vision loss from blood-pressure complications, including macular edema. Plaintiff's treating physicians attributed his hospitalization to a hypertensive emergency caused by work-related stress. Over the same four-month period during which Dawson and Caramanis escalated their threats and coercive text messages, Plaintiff's kidney function declined substantially. Plaintiff suffers long-term impairment from the health issues he experienced during this period. Dawson and Caramanis were privy to Plaintiff's health issues at the time, and they are well aware of the long-term impacts Plaintiff suffers.

**C.    Dawson Converts Predatory Debt into Equity Control, Becomes a Fiduciary, and Uses that Control to Extract ███████████ ███████ and Reconstitute the Board**

53.    By May 2024, █████████████████████████ ████████████████████████████████████████████ ███████████████████ **Exhibit Y**), ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████

54.    Dawson filed a UCC-1 financing statement on May 13, 2024, purporting to perfect his alleged security interest. (**Exhibit BB**.) Lenders that hold senior priority positions to Dawson are the Small Business Administration and CommerceWest Bank, whose loan is also collateralized by all assets and personal property of the Company, including intellectual property, which includes the Trade Secret Materials. (Small Business Administration and CommerceWest Bank Lien Financing

Statements attached hereto as **Exhibits CC and DD**, respectively.) Dawson knew or should have known of these senior liens because they are publicly available.

55.    Shortly thereafter, as part of the restructuring, Dawson formalized his control over Intrepid through June 2024 conversion agreements (the "Conversion Agreements") (attached hereto as **Exhibits Z, AA**) that converted his debt to equity, expressly cancelling $49,594,000 in notes and terminating all debt obligations underlying the very UCC-1 he had just filed. Caramanis also obtained equity in Intrepid under a restructured capitalization table.

56.    ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

57.    Despite being an adverse party, Dawson also directed Intrepid's counsel in ███████████████████████████ and even signed the engagement letter as Intrepid's purported "agent," without authority. Dawson also insisted on revising the Company's corporate governance documents and shareholders' shareholder agreements.

58.    On May 16, 2024, Company Shareholders entered into a Shareholders Agreement (the "Shareholders Agreement"). Under the Shareholder Agreement, Plaintiff expressly retained full creative control of the Company.

59.    After ███████████████████████████, Dawson gained both de jure and de facto control of the Company's finances and governance. He was not only the majority shareholder, but he also remained the primary provider of crucial debt financing. He leveraged his newly acquired power over Sharif and his team of employees by continuing to routinely threaten to withhold funds, especially just before bi-weekly payroll deadlines, to extract concessions. For example, based on the threat of withholding payroll funds, he forced Moore to resign from the board and transfer his equity to Sharif. Dawson and his deputies, including Caramanis, also frequently threatened to physically harm Steven and his loved ones if Steven did not

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

WITHERS
BERGMAN LLP

comply with his demands.

60.    As majority shareholder, Dawson voted himself and his close business associate, Ryan Ogden, onto the board of directors. During a September 4, 2024, board meeting, the board appointed Dawson as Chairman of the Board, and Ogden as CFO. Dawson directed Ogden to open new bank accounts for Intrepid at Pathway Bank, which is a bank Dawson owns and over which he exercises de facto or de jure control. To Plaintiff's knowledge, Dawson did not obtain the approvals required by California Corporations Code § 310(a) for this interested transaction. From that point, Sharif ceased to have any access to active company bank accounts, and he was effectively stripped of financial and other authority.

61.    By August 2025, Dawson elected Theresa Fette, also a substantial Company creditor, and Aaron Bartels to the board. Thus, from that time until Sharif's January 19, 2026, resignation from the Company, the board consisted of: Dawson, Ogden, Fette, Bartels, and Sharif. Ogden, Fette, and Bartels acted at the behest of Dawson rather than as independent board members, and they continually voted in alignment with him.

62.    Dawson frequently insisted that Sharif not publicize Dawson's role with the company. Ogden, too, did not wish for his identity and role to be revealed publicly. Sharif was under no express obligation to hide Dawson's or Ogden's roles and identities, but Sharif complied out of fear of reprisals, and he continued to act as the external face of the company.

63.    On October 15, 2025, Sharif notified the board that he would take a temporary medical leave, relating to the medical issues he had suffered in 2024. He advised the Board that he would be stepping back from his role as CEO and board member, but that he would continue, as he was able, as Creative Director.

**D.     Dawson Self-Dealt by "Reinstating" Debt while Retaining Equity and Poisoning the Company for Potential Outside Investors**

64.     After obtaining majority equity control, Dawson later attempted to revive the very debt he had cancelled under the Conversion Agreements—while retaining substantial equity—through retroactive amendments to the Conversion Agreements.

65.     In April and July 2025, in furtherance of his loan-to-own scheme, Dawson executed amendments (attached hereto as **Exhibits EE and FF**) to the Conversion Agreements (with a retroactive effective date of June 1, 2024—*i.e.*, the time of the original conversions of the debt to equity) purporting to unwind the equity conversions and reinstate his prior purportedly secured debt on the original terms of the Notes—including the terms stating that Dawson's debt was *unsecured and subordinated*. (*See* Exhibit EE at 2 ("all terms of the original Convertible Line of Credit Promissory Note remain in full force and effect"); Exhibit FF at 2 ("all terms of the original Conversion Agreement remain in full force and effect."); *see also, e.g.*, Ex. A § 7 ("this Note is unsecured and subordinated").) That this equity to debt transaction reinstated the original Notes on their original terms, once again, means that Dawson's claim that all of his debt is secured is false, and that the extent of his secured debt is grossly overstated.

66.     Among other reasons to doubt the validity of this transaction, Dawson, while purporting to reinstate the prior debt, apparently did not return all of the equity he had received under the Conversion Agreements: One of the amendments reflects the return of only 975.68 Class B shares, while Dawson retained more than 3,200 Class A shares. (Exhibit FF at 1.)

67.     Troublingly, a capitalization table dated April 30, 2025 (**Exhibit GG**)—the same date of Dawson's first supposed equity unwinding in which he turned his equity back into debt—shows Dawson's equity holdings in Intrepid inexplicably *increasing*, from ▮▮▮▮ shares to ▮▮▮▮ shares out of ▮▮▮▮, or to

approximately 70%.

68.    Because this transaction involved equity and debt of a financially interested director, it required approval by disinterested directors or shareholders under California Corporations Code § 310(a). No such formal approval occurred at Dawson's specific direction.

69.    These coercive and self-interested transactions appear intended to, and effectively did, poison Intrepid's ability to attract any alternative investors.

70.    Between 2023 and 2025, investment bank Aream & Co. contacted scores of potential investors and strategic partners; none made an offer. Several interested parties engaged in weeks of diligence and ultimately declined to proceed, citing, among other factors, the Company's high level of outstanding debt.

71.    Because of Dawson's 8-figure debt along with his inflated percentage of shares, Intrepid was unable to secure third-party investment or partnership. Dawson placed this black mark on the Company by design: to fulfill his objective to consolidate control and extract value solely for himself. The effort culminated in the unlawful foreclosure and self-interested transfer of Intrepid's assets to himself discussed *infra* Section G.

**E.    Intrepid Partners with Valve**

72.    In or around June 2025, the Board, against Sharif's and other senior leadership's advice, directed that Intrepid undertake an Early Access launch of *Ashes of Creation* in partnership with the online gaming platform, Steam, owned by Valve Corporation ("Valve"). Sharif did not believe the product was ready for public release and warned that forcing an Early Access launch in December 2025 would damage the game's reception, erode player trust, and harm the long-term health and value of the Company. The Early Access launch nonetheless occurred on December 11, 2025. Steam is a worldwide platform; accordingly, *Ashes of Creation*, to which the Trade Secret Materials relate, was distributed worldwide and used in interstate commerce.

73.    In July 2025, Ogden specifically assured CommerceWest Bank that the

revenue owing to the Company from Valve under the revenue share agreement relating to the Steam Early Access launch would cover outstanding obligations on the CommerceWest Bank loan.

**F.    Dawson Used his Personally Owned Bank to Engage in Self-Interested Transactions Harmful to Intrepid and to Exact Concessions from Sharif and Intrepid**

74.    Dawson used his personally owned bank, Pathway Bank, to harm Intrepid in several ways. After securing majority control of Intrepid and installing a Dawson-aligned board, Dawson directed Ogden to open an Intrepid account at Pathway Bank. To Plaintiff's knowledge, no disinterested director or shareholder approval was obtained for this interested transaction, as required by California Corporations Code § 310(a).

75.    Dawson also used his bank to exert additional pressure on Sharif and his husband, John Moore.

76.    In 2024, Moore sought to refinance an existing mortgage on his and Sharif's personal residence, which had separately served as collateral for CommerceWest Bank's loan to Intrepid.

77.    Dawson offered refinancing through Pathway Bank to ensure no adverse effect on CommerceWest's loan. Days before the final balloon payment on the existing mortgage came due, Dawson changed the promised Pathway mortgage terms by raising the mortgage rate from 6% to 10%, well above prevailing rates.

78.    At the same time, knowing that by then they had no realistic alternative options, Dawson coerced Moore to execute a forbearance agreement containing strict foreclosure provisions, stripping him of rights and protections typically afforded California mortgage holders.

79.    Dawson subsequently used his dual roles as owner of Pathway Bank, (holder of the new mortgage), and Chairman of Intrepid's board, to threaten Sharif with eviction to obtain increasing control of Intrepid.

23

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

**G.     Dawson, TFE, and the Board Execute a Wrongful Foreclosure in an Effort to Steal the Company's Intellectual Property and Trade Secrets**

80.     Beginning in 2025, the Board Defendants collectively devised a plan and agreement to take possession of the Company's assets via a wrongful Article 9 foreclosure process using Dawson's purported junior secured lien against the Company. They intentionally planned to do so without providing proper and legally required notice to senior secured lender, CommerceWest Bank, so that they could transfer Company assets to a new company created and controlled by Dawson, TFE, and wipe out equity holders and prior creditors in Intrepid. The Board Defendants also intended to lay off a large proportion of the Intrepid workforce without required wages, PTO, and severance because those debts would remain with Intrepid, while bringing a proportion of the employee base over to TFE to finish development of the *Ashes of Creation* project in order to monetize it for their own personal benefit. Dawson had indicated that he was considering executing this strategy to obtain greater control over the development project as early as 2024.

81.     This agreement was undertaken with the intent that TFE would take purported ownership of all of the Company's assets, including specifically the Company's intellectual property and Trade Secret Materials.

82.     Beginning in 2025 and in furtherance of their scheme, the Board Defendants intentionally permitted the Company to accrue substantial unpaid obligations to vendors and service providers with the goal of using this debt to improperly declare a default and justify an Article 9 foreclosure on Dawson's purported junior secured lien.

83.     Prior to the wrongful foreclosure, and to further justify a declaration of default, Ogden wrongfully directed Valve to divert and deposit funds owed to the Company under the partnership with Steam to a new Pathway Bank account for TFE. Valve did not comply because it flagged the request as suspicious and froze the funds, leaving Intrepid's promises and obligations to senior secured lender CommerceWest

unmet.

84.    As the Board Defendants moved from planning into execution, Plaintiff objected repeatedly and demanded that the Board abandon the foreclosure strategy. Plaintiff first objected to the Board Defendants' plan during a December 15, 2025, in-person board meeting. Specifically, he objected to the board causing the Company to not pay vendors, to the board's plan to lay off a large proportion of employees without requisite pay and benefits, and to the legality of the foreclosure plan. After the meeting ended and other board members had left, Dawson confronted Plaintiff in a physically intimidating manner. When Plaintiff attempted to stand and leave the room, Dawson stood up with him, tightly grabbed Plaintiff's arm, and forced him back to his seat. Dawson then pulled a stack of 30 to 40 signature pages, told Sharif he that he was having a "bad day" and "didn't want any shit," and coerced him to sign the 30 to 40 signature pages, the corresponding agreements for which Plaintiff was not permitted to review. In addition to Dawson not permitting Sharif to review the underlying agreements, Dawson did not inform Sharif what documents the signature pages corresponded to.

85.    Plaintiff next objected to the Board Defendants' plan to foreclose without notice to the senior secured lenders on a phone call with Dawson and TFE's counsel that occurred sometime between December 28, 2025, and January 3, 2026.

86.    Thereafter, at every board meeting between January 3, 2026 and his January 19, 2026 resignation—estimated to be between ten and fifteen times— Plaintiff objected to the Board Defendants' plan to wrongfully foreclose on Dawson's purported junior secured lien without notice to senior secured lender CommerceWest Bank, to the Board Defendants' attempt to divert from the Company to TFE the funds from the Steam partnership, and to the Board Defendants' plan to terminate a large portion of the Intrepid employee base without compensating PTO and severance.

87.    In advance of the wrongful foreclosure, and in furtherance of the Board Defendants' scheme to steal the Company's intellectual property and trade secrets,

WITHERS
BERGMAN LLP

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

Ogden prepared a Company asset list on December 31, 2025. That list specifically references components of *Ashes of Creation* that comprise the Company's intellectual property and Trade Secret Materials. The list references: "Ashes of Creation Codebase" (*e.g.*, the game design and other systems discussed *supra* ¶ 30) "Game content," (*e.g.*, models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations), "Customized Game Play: Audio Effects, Visual effects" and "Other Special Effects." It also includes a list titled "from ChatGPT" that includes "Software & Game Code," (*e.g.*, source code) "Game Engine & Technical Frameworks," (*e.g.*, all tool or game code); "Gameplay Systems & Trade Secrets," (*e.g.*, the systems and trade secrets described *supra* ¶ 30); and "Creative Content & Copyrighted Works."

88.    On January 7, 2026, in advance of the wrongful foreclosure, and in furtherance of the Board Defendants' scheme to steal the Company's intellectual property and trade secrets, Dawson changed the purportedly secured party on his UCC-1 secured party financing statement from himself to TFE. (Change of Secured Party attached hereto as **Exhibit HH**.)

89.    On January 14, 2026, Dawson, in concert with the Board Defendants, represented to investors that the Company had secured the necessary capital commitments to make it to the September 2026 launch. During this meeting, Dawson and the Board Defendants revealed the foreclosure scheme that would result in TFE owning Intrepid's assets and their intent to wipe Intrepid's investor and lender table clean. The Board Defendants told investors that, unless they committed to TFE an additional 25% to what they had already invested in Intrepid, they would be left behind in the old company (Intrepid) without recourse and without any meaningful chance of recouping their investments. Notably, Caramanis met this capital call and therefore stood to benefit from the Board Defendants successfully completing the wrongful foreclosure.

90.    On January 15, 2026, Sharif blew the whistle on Defendants' foreclosure

plan to CommerceWest Bank, whom Defendants had intentionally failed to notify of the foreclosure. Prompted by this information, CommerceWest Bank issued an Event of Default letter on January 18, 2026, demanding immediate and full repayment from either the Company or the personal guarantor of the loan, Moore. Although CommerceWest Bank holds approximately $1.3 million in funds from Moore and Sharif (proceeds from the sale of their home which collateralized the CommerceWest Bank loan), Sharif blew the whistle in view of his fiduciary duties to Intrepid, and so as to not be an accomplice to likely bank fraud. Whistleblowing did not personally benefit Sharif, as CommerceWest is still holding his collateral.

91.    On January 16, 2026, Dawson caused Intrepid to declare default, on the one hand, and he caused TFE to foreclose on the Company's assets, on the other hand. Dawson caused TFE to engage in a non-judicial and nonpublic disposition, in favor, instead, of a private sale at which TFE credit bid its purported secured debt.

92.    Because the extent to which Dawson's debt—which he assigned to TFE—was secured is and always has been grossly overstated, TFE did not have a right to foreclose on and credit bid Intrepid's assets.

93.    Additionally, Dawson, TFE, and the Board Defendants failed to advertise the sale in industry-standard publications or platforms. They did not involve a broker or auctioneer and did not publish any marketing of the sale in any manner.

94.    The intellectual property and trade secrets of an MMORPG are not customarily sold on a recognized market, but Dawson, TFE, and the Board Defendants pursued a self-serving private sale anyway.

95.    TFE obtained Intrepid's assets via a self-interested transaction between Dawson, who controlled Intrepid on the one hand, and Dawson, who controlled TFE on the other hand. This self-interested transaction was completed at the specific design of Dawson and the Board Defendants, who blessed the sale for their own personal profits. This unlawful foreclosure proximately and directly caused Intrepid harm in the form of the loss of its most valuable assets—its intellectual property and trade

secrets—through a foreclosure TFE had no right to conduct, and through a commercially unreasonable sale.

96. Dawson and the Board Members executed their agreement over Sharif's objections and in violation of the rights of senior secured creditors and Derivative Plaintiffs. Dawson performed the foreclosure in an intentionally clandestine manner, and he specifically ignored TFE's counsel's advice that Dawson must provide notice to senior secured creditors, including CommerceWest Bank.

97. Immediately thereafter, on January 19, 2026, Sharif resigned from the Company and as a member of the board. In his resignation letter, he specifically identified his reasons for resignation, among others, as: (1) his disagreement with the Board's repeated attempts to terminate employees without payment of wages and compensation legally owed to them; (2) his disagreement with the private foreclosure, given his serious concerns the approach raised regarding fiduciary duties owed to Derivative Plaintiffs, creditors, employees, and the Company; and (3) his being subjected to repeated threats, coercion, and ultimatums to execute documents and actions that he openly and consistently protested.

98. After his resignation, Board Defendants requested Sharif return as Chief Executive Officer, offering equity in TFE if he would support the foreclosure strategy. Sharif made clear that he would consider returning only under conditions designed to protect the Company and its stakeholders, including the reinstatement of independent corporate counsel rather than conflict-tainted advice from TFE-aligned counsel, the lawful treatment of employees, and the end of coercive practices within the Company in pursuit of their unlawful foreclosure strategy. Board Defendants rejected Sharif's conditions.

99. With their foreclosure strategy compromised by Sharif's whistleblowing, the Steam receivable no longer accessible, and the loss of Sharif as creative lead, the Board Defendants pivoted to shuttering Intrepid and leaving liabilities behind.

**H.      Dawson and the Board Illegally Separate Intrepid's Entire Workforce and Leave Intrepid and Plaintiff to Suffer the Fallout**

100.   On or about January 31, 2026, the Board Defendants caused Intrepid to issue WARN Act notices without the required notice period.

101.   On or about February 2, 2026, the Board Defendants caused Intrepid to terminate all Intrepid employees without providing the required 60 days' advance written notice under the federal WARN Act and California's WARN Act. The Board Defendants also caused Intrepid to not pay the Intrepid employees their final wages, including unpaid weeks of work and accrued paid time off, in violation of state wage laws.

102.   The Board Defendants took this action upon learning that CommerceWest Bank had learned of the wrongful foreclosure and had contacted Valve to intercept the funds due to Intrepid from the Steam partnership, meaning the Board Defendants could no longer access that money to fund TFE's ramp up.

103.   As a direct result, former Intrepid employees filed a putative class action in the U.S. District Court for the Southern District of California against, among others, Intrepid, alleging an unlawful mass layoff without the required 60 days' notice and without payment of final wages and accrued benefits. The complaint (attached hereto as **Exhibit II**) alleges that the layoffs were a foreseeable and avoidable consequence of the Board Defendants' unlawful Article 9 foreclosure. (*Id*. ¶¶ 27-38, 70.)

104.   The California Department of Industrial Relations has also opened a regulatory inquiry into suspected wage theft based on these actions, which is ongoing.

105.   The Board Defendants have additionally allowed Intrepid to incur default judgments. On December 2, 2025, a vendor sued Intrepid for breach of contract, alleging nearly $1 million in unpaid platform-usage fees. The Board Defendants permitted Intrepid to default by failing to respond or participate in the litigation, and the vendor has moved for entry of a default judgment.

106.   Similarly, dozens of other technology platforms that hold valuable

Company IP remain unpaid, leaving the status of the asset in limbo. This harm to the asset is only compounded by the fact that the Board Defendants failed to enable any orderly offboarding process for Intrepid employees, with the result that many former employees may still have access to the IP.

107.    The corporate unrest followed by the mass layoff generated significant agitation in the online gaming community. To shield themselves from the litigation fallout and public approbation, the Board Defendants deliberately tried to conceal their roles at Intrepid by falsifying regulatory filings in an effort to frame Sharif and Moore as the parties in control. Days before the unlawful foreclosure and resulting mass layoffs, on December 30, 2025, Ogden caused Intrepid to file a deliberately false California Statement of Information document with California's Secretary of State that inaccurately identified Sharif as the sole director and Moore as CFO, despite the fact that Ogden had been duly appointed CFO since September 2024, and omitted altogether mention of Dawson, Ogden, and the rest of the Board, who were in fact exercising full operational authority over the Intrepid and its disposition.

108.    Ogden, in concert with the other Board Defendants, filed the false Statement of Information in an effort to direct any public fallout from their conduct directly to Sharif. The Board Defendants did so despite actual knowledge of Sharif's fragile medical condition and knowledge that the gaming community would likely wrongly blame and eviscerate Sharif—as the only publicly identified director—should Intrepid and the *Ashes of Creation* endeavor fail or be involved in controversy.

109.    Plaintiff promptly notified the Board Defendants that the filing was inaccurate, unauthorized, and should be corrected. Unsurprisingly, they refused, leaving in place a public record that misidentified Intrepid's control persons while they executed the mass termination and wrongful foreclosure.

110.    The fallout for Sharif has been swift and devastating. The public has wrongly blamed Sharif for the downfall of Intrepid, accused Sharif of legal wrongdoing, and called Sharif a liar. Sharif has received death threats and both Sharif

and his family have feared for their physical safety.

111.   On information and belief, the Board Defendants specifically discussed during a January 30, 2026, board meeting, with multiple witnesses present, using this online campaign to frame Sharif for the Company's collapse: they would let Sharif take the fall and emerge as white knights in a few months with plans to revive the game beloved by millions.

112.   To the same end, the Board Defendants have piled onto this false narrative by making false allegations to prior employees, industry colleagues, Aream, prospective hires, creditors, and investors that Sharif misled creditors and investors as to game development milestones and completion dates, that Sharif misrepresented the nature of his relationships with business partners, and that Plaintiff and Moore misappropriated Company funds. On information and belief, the Board Defendants have taken the further step of distributing defamatory material, including false statements of criminal wrongdoing, about Sharif to members of the gaming public for public dissemination.

113.   On information and belief, Dawson and Ogden also agreed to provide and provided Jason Caramanis with confidential financial information in breach of their fiduciary duties for the purpose of Caramanis further disseminating the information to the public, and in order for him to make false accusations of financial misconduct by Plaintiff. These statements were false, were made to discredit Plaintiff and shift blame for Intrepid's collapse, and further damaged Intrepid's reputation in the gaming community.

114.   To accomplish this, Dawson has acted through and with his close associate Caramanis to deliberately damage Intrepid's value in the marketplace. Caramanis has embarked on a sustained public campaign, spanning dozens of hours of live YouTube interviews and social-media appearances, attacking Intrepid and Sharif and disparaging the Company and the game. On information and belief, as part of that campaign and in advance of the public broadcasts described below, Dawson

and Ogden caused Intrepid's confidential books and records to be provided to Caramanis for further dissemination.

## I.    Caramanis Wages a Smear Campaign to Scapegoat Sharif for Intrepid's Downfall

115.    Since February 14, 2026, Caramanis has partnered with a YouTube content creator with over 45.1 thousand subscribers, NefasQS,[5] to appear on several hours-long live stream videos where Caramanis repeatedly makes numerous false and defamatory statements about Sharif, as well as harmful and threatening statements to Sharif and his family and close friends.

116.    On information and belief, in connection with that calculated smear campaign, Caramanis also furnished Intrepid's confidential books and records to NefasQS, including accounting materials and internal financial documents, so that NefasQS could review, discuss, and publicly disseminate those materials in connection with attacks on Sharif and Intrepid. On information and belief, Dawson and Ogden agreed to supply, and did supply, those books and records to Caramanis for that purpose, in breach of their fiduciary duties, knowing and intending that Caramanis would substantially assist their breach of wrongful disclosure and public dissemination by making those materials public for no legitimate corporate purpose.

117.    Since February 2026, NefasQS has devoted scores of hours to live streams discussing Intrepid's downfall. Caramanis' appearances alone account for several hours on NefasQS' live streams since February 2026, on which Caramanis has participated in an effort to falsely pin the blame on Sharif for Intrepid's downfall, thereby exposing Sharif to contempt and ridicule, and damaging his professional reputation.

118.    Caramanis' public smear campaign against Sharif began on February 14, 2026, when Caramanis called in to a live stream video hosted by NefasQS to discuss

---

[5] *See* NefasQS, YOUTUBE, https://www.youtube.com/c/nefasqs (last visited May. 15, 2026).

Sharif and Intrepid for approximately one hour and 44 minutes.[6]

119.   When asked on this live stream whether he was concerned about making his statements publicly, Caramanis said, "I don't give a shit what I say or not [sic] say" and acknowledged that "slander is basically anything you're saying to hurt someone." (Feb. 14, 2026 Live Stream at 26:39) Caramanis then proceeded to make such harmful and defamatory statements on this live stream targeting Sharif's professional reputation as a game developer, including but not limited to: "The guy [Sharif] couldn't fucking run a company for his fucking toothpick brain. Fuck he's a fucking retard Okay. The only thing that guy's good at is bullshitting people. And he might be a good creative director. He might be a good gamer, but everything else is full of shit." (*Id*. at 17:28).

120.  Caramanis also made numerous false statements about Sharif's involvement in the downfall of Intrepid, falsely telling viewers that Sharif purposefully defrauded Intrepid investors and employees in an attempt to "steal" money owed to terminated former Intrepid employees in response to being denied equity in TFE.

121.   Specifically, Caramanis publicly claimed that Sharif's "ego and greed . . . buried the company," rather than Dawson's illicit scheme. (*Id*. at 1:32:01). He said that "the triggering point" that caused Dawson to foreclose and fire Intrepid employees in short order was "that Steven was trying to negotiate with Rob" and asked Dawson for equity in the new entity, TFE, which Dawson refused. (*Id*. at 45:10.) Caramanis claimed that Dawson offered Sharif an "earnout as creative director" but refused "to give [Sharif] equity in in the entity" Dawson planned to transfer the assets to, TFE. (*Id*. at 45:10; 48:11.).) Caramanis then claimed Sharif refused Dawson's offer and "threatened" Dawson, telling Dawson that he refused to

---

[6] NefasQS, *Steven Sharif's WORST Nightmare Comes True*, YouTube (Feb. 14, 2026), available at https://youtu.be/IQOTjfCIS3g?si=08zMSI6BWbtvjhn2 (hereinafter the "Feb. 14, 2026 Live Stream").

Withers Bergman LLP

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

go to TFE to continue developing the game without equity. (*Id*. at 48:44.) According to Caramanis, Sharif decided to "pretty much pull the rip cord and say to Rob, 'I'm resigning.' Sorry," (*id*. at 49:22), and then "went behind Rob's back." (*Id*. at 47:59.)

122.   Caramanis further stated on this Live Stream that Sharif knew revenue from the *Ashes of Creation* early-release in 2025 with Steam was being reserved by the Board in order to "pay all the payroll" (that the board was reserving the Steam funds for payroll is false), but that Sharif "took $3.7 million for his own greedy" purposes—claiming Sharif "literally stole" the Steam money "and pushed [Intrepid] to go out of business literally because he's a pretty narcissistic son of a bitch." (*Id*. at 50:55.)   Specifically, Caramanis claimed that Sharif blew the whistle to CommerceWest Bank "so Commerce Bank would get that money [*i.e.*, the Steam money] and pay out . . . [Plaintiff's] money being held in an escrow account by Commerce Bank . . . [b]ecause [CommerceWest Bank] had a secured position against [Plaintiff's] house on the money that he originally borrowed for the company." (*Id*. at 51:55.)

123.   In other words, Caramanis claimed publicly that "[Sharif] did it to spite you guys basically. He didn't even get the money. 100%. . . . He did it to fuck everyone over." (*Id*. at 52:42.) He further stated that, "[Sharif] didn't even care about saving the company. Just wanted to save his own ass" and wanted the "Commerce[West] Bank loan to be paid off so pretty much [he could] get the money out off of [his] house." (*Id*. at 55:08.)

124.   Caramanis manufactured and advanced the false narrative that Sharif intentionally withheld funds from terminated Intrepid employees in order to pay down Intrepid's debt to CommerceWest Bank and thereby extinguish the lien on his personal property. That narrative is false and was advanced to scapegoat Sharif for the consequences of the Board Defendants and TFE's own misconduct. In reality, Sharif whistle blew to CommerceWest Bank out of consideration for his fiduciary duties and to avoid being an accomplice to likely bank fraud. And in reality, it was

Caramanis who sent a letter to Valve, wrongly claiming entitlement to the Steam funds by asserting he is the senior secured lender to Intrepid when he is not, thus contributing to Valve's decision to withhold the funds from Intrepid. (*See infra* Section J.)

125.    As a result of these purportedly egocentric actions, Caramanis further publicly claimed, without basis, that Sharif will continue to be exposed to civil and criminal liability, claiming "[Sharif] is a pathological nutcase liar. And guess what? You're going to see numerous lawsuits come out against him." (*Id*. at 26:56) Caramanis falsely added that Sharif "lied about the revenues of the company. There were no revenues. He took all the loans and booked them on his federal tax return as basically as income. That's a fucking federal crime, you fucking dumb fuck." (*Id*. at 29:04).

126.    Caramanis also made additional harmful and homophobic statements about Sharif, attacking his mental health, character, and sexual orientation, seemingly for no reason but malice against Sharif.

127.    For example, Caramanis stated publicly, "go look up NPD, narcissistic personality disorder.  It describes him as a T. He's the most narcissistic fuck tool I've ever met in my entire life. The guy's a piece of shit. (*Id*. at 30:51). Caramanis also said that Sharif and Moore "make anyone in the gay community look bad. They're horrible human beings." (*Id*. at 1:29:18).

128.    On February 16, 2026, Caramanis participated in another YouTube livestream hosted by NefasQS, for approximately one hour and 15 minutes, and continued his campaign against Sharif—pinning the blame for Intrepid's downfall on Sharif, targeting his professional reputation as a game developer, and falsely attacking Sharif's general character.[7]

---

[7] NefasQS, *Steven Sharif and His Husband Paid THEMSELVES How Much???,* YOUTUBE (Feb. 16, 2026), available at https://youtu.be/WDJB-PRM2pY?si=vhOehnSqQc-R9m5C (hereinafter the "Feb. 16, 2026 Live Stream").

129.   Caramanis claimed, "I don't believe that the game was a scam. I believe Steven was the scam," (Feb. 16, 2026 Live Stream at 4:56), and that "Steven caused all this. Okay." (*Id*. at 10:37.) He stated publicly, "I think what he did is [] that he lived his comfortable lifestyle and portrayed like he was a big fucking baller and a big boss on all of our monies. Um, you know, $120, $110 million of, um, normal people's money and then probably another $10 to $12 million on bank loans money and then all the gamers that put in money in the beginning with you know the Kickstarter and leading up to everyone that bought anything on products [sic]." (*Id*. at 5:14.)

130.   Caramanis further stated, "I mean, Steven just ran a big ol' lie to make himself look like a demi [god] and he has a narcissistic personality disorder. Even after talking to a couple employees, you know, lead engineers and other people that have reached out to me that this guy had a serious problem, man. This guy is demented. He has like a schizophrenia split personality. He needs to be locked up in an asylum like his brother." (*Id*. at 16:30.)

131.   As to the events of January 2026, Caramanis furthered the story told two days prior, claiming that Sharif decided, "I'm going to go burn the house down because, you know, I, I'm, you know, you know, I'm the head kick in charge. And so, I'm going to pretty much torch everything because I'm a little baby and a crybaby, okay? And I'm not getting what I want, which is I wanted Rob to pretty much make me the CEO of the new company." (*Id*. at 35:11.) He added that, "Steven just decided to fucking be a greedy son of a bitch and fucking you know, all because pretty much he, he has a god complex. He has narcissistic personality disorder god complex." (*Id*. at 41:38.)

132.   Caramanis also repeated another slew of offensive and homophobic statements against Sharif, calling Sharif "a fucking Froot Loop con man," (*id*. at 35:44), and at one point speaking to Sharif directly, telling him: "I hope Steven is watching this. You fucking cockroach. You should watch yourself burn in hell for fucking everybody over. You, your mom, Tom, Beth, anything. They all fucking are

36

all rotten. Your husband rotten." (*Id*. at 37:06.)

133. On March 7, 2026, Caramanis again participated in a live stream hosted by NefasQS for approximately 57 minutes.[8] On this live stream, Caramanis made numerous additional harmful and false statements, including commenting on court filings in this case, to which Caramanis was not then a party, claiming Sharif's sworn statements were "a straight out lie" made in order to "rebuild his credibility to whoever will listen to the narcissist, sociopathic, pathetic person he is. But that's his bullshit just spin doctoring this." (Mar. 7, 2026 Live Stream at 29:28). He added that Sharif was "[l]ying," under penalty of perjury, "like a pathological narcissist does." (*Id*. at 35:19).

134. On a subsequent live stream hosted by NefasQS, on April 15, 2026,[9] Caramanis again called in for approximately one hour and 45 minutes to discuss Sharif and Intrepid, and to respond to sworn statements filed in this Court, including statements regarding threats made by Caramanis to Sharif threatening physical violence against him. When asked if he did physically harm Sharif, Caramanis repeatedly stated throughout the live stream that he wished he had. (Apr. 15, 2026 Live Stream at 7:31:20.)

135. As described above, on information and belief, Dawson and Ogden agreed with Caramanis to provide and did provide Caramanis with Intrepid's accounting books and records, in breach of their fiduciary duties, for the purpose of Caramanis substantially assisting their breach in distributing those materials publicly with NefasQS during the YouTube interviews and live streams. Caramanis has

---

[8] NefasQS, *Ashes of Creation Investor RESPONDS to Steven Sharif's 'Legal Victory'*, YOUTUBE (Mar. 7, 2026), available at https://youtu.be/khc0mBkI92A?si=_RO7su94RrjvPNyA (hereinafter the "Mar. 7, 2026 Live Stream).

[9] NefasQS, *AM I GOING TO COURT? STEVEN SHARIF JUST DROPPED A 400 PAGE NUCLEAR BOMB*, YOUTUBE (Apr. 15, 2026), available at https://www.youtube.com/live/bYeYPiWTx2M?si=IVKyZuSNJdW3nE-e (hereinafter the "Apr. 15, 2026 Live Stream").

37

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

publicly claimed as much. The disclosure of those confidential Company records to Caramanis was unauthorized and was undertaken in furtherance of the Board Defendants' scheme to defame Plaintiff, damage Intrepid, and depress the value of the Company's assets. It was not undertaken for any legitimate corporate purpose.

136. In those public statements, Caramanis, implying he acts on behalf of the Board Defendants, has also disclosed highly sensitive internal and confidential Company documents, which appear designed to place Intrepid in a negative light. This conduct has no legitimate purpose. All of these false statements were made in furtherance of Caramanis and the Board Defendants' scheme to pin the blame of Intrepid's downfall on Sharif in order to recover the value of Intrepid's assets for their own gain.

137. Caramanis continued his public campaign against Sharif by interacting directly with YouTube viewers in the comment section of several NefasQS videos. In these comments, Caramanis reinforced his spoken comments through additional false written statements, also published publicly on YouTube.

138. For example, in one comment, Caramanis reinforced the existence of an illicit plan completed by Dawson and the Board Defendants to wrongfully transfer Intrepid's assets to TFE. In response to one YouTube user's comment that *Ashes of Creation* could be completed by a "new buyer/funder," Caramanis wrote that he "[a]greed" and that "we need money from a serious group and I think Robert Dawson and myself would agree."[10]

139. Caramanis also responded to a YouTube user's comment parroting Caramanis' claims that Sharif had engaged in criminal activity, commenting that "Federal Crimes is a real deal. . . Tax Fraud Banking Fraud embezzlement corporate theft . . . breach of fiduciary duty and getting bank loans while filing fraudulent tax

---

[10] Feb. 14, 2026 Live Stream, comment by @Jasoncaramanis in response to @Izam_Shah, available at https://www.youtube.com/watch?v=IQOTjfCIS3g&lc=UgyUktMUdHPjI55_oQB4AaABAg.

returns." Caramanis even suggested to one viewer his desire to talk to a screen writer in Los Angeles for the purposes of pursuing a Netflix documentary on Intrepid's downfall.[11]

140. This targeted, aggressive behavior is not just limited to his interactions with Steven Sharif. Caramanis has threatened others in furtherance of his vendetta against Sharif.

141. On the February 14, 2026 live stream with NefasQS, Caramanis recalled texting Sharif's mother on February 2, 2026, reading out the text message he sent her as follows:

> Your son has destroyed the business and you have no idea what's coming soon. All of you lying piece of shit. Okay. . . . Hope you both hope you both rot in hell for destroying everyone's lives. Okay. Okay. Just a pathological narcissistic personality disorder worse than Mark, your other son. Is it your DNA in your sons? Okay. Or your ex-husbands that create these kind of human beings that lie, cheat, steal, and make everyone believe they are honored. Okay. He's destroyed my life and Tom and Bethany's life and so many other people's. Okay. He's a narcissist. He should be locked up like Mark in an asylum. Such a liar, cheat, thief. I can't believe this is scumbag of your DNA. Wish you never given birth to such a human scum. You have given birth to the worst of your three children. It is not Mark that's the devil and has issues. It's your son Steven that destroyed everyone's lives. ***You should have had an abortion.***

(Feb. 14, 2026 Live Stream at 1:06:13 (emphasis added).)

142. On April 24, 2026, Caramanis sent similarly threatening text messages to individuals who submitted declarations in support of a motion filed by Sharif in the

---

[11] Feb. 14, 2026 Live Stream, comment by @Jasoncaramanis in response to @maryjoness2898, available at https://www.youtube.com/watch?v=IQOTjfCIS3g&lc=Ugzp1qakqUutt9RLEI14AaABAg.

instant action in an evident attempt to intimidate them from participating further in this litigation. (*See* Dkts. 84-86.)

143. In response to one of the sworn statements filed, Caramanis texted Tom Alkazin, an investor in Intrepid, that he "can't wait to get you and you wife in depositions liar and cockroach as you are" and that "[t]hreatening that [I] will depose you and sue you is NOT a threat it's the truth." (*See* Dkt. 84-1.)

144. The negative impact of Caramanis' public smear campaign is readily evident by browsing any online platform devoted to the discussion of Sharif, Intrepid, and *Ashes of Creation* such as Reddit, Discord, and public comments left by viewers of the NefasQS YouTube videos, where hundreds of comments echo Caramanis' words that Sharif is a "liar," a "scammer," a "narcissist," and "guilty" of everything Caramanis falsely accused him of.

145. This campaign is another mechanism by which Dawson, acting through and with Caramanis, has sought to artificially shrink the value of Intrepid so that no third party would step forward to salvage Intrepid and its assets, conveniently leaving himself as the only viable acquirer of the Company's assets to the detriment of Intrepid and its other stakeholders.

146. At all times, Sharif appropriately caveated to potential lenders that any estimated timeframes with respect to *Ashes of Creation* development milestones or completion were just estimates, subject to a number of variables outside of Sharif's control. Game development is an iterative process and delays are standard in the industry. At no time did Sharif guarantee that *Ashes of Creation,* as a large, ambitious, and innovative game-changer in the world of MMORPG, would reach specific milestones, or be completed, by a specific time.

147. At all times, Sharif appropriately caveated that relationships that could increase the value of the game, *e.g.*, publishing deals, were speculative and were not guaranteed.

148. At no time did Sharif intentionally misappropriate funds from the

Company. Public statements to the contrary are intended to invoke public outrage and outcry against Sharif to shield the Defendants from the fallout of their wrongful actions, described herein.

## J.    Valve Freezes Revenues

149.    On February 3, 2026, Valve terminated Intrepid's partnership with Steam. Among others, Valve cited as reasons for the termination that it received multiple conflicting requests from alleged account administrators for Intrepid requesting authority to change Intrepid's banking information, without response to Valve's follow up requests seeking to confirm the validity of the requests; that Valve has received demands from multiple potential creditors for Intrepid's revenues—including, wrongly, Caramanis; and that Valve is receiving a large number of refund requests from players who purchased the early access release version of *Ashes of Creation*. Before the issue of refunds, Intrepid would have been entitled to approximately $5 million, thus demonstrating the value of, among other things, the Trade Secret Materials.

## K.    Dawson and the Board Defendants (through TFE) Purport to "Unwind" the Unlawful Article 9 Foreclosure Sale Via a Subsequent Assignment of Assets to Intrepid, and Seek to Conduct a Second Foreclosure Sale

150.    On February 14, 2026, Plaintiff filed this action challenging, among other things, the Board Defendants' and TFE's unlawful Article 9 foreclosure and their misappropriation of Intrepid's most valuable assets—its intellectual property and trade secrets—to Defendant TFE. Plaintiff promptly sought emergency injunctive relief to prevent the Board Defendants and TFE from using, accessing, selling, or disposing of those assets while this Court considered whether to enter a preliminary injunction. On March 4, 2026, the Court entered a temporary restraining order ("TRO") prohibiting the Board Defendants and TFE from using, accessing, selling, or distributing Intrepid's intellectual property and Trade Secret Materials. On March 10, 2026, the Court appointed an Intellectual Property Custodian to hold and control Intrepid's assets until further order of the Court. In the days that followed, the case

proceeded on a fast track toward a preliminary injunction hearing, and the Board Defendants and TFE faced the likelihood that the Court would convert the TRO into a preliminary injunction preserving the status quo. Rather than defend the legality of their conduct, the Board Defendants and TFE purportedly "set aside" the Article 9 sale to TFE and returned Intrepid's assets on March 25, 2026, just days ahead of the preliminary injunction hearing. (*See* Dkt. No. 58 at 1, 7.) The Board Defendants and TFE characterize their actions as a mere unwinding of the unlawful Article 9 transaction. But they did not actually unwind or rescind anything; instead, in a ***subsequent*** transaction, they purported to gift Intrepid's trade secrets back to the Company through an "Assignment and Assumption of Assets" and a Bill of Sale for no consideration.

151. Tellingly, Dawson executed the Bill of Sale on behalf of both purported buyer (TFE) and purported seller (Intrepid), underscoring the self-dealing nature of both the original illicit foreclosure, and the after-the-fact "unwinding".

152. To the extent they ever did, Defendants Dawson and TFE no longer possess any legal right to foreclose. The January 16, 2026 foreclosure extinguished any security interest TFE claims under the California Commercial Code. Cal. Com. Code § 9617(a).

153. Before the TRO and the purported unwinding, TFE and the Board Defendants had been actively (1) soliciting former employees and the former Director of IT, including with offers of compensation, to provide them access to *Ashes of Creation*, along with its intellectual property and Trade Secret Material components, and (2) attempting to sell *Ashes of Creation*, along with its intellectual property and Trade Secret Material components—the lifeblood of the Company and key to the value of shares owned by Sharif and the Derivative Shareholders—to competitor game developers in order to recoup their own investments. The Board Defendants and TFE's actions were in furtherance of the agreement between the Board Defendants to misappropriate the Company's intellectual property and Trade Secret

Materials.

154.   Since the purported unwinding, with the assets now back in Intrepid on paper, the Board Defendants—*i.e.*, the same individuals who orchestrated the theft of Intrepid's assets via the wrongful foreclosure in spite of their fiduciary duties to Intrepid—are continuing to solicit the former Director of IT, including with legal threats, to provide them access to the intellectual property and trade secret assets, now purportedly on behalf of Intrepid.

155.   The Board Defendants do not have access to those assets because they summarily laid off Intrepid's entire workforce before obtaining possession of the intellectual property assets, and without providing any offboarding process whatsoever for Intrepid employees.

156.   The Board Defendants and TFE, through legal counsel, have stated their intent to foreclose on Intrepid's assets again imminently—namely, as soon as they can obtain access to the intellectual property assets.

157.   Defendants' actions have already harmed the Company, and they continue to pose irreparable and imminent harm to the Company.

## FIRST CLAIM FOR RELIEF

(Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.)

AGAINST THE BOARD DEFENDANTS AND TFE

158.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

159.   This cause of action is brought by the Company as a derivative claim.

160.   The Company owned trade secret information as defined under 18 U.S.C. § 1839(3) and took reasonable steps to protect it.

161.   The Company's Trade Secret Materials derived independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person, including competitors, who can obtain economic value from the disclosure or use of the Company's trade secrets. Evidence of the value

of the Trade Secret Materials includes the fact that they served as collateral for loans (*see, e.g.*, Exhibit BB (securitizing the Company's intellectual property, which includes the Trade Secret Materials); Exhibit DD (same)); their use within *Ashes of Creation* generated revenues during the Early Access launch on Steam; and the existence of the Board Defendants' conspiracy alleged herein to steal them. The Trade Secret Materials include:

      a.     Audio/visual effects;

      b.     Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (i.e., production assets created by employees/contractors and incorporated into builds);

      c.     The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;

      d.     Designs and implementations of server meshing technology and distributed networking systems;

      e.     Proprietary PvP risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems;

      f.     The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

      g.     Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

h.     The event tool used to create open world events, wars, and caravan systems;

i.     The implemented seasonal environmental systems as built into the engine;

j.     The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

k.     Class implementation logic and stat balancing systems as embodied in the Company's codebase;

l.     Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

162.   The Board Defendants and TFE conspired to complete the wrongful foreclosure—which they knew or had reason to know was improper both due to defects in the foreclosed-upon secured debt and defects in the foreclosure process—in order to misappropriate the Company's intellectual property and Trade Secret Materials.

163.   After the foreclosure, The Board Defendants and TFE actively sought for TFE to (1) obtain access to *Ashes of Creation*, including the intellectual property and Trade Secret Materials, from former Intrepid employees in exchange for compensation; and (2) quickly sell the game to a third-party developer.

164.   The Board Defendants and TFE's actions in attempting to convert and misappropriate the Company's Trade Secret Materials for their own benefit were willful, wanton, and malicious, and taken with reckless disregard for the Company's rights.

165.   The Company's Trade Secret Materials, which the Board Defendants and TFE wrongfully misappropriated to Defendant TFE, and to which the Board Defendants and TFE actively sought access for TFE, relates to *Ashes of Creation*, a MMORPG that has been and was intended to be offered and provided in interstate commerce.

166. The Board Defendants and TFE's acquisition, use, access, and/or sale of the Company's Trade Secret Material violated the DTSA (18 U.S.C. § 1836(b)(1)).

167. The Board Defendants agreed to deprive the Company of its intellectual property and Trade Secret Materials via the wrongful foreclosure. In furtherance of this agreement, Defendant Ogden created a list of Intrepid's pre-foreclosure assets as described *supra* ¶ 87. When the Board Defendants' plan failed and they shuttered Intrepid by laying off all employees, they pivoted and instead sought to obtain immediate access to the Company's intellectual property and Trade Secret Materials from former employees in order to sell it.

168. As a direct and proximate result of this misconduct, the Company has suffered and continues to suffer substantial harm and money damages, including but not limited to loss of exclusivity over its proprietary technology; impairment of its ability to commercialize, license, or monetize its core assets; loss of competitive advantage and first-mover position; diminished enterprise and asset value; increased risk of irreparable dissemination of its Trade Secret Materials; disruption to development; and reputational damage in the market.

## SECOND CLAIM FOR RELIEF

(Misappropriation of Trade Secrets under California's Uniform Trade Secret Act, Cal. Civ. Code §§ 3426, *et seq.*)

AGAINST THE BOARD DEFENDANTS AND TFE

169. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

170. This cause of action is brought by the Company as a derivative claim.

171. The Company owned trade secret information as defined under California's Uniform Trade Secrets Act ("CUTSA"), California Civil Code § 3426.1(d) and took reasonable steps to protect it.

172. The Company's Trade Secret Materials derived independent economic value from not being generally known to, and not being readily ascertainable through

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

proper means by, another person, including competitors, who can obtain economic value from the disclosure or use of the Company's trade secrets. Evidence of the value of the Trade Secret Materials includes the fact that they served as collateral for loans (*see, e.g.*, Exhibit BB (securitizing the Company's intellectual property, which includes the Trade Secret Materials); Exhibit DD (same)); their use within *Ashes of Creation* generated revenues during the Early Access launch on Steam; and the existence of the Board Defendants' conspiracy alleged herein to steal them. The Trade Secret Materials include:

a. Audio/visual effects;

b. Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (i.e., production assets created by employees/contractors and incorporated into builds);

c. The Company's confidential source code and technical implementation architecture, including server-side node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies;

d. Designs and implementations of server meshing technology and distributed networking systems;

e. Proprietary PvP risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems;

f. The implemented Node-system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture;

g.   Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools);

h.   The event tool used to create open world events, wars, and caravan systems;

i.   The implemented seasonal environmental systems as built into the engine;

j.   The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic;

k.   Class implementation logic and stat balancing systems as embodied in the Company's codebase;

l.   Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

173.   The Board Defendants and TFE conspired to complete the wrongful foreclosure—which they knew or had reason to know was improper, both due to defects in the foreclosed-upon secured debt and defects in the foreclosure process—in order to misappropriate the Company's intellectual property and Trade Secret Materials.

174.   After the foreclosure, The Board Defendants and TFE actively sought for TFE to (1) obtain access to *Ashes of Creation*, including the intellectual property and Trade Secret Materials, from former Intrepid employees in exchange for compensation; and (2) quickly sell the game to a third-party developer.

175.   The Board Defendants and TFE's actions in attempting to convert and misappropriate the Company's trade secret information for their own benefit is willful, wanton, and malicious, and taken with reckless disregard for the Company's rights.

176.   The Board Defendants and TFE's use, access, or sale of the Company's Trade Secret Material violates the CUTSA (Cal. Civ. Code § 3426 *et seq.*).

177.   As a direct and proximate result of the Board Defendants and TFE's

wrongful acts alleged herein, the Company has been harmed.

178. The Board Defendants agreed to deprive the Company of its intellectual property and Trade Secret Materials via the wrongful foreclosure. In furtherance of this agreement, Defendant Ogden created a list of Intrepid's pre-foreclosure assets as described *supra* ¶ 87. When the Board Defendants' plan failed and they shuttered Intrepid by laying off all employees, they pivoted and instead sought to obtain immediate access to the Company's intellectual property and Trade Secret Materials from former employees in order to sell it.

179. As a direct and proximate result of this misconduct, the Company has suffered and continues to suffer substantial harm and money damages, including but not limited to loss of exclusivity over its proprietary technology; impairment of its ability to commercialize, license, or monetize its core assets; loss of competitive advantage and first-mover position; diminished enterprise and asset value; increased risk of irreparable dissemination of its Trade Secret Materials; disruption to development; and reputational damage in the market.

## THIRD CLAIM FOR RELIEF

(Violations of California Commercial Code §§ 9101, *et seq.*)

AGAINST THE BOARD DEFENDANTS AND TFE

180. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

181. This cause of action is brought by the Company as a derivative claim.

182. Between 2022 and 2025, Defendant Dawson extended debt to Intrepid through a series of Notes. Although only a small fraction of the Notes are secured by a March 2022 Security Agreement pledging a security interest in all of Intrepid's assets, Dawson has and continues to wrongfully assert that all of his debt is secured by that agreement. On May 13, 2024, Dawson sought to perfect his purportedly secured debt by filing a UCC-1 financing statement. (Exhibit BB.)

183. In January 2026, Dawson transferred this supposedly secured interest to

Withers Bergman LLP

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

a company he created and wholly owns, TFE. (*See* Exhibit HH.)

184. Beginning in 2025, Dawson, in concert with the other Board Defendants, coordinated to manufacture a default allowing for foreclosure of Intrepid's assets pursuant to California Commercial Code §§ 9610.

185. Dawson and TFE intentionally did not notify other secured parties prior to effecting the disposition of the Company's assets, as required by California Commercial Code § 9611, including senior secured party CommerceWest Bank, whose loan was secured by the same Company assets. Instead, they declared a default by Intrepid and engaged in a non-judicial, private disposition of the Company's assets where TFE credit bid its supposed secured debt. Because the extent of Mr. Dawson's debt that was actually secured is and was grossly overstated, TFE wrongly credit bid debt that was not, in fact, secured.

186. In addition to foreclosing on and credit bidding with largely unsecured debt, Dawson and TFE did not pursue disposition of the Company assets in a commercially reasonable manner, as required under California Commercial Code § 9610. Instead, they transferred the Company's assets, including valuable intellectual property and Trade Secret Materials, to a new entity, TFE, which was created and owned by Dawson. This transfer was not commercially reasonable under California Commercial Code § 9627. Transferring assets to a company created for the sole purpose of receiving assets via an unnoticed, self-interested disposition is not the usual manner of asset disposition recognized in any relevant recognized market. Transferring assets to a company created for the sole purpose of receiving assets via an unnoticed, self-interested disposition did not lead to the disposition being made at the price current in any relevant recognized market at the time of the disposition. Transferring assets to a company created for the sole purpose of receiving assets via an unnoticed, self-interested disposition is not a disposition that is in conformity with reasonable commercial practices among dealers in the MMORPG or video game market.

187. The collateral consisting of the Company's assets, including specifically the intellectual property and Trade Secrets Materials, are not of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations; accordingly, under California Commercial Code § 9610, Dawson and TFE were not at liberty to dispose of the collateral at a private disposition.

188. As a direct and proximate cause of Dawson's and TFE's unlawful actions, and the Board Defendants' unlawful actions in ratifying this transaction, the Company suffered harm, including but not limited to loss of exclusivity over its proprietary technology; impairment of its ability to commercialize, license, or monetize its core assets; loss of competitive advantage and first-mover position; diminished enterprise and asset value; increased risk of irreparable dissemination of its Trade Secret Materials; disruption to development; and reputational damage in the market.

## FOURTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty)

AGAINST BOARD DEFENDANTS

189. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

190. This cause of action is brought by the Company as a derivative claim.

191. At all relevant times, the Board Defendants served on Intrepid's Board.

192. As directors of Intrepid, the Board Defendants owed fiduciary duties of loyalty, care, candor, and independence to Intrepid and Derivative Plaintiffs, including Plaintiff Sharif. Those duties required the Board Defendants, among other things, to act in good faith; to place the interests of the Company and its shareholders above their own personal interests; to avoid self-dealing and conflicts of interest; to exercise independent judgment; and to refrain from using their positions as directors and officers to appropriate corporate assets, opportunities, or confidential information for their own benefit.

WITHERS BERGMAN LLP

51

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

193. The Board Defendants knowingly acted against the Company's interests by engaging in self-dealing, including by facilitating Defendant Dawson's "ping-pong" of Intrepid's capital structure between purported debt, equity, and back to purported debt; engineering and approving a wrongful Article 9 foreclosure and credit bid sale in favor of Defendant TFE's purported junior secured lien despite the lack of a sufficient secured interest, thereby misappropriating Intrepid's trade secrets; diverting or attempting to divert Company revenues to Defendant Dawson's affiliated entity, Defendant TFE; concealing their identities and misconduct through false regulatory filings; approving or allowing conflicted and self-interested transactions without the disinterested approvals as required by Cal. Corp. Code § 310(a), including opening and moving Company banking to Defendant Dawson's owned bank and allowing Defendant Dawson's conversion of equity back into debt when he was the Chairman of Intrepid; and positioning themselves to personally profit from the continued exploitation or sale of *Ashes of Creation* and its underlying intellectual property at the direct expense of their fiduciary beneficiary, Intrepid.

194. The Board Defendants further breached their fiduciary duties by failing to act independently or in good faith, by rubber-stamping Defendant Dawson's directives despite obvious conflicts of interest, by disregarding the interests of Intrepid's shareholders, creditors, and employees, by sharing confidential financial company documents, by exposing the Company to substantial legal and financial liability, and by knowingly participating in or facilitating unlawful conduct, including wrongful foreclosure, wage violations, and the misappropriation of intellectual property.

195. As a result of the Board Defendants' misconduct, Intrepid was stripped of valuable assets, deprived of revenue, rendered insolvent, exposed to significant creditor and employee claims, and effectively destroyed, all while Board Defendants sought to preserve or enhance their own financial positions at the Company's expense. This harm was compounded by Defendant Dawson's assertion of a purported

"secured" debt, and by his repeated "ping-pong" of the Company's capital through conflicted and self-interested debt-to-equity-to-debt transactions. These maneuvers saddled the Company with staggering purported debt while simultaneously inflating and destabilizing its equity, thereby poisoning Intrepid to outside investors and strategic partners, foreclosing alternative financing, and accelerating the Company's collapse.

196. As a direct and proximate result of Board Defendants' breaches of fiduciary duty, substantial harm was caused to the Company, Plaintiff, and Derivative Plaintiffs, including the loss of shareholder value, the misappropriation of corporate intellectual property and trade secrets, the forfeiture of legitimate business opportunities, reputational damage, and the incurrence of significant legal and remedial costs.

197. Plaintiff, on behalf of the Company, also seeks equitable relief to remedy and prevent further harm arising from those breaches, including appropriate corporate governance, compliance, and oversight reforms, such as removal of the Board Defendants from Intrepid's Board; enhanced board-level oversight mechanisms; institution of a receiver; revised policies governing risk management, internal controls, or compliance; changes to executive compensation, clawback, or incentive structures; and board or committee reconstitution and independence measures.

## FIFTH CLAIM FOR RELIEF

(Aiding and Abetting Breach of Fiduciary Duty)

AGAINST DEFENDANTS TFE AND JASON CARAMANIS

198. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

199. This cause of action is brought by the Company as a derivative claim.

200. Defendant TFE is controlled by Defendant Dawson. Defendant TFE was created by Defendant Dawson for the sole purpose of receiving, exploiting, and monetizing Intrepid's trade secrets and intellectual property. Defendant TFE had no

WITHERS
BERGMAN LLP

53

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

independent or legitimate business purpose apart from the wrongful conduct alleged herein, functioning solely as an instrumentality and vehicle through which Board Defendants consummated their illicit scheme.

201.    At all relevant times, the Board Defendants owed fiduciary duties of loyalty, care, candor, and good faith to Intrepid and Derivative Plaintiffs, including Plaintiff Sharif. Those fiduciary duties were knowingly breached through, among other things, conflicted self-dealing including facilitation of Defendant Dawson's debt-equity-debt reversals, approving a wrongful foreclosure and credit bid sale in favor of TFE despite the lack of a valid secured interest, attempted diversion of corporate revenues to TFE and Pathway Bank, concealing misconduct through false filings, misappropriation of intellectual property and trade secrets, sharing confidential financial company documents, and destruction of the Company, as alleged herein.

202.    At all relevant times, Defendant TFE had actual knowledge of the Board Defendants' fiduciary duties and breaches thereof. Defendant Dawson formed TFE for the express purpose of receiving assets, intellectual property, and trade secrets wrongfully taken from Intrepid in breach of his and the other Board Defendants' fiduciary duties, and TFE's existence and anticipated benefit depended entirely on the Board Defendants' unlawful conduct. The knowledge of Defendant Dawson, as TFE's sole owner, is imputed to Defendant TFE.

203.    Defendant TFE knowingly and substantially assisted the Board Defendants' breaches of fiduciary duty by, among other things, accepting and attempting to accept ownership, possession, or control over Intrepid's assets, including intellectual property and trade secrets; participating in the planning and execution of the wrongful Article 9 foreclosure; and serving as the intended recipient of diverted revenues and misappropriated property. Through its knowing participation and substantial assistance, Defendant TFE aided and abetted the Board Defendants' breaches of fiduciary duty and directly benefitted from those breaches, including by

seeking to acquire valuable intellectual property, trade secrets, and business opportunities without compensation and free of Intrepid's liabilities.

204. At all relevant times, Defendant Jason Caramanis—a sophisticated investor and businessman—also had actual knowledge that the Board Defendants' disclosure of confidential Intrepid information for external exploitation and public dissemination (*i.e.*, for no legitimate corporate purpose) would constitute a breach of their fiduciary duties. On information and belief, Defendant Caramanis agreed with Defendants Dawson and Ogden that they would disclose Intrepid's confidential books and records to him, in breach of those Defendants' fiduciary duties to Intrepid, for the purpose of Caramanis substantially assisting that breach by publicly disseminating them as part of the scheme alleged herein. On information and belief, Defendants Dawson and Ogden provided Defendant Caramanis with Intrepid's confidential books and records, including accounting materials, knowing that Defendant Caramanis intended to distribute those materials publicly and for no legitimate corporate purpose. Defendant Caramanis then accepted and publicly disseminated those confidential Company records in furtherance of the scheme alleged herein, including to defame Plaintiff, damage Intrepid, and depress the value of the Company's assets. By knowingly receiving and using confidential corporate information for that purpose, Defendant Caramanis substantially assisted the Board Defendants' breaches of fiduciary duty and directly contributed to the resulting harm to Intrepid.

205. As a direct and proximate result of TFE and Caramanis' aiding and abetting of fiduciary breaches, Intrepid has suffered substantial harm, including the loss of assets, loss of revenue, exposure to significant legal and financial liabilities, and destruction of corporate value.

## SIXTH CLAIM FOR RELIEF

(Corporate Waste)

AGAINST BOARD DEFENDANTS

206. Plaintiff realleges and incorporates by reference all allegations in all

preceding paragraphs.

207.   This cause of action is brought by the Company as a derivative claim.

208.   As directors of Intrepid, Board Defendants owed the Company and its shareholders fiduciary duties, including duties of care, loyalty, and good faith.

209.   Those duties required Board Defendants to act prudently, in good faith, and in the best interests of the Company and its shareholders, and to refrain from squandering corporate assets or exposing the Company to unnecessary and foreseeable harm.

210.   Board Defendants' decision to seize Intrepid's assets through a wrongful Article 9 foreclosure process was so egregious, reckless, and devoid of legitimate business purpose that it could not have been the product of a rational or good-faith exercise of business judgment on behalf of the Company.

211.   By, among other things, periodically and deliberately starving the Company of cash, allowing substantial unpaid obligations to accrue to vendors and service providers, engineering and approving a wrongful foreclosure designed to transfer Company assets to an affiliated entity, and terminating the entire workforce in violation of state and federal law, Board Defendants caused Intrepid to waste and destroy valuable corporate assets and business opportunities.

212.   Under these circumstances, no reasonable businessperson could conclude that the foregoing actions were undertaken for the benefit of Intrepid or were otherwise consistent with Intrepid's best interests. Rather, the actions constituted a wasteful dissipation of corporate assets undertaken to advance Board Defendants' personal and affiliated interests at the Company's expense.

213.   Board Defendants are therefore guilty of committing corporate waste and are liable to Intrepid for all damages sustained as a result of their misconduct.

# SEVENTH CLAIM FOR RELIEF

(Intentional Infliction of Emotional Distress)

AGAINST BOARD DEFENDANTS AND CARAMANIS

214. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

215. This cause of action is brought as a direct claim by Plaintiff Sharif.

216. The Board Defendants engaged in extreme and outrageous conduct directed at Sharif by directing Defendant Ogden to file a false Statement of Information in order to shield the Board Defendants from any public fallout arising from their illicit foreclosure and subsequent illegal firing of all Intrepid employees, and instead to pin the blame wrongfully on Plaintiff. Their premeditated plan to shield their identities from the public, and let Plaintiff take the fall, has ruined Plaintiff's reputation in the community he has devoted his professional life to, destroyed his sense of safety and wellbeing, and has put him directly in the way of harm.

217. In addition, Defendant Dawson engaged in extreme and outrageous conduct by orchestrating and ratifying a sustained campaign of intimidation and coercion directed at Sharif, including through Defendant Caramanis, to force Sharif to surrender equity and control and to facilitate Defendants' broader scheme. Defendants repeatedly threatened Sharif with financial ruin, destruction of the Company, and physical harm unless he executed documents and took actions demanded by Dawson. These threats included explicit threats of violence and intimidation communicated directly to Sharif, including a threat to "break [Sharif's] jaw," (Exhibit W) and statements that Sharif's "life is over" and that Caramanis "would fuck [Sharif's] whole world up" if Sharif did not sign the demanded documents. (Exhibit X). Such conduct was intended to—and did—terrorize Sharif into compliance.

218. Defendant Caramanis engaged in extreme and outrageous conduct by making harmful statements during numerous live streams that targeted Plaintiff's

professional reputation as a game developer. During those streams, Caramanis made numerous false statements about Plaintiff's alleged role in Intrepid's downfall, including statements accusing him of purposefully defrauding Intrepid investors and employees and attempting to "steal" money allegedly owed to terminated former Intrepid employees. Defendant Caramanis also further claimed, without basis, that Plaintiff would continue to face civil and criminal liability.

219. Defendant Caramanis' campaign of harassment extended beyond Plaintiff's professional reputation and into deeply personal and malicious attacks. During these same live streams and related communications, Caramanis targeted Plaintiff's mental health and character, and repeatedly directed homophobic and other offensive statements at him. When asked whether he had physically harmed Plaintiff, Caramanis did not disavow such conduct but instead stated that he wished he had actually done so. In addition, Caramanis sent a message to Plaintiff's mother describing Plaintiff as "the devil" and stating that she should have had an abortion.

220. This conduct is more than improper; it is extreme and outrageous, exceeding all bounds tolerated in a civilized society. Defendant Caramanis made these statements as part of a deliberate and coordinated scheme to scapegoat Plaintiff for Intrepid's collapse while enabling Defendants to seize and monetize the Company's assets for their own benefit. Caramanis' sustained campaign of false accusations and targeted attacks exposed Plaintiff to public vilification and fear for his safety. As a direct result of this conduct, Plaintiff has suffered, and continues to suffer, severe emotional distress, including profound damage to his reputation, loss of personal security, and ongoing fear of harm.

221. Board Defendants and Caramanis intended to cause Plaintiff severe emotional distress, or acted with reckless disregard of the probability that Plaintiff would suffer such distress, by deliberately subjecting him to a campaign of threats, coercion, harassment, and scapegoating, including threats of physical violence and ruin, while knowing Sharif's identity and reputation were uniquely tied to *Ashes of*

58

*Creation* and that Board Defendants and Caramanis' actions would expose him to public vilification and fear for his personal safety.

222.    As a direct and proximate result of Board Defendants and Caramanis' conduct, Plaintiff has suffered and continues to suffer severe emotional distress, including anxiety, fear, humiliation, loss of sleep, disturbance of daily functioning, and other symptoms of mental anguish.

### EIGHTH CLAIM FOR RELIEF

(Civil Conspiracy)

AGAINST ALL BOARD DEFENDANTS AND TFE

223.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

224.    This cause of action is brought as a derivative claim on behalf of the Company and as a direct claim by Sharif.

225.    Throughout the duration of Board Defendants' membership on the board of directors at Intrepid, Board Defendants knowingly and willfully conspired and agreed among themselves and TFE to directly or indirectly misappropriate and disclose the Company's confidential and proprietary business information, trade secrets, and intellectual property to Defendant TFE, and/or the organizers, officers, managers, or employees of Defendant TFE, and to use the Company's trade secrets and intellectual property for the benefit of Board Defendants and TFE, and with a deliberate intent to injure the Company. They also agreed to hide their identities in anticipation of public fallout and leave Plaintiff Sharif to take the blame for the failure of the Company and the project *Ashes of Creation*.

226.    Each of the Board Defendants and TFE knowingly performed the actions herein alleged pursuant to, and in furtherance of, the conspiracy.

227.    As a direct and proximate result of this misconduct, the Company, Derivative Plaintiffs and Plaintiff Sharif have suffered and continue to suffer substantial money damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF

(Conversion of Corporate Assets)

AGAINST BOARD DEFENDANTS

228.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

229.   This cause of action is brought as a derivative claim on behalf of the Company.

230.   At all relevant times, the Company owned and had the immediate right to possession of its corporate assets, including but not limited to, the Trade Secret materials.

231.   Board Defendants intentionally and wrongfully converted the Company's assets through a wrongful foreclosure and disposition—wrongful both on the basis of defects in the secured debt underlying the foreclosure and TFE's credit bid, and defects in the foreclosure procedure—and by subsequently transferring the Trade Secret materials to a new entity, TFE, which was created and controlled by Defendant Dawson.

232.   As a direct and proximate result of Board Defendants' wrongful conversion, substantial harm was caused to the Company, Plaintiff, and Derivative Plaintiffs, including the loss of shareholder value, the misappropriation of corporate intellectual property and trade secrets, the forfeiture of legitimate business opportunities, reputational damage, and the incurrence of significant legal and remedial costs.

## TENTH CLAIM FOR RELIEF

(Civil Extortion)

AGAINST DEFENDANTS DAWSON AND CARAMANIS

233.   Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

234.   This cause of action is brought as a direct claim on behalf of Plaintiff

Sharif.

235.    Defendants Dawson and Caramanis engaged in a deliberate and unlawful scheme to obtain control of the Company and its equity through extortionate threats, coercion, and abuse of Dawson's position as a lender and controlling shareholder. On information and belief, Defendants Dawson and Caramanis agreed that Caramanis would act on Dawson's behalf to communicate threats, escalate pressure, and coerce Plaintiff into surrendering equity and control. Dawson acted both directly and through Caramanis, whom Dawson used as an intermediary and enforcer to communicate threats, escalate pressure, and compel Plaintiff's compliance with Dawson's demands.

236.    Starting in 2023, Defendants Dawson and Caramanis repeatedly threatened Plaintiff with serious bodily harm, financial ruin, and the public exposure of purported criminal conduct unless Plaintiff acquiesced to Defendant Dawson's demands for increased equity, corporate control, and contractual concessions. These threats included, among other things, threats to withhold financing for employee payroll and health-insurance funding immediately before payroll deadlines, to shut down the Company through litigation, and to ruin Plaintiff financially and reputationally; they also included explicit threats of physical violence, including a threat to "break [Plaintiff's] jaw," (Exhibit W) and statements that Plaintiff's "life is over," that Caramanis was "NOT fucking around," and that he "would fuck [Plaintiff's] whole world up" if Plaintiff did not sign certain documents. (Exhibit X).

237.    Among other things, Defendant Dawson threatened: (1) to cause serious physical and financial harm to Plaintiff and his loved ones; (2) to destroy the Company through litigation; (3) to destroy the Company by withholding funds necessary to process payroll and health insurance; and (4) to publicly accuse Plaintiff of criminal wrongdoing, regardless of truth, and "put him in jail" unless Plaintiff complied with Dawson's demands. Dawson further exploited Plaintiff's known medical vulnerability by escalating his threats while Plaintiff was physically and emotionally compromised.

238.   Defendant Caramanis further advanced this coercive scheme by sending Plaintiff threatening text messages stating, among other things, that Plaintiff needed to understand "who [he was] fucking with," urging Plaintiff to "push [him] more," and threatening to push a "nuclear war button" if Plaintiff and Moore did not comply with Dawson's demands. Defendant Caramanis also threatened that Defendants Dawson and Caramanis would begin "aggressively attacking" Plaintiff and the Company, commence litigation, pursue involuntary bankruptcy, and obliterate payroll if Plaintiff did not yield. These threats were made in furtherance of Defendant Dawson's effort to force Plaintiff to surrender control and execute documents under duress.

239.   Defendant Dawson and Caramanis' threats were wrongful, coercive, and unlawful, and were made with the intent to instill fear and to deprive Plaintiff of his rights in the Company.

240.   As a direct result of these threats, Defendant Dawson extracted equity and control of the Company by forcing restructuring, converting his debt into equity on terms favorable to him, then attempting to reinstate that equity back into purportedly secured debt while retaining substantial equity, diluting Plaintiff's ownership interest, and consolidating Dawson's voting power and board control.

241.   Even after obtaining substantial control, Defendants Dawson and Caramanis continued the same coercive campaign by escalating threats of reputational destruction and public accusation. Acting in concert, they threatened to publicly accuse Plaintiff of criminal and financial misconduct and then amplified those accusations through Defendant Caramanis' subsequent public campaign, all in furtherance of the same effort to intimidate Plaintiff, isolate him, and deprive him of his rights in the Company.

242.   Defendants Dawson and Caramanis acted in concert and for their mutual financial benefit as aligned lenders and investors in Intrepid, including through their shared interest in extracting value and control from the Company.

243. As a direct and proximate result of Defendant Dawson and Caramanis' extortionate conduct, Plaintiff suffered substantial damages, including but not limited to: (1) dilution and loss of value of his equity interest; (2) loss of voting power and corporate control; (3) loss of future economic expectancy; (4) consequential financial and reputational harm; and (5) physical and health-related harm, including lasting complications.

244. Defendants Dawson and Caramanis' conduct was willful, malicious, oppressive, and undertaken with conscious disregard for Plaintiff's rights.

245. As a direct and proximate result of Defendant Dawson and Caramanis' conduct, Plaintiff has also suffered and continues to suffer severe emotional distress, including anxiety, fear, humiliation, loss of sleep, disturbance of daily functioning, and other symptoms of mental anguish.

## ELEVENTH CLAIM FOR RELIEF

### (Defamation)

AGAINST DEFENDANTS DAWSON, OGDEN, AND CARAMANIS

246. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

247. This cause of action is brought as a direct claim on behalf of Plaintiff Sharif.

248. Defendants Dawson, Ogden, and Caramanis made and caused to be published numerous false and defamatory statements of fact about Plaintiff, orally and written, to the gaming community, investors, employees, prospective hires, creditors, business counterparties, and the public at large, including through livestream broadcasts, YouTube comments, direct communications, and republication through third parties

249. These statements included false accusations that Plaintiff was responsible for Intrepid's collapse; that Plaintiff stole, embezzled, or misappropriated Company funds; that Plaintiff defrauded investors, creditors, employees, or banks;

WITHERS BERGMAN LLP

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

that Plaintiff intentionally withheld funds from employees for personal benefit; and that Plaintiff lied about the Company's finances, revenues, business relationships, and development milestones

250. Defendants made and republished these statements to thousands of members of the gaming public and to specific third parties, including investors, former employees, industry colleagues, Aream, prospective hires, creditors, and other business contacts, with the intent that the statements be repeated and believed

251. On February 14, 2026, February 26, 2026, March 7, 2026 and April 15, 2026, Defendant Caramanis caused to be published numerous false and defamatory statements about Plaintiff by participating in four separate live streams broadcasted publicly on YouTube by NefasQS (together the "Live Streams").

252. Defendant Caramanis made statements on these Live Streams accusing Plaintiff as solely responsible for the demise of Intrepid.

253. Defendant Caramanis caused these statements to be made publicly to thousands of viewers resulting in hundreds of comments demonstrating third parties viewed and understood these comments to implicate Plaintiff in the demise of intrepid.

254. On information and belief, Defendants Dawson, Ogden, and Caramanis agreed that Dawson and Ogden would provide Company documents to Caramanis so that Caramanis could use and publicly disseminate those materials, together with false and misleading accusations, as part of the campaign against Plaintiff. In furtherance of that agreement, on information and belief, Defendants Dawson and Ogden provided Caramanis with Company documents knowing that Caramanis intended to use those materials in his public campaign against Plaintiff, including by pairing them with false and misleading accusations for broader dissemination, and Caramanis did so. As a direct and proximate result of that agreement and the acts taken in furtherance of it, Plaintiff suffered reputational injury and Intrepid suffered damage to its goodwill and corporate value.

255. The statements were false at the time of publication because Plaintiff was not responsible for Intrepid's demise. To the contrary, Sharif did not have control over Intrepid as of June 2024; starting in 2023, Defendants Dawson and Caramanis worked together to secure increased equity stakes in Intrepid, reinstate previously converted debt to discourage a fair market sale of Intrepid's assets, position Defendant Dawson to wrongfully foreclose on Intrepid, and illicitly transfer all of Intrepid's assets to a separate entity, TFE, in violation of California law; the Board Defendants approved of the wrongful termination of all Intrepid employees in violation of California labor laws; and Plaintiff resigned in mid-January 2026 in light of the foregoing.

256. Viewers of the YouTube Live Streams could reasonably determine that the statements were clearly about Plaintiff because each hours long video was devoted to discussing the demise of Intrepid and Plaintiff was explicitly named by both the YouTube host, NefasQS, and Defendant Caramanis and discussed at length in each video as being responsible for such demise.

257. Defendant Caramanis' statements are defamatory because they have, and continue to, expose Plaintiff to extreme contempt and ridicule by fans of *Ashes of Creation* and have the general tendency to harm Plaintiff in his occupation as a video-game developer.

258. Defendant Caramanis knew that the statements were false when publishing the statements because he made these statements intentionally in furtherance of a scheme to pin the blame for Intrepid's downfall on Plaintiff alone and, simultaneously frame the Board Defendants and Defendant Caramanis as the saviors of Ashes of Creation.

259. Defendants knew these statements were false when they made them, or acted with reckless disregard for their truth or falsity. Defendants made the statements maliciously and in furtherance of a scheme to scapegoat Plaintiff, shield themselves from blame, depress Intrepid's value, and position themselves to benefit from the

Withers
Bergman LLP

65

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

Company's distress.

260. Defendants' statements are defamatory per se because the defamatory meaning is apparent on the face of the statements and without the necessity of explanatory matter. As a result of Defendants' publication of the statements, Plaintiff has suffered general damages due to loss of reputation, shame, and mortification. Specifically, the damage to Plaintiff's reputation is evidenced by hundreds of comments on each Live Stream that echo Defendant Caramanis' words that Sharif is a "liar," a "scammer," a "narcissist," and "guilty" of everything Defendant Caramanis falsely accused him of.

## TWELFTH CLAIM FOR RELIEF

(Declaratory Judgment)

AGAINST DEFENDANTS DAWSON AND TFE)

261. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

262. This cause of action is brought as a derivative claim on behalf of the Company.

263. Defendants Dawson and TFE contend that Dawson (and now TFE) holds a valid and perfected security interest in Intrepid's assets, including its intellectual property and trade secrets, and that they therefore have the right to foreclose on those assets and credit bid on those assets.

264. Plaintiff disputes Defendants' contention. An actual, present, and justiciable controversy exists between Plaintiff and Defendants Dawson and TFE regarding whether Dawson or TFE possesses any enforceable security interest in Intrepid's assets and any lawful right to conduct a foreclosure or other Article 9 disposition, and a right to credit bid at any such foreclosure.

265. As alleged herein, the existence and enforceability of any such security interest is independently defeated by multiple facts and legal grounds.

266. First, Dawson repeatedly "ping-ponged" Intrepid's capital structure

between purported debt and equity. In May 2024, Dawson converted and cancelled tens of millions of dollars of purported debt in exchange for equity and control, expressly terminating the underlying debt obligations on which any purported security interest would depend.

267. The operative promissory notes and related instruments Defendants rely upon expressly undermine Defendants' assertion that Dawson's debt is secured by Intrepid's assets and foreclosable under Article 9. Although Dawson points to a March 2022 security agreement (Dkt. 99-2), that agreement secures only the specific Note it references, plus any additional obligation only if a separate executed document states that such obligation "is secured hereby." (*Id*. at 3, § 3(c).) Of the twenty executed Notes in Plaintiff's possession, each expressly provides that the obligations are "unsecured and subordinated" to senior indebtedness. (Exhibits A-T.) Dawson and TFE therefore overstate—substantially—the existence and scope of any enforceable security interest. To the extent Defendants contend that Dawson later "reinstated" or "reconstituted" debt following the May 2024 conversions, any such reinstatement was on the terms of the original notes and instruments—which, again, expressly provide that the obligations are unsecured and subordinated. Those express contractual disclaimers are inconsistent with Defendants' position that Dawson's debt is secured by Intrepid's assets and foreclosable and credit-biddable under Article 9.

268. Second, even if Dawson and/or TFE did possess a valid security interest, Defendants' January 16, 2026 Article 9 disposition and transfer of Intrepid's assets to TFE extinguished any security interest that Dawson or TFE might claim to have held in the collateral. (Cal. Com. Code § 9617(a)). Having completed that disposition, Defendants cannot do it again by asserting a continuing lien interest in the same collateral to justify a second foreclosure. Nor did Defendants actually "unwind" or rescind the January 16 transaction. Defendants did not void the original foreclosure sale or restore the parties to the status quo ante; instead, TFE purported to transfer or assign back to Intrepid the rights in the assets TFE had already acquired in the original

Article 9 sale, through a subsequent Assignment and Assumption of Assets and Bill of Sale. (*See* Dkt. 58-1 at 4.) That later assignment did not rescind the original transaction, or revive or preserve the lien extinguished by the January 16 disposition.

269. Defendants have further indicated their intent to foreclose again imminently. Absent declaratory relief, Plaintiff and Intrepid face ongoing uncertainty and the continued threat that Defendants will again attempt to seize, use, transfer, or sell Intrepid's most valuable assets under the guise of a non-existent or extinguished security interest.

270. Plaintiff therefore seeks a declaration that Defendants Dawson and TFE do not possess any valid, enforceable, or foreclosable security interest in Intrepid's assets, and that they have no lawful right to conduct any further Article 9 foreclosure, disposition, or sale of Intrepid's collateral.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief as follows:

1. Voidance of any corporate acts taken in violation of fiduciary duties or applicable law, including the wrongful foreclosure;

2. Compensatory damages in an amount to be proven at trial;

3. Consequential damages;

4. Punitive damages;

5. An order requiring the Company to adopt and implement appropriate corporate governance, compliance, and oversight reforms, including, but not limited to:

   a. Removal of the Board Defendants from the Board of Intrepid;

   b. Enhanced board-level oversight mechanisms;

   c. Institution of a receiver;

   d. Revised policies governing risk management, internal controls, or compliance;

        e.  Changes to executive compensation, clawback, or incentive structures;

        f.  Board or committee reconstitution and independence measures;

6. Constructive trust;

7. Disgorgement of profits;

8. Attorney's fees, costs, and expenses;

9. Costs of suit herein;

10. Pre-judgment and post-judgment interest;

11. A declaration that Defendants Dawson and TFE do not possess any valid, enforceable, or foreclosable security interest in Intrepid's assets, and therefore have no lawful right to conduct any Article 9 foreclosure, disposition, or sale of Intrepid's collateral;

12. Such other and further relief as the Court deems just and proper.

DATED:  May 15, 2026          WITHERS BERGMAN LLP


By:  */s/ Jordan W. Garman*
Jessica Nall (SBN 215149)
jessica.nall@withersworldwide.com
Withers Bergman LLP
909 Montgomery Street, Suite 300
San Francisco, California 94133
Telephone:  415.872.3200

Leslie Evans (SBN173010)
Leslie.Evans@withersworldwide.com
4250 Executive Square, Suite 540
La Jolla, CA 92037
Telephone: 619.329.6454

Jordan W. Garman (admitted *pro hac vice*)
jordan.garman@withersworldwide.com
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone: 212.848.9882

*Attorneys for Plaintiff Steven Sharif as an individual and derivatively on behalf of Intrepid Studios, Inc.*

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT

## **VERIFICATION**

I, Steven Sharif, am the plaintiff in this proceeding. I have reviewed the allegations made in this Amended Shareholder Derivative Complaint and know the contents thereof, and authorize its filing. The allegations are true of my own knowledge, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 15, 2026



WITHERS
BERGMAN LLP

71

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DIRECT COMPLAINT