Samuel A. Schwartz, Esq.
  (admitted *pro hac vice*)
Nevada Bar No. 10985
saschwartz@nvfirm.com
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

Samuel B. Strohbehn, Esq.
California Bar No. 257697
sstrohbehn@rosinglaw.com
Amara S. Barbara, Esq.
California Bar No. 323332
abarbara@rosinglaw.com
Maddie Rudge, Esq.
California Bar No. 362727
mrudge@rosinglaw.com
ROSING POTT & STROHBEHN LLP
770 1st Avenue, Suite 200
San Diego, California  92101
Telephone: (619) 235-6000

*Attorneys for Defendants Robert Dawson,
Ryan Ogden, Theresa Fette, Aaron Bartels,
and TFE Games Holdings, LLC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT DAWSON; RYAN OGDEN; THERESA FETTE; AARON BARTELS; and TFE GAMES HOLDINGS, LLC,<br><br>Defendants,<br><br>and<br><br>INTREPID STUDIOS, INC.,<br><br>Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF STEVEN SHARIF'S MOTION FOR RECEIVER**<br><br>*Supporting Declarations of Robert Dawson, Theresa Fette, Ryan Ogden, Douglas Bartels, and Tim Sharif filed contemporaneously*<br><br>Judicial Officer: Hon. Linda Lopez<br>Courtroom: 14B (14th Floor)<br>Hearing Date: June 11, 2026<br>Hearing Time: N/A<br><br>Action Filed: February 14, 2026<br>Trial Date: Not Set |

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

In his Motion for Receiver ("**Plaintiff's Receiver Motion**"), Plaintiff Steven Sharif ("**Plaintiff**" or "**Mr. Sharif**") seeks the appointment of a "receiver over Intrepid with full equitable and exclusive powers to possess, control, preserve, or sell the assets as necessary; operate and manage the business; conduct financial

administration and accounting; litigate claims; and ensure legal and court compliance." Plaintiff's Receiver Motion at Page 29 of 30, lines 10-13. Plaintiff's Receiver Motion is substantively and procedurally deficient, however, and falls far short of making the necessary showing for the appointment of a receiver of limited scope, let alone a receiver with the unbridled powers requested by Plaintiff. Plaintiff cannot make such a showing because the appointment of a receiver is not necessary. In addition to being unjustified, Plaintiff's proposed receivership would be prohibitively expensive, cause irreparable harm to Defendants, and, of course, Plaintiff is not offering to fund it. As such, it would lead only to the further fruitless dissipation of the assets of Intrepid Studios, Inc. ("**Intrepid**" or the "**Company**"), and correspondingly, TFE's collateral.

Knowing that his motion was procedurally and factually deficient, Plaintiff sought to narrow his requested relief, by notice only (not an amended motion), on the eve of the deadline for the filing of this Opposition. *See* ECF 95 (the "**Noticed Relief**").[1] For the same reasons set forth herein, Plaintiff's belated request for limited relief also fails.

This lawsuit was initiated by Plaintiff to contest the validity of the January 16, 2026 foreclosure (the "**First Foreclosure**") of Intrepid's assets by TFE Games Holdings, LLC ("**TFE**"). The First Foreclosure was rescinded on March 25, 2026 (the "**Rescission**") and substantially all assets of Intrepid (the "**Collateral**") were returned. Though the appointment of a receiver is not necessary, any legitimate concerns about the foreclosure process can be addressed by the appointment of a limited receiver tasked only with marshaling, preserving and safeguarding Intrepid's Collateral;

---

[1] As discussed further below, since filing Plaintiff's Receiver Motion Plaintiff has offered to rein in, somewhat, the scope of his proposed receivership but it remains unnecessarily broad including an investigation into the validity of the liens on which the foreclosure is based (liens which Plaintiff has admitted are valid in his verified complaint) and authorizing legal action against non-party Jason Caramanis, who is the plaintiff in a separate lawsuit brought against Mr. Sharif relating to his extensive misconduct while he was an officer of Intrepid.

monitoring any Article 9 foreclosure process; and issuing a report to the Court as to the propriety of the Article 9 foreclosure process. This is exactly what is being proposed in Defendants' Counter-Motion for Receiver (the "**Counter-Motion**"), which is being filed concurrently with this opposition (the "**Opposition**"). Defendants would be willing to fund such a limited receivership up to $65,000. There is significant overlap between the relief sought between the parties. Where Defendants do not follow Plaintiff is to the creation of a receivership that amounts to a roving commission, tasked, among other things, with investigating the validity of Defendants' liens and to start legal challenges against the Defendants and non-parties – which authority permeates both Plaintiff's motion and its eleventh-hour request for limited relief. Defendants do not agree to such a broad scope and will not agree to fund it as it would cause irreparable harm. Plaintiff's Receiver Motion should be denied and, to the extent this Court deems the appointment of a receiver necessary, it should be a receivership limited to the terms set out in Defendants' Counter-Motion.

## II.      STATEMENT OF FACTS

### A.      Intrepid's Current Standing

Intrepid is not operating.  The Company does not have revenue.  The Board of Director Defendants are struggling to gain access and control of the Collateral. Appointing a receiver with a broad mandate in this case, including with the ability to bring claims against non-parties (as proposed in Plaintiff's Receiver Motion and in the Noticed Relief) would cause irreparable financial harm to Intrepid and TFE's collateral.  As set forth herein, such relief does not meet the standards required for the appointment of a receiver in the Ninth Circuit.

### B. Intrepid's Longstanding Lack of Effective Corporate Governance

From Intrepid's inception on May 20, 2015, through approximately October 2025, the Company operated without any formal board of directors or managers. *See* Fette Declaration, par. 5 During that entire period—Mr. Sharif and his husband, John Moore, were the only C-level officers, collectively serving as CEO, COO, CFO, and

CTO. *Id.* They exercised exclusive and unilateral control over all corporate decisions, finances, and operations with no independent governance oversight. *Id.*

The Board of Directors met in August 2025, but formally convened for the first time in October 2025, and has remained active since that time. *Id.*, par. 6. The Board operated through formal processes with regular meetings, notices, and collective decision-making. *Id.*, par. 16. Mr. Sharif participated fully. *Id.*

**C. The Convertible Line of Credit Promissory Note, Pledge and Security Agreement, and Related Documents, were Properly Documented, Valid, and Effective Contracts.**

Robert D. Dawson and Intrepid Studios, Inc. ("**Intrepid**") entered into the Convertible Line of Credit Promissory Note on March 23, 2022, in the amount of $8,000,000.00 (the "**Line of Credit Note**"). *See* Line of Credit Note, attached as Exhibit A to the Dawson Decl. The Line of Credit Note was secured by a Pledge and Security Agreement ("**Security Agreement**") dated March 23, 2022; specifically, the Security Agreement provides:

> **Intrepid Studios, Inc. is the borrower in the concurrently executed Promissory Note ("Note") <u>dated March 23, 2022</u> by and between Borrower and Secured Party.** As collateral for all sums borrowed by Borrower under the Notes from Secured Party, the Borrower pledges a lien and security interest in certain assets belonging to Borrower. The Borrower warrants and represents that he has the power and authority to pledge an ownership/lien interest in Borrower's assets to Secured Party.

*See* Security Agreement, Recital A, attached as Exhibit B to the Dawson Decl. The Security Agreement covers the following assets of Intrepid: (a) All assets belonging to the Borrower, including, but not limited to, shares, intellectual property, software, all real property, personal property, trademarks, licenses, cash, accounts and notes receivable, inventory, equipment, and any and all other assets, intangible or tangible, belonging to Borrower; and (b) All proceeds of the foregoing, whether voluntary or involuntary. Security Agreement, Sec. 2.

One year later, Mr. Sharif, on behalf of Intrepid, solicited additional funds from Mr. Dawson. On March 21, 2023, Mr. Dawson and Intrepid entered into a Convertible

Promissory Note in the amount of $1,400,000.00 (the "**Convertible Note**"). *See* Convertible Note, attached as Exhibit C to the Dawson Decl. The Convertible Note expressly incorporated the Security Agreement. See Convertible Note, Sec. 7. The Convertible Note expressly required Intrepid to issue a warrant to Mr. Dawson to purchase stock, specifically:

> 6. Warrants. As an additional inducement to extend the loan set forth herein, the Company shall issue to Holder (or its designee) a non-dilutable warrant equal to 1.5% of the Company's common stock to be issued at direction of Holder.

*See* Exhibit C, Sec. 6.

Of the fifty-four separate Notes (defined herein), forty-nine of them required that Intrepid contemporaneously issue a warrant to Mr. Dawson for the purchase of Intrepid stock. Despite this requirement, Mr. Sharif delayed causing Intrepid to issue the Warrant to Purchase Membership Interests of Intrepid until or around July 14, 2023. *See* Motion for Receiver at Exhibit 17. Furthermore, Mr. Sharif failed to cause Intrepid to issue warrants for all Notes that were executed after July 14, 2023, despite Mr. Dawson's demands that Intrepid comply with the Notes. *See* Directive for Issuance of Warrants dated April 23, 2024, May 15, 2024, and July 8, 2025, collectively attached as Exhibit D to the Dawson Decl.

Plaintiff accuses Mr. Dawson of impropriety regarding the Warrant to Purchase Membership Interests but fails to explain to the Court that each promissory note issued prior to July 14, 2023, between Intrepid and Mr. Dawson contained a fractional interest that adds up to 10.037%.[2] Accordingly, the Warrant to Purchase Membership Interests for ten percent (10%) of non-voting interest in Intrepid for $10.00 was in compliance with the Notes dated before July 14, 2023.

---

[2] The 10.037% ownership interest has a contractual basis as it was contained in the following promissory notes: March 21, 2023 (1.5%); March 30, 2023 (1.715%); April 20, 2023 (1.152%); May 12, 2023 (0.838%); May 26, 2023, as amended (0.3125%); May 31, 2023 (0.5875%); June 2, 2023 (0.5875%); June 14, 2023 (0.844%); June 29, 2023 (1.338%); and July 13, 2023 (1.1625%).

The Convertible Note was the start of Mr. Sharif's bi-monthly requests to Mr. Dawson for additional funds for Intrepid. Indeed, throughout 2023, Mr. Dawson loaned $22,880,000.00 to Intrepid through 22 separate promissory notes (collectively, the "**2023 Notes**"). In 2024, Mr. Dawson loaned $18,176,831.54 to Intrepid through 20 separate promissory notes (collectively, the "**2024 Notes**"). In 2025, Mr. Dawson loaned $29,424,000.00 to Intrepid through 12 separate promissory notes (the "**2025 Notes**," collectively, the "**Notes**"). Ultimately, there are 54 promissory notes that identify the $78,480,831.54 loaned to Intrepid by Mr. Dawson. Contrary to Mr. Sharif's misrepresentation in par. 12 of his Declaration, all of the Notes expressly reference the Security Agreement and, thus, are secured.

On May 13, 2024, Mr. Dawson caused a UCC-1 Financing Statement to be filed with the State of California (the "**Financing Statement**"). *See* Financing Statement, attached as Exhibit E to the Dawson Decl. The Financing Statement provided notice that the Collateral was security for Mr. Dawson; specifically:

> All assets and all personal property of Debtor, wherever located and whenever acquired, including, but no limited to: Equipment, Inventory, Fixture, Goods, Instruments, Chattel paper (including without limitation Electronic Chattel Paper), General Intangibles, payment Intangibles, Accounts and all other obligations now or hereafter owing to Grantor, all Deposit Accounts, cash, and money, certificates of deposit, Investment Property, Financial Assets, Letters of Credit Rights, all Commercial Tort Claims and any other causes of action against third parties (excluding only claims for death or personal Injury), As-Extracted Collateral, Intellectual property, copyrights, trademarks trade names, all Supporting Obligations for any of the foregoing, all Proceeds (including without limitation insurance proceeds) from and products of and accessions to any of the foregoing and all books and records relating to any of the foregoing. Terms and used herein shall have the meaning provided in the applicable Uniform Commercial Code.

*Id.*, p. 1. Mr. Dawson never canceled or released the Financing Statement, so it is still in effect.

**D. Robert Dawson Continues to Fund Intrepid After Execution of the Convertible Note Assignment, Conversion Agreement, and the Convertible Note Conversion Agreement.**

Following execution of the Convertible Note Assignment and Conversion

Agreement, and the Convertible Note Conversion Agreement (collectively "**Equity Conversion Agreements**"), Mr. Dawson continued to fund Intrepid. Indeed, Mr. Dawson loaned Intrepid a total of $36,757,831.54 from June 14, 2024, through December 4, 2025. None of the $36,757,831.54 was subject to the debt-to-equity conversion that was later voided by Intrepid and Mr. Dawson through the amendments to the Equity Conversion Agreements. Notably, Mr. Sharif – at the time of the amendments in July 2025 – agreed the debt-to-equity conversion should be voided because it would increase his respective ownership percentage of Intrepid.

### E. Steven Sharif Induced Loans and Investments with False Representations, and Wasted and Misappropriated Intrepid's Assets.

On February 8, 2021, Mr. Sharif provided Mr. Dawson and other investors with projected monthly cash flow models for 2021 and 2022. *See* Dawson Declaration, par. 10. These projections were material representations upon which Mr. Dawson relied in making continued investment decisions. *Id.* The 2021 financial projections represented Intrepid would generate approximately $⬛ in gross revenue in 2021, with monthly revenues escalating from $⬛ in January to $⬛ by December 2021. *Id.*, par. 11. The projections showed Intrepid reaching a positive cash position of approximately $⬛ by year-end 2021 and generating EBIT of negative $⬛. *Id.*

The 2022 financial projections were exponentially more aggressive. Mr. Sharif projected gross revenue of approximately $⬛ for calendar year 2022, with monthly revenues reaching $⬛ by December 2022. *Id.*, par. 12. The projections showed Intrepid ending 2022 with a cash position of approximately $⬛ and generating EBIT of approximately $⬛. *Id.* These projections were based on a game "Launch" occurring in approximately April 2022 with revenues of $⬛ in the launch month alone, growing to $⬛ per month by June 2022. *Id.*

These projections were wildly, recklessly, and materially false. *Ashes of*

*Creation* did not launch in April 2022, and – in hindsight – could never have launched on that timeframe. *Id.*, par. 13; Fette Declaration, pars. 7-8. The revenues projected in these models never materialized — not in 2022, not in 2023, not in 2024, and not in 2025. *See* Dawson Declaration, par. 13; Fette Declaration, pars. 7-8. Indeed, *Ashes of Creation* has never generated revenue even remotely approaching these projections. *See* Dawson Declaration, par. 13.

The actual revenues from the Phase 3 launch in August 2025 were approximately $▮▮▮-$▮▮▮ per day — a fraction of a fraction of what Mr. Sharif projected. *Id.* Mr. Sharif represented that $▮▮▮▮▮ would finish and launch the game in 2022. *Id.*, par. 14. That figure has since risen to over $▮▮▮▮, and, Mr. Sharif still has been unable to launch the completed game. *Id.* The gap between Sharif's representations and reality is not a matter of reasonable business judgment or optimistic forecasting — it reflects a pattern of systematic misrepresentation designed to induce continued investment. *Id.*

In addition to the false financial projections and systematic misrepresentations described above, Mr. Sharif engaged in a pattern of financial misappropriation and self-dealing with Company funds. *Id.*, par. 37. Mr. Sharif routinely used Company reimbursed credit cards and Company funds to pay for personal expenses that had no legitimate business purpose. *Id.*, par. 38. These included personal travel, luxury goods, dining, entertainment, and other lifestyle expenditures charged directly to the Company. *Id.*  At a time when the Company was perpetually cash-strapped — when Mr. Dawson was being pressured on a bi-weekly basis to fund emergency payroll — Mr. Sharif was treating the Company's accounts as his personal checkbook and as a quasi-grant program for his family and close friends. *Id.* These charges were never disclosed to or approved by the board. *Id.*

On July 24, 2025, Mr. Sharif sent a spreadsheet to Mr. Dawson and Mr. Douglas Bartels showing financial transactions including: Personal Transfers/CC Payments of $10,154,746.42; Business Expenses on Personal CC of $3,134,971.98;

Deposits into Company of $4,219,900.00; Transferred to Personal Account of $2,187,239.21; and Personal Contributions of $2,124,264.75, which spreadsheet was related to an audit CFO Ryan Ogden ("**Ogden**") was facilitating for the Company. *See* Fette Declaration, par. 9; *see* Ogden Declaration, par. 3. These figures reveal substantial commingling of personal and business funds. *See* Douglas Bartels Declaration, pars. 11-14. Despite repeated requests, Mr. Sharif could not corroborate any of these payments constituted valid business expenses. *See* Fette Declaration, par. 9. All of these transactions were recorded by an accountant hired by Mr. Sharif and managed by Mr. Sharif and his husband John Moore. *Id.* There was no Board in place and no independent financial controls during this period. *Id.*

Mr. Sharif later increased his own compensation without board authorization or approval. *See* Dawson Declaration, par. 39. As CEO, Mr. Sharif unilaterally set and escalated his own salary and benefits at levels that were never presented to or ratified by Company's board. *Id.* In January 2024, Mr. Sharif and Mr. Moore unilaterally raised Mr. Moore's salary to $480,000 per year, and in March 2024, raised Mr. Sharif's salary to $480,000 per year. *See* Fette Declaration, par. 10. This compensation was not approved by any Board, was not industry standard for a pre-revenue company of this size and was implemented unilaterally during a period of acute financial distress. *Id.* The Board subsequently directed Ms. Fette to ask Aream & Associates to benchmark industry-standard CEO compensation. The benchmark came back at $250,000–$400,000 with a 2–3% equity kicker and exit bonus. *Id.* The salary increases occurred while the Company was operating at a significant loss, while employees were being told that layoffs might be necessary, and while note holders were being pressured to provide emergency capital to cover basic operating expenses, including payroll. *See* Dawson Declaration, par. 39. Mr. Sharif's self-authorized compensation represented a direct misappropriation of investor capital and breached his duty of loyalty to the Company.

Mr. Sharif maintained exclusive control over the Company's financial

accounts, payment processing systems (including PayPal and Stripe), and banking relationships throughout his tenure as CEO. *Id.*, par. 40. He resisted all board efforts for transparency into the Company's financial operations and refused to provide the board with direct access to financial records and systems. *Id.* Upon information and belief, Mr. Sharif directed or caused Company revenue to be diverted to accounts or entities under his personal control, or to be used for purposes other than legitimate Company operations. *Id.*

Mr. Ogden, as CFO, requested full access to Gusto, the company's payroll and independent contractor payment system, on multiple occasions. *See* Ryan Ogden Declaration, par. 6. Mr. Sharif provided Ogden with access to the employee payroll portion but deliberately withheld access to other modules. The capital loaned to, and invested in, the Company was provided for the purpose of developing and launching *Ashes of Creation*. Mr. Sharif deployed this capital in ways that were inconsistent with, and at times directly contrary to, the representations he made to induce these various investments to fund the Company's operations and mission-critical prerogatives. Funds that were represented as necessary for game development, payroll, and operational expenses were instead diverted from their originally intended use and used to sustain Mr. Sharif's personal lifestyle, fund unauthorized expenditures, and support a corporate structure designed to insulate Mr. Sharif from accountability rather than to advance the Company's business objectives. Mr. Sharif's original $███████ projection for finishing the game ballooned to over $████████ — with no completed product to show for it — in substantial part because of the systematic diversion of Company resources for non-business purposes. The totality of Mr. Sharif's financial misappropriations — personal expenses on Company accounts, unauthorized compensation increases, diversion of revenue, misuse of investor capital, and self-dealing through document manipulation — demonstrates a pattern of conduct that is fundamentally incompatible with his current position before this Court as a fiduciary seeking equitable relief. The party who misappropriated

Company funds cannot credibly petition the Court to appoint a receiver to protect those same funds from the Board that was attempting to stop Mr. Sharif's serial and bad faith misappropriations.

Among the misrepresentations Mr. Sharif made to induce continued investments in Intrepid was a purported deal with Riot Games, the developer of League of Legends and one of the largest gaming companies in the world. *See* Dawson Declaration, par. 16. Mr. Sharif represented Riot Games had expressed significant interest in a strategic relationship with Intrepid. *Id.* Upon information and belief, the terms and nature of this purported "deal" were materially overstated or fabricated, and no binding agreement or significant commercial relationship with Riot Games ever materialized. *Id.*

Mr. Sharif also made misrepresentations to the public regarding how Intrepid was funded. In numerous YouTube videos and public statements, Mr. Sharif held himself out as having funded Intrepid entirely by himself with his own money. *Id.*, par. 35. This was, of course, false. The Company received approximately $125 million in total capital from outside investors, with approximately $78,480,83.54 in principal from Mr. Dawson. *Id.* Mr. Sharif also stated he and John Moore had invested $5 million and $1.35 million respectively, when – now – he only claims to have personally guaranteed certain portions of the Company's debt. *Id.*, par. 36.

Mr. Sharif also made misrepresentations to Company employees regarding how the Company was governed. *Id.*, par. 33; Fette Declaration, par. 17. After repeated Board requests over an extended period, Mr. Sharif arranged introductions to the executive team. *See* Dawson Declaration, par. 33. Rather than introducing board members in their governance capacity, Mr. Sharif introduced Mr. Dawson and Ms. Fette to executive team personnel as his personal "friends." *Id.* At no point did Mr. Sharif disclose the Board members' governance authority, titles, or oversight responsibilities. *Id.* This deliberate concealment had a devastating consequence: when the Board later took necessary governance actions, the employees — from whom the

Board members' status, authority, and responsibilities had been deliberately and misleadingly withheld by Mr. Sharif — viewed Board members as hostile interlopers rather than the legitimate governing body it both was and is. *Id.*, par. 34. Mr. Sharif manufactured this perception deliberately. *Id.*

**F. Mr. Sharif – Routinely – Refused to Execute Contracts for Intrepid Despite Accepting Loan Proceeds from Promissory Note Holders.**

A critical and recurring pattern was Mr. Sharif's refusal to execute legal documentation memorializing the terms of certain contracts. *Id.*, par. 17; *see also* generally the Tim Sharif Declaration filed concurrently herewith. For example, on numerous occasions, Mr. Sharif would agree to terms to induce Mr. Dawson to send the money Intrepid ostensibly needed, with accompanying promises by Mr. Sharif of signing the contracts that same day, but Mr. Sharif would then refuse to sign after receiving the money. *See* Dawson Declaration, par. 17. By January 23, 2023, Mr. Dawson had loaned approximately $17 million to the Company without signed documents, while Mr. Sharif ignored Mr. Dawson or attempted to change and/or re-trade the previously agreed upon terms after the parties had already struck their deal. *Id.*, par. 18. When Mr. Dawson engaged attorneys to formalize terms, Sharif and Mr. Dawson would reach agreement, and then Mr. Sharif would attempt to change and add terms through the Company's attorney. *Id.* When Mr. Dawson complained about Mr. Sharif refusing to sign the contracts, Mr. Sharif made explicit threats about the game's development if Mr. Dawson did not continue funding. *Id.*, par. 19. Notably, it was Mr. Sharif who wanted Mr. Dawson's initial investment backdated because Mr. Sharif had brought in investors at unrealistically higher valuations before Mr. Dawson funded the Line of Credit Note, and Mr. Sharif needed to reconcile the discrepancy. *Id.*, par. 20.

**G. Mr. Sharif Destroyed Intrepid to Protect Himself**

On multiple occasions, Mr. Sharif approached note holders and/or investors, including Mr. Caramanis and Mr. Dawson, to demand they provide or arrange

financing for Mr. Sharif's personal residence to prevent its loss through strict foreclosure. *Id.*, par. 24. Mr. Dawson agreed to assist only because Mr. Sharif had no other available financing options — no institutional lender was willing to offer Mr. Sharif acceptable mortgage terms. *Id.* Mr. Sharif persuaded Mr. Caramanis and Mr. Dawson into purchasing the approximately $4,000,000 first mortgage on the real property by threatening to quit and leave *Ashes of Creation* if his husband lost the house. *Id.*, par. 25. Mr. Dawson warned that this put Intrepid at risk as Mr. Dawson was not liquid and was rapidly running out of cash. Ultimately, Pathway Bank bought the mortgage from Mr. Caramanis and Mr. Dawson, and the two investors in turn put the $4,000,000 into Intrepid to make payroll. *Id.*

In January 2026, when Mr. Sharif was unable to obtain the equity terms he demanded as a condition of continuing as CEO, he did not resign gracefully or act in the Company's interest. *See* Fette Declaration, par. 14. Rather, Mr. Sharif notified CommerceWest Bank of the Article 9 foreclosure proceedings, knowing that CommerceWest Bank would immediately commence seizing the Company's funds. *Id.* The Board had always intended to honor CommerceWest Bank's loan and delayed formal notice to Commerce Bank to preserve Intrepid's ability to make payroll for its employees. *Id.* Mr. Sharif's notification caused CommerceWest Bank to demand all Steam revenue, thereby precluding the Company's ability to make payroll. *Id.* Upon information and belief, Mr. Sharif was motivated not only by the failed equity negotiations but also by the fact Commerce Bank held a $1.3 million escrow from the sale of his personal residence, which had been pledged as collateral for the loan. *Id.* Mr. Sharif's conduct in triggering the Commerce Bank crisis to protect his personal $1.3 million escrow while simultaneously destroying Intrepid's ability to make payroll for its employees constitutes a clear breach of his fiduciary duties and duty of loyalty as a director and officer of the company.

A fiduciary may not place his personal financial interests above those of the company and its stakeholders. Illustratively, Mr. Sharif received CommerceWest

Bank's default notice approximately two days before his resignation on January 19, 2026, and concealed that notice from the Board. *Id.*, par. 15.  Later the Board was informed it was Mr. Sharif's notification to CommerceWest Bank that ultimately caused the financial collapse of the company. *Id.*, pars. 14-15. Mr. Sharif admits he received the CommerceWest Bank default notice the day before resigning, without advising the Board of the default notice. *Id.*, par. 15.

**H. The Note Holders, Investors, and Board Members Have Always Behaved Professionally Towards Mr. Sharif Despite His Repeated Failures, Refusal to Implement the Board's Directives and Bad Faith.**

Mr. Sharif failed to make cuts to operating expenses and headcount as directed by Intrepid's Board on numerous occasions. *See* Dawson Declaration, par. 29; *See* Fette Declaration, par. 11. When it was apparent that cash was running out, Mr. Sharif would provide new financial projections showing that revenue would materialize through sales in a very short window of time. *See* Dawson Declaration, par. 29.  These projections were consistently and dramatically wrong. *Id.*

The Board's restructuring plan that was contemplated as early as October 2025, called for the reduction of approximately 100 employees, to be carried out in stages. *See* Fette Declaration, pars. 11-12. This phased approach was designed to minimize disruption and treat departing employees with dignity. Mr. Sharif's persistent insubordination and constant postponement of the layoffs, which he delayed from the originally planned timeline through repeated objections and counterproposals, reduced the planned reduction from 100 employees to only 10. *Id.*, par. 11.  Each week of delays cost the company hundreds of thousands of dollars, money the company did not have. Mr. Sharif's refusal to execute the Board's restructuring plan on a timely basis caused continuing and compounding financial harm to the very company and employees he now claims to be protecting. *Id.*

Mr. Sharif promised a November 2025 Early Access launch on Steam, but it was clear he was not ready and the development team was not even aware of the

deadline. *See* Dawson Declaration, par. 30. Mr. Sharif promised that if Intrepid was funded another 30 days — approximately $▮▮▮▮ — the December 2025 Early Access launch would generate in excess of $▮▮▮▮ in December alone. *Id.* Mr. Sharif did not hit his revenue projection of $▮▮▮▮ for December, achieving only 30% of that projection. *Id.* The Board met in December 2025 and acknowledged revenues had fallen far short, the Company was running out of money, and drastic cuts were necessary. Mr. Sharif refused to make those cuts. *Id.*, par. 31. Instead, he continued to resist every effort at fiscal discipline and operational restructuring. Ms. Fette, Aaron Bartels, and Mr. Dawson all repeatedly urged Mr. Sharif to execute the workforce reductions the Board had approved. *Id.* Each week of delays cost the Company hundreds of thousands of dollars it did not have. *Id.*

Mr. Sharif has alleged that following the December 15, 2025, Board meeting, Mr. Dawson confronted him in a physically intimidating manner and coerced him to sign documents. *See* Sharif Declaration, par. 18. This allegation is false. *See* Dawson Declaration, par. 27; Fette Declaration, par. 20. Mr. Dawson never touched Mr. Sharif. *See* Dawson Declaration, par. 27.  Never coerced him. *Id.*  Never physically menaced him in any manner. *Id.* Following the December 15, 2025, Board meeting, Mr. Dawson did speak with Mr. Sharif. *Id.*, par. 28. Indeed, the Board had been attempting, over an extended period, to obtain information, execute governance decisions, and address the Company's dire financial condition — and had been systematically obstructed by Mr. Sharif at seemingly every turn. *Id.*, par. 28. The documents presented to Mr. Sharif reflected decisions that had been discussed and made at Board meetings in which Mr. Sharif participated. *Id.*  The request that he execute signature pages for decisions already made by the Board was a routine governance request. *Id.*

The Motion alleges at Paragraphs 71–77 the Board Defendants "unilaterally imposed" layoffs. This is false. Mr. Sharif was an active, knowing participant in workforce reduction planning although, as discussed above, Mr. Sharif acted far too

slowly to implement desperately needed labor cuts. *See* Fette Declaration, par. 12. On December 26, 2025, Mr. Sharif acknowledged: "It's a rough expectation to terminate those people the day after Christmas. And with no PTO payout? How will we survive that backlash." *Id.*  He was not objecting to the layoffs themselves, he was negotiating timing, cost, and messaging.  Due to Mr. Sharif's continued insubordination, the Company became increasingly unable to meet its financial obligations and was forced to make difficult business decisions in an effort to keep the Company afloat. *Id.*, pars. 11-13. On December 30, 2025, Mr. Sharif counter-proposed delaying layoffs until after the DICE conference (February 10–13, 2026), estimating that delay would "basically cost 600k above and beyond the current severance proposal." *Id.*, par. 12. And on January 20, 2026, Mr. Sharif was "trying to write the layoff messaging for the studio." *Id.*  Mr. Sharif is named in a related WARN Act class action lawsuit precisely because of this involvement as a decision-maker, not a mere bystander.

## I.  The Article 9 Sale Has Not Been Set.

On March 25, 2026, TFE Games Holdings, LLC voluntarily set aside and rescinded the Article 9 sale and returned all Collateral, including Ashes of Creation and all associated intellectual property, to Intrepid subject to its extant and enforceable liens. *See* Dawson Declaration, par. 32. This was accomplished through an Assignment and Assumption of Assets and a Bill of Sale, both executed on March 25, 2026. *Id.* The assets were transferred back to Intrepid subject to TFE's existing, valid, and legally enforceable liens. There is no active foreclosure proceeding. *Id.*  The very premise of Sharif's receiver motion — that assets need to be protected from a foreclosure sale — has been rendered moot by this voluntary transfer. The assets are back in Intrepid's hands, subject to existing security interests, and there is no current sale process for a receiver to oversee.

/ / /

/ / /

/ / /

## III.    LEGAL ARGUMENT

### A. Receiverships Are An Extraordinary Equitable Remedy and Plaintiff Bears a Heavy Burden to Demonstrate Its Necessity

The party seeking appointment of receiver has a "heavy burden" – which exceeds a mere preponderance of the evidence. *See Wickes v. Belgian American Educational Foundation, Inc.*, 266 F. Supp. 38, 40 (S.D.N.Y. 1967) (limiting receiver appointments to cases of necessity and requiring a clear showing that an emergency exists, and a movant faces a heavy burden in seeking appointment of a receiver). Writing for a unanimous Supreme Court nearly a century ago on federal equity receiverships, Justice William O'Douglas echoed a well-understood distinction in federal equity receivership practice by distinguishing between errors in appointing receivers predicated upon questions of authority, versus errors predicated upon questions of propriety. *See Kelleam v. Maryland Casualty Co.,* 312 U.S. 377, 380 (1941) ("The error in appointment was not a question of authority but of propriety.") (citations omitted).  Plaintiff's Receiver Motion skews far too heavily to the issue of this Court's *authority* to appoint a receiver and not its *propriety*.

The parties agree the non-exhaustive list of factors used to guide federal courts in the Ninth Circuit in whether to appoint a federal equity receiver under Civil Rule 66, include the following: (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct by the defendant; (3) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered, (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and, (7) whether the plaintiff's interests sought to be protected will in fact be well-served by receivership." *Canada Life Assur. Co. v. LaPeter,* 563 F.3d 837, 844 (9th Cir. 2009).

While the parties agree with respect to the applicable factors here, Plaintiff

jumps right into a discussion of the "broad discretion in appointing a receiver". (Doc. No. 78-1, pg. 20 of 30, lines 7 – 21). Rendered all the more conspicuous by its absence is the Ninth Circuit's directly and immediately applicable observation that a "receiver is an extraordinary equitable remedy, which should be applied with caution." *Id.* at 844. The Ninth Circuit was not breaking new ground in noting either the extraordinary nature of the receivership remedy nor the need for federal courts to be sparing in their use of the same.

Indeed, in *Kelleam*, the Supreme Court laid out in painstaking detail why the receivership remedy must be jealously guarded, and invoked sparingly, by federal courts only in extreme situations:

> A receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity. *It is not an end in itself.* Receiverships for conservation of property are to be watched with jealous eyes lest their function be perverted … *This Court has frequently admonished that a federal court of equity should not appoint a receiver where the appointment is not a remedy auxiliary to some primary relief which is sought and which equity may appropriately grant.*

*Kelleam*, 312 U.S. at 381 (emphasis added) (internal quotation marks and citations omitted); *see also Aviation Supply Corp. v. RSBI Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993). These restrictions are omitted entirely from Plaintiff's Receiver Motion. Not only does this hamstring the legal standard applicable to Plaintiff's request for relief, but it also impoverishes the analysis of the applicable factors identified by the *Canada Life* Court because Plaintiff's submissions misapprehend what is at stake here. Perhaps the best example of Plaintiff's diminished analysis appears in his discussion of the alleged irreparable harm he will suffer if his requested relief is not granted, as set forth below in Section B.

**B. Plaintiff's Claims of Irreparable Harm Absent A Receiver Must Fail, As The Appointment Of A Receiver Must Be A Means, Not An End.**

In his discussion of irreparable harm, Plaintiff contends in error the following, "The absence of any neutral gatekeeper – who can sort through the legality of Mr.

Dawson's and TFE's original purported lien ahead of any sale and otherwise shepherd a commercially reasonable sale – at the moment of disposition is precisely what makes the harm irreparable." (Doc. 78-1, pgs. 24 – 25 of 30). Plaintiff's contemplated use of a receivership to oversee the "end" of the foreclosure process (where the receiver's foreclosure oversight capacity is an end unto itself) is fatal to Plaintiff's Receiver Motion.

Specifically, Plaintiff invites this Court to commit reversible error by appointing a receiver under circumstances materially indistinguishable from those that prompted the Supreme Court to reverse the lower court's appointment of a receiver in *Kelleam*. The controversy in *Kelleam* involved a probate proceeding in the Oklahoma state courts involving a surety on the probate administrator's bond. *Kelleam*, 312 U.S. at 381. A dispute broke out between various descendants in connection with the state probate proceedings that also threatened to ensnare the surety's bonded probate administrator, with the state court proceedings ultimately being subjected to collateral attack in the federal district court in Oklahoma. *Id.* As part of the Oklahoma federal district court action, the probate administrator's surety sought to be exonerated on its bond and, in furtherance of those efforts and to preserve property of the probate estate pending the outcome of the dispute between the competing heirs, sought the appointment of a receiver, claiming its remedies at law were inadequate. *Id.* at 379. The Supreme Court reversed the federal district court's appointment of the receiver. *Id.* at 380 ("We think the bill [seeking the receiver's appointment] should have been dismissed.").

The Supreme Court saw through the surety's efforts in obtaining the receiver's appointment, "The essential purpose of the bill was to secure the appointment of a receiver so as to conserve the property and to impress it with a lien for the surety's protection." *Id.* Recognizing that the surety's interest extended only to its request for exoneration and did not represent a stake in any particular outcome of the heirs' disputes, the Supreme Court then observed, "In this posture of the case it is manifest

19                                        26cv00965-LL-MMP

that respondent-surety sought the receivership not as a means to an end but as an end in itself." *Id.*

Plaintiff's arguments regarding the alleged invalidation of Defendants' liens by virtue of the now-rescinded private Article 9 foreclosure sale and that Defendants now have access (as Intrepid Board members) to the restored assets is equally unavailing. Plaintiff has not cited any authority for the remarkable proposition that a technical defect in a foreclosure process somehow amounts to a lien forfeiture with respect to a secured creditor. Indeed, Defendants cited California state law authority that is directly on point that refutes Plaintiff's position on this front. The most Plaintiff could bring himself to do is attempt to distinguish Defendants' authority and cite inapplicable statutory law on properly completed foreclosures for the proposition a lien forfeiture by Defendants is somehow required or supported here. Again, it is not surprising that, even in the aftermath of the recent Great Recession and all the foreclosures that took place during that time period, Plaintiff did not manage to cite a single case directly on point in support of Plaintiff's novel and remarkable lien-forfeiture argument. This line of argument changes nothing and Defendants respectfully call upon the Court to reject it out of hand.

Similarly, Plaintiff's argument Intrepid's restored assets can somehow be reached by Defendants (in their capacities as Intrepid Board members) is equally unavailing. Plaintiff does not cite any authority, again for the rather remarkable proposition, that Intrepid's properly constituted board of directors and officers should somehow not have access to Intrepid's assets, or that such access qualifies as irreparable harm. This unsupported argument ought to be ignored. This is especially so in a situation where the most Plaintiff can bring himself to argue is that any asset disposition through foreclosure "is not only likely not legal" or similar equivocal/agnostic statements. Indeed, Plaintiff seeks to reassign the daunting task of invalidating Dawsons' and TFE's liens to a contemplated receiver. This constitutes a fundamental misapprehension of the receiver's role as an agent of the Court, and not

someone who would act here as Plaintiff's agent. *See, e.g., Ledbetter v. Farmers Bank & Trust Co.,* 142 F.2d 147, 150 (4th Cir. 1944).

It is beyond manifest Plaintiff's request for the appointment of a receiver is an end in itself; rather, it is judicially admitted. As Plaintiff contends in error that his arguments on irreparable harm somehow satisfy factors three (property being in imminent danger), four (inadequate legal remedies), and the second half of six (possibility of irreparable harm to the Plaintiff), the admission that the receivership is the end unto itself is fatal to Plaintiff's motion. Defendants understand the *Canada Life* test is not a talismanic list of factors to be applied or that any one factor is necessarily dispositive; however, a request for drastic and extraordinary relief in the form of the appointment of a federal equity receiver that fails to establish adequately how legal remedies are inadequate, how the Plaintiff is likely to suffer irreparable harm, and the property being in imminent danger, again by its own admission, fails the *Canada Life* standard. And that is exactly the case here. Defendants respectfully submit Plaintiff's Receiver Motion should be denied on this basis alone.

**C. There Is No Imminent Danger To The Collateral And Plaintiff Cannot Establish A Likelihood of Success On The Merits.**

Plaintiff claims he will succeed on the following three sets of claims: (1) misappropriation of trade secrets; (2) wrongful (original) foreclosure under California Commercial Code; and (3) breach of fiduciary duty. (Doc. 78-1, pg. 22 of 30, lines 2 – 4). Plaintiff contends this line of argument satisfies the first *Canada Life* factor, and the first half of the sixth *Canada Life* factor. (*Id.* at lines 4 – 6). Plaintiff is again mistaken.

As the Supreme Court noted in *Kelleam*, "A receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity." 312 U.S. at 381. The *Kelleam* Court went on to observe, "This Court has frequently admonished that a federal court of equity should not appoint a receiver where the appointment is not a remedy auxiliary to some primary relief which is

sought *and which equity may appropriately grant*." *Id.* (emphasis added).

But Plaintiff admits with respect to his foreclosure claims, "That Defendants purport to have unwound that sale does not change the fact that Plaintiff is likely to succeed on this claim because Defendants did engage in this unlawful conduct *and did damage Intrepid in doing so.*" (Doc. 78-1, pg. 22 of 30, lines 19 – 21) (emphasis added). Plaintiff advanced a damage theory with respect to his misappropriation claims, as well, "The same is true for Plaintiff's trade secret claims, where this Court credited Plaintiff's misappropriation of trade secret claims through wrongful acquisition based on TFE acquiring the trade secrets material through an unlawful foreclosure sale." *Id.* at pgs. 22 -23).

What Plaintiff's arguments overlook and omit is that the claims upon which Plaintiff contends he is likely to succeed have to be tied or linked to the drastic and extraordinary equitable remedy of receivership. Here, Plaintiff never even attempts to make this showing of how a receiver is necessary to remedy the unwound foreclosure sale.

Plaintiff's breach of fiduciary duty claims do not fare any better because they either suffer from the same defect as Plaintiff's misappropriation and foreclosure claims or, to the extent any equitable relief is sought in connection with Plaintiff's breach of fiduciary duty claims, why the extraordinary equitable remedy of a receivership, and not some lesser remedy, is appropriate here. For these reasons, Defendants respectfully submit Plaintiff's showing on both the first and the first half of the sixth *Canada Life* factors fall far short of mark. Plaintiff's Receiver Motion should be denied on this basis, as well.

**D. Plaintiff Has Not Shown Fraudulent Conduct By the Defendants.**

The entirety of Plaintiff's fraud claims rest on the unwound foreclosure sale. Defendants have gone to great lengths, however, in their statement of facts above and in the accompanying Declarations, to demonstrate that the conduct Plaintiff seeks to portray (albeit unsuccessfully) here as "fraudulent" or "bad faith" amounts to nothing

more than: (1) Plaintiff chafing under, actively trying to subvert, and otherwise avoid the robust corporate governance and oversight procedures implemented by Defendants in an effort to bring *Ashes of Creation* to market and keep Intrepid operating as a viable going concern; and (2) the efforts to which Defendants have gone to aid Intrepid financially after receiving repeated representations from Plaintiff that the market entry of *Ashes of Creation* (and the related returns on their investments) were imminent. Defendants have been "turning the corner" for the better part of this decade and have nothing to show for it. As the statement of facts and Declarations demonstrate, Defendants have been patient, understanding, and supportive (to a fault) throughout this process. It was only when Intrepid ran out of road financially that Defendants' hand was forced to seek to monetize *Ashes of Creation* for the benefit of Intrepid and all of its stakeholders. Again, Plaintiff's argument on the second *Canada Life* factor is without merit, and without more, should be rejected by this Court. Plaintiff's Receiver Motion should be denied on this basis, as well.

**E. The Balance of the Equities Weigh Against A Receiver's Appointment and Plaintiff Has Unclean Hands.**

Plaintiff contends his arguments on the balance of the equities satisfies factors five and seven of the *Canada Life* standard. Defendants respectfully submit that is simply not the case. As discussed at greater length above and in the Declarations accompanying this Opposition, Defendants have been waiting for years to see a return on their investments in Intrepid and its development of *Ashes of Creation*. Plaintiff has disingenuously and in bad faith portrayed Defendants as lacking in patience and that they somehow rushed to purportedly terminate Intrepid's operations prematurely. These claims are specious. The blame for Intrepid's current state of affairs must be laid where it properly belongs: at Plaintiff's feet. On multiple occasions when Intrepid was in dire and desperate need of funds to meet its obligations, make payroll, pay vendors, and otherwise meet its obligations, Defendants answered the call.

Consistently. Plaintiff makes much of *Ashes of Creation* constituting his dream or passion project. What is minimized in this worldview is how much of Defendants' dreams, efforts, sacrifice, hard work, drive, and determination is bound up in the loans made to Intrepid. All of this is lost on Plaintiff as, in his mind, it is only his suffering that matters.

The key fact here for the Court to assimilate is that it is Defendants who are injured by every day, hour, minute and second of delay in bringing *Ashes of Creation* to market. That game is undoubtedly worth more today than it will be after months or years of litigation and the market ultimately moves on. But that is the whole point of Plaintiff's litigation strategy. Delay benefits Plaintiff, not Defendants. The longer Plaintiff can keep the litigation going, the more the Defendants stand to lose. It is the Defendants who stand to be damaged and, depending on the duration of any litigation-based delay, irreparably so. Plaintiff, by contrast, is currently acting in a derivative capacity as an out-of-the-money shareholder holding less than 5% of Intrepid. The balance of the equities clearly weighs in Defendants' favor. Defendants respectfully submit Plaintiff's Receiver Motion should be denied on this basis, as well.

## IV.    CONCLUSION

For all the reasons set forth above and in the supporting declarations, no receiver is necessary or appropriate. As a threshold matter, on March 25, 2026, TFE Games Holdings, LLC voluntarily set aside the Article 9 sale and transferred all Collateral — including Ashes of Creation and all associated intellectual property — back to Intrepid Studios, Inc. There is no active foreclosure proceeding. The very premise of Sharif's receiver motion has been eliminated. The assets Sharif claims need protection have been returned to the Company, subject to existing liens. There is nothing for a receiver to oversee, administer, or protect from foreclosure because there is no foreclosure.

Mr. Sharif holds approximately 4.91% of the Company's equity. His economic interest is minimal compared to the creditors and investors whose capital is at stake.

Mr. Sharif's personal financial exposure — the $1.3 million escrow tied to the CommerceWest Bank loan — gives him a concrete individual motive that has nothing to do with asset protection. The Receiver Motion is the judicial continuation of the same campaign that began with the unauthorized bank contact and the post-resignation system lockout: an effort to prevent legitimate governance from functioning by every available mechanism — operational, then judicial.

A party who caused the irreparable harm cannot petition for emergency equitable relief based on that harm. A party who engineered or participated in a post-resignation operational lockout cannot credibly petition the court to protect those same assets from the Board he locked out. A party with unclean hands — documented self-dealing, financial misappropriation, personal expenses charged to the Company, unauthorized compensation, false projections, and concealment of the board's existence — cannot invoke this Court's equity to obtain a receiver. Moreover, now that the Article 9 sale has been set aside and all assets returned to Intrepid, the factual predicate for receiver appointment no longer exists.

Dated: May 7, 2026.

By: /s/ Sasha Aliakbar-Amid

Samuel A. Schwartz, Esq.
(admitted *pro hac vice*)
Nevada Bar No. 10985
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101

Samuel B. Strohbehn, Esq.
California Bar No. 257697
Amara S. Barbara, Esq.
California Bar No. 323332
Maddie Rudge, Esq.
California Bar No. 362727
ROSING POTT & STROHBEHN LLP
770 1st Avenue, Suite 200
San Diego, California 92101

*Attorneys for Defendants Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels, and TFE Games Holdings, LLC*

25                              26cv00965-LL-MMP