Samuel A. Schwartz, Esq.
  (admitted *pro hac vice*)
Nevada Bar No. 10985
saschwartz@nvfirm.com
Sasha Aliakbar-Amid, Esq.
California Bar No. 334162
samid@nvfirm.com
SCHWARTZ, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

Samuel B. Strohbehn, Esq.
California Bar No. 257697
sstrohbehn@rosinglaw.com
Maddie Rudge, Esq.
California Bar No. 362727
mrudge@rosinglaw.com
Amara S. Barbará, Esq.
California Bar No. 323332
abarbara@rosinglaw.com
ROSING POTT & STROHBEHN LLP
770 1st Avenue, Suite 200
San Diego, California 92101
Telephone: (619) 235-6000

*Attorneys for Defendants Robert Dawson,
Ryan Ogden, Theresa Fette, Aaron Bartels,
and TFE Games Holdings, LLC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT DAWSON; RYAN OGDEN; THERESA FETTE; AARON BARTELS; and TFE GAMES HOLDINGS, LLC,<br><br>Defendants,<br><br>and<br><br>INTREPID STUDIOS, INC.,<br><br>Nominal Defendant. | Case No.: 3:26-cv-00965-LL-MMP<br><br>**DECLARATION OF ROBERT DAWSON IN SUPPORT OF THE OPPOSITION TO PLAINTIFF'S MOTION FOR APPOINTMENT OF RECEIVER**<br><br>Judicial Officer: Hon. Linda Lopez<br>Courtroom: 14B (14th Floor)<br>Hearing Date:  June 11, 2026<br>Hearing Time: N/A<br><br>Action Filed: February 14, 2026<br>Trial Date: Not Set |

I, ROBERT DAWSON, declare as follows:

1.     I am the Chairman of the Board of TFE Games Holdings, LLC, a secured lender of Intrepid Studios, Inc. ("**Intrepid**" or the "**Company**"). I have served as Chairman of the Board since September 2024, and as a majority shareholder since July 2024. I am also the principal secured creditor of the Company. I submit this

1                                          26cv00965-LL-MMP

July 2024. I am also the principal secured creditor of the Company. I submit this declaration in opposition to Plaintiff Steven Sharif's Motion for Appointment of Receiver.

2.    I make this declaration based on my own personal knowledge. If called as a witness, I could and would testify competently to all facts set forth herein. The following exhibits attached hereto are true and correct copies:

- Line of Credit Note, attached as **Exhibit A**;
- Security Agreement, attached as **Exhibit B**;
- Convertible Note, attached as **Exhibit C**;
- Directive for Issuance of Warrants dated April 23, 2024, May 15, 2024, and July 8, 2025, collectively attached as **Exhibit D**; and
- Financing Statement, attached as **Exhibit E**.

## I.    MY PROFESSIONAL BACKGROUND AND EXPERIENCE.

3.    I am a results-oriented professional with over eighteen years of broad-based experience and visible achievements in law, business development, strategic business partnerships, and emerging markets. I hold a Baccalaureate degree in Accounting and a Juris Doctorate degree from the University of Nebraska College of Law. My professional background includes:

**Director, Chairman, and Majority Shareholder, Pathway Bank:** Since 2019, I have served as Director, Chairman, and Majority Shareholder of Pathway Bank in Cairo, Nebraska. In this capacity, I oversee bank governance, strategic direction, and financial oversight, providing me with extensive experience in corporate governance, fiduciary responsibility, and financial management.

**Chief Legal Officer and Founder, Jeunesse:** From 2009 to 2020, I served as Chief Legal Officer and Founder of Jeunesse in Lake Mary, Florida. I oversaw all aspects of the Legal, Accounting, and Finance teams; participated in the definition and development of corporate policies, procedures, and programs; served as key lawyer and legal advisor on all major business transactions, including acquisitions, divestitures, and joint ventures; assumed ultimate responsibility for ensuring that the company conducted its business in compliance with applicable laws and regulations; and advised on legal aspects of the company's financing, including assessing and advising on current and future business structures and legal entities.

**Board Member, KAAPA Ethanol Holdings, LLC:** From 2011 to 2018, I served as a Board Member of KAAPA Ethanol Holdings, LLC in Minden, Nebraska, gaining experience in board-level governance and oversight of a significant operating enterprise.

**Partner, Hart, Dawson & Sudbeck, P.C., L.L.O.:** From 1996 to 2012, I served as a Partner at Hart, Dawson & Sudbeck, P.C., L.L.O. in Cozad, Nebraska, where I assisted a large agricultural client base with tax structuring, financial analysis, debt restructuring, and succession planning.

**Attorney, Ernst & Young:** From 1995 to 1996, I served as an Attorney in the Entrepreneurial Services Consulting Group at Ernst & Young in Kansas City, Missouri.

4.     I am not, and have never been, a professional video game developer. Prior to my involvement with Intrepid, I had no experience in the gaming industry. I was introduced to Steven Sharif through Jason Caramanis in October 2020. I relied on Mr. Sharif's representations regarding the gaming industry, the development status of *Ashes of Creation*, and the Company's financial projections in making my investment decisions.

5.     I received no compensation of any kind for my service as Chairman of the Board. My role was undertaken voluntarily and at substantial personal financial cost, motivated by my good-faith desire to protect the capital I had invested and to give the Company and its project the best possible chance of commercial success.

II.    **CHRONOLOGY OF MY INVESTMENT AND MR. SHARIF'S PATTERN OF INDUCING CONTINUED CAPITAL CONTRIBUTIONS.**

6.     I have invested approximately $78,000,000 in Intrepid across its history, in the form of equity investments and debt financing. No other investor contributed capital at a comparable level. The Company would not have survived to the point of its 2025 Steam Early Access launch without my continued financial support.

7.     My loans to the Company were made on a rolling basis, typically timed to meet urgent payroll and operating obligations that Mr. Sharif represented were critical to the Company's survival.

8.    I never desired to be a major shareholder in a gaming company. I stated on numerous occasions that I did not want to continue making loans and that I lacked the desire and, increasingly, the liquidity to continue funding at the pace and volume Mr. Sharif demanded.

9.    Despite my clear and repeated statements that I could not and would not continue funding the Company indefinitely, Mr. Sharif continued to press for additional investment. In several instances, the timing of bi-weekly payroll deadlines was used as a mechanism to pressure me to provide funds on an emergency basis, leaving me little practical ability to refuse without causing immediate harm to Company employees.

## III.    MR. SHARIF'S FALSE FINANCIAL PROJECTIONS INDUCED MY CONTINUED INVESTMENT

10.    On February 8, 2021, Mr. Sharif provided me and other investors with projected monthly cash flow models for 2021 and 2022. These projections were material misrepresentations upon which I relied in making continued investment decisions.

11.    The 2021 Projections represented that Intrepid would generate approximately ▮▮▮▮▮ in gross revenue in 2021, with monthly revenues escalating from ▮▮▮▮ in January to ▮▮▮▮ by December 2021. The projections showed the Company reaching a positive cash position of approximately ▮▮▮▮ by year-end 2021 and generating Earnings Before Interest and Taxes ("EBIT") of negative ▮▮▮▮. These projections were based on the "Alpha 1 Sales Ramp" beginning in the first quarter and "Alpha 2 Sales Ramp" beginning in approximately August 2021.

12.    Mr. Sharif projected gross revenue of approximately ▮▮▮▮ for calendar year 2022, with monthly revenues reaching ▮▮▮▮ by December 2022. See ECF 58, Exhibit B. The projections showed the Company ending 2022 with a cash position of approximately ▮▮▮▮ and generating EBIT of approximately

4                          26cv00965-LL-MMP

███████. These projections were based on a game "Launch" occurring in approximately April 2022 with revenues of ███████ in the launch month alone, growing to ███████ per month by June 2022.

13. These projections were wildly, recklessly, and materially false. The game did not launch in April 2022. Alpha 2 did not launch as projected. The revenues estimated in these models never materialized — not in 2022, not in 2023, not in 2024, and not in 2025. As of this declaration, the game has never generated revenue remotely approaching these projections. The actual revenues from the Phase 3 launch in August 2025 were approximately ███████ per day — a fraction of a fraction of what Mr. Sharif projected.

14. Mr. Sharif represented that ███████ would finish and launch the game in 2022. That figure has since risen to over ███████, and as of the date of this declaration, Mr. Sharif has been unable to launch the completed game. In my experience, the gap between Mr. Sharif's representations and reality is not a matter of reasonable business judgment or optimistic forecasting — it reflects a pattern of systematic misrepresentation designed to induce continued investment.

15. Copies of representative communications and financial documents setting forth these estimates are attached hereto as **Exhibit F**.

## IV. THE RIOT GAMES MISREPRESENTATION.

16. Among the misrepresentations Mr. Sharif made to induce my continued investment was a purported deal with Riot Games, the developer of League of Legends and one of the largest gaming companies in the world. Mr. Sharif represented that Riot Games had expressed significant interest in a strategic relationship with Intrepid. Upon information and belief, the terms and nature of this purported "deal" were materially overstated or fabricated, and no binding agreement or significant commercial relationship with Riot Games materialized. I relied on this misrepresentation, among others, in deciding to continue providing capital to the Company when I otherwise would not have done so. I do not recall whether the

voicemail from Feb. 4, 2023 [Sharif Declaration, Ex. 4], related to the offer from Riot, but I never told Mr. Sharif to cause Intrepid to reject a binding agreement with Riot Games. Mr. Sharif also represented that Riot indicated a "high 9-figure valuation "makes sense." Copies of representative communications and documents setting forth these estimates are attached hereto as **Exhibit G**.

## V.    MR. SHARIF REFUSED TO SIGN AGREEMENTS DESPITE ACCEPTING MY FUNDS.

17.    A critical and recurring pattern throughout my involvement with the Company was Mr. Sharif's refusal to execute legal documentation memorializing the terms of my investment. On numerous occasions, Mr. Sharif would agree to terms to induce me to send the money needed, with promises of signing the documents that same day. I would wire the funds as agreed, and Mr. Sharif would then refuse to sign after receiving the money.

18.    By January 23, 2023, I had approximately ███████ invested in the Company with no signed documents, and I could not even get a response from Mr. Sharif. When we engaged attorneys to formalize terms, Mr. Sharif and I would reach agreement, and then he would attempt to change and add terms through the Company's attorney. I did not agree to those changed terms and made clear I was not willing to fund on different terms than what we had agreed.

19.    On May 31, 2023, I made it clear I was done funding without signed agreements. On June 22, 2023, Mr. Sharif agreed to all of my changes to legal documents, but subsequently changed terms again through the Intrepid attorney for his own benefit. On July 31, 2023, Mr. Sharif made explicit threats about the game's development if I did not continue funding.

20.    Mr. Sharif later wanted my initial investment backdated — not at my request, but because he had brought in other investors at unrealistically higher valuations before bringing me in, and he needed to reconcile the discrepancy. This was Mr. Sharif's initiative, not mine.

21.     Copies of representative communications and documents setting forth these estimates are attached hereto as **Exhibit H**.

**VI.     I NEVER DESIRED CONTROL — I WAS FORCED TO ASSUME GOVERNANCE WHEN MR. SHARIF FAILED**

22.     I was not and am not an aggressive investor seeking to seize control — I am a frustrated financial backer who had poured tens of millions of dollars into a company run by a CEO who repeatedly failed to meet his own projections, refused to execute documents, and resisted all efforts at accountability and governance.

**VII.    THE HOME LOAN — CORRECTING THE RECORD**

23.     Mr. Sharif's complaint and declarations characterize our relationship as one in which I exercised coercive financial control over him. The facts are the inverse of this characterization.

24.     On multiple occasions, Mr. Sharif approached me personally and requested that I provide or arrange financing for his personal residence to prevent its loss through foreclosure. I did not solicit this arrangement and did not wish to carry a personal financial obligation on Mr. Sharif's behalf. I agreed to assist only because Mr. Sharif had no other available financing options — no institutional lender was willing to offer Mr. Sharif acceptable mortgage terms.

25.     Mr. Sharif coerced Jason Caramanis and me into purchasing the approximately ███████ first mortgage on the property by threatening to quit and leave Ashes of Creation if his husband lost the house. Neither Jason nor I wanted to do this. I protested that this put the Company at risk as I was not liquid and was rapidly running out of free cash. Ultimately, Pathway bought the mortgage from Jason and me, and we put the ███████ into Intrepid to make payroll.

26.     Copies of representative communications and documents setting forth these estimates are attached hereto as **Exhibit I**.

/ / /

7                                              26cv00965-LL-MMP

## VIII. THE DECEMBER 15, 2025 BOARD MEETING — CORRECTING MR. SHARIF'S ACCOUNT

27.     Mr. Sharif has alleged that following the December 15, 2025, board meeting, I confronted him in a physically intimidating manner and coerced him to sign documents. This allegation is false. I never touched Steven Sharif. I never coerced him. I never physically menaced him in any manner.  Mr. Sharif's negotiating tactics are described in **Exhibit J**.

28.     Following the December 15, 2025, board meeting, I did speak with Mr. Sharif. I will not deny that I was frustrated. The board had been attempting, over an extended period, to obtain information, execute governance decisions, and address the Company's dire financial condition — and had been systematically obstructed. My expression of frustration was not physical intimidation. The documents presented to Mr. Sharif reflected decisions that had been discussed and made at board meetings in which Mr. Sharif participated. The request that he execute signature pages for decisions already made by the board was a routine governance request. Copies of representative communications and documents setting forth these estimates are attached hereto as **Exhibit K**.

## IX. MR. SHARIF'S REPEATED FAILURE TO MAKE BOARD-DIRECTED CUTS

29.     Mr. Sharif failed to make cuts to operating expenses and headcount as directed by the board on numerous occasions. When it was apparent that cash was running out, Mr. Sharif would provide new financial projections showing that revenue would materialize through sales in a very short window of time. These projections were consistently and dramatically wrong.

30.     Mr. Sharif promised a 2025 November Early Access launch on Steam, but it was clear he was not ready and the development team was not even aware of the deadline. He promised that if I funded another 30 days — approximately ███ — the December Early Access launch would generate in excess of

███████ in December alone. Mr. Sharif did not hit his revenue projection of ███████ for December, achieving only 40% of that projection. The board met in December 2025 and acknowledged that revenues had fallen far short, the Company was running out of money, and drastic cuts were necessary.

31. Mr. Sharif refused to make those cuts. He refused to accept financial reality. Instead, he continued to resist every effort at fiscal discipline and operational restructuring. Theresa Fette, Aaron Bartels, and I all repeatedly urged Mr. Sharif to execute the workforce reduction the board had approved. Each week of delay cost the Company hundreds of thousands of dollars.

## X. THE ARTICLE 9 SALE HAS BEEN SET ASIDE AND ASSETS RETURNED TO INTREPID

32. On March 25, 2026, TFE Games Holdings, LLC voluntarily set aside the Article 9 sale and returned all collateral, including Ashes of Creation and all associated intellectual property, to Intrepid Studios, Inc. This was accomplished through an Assignment and Assumption of Assets and a Bill of Sale, both executed on March 25, 2026. The assets were transferred back to Intrepid subject to TFE's existing liens. There is no active foreclosure proceeding.

## XI. MR. SHARIF CONCEALED THE BOARD'S EXISTENCE FROM EMPLOYEES

33. After repeated board requests over an extended period, Mr. Sharif arranged introductions to the executive team. Rather than introducing board members in their governance capacity, Mr. Sharif introduced us to executive team personnel as his personal "friends." At no point did Mr. Sharif disclose the board members' governance authority, titles, or oversight responsibilities.

34. This deliberate concealment had a devastating consequence: when the board later took necessary governance actions, the employees — who had been told we did not exist — viewed us as hostile interlopers rather than a legitimate governing body. I believe Mr. Sharif deliberately manufactured this perception.

## XII.  MR. SHARIF'S PUBLIC MISREPRESENTATIONS ON FUNDING

35.  In numerous YouTube videos and public statements, Mr. Sharif held himself out as having funded the Company entirely by himself with his own money. This was false. The Company received approximately ▇▇▇▇▇▇ in total capital from outside investors, with approximately ▇▇▇▇▇▇ from me alone.

36.  On March 3, 2023, Mr. Sharif represented that he and John Moore had put in ▇▇▇▇▇ and ▇▇▇▇▇▇, respectively. In his filings, Mr. Sharif claims he personally guaranteed the Company's debt as if it were his own money. He did not personally guarantee any of my loans to Intrepid.

## XIII.  MR. SHARIF'S FINANCIAL MISAPPROPRIATIONS AND SELF-DEALING

37.  In addition to the false financial projections and systematic misrepresentations described above, Mr. Sharif engaged in a pattern of financial misappropriation and self-dealing with Company funds. It was Mr. Sharif who systematically diverted, misused, and misappropriated Company resources for his personal benefit. Mr. Ogden put together a spreadsheet identifying certain transactions that needed to be explained for the audit set for mid-2025 and sent it to Mr. Sharif. Mr. Sharif then sent it back to us without advising that any of the personal transactions with Intrepid funds were incorrect. A copy of the spreadsheet and communication from Mr. Sharif is attached hereto as **Exhibit L**.

38.  Mr. Sharif routinely used Company reimbursed credit cards and Company funds to pay for personal expenses that had no legitimate business purpose. These included personal travel, luxury goods, dining, entertainment, and other lifestyle expenditures charged directly to the Company. At a time when the Company was perpetually cash-strapped — when I was being pressured on a bi-weekly basis to fund emergency payroll — Mr. Sharif was treating the Company's accounts as his personal checkbook. These charges were never disclosed to or approved by the board.

39.     Mr. Sharif also increased his own compensation without board authorization or approval. As CEO, Mr. Sharif unilaterally set and escalated his own salary and benefits at levels that were never presented to or ratified by the board. These increases occurred while the Company was operating at a significant loss, while employees were being told that layoffs might be necessary, and while I was being pressured to provide emergency capital to cover basic operating expenses including payroll. For example, the text message in the Sharif Declaration at Exhibit 11 was sent because Mr. Sharif's husband – John Moore – was being paid by Intrepid when he was no longer an employee. I refused to continue paying Mr. Sharif's husband for service he was not providing.

40.     Upon information and belief, Mr. Sharif directed or caused Company revenue to be diverted to accounts or entities under his personal control, or to be used for purposes other than legitimate Company operations. Mr. Sharif maintained exclusive control over the Company's financial accounts, payment processing systems (including PayPal and Stripe), and banking relationships throughout his tenure as CEO. He resisted all board efforts to obtain transparency into the Company's financial operations and refused to provide the board with direct access to financial records and systems.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on May 7, 2026

/s/ *Robert Dawson*
Robert Dawson

11                                26cv00965-LL-MMP