Theresa C. Becerra, Esq. (State Bar No. 205338)
**SPENCER FANE LLP**
201 Santa Monica Blvd., Suite 550
Santa Monica, California 90401
Telephone: (424) 217-1830
Fax: (424) 217-1854
Email: tbecerra@spencerfane.com

Vincent J. Aiello, Esq. *Pro Hac Vice*
Jason D. Smith, Esq. *Pro Hac Vice*
Tyler B. Thomas, Esq. *Pro Hac Vice*
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: vaiello@spencerfane.com
jdsmith@spencerfane.com
tbthomas@spencerfane.com
*Attorneys for Cross-Claimant and Third-Party Plaintiff Intrepid Studios, Inc.*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC.,<br>Plaintiff,<br>v.<br>ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, TFE GAMES HOLDINGS LLC, and JASON CARAMANIS,<br>Defendants,<br>and<br>INTREPID STUDIOS, INC.,<br>Nominal Defendant. | Case No. 3:26-cv-00965-LL-MMP<br><br>**CROSS-CLAIMANT INTREPID STUDIOS, INC.'S OPPOSITION TO PLAINTIFF/CROSS-DEFENDANT STEVEN SHARIF AND THIRD-PARTY DEFENDANT JOHN MOORE'S MOTION TO COMPEL ARBITRATION AND STAY CROSS-COMPLAINT [ECF NO. 161]**<br><br>**Hearing Date: 09/07/2026**<br>**Courtroom 14B (14th Floor)**<br><br>**Action Filed: 02/14/2026**<br>**Jud. Officer: Hon. Linda Lopez** |
| INTREPID STUDIOS, INC., a California Corporation,<br>Cross-Claimant,<br>v.<br>STEVEN SHARIF, an individual<br>Cross-Defendant. | |

INTREPID STUDIOS, INC., a California Corporation,

Third-Party Plaintiff,

v.

JASON ZIMMERMAN an individual, JOHN MOORE an individual, MATTHEW RHOADES an individual, DOES INDIVIDUALS 1-10; and ROE ENTITIES I-X

Third-Party Defendants.

**TABLE OF CONTENTS**


I. INTRODUCTION....4
II. STATEMENT OF FACTS....5
The Parties' Roles Prior to Litigation....5
The MSA and its Arbitration Clause....6
The MSA's Approval....7
Sharif's Litigation Conduct....8
Movants' Post-2024 Actions....9
III. LEGAL STANDARD....9
IV. ARGUMENT....10
A. Sharif Waived His Ability to Arbitrate....10
B. Intrepid's Crossclaims Fall Outside the MSA's Arbitration Provision....13
C. Intrepid Never Validly Assented to Arbitrate....16
1. Formation and authority to bind are judicial questions....16
2. The MSA was a self-dealing transaction that no disinterested decision-maker approved....17
3. Compliance with § 310's mechanics does not eliminate fairness....20
4. The release cannot immunize the directors' own fiduciary breaches....20
D. None of Intrepid's Crossclaims are Released Under the MSA....21
E. Should This Court Grant the Motion, the Entire Suit Must be Moved to Arbitration....23
V. CONCLUSION....25

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Michaels Stores*, Inc., 59 F.4th 1011 (9th Cir. 2023)...............10, 11
*Caremark*, LLC v. Chickasaw Nation, 43 F.4th 1021 (9th Cir. 2022) ..........10, 16
*City of Vista v. Sutro & Co.*, 52 Cal. App. 4th 401 (1997) ..................................16
*Cox v. Ocean View Hotel*, Corp., 533 F.3d 1114 (9th Cir. 2008) ........................14
*Ensambles Hyson*, S.A. de C.V. v. Sanchez, 718 F. Supp. 3d 1258 (S.D. Cal. 2024) ..........................................................................................................10
*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) .................9, 16
*Heckmann v. Ahmanson*, 168 Cal. App. 3d 119 (1985) ......................................20
*Hill*, 59 F.4th 471.........................................................................................10, 11
*Martin v. Yasuda*, 829 F.3d 1118 (9th Cir. 2016) .........................................10, 11
*Neubauer v. Goldfarb*, 108 Cal. App. 4th 47 (2003)..........................................21
*Newirth*, 931 F.3d 935 (9th Cir.) ..........................................................................11
*Remillard Brick Co. v. Remillard-Dandini Co.*, 109 Cal. App. 2d 405 (1952) ...20
*Sammis v. Stafford*, 48 Cal. App. 4th 1935 (1996)........................................17, 19
*Tevis v. Beigel*, 174 Cal. App. 2d 90 (1959)........................................................20
*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136 (9th Cir. 1991) ..........................................................................................................16
*Verducci v. Coda*, 743 F. Supp. 2d 1182 (S.D. Cal. 2010) .................................14
*Volt Info. Scis.*, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468 (1989).............................................................................................................9

**Statutes**

Cal. Civ. Code § 1641.........................................................................................14
Cal. Civ. Code § 1648.........................................................................................14
Cal. Civ. Code § 1668.........................................................................................23
Cal. Corp. Code § 307(b)........................................................................................7
Cal. Corp. Code § 310 ...............................................................................17, 19, 20
Cal. Corp. Code § 310(a)........................................................................................17
Cal. Corp. Code § 310(a)(1) ...........................................................................17, 18
Cal. Corp. Code § 310(a)(2) ...........................................................................17, 18
Cal. Corp. Code § 310(a)(3) .......................................................................17, 18, 19
Federal Arbitration Act..........................................................................................14

**Other Authorities**

17A Am. Jur. 2d Contracts § 341 .......................................................................14

# I. INTRODUCTION

Plaintiff Steven Sharif ("Sharif") chose this Court to litigate his disputes. He filed his derivative complaint here, obtained a Temporary Restraining Order here, and invoked this Court's authority to appoint an Intellectual Property Custodian over Intrepid Studios, Inc. ("Intrepid" or the "Company"), all on the public docket and, tellingly, in Intrepid's own name when it suited his aims.

Now, six months later, with Intrepid's Cross-Complaint detailing Sharif's fiduciary breaches, fraud, conversion, and civil theft, Sharif and Third-Party Defendant John Moore ("Moore" and together with Sharif, "Movants") seek a different forum. They ask this Court to send Intrepid's claims, but not ***Sharif's claims***, to private arbitration based on a Master Settlement Agreement ("MSA"), an agreement that Sharif executed on behalf of parties sitting on both sides of the transaction. The Motion should be denied for the reasons detailed herein.

First, the MSA, including its arbitration and release provisions, has nothing to do with Intrepid's crossclaims. Instead, the MSA addressed the purported conversion of certain convertible notes and related debt instruments into equity in Intrepid. It dealt with the resolution of potential disputes arising from that transaction. *See* ECF No. 166, Exhibit A. Intrepid's claims are entirely unrelated. Indeed, they concern fraud regarding Sharif and Moore's use of Intrepid loans, the theft and conversion of Intrepid's intellectual property and trade secrets, and the misuse of Intrepid's funds for their own personal benefit. Much of that conduct also occurred well after the MSA's June 12, 2024, effective date, including Sharif's alleged concealment and resignation in January 2026, and his subsequent interference with Intrepid's assets. Intrepid discovered most of that conduct only after Sharif resigned.

Second, the Movants waived any right to compel arbitration through their own litigation conduct. Sharif commenced this action approximately six months ago, affirmatively selected this Court, sought and obtained affirmative relief here, as well as invoked this Court's authority on behalf of Intrepid. It is only after Intrepid

asserted claims against Sharif and Moore do Movants now seek to compel those claims to arbitration. Sharif has never moved to withdraw, dismiss, or stay a single one of the twelve causes of action he filed here. Movants cannot use this Court when it suits them, and demand a different forum when it does not.

Third, the Motion ignores a fundamental problem with the arbitration provision Movants seek to enforce: whether Intrepid ever validly agreed to it. The only purported corporate approval of the MSA came through a two-director written consent executed by Sharif and Moore themselves. *See* **Exhibit 1;** *see also* **Exhibit 5**. There was no disinterested director or shareholder approval. In other words, the very fiduciaries whose alleged misconduct is now at issue sat on both sides of the transaction they now claim prevents Intrepid from pursuing them in court.

Fourth, if the Court accepts Movants' expansive interpretation of the arbitration and release provisions, then the entire dispute must be submitted to arbitration (or dismissed altogether), not merely Intrepid's claims. The MSA does not create a one-way right to arbitration (or release) that applies only when claims are asserted against Movants. If the provision is broad enough to encompass Intrepid's unrelated crossclaims, as Movants contend, then it necessarily encompasses Sharif's own claims as well. Sharif claims he was coerced into signing a document in a verified complaint and now tries to invoke an expansive reading of the MSA to force Intrepid into arbitration while continuing to prosecute his own claims in this Court.

Fifth, the Motion cannot reach Intrepid's third-party claims against Jason Zimmerman and Matthew Rhoades. Neither is a party to the MSA, and Movants identify no theory under which non-signatories are bound by or may enforce arbitration under the MSA. For these reasons, and as set forth more fully below, the Motion to Compel Arbitration should be denied in its entirety.

## II. STATEMENT OF FACTS

***The Parties' Roles Prior to Litigation.***

Sharif founded Intrepid and served as its Chief Executive Officer and director from May 20, 2015, until his resignation on January 19, 2026. ECF No. 164 ¶ 2; ECF No. 135 ¶ 20. Moore served as Chief Financial Officer and a director from 2015 until approximately July 2024. ECF No. 163 ¶ 2. Sharif and Moore are spouses. ECF No. 135 ¶ 20.

***The MSA and its Arbitration Clause.***

By the Movants' own account, the parties entered into the MSA, which purportedly became effective on June 12, 2024. ECF No. 164 ¶ 4; ECF No. 163 ¶ 4. The MSA pertained to the issuance of stock from Intrepid to its "Equityholders" and contained the following recitals:

> WHEREAS, in connection with this Settlement Agreement, the Company is entering into (i) one or more note conversion agreements with each of the Equityholders to convert the principal amounts under the Agreements into shares of Class A Common Stock of the Company (the "Class A Common Stock"), shares of Class B Common Stock of the Company (the "Class B Common Stock" and, together with the Class A Common Stock, the "Voting Shares"), and/or shares of Class C Common Stock of the Company (the "Class C Common Stock" and, together with the Class A Common Stock and the Class B Common Stock, the "Common Stock") and to thereafter terminate the Agreements (collectively, the "Conversion Agreements"), and (ii) an exchange agreement with Caramanis to issue certain shares of Class A Common Stock and Class B Common Stock in exchange for agreement on the total principal and interest amounts and timing of interest payments (the "Exchange Agreement");
>
> WHEREAS, to avoid any dispute or disagreement between or among the Company and any of the Equityholders as to the capitalization of the Company, its corporate governance documents, any actions or governance of the Company prior to the Effective Date, any Agreement or any liens, security interest or other rights associated with, or principal or interest amounts owed under, any of the Agreements (each, a "Dispute"), the Parties believe it is in their best interest to enter into this Settlement Agreement;

*See* ECF No. 166, Exhibit A at 1.

The MSA further contained a release by Intrepid for actions "based upon or aris[ing] out of any Dispute." *Id*. § 4. Notably, "dispute" is capitalized to incorporate the meaning defined in the recitals. *Id*. at1. The MSA also contained an arbitration provision whereby the "Parties"[1] agreed to arbitrate the defined "Disputes" related to the "Agreements"[2] disputes or claims, inter alia, arising out of and related to the MSA. *Id*. § 12. Both Sharif and Moore signed the MSA, with Sharif signing as CEO "on behalf of Intrepid Studios, Inc.", as well as an "Equityholder"[3] in his individual capacity on the other side of the transaction. ECF No. 166 at 8, 10; ECF No. 164 ¶ 3; ECF No. 162 ¶ 5

***The MSA's Approval.***

At the time the MSA was approved, Intrepid's Board of Directors consisted solely of Sharif and Moore. Pursuant to California Corporations Code § 307(b), Sharif and Moore waived notice of a formal meeting and executed a Unanimous Written Consent of the Board, through which they "approve[d], confirm[ed], ratif[ied] and adopt[ed]" the MSA "in all respects," with the resolutions having the same force and effect as if adopted at a formal meeting of the Board. **Exhibit 1** page 1 to 3. Thus, the MSA received no approval from any director other than Sharif and Moore. Both Sharif and Moore executed the Written Consent as directors of Intrepid. *Id.*

The subsequent shareholder approval did not introduce an independent decision-maker. At the July 10, 2024, shareholder meeting, Sharif was the only individual present and also acted as proxy for Moore, who held 1,000 shares in

[1] The "Parties" to the MSA were Intrepid and its equityholders. ECF No. 166 Exhibit A.

[2] "Agreements" in the MSA is defined as "certain convertible notes, security and pledge agreements and other debt and security instruments (each, an 'Agreement', and collectively referred to herein as the 'Agreements')." *Id*.

[3] "Equityholder" is defined in the MSA as "certain of the equityholders of the Company listed on the signature page of this agreement." *Id*.

Intrepid. **Exhibit 2**. The Company's other identified shareholder, Tom Alkazin, who held 40 shares, was not present at the meeting. *Id*. During the meeting, the MSA was approved "by the Shareholders." *Id*.

Robert Dawson and Ryan Ogden were not serving on Intrepid's board of directors at the time of the MSA's approval. The September 4, 2024, board of directors meeting minutes reflect Dawson and Ogden serving as directors after the MSA's effective date. **Exhibit 3**. Accordingly, the Board approval of the MSA was executed by Sharif and Moore, while the subsequent shareholder approval was conducted through Sharif's vote of Moore's shares pursuant to Moore's proxy.

***Sharif's Litigation Conduct.***

Sharif filed his complaint with this Court on February 14, 2026, and filed an amended complaint on May 15, 2026, suing both in his individual capacity and derivatively on behalf of Intrepid. ECF No. 164 ¶ 7; ECF No. 161 at 6.

On March 2, 2026, Sharif filed his Ex Parte Motion for Temporary Restraining Order ("TRO"). ECF No. 10. Ultimately, the Court granted Sharif's TRO (ECF No. 20) and the Court subsequently appointed an Intellectual Property Custodian on March 10, 2026. ECF No. 135 ¶ 9 (citing ECF No. 33). On April 14, 2026, Sharif filed a Motion for Receiver, wherein he requested the Court to appoint "a neutral receiver over Intrepid with full equitable and exclusive powers to possess, control, preserve, or sell the assets as necessary; operate and manage the business; conduct financial administration and accounting; litigate claims; and ensure legal and court compliance." ECF No. 78 at 32. Sharif asked the Court to adjudicate on the merits "[t]he clandestine and unlawful Article 9 foreclosure and self-dealing of assets." *Id.* at 30. Sharif never reserved the right, at any point, to arbitrate his claims.

Intrepid filed its Cross-Complaint on June 24, 2026. ECF No. 161 at 6. On July 27, 2026—only after months of heavy litigation—did Sharif and Moore move to compel arbitration. ECF No. 161 at 3. Crucially though, the Motion is careful to state that Intrepid's, not Sharif's, claims belong in arbitration and/or should be

released.

***Movants' Post-2024 Actions.***

Much, if not all, the allegations contained in Intrepid's Cross-Complaint rests on events that took place well after June 12, 2024. On multiple occasions in 2025, Intrepid's Chief Financial Officer, Ryan Ogden, requested Sharif to corroborate approximately $10.15 million in personal transfers identified in Intrepid's QuickBooks records, which Sharif failed to do. ECF No. 135 ¶ 55. On January 18, 2026, Sharif received a Commerce West default notice, concealed it from the Board, and then resigned the next day. *Id.* ¶¶ 6, 57, 59. After resigning and without Board authority, Sharif communicated with Commerce West in a manner that resulted in the freeze of Intrepid's funds and impaired its payroll. *Id.* ¶¶ 7, 62. Moreover, upon information and belief, Sharif encouraged and facilitated the post-resignation withholding of Intrepid's credentials, source code, and physical assets with knowledge of this Court's Temporary Restraining Order and the appointment of the Custodian. ECF No. 135 ¶ 87. Moreover, Sharif and Moore's conduct representing a systematic pattern of causing corporate assets and monies to be transferred to themselves in their personal capacity (*Id.* ¶¶ 47-48) continued after the MSA's June 12, 2024 Effective Date, including after Moore's departure from the Board on or around July 2024 and Sharif's later resignation on or about January 19, 2026. These allegations, among others, are what underline Intrepid's conversion, civil-theft, and trade-secret claims. *Id.* ¶¶ 106, 167, 204.

## III. LEGAL STANDARD

Whether a valid agreement to arbitrate was ever formed is a threshold question for the court to decide under ordinary state contract law. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296-97 (2010). Arbitration "is a matter of consent, not coercion," and a party cannot be ordered to arbitrate a dispute it never agreed to submit. *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989); *see also Granite Rock*, 561 U.S. at 299.

Even where an agreement contains a clause delegating questions of arbitrability to the arbitrator, that delegation governs only disputes over an existing agreement's validity or scope. It does not reach a challenge that no agreement was ever formed, or that the signatory lacked authority to bind the party. *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). Likewise, whether a party has waived arbitration through its litigation conduct is presumptively a question for the court, not the arbitrator. *Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016). As a result, both questions the Motion presents, whether Intrepid ever formed an agreement to arbitrate and whether Sharif waived any right to invoke one, belong to this Court and not to an arbitrator. The Court must resolve both before any part of this dispute leaves this forum, and Movants cannot reach the scope of the MSA's arbitration provision without first proving that Intrepid agreed to arbitrate at all disputes of every nature.

## IV. ARGUMENT

### A. Sharif Waived His Ability to Arbitrate.

Waiver by litigation conduct is a gateway question of arbitrability. In the Ninth Circuit, "the test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Ensambles Hyson, S.A. de C.V. v. Sanchez*, 718 F. Supp. 3d 1258, 1270 (S.D. Cal. 2024) (internal quotation omitted); *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023). A party sued on an arbitrable claim must choose between compelling arbitration and litigating; it cannot do both, and may not belatedly change forums after electing to proceed in court. *Martin*, 829 F.3d at 1128. In assessing the second factor, the Ninth Circuit in *Amstrong* held:

> Because there is no "concrete test," for assessing whether Michaels took acts inconsistent with its right to arbitration, "we consider the totality of the parties' actions." *Hill*, 59 F.4th at 471 (quoting *Newirth*,

SPENCER FANE LLP
ATTORNEY AT LAW
SANTA MONICA

> 931 F.3d at 941). We ask whether those actions holistically "indicate a conscious decision ... to seek judicial judgment on the merits of the arbitrable claims, which would be inconsistent with a right to arbitrate." *Id*. at 473 n.19 (quoting *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016)). Under our precedent, a party generally "acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court." *Newirth*, 931 F.3d at 941.

*Armstrong*, 59 F. 4th at1015.

Here, both elements of waiver are readily satisfied. First, Sharif cannot claim ignorance of the purported right to arbitrate. Sharif himself executed the MSA containing the arbitration provision, signing on behalf of Intrepid as its CEO while also entering the agreement as an Equityholder. His knowledge of the provision cannot reasonably be disputed.

Second, Sharif's conduct over the last six months has been indisputably inconsistent with any intent to arbitrate. Sharif did not merely defend an action; he chose this forum and commenced this litigation himself. Sharif filed the derivative Complaint in this Court and affirmatively invoked this Court's jurisdiction to obtain relief several times on behalf of Intrepid. Sharif sought a Temporary Restraining Order (ECF No. 20), which resulted in this Court appointing an Intellectual Property Custodian on March 10, 2026. ECF No. 33. Sharif later sought the appointment of a receiver. ECF No. 78 at 32. That motion was also granted in part. ECF No. 176. At no point during his repeated invocation of this Court's authority did Sharif ever contend that the parties' disputes belonged in arbitration.

As noted above, Sharif's own verified pleadings confirm his election to proceed in this Court. The Amended Complaint asserts twelve causes of action: misappropriation of trade secrets under the Defend Trade Secrets Act; misappropriation under the California Uniform Trade Secrets Act; violation of the California Commercial Code's secured transactions provisions; breach of fiduciary duty; aiding and abetting breach of fiduciary duty; corporate waste; intentional

infliction of emotional distress; civil conspiracy; conversion; civil extortion; defamation; and declaratory relief. ECF No. 112. Sharif filed eight of those claims on February 14, 2026. ECF No. 1. On May 15, 2026, three months into this litigation, after obtaining the temporary restraining order and after this Court appointed the Intellectual Property Custodian, he amended to add four more: conversion of corporate assets, civil extortion, defamation, and declaratory judgment. ECF No. 112. He continues to prosecute all twelve in this Court today.

Indeed, Sharif's desire for arbitration only commenced once Intrepid asserted claims against Sharif and Moore and began seeking relief of its own. Only then did Sharif invoke the MSA and contend that Intrepid's claims must be removed from the judicial forum *that he voluntarily selected*. That is precisely the type of forum switching the waiver doctrine prevents. Sharif cannot affirmatively select a judicial forum, invoke this Court's equitable powers, obtain substantial relief, and then retreat to arbitration once continued litigation in that same forum becomes unfavorable to him. His conduct, viewed in its totality, demonstrates a deliberate election to resolve these disputes through litigation.

And if all of that were not enough to demonstrate the inconsistency in Sharif's position, his Motion, if successful, would remove Intrepid's crossclaims from the public docket and send them to private arbitration. That position is especially difficult to reconcile with Sharif's own recent public statements about this litigation. Sharif recently posted about this action on Reddit to his followers, describing the lawsuit, discussing the "justice" he claims to have received thus far, and highlighting the various forms of relief he has obtained from the Court. **Exhibit 4**. He has openly discussed the progress of this case, characterized the Court's rulings as victories, and represented that he will not "relent" in pursuing the litigation. *Id*. His own public characterization of this lawsuit therefore reinforces what his litigation conduct already demonstrates: Sharif elected to pursue this dispute in court and embraced that forum when it served his claims, but seeks a different forum for the claims

asserted against him. Accordingly, Sharif waived any right he otherwise possessed to compel arbitration such that the Motion should be denied in full.

**B. Intrepid's Crossclaims Fall Outside the MSA's Arbitration Provision.**

The Motion and the relief it seeks rests entirely on the language of the MSA. Movants contend that the MSA's arbitration provision is broad enough to ensnare Intrepid's claims. They are incorrect. None of Intrepid's crossclaims arise from the MSA or the transaction it was intended to resolve.

The MSA's own recitals demonstrate its purpose:

> WHEREAS, the Company issued certain convertible notes, security and pledge agreements and other debt and security instruments (each, an "Agreement", and collectively referred to herein as the "Agreements") to certain of the Equityholders…
>
> WHEREAS, to avoid any dispute or disagreement between or among the Company and any of the Equityholders as to the capitalization of the Company, its corporate governance documents, any actions or governance of the Company prior to the Effective Date, any Agreement or any liens, security interest or other rights associated with, or principal or interest amounts owed under, any of the Agreements (each, a "Dispute"), the Parties believe it is in their best interest to enter into this Settlement Agreement; and
>
> WHEREAS, the Parties have determined it is in their best interest to resolve any Dispute, and any and all disputes or disagreements between them, and to release any and all claims, known or unknown, any Party may have against another Party related to the Agreements and any and all claims any Equityholder may have against the Company, and any of its officers, directors, employees, shareholders, attorneys and agents (individually and their successor and assigns).

ECF No. 166, Exhibit A at 1.

The recitals clearly limit the disputes and agreements at issue in the Arbitration. The disputes dealt with converting certain noteholders' debt into equity, establish the resulting capitalization of Intrepid, terminate the underlying debt

instruments, and resolve disagreements specifically concerning that restructuring. Under California law, "[t]he whole of a contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other," (Cal. Civ. Code § 1641), and "[h]owever broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." Cal. Civ. Code § 1648. A district court's role under the Federal Arbitration Act is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Verducci v. Coda*, 743 F. Supp. 2d 1182, 1186 (S.D. Cal. 2010) (quoting *Cox v. Ocean View Hotel, Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008)).

Here, the arbitration provision at issue does not encompass Intrepid's crossclaims or its third-party claims. Although the MSA provision uses broad language concerning disputes or claims "arising out of or relating to any claims between"[4] the parties, that language does not exist in a vacuum – it is circumscribed by the limiting language in the recitals. *See* 17A Am. Jur. 2d Contracts § 341("if the language used by the parties is plain, complete, clear and unambiguous, the intention of the parties must be gathered from that language, and from that language alone."). Instead, it appears in the MSA which is directed at express transactions and a specific subject matter: the conversion of certain debt instruments into Company equity and the resolution of disagreements associated with that restructuring. *See* ECF No. 166, Exhibit A. As a result, the arbitration provision must be construed in that context. Its reference to disputes "including, but not limited to, the enforcement of this Settlement Agreement" is not a way to shoehorn in an overbroad concept into a narrow agreement.

The MSA's defined terms confirm that limit. "Dispute" is defined in the MSA to reach only a disagreement between the Company and an equityholder "as to the

---

[4] ECF No. 166, Exhibit A § 12.

SPENCER FANE LLP
ATTORNEY AT LAW
SANTA MONICA

capitalization of the Company, its corporate governance documents, any actions or governance of the Company prior to the Effective Date, any Agreement or any liens, security interest or other rights associated with, or principal or interest amounts owed under, any of the Agreements." *Id*. at 1. "Agreements" is itself a defined term, limited to the convertible notes and related debt instruments the MSA converted into stock and then terminated. *Id*. Every listed category is an equity, capitalization, or debt-instrument category tied to that single transaction.

Intrepid's crossclaims fall in none of those. The misuse of Company funds for personal purposes, the conversion of Company hardware and source code, the withholding of system credentials to more than twenty operational platforms, and the concealment of a secured lender's default notice are not disputes about who owns what stock, what the notes were worth, or how the Company was capitalized in June 2024. Neither "Dispute" nor "Agreement" says that Intrepid surrenders the right to sue its own fiduciaries for taking its money and its property, and nothing in the MSA purports to bar the Company from asserting separate claims for that conduct.

Sharif's own verified pleadings say the same thing. The Amended Complaint (**<u>which is also verified</u>**) describes the June 2024 transaction as a set of conversion agreements that "converted his debt to equity, expressly cancelling $49,594,000 in notes and terminating all debt obligations underlying the very UCC-1 he had just filed." ECF No. 112 ¶ 55. That is a debt-to-equity conversion and a capitalization event. It is the same subject matter the MSA's recitals identify, and it has nothing to do with the transfers, the withheld credentials, or the concealed default notice that Intrepid's crossclaims put at issue. Further, the Amended Complaint does not mention the MSA's provisions regarding release or waiver at all.

In any event, Intrepid's crossclaims have nothing to do with the MSA or the debt-to-equity transaction it resolved. Intrepid alleges, among other things, that Sharif misused Intrepid's funds and proceeds for personal expenses and purposes unrelated to Intrepid's benefit. ECF No. 135 ¶ 4. Under Sharif, Intrepid also failed

to file tax returns from 2017 through 2019. *Id*. ¶ 5. In the days leading up to his resignation, Sharif allegedly communicated with Intrepid's commercial lender without disclosing those communications to Intrepid, ultimately resulting in the freezing of Company assets. *Id*. ¶¶ 6–7. Intrepid further alleges that Sharif encouraged Jason Zimmerman ("Zimmerman") and Matthew Rhoades ("Rhoades") to withhold Intrepid's intellectual property and assets, including credentials necessary to access Intrepid's domain accounts, payment systems, distribution platforms, and other systems necessary to continue Intrepid's operations. None of these claims depends upon, seeks to enforce, or otherwise relate to the MSA. Accordingly, Intrepid requests that the Court find the arbitration provision to be inapplicable such that the Motion should be denied in its entirety.

### C. Intrepid Never Validly Assented to Arbitrate.

#### *1. Formation and authority to bind are judicial questions.*

Whether the parties formed an agreement to arbitrate is typically an issue for judicial determination. *Granite Rock Co.*, 130 S. Ct. at 2850. The Ninth Circuit acknowledged the holding in *Granite Rock* that issues reserved to the courts for decision, "always include whether an arbitration agreement was formed, even in the presence of a delegation clause." *Caremark*, 43 F.4th at 1030 (citing *Granite Rock*, 561 U.S. at 297, 130 S.Ct. 2847). A party that contests the making of the contract cannot be compelled to arbitrate the threshold question of the agreement's existence—including, specifically, where an agent signed "on behalf of" an entity without authority to bind it. *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991). California law governs that inquiry, and the court may resolve formation issues, including a signatory's authority to bind the entity, on the motion to compel. *City of Vista v. Sutro & Co.*, 52 Cal. App. 4th 401 (1997). Here, the absence of any disinterested approval, coupled with the one-sided nature of the transaction, supports the conclusion that Intrepid never validly consented to arbitrate.

***2. The MSA was a self-dealing transaction that no disinterested decision-maker approved.***

Before compelling arbitration, the Court must first determine whether a valid agreement to arbitrate exists. That threshold requirement presents a fundamental problem for Movants. The arbitration provision they seek to enforce against Intrepid appears in an interested-director transaction approved on Intrepid's behalf exclusively by the same directors who were parties to, and received benefits under, that agreement. Under California Corporations Code § 310, their own approval does not provide Movants with the disinterested corporate approval to establish the transaction's validity.

California Corporations Code § 310(a) governs contracts and transactions between a corporation and one or more of its directors having a material financial interest in the transaction. The statute provides alternative means by which such a transaction may be validated. First, the transaction may be approved in good faith by the shareholders after disclosure of the material facts, but "the shares owned by the interested director or directors [are] not . . . entitled to vote thereon." Cal. Corp. Code § 310(a)(1). Second, the transaction may be approved by the board after disclosure and "by a vote sufficient without counting the vote of the interested director or directors," provided the transaction is also just and reasonable to the corporation. *Id*. § 310(a)(2). Where neither form of approval exists, the statute places the burden on "the person asserting the validity of the contract or transaction" to prove that it was "just and reasonable as to the corporation at the time it was authorized, approved or ratified." *Id*. § 310(a)(3).

In *Sammis v. Stafford*, the Fourth District Court of Appeal for California explained that while the absence of disinterested approval does not automatically render an interested-director transaction void (*Sammis v. Stafford*, 48 Cal. App. 4th 1935, 1943-44 (1996)), where the approval depends upon the votes of interested directors, § 310(a)(3) applies and shifts the burden to the party seeking to uphold the

transaction to establish that it was just and reasonable to the corporation. *Id*.

Here, neither form of disinterested approval occurred. At the time of the MSA, Intrepid's Board consisted of Sharif and Moore. Both participated in the MSA and both received rights and releases under the agreement. Sharif and Moore also were the only directors who executed the Unanimous Written Consent approving, confirming, ratifying, and adopting the MSA "in all respects." **Exhibit 1**. There was therefore no Board vote sufficient to approve the MSA without counting the votes of Sharif and Moore, as contemplated by § 310(a)(2).

The subsequent shareholder vote does not supply the missing disinterested approval either. The July 10, 2024 shareholder minutes identify Sharif as the only shareholder present, acting as proxy for Moore and voting Moore's 1,000 shares pursuant to a proxy executed by Moore. **Exhibit 2**. The Company's other identified shareholder, Tom Alkazin, who held 40 shares, did not attend. *Id*. Thus, the shares actually used to approve the MSA were predominantly Sharif and Moore's shares, notwithstanding § 310(a)(1)'s requirement that shares owned by an interested director not be entitled to vote for purposes of that statutory approval mechanism. Accordingly, no viable disinterested shareholder vote approved the transaction.

Movants also cannot rely upon any purported approval from Intrepid's later directors. Robert Dawson and Ryan Ogden did not serve as directors until after the MSA had already been executed and become effective. **Exhibit 3**. They therefore played no role in Intrepid's decision to enter the MSA or, critically, its purported agreement to surrender its right to litigate covered claims in court.

The result is that Movants cannot establish the MSA's validity through either of the disinterested-approval mechanisms provided by § 310(a)(1) or (2). As a result, the transaction is squarely within § 310(a)(3). Given the parties now asserting the validity of the MSA and seeking to enforce Section 12 (the MSA's arbitration provision) against Intrepid, Movants bear the burden of proving the transaction, and whether Intrepid affirmatively agreed to waive and release potential claims, was

"just and reasonable as to the corporation" when it was authorized or approved. Cal. Corp. Code § 310(a)(3); *Sammis*, 48 Cal. App. 4th at 1943-44.

Here, Movants fail to make any plausible showing. The Motion offers no evidence of fairness: no valuation, no disinterested review, no independent advice to Intrepid, and no explanation of what Intrepid received in exchange for surrendering its right to litigate claims against its own fiduciaries. Put simply, the Motion assumes that Intrepid validly agreed to arbitration because Sharif signed the MSA on Intrepid's behalf. But that begs the very question § 310 requires the Court to examine. Sharif and Moore were not disinterested corporate decision-makers agreeing to arbitration with an unrelated third party. They were the entire Board, they were themselves parties to the MSA, and they approved an agreement containing provisions that directly affected Intrepid's ability to pursue claims against them.

The MSA's arbitration provision is particularly significant in that respect. Through that provision, Sharif and Moore purported to cause Intrepid to agree that "any disputes or claims arising out of or relating to any claims between" the parties, including claims involving their past, present, and future officers, directors, employees, attorneys, or agents, would be removed from the judicial forum and resolved exclusively through binding arbitration. In other words, while acting as Intrepid's only directors, Sharif and Moore purported to bind Intrepid to a provision restricting the forum in which Intrepid could later pursue claims against the same individuals approving that restriction.

This position becomes even more suspect given that it was Sharif himself who commenced this action in federal court, pursuing affirmative relief on behalf of Intrepid, and invoking this Court's equitable authority. And now Sharif relies upon the MSA to argue that Intrepid cannot pursue its claims against him in this Court.

Accordingly, Movants have failed to establish the threshold requirement for their Motion: a valid and enforceable agreement by Intrepid to submit these claims

to arbitration. The Motion should be denied on that basis as well.

***3. Compliance with § 310's mechanics does not eliminate fairness.***

Even if the interested-director statute was technically satisfied (it is not), California courts hold that transactions unfair and unreasonable to the corporation may still be avoided. *Tevis v. Beigel*, 174 Cal. App. 2d 90, 98 (1959). A director who acts both for the corporation and for himself enters a transaction voidable at the corporation's option, which may be set aside without proof of actual fraud or injury. *Id*. Once a director is shown to have received a personal benefit, the burden shifts to the director to prove not only good faith but the transaction's inherent fairness from the corporation's viewpoint. *Heckmann v. Ahmanson*, 168 Cal. App. 3d 119, 128 (1985). The statute does not permit an officer or director, by abuse of his power, to obtain an unfair advantage at the corporation's expense, and self-dealing transactions may be avoided notwithstanding disclosure and majority approval. *Remillard Brick Co. v. Remillard-Dandini Co.*, 109 Cal. App. 2d 405, 419-20 (1952).

Here, that principle has particular force. Sharif and Moore were not disinterested directors approving an ordinary agreement between Intrepid and a third party. They were themselves parties to the MSA and, while acting as Intrepid's only directors, approved an agreement that granted them releases and purported to restrict the forum in which Intrepid could pursue claims against them. And the Motion makes no attempt to explain why it was just and reasonable for Sharif and Moore, while acting on both sides of the transaction, to bind Intrepid to arbitrate claims against themselves. That omission further prevents Movants from carrying their burden of establishing a valid and enforceable agreement by Intrepid to arbitrate.

***4. The release cannot immunize the directors' own fiduciary breaches.***

To the extent the MSA purports to release Intrepid's claims against Sharif and Moore for their own breaches of fiduciary duty, it is independently unenforceable:

California treats a purported waiver of a corporate fiduciary's duties as against public policy. *Neubauer v. Goldfarb*, 108 Cal. App. 4th 47, 56-57 (2003). Here, Sharif and Moore were sitting fiduciaries of Intrepid when they approved the MSA on the Company's behalf, while simultaneously participating in the agreement as interested parties. Whatever effect the MSA may have had on existing disputes within its defined scope, Sharif and Moore cannot not use that agreement to prospectively immunize themselves from liability to Intrepid for fiduciary breaches they committed thereafter. Thus, the MSA cannot release Intrepid's claims arising from Sharif and Moore's subsequent misconduct, including the post-MSA conduct alleged in the Cross-Complaint.

**D. None of Intrepid's Crossclaims are Released Under the MSA.**

Movants separately argue that Intrepid's crossclaims were "released" under Section 4 of the MSA. ECF No. 161 at 8. The plain language of the MSA forecloses that argument. Section 4 does not release every claim Intrepid possessed, or might later possess, against the equityholders. Instead, despite broadly identifying various types of claims, the provision expressly limits the release to those claims "that are based upon or arise out of any Dispute." ECF No. 166, Exhibit A § 4. "Dispute" is a capitalized and specifically defined term under the MSA:

> any dispute or disagreement between or among the Company and any of the Equityholders as to the capitalization of the Company, its corporate governance documents, any actions or governance of the Company prior to the Effective Date, any Agreement or any liens, security interest or other rights associated with, or principal or interest amounts owed under, any of the Agreements (each, a "Dispute").

*Id*. at 1.

Here, that definition matters. The parties did not draft a blanket release of all claims between Intrepid and the purported "Equityholders." Instead, they released claims arising from specifically identified categories of "Disputes," including

disputes concerning Intrepid's capitalization, its corporate governance documents, pre-Effective-Date actions or governance, and the debt and security instruments that were being converted or terminated through the MSA. Thus, even though Section 4 uses broad language, that language remains expressly tethered to the defined term "Dispute." And Intrepid's crossclaims are not "Disputes" as defined by the MSA. As explained above, Intrepid's claims concern separate misconduct, including the misuse of Company funds for personal purposes, concealment of material information from Intrepid, interference with Company funds, and the withholding and conversion of Company intellectual property, source code, credentials, and other assets. Those claims are not based upon, and do not arise out of, a dispute concerning the conversion of debt into equity, the resulting capitalization of Intrepid, or the rights and obligations associated with the Agreements identified in the MSA.

Further, the timing of Sharif and Moore's misconduct further defeats their position. The definition of "Dispute" expressly reaches "any actions or governance of Intrepid prior to the Effective Date." The parties therefore placed an express temporal limitation on that category of released disputes. Yet, much of the misconduct underlying Intrepid's crossclaims occurred well after the MSA's June 12, 2024, Effective Date. As detailed throughout the Cross-Complaint, Sharif's alleged concealment and resignation in January 2026, his post-resignation interference with Company funds, and the withholding of Intrepid's intellectual property and source code all occurred long after the Effective Date.

Movants' interpretation effectively reads the defined term "Dispute" out of Section 4. Had the parties intended to release every claim Intrepid could ever assert against an "Equityholder," they could have said so. They did not. They instead expressly limited the release to claims "based upon or arise out of any Dispute," and then specifically defined what constitutes a "Dispute." Because Intrepid's crossclaims do not arise from those defined Disputes, they were not released by the

MSA.

Two further limits confirm that result. First, a release discharges claims in existence when it is given; it does not license or exonerate future misconduct. The conduct underlying Intrepid' s crossclaims, including the concealment of the Commerce West default notice, the post-resignation interference with Company funds, and the withholding of Intrepid's source code and credentials, had not occurred on June 12, 2024. Second, California Civil Code § 1668 voids any contract that purports to exempt a party from responsibility for its own fraud, willful injury to another, or violation of law, whether willful or negligent. Cal. Civ. Code § 1668. Movants read Section 4 to immunize their own fraud, conversion, and civil theft, which would be foreclosed by California law.

Discovery timing further exacerbates the problem. Intrepid's present board of directors did not exist in its current composition when the MSA was executed, and the Company did not learn of the personal transfers, the concealed Commerce West default notice, or the scope of the withheld credentials and source code until after Sharif resigned on January 19, 2026, more than eighteen months after the Effective Date of the MSA. Movants will point to language releasing claims "whether known or unknown." However, that phrase addresses the releasing party's state of knowledge. It does not enlarge the subject matter released, which remains limited to claims "based upon or aris[ing] out of any Dispute." And no release, however worded, discharges liability for conduct that has not yet occurred.

**E. Should This Court Grant the Motion, the Entire Suit Must be Moved to Arbitration**.

Movants are careful to argue that Intrepid's counterclaims and crossclaims must be submitted to arbitration while conspicuously leaving Sharif's own claims in this Court. Section 12 of the MSA contains no such one-way limitation. If the arbitration provision is as broad as Movants now contend, then its language necessarily applies equally to Sharif's claims. Sharif cannot have it both ways. The

arbitration provision provides that "any disputes or claims arising out of or relating to any claims between" the parties shall be submitted to binding arbitration. Movants rely on the purported breadth of that language to argue that Intrepid's claims must be arbitrated *despite having no relationship to the MSA*. But that same breadth cannot suddenly disappear when applied to Sharif's own claims.

Sharif's own claims bear at least as much, if not substantially more, connection to the parties' corporate relationship and the subject matter addressed by the MSA than Intrepid's crossclaims. Sharif has asserted claims concerning Intrepid, its governance, its assets, and the conduct of its board of directors. Having now taken the position that the MSA's arbitration provision broadly encompasses disputes among these parties, Sharif cannot selectively invoke that provision only against claims asserted against him.

Movants' proposed result would also fracture a single dispute into two forums. Most importantly though, this selective invocation by Sharif and Moore also underscores the gamesmanship behind the Motion. Sharif chose this Court and engaged in litigation. Only after Intrepid asserted claims against Sharif and his spouse did arbitration suddenly become the required forum, *and then only for the claims asserted against them*. As explained above, the better reading is that Section 12 does not encompass Intrepid's independent crossclaims at all. But if the Court accepts Movants' expansive construction of the MSA, that construction should be applied consistently. If Section 12 requires arbitration of this dispute, then the entire dispute, including Sharif's affirmative claims, must be submitted to arbitration.

The same point disposes of the requested stay as to the third-party claims. Movants ask the Court to stay the entire Cross-Complaint, including Intrepid's claims against Zimmerman and Rhoades. Section 12 binds the "Parties" to the MSA. Zimmerman and Rhoades are not among them, and Movants advance no equitable estoppel or agency theory that would make them so. Those claims remain in this Court in any event.

## V. CONCLUSION

The arbitration clause the Movants seek to enforce was authorized and executed by the only two interested directors, with no disinterested director or shareholder approval. Intrepid therefore never validly assented to arbitrate, and formation is for this Court—a burden the Movants cannot carry under Corporations Code § 310. Independently, Sharif waived arbitration by choosing this forum for the entire controversy and litigating the merits for months before demanding arbitration, a question this Court decides and the delegation clause does not reach. And most of the Cross-Complaint rests on post-June 12, 2024 conduct the clause and release do not touch. Intrepid Studios, Inc. respectfully requests that the Court deny the Motion to Compel Arbitration and Stay Cross-Complaint (ECF No. 161) in its entirety.

**DATED: August 17, 2026.**

Respectfully Submitted,

**SPENCER FANE LLP**

*/s/ Vincent J. Aiello*
Theresa C. Becerra, Esq.
201 Santa Monica Blvd., Suite 550
Santa Monica, California 90401
Telephone: (424) 217-1830
Fax: (424) 217-1854
Email: tbecerra@spencerfane.com

Vincent J. Aiello, Esq. *Pro Hac Vice*
Tyler B. Thomas, Esq. *Pro Hac Vice*
Jason Smith, Esq. *Pro Hac Vice*
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3419
Fax: (702) 408-3401
Email: vaiello@spencerfane.com
jdsmith@spencerfane.com
tbthomas@spencerfane.com
*Attorneys for Cross-Claimant and Third-Party Plaintiff Intrepid Studios, Inc.*