Theresa C. Becerra, Esq. (State Bar No. 205338)
**SPENCER FANE LLP**
201 Santa Monica Blvd., Suite 550
Santa Monica, California 90401
Telephone: (424) 217-1830
Fax: (424) 217-1854
Email: tbecerra@spencerfane.com

Vincent J. Aiello, Esq. *Pro Hac Vice*
Tyler B. Thomas, Esq. *Pro Hac Vice*
Jason D. Smith, Esq. *Pro Hac Vice*
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3419
Fax: (702) 408-3401
Email: vaiello@spencerfane.com
tbthomas@spencerfane.com
jdsmith@spencerfane.com

*Attorneys for Intrepid Studios, Inc.*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC.,

Plaintiff,

v.

ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, TFE GAMES HOLDINGS LLC, and JASON CARAMANIS,

Defendants,

and

INTREPID STUDIOS, INC.,

Nominal Defendant.

INTREPID STUDIOS, INC., a California Corporation,

Cross-Claimant,

v.

STEVEN SHARIF, an individual

Cross-Defendant.

Case No. 3:26-cv-00965-LL-MMP

**MOTION FOR AN ORDER TO SHOW CAUSE WHY SHARIF AND MOORE SHOULD NOT BE HELD IN CIVIL CONTEMPT**

Date: November 10, 2026
Courtroom: 14B (14th Floor)
Time: PER CHAMBERS RULE, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT

**Action Filed: 02/14/2026**
**Jud. Officer: Hon. Linda Lopez**

INTREPID STUDIOS, INC., a California Corporation,

Third-Party Plaintiff,

v.

JASON ZIMMERMAN an individual, JOHN MOORE an individual, MATTHEW RHOADES an individual, DOES INDIVIDUALS 1-10; and ROE ENTITIES I-X

Third-Party Defendants.

# TABLE OF CONTENTS

**PAGE**


I. INTRODUCTION ........ 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........ 2

- A. The Parties and the Underlying Dispute ........ 2
- B. The August 12, 2026 Turnover Order ........ 4
- C. Sharif and Moore's Noncompliance ........ 5

III. LEGAL STANDARD ........ 6

IV. ARGUMENT ........ 8

- A. The Court's Turnover Order is Clear ........ 8
- B. Intrepid Still Lacks Access to its Trademarked Accounts ........ 9
- C. No Access to *Ashes of Creation* Intellectual Property, Trade Secrets, and Systems to Access it ........ 10
- D. No Substantial Compliance ........ 12
- E. Non-Compliance Not Based on Good Faith Nor a Reasonable Interpretation ........ 13
- F. A Coercive Per Diem Fine is Necessary to Secure Compliance ........ 14

V. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Guccione*,
470 F.3d 89 (2d Cir. 2006) .......... 6

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) .......... 6

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) .......... 12, 13

*FTC v. Affordable Media, LLC*,
179 F.3d 1228 (9th Cir. 1999) .......... 7, 8, 10

*Gen. Signal Corp. v. Donallco, Inc.*,
787 F.2d 1376 (9th Cir. 1986) .......... 12

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821, 114 S. Ct. 2552 (1994) .......... 14

*Commodity Futures Trading Comm'n ex rel. Kelley v. Skorupskas*,
605 F. Supp. 923 (E.D. Mich. 1985) .......... 6

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) .......... 7

*Reno Air Racing Ass'n v. McCord*,
452 F.3d 1126 (9th Cir. 2006) .......... 9

*Roadway Express, Inc. v. Piper*,
447 U.S. 752 (1980) .......... 6

*SEC v. Res. Dev. Int'l*,
291 F. App'x 660 (5th Cir. 2008) .......... 6

*Shell Offshore Inc. v. Greenpeace, Inc.*,
815 F.3d 623 (9th Cir. 2016) .......... 7

*Shillitani v. United States*,
384 U.S. 364 (1966) .......................................................................... 6
*Taggart v. Lorenzen*,
587 U.S. 554 (2019) .......................................................................... 7
*Trans-Bridge Lines, Inc. v. Luxury Coach of Am. LLC*,
2025 WL 3085613 (C.D. Cal. Aug. 15, 2025) .................................................... 7
*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947) .......................................................................... 14
*Unites States v. Rylander*,
460 U.S. 752, 103 S. Ct. 1548 (1983) .......................................................... 8
*Whittaker Corp. v. Execuair Corp.*,
953 F.2d 510 (9th Cir. 1992) .................................................................. 14

## I. INTRODUCTION

Cross-Claimant and Third-Party Plaintiff Intrepid Studios, Inc. ("Intrepid" or the "Company") respectfully moves this Court for an Order to Show Cause why Steven Sharif ("Sharif") and John Moore ("Moore") should not be held in civil contempt for their continuing failure to comply with the Court's August 12, 2026 Order compelling the turnover of Intrepid's intellectual property to the Court-appointed IP Custodian. [ECF No. 176] (the "Turnover Order" or "Order").

The Turnover Order is clear and unambiguous. On or before August 17, 2026, Sharif and Moore were required to turn over to the reinstated IP Custodian all of Intrepid's intellectual-property assets requested in Intrepid's Motion to Compel Turnover, except for five disputed Ashes of Creation accounts,[1] and to remove or transfer to the IP Custodian any two-factor authentication tied to Company assets by that same date. More than six weeks later Intrepid still does not have possession of its intellectual property, trade secrets, and systems to access it. Sharif and Moore have marked the overwhelming majority of the Company's remaining systems and platforms to access its intellectual property as "N/A," professing to lack the credentials. Of the thirty-seven non-disputed systems on the turnover list, Sharif marked thirty-two "N/A," supplied usernames without passwords for three, and transferred one. *See* **Exhibit A**.

Intrepid attempted in good faith to resolve this dispute without motion practice, consistent with the Court's admonition at the August 11, 2026, hearing and again at the August 31, 2026 case management conference. Intrepid's September 8, 2026 meet-and-confer letter demanded compliance by September 10, 2026. *Id.* Intrepid renewed that demand on September 17, 2026. *See* **Exhibit B**. On September 18, 2026, Sharif's counsel represented that Sharif would provide a list of the

---

[1] Even to those disputed assets, Sharif was still required to provide Intrepid or the IP Custodian limited access. . . to the extent necessary that it is necessary for Intrepid to conduct the business of Intrepid." ECF No. 176.

individuals who hold the credentials. As of this filing, no list has been provided. *See* Aiello Decl. ¶ 9. However, Sharif and Moore remain adamant that they do not have access to the very systems that access the intellectual property and trade secrets at issue. Because Sharif's and Moore's noncompliance is beyond substantial compliance and rests on no good-faith reasonable interpretation of the Turnover Order, Intrepid respectfully requests that the Court issue the requested Order to Show Cause and award both coercive and compensatory relief.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties and the Underlying Dispute

Intrepid is a California corporation and the developer of the multiplayer online role-playing game *Ashes of Creation*. Sharif is a co-founder and former Chief Executive Officer ("CEO") of Intrepid; Moore is his spouse, co-founder of Intrepid and its former Chief Financial Officer ("CFO"). Moore's role required him to preside over vendor accounts and payments go directly to his knowledge of who administers each system. On February 14, 2026, Sharif filed a *verified* shareholder derivative and direct complaint arising out of a January 16, 2026 Article 9 foreclosure and private sale of Intrepid's assets to TFE Games Holdings LLC, asserting claims for trade-secret misappropriation and violations of the California Commercial Code, among others. [ECF No. 1].

On March 2, 2026, Sharif filed a Motion for a Temporary Restraining Order alleging that "*[t]hroughout the last decade, Intrepid developed the following intellectual property and trade secrets underlying Ashes of Creation*" [ECF No. 10] p.3 (emphasis added). Sharif then provided the following list of Intrepid's Intellectual Property and Trade Secrets:

> (1) Audio/visual effects; (2) Models for characters, monsters, the environment, visual effects, text narrative, sound effects, and animations (i.e., production assets created by employees/contractors and incorporated into builds); (3) The Company's confidential source code and technical implementation architecture, including server-side

> node simulation logic, distributed event-processing systems, dynamic resource-allocation algorithms, balancing formulas, and backend systems governing world persistence, territory control, and economic dependencies; (4) Designs and implementations of server meshing technology and distributed networking systems; (5) Proprietary Player versus Player risk-reward scaling algorithms and conditional reward-modification logic implemented within the combat and flagging systems; (6) The implemented Node system engine logic (predicate-based world-state engine, conditional matrices, progression thresholds, etc.) as embodied in the Company's code and backend architecture; (7) Developmental tools used in game creation (population tool, spawner systems, quest/story arc systems, internal admin tools); (8) The event tool used to create open world events, wars, and caravan systems; (9) The implemented seasonal environmental systems as built into the engine; (10) The implemented trade/caravan systems, including economic balancing parameters and resource distribution logic; (11) Class implementation logic and stat balancing systems as embodied in the Company's codebase; (12) Compiled builds, deployment pipelines, infrastructure configurations, and production environments.

*Id.*; *See also* [ECF No.1] ¶25; and [ECF No. 20] p. 2-3.

On March 4, 2026, the Court granted Sharif's *ex parte* motion for a temporary restraining order, enjoined the defendants from accessing or using *Intrepid's trade secrets and intellectual property* ("IP Assets")[2], and directed the parties to appoint a neutral intellectual-property custodian to hold, on a temporary and limited basis, the credentials, administrative privileges, and source-control access to the accounts, platforms, and repositories *containing those assets*. [ECF No. 20] p.10-11. On March 10, 2026 the Court appointed IP Custodian Michael Kunkel (the "IP Custodian") to safeguard Intrepid's trade secrets. [ECF No. 33]. However, the IP Custodian's tenure ended when then the Court's Temporary Restraining Order expired and Sharif's preliminary injunction was denied. The IP Custodian was unable and has been unable to secure the bulk of Intrepid's assets causing Intrepid to enter this litigation

[2] This definition also includes all assets subject to the Court's Order for Turnover (i.e. the systems necessary to access Intrepid's intellectual property and trade secrets). [ECF No. 136-1]; and [ECF No. 176].

and file its own Motion to Compel Turnover of Intrepid's Intellectual Property [ECF No. 136].

Intrepid's Turnover Motion sought the same assets Sharif now claims to own. In Opposition, Sharif abandoned his prior position and now claims he and Moore, not Intrepid, own the intellectual property and trade secrets behind *Ashes of Creation*. This contradicts Sharif's representations to this Court, to Intrepid's investors, and to its lenders that Intrepid owns the IP Assets. Sharif and Moore rely on a purported license agreement (the "License Agreement")[3] to claim ownership of the game systems, world design, and lore that make *Ashes of Creation* possible. But Intrepid exists to develop and commercialize *Ashes of Creation*. Credentials are not sought for their own sake but rather are the only path to the IP Assets Intrepid is entitled to recover under this Court's Turnover Order. The founders who now claim ownership of those IP Assets also claim they cannot access it and, as a result, Intrepid remains locked out of the very asset it was built to create.

**B. <u>The August 12, 2026 Turnover Order</u>**

On August 11, 2026, the Court heard the parties' cross-motions to appoint a receiver and Intrepid's Motion to Compel Turnover. On August 12, 2026, the Court entered its written Turnover Order reinstating the neutral IP Custodian the parties had previously selected in this litigation. [ECF No. 176] ¶5. The Turnover Order directed that, on or before August 17, 2026, Sharif and Moore "*shall turnover to the IP Custodian Intrepid's intellectual property assets requested by Intrepid in its Motion*," except as to the five disputed *Ashes of Creation* accounts: the GoDaddy www.ashesofcreation.com domain, as well as the Reddit, Discord, YouTube, and X accounts ("Intrepid's Trademarked Accounts") Sharif and Moore claim these accounts are "Founder-Owned Assets." The Court did not adopt that label, and instead ruled that the "disputed assets" shall be provided to the IP Custodian and

[3] [ECF No. 167-2].

Intrepid to the extent it is necessary for Intrepid to conduct its business. [ECF No. 176, ¶6]. The Turnover Order further directed that, to the extent two-factor authentication was employed for Intrepid's assets, "it should be removed or changed to the IP Custodian's credentials on or before August 17, 2026." [ECF No. 176, ¶7].

### C. Sharif and Moore's Noncompliance

The August 17, 2026 deadline passed with virtually nothing delivered. On August 20, 2026, three days after the deadline, the IP Custodian, Mike Kunkel, asked Sharif's counsel when he could "expect to receive credentials to the remaining systems on the list." *See* **Exhibit A**. On August 21, 2026, Sharif's counsel responded with an annotated spreadsheet marking the overwhelming majority of requested systems "N/A," representing that Sharif does not know or have access to the credentials. *Id*. Significantly, the "N/A" designation was applied to core production and infrastructure systems including Perforce (the Company's source-control repository for its game code), Amazon/AWS, MongoDB, Cloudflare, Digital Ocean, and the Company's Microsoft Master Account and Authenticator, among many others. *Id.* at 3. For Docusign, Sharif provided an @intrepidstudios.com address—an account within the Google Workspace that Sharif himself controlled as Super Admin until September 15, 2026. *See* **Exhibit A**; **Exhibit B**. Yet, his Google Workspace annotation stated only that "[i]nstructions on how to engage Google Support for Admin reset [were] provided to Kunkel" without revealing that Sharif was the Super Admin whose cooperation Google required. *See* **Exhibit A**. Google accordingly refused any administrative transfer or password reset, directing that the matter be resolved with "the Super Admin who currently manages this Google Workspace account." *Id*., Exhibit 3. Sharif did not release that role until September 15, 2026. *See* **Exhibit C**. Following the meet and confer, the only concession Sharif offered was to get on a call with Intrepid's counsel to facilitate transfer of Intrepid's Google Workspace, *a call that did not happen until a full month after this Court's turnover order*, with Google finally receiving authorization to effectuate transfer on

September 15, 2026. *Id*. Sharif could have contacted Google on his own at any point in that month and effectuated the transfer on his own. Instead, it took Intrepid affirmatively scheduling and arranging the call before Sharif took the steps necessary to complete the transfer. Furthermore, Google's audit logs show actions Sharif took within the Google platform between April 2026 and July 2026 leading into the court order from an IP address in the state of Virgina. Bartels Decl. ¶9. Concerningly, Intrepid remains without the bulk of its IP Assets subject to turnover despite numerous meet and confer attempts to recover access to it.

## III. LEGAL STANDARD

Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Indeed, courts "are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 19 U.S. 204 (1821)). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962)). The most prominent power is the contempt sanction, "which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). In exercising their inherent authority to enforce compliance, courts routinely find contempt where a party fails to comply with turnover orders. *See, e.g.*, *Armstrong v. Guccione*, 470 F.3d 89, 100–02 (2d Cir. 2006) (affirming incarceration of a corporate officer held in contempt of a turnover order for refusing to turn over corporate records and assets); *Commodity Futures Trading Comm'n ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 945 n.23 (E.D. Mich. 1985) (holding a defendant in contempt of the court's turnover and receivership orders); *SEC v. Res. Dev. Int'l*, 291 F. App'x 660,

661 (5th Cir. 2008) (affirming contempt where a party refused either to turn over assets to the receivership or to account for them).

Sharif and Moore have absolutely violated this Court's Turnover Order such that an Order to Show Cause is essential. "A court's contempt powers are broadly divided into two categories: civil contempt and criminal contempt." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016). "A court may wield its civil contempt powers for two separate and independent purposes": (1) "to coerce the defendant into compliance with the court's order"; and (2) "to compensate the complainant for losses sustained." *Id*. at 629 (quoting *United States v. United Mine Workers of Am*., 330 U.S. 258, 303–04 (1947)).

A *prima facie* case of civil contempt exists upon demonstration that "(1) that [the alleged contemnor] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Trans-Bridge Lines, Inc. v. Luxury Coach of Am. LLC*, 2025 WL 3085613, at *2 (C.D. Cal. Aug. 15, 2025) (quoting *Labor/Commy. Strategy Ctr. v. Los Angeles Cnty. Metropolitan Transp. Authority*, 564 F.3d 1115, 1123 (9th Cir. 2009)). Upon such a showing, the burden shifts to the nonmoving party to demonstrate they "took all reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original). Lack of intent does not make noncompliance reasonable: "[t]he absence of wilfulness does not relieve from civil contempt." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (quoting *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 191 (1949)). Nor may a contemnor rest on a bare assertion that compliance is impossible. "It is well established that a party petitioning for an adjudication that another party is in civil contempt does not have the burden of showing that the other party has the capacity to comply with the court's order." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1240-41 (9th Cir. 1999) (*citing NLRB v. Trans Ocean Exp. Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973). "Instead, the party asserting the impossibility defense must

show 'categorically and in detail' why he is unable to comply." *Id.* at 1241 (quoting *NLRB* at 616). "It is settled, however, that in raising this defense, the defendant has a burden of production." *Unites States v. Rylander*, 460 U.S. 752, 757, 103 S. Ct. 1548, 1552 (1983).

Here, an Order to Show Cause is supported, as Sharif and Moore have (1) violated a valid and clear court order, (2) have failed to substantially comply with the terms of the order, and (3) their violation is not supported by a good faith, timely, and reasonable interpretation of the Court's Turnover Order.

## IV. ARGUMENT

### A. The Court's Turnover Order is Clear

The Turnover Order is neither vague nor open to competing interpretations. The Turnover Order states, in relevant part:

> On or before August 17, 2026, Steven Sharif and John Moore shall turnover to the IP Custodian Intrepid's intellectual property assets requested by Intrepid in its Motion except for the following, which remain in dispute:
>
> a. the GoDaddy account for the domain of www.ashesofcreation.com
> b. the Ashes of Creation Reddit account
> c. the Ashes of Creation Discord account
> d. the Ashes of Creation YouTube account
> e. the Ashes of Creation X account
>
> The IP Custodian shall preserve the assets and provide Intrepid with full operational access for business purposes. Sharif shall provide Intrepid or the IP Custodian limited access to the disputed assets listed above to the extent that it is necessary for Intrepid to conduct the business of Intrepid.

[ECF No. 176] ¶6.

The foregoing paragraph is clear, and the parties undoubtedly understand what constitutes Intrepid's intellectual property and trade secrets. Sharif himself defined those assets, and the systems, credentials, and access required to reach them, when

he verified his complaint and moved this Court for a temporary restraining order and the appointment of an IP Custodian to hold and control the credentials to those very assets. [ECF No. 1] ¶¶25 and 29; [ECF No. 10] p.2-3; [ECF No. 10-2] ¶9; [ECF No. 10-5]; [ECF No. 20] p.2-3. Sharif's own public statement after the August 11 hearing confirms he understood the Turnover Order exactly as written. Posting as "Steven_AoC" on the official *Ashes of Creation* Reddit account, he announced that "all assets requested by Intrepid except the domain and social media sites identified by Sharif and communication devices, shall be turned over to the IP custodian," that the assets subject to custody included "the game and codebase, including those systems with which the codebase is stored," and that "[t]his turnover is required within 72-hours." *See* **Exhibit D**. A party who publicly explains an order's requirements in those terms cannot now claim the order was not "specific and definite." *See Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006).

**B. <u>Intrepid Still Lacks Access to its Trademarked Accounts</u>**

The Turnover Order makes clear that Intrepid has a right of limited access to Intrepid's Trademarked Accounts (which the Court labeled as the "disputed accounts") to the extent necessary for Intrepid to conduct its business. [ECF No. 176] ¶6. Indeed, the Court held at the hearing on Intrepid's Turnover Motion that "[Intrepid] needs its website and social media accounts to operate as a business, to communicate with customers and the public, to provide customer support, and manage its brand." *See* **Exhibit B** (Tr. 15:9-13). The Intrepid Trademarked Accounts are essential for the marketing of Intrepid's product, *Ashes of Creation*, and are needed to establish, maintain, and develop goodwill amongst its consumers. However, Sharif seems keen to use those Trademarked Accounts as a podium to provide Intrepid's consumers and community with his litigation narrative. *See* **Exhibit D**.

/ / /

### C. <u>No Access to *Ashes of Creation* Intellectual Property, Trade Secrets, and Systems to Access it</u>

Despite the Court's order mandating the turnover of Intrepid's IP Assets, it still does not have possession of the IP Assets or the systems necessary to reach them. Sharif and Moore have marked thirty-two of the thirty-seven non-disputes systems as "N/A," signifying that they claim to have no access to, and no knowledge of, the credentials for those systems, including core production and infrastructure systems such as Perforce, Amazon/AWS, MongoDB, Cloudflare, Digital Ocean, Docker, VMware/vSphere, Okta, and the Company's Microsoft Master Account and Authenticator. *See* **Exhibit A**. These systems contain Intrepid's source code, trade secrets, and development infrastructure, and Sharif and Moore's blanket claim that they lack access to nearly every one of them nor the knowledge of who would have administrative access leaves Intrepid without its product, without its code, and without any path to recover either. Further, a one-word "N/A" reply is not a showing, "categorically and in detail," of inability to comply. *Affordable Media*, 179 F.3d at 1241.

Neither Sharif nor Moore has stated—under oath or otherwise—who created any of the thirty-two accounts, which email address serves as each account's registered administrator, who paid for it, when either of them last accessed it, or what steps either took through the provider's own account-recovery process. Tellingly, the one account Sharif did identify, Docusign, is registered to an @intrepidstudios.com address within the very Google Workspace that Sharif controlled as Super Admin until September 15. *See* **Exhibit A**. Further research identified that Sharif in fact had a Docusign account that had been used as recently as December 5, 2026, to sign a document, approximately six weeks before Sharif's resignation.

Sharif resigned as CEO on January 19, 2026. Less than a month later, on February 14, 2026, he filed a verified complaint seeking emergency protection of the very IP Assets he now claims to own but cannot access. [ECF No. 1]. In seeking

that relief, Sharif gave the Court a detailed, system-by-system inventory—"AWS; Perforce; Github; Miro; MongoDB; Google workspace; Microsoft; Slack; Bitwarden; DB Scheme; GitKraken; JetBrains; incident.io; Lens; Docker; ScaleMatrix; CDW HPE lease; Universal Foundry"—[ECF No. 10-5], and asked the Court to direct a custodian to hold "the credentials, administrative privileges, and source-control access" to each platform. [ECF No. 10 at 2]. In other words, Sharif knew, in granular detail, exactly which systems held Intrepid's IP and exactly what access was required to secure them. Yet he now claims an inability to access the very IP Assets he says he owns—an inability that, conveniently, extends to nearly every system needed to access them.

Sharif also cannot shift responsibility to unnamed former employees. Sharif through previous counsel, Jessica Nall, Esq., proposed an agreement with the TFE Defendants to "obviate the need for . . . emergency relief in the Southern District and instead allow for preliminary-injunction motion practice with full briefing by both sides." [ECF No. 10-11] p.4. In that proposed agreement, Sharif's former counsel requested that "TFE or its agents will take appropriate steps (*or authorize Steven Sharif* to take such steps) as may be necessary to offboard former Intrepid employees from access to key systems as such access could result in inadvertent spoliation or other damage to the IP and/or trade secrets." *Id.* Clearly then, Sharif understood the risk posed by former employees having access to Intrepid's IP Assets and provided that he could take corrective action. Sharif cannot now turn around and claim he lacks knowledge of who those former employees may be.

Moreover, Sharif and Moore managed virtually every aspect of the Company's operations for approximately a decade, yet Sharif cannot identify a single individual who purportedly holds the missing credentials. Sharif quit on January 19, 2026. Twenty-six days later, he was in federal court naming every system, account, and repository holding Intrepid's trade secrets. If Sharif genuinely believed unnamed employees held the keys to Intrepid's IP Assets, that belief existed

in February when he moved for turnover—yet he raised no such concern then, and sought no order bringing those employees within the Court's reach. Having claimed to fear for the security of Intrepid's IP assets, he made no effort to prevent that security from slipping away into the hands of employees he now claims he cannot name.

The only conclusion that fits the facts is that Sharif's claimed ignorance is not confusion. Rather, it is a deliberate refusal to comply, dressed up as excuse.

### D. No Substantial Compliance

As acknowledged above, "substantial compliance with a court order is a defense to an action for civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). However, this defense is available to "an alleged contemnor who, despite not achieving total compliance, has achieved *near-total compliance* through the exhaustion of *all reasonable efforts*." *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025) (*citing In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). In other words, the substantial compliance standard is a stringent one, and a party's noncompliance is excused only when almost fully complied with an order, and no reasonable methods for furthering compliance remain. The Ninth Circuit has construed substantial compliance excusing violation of a court order as a particularly high standard. In *Coleman v. Newsom*, the court assessed a substantial compliance argument in the context of a court order mandating that California lower the vacancy rate of mental health care professionals in California prisons. 131 F.4th 948, 953 (9th Cir. 2025). Despite meaningful efforts by the state to lower vacancy rates, including "expanding the State's telepsychiatry program; launching a new telehealth program focused on psychologists and social workers; participating in new hiring events; conducting a system-wide analysis of procedures and protocols; and raising salaries for mental health providers[,]" the court found that substantial compliance had not occurred. *Id.* at 957. The court reached this determination, reasoning that, despite the efforts

described, the State "neglected to pursue certain reasonable steps that were available to it." *Id.* at 958.

Here, Sharif and Moore fall well short of that bar. As detailed above, Sharif fought Intrepid for a month merely to release the Google Workspace Super Admin role he had concealed, and Intrepid still has no access whatsoever to the Trademarked Accounts to which it is entitled. [ECF No. 176] ¶6. Worse, even after finally releasing Super Admin access (one of forty-two outstanding systems), Sharif's counsel affirmatively tried to block access and demanded Intrepid "specifically identify the actual, legitimate business purposes" and insisted "no super administrator or administrator rights be transferred to Intrepid." *See* **Exhibit B**. The Turnover Order contains no such pre-clearance right by Sharif. [ECF No. 176] ¶6.

Accordingly, Sharif and Moore should be compelled to comply in full: turn over the IP Assets and credentials, and provide the limited Trademarked Account access the Turnover Order requires. If they maintain that named former employees hold outstanding credentials, they must identify those individuals by name, under penalty of perjury.

### E. <u>Non-Compliance Not Based on Good Faith Nor a Reasonable Interpretation</u>

There is no basis for any claim that Sharif and Moore's continued noncompliance reflects a misinterpretation of the Turnover Order, reasonable or otherwise. The Turnover Order's terms admit no competing reading: Sharif and Moore must turn over all IP Assets, subject only to the narrow Trademarked Accounts carve-out (which were still required to be accessible to Intrepid or the IP Custodian, albeit limited). As shown above, Sharif's own contemporaneous public explanation of the Turnover Order mirrors Intrepid's reading exactly. *See* **Exhibit D**. Accordingly, Sharif cannot claim a good-faith misunderstanding of an order he's already told the public he understands.

/ / /

### F. <u>A Coercive Per Diem Fine is Necessary to Secure Compliance</u>

A daily fine is the appropriate mechanism to coerce Sharif and Moore into compliance with this Court's Turnover Order. [ECF No. 176]. A contempt fine is coercive, rather than punitive, when it is "designed to compel future compliance with a court order" and is "avoidable through obedience." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827, 114 S. Ct. 2552, 2557 (1994). A prospective, per-day fine that the contemnor can stop at any time by complying is the paradigmatic civil-coercive sanction. *See Id.*

In setting the amount and duration of a coercive fine, the Court considers "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Whittaker Corp. v. Execuair Corp*., 953 F.2d 510 (9th Cir. 1992) (*quoting United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947)). The Court must also "consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United States v. United Mine Workers of Am*., 330 U.S. 258, 304 67 S. Ct. 677, 701(1947).

Here, the harm from continued noncompliance is severe and ongoing. Sharif's former counsel recognized this harm when she requested that the TFE Defendants authorize Sharif to take such steps "as may be necessary to offboard former Intrepid employees from access to key systems, *since such access could result in inadvertent spoliation or damage to the IP and/or trade secrets*." [ECF No. 10-11] p.4. Sharif himself believes that the IP Assets and the systems to access them should be provided to the IP Custodian for "safe keeping." *See* **Exhibit D**. Every day that Sharif and Moore withhold the credentials, Intrepid is unable to operate its business, secure its systems, or protect the very intellectual property that Sharif concedes is at risk making the magnitude of the threatened harm substantial and continuing.

/ / /

A reasonable per diem fine of $30,000 per day,[4] per contemnor, is the minimum sanction likely to be effective while remaining well within Sharif's and Moore's means. The fine's coercive force lies not in any single day's amount but in its structure: it accrues every day that noncompliance continues, applies separately to each contemnor, and may be escalated if it proves insufficient. A continuing daily obligation of this kind imposes mounting, open-ended pressure that a one-time sanction cannot, while allowing Sharif and Moore to end the accrual immediately through compliance. Full compliance with this Court's Turnover Order will then cost Sharif and Moore nothing.

## V. <u>CONCLUSION</u>

For more than six weeks Sharif and Moore have defied a clear and unambiguous order of this Court. The Turnover Order required them to deliver Intrepid's IP Assets, and the system credentials necessary to reach them, to the IP Custodian on or before August 17, 2026. Instead, they delivered essentially nothing. Their conduct violates the Turnover Order, falls far short of substantial compliance, and rests on no good-faith or reasonable interpretation of the Turnover Order's plain terms.

Accordingly, Intrepid respectfully requests that the Court:

1. Issue an Order to Show Cause why Sharif and Moore should not be held in civil contempt of the Court's August 12, 2026 Turnover Order [ECF No. 176];

2. Order coercive relief sufficient to compel immediate and complete compliance with the Turnover Order within three (3) days, on the following self-executing terms:

---

[4] Financial disclosures confirm Sharif and Moore have the means to comply immediately. In a loan application Moore submitted to CommerceWest Bank, he represented an adjusted net worth of $467 million, and personal liquidity of approximately $600 million. **Exhibit E**. Given those figures, a coercive fine of $20,000 per day is not merely affordable to Sharif and Moore, it is a negligible fraction of his disclosed liquidity, underscoring why the fine should escalate if initial compliance is not forthcoming.

a. **Purge date.** Sharif and Moore shall purge their noncompliance by fully complying with the Turnover Order on or before three (3) days after entry of this Order (the "Purge Date");

b. **Coercive fine.** For each day of noncompliance after the Purge Date, Sharif and Moore shall each pay a coercive fine of $30,000 per day, per contemnor, to the Clerk of the Court, a sanction they may avoid through compliance with the Court's Turnover Order .

c. **Required signatures.** Within forty-eight [48] hours of a request by the IP Custodian, Sharif and Moore shall sign any provider authorization, account-recovery, or ownership-verification document the IP Custodian presents to effect the turnover of the IP Assets and credentials, including the authorization between the parties at **Exhibit A**; and

d. **Sworn Declarations**. Require Sharif and Moore, within three (3) court days, to file sworn declarations stating, for each system identified on Exhibit A: (a) the registered administrator email; (b) the person who created or last administered the account; (c) the payor and payment method; (d) the date each such person last accessed it; and (e) every account-recovery step taken to date — and, to the extent either maintains that a required credential is held by a former employee or third party, to identify that individual by name and describe the credentials believed held — and to appear in person at the show-cause hearing to testify.

3. Award Intrepid its compensatory damages, including the reasonable attorneys' fees and costs incurred in seeking Sharif's and Moore's compliance and in bringing this Motion; and

4. Grant such other and further relief as the Court deems just and proper.

DATED: October 6, 2026

**SPENCER FANE LLP**

*/s/ Vincent J. Aiello*
Theresa C. Becerra, Esq.
201 Santa Monica Blvd., Suite 550
Santa Monica, California 90401
Telephone: (424) 217-1830
Fax: (424) 217-1854
Email: tbecerra@spencerfane.com

Vincent J. Aiello, Esq. *Pro Hac Vice*
Tyler B. Thomas, Esq. *Pro Hac Vice*
Jason Smith, Esq. *Pro Hac Vice*
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3419
Fax: (702) 408-3401
Email: vaiello@spencerfane.com
tbthomas@spencerfane.com
jdsmith@spencerfane.com
*Attorneys for Cross-Claimant and Third-Party Plaintiff INTREPID STUDIOS, INC.*