# Exhibit A

Exhibit A

SpencerFane

Vincnet J. Aiello, Esq.
Direct Dial: 702-408-3418
vaiello@spencerfane.com

September 8, 2026

**VIA E-MAIL**

William F. Small, III, Esq.
Small Law
PC 402 West Broadway, Suite 1720
San Diego, California 92101
will@smalllawcorp.com
cc: john@sscelaw.com

**Re: *Sharif v. Dawson et al.*, No. 3:26-cv-00965-LL-MMP (S.D. Cal.): Meet-and-Confer Demand Re Non-Compliance with Court's August 12, 2026 Turnover Order; and Response to September 3, 2026 Notice of Breach of the Founders' IP License Agreement**

Dear Mr. Small,

We write on behalf of Cross-Claimant and Third-Party Plaintiff Intrepid Studios, Inc. ("Intrepid" or the "Company") to meet and confer in good faith regarding your clients' continuing failure to complete the turnover ordered by the Court on August 12, 2026 [ECF No. 176]. We would prefer to resolve these issues by agreement and without motion practice, consistent with the Court's admonition at the August 11 hearing and during the August 31, 2026, case management conference. We understand the court's directive that the parties resolve disputes they are capable of resolving themselves and this letter is our effort to do so.

**Non-Compliance with Turnover Order**. The Court ordered that, on or before **August 17, 2026**, Mr. Sharif and Mr. Moore turnover to the reinstated IP Custodian the Company's intellectual-property assets identified in Intrepid's motion, other than the five disputed *Ashes of Creation* accounts your clients dubbed "Founder-Owned" assets. [ECF No. 176]. The Court further ordered that any two-factor authentication tied to Company assets be removed or transferred to the IP Custodian by the same date. Based on the current record, your client's turnover and credential transfer remains incomplete. *See* **Exhibit 3**, the Google email attached stating the Super Admin, who we understand is Mr. Sharif, Mr. Moore, or their agent, is refusing to release access to the intrepid studios Google account and related emails. We also note that Mr. Sharif himself previously sought protection of these same IP assets on behalf of Intrepid through appointment of an IP Custodian in his own motion. [ECF No 10]. Given that history, it is unclear why he now declines to cooperate in identifying and securing the same assets he asked the Court to protect on the Company's behalf. We find it difficult to believe neither he, nor Mr. Moore nor Mr. Zimmerman has any idea who has the passwords and access to these systems, yet that appears to be your client's position,

per your correspondence with Mr. Kunkel. **Exhibit 4**. At an absolute minimum, Mr. Sharif and Mr. Moore should identify the individuals with knowledge of how to access the IP assets so the turnover can be completed[1].

On August 20, 2026, three days after Intrepid's IP Assets were required to be turned over, Mike Kunkel, the IP Custodian, asked you ,"[w]hen can I expect to receive credentials to the remaining systems on the list?" **Exhibit 4**. You responded on August 21, 2026, transmitting an annotated spreadsheet in which the overwhelming majority of the requested systems were marked "N/A" representing that Mr. Sharif either does not know or have access to those credentials. *Id.* "N/A" was the response for core production and infrastructure systems such as Perforce (the Company's source-control repository for its game code), Amazon/AWS, MongoDB, Cloudflare, Digital Ocean, Docker, VMware/vSphere, Okta, and the Company's Microsoft Master Account and Authenticator, as well as many others. Your clients' claim that they cannot provide passwords, credentials, or any access information for the Company's systems is, at a minimum, highly suspicious given that Mr. Sharif founded Intrepid, and he and Mr. Moore personally managed virtually every aspect of the Company's operations for approximately 15 years.

Mr. Sharif and Mr. Moore's position is even more suspect given that Intrepid's Board Resolution, dated January 24, 2026, discusses the access issues which now purportedly exist. **Exhibit 5**. That January 24, 2026 resolution "recites that Sharif, as CEO, was granted authority to act on behalf of the Corporation with respect to certain bank accounts, financial accounts, merchant accounts, payroll systems, credit facilities, *software platforms*, and *other third-party accounts*," and resolves that "all authority, signing power, *access rights, credentials, permissions, and authorizations* previously granted to Steven Sharif… are hereby revoked" and removes him "as an *authorized signer, administrator, user, representative, or contact on all accounts*." A board only revokes credentials and administrator status from someone who held them in the first place.

**Further Cooperation Required to Complete Turnover of Remaining Systems.** As set forth above, approximately forty three-party systems and platforms remain outstanding under the Court's Order, with your clients having designated the overwhelming majority of them "N/A." It is not sufficient for your clients to simply represent that they do not have, or cannot recall, the relevant passwords or credentials, or to assert that access rests solely with some unidentified third party. Given the Google Workspace experience described above (where a claimed lack of Super Admin cooperation has left Intrepid without a mechanism to recover access to its own systems **Exhibit 3**) Intrepid cannot accept a repeat of that outcome across the remaining outstanding systems. We therefore ask that your clients affirmatively cooperate in good faith to complete the turnover, including by personally contacting each remaining third-party provider identified in **Exhibit 4** with an Intrepid representative, confirm the account is subject to the Court's Turnover Order, and work directly with that provider (whether by phone, account-recovery process, or business-verification procedure) to restore and transfer access to the IP Custodian. To the extent your clients contend a particular

[1] Counsel's continued suggestion that Intrepid's IP Assets are unaccounted for due to a layoff earlier this year is equally unbelievable. Setting aside the cause of the layoff, to the extent your clients now contend that access instead rests with unidentified former employees, that assertion is unsupported by anything in the record. No affidavit, declaration, or personnel list has been offered identifying a single such individual who would have this information. Intrepid is entitled to know who these individuals are so they can be joined or subpoenaed to produce the access information to complete the turnover.

system can only be accessed by a former employee or other third party, please identify that individual by name so that Intrepid may pursue access directly or modify the turnover order accordingly.

We further ask that your clients advise whether Mr. Sharif and Mr. Moore will stipulate to a modification of the Court's turnover order confirming that all of the remaining outstanding IP assets identified in **Exhibit 4** (including the "Founder-owned assets if your clients are so willing) shall be turned over directly to the IP Custodian, with Mr. Sharif and Mr. Moore's affirmative cooperation, so that Intrepid is not left to independently pursue each of the approximately forty-three outstanding third-party providers one by one, as it has had to do with Google.

**Emails**. Your clients continue to assert privilege over, and have not produced, the sharif@intrepidstudios.com email account or given access to the IP Custodian for access to the Intrepid Studios' email accounts in their entirety as directed by the Court. The Court has already ruled that the account and its communications are "neither confidential nor privileged…" and should be turned over to the IP Custodian. A true and correct excerpt of the Court's transcript is attached as **Exhibit 1** (*see* p.16:10-13). Your clients have failed to produce that account and are in violation of the Court's Order. Please advise your position as to regarding whether you intend on producing the email accounts. If not, Intrepid will be forced to move to compel and seek attorney's fees, costs and sanctions for having to obtain the email accounts[2].

***Ashes of Creation* Trademark Websites**. We again request your clients' cooperation regarding turnover of the "Founder-Owned" assets. Mr. Sharif is aware that these assets belong to Intrepid; as reflected in the registered trademark attached as **Exhibit 2**, and your clients have identified no factual or legal basis for continuing to withhold this property.

Given Mr. Sharif's own declarations, representations, and warranties that all intellectual property is owned by the Company, we first ask that your clients stipulate to the voluntary turnover of these five "Founder-Owned" assets to the IP Custodian. By way of example, Intrepid as borrower of multiple promissory notes, made the following representations and warranties:

> The Company *owns* (or possesses sufficient legal rights to) *all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business without any conflict with, or infringement of the rights of, others*. Specifically, the Company acknowledges that Holder's investment is based on *Company's continuing ownership and legal rights to the intellectual property of "Ashes of Creation"*, including but not limited to all patents,

[2] Intrepid reserves all rights, upon receipt and review of the sharif@intrepidstudios.com and moore@intrepidstudios.com account, as well as other Intrepid email accounts, to seek an sdverse interest as to both the factual and legal significance of the withheld communications and an other spoilation-related relief the Court may deem appropriate should Intrepid determine that any responsive communications were deleted, altered, or otherwise rendered unavailable by the actions of Mr. Sharif, Mr. Moore, or any of their agents.

trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes related to Ashes of Creation[3].

*See* **Exhibit 6**, Intrepid000401.

If your clients will not stipulate to turnover, we ask instead that they stipulate to Intrepid's filing of an amended complaint adding claims against Mr. Sharif and Mr. Moore for misappropriation of trade secrets, trademark infringement, and negligent misrepresentation as to the ownership of the Intrepid IP assets. Absent a stipulation to one or the other, Intrepid will be forced to seek leave to amend its pleadings to add a trademark-infringement claim in order to compel the assets' return a step that will waste both the parties' and the Court's resources. We would prefer to avoid that path and ask that your clients reconsider, as Intrepid will seek recovery of its attorneys' fees and costs incurred in having to move to amend the pleadings.

**Response to the September 3, 2026, Notice of Breach of the Founders' Intellectual Property License Agreement**. Separately, Intrepid objects in its entirety to Mr. Small's September 3, 2026 notice asserting that Intrepid breached the Founders' Intellectual Property License Agreement dated March 19, 2024. The agreement is wholly suspect and unauthenticated. Even if the purported agreement was genuine, no breach has occurred, and no cure obligation has been triggered. Intrepid is not obligated to perform the demanded cure measures as it is the rightful owner of the intellectual property based on your client's declarations and representations provided to all investors.

Your clients claim to be the "Licensors" of the *Ashes of Creation* name, the Phoenix logo, and the related intellectual property. As stated above, records with the USPTO demonstrate that Intrepid Studios, Inc., not Mr. Sharif or Mr. Moore, is the owner of record of the *Ashes of Creation* mark (Reg. No. 5,697,812). Crucially, this application was filed October 29, 2016 and registered March 12, 2019, five years before the purported 2024 License Agreement and serves of prima facie evidence of Intrepid's ownership of the mark. If Intrepid owns the marks, there was no license to breach; and *to the extent your clients contend they personally owned what Section 6(a) warranted they owned*, it is they, not Intrepid, who breached that representation and warranty at execution.

**Missing Company Funds; Notice of Constructive Trust.** Finally, based on the information currently available to Intrepid, approximately $23 million in Company funds cannot presently be accounted for. Given the timing and circumstances, Intrepid has reason to believe that a portion of these unaccounted-for funds have been directed into your firms' client trust accounts to pay legal fees on Mr. Sharifs and/or Mr. Moore's behalf. To the extent any such funds constitute Company assets, Intrepid expressly reserves all rights to audit and investigate the source and use of those funds, and to seek disgorgement of any fees paid from Company assets without proper corporate authorization.[4]

---

[3] Notably, this is one of many promissory notes containing this exact representation and warranty by Sharif years prior to the purported execution of the March 19, 2024, Intellectual Property Licensing Agreement. This note specifically is dated June 30, 2022.

[4] See Cal Civ. Code §§ 2223-2224; *Church v. Bailey*, 90 Cal. App. 2d 501, 504–05 (1949) (one who wrongfully detains or misappropriates another's funds is an involuntary trustee, and a constructive trust is impressed on property acquired with those

This Letter serves as formal notice that any such funds are, or may be, the property of Intrepid held subject to a constructive trust in Intrepid's favor under Cal. Civ. Code. 2223-2225, and that any such funds were transferred without proper corporate authorization. By this notice, your firms are charged with knowledge of the trust and Intrepid's claim, and cannot claim the status of a Bonafide purchaser for value without notice as to any such finds received, at a minimum on or after the date of this letter[5]. Therefore, Intrepid demands your firms immediately preserve, segregate, and refrain from any further disbursement of any funds traceable to Intrepid, and provide an accounting of all such funds received, pending resolution of Intrepid's claims.

**Contemplated Relief Should Your Clients Not Cooperate With Turnover**. If your clients do not promptly and completely cooperate with the Court's Order at [ECF No. 176], and work with an Intrepid representative to obtain access to Company IP Assets, Intrepid will seek the following relief without limitation:

1. A Motion for an Order to Show Cause Why Sharif and Moore Should Not Be Held in Civil Contempt for Mr. Sharif's and Mr. Moore's non-compliance with the Court's Order, seeking compliance, as well as equitable relief and compensation for fees and costs incurred in securing compliance;
2. Modification of the Turnover Order to permit Intrepid to seek independent turnover of the IP assets covered by the Order; and leave to amend the pleadings to add claims for misappropriation of trade secrets, trademark infringement, and negligent misappropriation, to the extent your clients do not stipulate to either as set forth above; and
3. An Ex Parte Application for Order Shortening Time.

Intrepid demands that, on or before September 10, 2026, at 3:00 p.m. PST, your clients:

1. Promptly meet and confer to discuss Intrepid's Motion For an Order to Show Cause on an Ex Parte Application to shorten time pursuant to Civil Chambers Rule 5 and Civil Local Rule 83.3(g);
2. Fully comply and turnover all IP Assets subject to the Court's Order;
3. Identify all individuals with knowledge of how to access the Company's IP assets;
4. Advise whether your clients will agree to work with an Intrepid representative to personally contact each of the third-party systems and providers identified in Exhibit 4's spreadsheet to assist Intrepid with obtaining access to those systems;
5. Advise whether your clients would stipulate to a modification of the Court's Turnover Order requiring all remaining outstanding IP Assets identified in Exhibit 4 be turned over directly to the IP Custodian, with your clients affirmative cooperation to gain access to those assets to avoid a similar Google Super Admin access issue; and

---

funds unless held by a bona fide purchaser for value without notice); *King v. King*, 22 Cal. App. 3d 319, 329 (1971) (constructive trust reaches misappropriated funds "or [their] proceeds transferred to a third person" where the proceeds can be traced and the transferee had knowledge or notice).

[5] Intrepid does not concede that that the date of this letter marks the beginning of such notice, and expressly reserves its rights to establish that your firms' actual, constructive, or inquiry notice of Intrepid's claim no later than Intrepid's June 24, 2026 Cross-Complaint detailing the misappropriation of Intrepid funds.

SpencerFane®

6. Advise whether your clients will voluntarily stipulate to turnover of the five disputed *Ashes of Creation* "Founder-Owned" assets to the IP Custodian, and, if not, whether your clients will instead stipulate to Intrepid's filing of an amended complaint adding claims for trademark infringement and negligent misrepresentation based on Mr. Sharif's representations that the *Ashes of Creation* trademark as well as related intellectual property and trade secrets were owned by Intrepid to solicit loans the Company remains responsible for.
7. Immediately preserve, segregate, and account for any funds traceable to Intrepid, and refrain from further disbursement of such funds, on the grounds that they are property of Intrepid held subject to a constructive trust under California Civil Code §§ 2223–2224

Sincerely,

*/s/ Vincent J. Aiello, Esq.*

Vincent J. Aiello, Esq.

Enclosures: (1) Court Transcript Excerpt of August 11, 2026 Hearing Graning in Part and Denying in Part Intrepid's Motion to Compel Turnover; (2) Intrepid' s Registered Trademark; (3) Email Correspondence From Google; (4) Email Correspondence Between Will Small, Esq. and IP Custodian Mike Kunkel; (5) January 24, 2026 Board Resolution; and (6) Promissory Note dtd June 30, 2022.

# Exhibit 1

Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LINDA LOPEZ

UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC., Plaintiff, | Case No.26-CV-00965-LL-MMP |
| v. | Tuesday, August 11, 2026 |
| ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, and TFE GAMES HOLDINGS LLC, Defendants. | CERTIFIED TRANSCRIPT |
| and INTREPID STUDIOS, INC., Nominal Defendant. | REPORTER'S TRANSCRIPT OF MOTION HEARING<br>PAGES 3 THROUGH 23 |

APPEARANCES:

For Plaintiff: SMALL LAW PC
402 WEST BROADWAY, SUITE 1720
SAN DIEGO, CALIFORNIA 92101
BY: WILLIAM F. SMALL, III, ESQ.

For Defendants: SCHWARTZ, PLLC
601 EAST BRIDGER AVENUE
LAS VEGAS, NEVADA 89101
BY: SAMUEL A. SCHWARTZ, ESQ.

(Appearances continued on following page.)

Reported By: Jessica Borynack, RPR, CSR No. 14779
District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101-3806
(Reported stenographically; transcribed via computer)

Intrepid provides arguments as to trademark infringement, but, in its cross-complaint and third-party complaint, do not claim -- do not contain claims of trademark infringement. Intrepid does not show that the contested assets are trade secrets, nor has the Court ever previously found that those particular assets are trade secrets. Therefore, Intrepid is not likely to succeed on the merits of its claims with respect to these specific contested issues.

Intrepid will likely suffer irreparable harm in the absence of preliminary relief, because Intrepid needs its website and social media accounts to operate as a business, to communicate with customers and the public, to provide customer support, and manage its brand. The balance of equity tips in Intrepid's favor because, for the purposes of this motion, the contested assets would go to the IP custodian to preserve and use for the benefit of the company. It is not a decision of ownership.

Finally, an injunction is in the public interest because the public interest is served by the protection of intellectual property. However, on balance, the factors weigh toward denying the injunction as to these contested assets.

Next, Sharif also contests the turnover of his work email address. The Court agrees with Intrepid that an employee has no reasonable expectation of privacy in messages sent and received through a company email system maintained for business

use in which an employer has access to its own servers.

Furthermore, Sharif, as a founder and principal of Intrepid for many years, was at least aware that Intrepid's employee handbook provides that "Email" -- this is a quote -- "Email is not guaranteed to be private or confidential," end quote. And that, quote, "The company reserved the right to examine, monitor, and regulate email messages," end quote. It also states that, quote, "Internal and external email messages are considered business records and may be subject to discovery in the event of litigation," end quote.

Accordingly, I find that Sharif's work email communications are neither confidential nor privileged and should be turned over to the IP custodian.

Finally, the Court agrees with Mr. Sharif as to Intrepid's motion to compel turnover of communication devices. This request is too broad and the Court denies it. To the extent that two-factor authorization is employed on such devices, they should be deleted or changed to the IP's custodian -- custodian's credentials.

In sum, the Court grants in part and denies in part Intrepid's motion to compel turnover of Intrepid's intellectual property as follows:

All assets requested by Intrepid, except the domain and social media sites identified by Sharif and communication devices, shall be turned over to the IP custodian until further

# Exhibit 2

Exhibit 2

**Generated on:** This page was generated by TSDR on 2026-08-03 13:24:55 EDT

**Mark:** ASHES OF CREATION

Ashes of Creation

**US Serial Number:** 87220274

**Application Filing Date:** Oct. 29, 2016

**US Registration Number:** 5697812

**Registration Date:** Mar. 12, 2019

**Filed as TEAS Plus:** Yes

**Currently TEAS Plus:** Yes

**Register:** Principal

**Mark Type:** Trademark

**TM5 Common Status Descriptor:** LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** A Sections 8 and 15 combined declaration has been accepted and acknowledged.

**Status Date:** Dec. 15, 2025

**Publication Date:** Mar. 21, 2017 **Notice of Allowance Date:** May 16, 2017

# Mark Information

**Mark Literal Elements:** ASHES OF CREATION

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Computer game software; Downloadable electronic game software for use on personal computers and consoles; Interactive game programs; Video game software

**International Class(es):** 009 - Primary Class

**U.S Class(es):** 021, 023, 026, 036, 038

**Class Status:** ACTIVE

**First Use:** Nov. 30, 2016

**Use in Commerce:** Dec. 17, 2018

# Basis Information (Case Level)

**Filed Use:** No

**Currently Use:** Yes

**Filed ITU:** Yes

**Currently ITU:** No

**Filed 44D:** No

**Currently 44D:** No

**Filed 44E:** No

**Currently 44E:** No

**Filed 66A:** No

**Currently 66A:** No

**Filed No Basis:** No

**Currently No Basis:** No

# Current Owner(s) Information

**Owner Name:** Intrepid Studios Inc.

**Owner Address:** 4955 RANCHO DEL MAR TRAIL
San Diego, CALIFORNIA UNITED STATES 92130

**Legal Entity Type:** CORPORATION

**State or Country Where Organized:** CALIFORNIA

# Attorney/Correspondence Information

**Attorney of Record**

**Attorney Name:** David Schnider

**Attorney Primary Email Address:** dschnider@nolanheimann.com

**Attorney Email Authorized:** Yes

**Correspondent**

**Correspondent Name/Address:** David Schnider
NOLAN HEIMANN LLP
16000 Ventura Blvd., Ste 1200
Encino, CALIFORNIA United States 91436

**Phone:** 818-584-2612

**Correspondent e-mail:** dschnider@nolanheimann.com adarab@nolanheimann.com kholme@nolanheimann.com

**Correspondent e-mail Authorized:** Yes

**Domestic Representative - Not Found**

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Dec. 15, 2025 | NOTICE OF ACCEPTANCE OF SEC. 8 & 15 - E-MAILED | |
| Dec. 15, 2025 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Dec. 15, 2025 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Sep. 12, 2025 | TEAS SECTION 8 & 15 RECEIVED | |
| Aug. 27, 2025 | TEAS WITHDRAWAL OF ATTORNEY RECEIVED-FIRM RETAINS | |
| Aug. 27, 2025 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Aug. 27, 2025 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Aug. 27, 2025 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Aug. 27, 2025 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | |
| Aug. 27, 2025 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| Mar. 12, 2024 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Mar. 12, 2019 | REGISTERED-PRINCIPAL REGISTER | |
| Feb. 05, 2019 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Feb. 04, 2019 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Jan. 29, 2019 | STATEMENT OF USE PROCESSING COMPLETE | |
| Jan. 25, 2019 | USE AMENDMENT FILED | |
| Jan. 25, 2019 | TEAS STATEMENT OF USE RECEIVED | |
| Nov. 30, 2018 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Nov. 29, 2018 | SOU EXTENSION 3 GRANTED | |
| Nov. 16, 2018 | SOU EXTENSION 3 FILED | |
| Nov. 19, 2018 | NOTICE OF REVIVAL - E-MAILED | |
| Nov. 18, 2018 | SOU EXTENSION RECEIVED WITH TEAS PETITION | |
| Nov. 18, 2018 | PETITION TO REVIVE-GRANTED | |
| Nov. 18, 2018 | TEAS PETITION TO REVIVE RECEIVED | |
| Apr. 10, 2018 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Apr. 07, 2018 | SOU EXTENSION 2 GRANTED | |
| Apr. 07, 2018 | SOU EXTENSION 2 FILED | |
| Apr. 07, 2018 | SOU TEAS EXTENSION RECEIVED | |
| Dec. 05, 2017 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Dec. 04, 2017 | SOU EXTENSION 1 GRANTED | |
| Nov. 16, 2017 | SOU EXTENSION 1 FILED | |
| Dec. 04, 2017 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | |

| | |
|---|---|
| Nov. 17, 2017 | NOTICE OF REVIVAL - E-MAILED |
| Nov. 17, 2017 | SOU EXTENSION RECEIVED WITH TEAS PETITION |
| Nov. 17, 2017 | PETITION TO REVIVE-GRANTED |
| Nov. 17, 2017 | TEAS PETITION TO REVIVE RECEIVED |
| May 16, 2017 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT |
| Mar. 21, 2017 | TEAS CHANGE OF CORRESPONDENCE RECEIVED |
| Mar. 21, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED |
| Mar. 21, 2017 | PUBLISHED FOR OPPOSITION |
| Mar. 01, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED |
| Feb. 07, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER |
| Feb. 07, 2017 | ASSIGNED TO EXAMINER |
| Nov. 03, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED |
| Nov. 02, 2016 | NEW APPLICATION ENTERED |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

**Current Location:** Historical data usage    **Date in Location:** Dec. 15, 2025

# Exhibit 3

Exhibit 3

**DeFreitas, Sonny**

**From:** Douglas Bartels [redacted]
**Sent:** Tuesday, September 1, 2026 5:39 PM
**To:** Google Workspace Support
**Cc:** [redacted] Aiello, Vincent
**Subject:** [EXTERNAL] Re: Google Workspace Support 70416988: [rogue] [redacted]

**[Warning] This E-mail came from an External sender. Please do not open links or attachments unless you are sure it is trusted.**

---

Hi Mudassar,

Can you please provide details of all communications with the current super admin?

Thanks.

Doug

On Sep 1, 2026, at 6:28 PM, Google Workspace Support <workspacesupport@google.com> wrote:

Hello Douglas,

Thank you for your patience, and please accept my sincere apologies for the extended time this case has taken to reach a resolution.

Following a comprehensive review by our backend and specialist teams regarding the multiple competing requests, we have determined that this situation involves an internal conflict between parties. Unfortunately, our support team is not in a position to mediate or adjudicate account ownership disputes between third parties. As such, our backend team has decided not to move forward with the administrative credential transfer or password reset on behalf of our team.

I recommend that you resolve this issue by reaching out directly to the Super Admin who currently manages this Google Workspace account.

If you believe that the current Super Admin is unlawfully restricting access to your account, you may be able to seek a valid court order that determines account ownership and directs one party to provide to the other its credentials for Super Admin control over intrepidstudios.com and its associated Google Workspace services. Relief should be ordered between the parties and not directed to Google. Please note that Google will object to any court order that directs Google to provide access.

If the current Super Admin is unresponsive, it is recommended for you to go through the automated recovery flow, as outlined in the article: https://knowledge.workspace.google.com/admin/users/recovering-administrator-access-to-your-account?visit_id=639077236286129113-3502237084&rd=1.

Since no further action can be taken on our end regarding this dispute, I will now be moving your case to closure. The case will close automatically in 3 business days, but you will have 30 days after closure to reopen it by replying directly to any email referencing your unique Case Number.

Thank you for your understanding and cooperation.

Best regards,
Mudassar
Google Workspace Support

© 2026 Google LLC 1600 Amphitheatre Parkway, Mountain View, CA 94043

# Exhibit 4

Exhibit 4

**DeFreitas, Sonny**

**From:** Will Small <will@smalllawcorp.com>
**Sent:** Friday, August 21, 2026 1:16 PM
**To:** Mike Kunkel
**Cc:** Aiello, Vincent; DeFreitas, Sonny
**Subject:** Re: [EXTERNAL] Phone Call To Discuss Turnover?
**Attachments:** Intrepid Studios - List of Key Systems to Gather (Sharif Annotations).xlsx

**[Warning] This E-mail came from an External sender. Please do not open links or attachments unless you are sure it is trusted.**

**This message needs your attention**

- Someone new has been added to this email. Verify all addresses. sdefreitas@spencerfane.com recipient(s) added.

Powered by Mimecast

Mike and Vincent,

I am attaching the spreadsheet Vincent provided earlier this week with annotations from my client providing (a) whatever information he has, or (b) if he does not know or have access to certain credentials, he has marked "N/A". Let me know if you have any questions or want to discuss.

Regards,

Will

On Fri, Aug 21, 2026 at 12:38 PM Will Small <will@smalllawcorp.com> wrote:

> Mike,
>
> I am conferring with my client to determine whether he or John Moore has any of the remaining credentials on the list and will get back to you asap.
>
> On Thu, Aug 20, 2026 at 2:17 PM Mike Kunkel [redacted] wrote:
>
>> Will
>>
>> When can I expect to receive credentials to the remaining systems on the list?
>>
>> Thanks
>> Mike
>>
>> Setec Investigations
>> The Power of Electronic Evidence
>> A Licensed Investigative Agency

| # | System | Priority | |
|---|---|---|---|
| ~~1~~ | ~~GoDaddy - IntrepidStudios.com~~ | ~~0~~ | www.IntrepidStudios.com has been transferred to Mike Kunkel |
| ~~2~~ | ~~Google / Google Workspace - IntrepidStudios.com~~ | ~~0~~ | Instructions on how to engage Google Support for Admin reset provided to Kunkel, along with domain to verify request |
| ~~3~~ | ~~Kickstarter~~ | ~~0~~ | Usernames provided to Kunkel, PW unknown |
| 4 | Mongo DB | 0 | N/A |
| 5 | Amazon / AWS | 1 | N/A |
| 6 | Cloudflare | 1 | N/A |
| 7 | Digital Ocean | 1 | N/A |
| ~~8~~ | ~~Docusign~~ | ~~1~~ | Username: Mbond@IntrepidStudios.com was the company Docusign username I believe |
| 9 | Facebook - Ashes of Creation | 1 | N/A |
| 10 | Marketing Lists | 1 | N/A |
| 11 | Microsoft Master Account / Authenticator | 1 | N/A |
| 12 | Misc Corporate Documents (Vendor Agreements, Employee / Contractor Agreements, Policies and Procedures, Operating Docs, etc.) | 1 | N/A |
| 13 | Miscellaneous Artificial Intelligence Tools (Claude, ChatGPT, etc.) | 1 | N/A |
| ~~14~~ | ~~Steam~~ | ~~1~~ | Username: IntrepidStudiosInc |
| 15 | Twitch | 1 | N/A |
| 16 | Xsolla | 1 | N/A |
| 17 | Atlassian (Confluence) | 2 | N/A |
| 18 | Boomlibrary | 2 | N/A |
| 19 | DB Scheme | 2 | N/A |
| 20 | Docker | 2 | N/A |
| 21 | Duo | 2 | N/A |
| 22 | GitKraken | 2 | N/A |
| 23 | Incident.io | 2 | N/A |
| 24 | JetBrains | 2 | N/A |
| 25 | Jira | 2 | N/A |
| 26 | Lens | 2 | N/A |
| 27 | Miro | 2 | N/A |
| 28 | Okta | 2 | N/A |
| 29 | Perforce | 2 | N/A |
| 30 | Playfab Inc. | 2 | N/A |
| 31 | Resenble.ai | 2 | N/A |
| 32 | Sentry | 2 | N/A |
| 33 | Unifi / UI.com / Ubiquiti | 2 | N/A |
| 34 | Universal Foundry | 2 | N/A |
| 35 | Veeam | 2 | N/A |
| 36 | VMWare / Vsphere | 2 | N/A |
| 37 | Zoom | 2 | N/A |
| 38 | Discord - AoC | Shared | |
| 39 | GoDaddy - AshesOfCreation.com | Shared | |
| 40 | Reddit - AoC | Shared | |
| 41 | X / Twitter - AoC | Shared | |
| 42 | YouTube - AoC | Shared | |

# Exhibit 5

Exhibit 5

**CERTIFIED RESOLUTIONS OF THE BOARD OF DIRECTORS**
**OF**
**INTREPID STUDIOS, INC.**
**A California Corporation**

AUTHORITY REGARDING CORPORATE ACCOUNTS

The following resolutions were duly adopted by the Board of Directors (the "Board") of Intrepid Studios, Inc. (the "Corporation") at a special meeting of the Board, duly called and held on January 24th, 2026, in accordance with the Corporation's Bylaws and applicable law.

The Board consists of five (5) directors. Four (4) directors were present, constituting a quorum. Steven Sharif, a director of the Corporation, was not present at the meeting and did not participate in or vote on the resolutions set forth below. All four (4) directors present voted in favor of the resolutions.

WHEREAS:

Steven Sharif previously served as Chief Executive Officer of the Corporation and, in such capacity, was granted authority to act on behalf of the Corporation with respect to certain bank accounts, financial accounts, merchant accounts, payroll systems, credit facilities, software platforms, and other third-party accounts;

Steven Sharif is no longer serving as Chief Executive Officer or in any officer or authorized capacity of the Corporation;

The Board has determined that it is in the best interests of the Corporation to immediately revoke and terminate all such authority;

NOW, THEREFORE, BE IT RESOLVED THAT:

1. All authority, signing power, access rights, credentials, permissions, and authorizations previously granted to Steven Sharif to act for or bind the Corporation are hereby revoked and terminated or transferred effective immediately.

2. Steven Sharif is hereby removed as an authorized signer, administrator, user, representative, or contact on all accounts of the Corporation.

3. The Board hereby authorizes the designation of Ryan Ogden and / or Douglas Bartels to act on behalf of the Corporation with respect to such accounts.

4. Any officer or director of the Corporation is authorized and directed to take all actions necessary to implement these resolutions.

CERTIFICATION

The undersigned certifies that the foregoing resolutions were duly adopted, remain in full force and effect, and have not been amended or rescinded as of the date below.

DATED: January 24th, 2026

INTREPID STUDIOS, INC.

By: Robert D. Dawson
Robert D. Dawson (Jan 26, 2026 18:43:59 EST)

Robert Dawson

Chairman of the Board

**SECRETARY'S CERTIFICATE**

The undersigned, being the duly appointed and acting Secretary of Intrepid Studios, Inc., a California corporation (the "Corporation"), hereby certifies that the foregoing resolutions were duly adopted by the Board of Directors of the Corporation at a special meeting at which a quorum was present and acting throughout, and that such resolutions remain in full force and effect as of the date hereof.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of January 24th, 2026.

INTREPID STUDIOS, INC.

By: Robert D. Dawson
Robert D. Dawson (Jan 26, 2026 18:43:59 EST)

Name: Robert Dawson

Title: Acting Secretary

# Exhibit 6

Exhibit 6

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), IN RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE ACT AND REGULATION D THEREUNDER, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT AS PERMITTED UNDER VARIOUS EXEMPTIONS CONTAINED IN THE ACT, OR UPON SATISFACTION OF THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT. NEITHER THE SECURITIES AND EXCHANGE COMMISSION ("SEC") NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE MERITS OF PARTICIPATING IN THE OFFERING, NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS NOTE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SALE, TRANSFER OR OTHER DISPOSITION OF ANY SECURITIES PURCHASED PURSUANT HERETO OR UPON CONVERSION OF THIS NOTE IS RESTRICTED BY APPLICABLE FEDERAL AND STATE SECURITIES LAWS. EACH PROSPECTIVE INVESTOR MUST COMPLY WITH ALL APPLICABLE LAWS AND REGULATIONS IN FORCE IN ANY STATE OR OTHER JURISDICTION IN WHICH IT PURCHASES, OFFERS OR SELLS THE SECURITIES AND MUST OBTAIN ANY CONSENT, APPROVAL OR PERMISSION REQUIRED BY SUCH JURISDICTION FOR THE PURCHASE, OFFER OR RESALE OF THE SECURITIES UNDER THE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION TO WHICH IT IS SUBJECT OR IN WHICH IT MAKES SUCH PURCHASES, OFFERS OR RESALE, AND THE COMPANY SHALL NOT HAVE ANY RESPONSIBILITY THEREFOR.

THE SECURITIES OFFERED HEREBY ARE HIGHLY SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK AND SHOULD NOT BE PURCHASED BY ANYONE WHO CANNOT AFFORD THE LOSS OF HIS OR HER ENTIRE INVESTMENT. THE CONVERSION PRICE OF THE SECURITIES TO BE ISSUED PURSUANT TO THIS NOTE HAS BEEN DETERMINED BY THE COMPANY AND DOES NOT NECESSARILY BEAR ANY RELATIONSHIP TO THE ASSETS, BOOK VALUE OR POTENTIAL EARNINGS OF THE COMPANY OR ANY OTHER RECOGNIZED CRITERIA OF VALUE.

**INTREPID STUDIOS, INC.**

**CONVERTIBLE PROMISSORY NOTE**

Date of Note: June 30, 2022

Principal Amount of Note: $1,000,000.00

FOR VALUE RECEIVED, Intrepid Studios, Inc., a California corporation (the "**Company**"), hereby promises to pay to the order of Karen Boreyko, or its registered assigns (the "**Holder**") the principal sum of One Million Dollars ($1,000,000.00) upon the terms and subject to the conditions set forth in this Convertible Promissory Note (the "**Note**").

1. **Maturity; Payment**. If not sooner paid or converted according to the terms hereof, the outstanding principal amount of the Note, and all accrued and unpaid interest thereunder, shall be due and payable upon the written demand by the Holder at any time after the earlier of: (a) the date that is two (2) years after the date on which this Note is issued, (b) the closing date of an Acquisition (as defined below), or (c) the date of an Event of Default (as defined in Section 5 below) (the "**Maturity Date**"). All payments shall be made in lawful money of the United States at such place as the Holder may from time to time designate in writing to the Company. Payment shall be credited first to any fees and expenses due and payable under this Note, then to the accrued interest and the

remainder applied to principal. At any time prior to or after the Maturity Date, in lieu of demanding repayment of the outstanding principal amount and accrued and unpaid interest in cash as otherwise required under the Note, the Holder may elect in writing to extend the Maturity Date to a date mutually agreed between the Parties. "**Acquisition**" shall mean (i) a sale, lease or other disposition (or a series of sales, leases or other dispositions) of fifty-one percent (51%) or more assets or properties of the Company (and its subsidiaries, if any, calculated on a consolidated basis), in each case other than sales of inventory in the ordinary course of business, consistent with past practices, or (ii) any transaction, or series of transactions, in which any Person (defined below) shall directly or indirectly acquire by purchase or in a merger, consolidation or other transfer or exchange of outstanding capital stock, ownership of or control over capital stock of the Company (or securities exchangeable for or convertible into such stock or interests) entitled to elect a majority of the Company's Board of Directors or representing at least fifty-one percent (51%) of the number of shares of Common Stock outstanding. "**Person**" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

**2. Interest**. Interest shall accrue on the outstanding principal amount of this Note from the date hereof until the earlier of: (i) the date this Note is paid in full; or (ii) the Maturity Date, at the rate of ten percent (10%) per annum or the maximum rate permissible by law, whichever is less. Interest shall be due and payable on the Maturity Date, unless earlier paid in full, and shall be calculated on the basis of a 365-day year for the actual number of days elapsed. The Company shall pay all accrued interest in cash upon repayment of the principal amount of this Note, provided that upon the conversion of this Note pursuant to Section 4 below all accrued interest shall be converted into the shares of Common Stock of the Company into which the Note is converted, at the same conversion price. In connection with such conversion, the Company shall have the right to set a reference date for the conversion of accrued interest that is within ten (10) days of the conversion date, such that interest accrued through such reference date will be converted and the balance of such accrued interest through the conversion date will be paid in cash, provided that Holder may elect to waive any such remaining accrued interest that is not converted.

**3. Prepayment**. Prior to the Maturity Date, the Company may not prepay the Note, in whole or in part, without written approval by the Holder, except in the event of an Acquisition.

**4. Limited Conversion**.

**(a) Optional Maturity Date Conversion**. Upon the Maturity Date, Holder may elect, in its sole discretion, by written notice to the Company ("**Conversion Notice**"), to convert up to one hundred percent (100%) of the outstanding principal amount of the Note and accrued interest thereon (such amount, the "**Conversion Amount**") into shares of the Company's common stock ("**Common Stock**") at the Conversion Price (defined below). The number of shares of Common Stock issuable upon such conversion ("**Conversion Shares**") shall be rounded down to the nearest whole share (no fractional shares shall be issued) and the Company shall pay to Holder cash in lieu of any such fraction as set forth herein. The date on which such conversion shall be effected shall be the date of the Company's receipt of the Conversion Notice unless the Company and the Holder agree in writing to another date (such date, the "**Conversion Date**"). The Company shall take all action necessary to ensure that it has sufficient authorized shares of Common Stock to accommodate such conversion and the issuance of the Conversion Shares. In lieu of issuing a fraction of a share of Common Stock upon the conversion of this Note, the Company shall pay the Holder of this Note for any fraction of a share of Common Stock otherwise issuable upon the conversion of this Note, cash equal to the same fraction of the then current per share Conversion Price. For the avoidance of doubt, upon such conversion, the Holder hereof shall cease to have any right to repayment of the Conversion Amount or conversion hereof under Section 4.

**(b) Procedure for Limited Conversion**. Upon conversion of this Note in accordance with Section 4(a) above, (i) the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company to evidence the conversion, and (ii) the Company shall issue and deliver to Holder (w) a stock certificate representing the Conversion Shares, (x) a new promissory note (substantially in the form and substance of this Note) dated as of the Conversion Date to the Holder in the principal amount of the outstanding principal amount of the Note and accrued interest thereon *less* the Conversion Amount ("**New Note**"), (y) any documentation reasonably required by the Holder to evidence the conversion, and (z) in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by Conversion Price. The parties shall open an escrow to effect Company's issuance or delivery to Holder of the Conversion Shares and the New Note simultaneously with Holder's surrender or destruction and certification of destruction and certification of such destruction of this note. To secure the Holder's obligations to execute and deliver the documentation required by this Section, the Holder hereby appoints the Chief Executive Officer of the Company as the Holder's true and lawful attorney, with the power to act alone and with full power of substitution, to execute and deliver all such documentation required by this Section if, and only if, the Holder fails to execute or deliver such documentation as required by this Section within thirty (30) days of written notice from the Company. The power granted by the Holder pursuant to this Section is coupled with an interest and is given to secure the performance of the Holder's duties under this Note, and is irrevocable and will survive the death, incompetency, disability, merger or reorganization of the Holder.

**(c) Conversion Price**. For purposes of this Note, "**Conversion Price**" means, subject to adjustment, if any, pursuant to the immediately subsequent sentence, an amount (rounded to the nearest tenth of a cent) equal to the quotient resulting from dividing $1,000,000,000 by the number of outstanding shares of Common Stock of the Company as of the Conversion Date (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes) with a twenty percent (20%) discount. In the event the Company: (i) pays a dividend in Common Stock or makes a distribution in Common Stock, (ii) subdivides its outstanding Common Stock into a greater number of shares, (iii) combines its outstanding Common Stock into a smaller number of shares or (iv) increases or decreases the number of shares of Common Stock outstanding by reclassification of its Common Stock (including a recapitalization in connection with a consolidation or merger in which the Company is the continuing corporation), then the Conversion Price on the record date of such division or distribution or the effective date of such action shall be adjusted by multiplying such Conversion Price by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately before such event and the denominator of which is the number of shares of Common Stock outstanding immediately after such event. Whenever the Conversion Price is adjusted, as herein provided, the Company shall deliver to the Holder a certificate of the Company's Chief Financial Officer setting forth, in reasonable detail, the event requiring the adjustment and the method by which such adjustment was calculated (including, without limitation, a description of the basis on which the Company's Board of Directors determined the fair value of any evidences of indebtedness, other securities or property or warrants, options or other subscription or purchase rights) and specifying the Conversion Price after giving effect to such adjustment. Until the Maturity Date, the Company shall not create any class of stock with greater preferences or rights than those attributable to the holders of Common Stock.

**5. Event of Default.** For purposes of this Note, an "**Event of Default**" shall be deemed to have occurred if: (a) the Company fails to pay this Note in full when due, provided the parties have not otherwise mutually agreed to extend the Maturity Date; (b) the Company breaches any

representation, warranty or covenant contained in this Note which breach (to the extent of a nature that is capable of being cured) continues for fifteen (15) days after notice of breach from the Holder; (c) a default or event of default occurs under the terms of or in respect of Senior Indebtedness; (d) the Company voluntarily files for bankruptcy protection or makes a general assignment for the benefit of creditors, (e) the Company is the subject of an involuntary bankruptcy petition and such petition is not dismissed within ninety (90) days, or (f) the Company shall fail to honor any conversion notice under Paragraph 4 above (a "**Conversion Failure**"). If an Event of Default occurs and is continuing, the Holder may by written notice to the Company declare the outstanding principal amount of, and all unpaid accrued interest under, this Note in default and immediately due and payable. In addition, in the event of a Conversion Failure, Holder shall have all rights and remedies at law or in equity.

**6. Unsecured Obligation; Senior Indebtedness**. The indebtedness represented by this Note is unsecured and subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date of this Note or hereafter incurred. "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with: (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor. Nothing in this paragraph shall preclude or prohibit the Holder from receiving any payment or converting this Note into Company's Common Stock hereunder unless and until the Holder has received a default notice from any lender of Senior Indebtedness.

**7. Representations and Warranties**. As a material inducement to the Holder, the Company hereby makes the representations and warranties contained in Exhibit A attached hereto and incorporated herein by this reference. As a material inducement to the Company, the Holder hereby makes the representations and warranties contained in Exhibit B attached hereto and incorporated herein by this reference.

**8. Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) five (5) calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iii) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the other party hereto at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may notify the other party pursuant hereto. If notice is given to Company, a copy (which copy shall not constitute notice) shall also be given to Interactive Entertainment Law Group, Attn: Patrick Sweeney, 3868 Carson Street, Suite 110, Torrance, CA 90503.

**9. Governing Law**. This Note shall be governed by and construed under the laws of the State of California, without giving effect to its choice of law rules.

**10. Transfer; Successors and Assigns**. The rights and obligations of the Company and the Holder shall be binding upon and shall inure to the benefit of their successors, assigns and transferees. Notwithstanding the foregoing, (i) the Holder may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Company; provided that this Note may be assigned, conveyed or transferred without the prior written consent of the Company to any wholly-owned affiliate of Holder or any trust of Holder that executes and delivers to the Company an acknowledgement that such wholly-owned affiliate or trust agrees to be subject to, and bound by, all the terms and conditions of this Note, and (ii) the Company may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Holder. Subject to the

immediately preceding sentence, this Note may be transferred only in compliance with any applicable laws, and upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company, a new note for the same principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of this Note.

**11. Modification; Waiver**. Any term of this Note may be amended or waived only upon the written consent of the Company and the Holder.

**12. Expenses**. Company and Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein; provided that if any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party will be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

**13. Stockholders, Officers and Directors Not Liable**. In no event shall any stockholder, officer or director of the Company be liable for any amounts due or payable pursuant to this Note.

**14. No Rights of a Stockholder**. Nothing contained in this Note shall be construed as conferring upon the Holder or any other person the right to vote or consent or to receive notice as a stockholder in respect of meetings of stockholders for the election of directors of the Company or any other matters or any rights whatsoever as a stockholder of the Company prior to the time that this Note is converted in accordance with the terms of this Note.

**15. Further Assurances**. The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

**16. Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

**17. Interpretation**. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under all applicable laws and regulations. If, however, any provision of this Note shall be prohibited by or invalid under any such law or regulation in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such law or regulation, or, if for any reason it is not deemed so modified, it shall be ineffective and invalid only to the extent of such prohibition or invalidity without affecting the remaining provision of this Note, or the validity or effectiveness of such provision in any other jurisdiction.

**18. Entire Agreement**. This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants, and agreements except as specifically set forth herein.

**19. Counterparts**. This Note may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

*[signature page follows]*

**EXHIBIT A**

The Company hereby represents and warrants to the Holder, as of the date of this Note, as follows:

1. *Organization and Good Standing*. The Company is a corporation duly organized and validly existing under the laws of the State of California. The Company has the requisite corporate power and authority to own its properties and assets and to carry on its business as presently conducted. The Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's financial condition or business.

2. *Authorization*. The Company has all right, power and authority necessary to issue this Note, and all required corporate action on the part of the Company and its directors necessary for issuance of this Note and the performance of the Company's obligations under this Note has been taken. This Note is the valid, binding and enforceable obligation of the Company, subject to the laws of general application relating to bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. Shares of equity securities of the Company issued upon conversion of this Note, when issued in compliance with the provisions of this Note, will be validly issued, fully paid and nonassessable, and will be free of any liens or encumbrances.

3. *Non-Contravention*. The issuance by the Company of this Note and the performance and consummation of the transaction contemplated hereunder does not and will not: (i) violate the Company's Certificate of Incorporation or Bylaws, each as amended to date or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other person or entity to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

4. *Approvals*. No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person is required in connection with the issuance of this Note and the performance and consummation of the transactions contemplated hereby except as may be necessary to increase approved shares for the purpose of Conversion or to otherwise comply with the terms of this Note.

5. *No Violation or Default*. The Company is not in violation of or in default with respect to: (i) any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound.

6. *Intellectual Property*. The Company owns (or possesses sufficient legal rights to) all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business without any conflict with, or infringement of the rights of, others. Specifically, the Company acknowledges that Holder's investment is based on Company's continuing ownership and legal rights to the intellectual property of "Ashes of Creation", including but not limited to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes related to Ashes of Creation.

7. *Litigation*. There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened in writing (i) against

the Company that would reasonably be expected to be material to the Company; or (ii) that questions the validity of this Note or the right of the Company to enter into this Note, or to consummate the transactions contemplated by this Note.

DocuSign Envelope ID: 41BE237D-D0C6-46D5-98FD-0524215E240E

The parties have executed this Convertible Promissory Note as of the date first written above.

**COMPANY:**

**Intrepid Studios, Inc.**

By: ______________________
Name: Stev
Title: Chiel

E-mail:

Address: 3721 Valley Centre Dr. Ste. 200 San Diego, CA 92130

**HOLDER:**

Karen Boreyko

By: ______________________
Name: Karen Boreyko

[redacted]

# EXHIBIT B

The Holder and its members hereby represent and warrant to the Company, as of the date of this Note, as follows:

1. *Securities Law Compliance.* Holder and its members have been advised that the Note and the underlying securities have not been registered under federal and state securities laws and cannot be resold unless they are registered under applicable securities laws or unless an exemption from such registration requirements is available. Holder and its members are aware that the Company is under no obligation to effect any such registration or to file for or comply with any exemption from registration. Each of Holder's members represent that they are purchasing the Note for their own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Holder's members have no present intention of selling, granting any participation in, or otherwise distributing the Note. Holder's members have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of such investment, are able to incur a complete loss of such investment without impairing their financial condition and are able to bear the economic risk of such investment for an indefinite period of time. Each of Holder's members are an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and will submit to the Company such further assurances of such status as may be reasonably requested by the Company.

2. *Access to Information*. Holder acknowledges that the Company has given Holder access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by Holder, and has furnished Holder with all documents and other information required for Holder to make an informed decision with respect to the purchase of the Note.

3. *Forward-Looking Statements*. With respect to any forecasts, projections of results and other forward-looking statements and information provided to the Holder, the Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

4. *Restrictions on Resales*. Holder acknowledges that the securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. Holder is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time Holder wishes to sell the Securities and that, in such event, Holder may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. Holder acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities.

5. *No Public Market*. Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

*6.* *Brokers or Finders*. Holder has not engaged any brokers, finders or agents, and the Company has not incurred and will not incur, directly or indirectly, as a result of any action taken by Holder, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the transactions contemplated by this Note.

*7.* *Tax Advisors*. Holder has reviewed with his, her or its own tax advisors the U.S. federal, state and local and non-U.S. tax consequences of this investment and the transactions contemplated by this Agreement. With respect to such matters, Holder relies solely on any such advisors and not on any statements or representations of the Company or any of its agents, written or oral. Holder understands that he, she or it (and not the Company) will be responsible for his, her or its own tax liability that may arise as a result of this investment and the transactions contemplated by this Agreement.