William F. Small (Cal. SBN: 253443)
will@smalllawcorp.com
Kelly Ann Tran (Cal SBN: 254476)
kelly@smalllawcorp.com
**SMALL LAW PC**
402 W. Broadway, Ste. 1720
San Diego, CA 92101
Tel.: (619) 430-4793
Facsimile: (619) 664-4278

*Attorneys for Plaintiff,*
STEVEN SHARIF

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVEN SHARIF, as an individual and derivatively on behalf of INTREPID STUDIOS, INC.,<br>Plaintiff,<br>v.<br>ROBERT DAWSON, RYAN OGDEN, THERESA FETTE, AARON BARTELS, TFE GAMES HOLDINGS LLC, and JASON CARAMANIS,<br>Defendants,<br>and<br>INTREPID STUDIOS, INC.,<br>Nominal Defendant. | Case No. 3:26-cv-00965 LL-MMP<br><br>**DECLARATION OF STEVEN SHARIF IN SUPPORT OF OPPOSITION TO INTREPID STUDIOS, INC.'S MOTION FOR AN ORDER TO SHOW CAUSE WHY SHARIF AND MOORE SHOULD NOT BE HELD IN CIVIL CONTEMPT** |
| AND ALL RELATED CROSS-CLAIMS | |

I, Steven Sharif, declare:

1. I am the Plaintiff and a Cross-Defendant in this action, a founder of Intrepid Studios, Inc. ("Intrepid"), and its former Chief Executive Officer. Unless stated

otherwise, I have personal knowledge of the matters stated below and could testify competently to them.

2. I am providing this declaration in support of my opposition to Intrepid's Motion for an Order to Show Cause Why Sharif and Moore Should Not Be Held in Civil Contempt.

3. I have provided Michael Kunkel, the Court-appointed Intellectual Property Custodian, everything in my possession, custody, or control that the Court's August 12, 2026 turnover order, ECF No. 176, requires me to provide to him. This includes all credentials and access information in my possession, custody, or control that are subject to those turnover requirements.

4. I am not withholding any credential or access information required to be turned over to Mr. Kunkel. I have no additional items in my possession, custody, or control subject to those requirements that have not already been provided to him.

5. Specifically, I do not have any log-in information, access information or credentials for any of the systems identified in rows 4 through 7, 9 through 13, and 15 through 37 of ECF No. 195-1, page 21 (Exhibit A to Intrepid's Motion for Civil Contempt) ("the Systems Spreadsheet"). Most of those assets are related to game developer platforms used exclusively by individual contributors across the many teams at Intrepid. Sharif was the CEO of the company; neither he nor Moore were individual contributors on those development teams at the time of Sharif's resignation.

6. For the systems identified in rows 4 through 7, 9 through 13, and 15 through 37 of the Systems Spreadsheet, I have conducted a reasonable search of my records, data, devices and other sources in my possession, custody or control to attempt to locate any log-in information, access information or credentials for those systems, and I have been unable to locate any to turn over to Intrepid.

7. I also do not know what former Intrepid employees—or anyone—that does have the administrative log-in information, access information or credentials for those

systems identified in rows 4 through 7, 9 through 13, and 15 through 37 of the Systems Spreadsheet.

8. It is my belief and understanding that the root credential for the Intrepid-owned accounts identified in rows 4 through 7, 9 through 13, and 15 through 37 of the Systems Spreadsheet, is an Intrepid email.

9. Because I do not have access to the root credential for any of the accounts identified in rows 4 through 7, 9 through 13, and 15 through 37 of the Systems Spreadsheet, I am not aware of any account recovery method that either I or John Moore could employ to obtain access to those accounts.

10. Nonetheless, I am willing, and I have previously agreed through my counsel, to make myself available if needed to confirm the right of Mr. Kunkel to access any of the aforementioned accounts, or to approve the transfer of administrative access to Mr. Kunkel, or to confirm any other actions that are necessary to effectuate that Court's Turnover Order regarding the non-disputed IP assets.

11. I do not possess or control any Intrepid hardware, including, but not limited to, any server, server chassis, drive, computer, security key, development device, ScaleMatrix hardware, or separately packed hardware component.

12. I do not possess or control any separate copy of Intrepid source code.

13. Prior to Intrepid's filing of the Turnover Motion, I cooperated with Mr. Kunkel in transferring Intrepid assets to him. Everything in my possession, custody, or control that fell within the Court's temporary restraining order's scope was provided to Mr. Kunkel or made available as directed.

**A. My responsibilities and the administration of Company systems**

14. As CEO, I set the Company's strategic direction, led senior management, and built relationships with the Ashes community. As Creative Director, I defined and directed the creative vision for Ashes of Creation, my original intellectual property, and

supervised development of derivative works encompassing gameplay systems, worldbuilding, narrative, art, technical architecture, and design.

15. Development required Intrepid to contract with outside vendors and software-as-a-service platforms, which I refer to here as the "Company systems." Depending on the system, administration was performed by me, IT personnel, or the developers using it. My position as CEO did not make me the sole administrator or custodian of every vendor account and password.

16. Credentials were maintained primarily on Company workstations, in Bitwarden (password manager that stores logins, passwords, and other confidential information in an encrypted digital vault), or within Intrepid's private network, which authorized remote users reached through a credentialed VPN. IT and system administrators developed and maintained that security infrastructure over years. Administrative passwords were generally complex. I did not memorize a master set of passwords for the Company systems.

**B. Financial administration and access before my resignation**

17. Following the June 2024 Master Settlement Agreement, Robert Dawson directed me and IT personnel to provision Ryan Ogden with administrative access to Company systems. Ryan took over management of billing for development services. At my direction, IT began moving relevant administration and billing functions to Company email accounts controlled by Mr. Ogden.

18. On April 7, 2025, at 3:39 p.m., I expressly told Ogden regarding Gusto: "You have full administrator access. I sent the above screenshots of gusto back office showing that your account has the permissions checkbox added." (ECF No. 101-2, p. 2.) On May 9, 2025, at 9:59:01 a.m., I told Dawson and Ogden: "I have set up last week an 'Invoice@IntrepidStudios.com' account that will capture everything." On May 10, at 3:59:11 p.m., I sent them a completion list stating, "The following are completed." That list included Ryan's "Full access to Gusto" and "Set up accounting mail box for

invoices." Dawson reacted to that message with a thumbs-up at 5:08:42 p.m. that day. These were contemporaneous reports of access and billing arrangements already put in place. My recollection is that ServiceAccount@IntrepidStudios.com was also used in this transition.

19. On August 26, 2025, at 4:30:03 p.m., I expressly informed Theresa Fette and Aaron Bartels in our group text: "Ryan has complete control over the payments from PayPal and stripe which are the only inflows he is also the admin on gusto". At 4:38:51 p.m., I listed Ryan's existing administrative access to the Commerce bank account, Chase bank account, all credit cards, Gusto payroll, Stripe merchant account, and PayPal merchant account. I added: "He is the only one with access or oversight to the pathway bank account and credit cards." (Attached as Exhibit A, at pp. 5–6, are true and correct copies of the messages referenced in paragraphs 18 and 19 herein.)

**C. The Board's transition decisions and the source of access problems**

20. In January 2026, the Board directed an accelerated departure from Intrepid's offices as part of its unlawful foreclosure strategy. The Board expressed its intention to avoid paying the outstanding rent and its concern that the landlord would lock the Company out before the end of the month. I warned, along with other Company leaders, that dismantling the development environment on that schedule risked severe damage and, in some areas, irreversible loss.

21. On January 18, 2026, at 8:43:08 a.m., Dawson wrote in the AOC Board group: "To be out on the 25th, I've got movers hired to come on the 21st to start breaking down and preparing everything for move on 25th." He asked who the movers should coordinate with and what computer equipment was no longer needed. At 11:53:14 a.m., he added: "They think it's a 2 day job to tear down and load." These were two messages in the same exchange, setting the movers' schedule for the studio's departure. (Attached as Exhibit B, at pp. 2–3, are true and correct copies of the messages referenced in this paragraph.)

22. The Board proceeded despite the technical warnings. Subsequent sworn declarations document the Board's decision to move infrastructure, minimize software subscriptions, and operate a reduced team remotely. They also document the plan to continue development overseas while leaving the existing Company with its obligations. Zimmerman described those directions in paragraphs 6–9 of his declaration; Beucler described the Board's January 30 meeting in paragraphs 13–15 of his declaration. (ECF Nos. 78-51, ¶¶ 6–9; 78-50, ¶¶ 13–15.)

23. I resigned as CEO on January 19, 2026. Following my resignation, the Board tasked Jason Zimmerman with securing and transitioning the Company's infrastructure. On January 28, Zimmerman met with Doug Bartels concerning access and onboarding. Langford's declaration describes the Board's appointment of Bartels as interim CEO and the commencement of onboarding. (ECF No. 78-49, ¶ 25.) (Attached as Exhibit C, at pp. 4-6, are true and correct copies of the messages referenced in this paragraph.)

24. Zimmerman stated under oath: "Specifically, I provided the relevant access information to Doug Bartels after the Board unanimously appointed him as interim CEO. He did not accept the required invitations or complete the onboarding steps necessary to assume administrative control. As a result, access was not transitioned before I was terminated." Zimmerman further stated that, after his termination, he provided all relevant access information to Kunkel. (ECF No. 78-51, ¶ 8.)

25. At the final January workforce termination, the Board failed to carry out the measures needed to recover Company workstations and secure the restricted source code remaining on employee devices. Zimmerman's declaration confirms that he warned Bartels that the intellectual property had to be secured before layoffs, but Bartels did not agree to pay for the necessary services until afterward, "when it was too late." (ECF No. 78-51, ¶ 9.) Years of carefully developed security procedures were discarded. Former

employees retained workstations and local source-code depots outside the Company's controlled environment.

26. The Board had administrative access to the Company's Gusto payroll system, including employee and contractor contact information. (Exhibit C, p. 7.) It therefore had information needed to contact former personnel and arrange return of Company property. Its failure to perform that work cannot be explained by a lack of an employee address list that only John or I could supply.

**D. The March restrictions and delivery to the neutral custodian**

27. On March 4, 2026, the Court entered the TRO enjoining Robert Dawson, Ryan Ogden, Theresa Fette, Aaron Bartels, and TFE Games Holdings LLC, along with their agents, from "accessing, using, selling, distributing, or causing anyone to access, use, sell, or distribute the trade secrets of Intrepid," as defined in the order. The prohibition expressly covered causing other persons to access the protected materials. The TRO separately prohibited defendants from accessing accounts or other systems belonging to any former employee or contractor of Intrepid for those same purposes. (ECF No. 20, ¶¶ 1, 6, pp. 10, 13.) On March 10, the Court appointed Michael Kunkel as Intellectual Property Custodian and directed that he "shall have control of the passwords" and access to the identified accounts. (ECF No. 33, ¶¶ 1, 4.) (Exhibit D, pp. 2–18.)

28. On March 10, six days after entry of the TRO, Google Workspace Support emailed Zimmerman and me at 8:26 a.m. Google identified Ryan Ogden as the person seeking "Super administrator access to your Google Workspace account for intrepidstudios.com." (Exhibit D, pp. 2–18.) Thus, while the TRO was in force, an enjoined defendant was seeking direct administrative control over the Company's Workspace.

29. I responded to Google and stopped that attempt. I objected because the Court had restricted the defendants' access to the trade-secret environment. I believed

Ogden's effort to acquire direct Super Administrator control violated that restriction. My intervention prevented access by Ogden; it did not prevent turnover to the neutral custodian. (Exhibit D, p. 20.)

30. After Kunkel's appointment, I personally contacted Zimmerman and asked him to assist with the credentials he could provide, because I did not possess those credentials. I participated in the March 18, 2026 turnover process with Kunkel, Zimmerman, and Zimmerman's counsel. I recall credentials and access information for approximately seventeen systems being included in that handoff.

31. During that process, we encountered services that were inaccessible because their bills had not been paid. (Exhibit E, p. 2.) Google Workspace was particularly important because Company email supplied the recovery channel for the other systems. We explained the outstanding Gmail service bill and the need to restore email service, and those issues were recorded in the turnover spreadsheet. Intrepid's own later declaration acknowledges that the custodian reset Google passwords for all accounts except Zimmerman's "on or before March 18, 2026." (ECF No. 195-7, ¶ 9.)

My intervening Google access and the July disclosure

32. After the April 2 hearing and the end of the March custodial arrangement as I understood it, Google contacted me again about verification of the intrepidstudios.com domain. I supplied the requested verification. On June 5, 2026, Google restored my Workspace administrative access. (Exhibit F, p. 2.) After that restoration, I changed the password and removed other administrative access.

33. My July 29, 2026 declaration expressly disclosed my retained administrative capability for Google Workspace. Paragraph 9 states: "I retain administrative capability for Google Workspace." It also states that I did not oppose restoring a designated Company administrator or providing reasonable, logged access once billing or service impediments were addressed and an itemized request supplied. (Exhibit G, pp. 2–6.)

34. Paragraph 5 of that declaration states that I did not possess or control a separate copy of Intrepid source code or an operational development credential for the identified systems "that was not supplied to the Court-appointed custodian." That qualification is part of my actual testimony. Paragraphs 7–8 likewise describe my prior cooperation and the obstacles arising from vendor payments, subscriptions, and onboarding. (Exhibit G, pp. 2–6.)

35. Paragraph 10 explains that the personal GoDaddy account used to administer the domains belonged to John and was not registered to Intrepid. John personally purchased and registered intrepidstudios.com. It was never assigned to Intrepid. Control of the domain provided a means to verify ownership to Google through DNS records and request administrator recovery. That domain-verification capability and an existing Workspace login were separate forms of access. (Exhibit G, pp. 2–9.)

**E. The August order and the recovery steps I took**

36. At the August 11, 2026 hearing, TFE's counsel, Samuel Schwartz, asked whether turnover would be to Intrepid or to the custodian. Judge Lopez answered: "To the IP custodian." The written order entered August 12 reinstated Kunkel and required turnover by August 17. It directed him to preserve the assets and provide Intrepid full operational access for business purposes. It also required two-factor authentication employed on personal communication devices for Intrepid's assets to be removed or changed to Kunkel's credentials by August 17. (August 11 Hearing Transcript, p. 18:8–15; ECF No. 176, ¶¶ 5–7.) (Exhibit H, pp. 2–5.)

37. The Court excepted the GoDaddy account for ashesofcreation.com and the specified Ashes social accounts. When counsel asked about both domains, the Court clarified that the exception concerned ashesofcreation.com. The Court did not order transfer of intrepidstudios.com into Kunkel's personal GoDaddy account as the required technical method. (August 11 Hearing Transcript, p. 22:15–23; ECF No. 176, ¶ 6.) (Exhibit H, pp. 2–4, 6.)

38. On August 13, Intrepid's counsel sent a letter specifically identifying four systems as essential: GoDaddy, Google, MongoDB, and Kickstarter. The letter demanded Google Super Administrator access for Doug Bartels, with his personal Gmail as a possible secondary administrator, and requested administrative access for him to the other three systems. It simultaneously acknowledged that Kunkel was to hold and preserve the assets. (August 13 Aiello letter, pp. 1–2.) (Exhibit H, pp. 7–10.)

39. I participated in the August 17 meet and confer call with counsel and Kunkel. During that call, I provided the username that he recalled being associated with the Kickstarter account and instructions explaining how Mr. Kunkel can initiate the password-reset process. Mr. Sharif also offered to assist with any multi-factor authentication associated with accessing the account.

40. During the August 17 call, I also discussed the MongoDB account. I advised that this account (like many of the other accounts referenced in the turnover motion) was a development tool historically administered by Intrepid's development personnel. I informed the IP Custodian that I did not presently possess or control usable usernames, passwords, credentials, or access information for those accounts, nor did I possess or control any associated MFA device, authenticator application, token, recovery code, or other authentication method that I can turn over, apart from the Google access capability that was discussed during the call. Bartels circulated Google recovery instructions involving DNS verification. (Exhibit H, pp. 11–15.)

41. During the August 17 call, I explained the steps necessary to restore administrative control over Intrepid's Google Workspace to Mr. Kunkel. I explained how Mr. Kunkel can initiate a Google Workspace administrator-recovery support request in his capacity as the Court-appointed IP Custodian. I also provided step-by-step instructions on how the IP Custodian could work with Google to obtain administrative access to and control over the Google account (both on the call and in an email from my counsel after the call) by "pointing" the intrepidstudios.com domain to the IP Custodian

(which would allow him complete access to the domain) without transferring ownership of the intrepidstudios.com domain to the IP Custodian, as my counsel and I raised concerns over ownership interest in the domain being transferred to the IP Custodian. Indeed, on the call, the IP Custodian also raised concerns about having the domain transferred to him.

42. By that time, I was unable to use the Google account as I previously had. I suspected a billing-related service problem and explained the need for Google's assistance. I offered to make the DNS changes needed for Kunkel's support request. Intrepid instead insisted on transferring the domain itself into Kunkel's GoDaddy account. I explained that this would add an additional transfer step before Workspace recovery could be completed.

43. In good faith, however, I nevertheless agreed to transfer the domain to Kunkel, on the condition that he retain custody of the domain rather than transfer it onward to Intrepid. On August 18, I provided the domain-transfer assistance and Google support directions described in the associated correspondence. (Exhibit H, p. 16.) Bartels's later declaration acknowledges that the GoDaddy transfer to Kunkel was completed on August 19. (ECF No. 195-7, ¶ 5.)

44. After the August 17 meet and confer call, Intrepid's counsel provided, for the first time, a spreadsheet of Intrepid systems. I reviewed that spreadsheet and provided annotations for any additional access information I had or, if I had none, I marked "N/A" next to the respective system.

45. On August 21, my counsel supplied the annotated spreadsheet of the system list and explained that the "N/A" entries meant I did not know or have access to the specified credentials. My counsel also corrected the claim that I had said Zimmerman currently possessed them: my statements referred to the historical March handoff, not knowledge of what Zimmerman held in August. (Exhibit H, p. 17.) (August 21 Small emails, 1:16 p.m. and 3:51 p.m.; first email reproduced at ECF No. 195-1, p. 20.)

46. On August 21, Google notified my personal email that someone was seeking transfer of Super Administrator access. On August 28, I responded with the Court's orders and transcript and authorized restoration to Kunkel in his custodial capacity. I requested Google's legal and security review, preservation of the tenant's data, and verification of the recipient. I directed Google to deliver recovery credentials directly to Kunkel after that review, with Company operational access to be provisioned through him. (Exhibit I, pp. 2–3.)

47. On September 1, Google informed me that it had re-enabled my account and that I could provision Kunkel directly. I attempted to use the account. On September 3, I supplied a screenshot showing that it still did not permit Gmail access. I also explained that I did not have a retrievable copy of the current password: I had changed it several months earlier without writing it down and had previously authenticated using a passkey on my personal phone. (Exhibit I, pp. 4–5.)

48. My September 3 email expressly stated: "I expressly authorize Google, if technically supported, to revoke or replace any passkey, recovery method, or session associated with me and to provision a separately identified Super Administrator account controlled exclusively by Michael Kunkel of Setec Investigations in his capacity as the court-appointed Intellectual Property Custodian provided that Google has verified Michael Kunkel as the recipient." I also stated that I did not seek continuing administrative control and requested identification of any specific further step Google needed from me. (Exhibit I, pp. 4–5.)

49. Google's September 1 email to Bartels already described "multiple competing requests" and an "internal conflict between parties." On September 5, Google informed me that it would not provision Kunkel because of competing requests. I understood Bartels's direct request for administrator access to be one of those requests. Throughout this process, I repeatedly identified Kunkel as the person to receive

custodial control. (September 1 email to Bartels reproduced at ECF No. 195-1, pp. 17–18.)

50. Intrepid's counsel then asked me to join a Google Support call to assist with the transfer. (Exhibit J, p. 2.) I agreed and participated on September 15. On that call, I again expressly instructed Google to provision Kunkel as the custodian. When Google asked which account should receive the authority, Kunkel identified an Intrepid email account for which I understood he had retained credentials from the March turnover. Google confirmed my consent and stated that I would receive a notification when provisioning was completed.

51. On September 20, I received a Google email identifying Ryan Ogden as the newly provisioned Super Administrator. (Exhibit J, pp. 4–5.) That was not the recipient I had instructed Google to provision. Bartels separately admits that Intrepid regained Workspace access on September 22. (ECF No. 195-7, ¶ 8.) I describe the notices and the call because they identify the recovery process in which I participated and the access Intrepid acknowledges it obtained. Those events must be accounted for when evaluating its accusation that I refused to assist.

**F. Current access, remaining limitations, and my continuing assistance**

52. Bartels states under oath: "The Company's email, documents, and administrative records are hosted on Google Workspace for the domain intrepidstudios.com. Additionally, nearly all systems require email for two-factor authentication through an intrepidstudios.com email to reset passwords." (ECF No. 195-7, ¶ 7.) That admission confirms the significance of the Workspace recovery channel delivered through this process.

53. Based on how the Company systems were administered, my understanding and belief is that the Company-owned accounts at issue use an intrepidstudios.com email as their account or recovery address. Intrepid now controls that email environment. I have searched my records, data, devices, and other sources within my possession,

custody, or control and located no additional credentials for the remaining systems. I have neither the current credentials for those systems nor access to that Workspace. I cannot supply a password or credentials that I do not possess or perform recovery through an email account I cannot access.

54. My lack of those credentials is not a refusal to cooperate. I have repeatedly supplied information, made myself available, authorized Google to replace authentication associated with me, and assisted with the domain transfer. I remain available to confirm Kunkel's authority or perform a specifically identified act within my ability. There is no additional credential or access information subject to the turnover order that I am retaining or withholding from him.

55. I have provided Kunkel everything subject to the turnover requirements that is in my possession, custody, or control. I am not withholding any required credential or access information, and I possess no separate copy of Intrepid source code or Company hardware. I remain willing to perform a specifically identified act within my ability to carry out the Court's order.

**G. Intrepid's Allegations regarding deleted Slack messages**

56. In its motion, Intrepid appears to confuse missing Slack exports, messages disappearing from channel view, and actual destruction of the underlying data. Those are not the same thing. A missing export doesn't, by itself, prove the source communications are gone. Moreover, Slack logs at Intrepid were regularly backed up or archived. I have not deleted Slack records or asked that they be deleted.

57. In reality, Slack backups may have been deleted automatically due to storage constraints induced by billing failures. Any deleting of messages would have been routine moderation of the viable chat channel, not source data deletion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 13, 2026 **STEVEN SHARIF**

By: *<u>/s/ Steven Sharif</u>*
Steven Sharif